# EXHIBIT B

1 | Rick L. McKnight (State Bar No. 55183)
Alexis Adian Smith (State Bar No. 274429)
2 | JONES DAY
555 South Flower Street
3 | Fiftieth Floor
Los Angeles, CA 90071.2300
4 | Telephone:  +1.213.489.3939
Facsimile:  +1.213.243.2539
5 | Email:  fmcknight@jonesday.com
  asmith@jonesday.com
6
Gregory L. Lippetz (State Bar No. 154228)
7 | JONES DAY
1755 Embarcadero Road
8 | Palo Alto, CA 94303
Telephone:  +1.650.739.3939
9 | Facsimile:  +1.650.739.3900
Email:  glippetz@jonesday.com
10
Attorneys for Plaintiff
11 | CALIFORNIA BERRY CULTIVARS, LLC

**ENDORSED**
**FILED**
**ALAMEDA COUNTY**

MAY 02 2016

CLERK OF THE SUPERIOR COURT
By_____Xian-Xii Bowie_____

12

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

13

### COUNTY OF ALAMEDA

14

15

16 | CALIFORNIA BERRY CULTIVARS, LLC,

CASE NO. RG 1 6 8 1 3 8 7 0

17 | Plaintiff,

18 | v.

**VERIFIED COMPLAINT FOR:**

19 | THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA, a corporation

(1) BREACH OF CONTRACT
(2) CONVERSION

20 | Defendant.

(3) BREACH OF FIDUCIARY DUTY
(4) BREACH OF IMPLIED

21 | COVENANT OF GOOD FAITH AND
FAIR DEALING

22 | (5) UNFAIR COMPETITION

23 | **DEMAND FOR JURY TRIAL**

24

25

26

27

28

VERIFIED COMPLAINT

1    Plaintiff California Berry Cultivars, LLC ("CBC" or "Plaintiff"), assignee of certain rights

2    of Dr. Douglas V. Shaw ("Dr. Shaw") and Dr. Kirk David Larson ("Dr. Larson" and together

3    with Dr. Shaw, the "Breeders"), for its Complaint against Defendant The Regents of the

4    University of California ("University" or "Defendant"), alleges as follows:

5    **INTRODUCTION**

6         1.     This action concerns the University's disruption of a highly successful breeding

7    program that created new valuable varieties of strawberries for the benefit of California's

8    strawberry industry and California consumers.  In its own words, the University's policy has long

9    been to discharge its duty to license research results and to encourage the application of research

10   for the "broad public benefit."  For years, it did so under the guidance of two faculty members,

11   who, among their various academic responsibilities, led a strawberry breeding program with

12   stunning results.  California is now the top strawberry producing state, strawberries are one of

13   California's top five valued commodities, more than 2 billion pounds of strawberries are

14   harvested each year in California, most of the world's strawberries are produced from cultivars

15   invented by these faculty members, and the University program was widely recognized as the

16   foremost strawberry breeding program in the world.

17        2.     These two faculty members, the Breeders, retired from the University in 2014, but

18   have assigned their rights to Plaintiff CBC who wants to continue developing and breeding new,

19   distinct, and valuable varieties for California agribusiness.  Plaintiff also wants to prompt wide

20   distribution of breeding varieties to the public and to generate licensing income for the University

21   and for Plaintiff to fund their breeding programs.

22        3.     To this end, by this action Plaintiff seeks to license on a non-exclusive basis at a

23   reasonable royalty some of the strawberry varieties that the Breeders invented.  These varieties

24   would be used for breeding and further development by Plaintiff and by all others, including

25   Defendant, interested in breeding and developing these varieties.  Under the Breeders'

26   agreements with Defendant, CBC has the right to licenses for these varieties and much more.

27   Among other rights, if the varieties are being patented, the University has the obligation to license

28   the varieties to Plaintiff and others and to generate a royalty stream for Plaintiff as the assignee.

2

**VERIFIED COMPLAINT**

1   The University is required to work with Plaintiff in doing so.  If the University elects not to patent

2   varieties, Plaintiff has the right to do so.  For varieties in early stages of development, Plaintiff

3   has the right to release these to the public and to continue their development.

4        4.      The University, through its representatives at the Davis campus, has broken its

5   agreements, has converted and endangered the Breeders' material, has denied all of these rights

6   with respect to the plants at issue, has risked the loss and destruction of the varieties, and has put

7   them in a "black hole," unavailable to Plaintiff and unavailable to California agribusiness, all in

8   an apparent attempt to suppress competition.  And since doing so, the University has created no

9   new, valuable variety invented by others and, by its conduct, has taken steps to prevent others

10  from doing so, in breach of its duties and in violation of its policies.

11       5.      To right these wrongs, Plaintiff brings this action for breach of contract,

12  conversion, breach of fiduciary duty, breach of the implied covenant of good faith and fair

13  dealing, and unfair competition.  CBC seeks equitable and monetary relief for injuries that have

14  been, and will continue to be, caused by the University's unlawful conduct.

15                           **PARTIES AND BACKGROUND**

16       6.      Dr. Shaw was a Professor of Plant Sciences at the University's Davis campus, with

17  a special focus in the fields of genetics.  Dr. Shaw began teaching at the University's Davis

18  campus in 1986.  Dr. Shaw taught at the UC Davis Plant Breeding Academy, where his role was

19  to provide instruction in population and quantitative genetics applicable to plant breeding.  Dr.

20  Shaw also was a project leader of the University's Davis campus Breeding Program (the

21  "Breeding Program") from 1988 until he left the University.

22       7.      Dr. Shaw obtained his Bachelor's Degree from the University of California of San

23  Diego, La Jolla in 1976 and his Ph.D. from the University's Davis campus in 1981.  Dr. Shaw

24  published a number of works on the subject of strawberry breeding, including "Strawberry

25  breeding improves genetic resistance to Verticillium wilt," along with making contributions to

26  "Strawberry Production in California" and "Integrated Pest Management for Strawberries, 2nd

27  Edition."

28       8.      Dr. Larson was previously employed by the University as an Extension and

                                             3

1   Experiment Station Specialist at the University's Davis campus and, in the course of his academic

2   work, Dr. Larson joined the Breeding Program in 1991.

3        9.    CBC is a limited liability company organized under the laws of California with its

4   principal place of business in Irvine, California.  CBC is consortium of California strawberry

5   growers and shippers dedicated to ensuring continuous supply of new and improved strawberry

6   varieties for California agribusiness and consumers.  The Breeders are both members of CBC and

7   serve as employees or consultants to CBC.

8        10.   CBC is the assignee of: (a) the Breeders' rights in all germplasm not reduced to

9   patent, including the transition cultivars described in paragraph 22; (b) income from patenting or

10   licensing of the Breeders' genetic stocks for breeding new cultivars, including the core strawberry

11   germplasm described in paragraph 22; (c) the Breeders' rights to damages for unpaid royalties,

12   including those that would have been paid but for the University's unlawful conduct set forth in

13   this Complaint and those arising from the Breeders' right of reimbursement from the University

14   from royalties contributed by the Breeders to the Breeding Program; and (d) all intellectual

15   property rights of the Breeders in all materials created during their employment at the University

16   in connection with the creation, development and invention of the germplasm, including

17   transition cultivars and the core strawberry germplasm described in paragraph 22.

18        11.   On information and belief, the University is a registered California corporation

19   with its principal place of business in Oakland, California.

