# EXHIBIT A

**MORRISON | FOERSTER**

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA 94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SACRAMENTO, SAN DIEGO,
DENVER, NORTHERN VIRGINIA,
WASHINGTON, D.C.

TOKYO, LONDON, BERLIN, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG,
SINGAPORE

June 4, 2014

Writer's Direct Contact
+1 (415) 268.7178
RKrevans@mofo.com

*Via Email and UPS*

Patrick Nielson
23263 Park Corniche
Calabasas, CA 91302

Re:   Ownership of the Strawberry Breeding Program

Dear Mr. Nielson:

This letter responds to your letter dated May 16, 2014, and Dr. Doug Shaw's email dated April 10, 2014. We understand that you represent Dr. Shaw and California Berry Cultivars LLC ("CBC"), and we write now to correct several misimpressions you and Dr. Shaw may have about the legal precedent and University of California ("UC") policies that govern ownership and use of the strawberry germplasm at issue. We are also copying Dr. Kirk Larson on this letter because he appears to be in privity with Dr. Shaw and CBC on certain issues relating to the Strawberry Breeding Program at the UC's Davis Campus.

**UC Owns the Germplasm.** As an initial matter, we would like to make clear that UC — and not Drs. Shaw or Larson or any other third party — owns the intellectual and tangible property relating to the germplasm developed through the Strawberry Breeding Program. This property includes the rights to the subset of 180 elite cultivars you refer to as Tangible Research Product ("TRP").

California Labor Code § 2860 provides:

> Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment.

Courts have found that § 2860 "embodies the universally accepted principal that work product created by an employee belongs to the employer where the employee was hired to

sf-3423655

MORRISON | FOERSTER

Patrick Nielson
June 4, 2014
Page Two

create such work product." *See, e.g., GE v. Wilkins*, 2011 U.S. Dist. LEXIS 48362, at *29 (E.D. Cal. May 5, 2011). Applying this same principal, ownership of a faculty member's commercially valuable research results have been found to lie with the university that employs him. *See Wash. Univ. v. Catalona*, 437 F. Supp. 2d 985, 995 (E.D. Mo. 2006), *affirmed Wash. Univ. v. Catalona*, 490 F.3d 667 (8th Cir. Mo. 2007). We note that you claim § 2860 does not apply to Dr. Shaw, citing a Superior Court decision in an earlier case involving him. However, you fail to note that neither the Superior Court nor the Court of Appeals decisions ever mentioned § 2860 — much less found that it did not apply. *See Shaw v. Regents of the University of California*, (1994) 58 Cal. App. 4th 44, 56.

**UC Has the Right to the Germplasm IP Under the Patent Agreement.** As you know, both Drs. Shaw and Larson signed versions of the UC Patent Agreement that require them to assign their intellectual property rights in potentially patentable germplasm to UC:

> [E]very possibly patentable device, process, plant, or product, hereinafter referred to as "invention," which I conceive or develop while employed by University, or during the course of my utilization of any University research facilities . . . , shall be examined by University to determine rights and equities therein in accordance with the Policy, and I shall promptly furnish University with complete information with respect to each.
>
> In the event any such invention shall be deemed by University to be patentable, and University desires, pursuant to determination by University as to its rights and equities therein, to seek patent protection thereon, I shall execute any documents and do all things necessary, at University's expense, to assign to University all rights, title and interest therein and to assist University in securing patent protection thereon.

The Patent Agreement is a binding contract between the parties, as the Court of Appeals has made clear. *Ibid.* at 52-53.

