REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  Rick L. McKnight (SBN 55183)
   fmcknight@jonesday.com
2  Alexis Adian Smith (SBN 274429)
   asmith@jonesday.com
3  JONES DAY
   555 South Flower Street, Fiftieth Floor
4  Los Angeles, CA  90071.2300
   Telephone:    +1.213.489.3939
5  Facsimile:    +1.213.243.2539

6  Sharyl A. Reisman (Admitted *Pro Hac* Vice)
   sareisman@JonesDay.com
7  JONES DAY
   250 Vesey Street
8  New York, NY  10281.1047
   Telephone:    +1.212.326.3939
9  Facsimile:    +1.212.755.7306

10 Attorneys for Plaintiff and Crossclaim
   Defendants CALIFORNIA BERRY
11 CULTIVARS, LLC and Cross-Defendants
   DOUGLAS SHAW and KIRK LARSON

Greg L. Lippetz (SBN 154228)
glippetz@JonesDay.com
JONES DAY
Silicon Valley Office
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:    +1.650.739.3939
Facsimile:    +1.650.739.3900

Nathaniel P. Garrett (SBN 248211)
ngarrett@JonesDay.com
Paul C. Hines (State Bar No. 294428)
phines@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:    +1.415.626.3939
Facsimile:    +1.415.875.5700

12              UNITED STATES DISTRICT COURT

13           NORTHERN DISTRICT OF CALIFORNIA

14               SAN FRANCISCO DIVISION

15

16 CALIFORNIA BERRY CULTIVARS, LLC,

17              Plaintiff,

18       v.

19 THE REGENTS OF THE UNIVERSITY OF
   CALIFORNIA,

20              Defendant.

21 _____

22 THE REGENTS OF THE UNIVERSITY OF
   CALIFORNIA,

23 Cross-Complainant,

24 v.

25 CALIFORNIA BERRY CULTIVARS,
   DOUGLAS SHAW, AND KIRK LARSON
26
27 Cross-Defendants.

Case No. 3:16-cv-02477-VC

**CALIFORNIA BERRY CULTIVARS,
LLC, DOUGLAS SHAW, AND KIRK
LARSON'S NOTICE OF MOTION
AND MOTION FOR SUMMARY
JUDGMENT ON OWNERSHIP AND
NON-INFRINGEMENT**

Date:        **March 9, 2017**
Time:        **10:00 a.m.**
Judge:       **Hon. Vince Chhabria**
Courtroom:   **4**

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 9, 2017 at 10:00 a.m. before the Honorable Vince Chhabria, United States District Court, San Francisco, California, Cross-Defendants California Berry Cultivars, LLC, Douglas Shaw, and Kirk Larson will, and hereby do, move the Court for an Order under Rule 56 of the Federal Rules of Civil Procedure granting partial summary judgment in Cross-Defendants' favor.  This motion is based on the accompanying Memorandum of Points and Authorities, Declaration of Nathaniel P. Garrett and exhibits attached thereto, the complete files and records in this action, oral argument of counsel, and such other and further matters as the Court may consider.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II.  PROCEDURAL BACKGROUND ....................................................................... 2

III.  FACTUAL BACKGROUND ............................................................................... 3

    A.  Doug Shaw And Kirk Larson Sign Patent Agreements Upon Employment With The University................................................................................... 3

    B.  Professors Shaw and Larson Invent Thousands Of Strawberry Genotypes That Did Not Develop Into Possibly Patentable Plants........................................... 4

    C.  The University Demands That Professors Shaw And Larson Deliver the Strawberry Germplasm Upon Retirement................................................... 6

    D.  CBC Is Founded To Research and Develop New and Improved Strawberry Varieties. .................................................................................................... 7

        1.  CBC Grows Seeds Developed in Spain ........................................... 7

        2.  CBC Grows Patented Plants Purchased From a Licensee ................ 8

IV.  LEGAL STANDARD ......................................................................................... 9

V.  ARGUMENT ...................................................................................................... 9

    A.  There is No Dispute of Genuine Fact that CBC, as Assignee of the Rights of Drs. Shaw and Larson, Has an Ownership Interest in the Core Strawberry Germplasm and Transition Cultivars. ................................................................ 9

        1.  An Inventor Must Expressly Grant His Rights In an Invention if the Employer Is to Obtain Those Rights.................................................. 9

        2.  California Labor Code Section 2860 Does Not Revoke an Employee's Right to His Invention In the Absence of a Written Agreement......................... 10

        3.  The Patent Agreement Signed by Doug Shaw and Kirk Larson Does Not Assign All Inventions to the University.............................................. 14

            (a)  The Patent Agreement is an Agreement to Assign, Not a Present Assignment....................................................................... 14

            (b)  The Contractual Assignment is Limited to Possibly Patentable Inventions........................................................................... 16

        4.  The University's Policies Do Not Assign All Employee Inventions to the University.................................................................................... 17

            (a)  The 1982 Interim Guidelines on University Industry Relations ...................... 17

**TABLE OF CONTENTS**
(continued)

Page

(b)   Faculty Handbook ................................................................... 18

(c)   Academic Personnel Manual Section 020 .............................. 19

(d)   Division of Agriculture & Natural Resources Administrative Handbook
Section 485 ............................................................................. 20

5.   There Is No Evidence the Core Strawberry Germplasm or Transition
Cultivars Are Possibly Patentable. ............................................ 21

(a)   Core Strawberry Germplasm ................................................... 21

(b)   Transition Cultivars ................................................................ 23

B.   There Is No Genuine Dispute of Fact That CBC Did Not Infringe the
University's Plant Patents. ............................................................. 24

1.   The Plant Patent Act ............................................................. 25

2.   The Spanish Chain of Conduct Cannot Support Infringement. ............ 25

(a)   Seeds Are Not Covered by the PPA ........................................ 25

(b)   The University Cannot Expand the PPA to Plants Crossed in Spain ............ 28

3.   Plants Obtained from California Licensees Cannot Form the Basis of
Infringement. ........................................................................ 31

(a)   The University's Patent Rights to the Plants CBC Grows Have Been
Exhausted. ............................................................................. 31

(b)   CBC's Observation of Plants Cannot Constitute Infringement. ................ 32

VI.   CONCLUSION .................................................................................. 35

# TABLE OF AUTHORITIES

**Page**

Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................ 9

*Arachnid, Inc. v. Merit Indus., Inc.*,
939 F.2d 1574 (Fed. Cir. 1991) .......................................................................... 15

*Banks v. Unisys*,
228 F.3d 1357 (Fed. Cir. 2000) .......................................................................... 12

*Banner Metals, Inc. v. Lockwood*,
178 Cal.App.2d 643 (1960) ................................................................................. 12

*Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
563 U.S. 776 (2011) ...................................................................................... passim

*Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
583 F.3d 832 (Fed. Cir. 2009) ............................................................................ 15

*Bird-B-Gone, Inc. v. Bird Barrier Am., Inc.*,
No. SACV1200178AGRNBX, 2013 WL 11730662 (C.D. Cal. Mar. 20, 2013) ....... 34

*Cal. Table Grape Comm'n v. RB Sandrini, Inc.*,
No. 1:06-cv-00842-OWW-TAG, 2007 WL 1847631 (E.D. Cal. June 27, 2007) ....... 33

*Castillo v. City of Los Angeles*,
92 Cal.App.4th 477 (2001) .................................................................................. 13

*Cedars-Sinai Med. Ctr. v. Shewry*,
137 Cal.App.4th 964 (2006) ................................................................................ 24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................................... 9, 29

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*,
517 F.3d 1284 (Fed. Cir. 2008) .......................................................................... 15

*Filmtec Corp. v. Allied-Signal Inc.*,
939 F.2d 1568 (Fed. Cir. 1991) .......................................................................... 15

*FiTeq Inc v. Venture Corp.*,
169 F. Supp. 3d 948 (N.D. Cal. 2016) ............................................................... 16

*Gen. Elec. Co. v. Wilkins*,
No. CV F 10-0674 LJO JLT, 2012 WL 3778865 (E.D. Cal. Aug. 31, 2012) .............. 10, 11, 12

*Hernandez v. City of Pomona*,
46 Cal.4th 501 (2009) .......................................................................................... 13

*Imazio Nursery, Inc. v. Dania Greenhouses*,
69 F.3d 1560 (Fed. Cir. 1995) ............................................................................ 27

*Intermedics, Inc. v. Ventritex, Inc.*,
775 F. Supp. 1269 (N.D. Cal. 1991) .................................................................. 34

*IpVenture, Inc. v. Prostar Computer, Inc.*,
503 F.3d 1324 (Fed. Cir. 2007) .......................................................................... 15

*Kashmiri v. Regents of Univ. of California*,
156 Cal.App.4th 809 (2007) ................................................................................ 16

*Kaz Mfg. Co. v. Chesebrough-Ponds, Inc.*,
317 F.2d 679 (2d Cir. 1963) ............................................................................... 34

## TABLE OF AUTHORITIES
### (continued)

Page

*Kewanee Oil Co. v. Bicron Corp.*,
   416 U.S. 470 (1974)...................................................................................... 27

*KGB, Inc. v. Giannoulas*,
   104 Cal.App.3d 844 (1980)........................................................................... 11

*Kremer v. Chem. Const. Corp.*,
   456 U.S. 461 (1982)...................................................................................... 13

*L.A. Gear, Inc. v. E.S. Originals, Inc.*,
   859 F. Supp. 1294 (C.D. Cal. 1994) ...................................................... 33, 34

*Lexmark Int'l, Inc. v. Impression Prod., Inc.*,
   816 F.3d 721 (Fed. Cir. 2016)....................................................................... 31

*Lucido v. Superior Court*,
   51 Cal.3d 335 (1990) .................................................................................... 13

*Lugosi v. Univ. Pictures*,
   25 Cal.3d 813 (1979) .................................................................................... 11

*Mattel, Inc. v. MGA Entm't, Inc.*,
   616 F.3d 904 (9th Cir. 2010)......................................................................... 16

*Med. Sols., Inc. v. C Change Surgical LLC*,
   468 F. Supp. 2d 130 (D.D.C. 2006) .............................................................. 34

*Monsanto Co. v. David*,
   516 F.3d 1009 (Fed. Cir. 2008)..................................................................... 33

*Monsanto Co. v. Swann*,
   308 F. Supp. 2d 937 (E.D. Mo. 2003)........................................................... 33

*Morrison v. Wilson*,
   30 Cal. 344 (1866) ........................................................................................ 16

*NetApp, Inc. v. Nimble Storage, Inc.*,
   No. 5:13-CV-05058-LHKHRL, 2015 WL 400251 (N.D. Cal. Jan. 29, 2015) ...................... 11

