# EXHIBIT C

1  MARVIN B. STARR (Bar No. 29058)
   LYNNE M. YERKES (Bar No. 100496)
2  MILLER, STARR & REGALIA
   A Professional Law Corporation
3  1331 N. California Blvd., Suite 700
   Walnut Creek, California  94596
4  Telephone:  (510) 935-9400

5  Attorneys for Plaintiff
   DOUGLAS V. SHAW

6

7

8          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                IN AND FOR THE COUNTY OF YOLO

10 DOUGLAS V. SHAW,                 )  No. 71730
                                    )
11                Plaintiff,        )  DECLARATION OF DOUGLAS V.
                                    )  SHAW IN SUPPORT OF MOTION
12 v.                               )  FOR SUMMARY JUDGMENT
                                    )
13 THE REGENTS OF THE UNIVERSITY OF )  Date:   April 28, 1995
   CALIFORNIA,                      )  Time:   9:00 a.m.
14                                  )  Dept:   4
                  Defendants.       )  Trial Date:  [none set]
15 _____ )

16          I, DOUGLAS V. SHAW declare:

17          1.   I am the plaintiff in the above action.  I have

18 personal knowledge of the facts set forth herein and, if called

19 to testify, I could and would competently testify thereto.

20 Capitalized terms used in this declaration have the same

21 definition given them in the Memorandum of Points and

22 Authorities In Support of Plaintiff's Motion for Summary

23 Judgment filed therewith.

24          2.   I received an appointment at the University of

25 California Davis in 1986, and I continue to this date as a

26 tenured Associate Professor in the Department of Pomology.  My

27 responsibilities are teaching and instruction, and research

28 concerning the genetics of small fruit crops.  My recent work

1   has focused on inheritance of strawberry vegetative growth,

2   color, flavor and quality traits, pest and disease resistance in

3   strawberries and the development of molecular marker systems in

4   strawberries.

5         3.   Attached hereto as Exhibit "A" is a true and

6   correct copy of the Patent Document which contains the patent

7   agreement which I signed on February 25, 1986 (the "Shaw Patent

8   Agreement").   Prior to signing the Shaw Patent Agreement and

9   accepting my teaching and research appointment at U.C. Davis, I

10  discussed the Patent Policy and the Shaw Patent Agreement with

11  several representatives of the University, including, without

12  limitation, Professor Don Durzan, who was Pomology Department

13  Chair at the time of our discussions, and Dr. Noel Sommer, who

14  was Search Committee Chair at that time.   Both of these people,

15  and all others with whom I spoke during my interviews, confirmed

16  to me that I would have the right to 50% of the patent royalties

17  from my inventions pursuant to the Shaw Patent Agreement.

18        4.   I was familiar with the Patent Policy of the

19  University before I signed the Shaw Patent Agreement because I

20  had worked for the University as a graduate student at U.C.

21  Davis and had discussed the provisions of the Patent Policy

22  explicitly with members of the faculty at that time.

23        5.   At or near the time that I began my appointment at

24  the University, I received a copy of the October 1982 edition of

25  Patent Practices at the University of California, a true and

26  correct copy of which is attached hereto as Exhibit "B".   Page 2

27  of that booklet advised me that in return for my agreement to

28

1   assign patents, I would receive 50% of net royalties and fees

2   received by the University for my inventions.

3        6.   Attached hereto as Exhibit "C" is a true and

4   correct copy of a revision of Exhibit "B" entitled A Guide To

5   Patenting And Technology Transfer put out by the Office of

6   Technology Transfer (the "OTT") in 1991.

7        7.   My communications with University personnel

8   confirmed my understanding that I had a right to 50% of the

9   patent royalties for my inventions as provided in the Shaw

10  Patent Agreement.  In April 1989, the University asked me and my

11  co-inventors to approve a proposal to increase certain costs

12  paid from royalties from patents of strawberry cultivars because

13  that would decrease the cumulative net royalties and thus the

14  payments to inventors to which we were entitled under the

15  respective Patent Agreements that we had signed with the

16  University.  Attached hereto as Exhibit "D-1" is a true and

17  correct copy of an April 7, 1989 letter to me and my co-

18  inventors from Adel A. Kader, Chairman of the Department of

19  Pomology at U.C. Davis requesting our agreement that additional

20  costs be deducted from patent royalties before arriving at the

21  net royalties, which are the basis for the calculation the

22  inventors share.  Attached hereto as Exhibits "D-2" through "D-

23  4", inclusive, are true and correct copies of the responses from

24  me and my co-inventors together with a cover letter from

25  Professor Kader, forwarding those responses to Dean Charles E.

26  Hess of the College of Agriculture and Environmental Sciences at

27  U.C. Davis on April 14, 1989.  Attached hereto as Exhibit "D-5"

28  is a true and correct copy of the letter from Dean Hess dated

1    April 17, 1989 to Vice Chancellor Vanderhoef at U.C. Davis,

2    advising the University that he had obtained "releases" from my

3    co-inventors and me for use of royalty funds, as requested,

4    "prior to distribution of royalty income to the inventors". At

5    the time that my consent and approval was requested to this use

6    of funds by the University, the only agreement I had signed with

7    the University with respect to the patent royalties from my

8    inventions was the Shaw Patent Agreement.  I did not sign any

9    assignment of patent documents until 1993.

10        8.  I am informed and believe that prior to the

11   April 16, 1990 reduction in the inventor's share of patent

12   royalties under the University's Patent Policy that the

13   inventor's share under the Patent Policy had always been 50%.

14   At the time that I signed the Shaw Patent Agreement, I knew of

15   no other percentage that was used for the inventor's share of

16   patent royalties under Patent Agreements other than 50%.

17   Neither did I become aware that the University was contemplating

18   any change in that 50% inventor's share at any time prior to

19   1989.  Attached hereto as Exhibit "G" is a true and correct copy

20   of "Communication 28" specifically regarding plant patents.

21   This document indicates at page 2, ¶ II.A, that the University

22   of California has maintained an active patent program for over

23   40 years.

24        9.  When I became aware that the University was

25   proposing reductions in the inventor's share of net royalties in

26   its Patent Policy, I communicated my view to the University on

27   several occasions that the Shaw Patent Agreement would not be

28   affected by any such changes.  Attached hereto as Exhibits "E"

1   and "F", respectively, are true and correct copies of two

2   written memoranda which I forwarded to Carol Cartwright, Vice

3   Chancellor of Academic Affairs at U.C. Davis, pointing out that

4   it was not clear to me what the University intended in terms of

5   when it would apply any new policy regarding reduction in the

6   inventor's share of patent royalties and advising the University

7   that I did not believe that any such changes would apply to

8   individuals such as me who had already signed patent agreements

9   under the existing policy.

10         10. Despite several requests and numerous letters and

11   inquiries forwarded by Professor Hansche of our department to

12   the administration asking for a specific answer to the question

13   of whether the University intended to apply any change in the

14   Patent Policy retroactively to inventors who had already signed

15   patent agreements under the old Patent Policy, and several

16   incomplete and non-responsive letters, it was not until

17   February 1, 1993 that I received a direct written response to

18   that specific question from Carl B. Wootten, as Director of the

19   OTT, which response stated that the University intended to apply

20   the reduced inventor's share under the new policy retroactively

21   to the inventions of inventors who had signed a Patent Agreement

22   under the former Patent Policy, but who disclosed inventions

23   after April 16, 1990, the effective date of the new Patent

24   Policy which provided for a reduced inventor's share of patent

25   royalties.  Mr. Wootten's response is in a letter to me dated

26   February 1, 1993, a true and correct copy of which is attached

27   hereto as Exhibit "K".  I responded to Mr. Wootten's letter,

28   advising him that I did not accept the position stated in his

1   letter by letter dated February 7, 1993, a true and correct copy

2   of which is attached hereto as Exhibit "L".

3       11. I am informed and believe that I received the

4   letter from Mr. Wootten set forth in Exhibit "K" as a result of

5   the fact that on December 16, 1992, my co-inventors and I

6   disclosed to the OTT six new strawberry cultivars.   Attached

7   hereto as Exhibit "H" is a true and correct copy of the letter I

8   received from Linda Stevenson, Prosecution Analyst at the OTT,

9   acknowledging the disclosure and advising me that "These

10  disclosures will be governed by the U.C. Patent Policy at the

11  time of the disclosure."  It was my understanding at the time

12  that this language meant that the University intended to try to

13  apply the new Patent Policy to my disclosures, and I did not

14  agree that they had a right to do so.   In response, I wrote to

15  Linda Stevenson on December 30, 1992, advising her that I

16  expected the University to meet its obligations under the Shaw

17  Patent Agreement, a true and correct copy of which letter is

18  attached hereto as Exhibit "I".   The handwritten notes on

19  Exhibit "I" were apparently added by persons at the University,

20  and were not a part of my original letter.

21      12. Attached hereto as Exhibit "M" is a true and

22  correct copy of a letter, together with the enclosed draft

23  Assignment of patents, which I received on or about February 1,

24  1993, from Anthony B. Diepenbrock, patent counsel for the

25  University, forwarding a copy of the Assignment form for my

26  review because he was aware of my disagreement with the

27  University.   The Assignment form sent by Mr. Diepenbrock

28  provided that the April 16, 1990 Patent Policy would apply to my

1  assignment.  I objected to that language and requested that

2  reference to the April 16, 1990 patent policy be deleted.  In

3  order to accommodate the pending dispute, we agreed that the

4  reference could be to the "applicable University of California

5  Patent Policy", with the understanding that the applicable

6  policy would be determined by this action.

7      13. Attached hereto as Exhibit "N" is a true and

8  correct copy of a letter dated February 16, 1993, which I

9  received from William Gerlach of the OTT, requesting that I sign

10  appropriate documents following disclosure of the new strawberry

11  cultivars.  I have cooperated and provided Mr. Gerlach with all

12  of the documents he requested, including the Assignment of

13  patent document with the revised language referred to in

14  paragraph 14.

15      14. Attached hereto as Exhibit "O" is a true and

16  correct copy of a letter dated February 19, 1993 which I

17  received from Mr. Diepenbrock containing the Assignment of

18  patent document with the revised language referring to the

19  "applicable University of California Patent Policy."  I signed

20  and returned this revised form of Assignment to Mr. Diepenbrock.

21      15. My job description does not include producing

22  patentable inventions.  I was not employed to invent and I have

23  never been advised by anyone at the University that I am

24  employed to invent.  I did not disclose any inventions prior to

25  the time that I was promoted to associate professor and received

26  tenure at the University.  My performance evaluations, continued

27  employment and professional advancement are not conditioned on

28  my development of patentable inventions and have been

1    consistently positive since the beginning of my appointment at

2    U.C. Davis.  No one at the University has ever advised me that

3    they believed that I did not comply with my duties with respect

4    to the University at any time.