20        12.   As one of California's top five valued commodities, strawberries are important in

21   California business and agriculture.  California is the top strawberry producing state within the

22   United States.  In 2014, more than 2.3 billion pounds of strawberries were harvested in California,

23   which were valued at approximately $2.6 billion and accounted for approximately 88% of the

24   entire United States strawberry crop.  The continued development of new strawberry varieties is

25   important to maintain strawberry crop volumes in light of climate changes, pests, diseases

26   affecting currently grown varieties, labor shortages, and consumer demand.

27        13.   The University's Davis College of Agriculture has historically been the leading

28   driver for the development of new varieties of strawberries.  In 1930, researchers from the

4

**VERIFIED COMPLAINT**

1   University initiated the Breeding Program to develop and breed improved varieties of strawberry

2   cultivars, which are plant varieties produced in cultivation by selective breeding, for release to the

3   public.  The Breeding Program was initially run out of the University's Berkeley campus, but was

4   moved to the Davis campus in 1946.  Today, about 55% of the acres of strawberries grown in

5   California are produced from cultivars released from the Breeding Program, producing about 70%

6   of the state's strawberries.

7          14.     The University's Davis campus has a mandate to develop agricultural innovations

8   in support of agribusiness and the public good.  Furthermore, the University's stated policies on

9   licensing technology resulting from research are intended to provide a mechanism for transferring

10  and disseminating the results of University research to the public for the public benefit.

11         15.     The University's Davis campus has now disrupted the previously successful

12  breeding efforts.  At the approximate time of the Breeders' retirement in late 2014 and early

13  2015, the University released the last 4 new cultivars invented by the Breeders from the Breeding

14  Program; these cultivars are subject to pending patent applications listing the Breeders as the

15  inventors.  Since then, the University has not released any new cultivars and the process of

16  selecting, reducing, and developing germplasm toward new cultivars has wound down.  The

17  University is also preventing CBC from completing the evaluation of the transition cultivars

18  described in paragraph 22.

19         16.     CBC wishes to continue the Breeders' efforts in developing new strawberry

20  cultivars for the public benefit.  The Breeders formed, along with other growers and suppliers,

21  CBC in order to continue these research and commercialization efforts.

22         17.     In disregard of the California strawberry growers it serves, the University at the

23  Davis campus refuses to license the rights to propagate and breed cultivars of strawberry varieties

24  invented by the Breeders.  The University also refuses to allow CBC any access to the plant

25  material created by the Breeders and assigned to CBC, thereby preventing CBC from using the

26  Plant Types at Issue (as defined in paragraph 22) to develop new and distinct strawberry cultivars

27  for California's strawberry industry.

28         18.     Since at least 2013, the Breeders, and later CBC, have proposed taking a non-

5

**VERIFIED COMPLAINT**

1   exclusive license on reasonable terms in order to continue the research and development of new

2   strawberry cultivars for agribusiness.  Specifically, CBC has requested a royalty-bearing non-

3   exclusive license to the cultivars and genotypes at issue here.  Relying on a series of pretextual

4   excuses, the University, through its representatives at the Davis campus, has refused to license

5   CBC or the Breeders or to even discuss licenses on fair and equitable terms, even though the

6   cultivars and other plant material are the Breeders' own inventions that were assigned to CBC.

7        19.    The terms of the proposed licenses offered by the Breeders, and now CBC, would

8   generate royalties for both CBC and the University.  The contemplated license would also

9   promote cooperation between the industry and the University and expand the number of

10  researchers developing new strawberry varieties in California, providing a steady stream of new

11  strawberry varieties for commercialization by California growers and producers.

12                          **JURISDICTION AND VENUE**

13       20.    This Court has jurisdiction and venue over the claims herein because the

14  University resides in and has its principal place of business in Oakland, California, which is in

15  Alameda County.

16                            **THE PLANTS AT ISSUE**

17       21.    The plants at issue in this case are the plant varieties created, asexually

18  reproduced, and invented by the Breeders during their time participating in the Breeding Program.

19       22.    There are two groups of plant varieties at issue.  The first group, known as the

20  "Core Strawberry Germplasm," consists of the approximately 168 cultivars developed by the

21  Breeders, which are subject to a pending United States plant patent application.  The second

22  group, known as "Transition Cultivars," consists of approximately 250 plant varieties developed

23  by the Breeders that may have value as breeding stock.  The Core Strawberry Germplasm and the

24  Transition Cultivars are collectively referred to as the "Plant Types at Issue."

25       23.    The Plant Types at Issue are a subset of the full germplasm collection of

26  approximately 1,500 genotypes of strawberries in the Breeding Program.

27       24.    At the University's request in December 2013, the Breeders transferred a complete

28  set of plant material to the University, including the Plant Types at Issue.  Such plant material of

1   the Plant Types at Issue is hereinafter referred to as the "Plant Material." At the time, the

2   University acknowledged that the official request to transfer the Breeders' Plant Material to the

3   department was "highly unusual" and agreed that the transfer was for preservation only and that

4   "the [Department of Plant Sciences at the University Davis campus] will guarantee the security of

5   the material to protect [the Breeders' and now CBC's as their assignee] commercial and research

6   interests in any and all materials transferred."

7         25.    Although Plaintiff as the assignee of the Breeders has rights in the plants, the Plant

8   Material wrongfully remains in the University's possession. The University asserted it requested

9   this highly unusual transfer of materials because of the then pending litigation (the "Commission

10  Litigation") between the University and the California Strawberry Commission (the

11  "Commission"). After learning that the litigation between the University and the Commission

12  settled, Plaintiff and before it, the Breeders, requested the return of the Plant Material, but the

13  University refused and continues to refuse to turn it over.

14                  **THE PARTIES' AGREEMENTS**

15         26.    Under federal and state law, the general rule is that the rights in an invention

16  belong to an inventor. An inventor may assign all or part of his rights in an invention by express

17  agreement.

18         27.    The Breeders, whose rights have been assigned to Plaintiff CBC, each have Patent

19  Agreements with the University. Dr. Shaw's Patent Agreement is dated February 25, 1986 and

20  Dr. Larson's Patent Agreement is dated July 1, 1991, (the "Patent Agreements"). The Patent

21  Agreements are substantially similar in most respects, including in those respects discussed in this

22  Complaint (except the inventors are entitled to varying percentages of royalties in each of the

23  agreements). The Patent Agreements preserve the rights of the Breeders as inventors of the plants

24  they develop with a partial and limited exception which accords the University a right of first

25  refusal to patent the invented variety but with an obligation to share royalties for the variety in

26  consideration of the Breeders' assignment of those patent rights. These Patent Agreements

27  required disclosure of "possibly patentable . . . plant[s]" conceived of or developed by the

28  Breeders while employed by the University ("Covered Inventions"), consistent with their rights as

7

inventors and in furtherance of the University Policy Regarding Patents ("Patent Policy"), which is incorporated in the Breeders' Patent Agreements.  For any inventions or developments that were not Covered Inventions, including the Transition Cultivars, the Breeders retained full rights to those inventions, which have subsequently been assigned to CBC.  Here, CBC as the assignee merely wants a non-exclusive license that makes the Transition Cultivars available to the public and to the University with a financial advantage for the University.

28.     The Patent Agreements provided that if the University decided to pursue patent protection for a disclosed Covered Invention, the parties made a further deal -- the University would generate and share a royalty stream for the variety in exchange for the Breeder's assignment of his patent rights for the variety.  Those royalties were typically generated by licenses and were the specific consideration for the assignment of the patent rights to the Covered Invention.  Pursuant to the Patent Policy incorporated into the Patent Agreements, the University had the "duty . . . to negotiate licenses and related agreements . . . concerning patent and related property rights held by the [University]."  Here, with respect to the Core Strawberry Germplasm, the University, in breach, has refused to generate a royalty stream for the Breeders' assignee CBC; and, because of the University's breach, any assignment to the University of the rights to the varieties is excused, rescinded, or avoided.  The University also acknowledged that, after a patent application is filed, it "shall" work with the breeder/inventor (now, Plaintiff CBC) "to determine the appropriate time and method for releasing plant materials into commercial/public use."  Here, with respect to the Core Strawberry Germplasm, the patent applications are listed as having been filed on June 3, 2015, but the University refused and refuses to work with CBC to license or otherwise release the material, in violation and breach of its policy and agreement.