**UC Has the Right to the Germplasm Under UC Policy.** UC's ownership rights extend not only to the patents covering germplasm developed through the Strawberry Breeding Program, but also to the tangible materials, including the germplasm itself and all research records regarding the germplasm. (*See* 1982 Interim Guidelines on University-Industry Relations ("[UC] does not authorize the use of [tangible research products] for commercial purposes" and asserts and maintains a "property right in such products."); *see also* Faculty Handbook, Other Forms of Intellectual Property ("Other forms of intellectual property

sf-3423655

MORRISON | FOERSTER

Patrick Nielson
June 4, 2014
Page Three

including tangible research products such as cell lines, plasmids, technical schematics, and physical models are also governed by University policy. Ownership is generally with the University."); APM 020 ("Notebooks and other original records of the research are the property of the University.").) Indeed, both Drs. Shaw and Larson have repeatedly recognized UC's ownership rights in these tangible research products by signing test agreements involving various cultivars, including many of the 180 elite cultivars. These agreements state that the "[c]ultivars were developed at the University of California and are owned by The Regents." Accordingly, UC owns the intellectual and tangible property developed from the Strawberry Breeding Program and all associated records.

**Communication 28 and Guideline #10 Do Not Control.** You and Dr. Shaw have suggested previously that he is entitled to a license to the 180 elite cultivars identified as TRP, but you misread the applicable UC policies. Communication 28, which you each have cited as support, does not apply for at least the following three reasons. First, that communication postdates Dr. Shaw's employment agreement with UC, so it cannot have been incorporated into that agreement. Second, Communication 28 was superseded by ANR 485, which "delegates responsibility for the final authority for the commercial release of protected plant materials to the Dean of the breeder/inventor's campus." Finally, Dr. Shaw has recognized that Communication 28 is irrelevant in the event that UC seeks patents on the TRP, which UC is currently doing, and he "declared the 180+ genotypes listed in the patent/TRP disclosure as a patentable invention." Both he and Dr. Larson are therefore contractually bound "to assign [UC] all rights, title and interest therein."

In previous communications, both you and Dr. Shaw have also mentioned Guideline #10. However, the *Guidelines on University-Industry Relations* (including Guideline #10) were recently rescinded. Moreover, Guideline #10 refers to "Licensing of tangible research products." It does not govern patents or licensing of patents, though it does note UC's preference for patenting research results "when possible."

**UC Is Patenting the TRP.** Both you and Dr. Shaw state that Dean Dillard rejected making TRP available through licenses alone. However, if you meant to suggest that she decided not to patent the TRP, that is incorrect. She *has* in fact approved moving forward with seeking patent protection on each of the 180 cultivars that Dr. Shaw identified as a patentable invention. Mr. Appelsmith communicated this decision to you in his letter dated May 8, 2014. We expect that Drs. Shaw and Larson will comply fully with their contractual obligation to "execute any documents and do all things necessary" to aid UC in seeking patent protection on these 180 cultivars (and any other germplasm they helped develop), as and when their assistance is requested.

**UC Intends to Preserve the Program for the Public Good.** You claim in your letter that, if UC does not license the TRP to your clients, independent strawberry growers could be deprived of new strawberry cultivars. That is incorrect. In fact, the only scenario where that

sf-3423655

MORRISON | FOERSTER

Patrick Nielson
June 4, 2014
Page Four

might occur is one in which Drs. Shaw and Larson decide to leave UC and then refuse to cooperate in developing the 180 elite cultivars and assisting the new breeders who assume their roles after they leave. You also mischaracterize UC's proposals as outlined in Mr. Appelsmith's May 8 letter. UC's decision regarding these cultivars was not made at the behest of the California Strawberry Commission. Rather, UC made a careful judgment that the best option for preserving a public breeding program in California would be to retain the TRP for the exclusive use of its public program, as has historically been the case.

Throughout your letter, you assert that licensing the TRP to CBC will somehow benefit independent growers in California. It is unclear how granting a license to either Dr. Shaw or CBC would benefit independent growers, given that the availability of new cultivars CBC releases would be determined solely at the discretion of CBC. Ceding decision-making over the disposition of UC property to a private enterprise would be inconsistent with appropriate stewardship of what is ultimately a public asset.

Sincerely,

Rachel K——

Rachel Krevans

cc: Kirk Larson, Ph.D.
     Jacob Appelsmith, Chief Campus Counsel

sf-3423655