*Nomadix, Inc. v. Hewlett-Packard Co.*,
   No. CV 09-08441 DDP VBKX, 2012 WL 1577436 (C.D. Cal. May 7, 2012) ...................... 15

*NTP Inc. v. Research in Motion Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005)............................................................... 30, 34

*Peregrine Semiconductor Corp. v. RF Micro Devices, Inc.*,
   No. 3:12-CV-0911-H WMC, 2014 WL 67509 (S.D. Cal. Jan. 8, 2014) .................................. 12

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013)..................................................................... 29

*Premier Displays & Exhibits v. Cogswell*,
   No. SACV 09-354 JVS ANX, 2009 WL 8623588 (C.D. Cal. Dec. 23, 2009) ........................ 12

*QR Spex, Inc. v. Motorola, Inc.*,
   507 F. Supp. 2d 650 (E.D. Tex. 2007)........................................................... 34

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
   553 U.S. 617 (2008)...................................................................................... 31

*Robi v. Five Platters, Inc.*,
   838 F.2d 318 (9th Cir. 1988).......................................................................... 13

*S. Cal. Disinfecting Co. v. Lomkin*,

## TABLE OF AUTHORITIES
### (continued)

Page

183 Cal.App.2d 431 (1960)...................................................................................... 11

*Securitas Sec. Servs. USA, Inc. v. Superior Court of San Diego Cty.*,
234 Cal.App.4th 1109 (2015) ................................................................................ 23

*Shaw v. Regents of Univ. of California*,
58 Cal.App.4th 44 (1997) ........................................................................................ 3

*United States v. Dubilier Condenser Corp.*,
289 U.S. 178 (1933) .............................................................................................. 10

*Univ. Patents, Inc. v. Kligman*,
762 F. Supp. 1212 (E.D. Pa. 1991) ............................................................. 18, 19, 21

*Van Well Nursery, Inc. v. Mony Life Ins. Co.*,
362 F. Supp. 2d 1223 (E.D. Wash. 2005) ......................................................... 33, 34

*Williams v. Weisser*,
273 Cal.App.2d 726 (1969).................................................................................... 11

*Yoder Bros., Inc. v. California-Florida Plant Corp.*,
537 F.2d 1347 (5th Cir. 1976)................................................................................ 27

**Statutes**

35 U.S.C. § 101 ...................................................................................................... 22

35 U.S.C. § 161 ...................................................................................................... 25

35 U.S.C. § 163 .......................................................................................... 25, 26, 29

35 U.S.C. § 271 ...................................................................................... 29, 30, 31, 34

42 U.S.C. § 2182 .................................................................................................... 19

42 U.S.C. § 2457 .................................................................................................... 19

7 U.S.C. § 2321 ...................................................................................................... 25

Cal. Civ. Code § 1644 ............................................................................................ 32

Cal. Food & Agric. Code § 77422 .......................................................................... 32

Cal. Labor Code § 2860 .................................................................................... passim

Cal. Labor Code § 2870 .......................................................................................... 12

Cal. Labor Code § 2872 .......................................................................................... 12

Plant Patent Amendments Acts of 1998, Pub. L. No. 105-289, 112 Stat. 2780 ............... 28

Protection of Plant Varieties (Law No. 3/2000) (Spain)............................................. 8

**Rules**

Fed. R. Civ. P. 56 ..................................................................................................... 9

**Other Authorities**

144 Cong. Rec. H10260 (daily ed. Oct. 9, 1998).................................................... 28

8-22 Chisum on Patents § 22.03(2016)................................................................... 10

8-24 Chisum on Patents § 24.02 (2016).................................................................. 26

Chengfei Ding, *The Protection for New Plant Varieties of American Businesses in China After China Enters the WTO*, 6 DRAKE J. AGRIC. L. 333 (2001) ...................................... 27

**TABLE OF AUTHORITIES**
(continued)

**Page**

G. Kenneth Smith, *Faculty and Graduate Student Generated Inventions: Is University Ownership A Legal Certainty?*, 1 VA. J.L. & TECH. 4 (1997) ........................................................................ 1

*Manual of Patent Examining Procedure* ("MPEP") § 1605 (Rev. 14, Nov. 1992) ...................... 30

S.Rep. 105-42 (1997) ............................................................................................................. 28

S.Rep. 71-315 (1930) ...................................................................................................... 5, 26, 34

Sandip H. Patel, *Graduate Students' Ownership and Attribution Rights in Intellectual Property*, 71 IND. L.J. 481 (1996) ...................................................................................................... 14

Sunil R. Kulkarni, *All Professors Create Equally: Why Faculty Should Have Complete Control over the Intellectual Property Rights in Their Creations*, 47 HASTINGS L.J. 221 (1995) .......... 14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    **INTRODUCTION**

California Berry Cultivars, LLC, Douglas Shaw, and Kirk Larson (collectively, "CBC")
move for summary judgment on The Regents of the University of California's ("University")
claims that: (1) it is the sole owner of all intellectual and tangible property rights to the Core
Strawberry Germplasm and Transition Cultivars; and (2) CBC and Drs. Shaw and Larson have
infringed the University's plant patent rights.

*First*, the University's claim of ownership brings to mind a commentator's observation
that "[i]n their haste to commercialize the fruits of academic labor, many universities have simply
assumed that any invention generated by its employees, especially faculty and graduate students,
is property of the university." G. Kenneth Smith, *Faculty and Graduate Student Generated
Inventions: Is University Ownership A Legal Certainty?*, 1 VA. J.L. & TECH. 4 (1997). The
University assumes that because Professors Doug Shaw and Kirk Larson invented new strawberry
genotypes using University resources, the University must therefore own their inventions. But
that assumption contravenes over 200 years of intellectual property law. "Since 1790, the patent
law has operated on the premise that rights in an invention belong to the inventor," *Bd. of
Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 785
(2011), even though that invention was conceived or reduced to practice during the scope of
employment. In the absence of some express contract or law that assigns the invention to the
employer, the employer enjoys only a "shop right," *i.e.*, a nonexclusive royalty-free license to use
the invention.

No law or contract supports the University's claim to be sole owner and assignee of all the
professors' inventions. The University relies primarily on California Labor Code section 2860,
but courts have uniformly rejected the view that section 2860 revokes an employee's right to his
invention in the absence of a written agreement. The University then points to its Patent
Agreement with the professors, but that agreement does not vest legal title in the University at all.
Rather, the contract merely contains a promise to assign "possibly patentable" inventions in the
future. As both Dr. Shaw and the geneticist hired to replace him agree, the Core Strawberry
Germplasm and Transition Cultivars at issue here are not patentable because the data needed to

1   support a patent application does not now, and may never, exist.  Finally, the University relies on

2   a smattering of University policies that it claims divest the professors of ownership.  But while

3   ownership of intellectual-property rights traditionally can be assigned only by a clear and express

4   assignment, the University cannot point to any single policy that so provides.  None contains

5   language that even comes close to the type of clear and unambiguous language found necessary to

6   divest an inventor of his intellectual property rights.

7   　　　　*Second*, the University's patent-infringement allegations rest on conduct that cannot

8   constitute infringement as a matter of law and undisputed fact.  The University's infringement

9   allegations are based on patented strawberry varieties invented by Drs. Shaw and Larson, and

10  which, unlike the varieties discussed above, were assigned by Drs. Shaw and Larson to the

11  University.  But the University cannot show infringement because (i) the challenged conduct

12  relating to Spanish cross-breeding does not fall within the scope of the Plant Patent Act ("PPA")

13  and (ii) the challenged conduct relating to fruit production in the United States was contractually

14  authorized by the University.  Neither of these actions constitutes infringement.

15  ## II.　　PROCEDURAL BACKGROUND

16  　　　　On May 2, 2016, CBC—a limited liability company whose members consist of strawberry

17  growers, breeders, and nurseries—filed suit in California state court as the assignee of certain

18  rights to the inventions of Professors Shaw and Larson against The Regents of the University of

19  California, alleging that the University had converted and endangered the strawberry germplasm

20  invented by the breeders.

21  　　　　As relevant for purposes of this motion, the University filed counterclaims against CBC

22  and Drs. Shaw and Larson, contending that "the University is the sole assignee and rightful owner

23  of the intellectual and tangible property rights to the Core Strawberry Germplasm and Transition

24  Cultivars with the right to exclude others."  ECF No. 104 ¶ 42.  This legal assertion, which

25  underlies several of the University's causes of action—including its claims for declaratory relief,

26  breach of an implied contract, and unjust enrichment—is erroneous as a matter of law and fact.

27  *See id.* ¶¶ 42, 51, 109.

28  　　　　The University also alleges that CBC has infringed several University strawberry patents

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

(i) by facilitating importation of seeds from crosses of University-patented varieties in Spain, and

(ii) by purchasing University-patented varieties in California and then observing the plants. *Id.*
¶¶ 20, 23, 25.

### III.   FACTUAL BACKGROUND

#### A.   Doug Shaw And Kirk Larson Sign Patent Agreements Upon Employment With The University.

On February 25, 1986, Doug Shaw received an appointment at the University of California Davis "to teach and do research." *Shaw v. Regents of Univ. of Cal.*, 58 Cal.App.4th 44, 47 (1997).  At the University of California, "[t]eaching, research or other creative activities, and the cultivation of scholarly or creative competence" are the primary activities of faculty members. Decl. of Nathaniel P. Garrett in Supp. of Pl. and Cross-Defs.' Mot. for Summ. J. Ex. A § 2(a).[1] Dr. Shaw's appointment was no different.  The University appointed Dr. Shaw to dedicate 15% of his time to teaching and research, and 85% of his time to the Agricultural Experiment Station, a unit of the University's Division of Agriculture and Natural Resources, which conducts research in agriculture and natural resources. Ex. B at 1.  The University did not expressly hire Dr. Shaw to produce patentable inventions.  Indeed, Dr. Shaw did not even disclose any inventions to the University prior to the time he was promoted to a tenured professor.  Ex. C ¶ 15.

Like all faculty, however, Dr. Shaw signed a Patent Agreement with the University upon employment.  Ex. D at 2.  Pursuant to that agreement, Shaw agreed that every "invention"— defined to mean "possibly patentable device, process, plant, or product"—that he conceived or developed during employment or conceived during the course of utilizing University research facilities, "shall be examined by University to determine rights and equities therein…." *Id.*  The Patent Agreement provided that "[i]n the event any such invention shall be deemed by University to be patentable, and University desires…to seek patent protection thereon," Shaw pledged to "execute any documents and do all things necessary … to assign to University all rights, title and interest therein and to assist University in securing patent protection thereon." *Id.*  In plain English, Shaw agreed to assign rights (*in the future*) to a limited set of inventions (*possibly*

---

[1] Unless otherwise noted, all exhibit citations ("Ex.") refer to the exhibits attached to the concurrently-filed Declaration of Nathaniel P. Garrett in support of this motion.