5         16. When I signed the Shaw Patent Agreement, I

6    understood the reference to the "percentage ... as set forth in

7    the University policy regarding patents" to refer to the 50%

8    stated in ¶ 6 of the University Patent Policy printed on the

9    same sheet of paper as the Shaw Patent Agreement, and which the

10   Shaw Patent Agreement expressly advised me to read.  I was aware

11   of no other "percentage" that the language could have referred

12   to at that time or at any other time prior to 1990.  When I

13   signed the Shaw Patent Agreement, my intent was that, in

14   agreeing to assign patent rights, to the University, I was not

15   waiving any rights to 50% of the patent royalties from my

16   inventions, and that, in any patent assignment, I would be given

17   the right to receive 50% of the net royalties as defined in the

18   University Policy Regarding Patents printed on the same sheet as

19   the Shaw Patent Agreement.  The 50% inventor's share was the

20   only percentage that I ever considered to be the portion of

21   patent royalties that I was not waiving in the Shaw Patent

22   Agreement.  None of the publications given to me by the

23   University, none of the discussions I had with any University

24   personnel, and nothing else ever gave me any hint, or the

25   slightest indication that the University believed that they were

26   reserving the right to reduce my share of patent royalties,

27   unilaterally pursuant to a change in the Patent Policy at some

28   indeterminate future date, and still require that I assign all

1  patent rights to the University.  I did not know that the
2  University was even considering, if in fact it was, a reduction
3  in the inventor's share of patent royalties at the time I signed
4  the Shaw Patent Agreement.

5          I declare under penalty of perjury under the laws of
6  the State of California that the foregoing is true and correct.
7  Executed this 8th day of March, 1995, at Walnut Creek,
8  California.

9
10                                    DOUGLAS V. SHAW
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



UNIVERSITY OF CALIF___IIA
**STATE OATH OF ALLEGIANCE**
and
**PATENT AGREEMENT**

UPAY 585 (9/81)

| NAME (Last, First, middle initial) | DATE PREPARED | | |
|---|---|---|---|
| Shaw  Douglas V. | 02 | 25 | 86 |
| DEPARTMENT<br>Pomology | EMPLOYMENT DATE | | |
| | 02 | 25 | 86 |

# STATE OATH OF ALLEGIANCE

I do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of California against all enemies, foreign and domestic; that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of California; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter.

Taken and subscribed before me this

25th day of _ February , 19 86

_Gloria Callis_
Signature of Authorized Official

Administrative Assistant
Title

Yolo                    CA
County                  State

_Douglas V. Shaw_
Signature of Officer or Employee (DO NOT Sign Until in The Presence of Proper Witness)

**NOTE:** No fee may be charged for administering this oath.

---

Oath must be administered by either (1) a person having general authority by law to administer oaths—for example: Notaries Public, Civil Executive Officers (Section 1001 of Government Code), Judicial Officers, Justices of the Peace, and county officials named in Sections 24000, 24057 of Government Code; such as, district attorneys, sheriffs, county clerks, members of boards of supervisors, etc., or (2) by any University Officer or employee who has been authorized in writing by the Regents to administer such oaths.

**WHO MUST SIGN THE OATH:** All persons (other than aliens) employed by the University, in common with all other California public employees, whether with or without compensation, must sign the Oath. (Calif. Constitution, Article XX, Section 2, Calif. Government Codes, Sections 3100-3102.)

All persons re-employed by the University after a termination of service must sign a new Oath if the date of re-employment is more than one year after the date on which the previous Oath was signed (Calif. Government code, Section 3102).

**WHEN MUST OATH BE SIGNED:** The Oath must be signed **BEFORE** the individual enters upon the duties of employment. (Calif. Constitution, article XX, Section 3; Calif. Government Code Section 3102).

**WHERE OATHS ARE FILED:** The Oaths of all employees of the University shall be filed with the Campus Accounting Office.

**FAILURE TO SIGN OATH:** No compensation for service performed prior to his subscribing to the Oath or affirmation may be paid to a University employee, and no reimbursement for expenses incurred may be made prior to his subscribing to the Oath or affirmation. (Calif. Government Code, Section 3107).

**PENALTIES:** "Every person who, while taking and subscribing to the Oath or affirmation required by this chapter, states as true any material which he knows to be false, is guilty of perjury, and is punishable by imprisonment in the state prison not less than one or more than 14 years." (Calif. Government Code, Section 3108).

---

# UNIVERSITY POLICY REGARDING PATENTS
## PREAMBLE

The Regents of the University of California, in administering intellectual property rights for the public benefit, desire to encourage and assist members of the faculties, employees, and others associated with the University in the use of the patent system with respect to their discoveries and inventions in a manner that is equitable to all parties involved.

The Regents recognize the need for and desirability of encouraging the broad utilization of the results of University research not only by scholars but in practical application for the general public benefit and acknowledge the importance of the patent system in bringing innovative research findings to practical application.

Within the University, innovative research findings often give rise to patentable inventions as fortuitous by-products, even though the research was conducted for the primary purpose of gaining new knowledge. Equity in such patentable inventions may involve parties other than the inventor and The Regents. The use of University facilities or services, particular assignment of duties or conditions of employment, possible claims of a cooperating agency where research is supported from extramural funds, and other situations may give rise to a complex of interrelated equities or rights, which must be appraised and appropriately disposed by agreement between the parties.

Therefore, to encourage the practical application of University research for the broad public benefit, to appraise and determine relative rights and equities of all parties concerned, to facilitate patent applications, licensing, equitable distribution of royalties, if any, to assist in obtaining funds for research to provide for the use of invention-related income for the further support of research and education, and to provide a uniform procedure in patent matters where The Regents have a right or equity, the policy herein set down is adopted.

## STATEMENT OF POLICY

1. All matters relating to patents in which the University of California is in any way concerned shall be administered by an agency known as the **University of California Board of Patents.**

2. a. The Board of Patents shall be appointed by The Regents. It shall have full power of organization, except as hereinafter provided, subject to the provision that it shall meet at least once a year. The members shall serve without extra compensation at the pleasure of The Regents. The normal term of appointment shall be for three years.

b. The Board of Patents shall consist of eleven persons selected from among the faculties and the administration of the University, and of such other groups as The Regents may determine, but of this number the Committee on Committees of the Academic Senate shall select from the Senate at large one person to serve as a member for the normal term. The Chairman of the Board of Patents and Patent

Administrator shall be approved by The Regents upon the recommendation of the President of the University.

c. In its consideration of matters relating to each particular patent case or situation, the Board of Patents shall take into consideration the principles laid down in the patent laws, appropriate judicial decisions, and the facts of the case as applicable to California.

3. The Board of Patents shall have the following powers and duties, which may be delegated in whole or in part to the Patent Administrator:

a. To evaluate inventions and discoveries for patentability, as well as scientific merit and practical application and, where desirable, to appoint a committee or experts to examine the merits of each potentially patentable invention and to cause such committee to report its findings to the Board of Patents

ACCOUNTING
U.C. DAVIS
9 JAN

---

**(POLICY IS CONTINUED . . . Please sign Patent Agreement on reverse side)**
_ATTACH TO PERSONNEL ACTION FORM (UPAY 560)_

# PATENT PRACTICES

## AT THE

## UNIVERSITY OF CALIFORNIA

Prepared for Faculty and Staff

Patent, Trademark, and Copyright Office
Systemwide Administration
University of California
Berkeley, California 94720
(415) 642-5000

©October 1982

# INTRODUCTION

The University of California has maintained an active patent and patent licensing program for over 35 years. The major objectives of the University patent program are: (1) to disseminate new and useful knowledge resulting from University research through the use of the patent system; (2) to license patents to industry in order to promote the development of inventions toward practical application for use by the general public; (3) to provide income for use in supporting further research and education, with a share of the income going to the inventor, and (4) to assure that patent-related obligations to sponsors of research are met.

The purpose of this brochure is to highlight what University inventors should know about University patent policy and procedures currently in effect.

## PATENT POLICY

It is an objective of the University to promote the wide dissemination of new ideas to the general public. Most new ideas, however, require considerable development before tangible results are available for the public benefit. The patent system is an effective means for promoting such development. By granting to the inventor a limited period (17 years) of exclusivity for the invention, the patent system of the United States encourages the investment of resources necessary for developing the invention to the point of practical application. In return for this limited right to exclude others, the inventor must disclose the details of the invention, thereby making new knowledge available to everyone and stimulating others to make still further inventions.

Much of the research at the University is supported by Federal agencies or other outside sources under contractual arrangements controlling the disposition of patent rights. Thus, rights to patentable inventions resulting from University research may involve parties other than the University and the inventor.

In order to encourage and assist the University inventor in the use of the patent system in a manner that is equitable to all parties involved, The Regents have adopted the University Policy Regarding Patents. The Policy requires all University employees, persons not employed by the University but who use University research facilities, and those who receive grant or contract funds through the University to agree to assign patents and inventions to the University. In return, the inventor receives 50% of net royalties and fees received by the University.

The full text of the University Policy Regarding Patents is available on campus at the Contracts and Grants Office or the Office of the Vice Chancellor of Research or equivalent or from the Patent, Trademark, and Copyright Office (hereinafter referred to as University Patent Office) at Systemwide Administration.

All policy matters relating to patents in which the University is in any way concerned are the responsibility of the Board of Patents. The Board, which is appointed by The Regents, consists of eleven members selected from the various campuses. The Board meets on a regular basis.

The University Patent Office staff carries out administrative operations in a manner consistent with the University Policy Regarding Patents and related University policies.

## SPONSORED RESEARCH

If your research is supported by an outside source under a contract or grant, the contractual agreement most probably contains "patent provisions". Read them. The patent provisions define your patent obligations and those of the University to your research sponsor and set forth the sponsor's patent rights. Even if the support is minimal, the patent provisions will still apply.

Because early publication may destroy patent rights, particularly in foreign countries, patent provisions may also include restrictions on publication such as prior review. Therefore, it is important that you read and understand the patent provisions of your research agreement. If you have any questions about them, contact your Contracts and Grants Office.

If your research agreement does not contain any patent provisions, then ownership of all patent rights remains in the University.

Patent provisions of research contracts, grants, and agreements with Federal agencies are established by law.  If you should seek research funding from non-federal sponsors, you are strongly urged to contact your campus Contracts and Grants Office in the early stage of discussions so that potential patent problems may be avoided.

# INVENTION EVALUATION AND
# THE PATENTING PROCESS

The first step toward obtaining a patent is to determine whether you have made a possibly patentable invention. If you have discovered or made a new and useful process, device or apparatus, article of manufacture, composition of matter (including chemical compounds, microorganisms, and the like), plant, or related improvement, or a new use for a known material or device, then you probably have made an invention which may be patentable. If you are not sure or if you want more information about what is patentable, do not hesitate to contact the University Patent Office.

When you believe that you may have a patentable invention, the next step is to submit an invention record promptly to the University Patent Office. "University of California "Record of Invention" forms should be used for this purpose. These forms can be obtained by calling the University Patent Office, or on campus at the Contracts and Grants Office or the office of the Vice Chancellor of Research or equivalent. Prompt action will help prevent loss of essential rights. The Record of Invention form provides information necessary to evaluate patentability, inventorship, desirability of obtaining patent coverage, and patent obligations to research sponsors. THIS INFORMATION IS CONFIDENTIAL; do not disclose the Record of Invention to others, not even to your research sponsor.

A preliminary evaluation of the Record of Invention is made in-house by the professional staff of the University Patent Office. Such factors as patentability, benefit to the public, commercial potential, and patent rights of outside parties are considered in selecting cases to pursue further. The costs of patent processing are significant and are also considered in the evaluation process. While preliminary evaluation normally takes about 90 days, priority matters are handled as rapidly as possible.

If, after preliminary review, your invention qualifies for further patent action, it will be referred to an outside patent attorney for a preliminary patentability opinion. Normally, the patent attorney will confer with you at this point. In many cases, but not always, the patent attorney is requested to conduct a novelty search of the appropriate patent literature. Inasmuch as University inventors generally invent in their own area of expertise and are aware of the most pertinent literature related to their inventions, a novelty search is not always warranted. However, such searches can be of substantial value to the inventor since they often show a state of the art not apparent from the technical literature.