29.     For Covered Inventions developed by the Breeders that were not deemed by the "University to be patentable" and/or for which the University did not seek "patent protection," the Breeders retained and have now assigned to CBC their full rights in the plants as well as the option to release the plant selection to the public pursuant to the University's policies incorporated into the Patent Agreements.

30.     The Breeders also retained and assigned to CBC their rights to Covered Inventions

8

1   in the event the criteria set forth in the Patent Policy were met or where the "equity of the

2   situation clearly" indicated that the inventors' rights should be honored.  The Patent Policy

3   prominently included:

4         (a)    "administering intellectual property rights for the public benefit;"

5         (b)    recognizing the "desirability of encouraging the broad utilization of the results of

6         . . . research . . . for the general public benefit;" and

7         (c)    encouraging "the practical application of University research for the broad public

8         benefit."

9   Those policies will be met and equity served by the University broadly licensing the Plant Types

10   at Issue and providing the requested licenses to CBC.

11         31.    CBC, as assignee of the rights of the Breeders, is entitled to receive a percentage

12   of the net royalties received by the University for the licensing of certain plants developed by the

13   Breeders, which the University has sought to patent.  That promised royalty flow requires the

14   University to license the Core Strawberry Germplasm promptly after submitting its patent

15   application for these varieties in order to meet its contractual obligation.  CBC, as assignee of the

16   Breeders, also received: (a) the rights to varieties developed by the Breeders that the University

17   elects not to patent; (b) the rights to varieties that are not Covered Inventions, such as the

18   Transition Cultivars; and (c) the rights to the varieties which the University sought to obtain

19   assignments of rights (i.e., the Core Strawberry Germplasm), but which the University has

20   relinquished because of its breach of its obligation to pay for those rights.  All of the Plant Types

21   at Issue fall within one or more of these rights belonging to CBC.  CBC also succeeds to the

22   Breeders' rights consistent with the Patent Policy incorporated into the Patent Agreements.

23         32.    The Breeders also entered into a letter agreement for a joint venture to obtain

24   additional research funding for the Breeding Program (the "JV Agreement"), dated March 20,

25   2000, for the mutual benefit of the co-venturers.  The terms of the JV Agreement provided that

26   the University and the Breeders would provide discounted licenses to certain licensees who were

27   to provide research funding to fund the "strawberry breeding and commercialization program . . .

28   managed by Douglas Shaw and/or Kirk Larson, during their tenures . . . and thereafter…"

9

**VERIFIED COMPLAINT**

33.     In exchange for that funding arrangement, the Breeders agreed to a reduction in their share of royalties, which provided for the funding of the Breeding Program in an amount exceeding $9 million.  The JV Agreement reaffirmed all of the Breeders' rights under the Patent Policy, the Patent Agreements, or otherwise in law or in equity, all of which remain in full force and effect, as assigned to Plaintiff.

**FIRST CAUSE OF ACTION BY PLAINTIFF AGAINST DEFENDANT FOR BREACH OF CONTRACT**

34.     CBC incorporates by reference, as though fully set forth, paragraphs 1 through 33 of this Complaint.

35.     As set forth above, the Breeders are parties to Patent Agreements with the University, copies of which are attached as Exhibits 1 and 2.

36.     The Breeders have at all times performed the terms of their respective Patent Agreements in the manner specified by the Patent Agreements.

37.     The Breeders bargained for and assigned to CBC the right to: (a) use the plants they invented, (b) patent them under certain circumstances, (c) obtain a license for them, and (d) make them available to the public.  The Breeders also bargained for and assigned to CBC a royalty stream of income from the licensing of the plants they invented and the University elected to patent in exchange for the assignment of the Breeders' rights, which the University has represented it received nearly 30 years ago in its recorded assignment filed with the United States Patent and Trademark Office on March 1, 2016, for the Core Strawberry Germplasm patent application.

38.     The University has failed and refused, and continues to refuse, to tender its performance as required by the Patent Agreements.  The breaches of the Patent Agreements, include but are not limited to the following:

(a)     the University has refused to recognize the Breeders' rights to the Plant Types at Issue, and on approximately a dozen times over the past two years has refused to license the Plant Types at Issue to CBC;

(b)     the University has refused to return the Breeders' Plant Material for both the Core

10

**VERIFIED COMPLAINT**

1    Strawberry Germplasm and the Transition Cultivars;

2    (c)    the University has refused CBC's request to start a licensing program that would

3    generate income for the University and CBC and would facilitate other breeding programs

4    that would serve the University's mission;

5    (d)    the University has sought to exercise the right to patent the Core Strawberry

6    Germplasm based on an assignment of those rights from the Breeders, but has refused to

7    pay for that assignment by licensing and generating a royalty stream owed to CBC as the

8    assignee of the Breeders; and

9    (e)    the University has refused even to discuss with CBC releasing the Core Strawberry

10   Germplasm into commercial/public use.

11   39.    The University's breaches have directly and proximately caused CBC past and

12   continuing injury including among others: (a) the diminished opportunity to continue developing

13   new strawberry cultivars for several seasons; (b) the loss of the royalty income that would have

14   been generated by the licensing of the germplasm from the Breeding Program; (c) the loss of

15   future income from the licensing of the germplasm from the Breeding Program; and (d) the

16   fraudulent arrogation of the rights of assignment of the Breeders rights without paying for those

17   rights, requiring the rescission of these assignments and the reversion of those assigned rights to

18   the Breeders' assignee CBC.

19   40.    CBC is entitled to: (a) the licenses requested; (b) the plants necessary to practice

20   the licenses; (c) compensatory damages for the lost opportunity to develop the Plant Types at

21   Issue and for the lost licensing income resulting from the University's failure to license the Plant

22   Types at Issue; and (d) the rescission and reversion to CBC of the Breeders' fraudulently induced

23   assigned rights to the University.

24   **SECOND CAUSE OF ACTION BY PLAINTIFF AGAINST DEFENDANT FOR**

25   **CONVERSION**

26   41.    CBC incorporates by reference, as though fully set forth, paragraphs 1 through 33

27   and paragraphs 35 through 40 of this Complaint.

28   42.    Inventors have a property right in their inventions absent assignment or operation

11

**VERIFIED COMPLAINT**

1    of law as described above.  CBC, as assignee of the Breeders, has a property right in all of the

2    Plant Types at Issue and in the Plant Material at issue here as described above.

3         43.    The Breeders' Plant Material is not a thing acquired, nor were the plants acquired

4    by the Breeders.  The Plant Material was created and invented by the Breeders, and subsequently

5    assigned to CBC.

6         44.    Further, CBC as the assignee of Breeders has an interest in the genotypes of the

7    Plant Types at Issue, because the Breeders invented them and paid for their development as part

8    of the joint venture with the University for strawberry breeding and commercialization under the

9    JV Agreement.

10        45.    At the University's fraudulent request, the Breeders, prior to their retirement,

11   temporarily transferred all of their Plant Material, including necessarily the unique genotypes of

12   each of the plants within that Plant Material.  The Breeders relied on the University's false

13   representation that it needed access to the Plant Material in connection with the Commission

14   Litigation, that the Plant Material would be returned, and that the University would guarantee to

15   protect Dr. Shaw's commercial and research interest in the Plant Material.  The University itself

16   recognized that the transfer was "highly unusual."