1   *patentable plants*), but only if a condition precedent were satisfied (*the University deemed the*
2   *possibly patentable plants to be patentable*).

3       Kirk Larson joined the University of California on July 1, 1991.  Ex. E at 24:25–25:3.  Dr.
4   Larson performed a variety of tasks for the University, including organizing and hosting
5   conferences, participating in conferences focused on horticultural science, making presentations
6   to news media, researching strawberry production, presenting lectures, and supporting thesis and
7   dissertation research projects. Ex. F.

8       Dr. Larson likewise signed a Patent Agreement with the University upon employment.
9   Larson's Patent Agreement similarly provided that every "possibly patentable device, process,
10  plant, or product" conceived or developed during employment or conceived during the course of
11  utilizing University research facilities, "shall be examined by University to determine rights and
12  equities therein…."  Ex. G at 2.  Dr. Larson agreed that "[i]n the event any such invention shall be
13  deemed by University to be patentable, and University desires … to seek patent protection
14  thereon," Larson would "execute any documents and do all things necessary … to assign to
15  University all rights, title and interest therein and to assist University in securing patent protection
16  thereon."  *Id.*

17                    **B.    Professors Shaw and Larson Invent Thousands Of Strawberry**
18                           **Genotypes That Did Not Develop Into Possibly Patentable Plants.**

19      Beginning in 1988, Dr. Shaw became the project leader for the University's "Breeding
20  Program," the purpose of which is to develop improved varieties of strawberry cultivars through
    selective breeding and to release those improved cultivars to the public.  ECF No. 2-2 ¶ 13.  ███
21  ████████████████████████████████████████████████████████████████████████████
22  ████████████████████████████████                    In 1991, Dr. Larson joined the Breeding Program, where
23  he collaborated with Dr. Shaw in the creation and evaluation of new varieties of cultivars. Ex. E
24  at 15:21, 16:18-24.

25      Strawberry plants can reproduce both sexually and asexually.  ████████████████
26  ████████████████████████████████████████████████████████████████████████████
27  ████████████████████████████████████████████████████████████████████████████
28

1   Hundreds of seeds are found on a single strawberry. ██████████████████

2   ████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████

4   ██████████████████████   By contrast, asexual reproduction is propagation by cloning a

5   plant, *e.g.*, by runners, cutting, layering, or division.  S.Rep. 71-315 at 1 (1930); *see also* Ex. I at

6   3.  When a plant is asexually reproduced, no seed or pollination is involved; instead, the plant

7   clones itself and the offspring contain the same genetic material.  S.Rep. 71-315 at 3-4.

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████████████████████████

16   ████████████████████████████████████

17      When Drs. Shaw and Larson developed a cultivar sufficiently new, distinct, and useful to

18   qualify for a plant patent, they would notify the University that the cultivar constituted a possibly

19   patentable invention.  *See, e.g.*, Exs. █ K.  The judgment that a variety is potentially patentable is

20   based on a range of characteristics including suitable climates for growth, production patterns,

21   resistance to disease and insects, plant yield, fruit firmness, color, and flavor.  *Id.*  Over the course

22   of their employment with the University, Drs. Shaw and Larson invented and disclosed to the

23   University approximately two dozen possibly patentable cultivars, which resulted in the

24   University obtaining and/or filing 24 patents.  Ex. L.  Those patents have generated nearly ███

25   ████ in royalty payments.  Ex. M.

26      Prior to the professors' retirement, Dr. Shaw also submitted to the University a list of 168

27   strawberry genotypes that were unique and useful as breeding stock.  Ex. N.  These genotypes

28

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

1   constitute the "Core Strawberry Germplasm" or "CSG."[2]  █████████████████

2   ███████████████████████████████████████████████████████

3   ███████████████████████████████████████████████████

4   ███████████████████████████████████████████████████████

5   ████████████████████████████████████████████  He alerted

6   the University to the collection's value as breeding stock because he believed it could be

7   protected, either through a "utility patent" or under University policy as "tangible research

8   product."  Ex. N at 1-2;  ██████████████████████

9          **C.     The University Demands That Professors Shaw And Larson Deliver
               the Strawberry Germplasm Upon Retirement.**

10  
11         In anticipation of their pending retirement, Professors Shaw and Larson negotiated with

12  the University to preserve the collection of strawberry germplasm. Ex. O.  Professor Shaw

13  presented the University with several preservation options, including by providing the

14  Department of Plant Sciences with plants of each genotype in the collection.  *Id.*  But Professor

15  Shaw made clear that he did not intend to transfer ownership of the materials to the University.

16  As counsel for Dr. Shaw made clear, the purpose of transitioning cultivars to the University was

17  to "recognize[] Doug's right to continue his breeding work, both within the UC until his

18  retirement and outside of the UC."  Ex. P.

19         On December 12, 2013, the Chair of Davis' Department of Plant Sciences, Chris van

20  Kessel, notified Shaw that "[t]he transfer of the strawberry genetic material from your collection"

21  to the University "has been carried out." Ex. Q.  Professor van Kessel explained that the transfer

22  included all historical material, including the Core Strawberry Germplasm genotypes and

23  approximately 400 selections "too new to the program to justify listing in the [Tangible Research

24  Product] file or to be discarded."  *Id.*  The letter noted that the University's request to transfer

25  research material to the department was "highly unusual," that the transfer was "to be for

26  ───────────────
    [2] ████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28  ██████████████████████████████  Thus, the CSG at issue in this case contains
    168 strawberry genotypes.

materials preservation only," and that the Department was guaranteeing the security of the material to protect Professor Shaw's own "commercial and research interests."  *Id.*

On June 4, 2014, however, counsel for the University wrote Dr. Shaw's attorney to assert the University's position "that UC—and not Drs. Shaw or Larson or any other third party—owns the intellectual and tangible property relating to the germplasm developed through the Strawberry Breeding Program."  Ex. R.  According to the University, its ownership right derived from three sources:  (1) California Labor Code section 2860; (2) the Patent Agreement signed by Drs. Shaw and Larson; and (3) University policies, including the University's (a) 1982 Interim Guidelines on University Industry Relations; (b) the Faculty Handbook; and (c) Academic Personnel Manual ("APM") Section 020.  *Id.*

### D.     CBC Is Founded To Research and Develop New and Improved Strawberry Varieties.

Several independent California strawberry growers and others, including Drs. Shaw and Larson, founded CBC. Ex. S at 54:1-22.  CBC grows strawberry plants from seeds for purposes of researching and developing a supply of new and improved strawberry varieties.  ECF No. 2-2 ¶ 9.  Drs. Shaw and Larson are both members and serve as employees or consultants to CBC.  *Id.*  While CBC's work is complicated and involves various steps and other entities, two chains of conduct are at issue with respect to the University's infringement allegations, and we address them here.

### 1.     CBC Grows Seeds Developed in Spain.

To evaluate new varieties, CBC begins with seeds imported from Spain.  Ex. T at 10:1-3.  For purposes of this motion, CBC assumes that International Semillas, LLC—a CBC member and the company responsible for breeding in Spain to create the new varieties that CBC evaluates— used some University-patented plants as at least one of the parent plants in its crossings.  *Id.* at 10:3-6.  (If no University-patented plant was used, there could be no infringement.)  As with all strawberry seeds, the seeds at issue here were the result of sexual reproduction that took place in Spain, and the resulting seeds were delivered to the United States.  *Id.* at 12:18-19. The commercially valuable part of the plant, the berry, was never sent from Spain to CBC.  *Id.* at

8:15-18.  Once received by CBC, the coats of the seeds are removed using acid to break down the seed coat to facilitate germination.  *Id.* at 14:4-8.  CBC then germinates the seeds, grows the new variety plants, observes the new variety plants, and selects certain of the new variety plants for further pursuit.  *Id.*

The rights and duties of CBC and International Semillas relating to these plants are governed by a Services Agreement dated June 30, 2014.  Ex. U.  Pursuant to the Services Agreement, any seeds sent from Spain, and all plants grown from those seeds, are owned by International Semillas.  *Id.* ¶¶ 1.1, 4.1, 8.1.  As payment for its services, CBC is paid a monthly service fee and is entitled to an exclusive license to varieties that become commercially viable cultivars.  *Id.* ¶ 4.1.  Neither CBC, nor Shaw, nor Larson sent, or caused to be sent, any University-patented plants to International Semillas for crossing.  Ex. T at 15:17-22.  ██████

████████████████████████████████████████████████████████████████

████████████████  which is an explicitly permissible use under Spanish law.  ████████

██████; *see* Protection of Plant Varieties (Law No. 3/2000) art. 15 (Spain) (explicitly limiting the protections for plants under the Act and stating that such protections "shall not extend to . . . acts done for the purposes of creation of new varieties…").

**2.     CBC Grows Patented Plants Purchased From a Licensee.**

In conjunction with the plants that it grows from seeds produced by International Semillas, CBC also acquires plants from a nursery in California, Lassen Canyon Nursery, Inc. ("LCN").  Ex. T at 8:26-27.  LCN is a licensee of the University pursuant to an agreement ████

████████████████████.  Ex. X.  ██████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████  *Id.* at ¶ 2.2.  CBC purchased various University-patented strawberry varieties from LCN under industry standard terms, and a portion of that purchase price included an amount for royalties to the University.  Ex. T at 8:26-27; Ex. ZZ.

CBC does not reproduce the plants it obtains from LCN—CBC does not sexually reproduce, asexually reproduce, multiply, or clone any of them.  Ex. T at 9:8-9.  Instead, it grows the plants in California, sells their fruit to juicers, and, as the plants are growing, observes their

development as a point of comparison to the plants grown from the seeds developed in Spain.  *Id*. at 8:26-9:9.  CBC observes such characteristics as the size, appearance, and firmness of the fruit.  *Id*.  After the fruit is harvested for sale to juicers, CBC destroys all of these plants.  *Id*. at 9:6-8.

## IV.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

## V.    ARGUMENT

### A.    There is No Dispute of Genuine Fact that CBC, as Assignee of the Rights of Drs. Shaw and Larson, Has an Ownership Interest in the Core Strawberry Germplasm and Transition Cultivars.

#### 1.    An Inventor Must Expressly Grant His Rights In an Invention if the Employer Is to Obtain Those Rights.

Starting with first principles, the general rule is that "rights in an invention belong to the inventor."  *Roche*, 563 U.S. at 785.  This rule holds true even when the subject matter of the invention was conceived or reduced to practice during the scope of employment.  *United States v.*

1    *Dubilier Condenser Corp.*, 289 U.S. 178, 189 (1933).  Thus, federal courts have consistently

2    "rejected the idea that mere employment is sufficient to vest title to an employee's invention in

3    the employer."  *Roche*, 563 U.S. at 789.