If, upon review of the patent attorney's findings, it is decided to proceed with patenting your invention, the Patent Administrator then instructs the attorney to draft a patent application. The patent attorney will need to work closely with you in the preparation of the application. In some instances further work may be required so that a proper application can be drafted. Upon completion of the application, including your detailed review of the final draft and execution of the necessary documents (called a Declaration or Oath), the attorney will submit the application to the United States Patent and Trademark Office in your name. Before the application is submitted, you will be asked to assign patent rights to the University in writing in accordance with the University Policy Regarding Patents.

In general, about a year will elapse before any substantive action is taken by the U. S. Patent and Trademark Office on a newly filed application. This "first Office Action" often, but not always, is a "rejection" by the examiner in the U. S. Patent Office of all the proposed claims with reasons given for the "rejection". Don't feel rejected. The patenting process is essentially a negotiation between the inventor and the Government. The patent attorney representing you and the University generally presents the broadest possible claims in order to obtain the broadest possible protection for your invention. The patent examiner usually finds some earlier patents or publications which show some aspects of your invention as it is defined in the claims, or the examiner may hold that you are trying to claim more than is justified by the detailed description in your application. At this point, the patent attorney will consult with you and prepare a response, revising the claims if necessary. Normally, about two years will elapse between the filing of a patent application and the issuance of a patent. In the majority of cases filed by the University, a patent has been issued.

If, after preliminary review or at any other time in the patenting process, it is determined that the University will not take any further patent action on your invention, you may request reconsideration or a release of Patent Rights in accordance with the University Policy Regarding Patents. If the issue is not resolved to your satisfaction you may request that the matter be presented to the Board of Patents for final resolution.

-5-

-4-

## LICENSING OF INVENTIONS TO INDUSTRY

The purpose of licensing inventions to industry is twofold: (1) to provide a mechanism for transferring the results of University research to the public for the public benefit, and (2) to generate income for education and research. Net proceeds from licensing income are shared equally between the inventor and the University in accordance with the University Policy Regarding Patents. The University's share is used to finance Patent expenses and to support research generally in the University. Funds to support research are allocated annually to each Chancellor by the President. Since 1962 over $3.5 million have been returned to the campuses for graduate student research, special research projects, and other academic needs.

The licensing process begins when the University Patent Office staff contacts individual companies to assess their interest in obtaining a license. Information you can provide which will help identify potential licensees for your invention will often greatly facilitate the licensing process. If a private company contacts you directly for information about your invention, be sure to refer the company representative to the University Patent Office so that appropriate steps can be taken to protect both your rights and those of the University.

Terms and conditions for licensing agreements are negotiated on a case-by-case basis. If your invention was made under a Government-supported research agreement, the Government receives a royalty-free license for its use. If the company needs more time to evaluate your invention, an option-to-license agreement may be negotiated by the University Patent Office.

In some cases, a license or option agreement is negotiated at the same time that a separate research funding agreement with the licensee or optionee is arranged by the campus Contracts and Grants Office working with the inventor.

Separate consulting agreements may be arranged between you and the licensee of your invention so that your knowledge can be used to assist in transferring the technology covered by the license. The University does not become a party to such consulting agreements, which are between you and the licensee, but you are subject to the limitations of University policies.

## PUBLICATION OF RESEARCH

The University does its best not to interfere with your right to publish promptly research results through the usual academic channels (but watch the patent provisions of your agreement). In fact, publications and oral presentations can play an important role in promoting interest in inventions among potential licensees. However, you should be aware that a public "enabling" disclosure of your invention before the actual filing date of a United States patent application automatically destroys patent rights in nearly all foreign countries. An "enabling" disclosure or description is one which will enable others in the same or related field to practice your invention without undue experimentation. Public disclosure means disclosure in any manner such as by oral or written description, exhibit, demonstration, use, or the like, to outside parties in a nonconfidential environment.

United States patent law allows you a one-year grace period after first enabling printed publication, public use or sale of your invention in which to file a patent application, but BEWARE!! "Enabling," "printed publication," "public use," "sale," and "invention" are legal terms defined by a vast body of case law, not by ordinary usage. For example, abstracts, theses, and typewritten papers distributed freely at a conference may constitute "printed publication". If you have doubts about the consequences of this type of "publication," do not hesitate to contact the University Patent Office.



# FURTHER INFORMATION

If you wish to further explore various aspects of patents and inventions, the following reference, which is probably available in your campus library, may be helpful:

*IEEE Transactions on Professional Communications*, June 1979, Volume PC-22, Number 2 (Special Issue on Patents).

The following Government publications, available from the U. S. Government Printing Office, provide more detailed information:

    General Information Concerning Patents

    Patents & Inventions: An Information Aid for Inventors

    Code of Federal Regulations, Title 37: Patents, Trademarks, and Copyrights

        Patent Laws

The staff of the University Patent Office looks forward to serving you and welcomes your inquiries, in writing, by phone, or in person.

Patent, Trademark, and Copyright Office
Systemwide Administration
University of California
2490 Channing Way
Berkeley, California 94720

Telephone:  (415) 642-5000

-8-

Davis: Department of Pomology

April 7, 1989

TO:      Royce Bringhurst
         Doug Shaw
         Victor Voth

FROM:    *Adel A. Kader*
         Adel A. Kader, Chairman
         Department of Pomology

RE:      PROVIDING FINANCIAL SUPPORT FOR FSPMS FROM STRAWBERRY PATENTS'
         ROYALTIES INCOME.

         As you know the UC-DANR Communication 28 and related policy
statements require that disease-free propagating materials of related
cultivars be made available by the FSPMS.  The cost of this operation has
been at least partially, if not fully, covered by funds provided to the FSPMS
by the UC Patent Office.  These funds have represented 10% of the income from
royalties on patents of cultivars of all woody plant species released by the
university.  Strawberries were not included in the original agreement.

         Discussions with university administrators, strawberry industry
leaders, and FSPMS director have resulted in a proposal to include
strawberries in this process.  Thus, I am asking for your approval to request
the UC Patent Office to pay the actual costs of producing disease-free
strawberry plants from income of royalties on patents of strawberry cultivars
up to a maximum of 10% of those royalties.  This would be paid as part of the
administrative costs, i.e., before dividing the net income between the
university and the inventors.  Such action will provide for a more stable
funding situation for FSPMS, which would improve the quality and productivity
of the strawberry indexing and cleaning program.

         I would appreciate receiving a written response from each of you by
April 14, 1989.  Thank you for your cooperation.

AAK:cbw

Davis: Department of Pomology

April 14, 1989

TO:     Charles E. Hess, Dean
        College of A&ES
        Mrak Hall

FROM:   *Adel A. Kader*
        Adel A. Kader, Chairman
        Department of Pomology

RE:     PROVIDING FINANCIAL SUPPORT FOR FSPMS FROM STRAWBERRY PATENTS'
        ROYALTIES INCOME.

        I am forwarding responses (to my enclosed request) from Drs. Royce
Bringhurst, Douglas Shaw and Mr. Victor Voth indicating their agreement to
provide a more stable funding for FSPMS' program aimed at producing disease-free
strawberry plants.  The agreement is to pay for actual costs of this program up
to a maximum of 10% of the royalties income on strawberry cultivars' patents.

        I propose that the FSPMS' Strawberry Technical Advisory Committee
be charged with developing guidelines and annual budget for the indexing and
cleaning of strawberry plants to ensure timely release of disease-free plants
of new cultivars from the UC Strawberry Breeding Program.  FSPMS should follow
the guidelines developed by this committee and present a list of expenses for
reimbursement from the UC Patent Office on a schedule to be worked out between
FSPMS and the UC Patent Office.

        I would appreciate your forwarding this letter and enclosures with
your support to the UC Patent Office for implementation as soon as feasible.
Thank you for your assistance and cooperation.

AAK:cbw
cc:  Robert Ball, FSPMS
     Royce Bringhurst
     Doug Shaw
     Victor Voth
     Robert Webster, Chair, UC Strawberry Advisory Committee

April 13, 1989

TO:  Adel A. Kader

FROM:  R. S. Bringhurst   R. J. Bringhurst

RE:  Financial support for FSPMS from strawberry patents royalty income

This is to indicate my somewhat reluctant agreement to support the proposal to pay the actual costs of producing disease-free strawberry plants from income of royalties from patented strawberry cultivars up to a maximum of 10% of those royalties before dividing the net income.

My reluctance stems first from my negative perception about the performance of FSPMS in regard to strawberries and other clonally propagated plants in the recent and not so recent past and second, from the fact that the service FSPMS provides or rather is preparing to provide for strawberries is already or shortly will be available from commercial people on a competitive basis at less cost to all concerned.

In my estimation the problems that FSPMS have had or are having are not due primarily to a shortage of funds but rather to the motivation and orientation of those concerned.



Davis: Department of Pomology

April 12, 1989

TO:       Adel Kader, Chairman
          Department of Pomology

From:     Douglas V. Shaw
          Asst. Professor

RE:       Provision of financial support to FSPMS from strawberry royalty income.

The following is a response to your request of April 7, 1989, soliciting breeder's approval for allocation of royalty income to cover the cost of the University's strawberry clean stock program. I have no fundamental objection to this policy, as it is obvious that the industry, my breeding project, and the University will all benefit from a properly run program. I do have several serious concerns regarding the implementation of such a policy, and have cited these below.

1.    I am very concerned that the funds be allocated for services related only to the provision strawberry clean stock. Funding for research related to clean stock, or for clean stock programs for other commodities, must be requested separately and from other sources. I suggest that allocation will require review by a critical and informed committee on a continuing annual basis. Also, a clear statement should be compiled that details those functions that will be subject to funding and which states clearly that allocation will be on an as-needed basis up to but not necessarily at a 10% level.

2.    I am also concerned that the services provided be conducted in an efficient and cost-effective manner. Fair review of procedures and accomplishments should be a second function of the committee mentioned above.

3.    FSPMS services relating to strawberry clean stock were originally intended to be self-supporting through sales of plant material. Although this is still the official University policy, it appears unworkable for two reasons: 1) Private organizations in combination with CDFA are providing the required services for established varieties at lower cost than FSPMS. The University need not compete with these services. 2) Provision and maintenance of clean stock for advanced selections prior to release, and provision of the original clean stock and foundation stock at the time of release are perhaps the most important functions of FSPMS. These services cannot be self-supporting, because most selections entering the program are eventually discarded without release. Selections must enter the clean stock program early and based on very incomplete information if the necessary volume of clean plant materials are to be available at the time of release. There are two issues here. First, the University policy should be changed to acknowledge that one important function of FSPMS cannot be self-supporting. Second, FSPMS will generate substantial income from plant sales. The income generated from these sales should be the primary source for strawberry clean stock services, and royalty income must be used only to fill the remaining budgetary deficit. Unused funds should be allocated according to present University policy.

I support the allocation of royalty funds to the strawberry clean stock program, given that carefully documented procedures are developed to accommodate the above concerns.

UNIVERSITY OF CALIFORNIA



BERKELEY · DAVIS · IRVINE · LOS ANGELES · RIVERSIDE · SAN DIEGO · SAN FRANCISCO          SANTA BARBARA · SANTA CRUZ

SOUTH COAST FIELD STATION
7601 IRVINE BOULEVARD
IRVINE. CALIFORNIA 92718

OFFICE OF THE PRESIDENT
DIVISION OF AGRICULTURE
AND NATURAL RESOURCES

April 12, 1989

Dr. Adel A. Kadar, Chairman
Department of Pomology
University of California
Davis, CA  95616

Dear Adel:

I give my approval to the proposal to include strawberries in the process to request the UC Patent Office to pay actual costs of producing disease free strawberry plants from income of royalties on patents of strawberry cultivars up to a maximum of 10% of those royalties.