17        46.    Even though the Commission Litigation has been settled, the University

18   wrongfully continued and continues to exercise control over the Plant Material and refused and

19   continues to refuse requests to turn over the Breeders' Plant Material to CBC.

20        47.    Contrary to the University's guarantee to protect the Breeders', and now CBC's,

21   commercial and research interest in the Plant Material and as further acts of conversion, the

22   University is failing to maintain the Plant Material in a healthy viable condition.  In so failing, the

23   University is threatening the use of the Plant Material for breeding purposes and is threatening the

24   very survival of the genetic code of the affected plants.

25        48.    As a direct and proximate result of the University's acts of conversion and failure

26   to return the Breeders' Plant Material, CBC has been damaged and prevented from enjoying the

27   benefits of its property and continuing the research and commercialization efforts in breeding

28   strawberries using the Plant Types at Issue.

**VERIFIED COMPLAINT**

49.     CBC is entitled to damages and repossession of the Plant Material and the rights to the Plant Types at Issue.  CBC is further entitled to compensation for the time and money expended in pursuit of the Plant Material and rights to the Plant Types at Issue.

50.     In committing the acts described above, the University acted with oppression, fraud, malice, and in conscious disregard of the rights of CBC, and CBC is entitled to exemplary and punitive damages.

**THIRD CAUSE OF ACTION BY PLAINTIFF AGAINST DEFENDANT FOR BREACH OF FIDUCIARY DUTY**

51.     CBC incorporates by reference, as though fully set forth, paragraphs 1 through 33, paragraphs 35 through 40, and paragraphs 42 through 50 of this Complaint.

52.     The JV Agreement between the Breeders and the University created a joint venture in the Breeding Program and imposed on the University a fiduciary duty that continues to exist. Under the JV Agreement, the Breeders and the University, directly and indirectly, together would fund the Breeding Program and together would share the benefits of that Breeding Program, while preserving the Breeders' full rights.  This duty required and requires the University to act with the highest loyalty and utmost good faith towards the Breeders, and now CBC, and required and requires the University to share, to protect, and to preserve the assets of the joint venture.  The Plant Types at Issue and the Breeders' Plant Material were invented by the Breeders, paid for by the Breeders, and are the product and asset of the joint venture.

53.     The University breached its fiduciary duty by failing to share by license or otherwise, to protect, and to preserve joint venture assets, specifically by denying CBC access to the Plant Material and the Plant Types at Issue.

54.     As a direct and proximate result of the University's conduct, CBC has been damaged and continues to be damaged because it has been denied access to the Plant Material and the Plant Types at Issue and is unable to continue efforts to breed and commercialize new strawberry cultivars with these plants and their unique genotypes.

55.     CBC continues to be damaged by the threatened harm to the Plant Material and the Plant Types at Issue.  Each of the cultivars has a unique genotype or genetic code that cannot be

13

**VERIFIED COMPLAINT**

1    reproduced by planting seeds or recreating the crosses of the parent varieties.  The code can only

2    be preserved by cloning or asexually reproducing the plant in the breeding stock.  If the plants of

3    a particular variety are allowed to die, their genotype dies with them forever.  The genotype of

4    each of those unique plants must be propagated and preserved to prevent the loss of the genetic

5    code by neglect, design, or natural happenstance.

6           56.    As a result of the University's breach of fiduciary duty, CBC is entitled to

7    compensatory damages in an amount to be determined at trial and to a constructive trust to protect

8    the Plant Materials and the Plant Types at Issue

9           57.    In committing the acts described above, the University acted with oppression,

10   fraud, malice, and in conscious disregard of the rights of CBC, and CBC is entitled to exemplary

11   and punitive damages.

12   **FOURTH CAUSE OF ACTION PLAINTIFF AGAINST DEFENDANT FOR BREACH OF**

13   **THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

14          58.    CBC incorporates by reference, as though fully set forth, paragraphs 1 through 33,

15   paragraphs 35 through 40, paragraphs 42 through 50, and paragraphs 52 through 57 of this

16   Complaint.

17          59.    Under California law, there is an implied covenant of good faith and fair dealing

18   under every contract, and the Patent Agreements are governed by California law.

19          60.    Implied by the Patent Agreements was a covenant that the University would act in

20   good faith and deal fairly and that the University would do nothing to interfere with the rights of

21   the Breeders to receive the benefits of the Patent Agreements and the royalties promised to the

22   Breeders in connection with the licensing of patented strawberry cultivars.

23                        **Refusal to License Plant Types at Issue**

24          61.    The University failed and continues to fail to license the Plant Types at Issue to

25   CBC, which in turn would prompt further licensing and the promised royalty stream to CBC.  The

26   University has done this in bad faith and in contradiction of the University's Davis campus

27   Department of Plant Sciences Cultivar Release Committee's recommendation in 2013 that the

28   Core Strawberry Germplasm be licensed on a non-exclusive basis to external researchers,

14

**VERIFIED COMPLAINT**

1   including CBC.

2       62.     As a direct and proximate result of the University failure to license the Plant Types

3   at Issue, CBC has been deprived of its rights to the Plant Materials, the Plant Types at Issue, and

4   the royalties in an amount to be determined at trial, income that was promised under the Patent

5   Agreements.

6                **Filing Plant Patent Applications for the Core Strawberry Germplasm**

7       63.     The University filed plant patent applications for all Core Strawberry Germplasm,

8   even though many genotypes in the Core Strawberry Germplasm will not be commercially

9   valuable.  The University did so to prompt assignments from the Breeders for their patent rights

10  and to attempt to prevent the exercise of rights in those varieties to their rightful owners, the

11  Breeders and now their assignee, CBC.

12      64.     As a direct and proximate result of the University's bad faith decision to apply for

13  plant patents on non-commercially valuable varieties of the Core Strawberry Germplasm, CBC

14  has been deprived of its rights in the varieties as well as the ability to use the varieties for

15  breeding new possibly patentable cultivars.

16                   **Failure to Collect License Royalties Due**

17      65.     The University failed and continues to fail to collect license royalties and late fees

18  owed by licensees of some or all of the 24 released cultivars invented by the Breeders and

19  assigned to the University for licensing (the "Released Cultivars"), in violation of the implied

20  covenant of good faith and fair dealing.  The California State Auditor report identified at least

21  $157,000 in interest charges due from three licensed nurseries for late royalty payments over a

22  three year period.  The University also continued to give certain licensees discounted royalties

23  after the Breeders terminated the JV Agreement, without even collecting contributions from those

24  licensees in return.

25      66.     As a direct and proximate result of the University's failure to collect all license

26  royalties due, CBC has been deprived of its full royalty income.

27

28

1

**Failure to Charge Reasonable Royalty Rates**

2      67.    The University failed and continues to fail to charge reasonable royalty rates for

3 Released Cultivars in violation of the implied covenant of good faith and fair dealing and to

4 CBC's detriment.  Industry peers like the University of Florida and Oregon State University

5 charge $10 to $20 per 1,000 plants, respectively, and private companies like Planasa, Plant

6 Sciences, and Driscoll's charge up to effective rates of $300 per 1,000 plants, whereas the

7 University only charges $8 per 1,000 plants invented by the Breeders, resulting in lost royalty

8 income to CBC.

9      68.    As a direct and proximate result of the University's failure to charge reasonable

10 royalty rates, CBC has been deprived of the reasonable amount of royalty income owed.