4         It is "equally well established that an inventor can assign his rights in an invention to a

5    third party."  *Roche*, 563 U.S. at 786.  To pass ownership rights from employee to employer,

6    however, "an inventor must expressly grant his rights in an invention to his employer," and this

7    assignment must be "unambiguous."  *Id.* at 786, 787.  In the absence of an agreement to the

8    contrary, the employer has no rights in an invention "'which is the original conception of the

9    employee alone.'"  *Id.* at 786 (citation omitted).

10        Employers do receive some limited rights in employees' inventions, however.  When an

11   employee uses his employer's resources to conceive an invention or to reduce it to practice, the

12   employee must afford his employer a non-exclusive, royalty-free, nontransferable license to make

13   use of the invention– a so-called "shop right."  *Dubilier*, 289 U.S. at 188–89.  This shop right is

14   not an ownership interest in the invention; it simply permits the employer to defeat a charge of

15   patent infringement by the employee or his assignee.  8-22 Chisum on Patents § 22.03[3] (2016).

16              **2.        California Labor Code Section 2860 Does Not Revoke an
                            Employee's Right to His Invention In the Absence of a Written
17                          Agreement.**

18        Because mere employment does not vest title to Drs. Shaw and Larson's inventions in the

19   University, the University must identify some law or contract that unambiguously divests the

20   professors of their rights in inventions.  *See Roche*, 563 U.S. at 787. ████████████████

21   ██████████████████████████████████████████████████████████████████████████████████

22   ██████████

23        The University maintains that, even in the absence of an express assignment, the

24   University owns all of the right, title, and interest in the inventions of Professors Shaw and

25   Larson by virtue of section 2860.  Ex. R at 1-2; ████████████████████  This position

26   represents an unprecedented interpretation of the statute.  *See Gen. Elec. Co. v. Wilkins*, No. CV F

27   10-0674 LJO JLT, 2012 WL 3778865, at *11 (E.D. Cal. Aug. 31, 2012) ("Section 2860 has never

28   been applied to revoke an employee's right to his invention in the absence of a written

1    agreement…").

2         In relevant part, section 2860 provides that "[e]verything which an employee acquires by

3    virtue of his employment, except the compensation which is due to him from his employer,

4    belongs to the employer…."  Cal. Lab. Code § 2860.  This statute "'applies to a limited class of

5    cases, primarily involving the exploitation of an employer's confidential information or trade

6    secrets by a former employee to the employer's detriment.'"  *NetApp, Inc. v. Nimble Storage,*

7    *Inc.*, No. 5:13-CV-05058-LHK (HRL), 2015 WL 400251, at *17 (N.D. Cal. Jan. 29, 2015)

8    (quoting *Lugosi v. Univ. Pictures*, 25 Cal. 3d 813, 853 (1979) (Bird, C.J., dissenting)).  It has

9    been found to apply, for example, where an ex-employee misappropriates his employer's

10   customer lists and wrongfully solicits the employer's customers.  *S. Cal. Disinfecting Co. v.*

11   *Lomkin*, 183 Cal.App.2d 431, 444 (1960).

12        Based on the plain text of the statute, however, courts have refused to interpret section

13   2860, as the University does here, to divest employees of their own inventions.  For example, in

14   *Williams v. Weisser*, 273 Cal.App.2d 726 (1969), the defendant argued that under section 2860,

15   the University of California owned a professor's lectures.  In rejecting that contention, the court

16   observed that "[t]he code speaks of things which the employee 'acquires,' not matters which he

17   creates."  *Id.* at 734.  Accordingly, the statute has been "narrowly employed," principally "to

18   unfair competition carried on by former employees with the use of trade secrets and the like."  *Id.*

19   at 733-34.  Because the University could not "prescribe" the professor's "way of expressing the

20   ideas he puts before his students," the University did not own the professor's lecture notes.  *Id.* at

21   734.

22        Numerous other California cases are in accord.  Section 2860 simply "does not grant [the

23   employer] a general property right for non-confidential, non-trade secret employee work

24   product."  *NetApp*, 2015 WL 400251, at *17; *see also Wilkins*, 2012 WL 3778865, at *12 ("this

25   Court has not found any California cases that have interpreted Section 2860 to include a duty to

26   assign invention rights from an employee to an employer"); *KGB, Inc. v. Giannoulas*, 104

27   Cal.App.3d 844, 855 (1980) (section 2680 applies to protect employee misappropriation of trade

28   secrets and confidential information, not "creations"); *Premier Displays & Exhibits v. Cogswell*,

- 11 -

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

No. SACV 09-354 JVS (ANX), 2009 WL 8623588, at *6 (C.D. Cal. Dec. 23, 2009) ("The plain language of the statute applies only to things an employee 'acquires' by virtue of employment, not to things 'created' by an employee.").

The legislative history of section 2860 buttresses the conclusion that the statute does not automatically divest employees of their rights to an invention.  In 1979, the California legislature enacted new legislation addressing employer-employee agreements regarding inventions in the workplace.  *See* Cal. Lab. Code §§ 2870-72.  Although section 2860 had existed for over forty years, the California Legislature stated that "[t]he existing law ... contains no provisions relating to the right to ownership of an invention made by an employee." A.B. 474, 1979–80 Reg. Sess. (Goggin) (introduced Feb. 5, 1979, last amended Sept. 4, 1979), *quoted in Wilkins*, 2012 WL 3778865, at *12.  The University's contention that section 2860 regulates ownership of employee inventions thus runs head first into the Legislature's own understanding of its statutory framework.

In recent years, at least two federal district courts have expanded the reach of section 2860, holding that the statute is coextensive with the common law "hired to invent" doctrine.  *See Wilkins*, 2012 WL 3778865, at *13; *Peregrine Semiconductor Corp. v. RF Micro Devices, Inc.*, No. 3:12-CV-0911-H (WMC), 2014 WL 67509, at *2 n.2 (S.D. Cal. Jan. 8, 2014).  But even this interpretation, untethered from the plain language of section 2860, does not aid the University.

The hired-to-invent doctrine holds that, although an individual will typically own the exclusive rights to his own inventions, an employer will own an employee's patentable invention if the employee was "hired to invent ... or solve a particular problem" and produced the invention in the course of the employment relationship.  *Banks v. Unisys Corp.*, 228 F.3d 1357, 1359 (Fed. Cir. 2000).  "If the scope of an employee's work is narrowly directed by the employer towards the resolution of a specific problem, then the employee is obligated to assign to his employer any patents resulting from the work."  *Peregrine*, 2014 WL 67509, at *3 (citing *Banner Metals, Inc. v. Lockwood*, 178 Cal.App.2d 643, 658 (1960)).  "On the other hand, if the scope of an employee's work is generalized within a field, a Court will not presume an employee's duty to assign his employer patents, absent a contract."  *Peregrine*, 2014 WL 67509, at *3.

A California state court has already ruled that "Shaw was not employed by the Regents to invent," and that ruling has preclusive effect here.  Ex. Z ¶ 3.  Under the Full Faith and Credit Act, federal courts must give preclusive effect to state-court decisions.  *Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir. 1988).  In determining the preclusive effect of a state court judgment, federal courts follow the state's rules of preclusion.  *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482 (1982).  The state court's earlier ruling has preclusive effect here because all six criteria of California's issue-preclusion doctrine are satisfied.  *See Lucido v. Superior Court*, 51 Cal.3d 335, 341 (1990).

*First,* the factual issue at stake in the two proceedings—whether The Regents hired Dr. Shaw to invent—is identical.  *See Hernandez v. City of Pomona*, 46 Cal.4th 501, 512 (2009).

*Second*, the issue was actually litigated in the prior proceeding.  Dr. Shaw sued the University for unilaterally amending its Patent Policy governing patent royalties.  In moving for summary judgment on his claim, Dr. Shaw actually litigated the issue that, because he was not "hired to invent," the University's rights to his inventions, if any, were "only pursuant to contract."  Ex. AA at 15-16.

*Third*, the superior court's ruling that Dr. Shaw was not hired to invent was "necessarily decided."  Dr. Shaw was obligated to prove that he was not "hired to invent"—and thus that the University's only rights to patent royalties, if any, were those it acquired under the Patent Agreement—to sustain his ultimate position that the University could not unilaterally alter the governing royalty distribution rate.  *Id*.

*Fourth*, the superior court's summary judgment ruling was final and on the merits.  *See Robi*, 838 F.2d at 327.

*Fifth*, the party against whom preclusion is sought—The Regents of the University of California—is the same party to the former proceeding.

*Sixth*, adhering to the Superior Court's final ruling promotes the integrity of the judicial system (by eliminating the risk of inconsistent judgments) and promotes judicial economy (by minimizing repetitive litigation).  *See Castillo v. City of Los Angeles*, 92 Cal.App.4th 477, 483 (2001).

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

1    But even aside from the preclusive effect of the prior ruling, there is no genuine dispute

2  that Drs. Shaw and Larson were not "hired to invent."  In general, "[t]he nature of the university-

3  professor relationship is different from the ordinary employer-employee relationship."  Sandip H.

4  Patel, *Graduate Students' Ownership and Attribution Rights in Intellectual Property*, 71 IND. L.J.

5  481, 499 (1996).  "Since professors are usually hired to teach and do general research in areas

6  substantially of their own choosing, not to create particular products, they have not been 'hired to

7  invent.'"  Sunil R. Kulkarni, *All Professors Create Equally: Why Faculty Should Have Complete*

8  *Control over the Intellectual Property Rights in Their Creations*, 47 HASTINGS L.J. 221, 232

9  (1995).  That general understanding applies with full force here.  According to the University's

10  own policies, "the primary purpose of University research is *not* commercially applicable

11  discoveries and inventions." Ex. BB at 8.  Thus, Drs. Shaw and Larson were expected to teach, to

12  publish, to attend conferences, and to research–but not simply to invent new strawberry

13  genotypes.[3]  █████████████

### 3.    The Patent Agreement Signed by Doug Shaw and Kirk Larson Does Not Assign All Inventions to the University.

16    The University has also taken the position that under the Patent Agreement signed by Drs.

17  Shaw and Larson upon employment,████████████████████████████████

18  This contention is also misguided, for two reasons.  First, the Patent Agreement does not vest

19  legal title to the professors' inventions at all because it is merely a promise to assign in the future.

20  Second, the Patent Agreement is, on its face, limited to "possibly patentable" plants—not *all*

21  professor inventions.