Hoping the FPMS performs better than they have in the past.

Sincerely yours,

Victor Voth
Pomologist

VV:r



(714) 559-4050

DAVIS: COLLEGE OF AGRICULTURAL AND ENVIRONMENTAL SCIENCES
DIVISION OF AGRICULTURE AND NATURAL RESOURCES
AGRICUL        AL EXPERIMENT STATION
COOPERA . /VE EXTENSION
OFFICE OF THE DEAN AND DIRECTOR OF PROGRAMS

April 17, 1989


VICE CHANCELLOR VANDERHOEF

RE: "Off the Top" Royalty Funds for the Cost of Propagating and Indexing Strawberry Plants

Dear Larry:


Pursuant to our discussion with Vice President Brady and Roger Ditzel, Adel Kader, Chair of the Department of Pomology, has obtained releases from Royce Bringhurst, Victor Voth, and Douglas Shaw for the use of royalty funds to propagate and virus index the new strawberry varieties, prior to distribution of royalty income to the inventors.

We agreed at the meeting with Vice President Brady not to use a flat percentage, but to determine what were the actual costs associated with the indexing and propagation program. As indicated in the attached memo, Dr. Kader will use the FSPMS' Strawberry Technical Advisory Committee to develop an annual budget. I will forward that information to you as soon as it is received in this office. Perhaps it would be good to share our present progress with Vice President Brady and Roger Ditzel.

Charles E. Hess
Dean

CEH/lh
Attachment

cc:   A. Kader
      R. Ball
      R. Bringhurst
      D. Shaw ✓
      V. Voth
      R. Webster


Vice Chancellor L. Vanderhoef
Chancellor's Office
Davis Campus

Davis: Department of Pomology

October 25, 1989

**TO:**   Carol Cartwright, Vice Chancellor
Academic Affairs
Mrak Hall

**FROM:**   *[signature]*
Douglas V. Shaw
Assistant Professor/Geneticist
Department of Pomology
Wickson Hall

**RE:**   THE PROPOSED REVISION IN UNIVERSITY PATENT POLICY

On October 23, 1989, I received a copy of the memo from the University Office of Academic Affairs, dated September 27, 1989. This memo concerned changes in Section II.C of the University's patent policy and proposed a reduction of the inventor's share of net royalties. My position with the University includes responsibility for development and release of strawberry varieties for the state of California and, as a potentially affected employee, I wish to respond to these proposed changes with the comments below. I anticipate that the central office will provide responses to these specific comments.

1.   The use of absolute dollar values is not an effective long-term solution. Royalties have increased in the past, and no doubt will change with patterns of inflation in the future. If absolute percentages and dollar values are to be included in a distribution formula, these values must be indexed to change with the value of actual currency. The formula as given will result in a decreasing fraction allocated to the inventor as inflation changes the value of the dollar.

2.   These proposed changes should not be considered in isolation of actions related to financing of the patent, distribution of gross royalty income, and allocation of net royalty income to departments or specific programs. For example, my concurrence was recently asked for and obtained regarding a proposal to allocate up to 10% of the gross royalties from current and eventual strawberry patents to finance a University clean-stock program for this crop; this policy reduced the current inventor's share by an additional 5%. I am also concerned that no policy exists regarding the distribution of net royalty income to specific departments or programs of origin. Some of the income should be allocated to defray departmental costs and to encourage long-term industry investment in research. A comprehensive statement that details all intended allocations and distributions is needed.

3.   The wording of the memo attached to the proposed changes does not describe which employees and which patents will be affected by these policy changes. Specifically, are the proposed changes intended to apply to inventions that may

D0000035

Cartwright
October 25, 1989
Page 2

eventually be patented by myself and by others currently employed by the
University? The current policy was explained to me during my interview and
provided incentive for my present position, and for a career with the University
of California. The current distribution policy is part of the compensation package
that was offered by the University at the time of my recruitment and initial
employment. I equate reductions in royalty allocation to reductions in salary or
benefits, and expect that conditions that existed at time of my initial employment
will be honored for inventions generated during my career with the University.
If the University can change compensation policy for existing employees, what
assurance do we have that further reductions will not be implemented in the
future? This issue requires a detailed description of the individuals and inventions
that will be affected by the proposed changes.

DVS:cbw
cc:     Dr. Adel Kader
        Dr. Robert Webster

D0000036

RECEIVED
ACADEMIC AFFAIRS
UC DAVIS

DAVIS: Department of Pomology

January 24, 1990

JAN 25  1 28 PM '90

TO:     Carol Cartwright, Vice Chancellor
        Academic Affairs
        Mrak Hall

FROM:   *[signature]*
        Douglas V. Shaw
        Assistant Professor/Geneticist
        Department of Pomology
        Wickson Hall

RE:     **PROPOSED REVISION IN UNIVERSITY PATENT POLICY**

        Thank you for your response to my memo of October 25, 1989, and for the
background material provided by Associate Vice President Moore.  Although this
information justifies my concerns, it unfortunately provides no satisfactory
resolution.  To reiterate, my three primary objections are as follows:

   1.   A distribution system based on percentages of fixed dollar values
        is unworkable when inflation is changing the value of the currency.
        Distribution must be based on percentage only, or the fixed values
        must be indexed.

   2.   Any change in current distribution policy should include clear and
        comprehensive directives regarding the distribution of gross patent
        income, not just net income, and should provide for a reasonable and
        fair distribution to both the departments and programs of origin.
        There are multiple incentives in the distribution of patent income,
        one of which is the opportunity to fund the inventor's research and
        complementary research conducted within the inventor's department.

   3.   The information provided a clear statement that new policy would not
        be retroactive to existing inventions, but does not address the
        question of inventions by current employees.  To reiterate, I
        consider the current policy as part of the compensation package
        offered by the university at the time of my employment, and expect
        that any changes in this policy will apply only to inventions
        developed by individuals hired after any changes in existing policy,
        and thus not to myself.

        Rather than reiterate these concerns in any greater detail, I have enclosed
a copy of my original memo.  As before, I anticipate that the university will
consider and to these specific concerns.

Enclosure

cc: Dr. Adel Kader
    Dr. Robert Webster



D0000034

DEPARTMENT OF LAND, AIR AND ENVIRONMENTAL SCIENCES
DIVISION OF AGRICULTURE AND NATURAL RESOURCES
AGRICULTURAL EXPERIMENT STATION
COOPERATIVE EXTENSION
OFFICE OF THE DEAN AND DIRECTOR OF PROGRAMS

February 7, 1992

**PAULINE FROMMELT**

Enclosed please find the "latest version" of Communication 28.  I received this from the Office of Technology Transfer.  I don't think there are too many changes since the last version of Communication 28 was distributed to the departments last year.  Anywho, you may want to pass this on to your faculty members since your department is heavily involved with cultivars and variety releases.  Give me a ringy-ding if you have any questions.

CeCe Price

Enclosure

**485   RELEASE OF SEXUALLY AND ASEXUALLY PROPAGATED CULTIVARS**

This Policy and Procedure for release of sexually and asexually propagated plant materials is guided by and embraces the principles outlined in "A Statement of Responsibilities and Guidelines Relating to Development, Release and Multiplication of Publicly Developed Germplasm and Varieties of Seed-Propagated Crops" revised by Experiment Stations Committee on Policy, November 16, 1988.

I.   RELEASE FOR COMMERCIAL PURPOSES OF SEXUALLY AND ASEXUALLY PROPAGATED PLANT MATERIALS

The Vice President delegates responsibility for the final authority for the commercial release of protected plant materials to the Dean of the breeder/inventor's campus. In arriving at a decision to release a cultivar for commercial use, the Dean will be guided by the recommendations of a Technical Advisory Committee for that particular commodity and concurrence in that recommendation by the appropriate Department Chair(s). The breeder/inventor may recommend that disclosure to the Director of the Patent, Trademark and Copyright Office (UCPTCO) or the local campus patent office (LCPO) be made for the purpose of 1) seeking protection of the plant selections under the Plant Patent Act (PPA) or the Plant Variety Protection Act (PVPA), 2) that licensing to commercial firms be pursued without recourse to formal protection, or 3) release into the public domain without formal protection or licensing. The Department Chair of the breeder's/inventor's department would submit the recommendation for this commercial release to the Dean and UCPTCO/LCPO simultaneously in order to expedite the process. In the event that UCPTCO/LCPO agrees that licensing to commercial firms be pursued without recourse to formal protection, such licensing would be arranged through UCPTCO/LCPO with the specific licensing terms agreed upon by UCPTCO/LCPO and the campus Dean. For materials protected under patents or the plant variety protection act, or through a nonprotected licensing agreement, it is the responsibility of the breeder/inventor's department to provide a mechanism for assuring availability of such material for the life of the protection or the terms of the licensing agreement. The breeder/inventor in consultation with the Department Chair is responsible for the proper condition of the plant material upon commercial release at the time of licensing.

This policy does not restrict the public breeders' rights/responsibilities to distribute seed samples of exotic germplasm materials (e.g. accessions of allied wild species, landraces or other feral/primitive materials), or of breeders' germplasm stocks (e.g. early generation materials arising from interspecific or intraspecific hybridization/fusions, prebreeding lines or other heterozygous materials) into the public domain. It is the responsibility of the breeder to adjudge, guided by his/her prior experience and available knowledge, the prospects for future patentability within such materials, and to consult with the Technical Advisory Committee if questions arise whether such releases would be prudent.

TECHNICAL ADVISORY COMMITTEE REVIEW

The Technical Advisory Committees, composed of University and/or other public scientists representing appropriate disciplines for the needs of the specific commodity, as well as industry representatives where appropriate, shall be appointed by the Dean, upon consultations with the Department Chair(s). In reviewing the proposal to seek protection/licensing of a new cultivar, the Technical Advisory Committee shall consider appropriate information concerning the amount of material available, characteristics, performance, area of adaptation, specific use values, propagating stocks, and proposed methods of cultivar maintenance and increase and distribution. In addition, assurance should be made that stock released into commercial use has been tested for disease-causing agents of significance to that species and is distributed by systems that minimize risks of contamination. In arriving at the recommendation as to whether to pursue protection of plant materials or not, the committee must be mindful of assessing the potential benefits and risks in regard to that industry as far as can be reasonably determined.

January 1991

**485   RELEASE OF SEXUALLY AND ASEXUALLY PROPAGATED CULTIVARS**

II.   POLICIES

Policies of the University of California regarding Plant and other Plant Material Subject Matter which may be Protected under Intellectual Property Laws

A.   General University Policies Regarding Intellectual Property;

The University of California has maintained an active patent program for over 40 years.  In order to encourage and assist the University inventor in the use of the patent system in a manner that is equitable to all parties involved, The Regents have adopted the University of California Patent Policy (APPENDIX A).  The Policy requires all University employees, persons not employed by the University but who use University research facilities and those who receive grant or contract funds through the University to agree to assign patents and inventions to the University.  Such individuals who have agreed to assign patents and inventions are required to promptly report and fully disclose the conception and/or reduction to practice of potentially patentable inventions to the UCPTCO/LCPO.