11

**Unreasonable Delay in Releasing Patented Cultivars**

12      69.    The University has delayed and continues to delay the licensing and release of

13 newly released cultivars, including in the release of 18 of the Released Cultivars, to growers

14 outside of California for two years after the release of a given cultivar to growers in California,

15 causing the Breeders to lose two years of royalties from growers outside of California.  The

16 University also prohibits California nurseries from selling any newly released cultivars outside of

17 the State of California, which eliminates a secondary market for California nurseries that in turn

18 grow fewer plants for fear they will not be able to sell any excess inventory.  This prohibition

19 reduced the royalties the Breeders received from California nurseries who grow fewer plants of

20 newly released cultivars.  The right to these lost royalties has been assigned to CBC.

21      70.    As a direct and proximate result of the University's policies delaying the licensing

22 newly released cultivars outside of California, CBC has been deprived of significant royalty

23 income that would have otherwise been collected from licensees both in California and outside

24 California.

25      71.    CBC is entitled to compensatory damages for its losses in an amount to be

26 determined.

27

28

**FIFTH CAUSE OF ACTION BY PLAINTIFF AGAINST DEFENDANT FOR COMMON**

**LAW UNFAIR COMPETITION**

72.     CBC incorporates by reference, as though fully set forth, paragraphs 1 through 33, paragraphs 35 through 40, paragraphs 42 through 50, paragraphs 52 through 57, and paragraphs 59 through 71 of this Complaint.

73.     The Breeders are now members of CBC and serve as employees or consultants to CBC.  CBC is in the business of developing new and distinct strawberry varieties and CBC now competes with the University's Breeding Program.

74.     CBC, as the assignee, has an interest in the Plant Types at Issue as well as the Plant Material that was transferred to the University under false pretenses.  The University led the Breeders to believe that the University needed the Plant Material in connection with the Commission Litigation and that the Plant Material would be returned to the Breeders.  The Commission Litigation concluded more than a year ago and the University refuses to return the Plant Material to its rightful owners.

75.     The University never intended to return the Plant Material to the Breeders, or their assignee CBC, as part of its efforts: (a) to prevent CBC and the Breeders from continuing to develop new strawberry cultivars; (b) to restrain trade; (c) to prevent CBC and the Breeders from continuing research and competing with the University and the Commission members in the commercialization of new strawberry varieties; and (d) to prevent CBC and the Breeders from utilizing their trade secrets.

76.     CBC has also made numerous requests for a non-exclusive license to use the Plant Types at Issue, but the University inappropriately seeks to prevent licensing the Plant Types at Issue to CBC in order to unfairly prevent competition.

77.     The University is attempting to coerce disclosure of trade secrets by continuing to insist that the Breeders reveal their trade secrets before the University will even discuss offering a license to CBC or return the Plant Materials needed for CBC to make use of the trade secrets. Based on their years of experience, the Breeders have information and insight into the Plant Types at Issue and the likely crossbreeds of the Plant Types at Issue that will yield patentable and

17

**VERIFIED COMPLAINT**

1   licensable strawberry genotypes.  The Breeders' information has potential economic value in the

2   future licensing of the Plant Types at Issue that, through development and crossbreeding, may

3   become commercially useful.  This information is contained in the minds of the Breeders, and the

4   value can only be realized by allowing CBC and the Breeders access to their Plant Material that

5   the University is holding hostage.

6        78.       Furthermore, the University is conspiring with the Commission to restrain trade

7   and unfairly prevent CBC from continuing the research and commercialization of new strawberry

8   varieties using the Plant Types at Issue.  For example, at a meeting held on February 26, 2014,

9   CBC's counsel and representatives met with members of the Commission, the president of the

10  Commission's board of directors, and the Commission's legal counsel.  At that meeting, the

11  Commission representatives stated bluntly that the goal of the Commission Litigation was to deny

12  Dr. Shaw access to the Breeding Program germplasm and materials, because Dr. Shaw's

13  involvement would compete with the strawberry breeding program that the Commission and the

14  University desired to put into place.  The University has conspired and agreed to this effort to

15  suppress competition and has committed various overt acts pursuant to this conspiracy, including

16  denying CBC a license, converting the Plant Types at Issue and Plant Material, and trying to

17  coerce the Breeders to work exclusively in support of the University Breeding Program.

18       79.       On information and belief, the University is refusing to turn over the Transition

19  Cultivar Plant Material so that the University can pass off the Transition Cultivars as its own by

20  selling or licensing those cultivars to nurseries for sale to the consuming public.

21       80.       The University has taken the actions set forth in paragraphs 74 through 79, among

22  others, to usurp CBC's future business in licensing new and distinct strawberry varieties.  The

23  University's actions are unethical, oppressive, and constitute common law unfair competition.

24       81.       As a direct and proximate result of the University's wrongful acts, CBC has been

25  damaged and prevented from enjoying the benefits of its property and from researching and

26  commercializing new strawberry varieties.  CBC is entitled to damages, repossession of the Plant

27  Material, and a license to use the Plant Types at Issue.

28       82.       CBC, as assignee of the Breeders, is entitled to: (a) the licenses requested by the

18

VERIFIED COMPLAINT

Breeders, (b) the plants necessary to practice the licenses, and (c) immediate return of the Plant Material.

83.   The University committed the actions set forth in paragraphs 74 through 79 in conscious disregard for the rights of CBC, justifying an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, CBC respectfully requests judgment against the University as follows:

1.   That the University be immediately required to provide CBC or a nursery that can act as an escrow agent with 5 plants of each cultivar of the Plant Types at Issue for preservation and propagation to prevent the University from destroying or otherwise losing the unique genotypes created by the Breeders pending the outcome of this case.

2.   That the University be required to place the Plant Materials in a constructive trust.

3.   That the University be required to return at least 5 plants of each cultivar of the Plant Types at Issue to CBC.

4.   That the University be restrained from continuing to refuse to license on reasonable terms the Plant Types at Issue.

5.   That the University be required to adhere to its publicly proclaimed policies to share the Breeders' research for the broad public benefit.

6.   That the assignment of the patent rights to the Core Strawberry Germplasm be rescinded or avoided.

7.   That CBC be awarded compensatory damages in an amount to be determined.

8.   That CBC be awarded their reasonable costs and attorneys' fees.

9.   That CBC be awarded punitive damages.

10.   That CBC be awarded such other and further relief as the Court may deem equitable.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all issues triable by jury.

**VERIFIED COMPLAINT**

Dated: May 2, 2016

Jones Day

By:  _____
      Rick L. McKnight

Attorneys for Plaintiff
CALIFORNIA BERRY CULTIVARS, LLC

## <u>VERIFICATION</u>

I, Douglas V. Shaw, am a member and employee of Plaintiff, California Berry Cultivars, LLC.  I have read the Complaint and know the contents thereof.  The allegations set forth in the Complaint are true and correct to the best of my own knowledge, except as to the matters which are therein stated on information and belief and those matters set forth in paragraphs 11, 20, 65, 67, 75, and 79, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 2, 2016, at *DAVIS, CALIFORNIA*

By: _____
Douglas V. Shaw

1  **VERIFICATION**

2      I, A.G. Kawamura, am the President of Plaintiff, California Berry Cultivars, LLC and am

3  authorized to make this verification.  I have read the Complaint and know the contents thereof.

4  The allegations set forth in the Complaint are true on information and belief, except as to the

5  matters that are set forth in paragraphs 9, 10, 12-19, 31, 73-74, and 76, which are true and correct

6  to the best of my own knowledge.

7      I declare under penalty of perjury under the laws of the State of California that the

8  foregoing is true and correct.