### (a)    The Patent Agreement is an Agreement to Assign, Not a Present Assignment.

23    The Patent Agreement signed by Drs. Shaw and Larson is an agreement to assign, not a

24  present assignment of rights.  The distinction is material.  The question whether contractual

---

[3] Even when the University hired a replacement for Drs. Shaw and Larson, it did not seek
to narrowly direct the employee towards the resolution of a specific problem. ████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

language effects a present assignment of intellectual property rights is resolved by Federal Circuit law.  *See DDB Techs., LLC v. MLB Advanced Media, LP*, 517 F.3d 1284, 1290 (Fed. Cir. 2008).  The Federal Circuit has repeatedly held "that the contract language 'agree to assign' reflects a mere promise to assign rights in the future, not an immediate transfer of expectant interests."  *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841 (Fed. Cir. 2009); *see also IpVenture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324, 1327 (Fed. Cir. 2007) (interpreting "agree to assign" as "an agreement to assign," requiring a subsequent written instrument); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580–81 (Fed. Cir. 1991) (holding that "will be assigned" does not create "a present assignment of an expectant interest").  An agreement to assign in the future inventions not yet developed "may vest the promisee with *equitable* rights in those inventions once made," but does not "by itself vest *legal* title to patents on the inventions in the promisee."  *Arachnid*, 939 F.3d at 1581 (emphasis in original).

Here, Drs. Shaw and Larson agreed they "shall … assign to University all rights, title and interest" in possibly patentable inventions.  Ex. D at 2; Ex. G at 2.  Courts interpreting this precise University language have held that "UC does not hold 'present *legal* title'" because the language in the agreement is "promissory."  *Nomadix, Inc. v. Hewlett-Packard Co.*, No. CV 09-08441 DDP (VBKx), 2012 WL 1577436, at *2 (C.D. Cal. May 7, 2012) (emphasis in original).

The upshot of all this is that the University "did not immediately gain title to" the professors' inventions as a result of the Patent Agreement, "nor at the time the inventions were created."  *Roche*, 583 F.3d 841–42.  This becomes even clearer by comparison to Drs. Shaw and Larson's assignments of their interests to CBC:  They effected a *present* assignment, stating they "hereby assign" to CBC all property, right, title in and to all germplasm not reduced to patent. Ex. FF § 2, Schedule 1; *see also Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1570, 1573 (Fed. Cir. 1991) ("agrees to grant and does hereby grant"); *Roche*, 583 F.3d at 842 ("I will assign and do hereby assign"); *DDB Techs.*, 517 F.3d at 1290 ("agrees to and does hereby grant and assign").

In the wake of *Roche*, the University recognized that its Patent Agreement language did not vest legal title in the University.  Accordingly, the University amended its Patent Agreement

by adding a present promise to assign to "[e]nsure[] that your IP obligations to UC come first-in-time and are controlling over outside agreement(s) that you enter into."  Ex. GG at 13; *see also* Ex. HH.  Neither Dr. Shaw nor Dr. Larson ever signed the amended Patent Agreement.  *See, e.g.* ECF 104 ¶ 45 (acknowledging that the controlling patent agreements between the University and Drs. Shaw and Larson are those originally signed by them in 1986 and 1991 and attached to CBC's complaint).

> **(b)     The Contractual Assignment is Limited to Possibly Patentable Inventions.**

But, even if the University were correct that the Patent Agreement effected a present assignment of the professors' intellectual property rights, its contention that the Patent Agreement governs "everything"—*i.e.*, all inventions—contravenes the contract's unambiguous language.

Under California law, "[i]f the contractual language is clear and explicit, it governs." *FiTeq Inc v. Venture Corp.*, 169 F. Supp. 3d 948, 956 (N.D. Cal. 2016) (quotation marks and citation omitted).  And while the circumstances surrounding and leading to the execution of a contract may be considered to ascertain its true meaning, "these circumstances cannot be considered for the purpose of creating undertakings contrary to the specific terms of the writing." *Kashmiri v. Regents of Univ. of California*, 156 Cal.App.4th 809, 838 (2007) (quotation marks and citation omitted).

The plain language of the professors' Patent Agreements provides that "every possibly patentable …invention" shall be examined by the University and, in the event the University deems the invention patentable, the employee shall execute documents and do all things necessary to assign rights to the University.  Ex D at 2; Ex. G at 2.  The contract does not provide the University with rights to *all* inventions; indeed, it expressly defines covered "invention" to mean "*possibly patentable* device, process, plant, or product."  This agreed-upon definition must be respected.  *See Morrison v. Wilson*, 30 Cal. 344, 347–48 (Cal. 1866) (parties may define the words which they will use in the contract).  As explained below in Part IV.E, there is no triable issue that the Transition Cultivars and the CSG, after the United States Patent and Trademark Office's rejection and the UC's breeders sworn testimony, are "possibly patentable." Ex. II at 3.

4.    **The University's Policies Do Not Assign All Employee Inventions to the University.**

To support its allegation that the University is the sole and rightful owner of rights in the Core Strawberry Germplasm and Transition Cultivars, the University is thus left to invoke a smattering of University policies issued by various branches of the institution over the last forty years.  The University's attempt to divine an automatic assignment of inventions from these policies—policies issued by different entities at different times to address different subject matters—is misguided.  Several University policies support the professors' position, making clear, for example, ███████████████████████████████████████████████████████ ████████████████████████████████████████████  The University, however, has cherry-picked several other policies to support its claim of ownership, including the 1982 Interim Guidelines on University Industry Relations, the Faculty Handbook, Academic Personnel Manual ("APM") Section 020, and Division of Agriculture and Natural Resources Administrative Handbook Section 485.  Ex. R; ███████████  None amounts to an unambiguous, automatic assignment of rights.

(a)    **The 1982 Interim Guidelines on University Industry Relations**

The University maintains it has ownership rights over the CSG and Transition Cultivars under its 1982 Interim Guidelines on University Industry Relations.  Ex. R; Ex. KK at 2.  The University, however, never produced a copy of the 1982 Interim Guidelines in discovery.  Presumably, that is because the *interim* guidelines upon which the University relies were superseded by the May 1989 Guidelines on University-Industry Relations.  *See* Ex. BB at 1. ████████████████████████████████████████████████████████████ ██████████████████████████████████████████

The 1989 Guidelines, however, do not assist the University.  If anything, the Guidelines confirm—consistent with the language of the Professors' Patent Agreements—that professors are expected to disclose, and ultimately assign, only "potentially patentable inventions." Ex. BB at 8.  The policy contains a Guideline (#10) governing "tangible research products," which "include a wide range of tangible property resulting from the conduct of research, as distinct from

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

1  copyrightable expressions and patentable inventions." *Id.* at 10-11.  That Guideline provides that

2  "<u>The University will permit the licensing of tangible research products as long as no</u>

3  <u>inappropriate restrictions are placed on publication or dissemination of research results and</u>

4  <u>materials."</u> *Id.* (emphasis in original).  But the Guideline does not purport, and certainly not in

5  anything resembling clear and unambiguous language, to deprive inventors of their ownership

6  rights in inventions.  At best, the Guidelines provide that the University—and the researchers—

7  have the right to approve, or disapprove, of the licensing of tangible research products.  *Id.*  But

8  CBC and Drs. Shaw and Larson have never disputed certain shared rights in the CSG and

9  Transition Cultivars.  The point is that the University's right to approve *licensing* over tangible

10  research products does not transfer *ownership* of tangible research products from the inventor to

11  the University.

12  **(b)  Faculty Handbook**

13  Next, the University claims Drs. Shaw and Larson's ownership in the CSG and Transition

14  Cultivars has been divested by the University's 1995 Faculty Handbook, which provides that

15  tangible research products "such as cell lines, plasmids, technical schematics, and physical

16  models are … governed by University policy" and that "[o]wnership is generally with the

17  University."  *See* ECF No. 2-4 at 38; Ex. R at 2-3▮▮▮▮▮▮▮▮▮  The Faculty Handbook

18  instructs readers to "consult the systemwide Office of Technology transfer" for further

19  information.  ECF No. 2-4 at 38.

20  To begin, the "Handbook itself suggests that it is a 'guide' rather than an enforceable legal

21  document."  *Univ. Patents, Inc. v. Kligman*, 762 F. Supp. 1212, 1224 (E.D. Pa. 1991).  Thus, the

22  Handbook begins by stating that it "does not replace the underlying written policies of the

23  University" and is intended to provide "summary information as well as a guide to where official

24  policies and more detailed information can be found."  Ex. LL.

25  Moreover, it is worthwhile to compare the language used in the University's Faculty

26  Handbook against the title allocation statutes enacted by Congress, which are limited to narrow

27  areas of exceptional national interests (such as national security, atomic energy, and space

28  exploration), and which include unambiguous language stating the invention shall be transferred

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

1  from the inventor and giving special provisions for how the USPTO should process any

2  application claiming an invention in the field of technology.  These title allocation statutes

3  provide, for example, that "[a]ny invention … shall be vested in, and be the property of" the

4  Atomic Energy Commission, 42 U.S.C. § 2182, and that an "invention shall be the exclusive

5  property of the United States," 42 U.S.C. § 2457(a) (2009) (repealed).  As in *Roche*, such

6  unambiguous language "is notably absent" from the Faculty Handbook.  563 U.S. at 787.

7      There is a country mile between the type of language used in §§ 2182 and former 2457(a),

8  which "show a clear and unmistakable intent to transfer ownership," *Kligman*, 762 F. Supp. at

9  1219, and the Faculty Handbook's assertion that ownership of tangible research products is

10 *generally* (but not exclusively) with the University under University policy.  Given courts'

11 traditional hostility to the use of "handbooks to effect the transfer of [intellectual property]

12 rights," *id.* at 1224 n.14, the University cannot divest ownership of the strawberry germplasm in

13 the absence of a University policy that itself specifically transfers ownership from the inventor to

14 the University.

15                    **(c)      Academic Personnel Manual Section 020**

16      The University also asserts sole and exclusive ownership over the germplasm based on its

17 1958 Policy governing "Special Services to Individuals and Organizations."  *See* ▮▮▮ Ex. R

18 at 3; ▮▮▮▮▮▮.  According to the University, this policy (known as APM 020) leads

19 to the conclusion that ▮▮▮▮▮▮▮▮.

20      APM 020, however, says nothing of the sort.  ▮▮▮▮▮

21 ▮▮▮▮▮▮ it does not purport to establish rules

22 governing ownership of inventions.  ▮▮▮▮▮

23 ▮▮▮▮▮

24 ▮▮▮▮▮

25 ▮▮▮▮▮

26 ▮▮▮▮▮

27 ▮▮▮▮▮

28      On its face, APM 020 does not inform the circumstances here.  The CSG and Transition

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

Cultivars were not invented pursuant to a sponsored research project. And neither CBC nor the professors dispute the University's ownership over patented germplasm. The question here is whether, as the University maintains, the professors were divested of *all* ownership rights, including rights to inventions that are not possibly patentable. APM 020 simply does not speak to that issue.