B.   United States (US) Intellectual Property Laws Encompassing Plant Subject Matter;

1.   THE PLANT PATENT ACT (PPA) - The earliest of plant protection laws in the US, The Plant Patent Act of 1930 states as follows: "Whoever invents or discovers and asexually reproduces any distinct and new variety of plant, including cultivated sports, mutants, hybrids, and newly found seedlings, other than a tuber propagated plant or a plant found in an uncultivated state, may obtain a patent therefor, ...." (Section 161, United States Code (USC) Title 35).  Certain asexually propagated plant selections were included as patentable subject matter under University of California patent policy in January of 1968 and these selections must therefore be disclosed to the UCPTCO/LCPO.

2.   THE PLANT VARIETY PROTECTION ACT (PVPA) - To give similar protection in the US for seed propagated cultivars, Congress passed The Plant Variety Protection Act of 1970 which states as follows: "The breeder of any novel variety of sexually reproduced plant (other than fungi, bacteria, or first generation hybrids) who has so reproduced the variety, or his successor in interest shall be entitled to plant variety protection therefor, ..." (Section 42, 7 USC 2321 Et Seq. Title 2).  As of the publication date of this UC policy statement, certain seed propagated selections shall be considered as patentable subject matter and must be disclosed to the UCPTCO/LCPO.  Should such a selection be developed under a federal contract or grant, it would fall within the definition of "invention" under Title 37 of the Code of Federal Regulations.  These regulations require that such selections be disclosed to the UCPTCO/LCPO as would any other potentially patentable invention, so that the federal research sponsor can be formally notified, title to the invention can be elected by the University, if it so desires, and a decision relative to filing under PVPA can be made.

3.   SECTION 101 OF US PATENT LAW - In the Supreme Court's Chakrabarty decision of 1980, concerning the patentability of living organisms, the justices held that Section 101 of the Patent Laws is applicable to virtually "anything under the sun that is made by man".  Section 101 states as follows: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, ....(Section 101, USC Title 35).  Inventions relating to plant material subject matter which are potentially patentable under Section 101 of US patent law fall within the University's patent policy and must therefor be disclosed to the UCPTCO/LCPO.

January 1991

**485   RELEASE OF SEXUALLY AND ASEXUALLY PROPAGATED CULTIVARS**

C.   Discussion of the Various Laws:

1.   THE PPA AND THE PVPA require that a single plant selection have novelty; protection is limited under one claim, that being to the described selection. Regarding the PPA, plants originally discovered at an uncultivated site may possibly be patentable if they are collected and brought into cultivation where it is discovered they have specific useful traits. On the other hand, if these traits were to be expected based upon some environmental factor at the uncultivated selection site, the selection most likely would not be patentable under the PPA. Regarding the PVPA, plant germplasm useful in traditional plant breeding programs for seed propagated plant types is not in itself patentable under the PVPA. However, a plant selection giving rise to novel and useful germplasm might in itself be protected if the selection must be used repeatedly to cross-pollinate another selection to produce commercial F1 seed and can be either asexually propagated (PPA) or reproduced as a relatively stable homozygous line from seed (PVPA). (Plant germplasm may be protected under Section 101 of the patent laws as discussed below.) The UCPTCO/LCPO generally will file applications for protection (PPA or PVPA) on individual plant selection(s) if they are novel, have commercial utility, and are either at the stage in the experimental or evaluation process where they will receive widescale testing at non-UC sites or are suitable for commercial release.

2.   SECTION 101 PATENTS are more difficult and expensive to obtain than are plant patents or plant variety protection certificates; the application subject matter must be novel, useful and non-obvious over prior art to those skilled in the art. Also, applications under Section 101 must be in sufficient detail to enable others skilled in the art to practice the invention. Deposits of novel genetic or plant material in a public repository is generally required to meet the enabling requirements. Section 101 patents are generally allowed multiple claims. Novel plant material (plant selection(s), asexual propagating material, seeds, germplasm, tissue culture, and even flowers, fruit and other plant parts) may be claimed in applications under Section 101 dealing with potentially patentable plant subject matter as follows:

a.   discovery of novel and useful non-plant genes, or other DNA sequences, which have been isolated in a usable medium for transfer into plant material using traditional (obvious, known to others skilled in the existing art) breeding and/or genetic manipulation techniques.

b.   discovery of novel, useful and naturally occurring plant gene(s), which have been isolated in a usable medium for transfer using traditional breeding and/or genetic manipulation techniques into plant material of another botanical species, genus or family where such gene(s) are not naturally occurring.

c.   discovery of novel, useful and naturally occurring plant gene(s) whose morphological and/or physiological expression in subsequent generations of plant material of the same genus and/or species has been successfully perfected and defined using traditional plant breeding methods.

d.   discovery of new and useful techniques for genetic manipulation in plant material.

e.   various combinations of a - d above.

D.   <u>Material to be Treated as Potentially Patentable Plant Subject Matter And Therefore Proprietary to the University of California:</u>

1.   UNDER THE PPA OR PVPA - UC Plant Selection(s) showing promise for widespread testing at non-UC sites or possible commercial release and selections needing extended evaluation before decisions can be made as to possible commercial utility shall be treated as proprietary, potentially patentable plant selections under this policy statement.

2.   UNDER SECTION 101 OF US PATENT LAW - Any novel and useful gene isolates, plant tissue cultures, plant germplasm, plant selections, seeds, and/or asexual propagating material (biological material) or any written material, data or information on methodology (data) which would enable others to practice a potentially patentable invention under Section 101 of US Patent Law shall be treated as proprietary, potentially patentable biological material and/or data under this policy statement.

E.   <u>Commercial Sale and/or Public Use Bars to Obtaining Protection Under US Intellectual Property Laws:</u>

1.   GENERAL DISCUSSION:  As any commercial sale or public use of potentially patentable selections, biological material and/or data (patentable material) one year before the filing date of a US patent, plant patent or plant variety protection certificate application will bar obtaining US plant patent, patent or plant variety rights, the breeder/inventor must minimize the possibility of any inadvertent release of such patentable material to persons outside of the University. In no circumstances are University employees permitted to sell, give away or otherwise transfer patentable material to anyone for purposes other than testing or experimental use as approved by the breeder/inventor. When potentially patentable selections or biological material is viewed by the public such as on field days or informal visits, visitors shall be informed that such selection(s) and/or biological material is the property of the University and unavailable to the general public. Lists or log entries of people attending field days or of individuals viewing such selection(s) or biological material could be helpful as a deterrent to theft, and useful should UC Material actually be stolen. These lists could be maintained by the organized research unit and/or the breeder/inventor(s). As a general rule, to prevent the spread of plant material of undetermined plant health and to prevent the inadvertent release or possible theft of potentially patentable selection(s) and/or biological material, the breeder/inventor should limit any test plantings with non-UC third parties to the minimum number and size necessary for evaluation in the relevant growing areas in California or elsewhere.

2.   TRANSFER OF POTENTIALLY PATENTABLE SELECTION(S), BIOLOGICAL MATERIAL AND/OR DATA TO NON-UC THIRD PARTIES FOR RESEARCH PURPOSES:  Field, lab testing or increase of potentially patentable selection(s) and/or biological material should be conducted on land or within facilities owned or controlled by the University whenever possible. When University facilities are inadequate for increase or for proper field or laboratory evaluations, an appropriate written agreement shall be used for all transfers of such Material to non-UC third parties.

Agreement(s) for use with plant selection(s) which can be protected under PPA or PVPA:

a.   <u>For Asexually Propagated Plant Selections or Cultivars:</u>  "Agreement for Testing Asexually Propagated Plant Selection(s) and/or Cultivar(s) Produced and Selected at The University of California" - APPENDIX B

**485** RELEASE OF SEXUALLY AND ASEXUALLY PROPAGATED CULTIVARS

    b.   <u>For Seed Propagated Plant Selection(s) and/or Cultivar(s)</u>: "Agreement for Testing Seed Propagated Plant Selection(s) and/or Cultivar(s) Produced and Selected at the University of California" - APPENDIX C

Agreements for use with potentially patentable biological material (biological material) and/or data which can be protected under SECTION 101 of US Patent Law:

For transfer of biological material prior to disclosure of potentially patentable plant subject matter invention(s) to the UCPTCO/LCPO:

    a.   FOR USE WITH NONPROFIT, NON-UC THIRD PARTIES: "Instructions for Standard Letter Transmitting Biological Materials to Universities and Nonprofit Institutions" - APPENDIX D

    b.   FOR USE WITH INDUSTRIAL (FOR PROFIT) NON-UC THIRD PARTIES: "Instructions for Standard Letter Transmitting Biological Materials to Industrial (for profit) Companies" - APPENDIX E

For transfer of biological material and/or data to non-UC third parties subsequent to disclosure of potentially patentable plant subject matter invention to the UCPTCO/LCPO (Generally used with potential commercial licensees):

    a.   "Secrecy Agreement for Biological Material" - APPENDIX F

    b.   "Secrecy Agreement for Data" - APPENDIX G

    c.   "Secrecy Agreement for Data and Biological Material" - APPENDIX H

F.   <u>Publication Bar to Obtaining Protection Under US Intellectual Property Laws</u>:

A printed publication can bar US patent rights only if it appears more than one year before the application for patent is filed and it must provide sufficient information to enable one skilled in the art to reproduce the invention. In the case of plant patents or PVP certificates generally, there is no written description presently known from which one skilled in the art can reproduce the invention. To reproduce a new plant selection it is generally necessary to obtain asexual propagation material or seed of that selection. Therefore, the courts have held that a printed publication which contains a full and complete description of a new plant selection will not operate to defeat valid patent rights, because the publication in and of itself is not enabling. However, in the case of a discovery of a new selection under cultivation in a location accessible to the public, a printed publication which describes the characteristics of the new selection and gives the location where it was found may enable others to collect and reproduce that selection. As a matter of practicality, the publication of articles concerning new plant selections can best be timed to occur just prior to the release of the cultivar into commercial use. Regarding Section 101 Patents, the following should be noted: A public "enabling" disclosure before the actual filing date of the United States patent application automatically destroys patent rights in nearly all foreign countries. Public disclosure means disclosure in any manner, such as by oral or written description, exhibit, demonstration, use, or the like to outside parties in a nonconfidential environment. US patent law allows a one-year grace period in which to file after the first enabling printed publication.

G.   Interaction of the Breeder/Inventor with the UCPTCO/LCPO:

1.   TIMING OF DISCLOSURE TO THE UCPTCO/LCPO:

   a.   FOR PPA AND PVPA DISCLOSURES : It is the responsibility of the breeder/inventor to promptly disclose novel plant selections to the UCPTCO/LCPO when sufficient evidence of uniqueness and usefulness is sufficient to justify large scale testing or commercial use.

   b.   FOR SECTION 101 DISCLOSURES - It is the responsibility of the breeder/inventor to promptly disclose plant subject matter patentable under Section 101 of US Patent Law at the time the invention has been reduced to practice.

   DISCLOSURE FORMS ARE ATTACHED AS APPENDIX I

2.   EVALUATION OF THE DISCLOSURE:

   A preliminary evaluation of the disclosure will be made by UCPTCO/LCPO staff. This assessment normally will include discussions with the breeder/inventor, industry representatives, and others who could provide information on the background and potential value or usefulness of the subject matter or plant material. Factors such as patentability, benefit to the public and commercial potential shall be considered.