9      Executed on May 2, 2016, at  _IRVINE, CA_ .

10

11

12  By: _____

13      A.G. Kawamura

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFIED COMPLAINT**



**UNIVERSITY OF CALIFORNIA**
**STATE OATH OF ALLEGIANCE**
**and**
**PATENT AGREEMENT**

UPAY 585 (9/81)

| EMPLOYEE'S NAME (Last, first, middle initial) | DATE PREPARED |
|---|---|
| Shaw  Douglas V. | MO  DY  YR |
| DEPARTMENT | EMPLOYMENT DATE |
| Pomology | 02  MO  25  DY  86  YR |

# STATE OATH OF ALLEGIANCE

I do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of California against all enemies, foreign and domestic; that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of California; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter.

Taken and subscribed before me this

25th day of February , 19 86

Signature of Authorized Official

Title  Administrative Assistant

County  Yolo     State  CA

Signature of Officer or Employee (DO NOT Sign Until In The Presence of Proper Witness)

NOTE: No fee may be charged for administering this oath.

Oath must be administered by either (1) a person having general authority by law to administer oaths—for example: Notaries Public, Civil Executive Officers (Section 1001 of Government Code), Judicial Officers, Justices of the Peace, and county officials named in Sections 24000, 24057 of Government Code; such as, district attorneys, sheriffs, county clerks, members of boards of supervisors, etc., or (2) by any University Officer or employee who has been authorized in writing by the Regents to administer such oaths.

**WHO MUST SIGN THE OATH:** All persons (other than aliens) employed by the University, in common with all other California public employees, whether with or without compensation, must sign the Oath. (Calif. Constitution, Article XX, Section 2, Calif. Government Codes, Sections 3100-3102.)

All persons re-employed by the University after a termination of service must sign a new Oath if the date of re-employment is more than one year after the date on which the previous Oath was signed. (Calif. Government code, Section 3102.)

**WHEN MUST OATH BE SIGNED:** The Oath must be signed BEFORE the individual enters upon the duties of employment. (Calif. Constitution, article XX, Section 3: Calif. Government Code Section 3102).

**WHERE OATHS ARE FILED:** The Oaths of all employees of the University shall be filed with the Campus Accounting Office.

**FAILURE TO SIGN OATH:** No compensation for service performed prior to his subscribing to the Oath or affirmation may be paid to a University employee and no reimbursement for expenses incurred may be made prior to his subscribing to the Oath or affirmation. (Calif. Government Code, Section 3107).

**PENALTIES:** "Every person who, while taking and subscribing to the Oath or affirmation required by this chapter, states as true any material which he knows to be false, is guilty of perjury, and is punishable by imprisonment in the state prison not less than one or more than 14 years." (Calif. Government Code, Section 3108).

# UNIVERSITY POLICY REGARDING PATENTS

## PREAMBLE

The Regents of the University of California, in administering intellectual property rights for the public benefit, desire to encourage and assist members of the faculties, employees, and others associated with the University in the use of the patent system with respect to their discoveries and inventions in a manner that is equitable to all parties involved.

The Regents recognize the need for and desirability of encouraging the broad utilization of the results of University research not only by scholars but in practical application for the general public benefit and acknowledge the importance of the patent system in bringing innovative research findings to practical application.

Within the University, innovative research findings often give rise to patentable inventions as fortuitous by-products, even though the research was conducted for the primary purpose of gaining new knowledge. Equity in such patentable inventions may involve parties other than the inventor and The

Regents. The use of University facilities or services, particular assignment of duties or conditions of employment, possible claims of a cooperating agency where research is supported from extramural funds, and other situations may give rise to a complex of interrelated equities or rights, which must be appraised and appropriately disposed by agreement between the parties.

Therefore, to encourage the practical application of University research for the broad public benefit, to appraise and determine relative rights and equities of all parties concerned, to facilitate patent applications, licensing, equitable distribution of royalties, if any, to assist in obtaining funds for research, to provide for the use of invention-related income for the further support of research and education, and to provide a uniform procedure in patent matters where The Regents have a right or equity, the policy herein set down is adopted.

## STATEMENT OF POLICY

1. All matters relating to patents in which the University of California is in any way concerned shall be administered by an agency known as the University of California Board of Patents.

2. a. The Board of Patents shall be appointed by The Regents. It shall have full power of organization, except as hereinafter provided, subject to the provision that it shall meet at least once a year. The members shall serve without extra compensation at the pleasure of The Regents. The normal term of appointment shall be for three years.

b. The Board of Patents shall consist of eleven persons selected from among the faculties and the administration of the University, and of such other groups as The Regents may determine, but of this number the Committee on Committees of the Academic Senate shall select from the Senate at large one person to serve as a member for the normal term. The Chairman of the Board of Patents and Patent

Administrator shall be approved by The Regents upon the recommendation of the President of the University.

c. In its consideration of matters relating to each particular patent case or situation, the Board of Patents shall take into consideration the principles laid down in the patent laws, appropriate judicial decisions, and the laws of the State of California.

3. The Board of Patents shall have the following powers and duties, which may be delegated in whole or in part to the Patent Administrator.

a. To evaluate inventions and discoveries for patentability, as well as scientific merit and practical application and, where desirable, to appoint a committee of experts to examine the merits of each potentially patentable invention and to cause such committee to report its findings to the Board of Patents.

**(POLICY IS CONTINUED . . . Please sign Patent Agreement on reverse side)**

*ATTACH TO PERSONNEL ACTION FORM (UPAY 560)*

DX059-1 (4/85) 71443-180

**PATENT**
**REEL: 037866 FRAME: 0420**

University of California

## UNIVERSITY POLICY REGARDING PATENTS, continued . . .

b. To authorize applications for patent and to retain patent counsel, in association with the General Counsel, for matters pertaining to the filing of patent applications, the prosecution thereof, and the litigation that may arise therefrom.

c. To discover the patent and related rights or equities held by The Regents in an invention, and to negotiate agreements with cooperating organizations, if any, with respect to such rights or equities.

d. In the absence of overriding obligations to outside sponsors of research, to release patent rights to the inventor in those circumstances, (i) where The Regents elect not to file a patent application and the inventor is prepared to do so, and where no further research or development to develop that invention will be conducted involving University support or facilities, subject to a shop right being granted to The Regents, or (ii) where the equity of the situation clearly indicates such release should be given.

e. To negotiate licenses and related agreements with other parties concerning patent and related property rights held by The Regents.

f. To arrange for and direct the collection of royalties and fees and the distribution thereof to those entitled thereto.

g. To assist University officers in negotiating agreements with cooperating organizations concerning prospective rights to patentable inventions or discoveries made as a result of research carried out under grants, contracts, or other agreements to be funded in whole or in part by such cooperating organizations, and to negotiate Institutional Patent Agreements or other agreements with Federal agencies regarding the disposition of patent rights.

h. To recommend to the President appropriate exemptions from the agreement to assign inventions and patents to The Regents as required by paragraph 4 of this policy.

i. To make such reports and recommendations to The Regents as The Regents or the President shall direct.

4. An agreement to assign inventions and patents to The Regents, except those resulting from permissible consulting activities without use of University facilities, shall be mandatory for all employees, for persons not employed by the University but who use University research facilities, and for those who receive grant or contract funds through the University. Exemptions from such agreements to assign may be authorized in those circumstances where the mission of the University is better served by such action, provided that overriding obligations to other parties are met and such exemptions are not inconsistent with other University policies.