(d)    **Division of Agriculture & Natural Resources Administrative Handbook Section 485**

The University also traces its purported ownership rights to the 2007 version of ANR 485, entitled "Commercial Release of Protected Plant Materials." ███████████████; Ex. OO. Once again, however, clear and unambiguous language divesting the professors of their ownership rights is nowhere to be found.

████████████████████████████████████████████ ████████████████████████████████████████ Notably, that 1991 version includes language demonstrably at odds with the University's current position. In particular, ANR 485 provided that ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ It is anomalous, to say the least, that ████████████████████████████████████████████ ████████████████ if, as the University now contends, all intellectual property rights were divested to the University upon conception.

The University has no explanation for this anomaly, ████████████████████████████ ████████████████████████████████████████████.

But the 2007 amendment did not divest the inventors of their non-patentable inventions, nor could

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

it as a matter of law.  "[T]he unilateral imposition of a new obligation" on a tenured professor, like Dr. Shaw, is not enforceable without additional consideration.  *Kligman*, 762 F. Supp. at 1227.  None was given here in exchange for the 2007 amendment.  Moreover, the University did not provide the professors with reasonable notice of the 2007 amendment or that it claimed to divest the professors of ownership.  To the contrary, as late as June 2014, the Chair of the Department of Plant Sciences, Chris van Kessel, informed Professor Shaw that the prior language remained in effect and that "it will be up to the breeders to decide if they wish to proceed with a public release of the germplasm."  Ex. QQ at 1; ████████████████ .  ████████████████
████████████████████████████████████████████

In any event, nothing in the amended version affirmatively divests the inventors of their ownership rights.  To the contrary, the revised language provides that responsibility for the final authority "for the commercial release of ***protected*** plant materials" is delegated to the Dean of each breeders' campus. Ex. OO at 1 (emphasis added).  Context makes clear that ANR 485 is addressed to possibly patentable inventions (not *all* inventions), as it addresses the breeders' disclosure of material – a disclosure that, under the Patent Agreement, is limited to possibly patentable plants.  *Id.*  Nothing in ANR 485 clearly and unambiguously transfers ownership over non-possibly patentable inventions to the University.  At most, ANR 485 bestows on the University a *shared* right to determine whether to seek patent protection or license plant materials.

### 5. There Is No Evidence the Core Strawberry Germplasm or Transition Cultivars Are Possibly Patentable.

For the reasons just explained, the only valid source of ownership to the University is the breeders' promise to assign possibly patentable plants in the future.  There is no genuine dispute of fact, however, that neither the CSG nor the Transition Cultivars are, at this time, possibly patentable.

#### (a) Core Strawberry Germplasm

On November 25, 2013, shortly before his retirement, Dr. Shaw sent an email to the Chair of Davis' Department of Plant Sciences, which identified 168 genotypes in the strawberry

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

germplasm with "considerable commercial potential" – the so-called CSG.  Ex. N at 1.  Dr. Shaw did not disclose any of the CSG genotypes in a Record of Invention Form, which is the typical method for disclosing a possibly patentable invention (Ex. RR at 11), ████████████████

████████████████████████████████████████████████████████

The Department of Plant Sciences Cultivar Release Committee recommended that the CSG genotypes be publicly released under contractual license arrangements.  Ex. SS at 2.  The Dean of the College of Agricultural and Environmental Sciences rejected that recommendation, however, concluding that "[p]lant patents provide the best possible protection of UC plant intellectual property."  Ex. TT.  Accordingly, the University elected to file one consolidated plant patent application on the 168 CSG genotypes with the USPTO.[4]

Notwithstanding the actions of University administration, witnesses from both parties agree that, at present, the CSG is not possibly patentable under the Plant Patent Act.  To obtain a plant patent, the applicant must demonstrate, among other things, that the plant differs from known, related plants by at least one distinguishing characteristic, which is more than a difference caused by growing conditions or fertility levels.  *See* 35 U.S.C. § 101; Ex. I at 5-6.  As Dr. Shaw explained to the University, the information provided on the University's CSG patent application "can't possibly fulfil [sic] the usual plant patent requirement for demonstration of uniqueness, and the information necessary to support individual plant patent applications simply does not exist for almost all these genotypes."  Ex. UU at 2.

Notably, the University's replacement for Drs. Shaw and Larson—Dr. Steven Knapp—is in full agreement.  ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

---

[4] To put the University's conduct in perspective, Dr. Shaw prepared only 23 patent descriptions in his 28 year tenure at the University. Ex. UU at 2.

1 ████████████████████████████████████████████████████

2 ██████████████████████████████████████████

3        The USPTO rejected the University's CSG patent application on October 13, 2016.  Ex.

4 II.  The PTO noted that because plant patents "are restricted to one plant and therefor one

5 invention," it was improper for the University to claim 168 different genotypes in one application.

6 *Id.* at 3.  This is precisely what Dr. Shaw told the University more than a year earlier in

7 explaining his decision not to assign the CSG to the University.  Ex. UU at 2 (noting that the

8 approach of filing one plant patent for all 168 genotypes "seems on its face highly inappropriate

9 for the usual usage of the plant patent process, and a procedure inappropriate to the original

10 objectives of our disclosure.  I have never seen anything like this, and can't imagine that the

11 patent office will proceed with this request").

12        In effect, the University's claim of ownership over the CSG boils down to the position

13 that because it filed a patent application, the CSG must be possibly patentable.  But that position

14 would improperly convert the meaning of the contractual term "possibly patentable" to a

15 subjective test.  *Securitas Sec. Servs. USA, Inc. v. Superior Court of San Diego Cty.*, 234

16 Cal.App.4th 1109, 1125 (2015) ("The parties' expressed objective intent, not their unexpressed

17 subjective intent, governs.").  At the least, when both Dr. Shaw and both Dr. Knapp agree that the

18 genotypes contained within the CSG are not presently patentable, that shared agreement ought to

19 end the matter.

20                              **(b)     Transition Cultivars**

21        The Transition Cultivars—*i.e.*, all unpatented cultivars other than the CSG conceived by

22 Drs. Shaw and Larson since 2004—are likewise not possibly patentable at present, and may never

23 be.  *See* ECF No. 104 ¶ 19.  ███████████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████

26 ███████████████████████████████████████████████

27 ██████████████████████████████████████

28        It is not sufficient for the University to contend that *anything* is "possibly" patentable

1    because nothing is impossible.  The conduct of the parties operating under the Patent Agreement

2    belies such a boundless interpretation.  *See Cedars-Sinai Med. Ctr. v. Shewry*, 137 Cal.App.4th

3    964, 983 (2006) ("A party's conduct subsequent to the formation of a contract may be looked

4    upon to determine the meaning of disputed contractual terms.").  During the term of the Patent

5    Agreement, the University only sought to patent inventions disclosed by Drs. Shaw and Larson

6    that, in the professors' sound judgment and based on their scientific results, were possibly

7    patentable.  Ex. L. ████████████████████████

8    ███████████████████████████████████████████████

9    ███████████████████████████████████████████████

10   ██ █████████████████████████████████████████

11   ████████████████████████████████████████████

12   ██████████████████ ████████████████████████████

13   ████████████████████████████████████████████

14   ██████████████████████████████████████

15   █████████████████████ ███████████████████████

16   ███████████████████████████████████████████████

17       In sum, the University does not own the Core Strawberry Germplasm and Transition

18   Cultivars, and this Court should grant summary judgment to that effect.

         **B.      There Is No Genuine Dispute of Fact That CBC Did Not Infringe the
19                 University's Plant Patents.**

20       Nor did the professors and CBC infringe the University's patented varieties.  Certain

21   patented varieties of strawberries were invented by Drs. Shaw and Larson, who assigned their

22   rights to the University.  The University asserts infringement of twelve of those patented varieties

23   against two aspects of CBC's conduct.  *First*, the University complains of conduct involving or

24   initiated by foreign entities overseas, leading to the importation into the United States of

25   strawberry seeds, which CBC grows into new varieties of strawberry plants.  In particular, the

26   University alleges that CBC sends University-patented plants to Spain and directs the crossing of

27   those plants in Spain, and it also alleges that CBC imports the seeds from the resulting crosses

28

into the United States.  ECF No. 104 ¶¶ 22-24.  *Second*, the University complains of conduct involving patented plants purchased by CBC from a licensee in California.  *Id.* ¶¶ 20-21, 23.  According to the University, these actions constitute infringement.  Neither does.  Accordingly, as shown below, the Court should grant summary judgment of noninfringement as a matter of law.

### 1.      The Plant Patent Act.

We begin with the Plant Patent Act, the statute that governs all of the University's patents asserted in this case.  That statute itself precludes infringement under the undisputed or presumed facts.  The accused conduct simply is not within the scope of the PPA.

Originally passed in 1930, the PPA was incorporated into the 1952 Patent Act as 35 U.S.C. §§ 161-164.  Importantly for purposes of this case, the PPA is concerned with "asexual reproduction," *i.e.*, cloning, of plants:

> Whoever invents or discovers *and asexually reproduces* any distinct and new variety of plant, including cultivated sports, mutants, hybrids, and newly found seedlings, other than a tuber propagated plant or a plant found in an uncultivated state, may obtain a patent therefore, subject to the conditions and requirements of this title.

35 U.S.C. § 161 (emphasis added).  Accordingly, the scope of a patentee's rights under the PPA relates solely to asexual reproduction:

> In the case of a plant patent, the grant shall include *the right to exclude others from asexually reproducing the plant*, and from using, offering for sale, or selling the plant so reproduced, or any of its parts, throughout the United States, or from importing the plant so reproduced, or any parts thereof, into the United States.

35 U.S.C. § 163 (emphasis added).  The Plant Variety Protection Act of 1970, which is not at issue here, separately provides protection for *sexually reproduced* plants, *i.e.*, propagation by seeds.  7 U.S.C. §§ 2321-2582.

### 2.      The Spanish Chain of Conduct Cannot Support Infringement.

#### (a)      Seeds Are Not Covered by the PPA.

With respect to the chain of conduct involving International Semillas in Spain, a principal

1   theory of the University is premised on seeds—*i.e.*, the use or importation of seeds that CBC

2   grows in California to develop new, undisputedly non-infringing varieties of strawberry plants.