3.   DISPOSITION OF DISCLOSURES:

   The UCPTCO/LCPO, after consultation with the appropriate Dean, will provide written notice to the Breeder/Inventor as to whether the University will pursue a patent or PVP certificate or not. This written notice will occur as expeditiously as possible, and normally within ninety (90) days after receipt of the disclosure from the breeder/inventor. The written notice will indicate the University's decision as well as outline the options available to the breeder/inventor, should the decision be not to file for protection. Normally, if the decision is not to file and if significant amounts of University monies, staff sources, land and/or facilities were used to develop the potentially patentable invention, patent or PVP certificate rights are not released to the breeder/inventor. Plant selection(s) in this category may possibly be licensed to commercial firms as tangible research products, arranged through the UCPTCO/LCPO upon mutual agreement with the Dean. If the decision is not to patent/protect/license, the breeder retains the option to formally or informally release such selection(s) into the public domain.

4.   APPLICATIONS FOR PATENT(S) OR PVP CERTIFICATES:

   If the University decides to proceed with a patent or PVP certificate application, the disclosure of the possibly patentable plant material or plant subject matter will be forwarded to a private patent attorney for an opinion as to patentability. If deemed patentable, the UCPTCO/LCPO will authorize the attorney to work with the breeder/inventor on the preparation of the application for filing in the United States Patent and Trademark Office or in the PVPA Office. If there are any questions regarding inventorship, it is the private patent attorney's responsibility to determine legal inventorship and file the application in the name of the true inventor(s). Any known disputes regarding inventorship should be noted in the disclosure to the UCPTCO/LCPO, so that inventorship issues can be resolved before an application is filed. Obtaining foreign protection for UC plant selections and foreign licensing under this protection is also possible, and may be desirable for UC. The

**485   RELEASE OF SEXUALLY AND ASEXUALLY PROPAGATED CULTIVARS**

UCPTCO/LCPO will provide information and carry out the steps necessary for foreign protection and licensing of protected UC cultivars.

5.   NAMING PLANT SELECTIONS:

Selecting a name for a plant selection is normally the responsibility of the breeder/inventor. The process may vary according to policies within the breeder/inventor's department. The plant selection should be named by the time the application is ready for filing so that it can be included in the application. The US Patent and Trademark Office or the PVP Office will normally conduct a search to determine whether or not a selected name violates trademark or other rights to cultivar names for similar plant material. Until the US Patent and Trademark Office publishes its anticipated rules and regulations regarding the naming of plant selections, breeder/inventors should follow the "International Code of Nomenclature for Cultivated Plants" - 1980. Another consideration in naming University of California plant selections regards the possible use the name "University of California", campus names or abbreviations or contractions thereof, as the name or a portion of a name for a plant selection. The use of the University's name for commercial purposes is subject to law in the State of California's Education Code and also to University policy. The UCPTCO/LCPO would prefer that, unless the breeder/inventor, department or organizational research unit has obtained proper authorization under UC policy, the University's name, campus names or abbreviations or contractions thereof not be used in the naming of UC developed cultivars.

6.   COMMERCIAL RELEASE OF PLANT MATERIAL:

After the PPA, PVPA or Patent Application is on file in the US Patent and Trademark Office or in the Plant Variety Protection Office, the UCPTCO/LCPO shall work with the breeder/inventor to determine the appropriate time and method for releasing plant materials into commercial/public use. Available material will generally be divided in an equitable manner to firms and individuals who have executed commercial license agreements with The Regents of The University of California. Negotiating licensing terms and conditions and execution of commercial license agreements for cultivars under PPA, or PVPA, or if a Patent Application is on file, is the responsibility of the UCPTCO/LCPO.

-<>-

# UNIVERSITY OF CALIFORNIA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • RIVERSIDE • SAN DIEGO • SAN FRANCISCO



SANTA BARBARA • SANTA CRUZ

J.W. PELTASON
    President

RONALD W. BRADY
    Senior Vice President—
    Administration

OFFICE OF TECHNOLOGY TRANSFER
1320 Harbor Bay Parkway, Suite 150
Alameda, CA 94501
tel: (510) 748-6600
fax: (510) 748-6639

*December 16, 1992*

*Dr. Royce S. Bringhurst*
*2049 Wickson Hall*
*Pomology Department*
*University of California*
*Davis, CA 95616*

*Dr. Douglas V. Shaw*
*2021 Wickson Hall*
*Pomology Department*
*University of California*
*Davis, CA 95616*

*Dr. Victor Voth*
*Pomology Department (UCD)*
*South Coast Research and Extension Center*
*7601 Irvine Blvd.*
*Irvine, CA 92718*

*Re:  NEW STRAWBERRY CULTIVAR, 'C202', 'CN201', 'C66', '67', 'C25', 'C70'*
*      UC Case No.: 92-363-1, 92-364-1, 92-365-1, 92-366-1, 92-367-1, 92-368-1*

*Dear Drs. Voth, Shaw, and Bringhurst:*

*This letter acknowledges receipt of your formal written disclosures and records of invention.  Permanent files have been established as our official record, and will be referred to by the UC Case numbers shown above.*

*Your disclosures have been assigned to William E. Gerlach, who will be completing a review of patentability and a licensing assessment and will call you to discuss your inventions.*

*These disclosures will be governed by the UC Patent Policy at the time of the disclosure.*

*If you have any further questions, please do not hesitate to call us at (510) 748-6600.*

*Sincerely,*

*Linda S. Stevenson*
*Prosecution Analyst*

*LSS:pkd*
*cc:  Nora Hackett, TLO, UCD*



D0000014

Davis: Department of Pomology

*Decided to have UCOP handle Jul S. 1-29-93*

December 30, 1992

*GRH,
Perhaps we should write Shaw... or should we let OT write the "sorry, that's not the way it is..." letter?*

*JdW 6 Jan 93*

TO:       Linda S. Stevenson
          Office of Tech. Transfer
          1320 Harbor Bay Parkway, Suite 150
          Alameda, CA 94501

FROM:     *Douglas V. Shaw*
          Douglas V. Shaw
          **Associate Professor**
          **Department of Pomology**

RE:       **Governance of disclosures strawberry cultivars C25, C66, C67, C70
          CN201, and C202**

Your memo dated December 16, 1992 includes the following statement: "These disclosures will be governed by the UC Patent Policy at the time of disclosure". As you and your colleagues at the Office of Technology Transfer are aware, the implications of this statement for distribution of royalties to the inventor(s) are unacceptable. I expect that the University will meet its obligations according to the Patent Agreement that I signed, at the University's request, on February 25, 1986. I have enclosed a copy of that agreement for your records.

cc:  Nora Hackett
     Larry Vanderhoef
     Carl Wootten

D0000010

# UNIVERSITY OF CALIFORNIA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • RIVERSIDE • SAN DIEGO • SAN FRANCISCO        SANTA BARBARA • SANTA CRUZ

J.W. PELTASON
President

RONALD W. BRADY
Senior Vice President—
Administration

OFFICE OF TECHNOLOGY TRANSFER
1320 Harbor Bay Parkway, Suite 150
Alameda, CA 94501
tel: (510) 748-6600
fax: (510) 748-6639

February 1, 1993

Dr. Douglas V. Shaw
Associate Professor
2021 Wickson Hall
Department of Pomology
University of California
Davis, CA  95616

**Re:    UC CASE NOS. 92-363-1, 92-364-1, 92-365-1, 92-366-1, 92-367-1, 92-368-1**

Dear Professor Shaw:

This is in response to your December 30, 1992 memo to Linda Stevenson of this office concerning the application of University Patent Policy to your recently disclosed, above-referenced inventions.

As background, the University adopted a revised Patent Policy effective April 16, 1990 after careful consideration by Office of the President and campus administrative and academic representatives. The revised Policy provides a sliding scale for inventors' share of patent royalty distributions. The overwhelming majority of current University inventions fall within the income category providing inventors 50% of the first $100,000 of cumulative net royalties and fees per invention. Such distributions are unchanged from the 1985 Patent Policy. Only a "big winner" would be affected by the April 1990 policy change which provides inventors 35% of the next $400,000 of cumulative net royalties and fees, and 20% of all additional cumulative net royalties and fees per invention. Of course, there is no way to predict whether any particular invention will achieve a future royalty income sufficient to result in differing distributions under the 1985 and 1990 policies. You should note that sliding scale thresholds are applied separately to each invention.



D0000019

As policies have changed and, possibly will change again, over the years, the impact of such policy changes on any one individual's circumstances will differ. The 1990 Policy, however, has been applied consistently by the University to all new inventions disclosed after April 16, 1990. This policy has not been applied retroactively to inventions disclosed before that date. Nor have earlier policies been applied to inventions disclosed after that date. It is essential that the University apply its policies consistently.

The University Patent Policy is a personnel policy grounded in the employment relationship. The Policy is not an independent contract. The University may prospectively change its personnel policies unilaterally with notice to the employees. Unilateral changes of personnel policies for public employers in California is well-supported in case law. The University changed the Patent Policy based on the recommendations of the Intellectual Property Advisory Committee. This was a Universitywide committee. The policy change included notice to the University community and a chance for comment prior to the change on April 16, 1990. Thus, the Patent Policy change does apply prospectively from the effective date of the new Patent Policy for those employed by The Regents prior to that date.

I hope this clarifies the applicability of University Patent Policy to individual cases. If I can be of further assistance, please let me know.

Sincerely,

Carl B. Wootten
Director

CBW:JA:sc

cc:   L. Vanderhoef
      R. N. Shelton
      N. Hackett
      M. Simpson
      W. Davis
      J. Lundberg

D0000020

Davis: Department of Pomology


February 7, 1993



TO:        Mr. Carl Wootten
           Office of Tech. Transfer
           1320 Harbor Bay Parkway, Suite 150
           Alameda, CA 94501

FROM:      Douglas V. Shaw
           Associate Professor
           Department of Pomology


RE:        Response to memo dated February 1, 1993 regarding strawberry
           cultivars C25, C66, C67, C70, CN201, and C202


You have stated the University's position clearly. It is probably unnecessary,
but I reiterate here that I do not now, and have never, accepted this position.
I have obtained independent legal counsel and their opinion is that I am well
within my legal rights to expect that the University will meet its obligations
according to the Patent Agreement that I signed on February 25, 1986. I have
authorized an attorney to pursue this on my behalf. I expect that my legal
representative will be contacting the Office of the President directly.



cc:   Robert Shelton
      Larry Vanderhoef
      Richard W. Gable



D0000001

LAW OFFICES
# TOWNSEND AND TOWNSEND

ANTHONY B. DIEPENBROCK
DIRKS B. FOSTER
WILLIAM MICHAEL HYNES, P.C.
ROGER L. COOK
WARREN P. KUJAWA
ROBERT J. BENNETT
ROBERT C. COLWELL
JOHN W. SCHLICHER
JAMES M. HESLIN
GARY T. AKA
CHARLES E. KRUEGER
E. LYNN PERRY
THEODORE G. BROWN, III
JAMES A. DELAND
VERNON A. NORVIEL
WILLIAM J. BOHLER
ELLEN LAUVER WEBER
MARK L. PETTINARI
JEANNE C. SUCHODOLSKI
SUSAN M. SPAETH
ROBERT L. RISBERG, JR.
DAVID L. BILSKER
ERIC H. WILLGOHS
KAREN BABYAK DOW
JEFFREY K. WEAVER
CHARLES J. KULAS
TRACY L. DUNN*
JEFFRY J. GRAINGER
EUGENIA GARRETT-WACKOWSKI
MICHAEL L. CRAPENHOFT