5. Those individuals who have so agreed to assign inventions and patents shall promptly report and fully disclose the conception and/or reduction to practice of potentially patentable inventions to the Patent Administrator. They shall execute such declarations, assignments, or other documents as may be necessary in the course of invention evaluation, patent prosecution, or protection of patent rights, to assure that title in such inventions shall be held by The Regents or by such other parties as may be appropriate under the circumstances. Such circumstances would include, but not be limited to, those situations where there are overriding patent obligations of The Regents arising from grants, contracts or other agreements with outside organizations. Releases of patent rights may be authorized by the Board of Patents where the equities so indicate.

6. Subject to restrictions arising from overriding obligations of The Regents pursuant to grants, contracts, or other agreements with outside organizations, The Regents agree, for and in consideration of said assignment of patent rights, to pay annually to the named inventor(s), the inventor(s)' heirs, successors, or assigns 50 percent of the net royalties and fees received by The Regents. Net royalties are defined as gross royalties and fees, less 15 percent thereof for administrative costs, and less the costs of patenting, protecting and preserving patent rights, maintaining patents, the licensing of patent and related property rights, and such other costs, taxes, or reimbursements as may be necessary or required by law. Where there are two or more inventors, each inventor shall share equally in the inventor's share of royalties, unless all inventors previously have agreed in writing to a differing distribution of such share. Distribution of the inventor's share shall be made annually in February from the amount received during the penultimate calendar year. In the event of any litigation, actual or imminent, or any other action to protect patent rights, The Regents may withhold distribution and impound royalties until resolution in the matter.

7. In the disposition of any net income accruing to The Regents from patents, first consideration shall be given to the support of research.

Revised effective April 1, 1980.

---

## PATENT AGREEMENT

(Please read Patent Policy on reverse side and above.)

This agreement is made by me with The Regents of the University of California, a corporation, hereinafter called "University," in part consideration of my employment, and of wages and/or salary to be paid to me during any period of my employment, by University, and/or my utilization of University research facilities.

By execution of this agreement I understand that I am not waiving any rights to a percentage of royalty payments received by University, as set forth in University Policy Regarding Patents, hereinafter called "Policy."

I agree that every possibly patentable device, process, plant, or product, hereinafter referred to as "invention," which I conceive or develop while employed by University, or during the course of my utilization of any University research facilities, shall be examined by University to determine rights and equities therein in accordance with the Policy, and I shall promptly furnish University with complete information with respect to each.

In the event any such invention shall be deemed by University to be patentable, and University desires, pursuant to determination by University as to its rights and equities therein, to seek patent protection thereon, I shall execute any documents and do all things necessary, at University's expense, to secure and assign University all rights, title and interest therein and to assist University in securing patent protection thereon. The scope of this provision is limited by California Labor Code section 2870, to which notice is given below. In the event I protest the University's determination regarding any rights or interest in an invention, I agree: (a) to proceed with any University requested assignment or assistance; (b) to give University notice of that protest no later than the execution date of any of the above-described documents or assignment; and (c) to reimburse University for all expenses and costs it encounters in its patent application attempts, if any such protest is subsequently sustained or agreed to.

I shall do all things necessary to enable University to perform its obligations to grantors of funds for research or contracting agencies as said obligations have been undertaken by University.

University may relinquish to me all or a part of its right to any such invention, if, in its judgment, the criteria set forth in the Policy have been met.

I agree to be bound hereunder for and during any periods of employment by University or for any period during which I conceive or develop any invention during the course of my utilization of any University research facilities.

In signing this agreement I understand that the law, of which notification is given below, applies to me, that I am still required to disclose all my inventions to the University.

### NOTICE

This agreement does not apply to an invention which qualifies fully under the provisions of Labor Code section 2870 of the State of California which provides that: Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time and (a) which does not relate (1) to the business of the employer, or (2) the employer's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

In any suit or action arising under this law the burden of proof shall be on the individual claiming the benefits of its provisions.

Employee/Guest Name _____Douglas V. Shaw_____   Witness Signature _____ Date: 2/25/86
                              (Please Print)

Employee/Guest Signature: _____   Date: __2/25/86__
(Please complete withholding certificate and State Oath, also.)

D1089-2 (4/85) 71443-180

ATTACH TO PERSONNEL ACTION FORM (UPAY 560)

PATENT
REEL: 037866 FRAME: 0421



**UNIVERSITY OF CALIFORNIA**
**STATE OATH of ALLEGIANCE**
**and**
**PATENT AGREEMENT**
UPAY 585 (R7/90)

| EMPLOYEE'S NAME (Last, first, middle initial) | DATE PREPARED |
|---|---|
| Larson Kirk | 02 / 07 / 91 |
| DEPARTMENT | EMPLOYMENT DATE |
| Pomology | 03 / 01 / 91 |

## STATE OATH OF ALLEGIANCE

I do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of California against all enemies, foreign and domestic; that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of California; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter.

Taken and subscribed before me this

1st day of July 19 91

_Signature of Authorized Official_
Administrative Assistant
_Title_

Yolo                              CA
_County_                          _State_

X _Signature of Officer or Employee (DO NOT Sign Until In The Presence of Proper Witness)_

NOTE: No fee may be charged for administering this oath.

Oath must be administered by either (1) a person having general authority by law to administer oaths—for example: Notaries Public, Civil Executive Officers (Section 1001 of Government Code), Judicial Officers, Justices of the Peace, and county officials named in Sections 24000, 24057 of Government Code; such as, district attorneys, sheriffs, county clerks, members of boards of supervisors, etc., or (2) by any University Officer or employee who has been authorized in writing by The Regents to administer such oaths.

**WHO MUST SIGN THE OATH:** All persons (other than aliens) employed by the University, in common with all other California public employees, whether with or without compensation, must sign the Oath. (Calif. Constitution, Article XX, Section 2. Calif. Government Codes, Sections 3100-3102.)

All persons re-employed by the University after a termination of service must sign a new Oath if the date of re-employment is more than one year after the date on which the previous Oath was signed (Calif. Government Code. Section 3102.)

**WHEN MUST OATH BE SIGNED:** The Oath must be signed BEFORE the individual enters upon the duties of employment. (Calif. Constitution, Article XX, Section 3; Calif. Government Code Section 3102.)

**WHERE OATHS ARE FILED:** The Oaths of all employees of the University shall be filed with the Campus Accounting Office.

**FAILURE TO SIGN OATH:** No compensation for service performed prior to his subscribing to the Oath or affirmation may be paid to a University employee. And no reimbursement for expenses incurred may be made prior to his subscribing to the Oath or affirmation. (Calif. Government Code, section 3107.)

**PENALTIES:** "Every person who, while taking and subscribing to the Oath or affirmation required by this chapter, states as true any material which he knows to be false, is guilty of perjury, and is punishable by imprisonment in the state prison not less than one or more than 14 years." (Calif. Government Code, Section 3108.)

## UNIVERSITY OF CALIFORNIA PATENT POLICY

### I. PREAMBLE

It is the intent of the President of the University of California, in administering intellectual property rights for the public benefit, to encourage and assist members of the faculty, staff, and others associated with the University in the use of the patent system with respect to their discoveries and inventions in a manner that is equitable to all parties involved.

The University recognizes the need for and desirability of encouraging the broad utilization of the results of University research, not only by scholars but also in practical application for the general public benefit, and acknowledges the importance of the patent system in bringing innovative research findings to practical application.

Within the University, innovative research findings often give rise to patentable inventions as fortuitous by-products, even though the research was conducted for the primary purpose of gaining new knowledge.

To encourage the practical application of University research for the broad public benefit, to appraise and determine relative rights and equities of all parties concerned, to facilitate patent applications, licensing, equitable distribution of royalties, if any, to assist in obtaining funds for research, to provide for the use of inventors' expenses for the further support of research and education, and to provide a uniform procedure for patent matters when the University has a right or equity, the following University of California Patent Policy is adopted.