3   ECF No. 104 ¶¶ 23-24.  While there are disputed issues of material fact that would preclude

4   summary judgment in the University's favor on its theory, such as who "uses" or "imports" the

5   seeds, even assuming the University's version of the facts, this theory fails as a matter of law for

6   a fundamental reason:  The PPA does not reach seeds (or seed coats).

7        The PPA is concerned solely with *asexual* reproduction, *i.e.*, cloning, which is the

8   opposite of reproduction by seed, *i.e.*, *sexual* reproduction.  This is apparent from the text of the

9   statute, which provides the patent holder "the right to exclude *others* from *asexually reproducing*

10  the plant, and from using, offering for sale, or selling the plant *so reproduced*, or any of its parts,

11  throughout the United States, or from importing the plant *so reproduced*, or any parts thereof, into

12  the United States." 35 U.S.C. § 163 (emphases added).  Seeds are the result of sexual

13  reproduction (*i.e.*, pollinating a flower), such that the seed is the product of genetic material from

14  male and female plant parts, and is not an asexually reproduced clone of either parent plant.

15  ███████████████████████████████████████████████████████████

16  ███████████  A longstanding treatise confirms that the PPA does not reach propagation by

17  seeds:  "Given the language of Section 163, one does not infringe by sexually reproducing the

18  patented plant (that is, reproducing by seeds)."  8-24 Chisum on Patents § 24.02 (2016).  Thus,

19  the exclusionary scope of a PPA patent does not extend to the seed, which is produced through

20  sexual, not asexual, means and grows a new plant genetically unique from the parent plants.

21       The legislative history confirms that the PPA does not reach propagation by seed and thus

22  not the seed itself.  When Congress first proposed the PPA, it made clear its aim to provide patent

23  protection to inventors of new varieties of plants "to *propagate* that plant by *asexual*

24  reproduction." S.Rep. 71-315 at 1 (1930) (emphases added).  Indeed, the Senate Report expressly

25  noted that the PPA "does not give any patent protection to the right of propagation of the new

26  variety *by seed*, irrespective of the degree to which the seedling come true to type."  *Id.* at 1

27  (emphasis added).  As the Senate Report further explained, even if the seedling is similar to a

28  patented parent plant, the seedling "would not preserve the character of the individual," since it

was developed from a seed with genetic material unique from either parent plant.  *See id.* at 3; *see also id.* ("All such plants must be *asexually* reproduced in order to have their identity preserved." (emphasis added)).

Likewise, the Senate Report explained that an inventive "hybrid"—the "new and distinct variety [that] results from seedlings of cross-pollenization of two species, two varieties, or a species and a variety"—is itself patentable, even if one of the species or varieties that produces it is itself patented.  *Id.*  The seeds (and seed coats) produced in Spain are seeds of a hybrid, not clones of the parents; they are the result of sexual reproduction via cross pollenization of two varieties.  Ex. T at 12, 23.  Thus, the seeds themselves are so distinct that they may be the subject of a new patent as hybrids; they are not, and cannot be, covered by any original patent from either of the parent plants.

In one of the few cases addressing the PPA, the Federal Circuit emphasized that, "for purposes of plant patent infringement, the patentee must prove that the alleged infringing plant is an asexual reproduction," meaning a clone, *i.e.*, an "asexual reproduction of the plant claimed." *Imazio Nursery, Inc. v. Dania Greenhouses*, 69 F.3d 1560, 1569-70 (Fed. Cir. 1995).[5]  "Due to the asexual reproduction prerequisite, plant patents cover a single plant and its asexually reproduced *progeny*."  *Id.* (emphasis added); *see also Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1380 (5th Cir. 1976) (Asexual reproduction "has been described as the 'very essence' of the patent" and "the heart of the present plant patent system.").  A seed, with unique genetic material and the result of sexual reproduction, is not "asexually reproduced progeny" of the patented plant.  Indeed, the University's contrary theory would render the statute's focus on asexual reproduction meaningless, the bounds of a PPA patent endless, and stifle creation of something new from the genetically unique seeds—all contrary to the interest in promoting invention.  *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480-81 (1974).

---

[5] *See also* Chengfei Ding, *The Protection for New Plant Varieties of American Businesses in China After China Enters the WTO*, 6 DRAKE J. AGRIC. L. 333, 343 (2001) ("One problem with the *PPA is that it only protects asexually reproduced plants and not the seeds that are produced sexually*.  Congress solved this problem in 1970 by passing the Plant Variety Protection Act." (emphasis added and footnotes omitted)).

1    The University ████████ rely on the statute's inclusion of "plant parts."  ECF No. 104

2    ¶¶ 55, 60, 65, 70, 75, 80, 85, 90, 95, 100, 105; ████████.  But the inclusion of that

3    phrase, which was added in the 1998 amendments, did not change the scope of the Act beyond

4    asexual reproduction.  Rather, the legislative history shows that Congress had in mind flowers

5    and fruits, not seeds that produce entirely new varieties of plants:  the phrase "plant parts" was

6    added "to provide patent protection to the sale of *asexually produced* parts of plants (i.e., flowers,

7    fruits) as well as the entire plant."  S.Rep. 105-42 (1997); 144 Cong. Rec. H10260 (daily ed. Oct.

8    9, 1998) (emphasis added).  As the Senate Report noted, parties were evading infringement by

9    taking parts "from illegally reproduced plants," *i.e.*, asexually reproduced plants.  Plant Patent

10   Amendments Acts of 1998, Pub. L. No. 105-289, § 2(a)(3), 112 Stat. 2780.  By importing only

11   the fruit or the flower, *i.e.*, "the commercially profitable part of the plant," S.Rep. 105-42, parties

12   were able to "trade in United States markets to the detriment of plant patent holders," Plant Patent

13   Amendments Act § 2(a)(3); *see also* 144 Cong. Rec. H10260 (daily ed. Oct. 9, 1998)

14   (reproducing statement from the National Association of Plant Patent Owners that the current

15   scheme results in the "los[s of] royalty income due [patent holders] for plant parts taken from

16   plants reproduced asexually without authorization").  Thus, the amendment to include "plant

17   parts," with its focus on the commercially profitable part of the plant, did not alter the scope of

18   the statute's focus on asexual reproduction or somehow redefine the scope of a PPA patent to

19   include sexually produced seeds that are entirely new varieties.[6]  There is no support for reading

20   the 1998 amendments to the PPA to include seeds.

21       For these reasons, seeds (and seed coats) are not covered by the PPA, and cannot be the

22   basis for a claim of infringement under the PPA.

23                     **(b)     The University Cannot Expand the PPA to Plants
                                 Crossed in Spain.**
24
         The other conduct accused in the chain of events involving Spain cannot constitute
25

26   ───────────
     [6] ████████████████████████████████████████████████

27   ████████████████████████████████████████████████ CBC destroys the seed coat because it *inhibits* germination of

28   the seed.  Ex. T at 14:4-5.

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

1   infringement, either.  The University argues (i) that CBC sent University-patented plants to Spain;

2   (ii) that CBC "used" the plants in the United States because it controlled the crossing in Spain and

3   benefitted from the crossing in the United States; and (iii) that CBC supplied substantial

4   components of the University-patented plants abroad to induce the combination of those

5   components in a manner that would constitute infringement if done in the United States.  *See* ECF

6   No. 104 ¶¶ 22-24; ███████████████.  Under any provision of § 271, these theories fail

7   as a matter of law.

8        To start, CBC never sent any University-patented plants to Spain to be crossed; those

9   plants were already available in Spain and the United States patented varieties were in the stream

10  of commerce.  Indeed, the University licenses released varieties pursuant to master license

11  agreements with Eurosemillas, S.A. in Spain, allowing those varieties to be propagated and sold

12  in Spain. ██████████████████  The University lacks any evidence that CBC sent any

13  patented plants to Spain.  That absence of evidence is reason alone that these theories fail as a

14  matter of law.  *See Celotex*, 477 U.S. at 325 ("[T]he burden on the moving party may be

15  discharged by 'showing'—that is, pointing out to the district court—that there is an absence of

16  evidence to support the nonmoving party's case.").

17       Just as importantly, these acts of alleged infringement did not occur in the United States,

18  which means that they are not actionable under the U.S. patent laws.  "[I]t is axiomatic that U.S.

19  patent law does not operate extraterritorially to prohibit infringement abroad." *Power*

20  *Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013);

21  *see also* 35 U.S.C. § 163 (limiting right to exclude to acts done in "the United States"); 35 U.S.C.

22  § 271(a) (limiting definition of infringement to acts done in "the United States").  While certain

23  limited exceptions to that rule exist, none applies here.  Indeed, Congress addressed the very issue

24  of asexual reproduction of patented plants on foreign soil in the 1998 amendments to the PPA, but

25  did not expand the Act's coverage to conduct committed abroad.  Plant Patent Amendments Act §

26  2(a)(3) ("Plant parts produced from plants protected by United States plant patents are being

27  taken from illegally reproduced plants and *traded in United States markets* to the detriment of

28  plant plant holders." (emphasis added)).  Rather, § 163 requires the importation of plant parts

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

1   taken from plants asexually reproduced abroad in order for foreign conduct to serve as the basis

2   of a PPA claim.

3   ████████████████████████████████████████████████████████████████

4   ██████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████

6   ████     That is a misreading of *NTP*.  In *NTP*, the owner of system patents and process patents

7   for enabling mobile users to check email over their wireless network sued the makers of

8   BlackBerry devices for patent infringement.  418 F.3d at 1290.  In holding that the system claims

9   were infringed, even though a component (a relay server) necessary for operating that system was

10  located in Canada, the Federal Circuit relied on the nature of the asserted claims, *i.e.*, "a system

11  comprising multiple distinct components" where the nature of the components permitted "their

12  function and use to be separate from their physical location" in Canada.  *Id.* at 1313.  In reaching

13  that conclusion, the Court made clear that the analysis depends on the type of claim.  *Id.* at 1316

14  (stating the analysis will "differ as the result of differences between different types of claims").

15      A plant patent is fundamentally different from a claim to a system for receiving and

16  sending mobile email.  "A plant patent is granted only on the entire plant."  *Manual of Patent*

17  *Examining Procedure* ("MPEP") § 1605 (Rev. 14, Nov. 1992).  The claim—typically written in

18  the form "The new and distinct variety of plant herein described and illustrated and identified by

19  the characteristics enumerated above"—is to a tangible item.  *NTP*'s ruling, which was reached in

20  the context of the system claims at issue there (multiple components having functions distinct

21  from their physical locations), cannot plausibly be extended to a plant patent encompassing a

22  single object with a single, static physical location indivisible from its function of growing new

23  plants.

24      The University's reliance on 35 U.S.C. § 271(f)(1) fails for the same reason.  ████████

25  ████████     Section 271(f)(1) applies only to patented inventions with "component[s]."  35

26  U.S.C. § 271(f)(1).  CBC cannot infringe the University's patents under that statute; there are no

27  "components" of the singular, indivisible patented plant that could be sent and combined abroad

28  with another component of that same plant.