ALBERT J. HILLMAN
PAUL W. VAPNEK
J. GEORG SEKA
BRUCE W. SCHWAB
GEORGE M. SCHWAB
KENNETH R. ALLEN
DAVID N. SLONE
JAMES F. HANN
M. HENRY HEINES
WILLIAM M. SMITH
MARK A. STEINER
PAUL C. HAUGHEY
GUY W. CHAMBERS
KENNETH A. WEBER
STEVEN W. PARMELEE*
RICHARD L. HUGHES
MICHAEL E. WOODS
K. T. CHERIAN
KEVIN L. BASTIAN
A. JAMES ISBESTER
ANNA C. SILVA
DENISE A. LEE
HARRY J. MACEY
DUANE H. MATHIOWETZ
PHILIP H. ALBERT
J. STEVEN WHITAKER*
LAUREN C. O'NEAL
JACQUELINE L. FUCHS
R. GWEN LIPSEY*

PATENTS, TRADEMARKS, AND COPYRIGHTS

TWENTIETH FLOOR
STEUART STREET TOWER
ONE MARKET PLAZA
SAN FRANCISCO, CA 94105-1492
(415) 543-9600
FAX (415) 543-5043

PALO ALTO OFFICE
379 LYTTON AVENUE
PALO ALTO, CA 94301-1431
(415) 326-2400
PALO ALTO FAX (415) 326-2422

SEATTLE OFFICE
1201 THIRD AVENUE
SUITE 2600
SEATTLE, WA 98101-3000
(206) 467-9600
SEATTLE FAX (206) 623-6793

CHARLES E. TOWNSEND (1904-1944)
STEPHEN S. TOWNSEND (1942-1986)

WRITER'S DIRECT DIAL NUMBER:

CHARLES E. TOWNSEND, JR.
JOHN L. McGANNON
HENRY K. WOODWARD
EDWARD J. KEELING
JOHN A. HUGHES
OF COUNSEL

* NOT ADMITTED IN CALIFORNIA

February 5, 1993

FAX 916/752-8502/mail confirmation

Dr. Douglas V. Shaw
Pomology Department
2021 Wickson Hall
University of California, Davis
Davis, CA 95616

Re:  New Strawberry Plant Patent Applications
     Our Files 2307-416, 417, 418, 419, 420, 421

Dear Dr. Shaw:

     In the hopes of expediting any problem which may exist, I am
sending you a copy of an assignment form which we intend to use
for each of the six strawberry varieties.

     After you have reviewed the form, please let me know if it
is acceptable or if any changes are suggested.

                              Yours very truly,

                              Anthony B. Diepenbrock

ABD/meg
Enclosure
1. Assignment
b:2307-416.Sha

Attorney Docket No. 2307-416
UC 92-363-1

## ASSIGNMENT

THIS ASSIGNMENT, by Royce S. Bringhurst, residing at 738 Mulberry Lane, Davis, California 95616, Douglas V. Shaw, residing at 1002 Stanford Drive, Davis, California 95616, and Victor Voth, residing at 906 Grovement Street, Santa Ana, California 92706 (hereinafter referred to as "ASSIGNORS"), witnesseth:

WHEREAS, the ASSIGNORS, have invented a new and distinct cultivar of strawberry plant called 'Cuesta' as set forth in an application for Plant Letters Patent of the United States,

( )   having an oath or declaration executed on
_____;
( )   bearing Serial No. _____ and filed on
_____; and,

WHEREAS, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation duly organized under and pursuant to the laws of the State of California, and having its principal place of business at 300 Lakeside Drive, 22nd floor, Oakland, CA 94612-3550 (hereinafter referred to as the "ASSIGNEE") is desirous of acquiring the entire right, title and interest in and to said invention and said application for Plant Letters Patent of the United States, and in and to any United States Plant Letters Patent or any foreign patent(s) or Certificates of Protection to be obtained therefor and thereon:

NOW, THEREFORE, in consideration of the sum of One Dollar ($1.00), and in consideration of the benefits stipulated for the inventor in the "University of California Patent Policy" revised effective April 16, 1990, which document is made by reference a part hereof, and in fulfillment of the ASSIGNORS' Patent Agreement with the University of California and for other good and sufficient consideration the receipt of which is hereby acknowledged, the ASSIGNORS have sold, assigned, transferred and set, over to the ASSIGNEE, its successors, legal representatives and assigns, the entire right, title and interest in and to the above mentioned invention, the application for United States Plant Letters Patent, and any Plant Letters Patent in the United States of America and any and all patent(s) and Certificates of Protection in any and all foreign countries which may be granted therefor and thereon and in and to any and all divisions, continuations, and continuations-in-part of said applications, or reissues or extensions of said United States Plant Letters Patent or any foreign patent(s), and all rights obtained under the International Union for the Protection of Varieties of Plants (UPOV), the same to be held and enjoyed by the ASSIGNEE, for its own use and benefit and the use and benefit of its successors,

legal representatives and assigns, to the full end of the term or terms for which the United States Letters Patent or foreign patent(s) or certificate(s) of protection may be granted, as fully and entirely as the same would have been held and enjoyed by the ASSIGNORS had this sale and assignment not been made.

AND, for the same consideration, the ASSIGNORS hereby covenant and agree to and with the ASSIGNEE, its successors, legal representatives and assigns, that, at the time of execution and delivery of these presents, the ASSIGNORS are the sole and lawful owners of the entire right, title and interest in and to the said invention and the application for United States Plant Letters Patent above mentioned, and that the same is unencumbered and that the ASSIGNORS have full and good right and lawful authority to sell and convey the same in the manner herein set forth.

AND for the same consideration, the ASSIGNORS hereby covenant and agree to and with the ASSIGNEE, its successors, legal representatives and assigns that the ASSIGNORS, whenever counsel for the ASSIGNEE or counsel of its successors, legal representatives and assigns, shall advise that any proceedings in connection with said invention or said application(s) for United States Plant Letters Patent or any foreign patent(s) or certificate(s) of protection, or any proceeding in connection with the United States Plant Letters Patent or foreign patent(s) or certificate(s) of protection for said invention in any country, including interference proceedings, is lawful and desirable, or any division, continuation or continuation-in-part of any application for United States Plant Letters Patent, any foreign patent(s) or certificate(s) of protection or any reissue or extension of any United States Plant Letters Patent, any foreign patent(s) or certificate(s) of protection to be obtained thereon, is lawful and desirable, will sign all papers and documents, take all lawful oaths, and do all acts necessary or required to be done for the procurement, maintenance, enforcement, and defense of United States Plant Letters Patent, any foreign patent(s) or any certificate(s) of protection for said invention, without charge to the ASSIGNEE, its successors, legal representatives, and assigns, but at the cost and expense of the ASSIGNEE, its successors, legal representatives and assigns.

AND the ASSIGNORS hereby request the Commissioner of Patents to issue said Plant Letters Patent of the United States to the ASSIGNEE as the ASSIGNEE of said invention and such United

2

States Plant Letters Patent to be issued thereon for the sole use and benefit of the ASSIGNEE, its successors, legal representatives and assigns.


Dated: _____, 1993.          By: _____
                                              Royce S. Bringhurst


STATE OF CALIFORNIA )
                    )  ss:
COUNTY OF YOLO      )

        Before me, a notary public in and for said county and state, personally appears Royce S. Bringhurst to me known to be the person described in the foregoing instrument, who signed the foregoing instrument in my presence and declared the same to be his free act and deed, on the day and year last above written.


Dated:_____, 1993.          _____
                                              Notary Public


Dated: _____, 1993.          By: _____
                                              Douglas V. Shaw


STATE OF CALIFORNIA )
                    )  ss:
COUNTY OF YOLO      )

        Before me, a notary public in and for said county and state, personally appears Douglas V. Shaw to me known to be the person described in the foregoing instrument, who signed the foregoing instrument in my presence and declared the same to be his free act and deed, on the day and year last above written.


Dated:_____, 1993.          _____
                                              Notary Public


3

Dated: _____, 1993.          By: _____
                                            Victor Voth

STATE OF CALIFORNIA          )
                             )  ss:
COUNTY OF ORANGE             )

          Before me, a notary public in and for said county and
state, personally appears Victor Voth to me known to be the
person described in the foregoing instrument, who signed the
foregoing instrument in my presence and declared the same to be
his free act and deed, on the day and year last above written.

Dated: _____, 1993.

c:\work\2307-416.Ass                         _____
                                                  Notary Public

4

LAW OFFICES
# TOWNSEND AND TOWNSEND

PATENTS, TRADEMARKS, AND COPYRIGHTS

ANTHONY B. DIEPENBROCK
DIRKS B. FOSTER
WILLIAM MICHAEL HYNES, P.C.
ROGER L. COOK
WARREN P. KUJAWA
ROBERT J. BENNETT
ROBERT C. COLWELL
JOHN W. SCHLICHER
JAMES M. HESLIN
GARY T. AKA
CHARLES E. KRUEGER
E. LYNN PERRY
THEODORE G. BROWN, III
JAMES A. DELAND
VERNON A. NORVIEL
WILLIAM J. BOHLER
ELLEN LAUVER WEBER
MARK L. PETTINARI
JEANNE C. SUCHODOLSKI
SUSAN M. SPAETH
ROBERT L. RISBERG, JR.
DAVID L. BILSKER
ERIC H. WILLGOHS
KAREN BABYAK DOW
JEFFREY K. WEAVER
CHARLES J. KULAS
TRACY L. DUNN*
JEFFRY J. GRAINGER
EUGENIA GARRETT-WACKOWSKI
MICHAEL L. CRAPENHOFT

ALBERT J. HILLMAN
PAUL W. VAPNEK
J. GEORG SEKA
BRUCE W. SCHWAB
GEORGE M. SCHWAB
KENNETH R. ALLEN
DAVID M. SLONE
JAMES F. HANN
M. HENRY HEINES
WILLIAM M. SMITH
MARK A. STEINER
PAUL C. HAUGHEY
GUY W. CHAMBERS
KENNETH A. WEBER
STEVEN W. PARMELEE*
RICHARD L. HUGHES
MICHAEL E. WOODS
K. T. CHERIAN
KEVIN L. BASTIAN
A. JAMES ISBESTER
ANNA C. SILVA
DENISE A. LEE
HARRY J. MACEY
DUANE H. MATHIOWETZ
PHILIP H. ALBERT
J. STEVEN WHITAKER*
LAUREN C. O'NEAL
JACQUELINE L. FUCHS
R. GWEN LIPSEY*

CHARLES E. TOWNSEND, JR.
JOHN L. McGANNON
HENRY K. WOODWARD
EDWARD J. KEELING
JOHN A. HUGHES
   OF COUNSEL

* NOT ADMITTED IN CALIFORNIA

TWENTIETH FLOOR
STEUART STREET TOWER
ONE MARKET PLAZA
SAN FRANCISCO, CA 94105-1492
(415) 543-9600
FAX (415) 543-5043

PALO ALTO OFFICE
379 LYTTON AVENUE
PALO ALTO, CA 94301-1431
(415) 326-2400
PALO ALTO FAX (415) 326-2422

SEATTLE OFFICE
1201 THIRD AVENUE
SUITE 2600
SEATTLE, WA 98101-3000
(206) 467-9600
SEATTLE FAX (206) 623-6793

CHARLES E. TOWNSEND (1904-1944)
STEPHEN S. TOWNSEND (1942-1986)

WRITER'S DIRECT DIAL NUMBER:

February 16, 1993

Dr. Douglas V. Shaw
Associate Professor
Department of Pomology
University of California, Davis
Davis, California 95616

Re:   New Strawberry Plant Patent Applications

| Varietal Name | UC No. | Our File No. |
|---|---|---|
| 'Cuesta' | 92-363-1 | 2307-416 |
| 'Sunset' | 92-364-1 | 2307-417 |
| 'Anaheim' | 92-365-1 | 2307-418 |
| 'Laguna' | 92-366-1 | 2307-419 |
| 'Camarosa' | 92-367-1 | 2307-420 |
| 'Carlsbad' | 92-368-1 | 2307-421 |

Dear Dr. Shaw:

Enclosed are two originals of the applications for the captioned strawberry varieties. Also enclosed is an Assignment for each application.