### II. STATEMENT OF POLICY

A. An agreement to assign inventions and patents to the University, except those resulting from permissible consulting activities without use of University facilities, shall be mandatory for all employees, for persons not employed by the University but who use University research facilities, and for those who receive gift, grant, or contract funds through the University. Exemptions from such agreements to assign may be authorized in those circumstances when the mission of the University is better served by such action, provided that overriding obligations to other parties are met and such exemptions are not inconsistent with other University policies.

B. Those individuals who have so agreed to assign inventions and patents shall promptly report and fully disclose the conception and/or reduction to practice of potentially patentable inventions to the Director of the, Patent, Trademark, and Copyright Office. They shall execute such declarations, assignments, or other documents as may be necessary in the course of invention evaluation, patent prosecution, or protection of patent or analogous property rights, to assure that title in such inventions shall be held by the University or by such other parties as may be designated by the University as may be appropriate under the circumstances, Such circumstances would include, but not be limited to, those situations when there are

overriding patent obligations of the University arising from gifts, grants, contracts, or other agreements with outside organizations.

In the absence of overriding obligations to outside sponsors of research, the University may release patent rights to the inventor in those circumstances when:
(1) the University elects not to file a patent application and the inventor is prepared to do so, or
(2) the equity of the situation clearly indicates such release should be given, provided in either case that no further research or development to develop that invention will be conducted involving University support or facilities, and provided further that a shop right is granted to the University.

C. Subject to restrictions arising from overriding obligations of the University pursuant to gifts, grants, contracts, or other agreements with outside organizations, the University agrees, for and in consideration of said assignment of patent rights, to pay annually to the named inventor(s), or to the inventor(s)' heirs, successors, or assigns, 50% of the first $100,000 of cumulative net royalties and fees per invention received by the University, 35% of the next $400,000 of cumulative net royalties and fees per invention received by the University, and 20% of all additional cumulative

**(POLICY IS CONTINUED . . . Please sign Patent Agreement on reverse side)**
*ATTACH TO PERSONNEL ACTION FORM (UPAY 560)*

EO420                                                                                       71443-180

PATENT
REEL: 037866 FRAME: 0422

University of California

# UNIVERSITY PATENT POLICY, continued . . .

net royalties and fees per invention received by the University. Net royalties are defined as gross royalties and fees, less 15% thereof for administrative costs, and less the costs of patenting, protecting, and preserving patent rights, maintaining patents, the licensing of patent and related property rights, and such other costs, taxes or reimbursements as may be necessary or required by law.

When there are two or more inventors, each inventor shall share equally in the inventor's share of royalties, unless all inventors previously have agreed in writing to

a different distribution of such share.

Distribution of the inventor's share shall be made annually in February from the amount received during the penultimate calendar year. In the event of any litigation, actual or imminent, or any other action to protect patent rights, the University may withhold distribution and impound royalties until resolution of the matter.

D. In the disposition of any net income accruing to the University from patents, first consideration shall be given to the support of research.

## III. PATENT RESPONSIBILITIES AND ADMINISTRATION

A. Pursuant to Standing Order 100.4(gg), the President has responsibility for all matters relating to patents in which the University of California is in any way concerned.

B. The President is advised on such matters by the Intellectual Property Advisory Council (IPAC), which is chaired by the Senior Vice President—Academic Affairs. The membership of IPAC includes representatives from campuses, Agriculture and Natural Resources, the Department of Energy Laboratories, and the Director of the Patent, Trademark, and Copyright Office. IPAC is responsible for:
1. reviewing and proposing University policy on intellectual property matters including patents, copyrights, trademarks, and tangible research products;
2. reviewing proposed exceptions to established policies; and
3. advising the President on related matters as requested.

C. The Senior Vice President—Administration is responsible for implementation of this Policy, including the following:
1. Evaluating inventions and discoveries for patentability, as well as scientific merit and practical application, and requesting the filing and prosecution of patent applications.

2. Evaluating the patent or analogous property rights or equities held by the University in an invention, and negotiating agreements with cooperating organizations, if any, with respect to such rights or equities.
3. Negotiating licenses and license option agreements with other parties concerning patent and/or analogous property rights held by the University.
4. Directing and arranging for the collection and appropriate distribution of royalties and fees.
5. Assisting University officers in negotiating agreements with cooperating organizations concerning prospective rights to patentable inventions or discoveries made as a result of research carried out under grants, contracts, or other agreements to be entered in whole or in part by such cooperating organizations, and negotiating with Federal agencies regarding the disposition of patent rights.
6. Recommending to the President appropriate action on exemptions from the agreement to assign inventions and patents to the University as required by Section II, A., above.

Revised April 18, 1990

# PATENT AGREEMENT

### (Please read Patent Policy on reverse side and above.)

This agreement is made by me with The Regents of the University of California, a corporation, hereinafter called "University," in part consideration of my employment, and of wages and/or salary to be paid to me during any period of my employment, by University, and/or my utilization of University research facilities and/or my receipt of gift, grant, or contract research funds through the University.

By execution of this agreement I understand that I am not waiving any rights to a percentage of royalty payments received by University, as set forth in University Patent Policy, hereinafter called "Policy."

I agree that every possibly patentable device, process, plant, or product, hereinafter referred to as "Invention," which I conceive or develop while employed by University, or during the course of my utilization of any University research facilities or any connection with my use of gift, grant, or contract research funds received through the University, shall be examined by University to determine rights and equities therein in accordance with the Policy, and I shall promptly furnish University with complete information with respect to each.

In the event any such invention shall be deemed by University to be patentable, and University desires, pursuant to determination by University as to its rights and equities therein, to seek patent protection thereon, I shall execute any documents and do all things necessary, at University's expense, to assign to University all rights, title and interest therein and to assist University in securing patent protection thereon. The scope of this provision is limited by California Labor Code section 2870, to which notice is given below. In the event I protest the University's determination regarding any rights or interest in an invention, I agree: (a) to proceed with any University requested assignment or assistance; (b) to give University notice of that protest no later than the execution date of any of the above-described documents or assignment; and (c) to reimburse University for all expenses and costs it encounters in its patent application attempts, if any such protest is subsequently sustained or agreed to.

I shall do all things necessary to enable University to perform its obligations to grantors of funds for research or contracting agencies as said obligations have been undertaken by University.

University may relinquish to me all or a part of its right to any such invention, if, in its judgment, the criteria set forth in the Policy have been met.

I agree to be bound hereunder for and during any periods of employment by University or for any period during which I conceive or develop any invention during the course of my utilization of any University research facilities, or any gift, grant, or contract research funds received through the University.

In signing this agreement I understand that the law, of which notification is given below, applies to me, that I am still required to disclose all my inventions to the University.

## NOTICE

This agreement does not apply to an invention which qualifies under the provisions of Labor Code section 2870 of the State of California which provides that (a) Any provisions in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either: (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer. (2) Result from any work performed by the employee for the employer. (b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

In any suit or action arising under this law the burden of proof shall be on the individual claiming the benefits of its provisions.

Employee/Guest Name   Kirk Larson   Witness Signature: _____ Date: 7/1/91
                        (Please Print)

Employee/Guest Signature: X _____   Date: 7/1/91
                        (Please complete withholding certificate and State Oath, also.)

RETN:   ACCOUNTING—5 yrs. after separation, except in cases of disability, retirement or disciplinary action, in which cases retain until age 70.
        Other Copies:   0–5 years after separation.

*ATTACH TO PERSONNEL ACTION FORM (UPAY 560)*

Form UPAY 585 (R7/90)

RECORDED: 03/01/2016

PATENT
REEL: 037866 FRAME: 0423