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

In sum, the University cannot demonstrate infringement under the PPA, based on CBC's alleged involvement in events occurring in Spain or the seeds imported as a result.

### 3. Plants Obtained from California Licensees Cannot Form the Basis of Infringement.

The second type of conduct is likewise a non-starter for the University's infringement claims.  The University argues that CBC is liable for infringement for observing certain University patented plants because (1) CBC's conduct falls outside the scope of the LCN license because CBC is not a "grower[] for fruit production" and (2) CBC's observation of plants purchased from LCN, which the University calls "benchmarking," falls outside an authorized use under the license.  ECF No. 104 ¶¶ 20, 25.  Both arguments fail.

#### (a) The University's Patent Rights to the Plants CBC Grows Have Been Exhausted.

CBC purchased the University-patented plants from LCN, a licensee of the University.  The agreement between the University and LCN included certain use restrictions.  Even assuming those use restrictions are valid, and further assuming that they were communicated to CBC, CBC's compliance with the use restrictions exhausted the University's right to claim infringement for those acts.

"The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item."  *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008).  Under *Quanta*, LCN's license from the University authorized LCN to sell the patented plants, terminating the University's patent rights with respect to those plants.  Even assuming that LCN's sales of the plants to CBC was subject to an authorized use restriction, CBC would not violate that restriction.  The Federal Circuit recently concluded that "a patentee *may* preserve its rights against infringement by establishing restrictions accompanying the sale of the patented article (communicated at the time of sale), including restrictions on the buyer's post-acquisition use."  *Lexmark Int'l, Inc. v. Impression Prod., Inc.*, 816 F.3d 721, 743 (Fed. Cir.) (emphasis in original), *cert. granted*, 137 S. Ct. 546 (2016).  The corollary is that any use, as here, authorized by a license exhausts the patentee's right to assert infringement based on that conduct.  *See id.* at 737, 744; 35 U.S.C. § 271(a) (infringement only occurs when a patented

1    item is made, sold, etc. "without authority").

2           The University entered into a ██████████ Agreement with LCN ████████

3    ████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████

7           Under all relevant definitions, CBC is "a grower[] for fruit production," and thus LCN's

8    sale of plants to CBC was authorized and exhausts the University's rights against CBC.  The

9    License Agreement provides no special definition for "grower" or "fruit production," and so their

10   plain and ordinary meaning is dispositive.  *See* Cal. Civ. Code § 1644 ("The words of a contract

11   are to be understood in their ordinary and popular sense, rather than according to their strict legal

12   meaning; unless used by the parties in a technical sense, or unless a special meaning is given to

13   them by usage, in which case the latter must be followed.").  Merriam-Webster defines "grow" as

14   "to be able to grow in some place or situation," "to develop from a parent source," and "to cause

15   to grow."  Merriam-Webster Online, *available at* https://www.merriam-

16   webster.com/dictionary/grower.  Likewise, California statutory law defines a strawberry "grower"

17   as synonymous with a "producer," meaning "any person who produces or causes to be produced

18   strawberries for market…."  Cal. Food & Agric. Code § 77422.  Under this plain and ordinary

19   meaning, CBC is a "grower for fruit production":  CBC grows strawberries, harvests them, and

20   sells them on the market to be used for juice. Ex. T at 8:26-9:6.  In short, the University's patent

21   rights were exhausted by its sale to LCN, because LCN's further sale to CBC's was authorized by

22   the use restriction in the License Agreement.

23                              **(b)    CBC's Observation of Plants Cannot Constitute**
                                        **Infringement.**
24
25          The only conduct about which the University complains with respect to LCN-licensed

26   plants is CBC's observation of those plants, or "benchmarking."  This is not infringement.  *First*,

27   the University's license agreement with LCN provides no restriction or prohibition against a

28   purchaser's observation of the licensed plants, which is unsurprising since observation is

1    inherently part of growing strawberries for fruit production.  Ex. YY at 249:12–250:11.

2         *Second*, observation does not constitute "use" under the PPA, and cannot form the basis of

3    a cause of action for infringement.  "The inquiry as to what constitutes 'use' of a patented item is

4    highly case-specific."  *Van Well Nursery, Inc. v. Mony Life Ins. Co.*, 362 F. Supp. 2d 1223, 1229

5    (E.D. Wash. 2005).  "Although the common law of patents interprets the word 'use' broadly, the

6    term 'never has been taken 'to its utmost possible scope' of meaning any activity tangentially

7    involving the accused item.'"  *Id.* at 1228.  "[M]erely observing an allegedly infringing device,

8    demonstrating that device, or observing a demonstration of a device, does not constitute 'use' of

9    that device."  *Id.* (rejecting argument that a lender "used" apple trees under PPA).  Other cases

10   interpreting  "use" in the context of plants, whether patented under the PPA or the utility statute,

11   likewise focus on active use, *e.g.*, planting or growing.  *See Monsanto Co. v. David*, 516 F.3d

12   1009, 1014 (Fed. Cir. 2008) ("The gene itself is being used in the planting, an infringing act."

13   (utility patent claims covering gene sequence)); *Monsanto Co. v. Swann*, 308 F. Supp. 2d 937,

14   941 (E.D. Mo. 2003) ("Planting and harvesting seed is a 'use' under section 271(a)." (utility

15   patent claims covering seeds)); *see also Cal. Table Grape Comm'n v. RB Sandrini, Inc.*, No. 1:06-

16   cv-00842-OWW-TAG, 2007 WL 1847631, at *20 (E.D. Cal. June 27, 2007) (opining that cultural

17   practices used to "bring the grapes to harvest" might constitute "use" (PPA patent)).

18        Observation does not fall within that scope.  Another district court within this Circuit

19   carefully considered the meaning of "use" in the patent context and expressly concluded that

20   observation does not constitute use.  *See L.A. Gear, Inc. v. E.S. Originals, Inc.*, 859 F. Supp. 1294

21   (C.D. Cal. 1994).  There, the court found that the licensor did not "use" the allegedly infringing

22   shoe by "unofficially observing and examining samples which were on display in retail stores."

23   *Id.* at 1297.  The court stated:  "As a matter of law, merely observing an allegedly infringing

24   device, demonstrating that device, or observing a demonstration of that device does not constitute

25   a 'use' of that device."  *Id.* at 1298.  Distinguishing prior case law, the court found it important

26   that "any testing or inspection of samples of the accused shoes by Voit was not directed towards

27   adapting the shoes to Voit's business."  *Id.* at 1299.  "Voit's 'experiments' would be directed

28   instead towards evaluating and approving the appearance and quality of construction of the

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

1    accused shoes." *Id.*; *see also NTP*, 418 F.3d at 1317 ("The ordinary meaning of 'use' is to 'put

2    into action or service.'"); *Kaz Mfg. Co. v. Chesebrough-Ponds, Inc.*, 317 F.2d 679, 680-81 (2d Cir.

3    1963) (affirming determination that use of a combination of two patented products "for the

4    purpose of advertising defendant's product was not an infringement of any of plaintiff's

5    patents").[7]

6        Just like the passive, non-infringing observation in *L.A. Gear* where the shoe was not put

7    into action, CBC's observation of plants obtained from LCN, if distinguished from CBC's

8    authorized conduct of putting them into action for fruit production, *see supra*, cannot form the

9    basis of infringement.  CBC's observation of the plants was "superficial" and passive; it was

10   geared "towards evaluating . . . the appearance and quality" and was "not directed towards

11   adapti[ng]" the plants into CBC's business for sale or to garner sales of CBC's plants.  *See L.A.*

12   *Gear*, 859 F. Supp. at 1299.  In short, to the extent CBC's observation is not use authorized by

13   License Agreement, then it is not a type of "use" that may constitute infringement.  *See Van Well*

14   *Nursery*, 362 F. Supp. 2d at 1229; *L.A. Gear*, 859 F. Supp. at 1296.[8]

15

16

17       [7] When interpreting "use" under the patent statute, other courts likewise require more than
     observation or demonstration.  Generally, they require some activity resulting in the culmination
18   of a sale.  *See Intermedics, Inc. v. Ventritex, Inc.*, 775 F. Supp. 1269, 1281, 1285-86 (N.D. Cal.
     1991), *aff'd sub nom. Intermedics, Inc. v. Ventritex Co.*, 991 F.2d 808 (Fed. Cir. 1993) (noting
19   "the use of clinical data, in a prospectus or otherwise, is not an infringing act under § 271(a)," and
     stating that courts "generally required not only demonstration of the accused device, but also
20   some other activity culminating in a sale of that device"); *see also Bird-B-Gone, Inc. v. Bird*
     *Barrier Am., Inc.*, No. SACV1200178AGRNBX, 2013 WL 11730662, at *4 (C.D. Cal. Mar. 20,
21   2013) (citing cases for the proposition "that merely displaying a product at a trade show, without
     more, does not rise to the level of an actual offer for sale"); *QR Spex, Inc. v. Motorola, Inc.*, 507 F.
22   Supp. 2d 650, 659 (E.D. Tex. 2007) (finding no jurisdiction for an infringing use claim where the
     defendant sent samples for demonstrative purposes and "there [wa]s no evidence that the
23   engineering samples were used to garner the interest of any customers"); *Med. Sols., Inc. v. C*
     *Change Surgical LLC*, 468 F. Supp. 2d 130, 132, 134 (D.D.C. 2006), *aff'd*, 541 F.3d 1136 (Fed.
24   Cir. 2008) (finding no jurisdiction for an infringing use claim where the defendant demonstrated
     the product but "did not make sales, negotiate sales or take orders at the meeting").
25

26       [8] This conclusion aligns with the PPA's focus on protecting the asexual reproduction of
27   patented plants.  *See* S.Rep. 71-315 at 1 (1930).  It is also consistent with industry practice.  *See*
     ECF No. 104 ¶ 23 ("[I]t is routine in the industry to benchmark a parent variety's performance
28   against that of its children."); *see also* ████████████████

CBC, Shaw, and Larson MSJ
3:16-cv-02477-VC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.  **CONCLUSION**

For these reasons, California Berry Cultivars, LLC, Douglas Shaw, and Kirk Larson's motion for summary judgment should be granted as to ownership and noninfringement.

Dated: January 30, 2017

Respectfully submitted,

Jones Day

By: */s Nathaniel P. Garrett*
    Nathaniel P. Garrett

Counsel for Plaintiff and Cross-Defendant CALIFORNIA BERRY CULTIVARS, LLC and Cross-Defendants DOUGLAS SHAW AND KIRK LARSON