I would appreciate it if you would review the applications for accuracy and if correct, please sign and date the Declaration for both originals of each application. Similarly, you should date and sign the Assignment documents before a notary public. Then, please have Royce Bringhurst execute in a like manner. Please then send the document to Mr. Victor Voth for his execution. Mr. Voth should return both originals of the applications and declarations and the Assignments to me in the self-addressed envelope.

TSEND AND TOWNSEND

Dr. Douglas Shaw
February 16, 1993
Page 2

Should you have any questions, please call me.

Yours very truly,

Anthony B. Diepenbrock

ABD/meg
Enclosures
1. plant patent applications each variety/two originals
2. Assignments
3. return envelope

cc:  William E. Gerlach
     Office of Technology Transfer

b:2307-416.tr

LAW OFFICES

# TOWNSEND AND TOWNSEND

ANTHONY B. DIEPENBROCK
DIRKS B. FOSTER
WILLIAM MICHAEL HYNES, P.C.
ROGER L. COOK
WARREN P. KUJAWA
ROBERT J. BENNETT
ROBERT C. COLWELL
JOHN W. SCHLICHER
JAMES M. HESLIN
GARY T. AKA
CHARLES E. KRUEGER
E. LYNN PERRY
THEODORE G. BROWN, III
JAMES A. DELAND
VERNON A. NORVIEL
WILLIAM J. BOHLER
ELLEN LAUVER WEBER
MARK L. PETTINARI
JEANNE C. SUCHODOLSKI
SUSAN M. SPAETH
ROBERT L. RISBERG, JR.
DAVID L. BILSKER
ERIC H. WILLGOHS
KAREN BABYAK DOW
JEFFREY K. WEAVER
CHARLES J. KULAS
TRACY J. DUNN*
JEFFRY J. GRAINGER
EUGENIA GARRETT-WACKOWSKI
MICHAEL L. CRAPENHOFT

ALBERT J. HILLMAN
PAUL W. VAPNEK
J. GEORG SEKA
BRUCE W. SCHWAB
GEORGE M. SCHWAB
KENNETH R. ALLEN
DAVID N. SLONE
JAMES F. HANN
M. HENRY HEINES
WILLIAM M. SMITH
MARK A. STEINER
PAUL C. HAUGHEY
GUY W. CHAMBERS
KENNETH A. WEBER
STEVEN W. PARMELEE*
RICHARD L. HUGHES
MICHAEL E. WOODS
K. T. CHERIAN
KEVIN L. BASTIAN
A. JAMES ISBESTER
ANNA C. SILVA
DENISE A. LEE
HARRY J. MACEY
DUANE H. MATHIOWETZ
PHILIP H. ALBERT
J. STEVEN WHITAKER*
LAUREN C. O'NEAL
JACQUELINE L. FUCHS
R. GWEN LIPSEY*

CHARLES E. TOWNSEND, JR.
JOHN L. McGANNON
HENRY K. WOODWARD
EDWARD J. KEELING
JOHN A. HUGHES
OF COUNSEL

* NOT ADMITTED IN CALIFORNIA

PATENTS, TRADEMARKS, AND COPYRIGHTS

TWENTIETH FLOOR
STEUART STREET TOWER
ONE MARKET PLAZA
SAN FRANCISCO, CA 94105-1492
(415) 543-9600
FAX (415) 543-5043

PALO ALTO OFFICE
379 LYTTON AVENUE
PALO ALTO, CA 94301-1431
(415) 326-2400
PALO ALTO FAX (415) 326-2422

SEATTLE OFFICE
1201 THIRD AVENUE
SUITE 2600
SEATTLE, WA 98101-3000
(206) 467-9600
SEATTLE FAX (206) 623-6793

CHARLES E. TOWNSEND (1904-1944)
STEPHEN S. TOWNSEND (1942-1986)

WRITER'S DIRECT DIAL NUMBER:

February 19, 1993

EXPRESS MAIL
Dr. Douglas V. Shaw
Associate Professor
Department of Pomology
University of California, Davis
Davis, California 95616

Re:   New Strawberry Plant Patent Applications

| Varietal Name | UC No. | Our File No. |
|---|---|---|
| 'Cuesta' | 92-363-1 | 2307-416 |
| 'Sunset' | 92-364-1 | 2307-417 |
| 'Anaheim' | 92-365-1 | 2307-418 |
| 'Laguna' | 92-366-1 | 2307-419 |
| 'Camarosa' | 92-367-1 | 2307-420 |
| 'Carlsbad' | 92-368-1 | 2307-421 |

Dear Dr. Shaw:

Enclosed are the revised Assignment documents for each of the applications.

Should you have any questions, please call me.

Yours very truly,

Anthony B. Diepenbrock

ABD/meg
Enclosures
1. Assignments
cc:   William E. Gerlach
      Office of Technology Transfer

b:2307-416.tr2

Attorney Docket No. 2307-419
UC 92-366-1

ASSIGNMENT

THIS ASSIGNMENT, by Victor Voth, residing at 906 Grovement Street, Santa Ana, California 92706, Douglas V. Shaw, residing at 1002 Stanford Drive, Davis, California 95616, and Royce S. Bringhurst, residing at 738 Mulberry Lane, Davis, California 95616 (hereinafter referred to as "ASSIGNORS"), witnesseth:

WHEREAS, the ASSIGNORS, have invented a new and distinct cultivar of strawberry plant called 'Laguna' as set forth in an application for Plant Letters Patent of the United States,

( )   having an oath or declaration executed on
_____;
( )   bearing Serial No. _____ and filed on
_____; and,

WHEREAS, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation duly organized under and pursuant to the laws of the State of California, and having its principal place of business at 300 Lakeside Drive, 22nd floor, Oakland, CA 94612-3550 (hereinafter referred to as the "ASSIGNEE") is desirous of acquiring the entire right, title and interest in and to said invention and said application for Plant Letters Patent of the United States, and in and to any United States Plant Letters Patent or any foreign patent(s) or Certificates of Protection to be obtained therefor and thereon:

NOW, THEREFORE, in consideration of the sum of One Dollar ($1.00), and in consideration of the benefits stipulated for the inventor in the applicable University of California Patent Policy which policy is made by reference a part hereof, and in fulfillment of the ASSIGNORS' Patent Agreement with the University of California and for other good and sufficient consideration the receipt of which is hereby acknowledged, the ASSIGNORS have sold, assigned, transferred and set, over to the ASSIGNEE, its successors, legal representatives and assigns, the entire right, title and interest in and to the above mentioned invention, the application for United States Plant Letters Patent, and any Plant Letters Patent in the United States of America and any and all patent(s) and Certificates of Protection in any and all foreign countries which may be granted therefor and thereon and in and to any and all divisions, continuations, and continuations-in-part of said applications, or reissues or extensions of said United States Plant Letters Patent or any foreign patent(s), and all rights obtained under the International Union for the Protection of Varieties of Plants (UPOV), the same to be held and enjoyed by the ASSIGNEE, for its own use and benefit and the use and benefit of its successors,

legal representatives and assigns, to the full end of the term or terms for which the United States Letters Patent or foreign patent(s) or certificate(s) of protection may be granted, as fully and entirely as the same would have been held and enjoyed by the ASSIGNORS had this sale and assignment not been made.

AND, for the same consideration, the ASSIGNORS hereby covenant and agree to and with the ASSIGNEE, its successors, legal representatives and assigns, that, at the time of execution and delivery of these presents, the ASSIGNORS are the sole and lawful owners of the entire right, title and interest in and to the said invention and the application for United States Plant Letters Patent above mentioned, and that the same is unencumbered and that the ASSIGNORS have full and good right and lawful authority to sell and convey the same in the manner herein set forth.

AND for the same consideration, the ASSIGNORS hereby covenant and agree to and with the ASSIGNEE, its successors, legal representatives and assigns that the ASSIGNORS, whenever counsel for the ASSIGNEE or counsel of its successors, legal representatives and assigns, shall advise that any proceedings in connection with said invention or said application(s) for United States Plant Letters Patent or any foreign patent(s) or certificate(s) of protection, or any proceeding in connection with the United States Plant Letters Patent or foreign patent(s) or certificate(s) of protection for said invention in any country, including interference proceedings, is lawful and desirable, or any division, continuation or continuation-in-part of any application for United States Plant Letters Patent, any foreign patent(s) or certificate(s) of protection or any reissue or extension of any United States Plant Letters Patent, any foreign patent(s) or certificate(s) of protection to be obtained thereon, is lawful and desirable, will sign all papers and documents, take all lawful oaths, and do all acts necessary or required to be done for the procurement, maintenance, enforcement, and defense of United States Plant Letters Patent, any foreign patent(s) or any certificate(s) of protection for said invention, without charge to the ASSIGNEE, its successors, legal representatives, and assigns, but at the cost and expense of the ASSIGNEE, its successors, legal representatives and assigns.

AND the ASSIGNORS hereby request the Commissioner of Patents to issue said Plant Letters Patent of the United States to the ASSIGNEE as the ASSIGNEE of said invention and such United

States Plant Letters Patent to be issued thereon for the sole use and benefit of the ASSIGNEE, its successors, legal representatives and assigns.


Dated: _____, 1993.          By: _____
                                            Victor Voth


STATE OF CALIFORNIA        )
                           )  ss:
COUNTY OF ORANGE           )

        Before me, a notary public in and for said county and state, personally appears Victor Voth to me known to be the person described in the foregoing instrument, who signed the foregoing instrument in my presence and declared the same to be his free act and deed, on the day and year last above written.


Dated: _____, 1993.          _____
                                            Notary Public


Dated: 3-1_____, 1993.          By: _____
                                            Douglas V. Shaw


STATE OF CALIFORNIA )
                    )  ss:
COUNTY OF YOLO      )

        Before me, a notary public in and for said county and state, personally appears Douglas V. Shaw to me known to be the person described in the foregoing instrument, who signed the foregoing instrument in my presence and declared the same to be his free act and deed, on the day and year last above written.


Dated: march 1 , 1993.          _____
                                     Notary Public



OFFICIAL SEAL
KAREN MORGAN YOUNT
NOTARY PUBLIC - CALIFORNIA
YOLO COUNTY
My Comm. Expires Jan. 1, 1994

3

Dated: _____, 1993.          By:_____

                                           Royce S. Bringhurst


STATE OF CALIFORNIA )
                    )  ss:
COUNTY OF YOLO      )


     Before me, a notary public in and for said county and state, personally appears Royce S. Bringhurst to me known to be the person described in the foregoing instrument, who signed the foregoing instrument in my presence and declared the same to be his free act and deed, on the day and year last above written.


Dated:_____, 1993.         _____

                                           Notary Public

c:\work\2307-419.Ass

4