RACHEL KREVANS (CA SBN 116421)
RKrevans@mofo.com
WESLEY E. OVERSON (CA SBN 154737)
WOverson@mofo.com
MATTHEW A. CHIVVIS (CA SBN 251325)
MChivvis@mofo.com
JACOB P. EWERDT (CA SBN 313732)
JEwerdt@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  415.268.7000
Facsimile:  415.268.7522

Attorneys for Defendant and Cross-Complainant
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA BERRY CULTIVARS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation,<br><br>Defendant. | Case No. 3:16-cv-02477-VC<br><br>**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO CBC'S MOTION FOR SUMMARY JUDGMENT** |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation,<br><br>Cross-Complainant,<br><br>v.<br><br>CALIFORNIA BERRY CULTIVARS, LLC, DOUGLAS SHAW, and KIRK LARSON,<br><br>Crossclaim Defendants. | Date: March 9, 2017<br>Time: 10:00 a.m.<br>Place: Courtroom 4, 17th Floor<br>Judge: Hon. Vince Chhabria |

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE

2  NOTICE that on March 9, 2017, at 10:00 a.m., or as soon as the matter may be heard, The

3  Regents of the University of California (the "University") cross move for summary judgment on

4  several of its causes of action against California Berry Cultivars LLC, Douglas Shaw, and Kirk

5  Larson (collectively, "CBC") and all of the causes of action asserted by CBC.  In addition, the

6  University opposes CBC's Motion for Summary Judgment on the University's claims.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      STATEMENT OF FACTS

For more than 80 years, the University has maintained a Strawberry Breeding Program

(the "Program").  (Ex. 1 at 79:5-10.)  The Program was initiated by strawberry breeders Harold

Thomas and Earl Goldsmith in 1930, built upon briefly by Richard Baker, and then more

extensively by Victor Voth and Royce Bringhurst.  (*Id.*)  From the 1950s to the 1980s, the

combined research and breeding skills of Dr. Bringhurst and Mr. Voth led to the development of

varieties that came to dominate the California and global strawberry grower industry.  (*Id.* at

79:12-17.)  In 1986, Douglas Shaw was hired by the University; in 1990, assumed direction of the

Program; joined by Kirk Larson in 1991.  (Ex. 1 at 17:2-4; ComplaintComplaint ¶¶ 6-8, ECF No.

2-2.)  Drs. Shaw and Larson used the University collection of strawberry plants ("germplasm")

developed by Dr. Bringhurst and Mr. Voth as the basis for breeding new varieties.  (Ex. 1 at

17:25-18:4, 79:18-23.)  The University's germplasm at issue here would not exist if Drs. Shaw

and Larson had not had the benefit of the prior breeder's work.  (*Id.* at 18:16-19.)

The University owns all the strawberry germplasm and research records developed by

University employees in its Program, just as it does in its breeding programs for other plant

species.  (Ex. 2 at 138:11-140:7; Ex. 3 at 131:14-133:1; Ex. 87; Ex. 4; Ex. 79.)  The University

patents new and distinct strawberry varieties and releases them to commercial growers if, in its

judgment, they are of sufficient value to warrant release and patent protection.  (Ex. 3 at 148:10-

149:5, 217:16-219:5.)  All commercially released strawberry varieties are patented to protect

against inappropriate use, such as use by private breeding programs.  (Ex. 3 at 208:4-14; Ex. 5 at

UC_STRAW2_00049262; Ex. 6 at CBC_DS_00003005-3006.)  Otherwise, the University relies

on California state law, its own policies, and contracts to protect its propriety interest in Program germplasm that it decides to maintain but not to commercially release.  (Ex. 3 at 130:23-133:12; Ex. 7 at UC_STRAW2_00000916; UC_STRAW2_00050983; CBC Ex.[1] BB at CBC_DS_00006693-6694; CBC Ex. OO; UC_STRAW2_00050995; UC_STRAW2_00050954; Cal. Lab.  Code § 2860.)  The University licenses patented, released varieties to selected nurseries, which asexually reproduce them under those licenses for sale to strawberry growers.  (*E.g.*, Ex. 9.)  As part of its mission to serve the California public, the University restricts licensing of varieties in certain key ways.  (Ex. 11 at 114:18-115:11.)  For example, growers may *only* grow them for purposes of commercial fruit production.  (*E.g.*, Ex. 9 at ¶¶ 2.2, 2.5.)  The University has a longstanding policy not to grant licenses that permit the use of its germplasm for any breeding purpose.  (*See* Carriere Dep at 101:6-18, 102:6-21; CBC_DS_00003034.)  In addition, for the first two years after each variety's release, the University licenses it only to California nurseries.  (Carriere Dep at 105:21-106:10.)  Breeders receive a substantial share of net royalties from the licenses on released varieties they invented.[2]

   At the request of the Breeders, the University will sometimes enter into agreements with nurseries, including nurseries in other countries, for pre-commercialization testing of strawberry varieties, subject to many contractual restrictions.  (Carriere Dep at 109:11-110:21.)  These agreements specify that the varieties are owned by the University, may only be tested for the University, may not be used for breeding, may not be transferred to anyone, and may not have information about them disclosed to anyone, all unless the University specifically allows it.  (*See, e.g.*, Ex. 13 at ¶¶ 2.1, 2.2, 2.7, 2.8; Carriere Dep at 110:22-111:7, 113:8-114:4.)  Eurosemillas, S.A., in Spain (together with its U.S.-based affiliate, International Semillas LLC, collectively "Semillas"), is one such testing nursery.  (*See* Ex. 13; Ex. 14; Ex. 15; Ex. 16.)

---

[1] References to "CBC Ex." are to the Declaration of Nathaniel P. Garrett, filed in support of CBC's Motion for Summary Judgment (ECF No. 145).  ).  Otherwise, all Exhibit citations are to the Declaration of Matthew A. Chivvis, filed herewith.

[2] Drs. Shaw and Larson have been paid millions of dollars in royalties from released varieties they invented or helped invent.  (Ex. 1 at 22:1-24; Ex. 12; CBC Ex. M.)  Dr. Shaw has made the most from the Camarosa variety, on which Dr. Bringhurst and Mr. Voth are also named inventors.  (Ex. 1 at 20:17-21:25; Ex. 12; CBC Ex. M.)

**A.    Crossclaim Defendants Drs. Shaw and Larson Were Employees of the University When the Varieties They Bred Were Developed**

Complaint  As a condition of their employment, both Drs Shaw and Larson signed University of California State Oath of Allegiance and Patent Agreements (hereinafter, "employment agreements").  These agreements explicitly provide:

> ***I agree that every possibly patentable*** device, process, ***plant***, or product, ***hereinafter referred to as "invention," which I conceive or develop while employed by University, or during the course of my utilization of any University research facilities…shall be examined by University*** to determine rights and equities therein in accordance with the Policy, and I shall promptly furnish University with complete information with respect to each.
>
> ***In the event any such invention shall be deemed by University to be patentable***, and University desires, pursuant to determination by University as to its rights and equities therein, to seek patent protection thereon, ***I shall execute any documents and do all things necessary, at University's expense, to assign to University all rights, title and interest therein*** and to assist University in securing patent protection thereon.

(Ex. 17 (emphasis added); *see* Ex. 8.)  California law and University policy at the relevant times also provided that ownership of an employee's tangible research materials, such as germplasm and the notebooks and records of research, lies with the University.  (UC_STRAW2_00000914; UC_STRAW2_00000906; UC_STRAW2_00000904; CBC Ex. OO.)  All the University strawberry varieties at issue were conceived and developed by Drs. Shaw and Larson (the "Breeders") for the University while University employees.  (Ex. 19 at UC_STRAW2_00075864; CBC's Mot. for Summ. J. (ECF No. 144-4) (hereinafter "CBC MSJ") at 21-24).  The CBC strawberry varieties at issue are all progeny of University varieties conceived and developed while they were University employees.  (Ex. 1 at 219:10-228:1, 235:12-247:22; Ex. 20; Ex. 21; Ex. 22; Ex. 23; CBC Ex. T at 10.)

**B.    The Breeders Refused to Assist the Continuance of the Program**

Although they had notified the University of their intent to leave the University at some future date in 2011, in 2013, Drs. Shaw and Larson more formally told the University that they would retire from the University, with the exact date still to be determined.  (Ex. 1 at 26:23-27:1; Ex. 24 at UC_STRAW2_00050998-9.)  In a written communication, Dr. Shaw disclosed an elite

set of "180 genotypes" (that is, 180 specific varieties) as a patentable invention of very high value that he and Dr. Larson believed the University should make available for use as breeding material outside the University, including to the private commercial breeding program he intended to join. (CBC MSJ Ex. N at CBC_DS_00019786-00003 to 06, 19786-88; Ex. 24 at UC_STRAW2_00050997.)  Dr. Shaw knew the proposal to license for breeding contravened longstanding University policy.  (Ex. 1 at 108:14-111:21; Ex. 6 at CBC_DS_00003005-06.)

Out of concern that some varieties in the Program germplasm collection might be "lost" in the transition to a new University breeder, the acting Dean of the College of Agriculture and Environmental Sciences asked that a back-up copy of these 180 varieties be made.  (Ex. 2 at 133:9-25.)  The chair of Drs. Shaw and Larson's department facilitated the process of creating this back-up copy, and in doing so he said he would confirm Drs. Shaw and Larson's commercial interests, but he was referring only to their rights as inventors to royalties should any of those varieties by patented and licensed by the University, just as with any other employee.  (van Kessel Dep at 134:1-136:17.)  He was not authorized to dispossess the University of its ownership rights in Program germplasm or materials, nor did he.  (Ex. 2 at 244:2-245:23; UC_ STRAW2_ 00000937 at UC_ STRAW2_ 00000937.)  And Drs. Shaw and Larson knew that to be the case.  (Ex. 2 at 245:25-246:21.)

Based on Dr. Shaw's disclosure, the University filed a new, provisional U.S. Plant Patent Application on 169 varieties.  (UC_STRAW2_00050997; UC_STRAW2_0000943; Ex. 27; Ex. 1 at 100:10-101:1.)  The University had already submitted individual U.S. Plant Patent Applications on the 11 other varieties:  Portola, Fronteras, San Andreas, Petaluma, Monterey, Merced, Grenada, Benicia, Albion, Mojave, and Palomar.  (*See* ECF Nos. 104-1 to 104-11.)  The University then carved out the Cabrillo variety from the provisional application and pursued a separate U.S. Plant Patent Application on that variety.  (Ex. 28; Ex. 3 at 176:15-177:3; Ex. 1 at 179:11-180:16.)  The University later filed non-provisional U.S. Plant Patent Application No. 14/545,653 on the 168 remaining varieties, which published as US 2015/0359150.  (Ex. 19.)  In accordance with their employment agreements, this application and the provisional application are recorded with the U.S. Patent and Trademark Office as assigned from Drs. Shaw and Larson

1   to the University, although they have refused multiple times to execute confirmatory assignments.

2   (*See, e.g.*, Ex. 23; Ex. 81; Ex. 1 at 216:7-15; Ex. 29; Ex. 30; Ex. 31.)

3          Drs. Shaw and Larson did not actually retire until November 2014, although (without

4   disclosing this to the University) they effectively stopped any further breeding or selection

5   activities as to previously bred plants in 2011.  (Ex. 1 44:23-50:1, 182:21-183:13; Ex. 32.)  Before

6   they retired, the University required that Drs. Shaw and Larson leave behind all Program

7   germplasm and materials they had conceived or developed while employed at the University.

8   (Ex. 33.)  Drs. Shaw and Larson left behind what they reported were all copies of the complete

9   germplasm, but in fact were only progeny of crossbreeding (or "crosses") that they had performed

10  as of 2011.  (Ex. 10; Ex. 18.)  After they transferred these copies, they told the University that

11  they had already destroyed the results of their 2013 crosses.  (Ex. 32.)  They did no crosses for the

12  University in 2014 (only secretly for CBC) — leaving a deliberate three year gap in the Program,

13  which extended into 2015, when the new breeder, Dr. Knapp was hired, because without crosses

14  planned in the fall of 2014 there were no new varieties for Dr. Knapp to work with in 2015.  (Ex.

15  34; Ex. 1 at 44:24-46:19, 48:5-21, 49:16-50:1.)

16      **C.    Crossclaim Defendants Developed and Executed a Plan to Misappropriate
             University Tangible and Intellectual Property**

17

18          While they were still University employees, Drs. Shaw and Larson developed and secretly

19  began implementing a plan to use Program germplasm as parents to create new varieties — an

20  activity that extracts the genetic value of the germplasm — and to commercially release the new

21  varieties through a new, private, breeding company (ultimately CBC) in direct competition with

22  the University.  (*See* Ex. 1 at 57:4-14; Ex. 35 at CBC00002070-71; Ex. 36 (attaching

23  CBC00000909); Ex. 37 (attaching UC_STRAWB2_00070498); Ex. 38 (attaching

24  CBC00000918); Ex. 39 (attaching CBC00000920).)  In 2013, Drs. Shaw and Larson formally

25  established CBC.  (Ex. 1 at 56:8-57:3; UC_STRAW2_00000918 at 19.)  Among the founders of

26  CBC were Semillas and the University's domestic licensee, Lassen Canyon Nursery, Inc.

27  ("Lassen").  (UC_STRAW2_00000918 at 19; Ex. 40.)  Drs. Shaw and Larson had worked closely

28  with Semillas and Lassen while at the University, as both were contractors for the Program during

1   that time (and still are today).  (Ex. 1 at 53:16-54:17, 55:7-21.)

2         Drs. Shaw and Larson laid the groundwork for CBC well before CBC was formally

3   established.  In 2011, Drs. Shaw and Larson had already convinced the CBC members to commit

4   to his plan to create a private breeding program.  (Ex. 35 at 2073; Ex. 41 at 247:14-248:22.)  A

5   year prior, in 2010, Drs. Shaw and Larson began transferring valuable, unreleased, unpatented

6   Program varieties to Semillas in Spain, purportedly to be "tested" for the University.  (CBC Ex. T

7   at 10, 15; Ex. 1 at 59:15-25, 63:23-64:6.)  Drs. Shaw and Larson transferred at least 17 such

8   varieties to Semillas in 2010, 12 in 2011, 13 in 2012, and 10 in 2013, although they had only

9   shipped 17 such varieties to Semillas in the combined 10 previous years.  (*See* Ex. 42; Ex. 13; Ex.

10   14; UC_STRAW2_00045671; Ex. 44; Ex. 36 (attaching CBC00000909); Ex. 37 (attaching

11   UC_STRAWB2_00070498).)  In addition to never-released varieties, they transferred varieties

12   that had been released commercially in the U.S. but were not yet commercially released in

13   Europe.  (Ex. 1 at 71:4-22, 76:18-77:2.)  The unreleased varieties were governed by test

14   agreements between the University and Semillas that allowed for pre-commercialization testing in

15   Spain but explicitly forbade using the varieties to breed new varieties.  (*E.g.*,

16   UC_STRAW2_00076481 at ¶ 2.9.)  Drs. Shaw and Larson nevertheless personally, while still

17   employed by the University, planned and directed breeding by Semillas in Spain with the

18   patented and unpatented varieties, choosing each parent variety.  (Ex. 1 at 63:23-64:6, 65:18-21,

19   72:3-12, 228:20-24, 229:25-232:16, 233:15-22; CBC Ex. T at 10-11; Ex. 45; Ex. 46; Ex. 47

20   (attaching CBC00000935); Ex. 39 (attaching CBC00000920); Ex. 48 96:15-103:3.)  The seeds of

21   the mother plant used in the breeding were then harvested by Semillas and received in the U.S. by

22   CBC.  (CBC Ex. T at 12, 14; Ex. 49 at 161:7-162:17, 266:11-22; Ex. 1 at 248:11-249:9, 65:15-21;

23   Ex. 50 at 118:13-119:17; Ex. 51 at 214:4-10.)  Drs. Shaw and Larson disclosed none of this to the

24   University, in contravention of University policies that required them to disclose any non-

25   University employment, contracting, and conflicts of interest.  (Ex. 1 at 72:16-24; Ex. 52 at

26   UC_STRAW2_00058558.)

27         Drs. Shaw and Larson made their plans for this secret, ex-U.S. breeding because they

28   knew that CBC could not breed with patented Program varieties in the U.S. without violating U.S.

patent laws, but hoped this plan would evade those laws.  (Ex. 50 91:24-92:11; Ex. 6 at CBC_DS_00003005-06; Ex. 53 at CBC00009328; Ex. 45.)  CBC has evaluated and continues to evaluate in the U.S. the progeny grown from these seeds.  (VandenLangenberg Dep. at 114:23-115:2, 290:12-293:19; CBC Ex. T at 14.)  And CBC has continued this attempt to evade U.S. patent laws:  CBC is currently growing in the U.S. progeny from crosses directed by CBC but performed in Spain in 2014, 2015, and 2016, and is currently performing another set of crosses in Spain and in California.  (Ex. 1 249:2-9; Ex. 41 at 125:7-9; CBC Ex. T at 10, 14.)

### D.     Procedural Posture

On February 12, 2016, CBC informed the University that Drs. Shaw and Larson had purported to assign rights that they claimed to have in Program germplasm to CBC.  (Ex. 57.)  On May 2, 2016, CBC filed suit against the University in California Superior Court.  The University filed a crossclaim four days later, on May 6, and removed the case to this Court.  The University filed several Amended Crossclaims in light of facts learned during discovery.

## II.     THE UNIVERSITY'S CROSS-MOTION FOR SUMMARY JUDGMENT

### A.     The Court Should Enter Summary Judgment for the University on the University's First (Declaratory Relief) and Second (Breach of Contract) Causes of Action and CBC's Second (Conversion) Cause of Action Because the University Owns All Program Germplasm

#### 1.     The University owns all Program germplasm regardless of its patentability or patent status

CBC frames its entire case on the unfounded assertion that it owns *all* the strawberry germplasm developed in the Program since 1986.  CBC's only basis for this assertion is an assignment to CBC from Drs. Shaw and Larson.  (CBC MSJ at 9.)  But Drs. Shaw and Larson could not assign what they never owned in the first place.  It is black letter law in California that "[w]here an employe [sic] creates something as part of his duties under his employment, the thing created is the property of his employer unless, of course, by appropriate agreement, the employe [sic] retains some right in or with respect to the product."  *Zahler v. Columbia Pictures Corp.*, 180 Cal. App. 2d 582, 589 (1960); *Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 826 (1979) (Mosk, J., concurring).  California codified this common law principle as California Labor Code § 2860, which provides:

1
2
3

> Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment.

4   Cal. Lab. Code § 2860.  (*See* Ex. 87 (discussing how § 2860 applies in the University setting)).

5         There is a narrow exception to § 2860 relevant to the analysis here.  That section does not

6   dictate who owns patent rights in an "invention" conceived by an employee.  An employee can

7   retain the *patent rights* in an invention in the limited circumstance where the invention is not

8   covered by a patent assignment agreement between the employer and its employee.[3]  *GE v.*

9   *Wilkins*, No. CV F 10-0674 LJO JLT, 2012 WL 3778865, at *11 (E.D. Cal. Aug. 31, 2012) (§

10  2860 does not "revoke an employee's right to his invention *in the absence* of a written

11  [assignment agreement]" with the employer) (emphasis added); *see also Bd. of Trs. of Leland*

12  *Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 785-86 (2011) (confirming the

13  basic idea that "inventors have the right to patent their inventions" but can "assign [their] rights"

14  to their employers).

15        But the exception does not apply here, because Drs. Shaw and Larson both executed

16  employment agreements that expressly require them to assign to the University everything

17  covered by the exception — not just patent rights obtained, but anything "possibly patentable"

18  deemed by the University to warrant seeking patent protection:

19
20
21
22

> *I agree that every possibly patentable* device, process, *plant*, or product, *hereinafter referred to as "invention," which I conceive or develop while employed by University, or during the course of my utilization of any University research facilities…shall be examined by University* to determine rights and equities therein in accordance with the Policy, and I shall promptly furnish University with complete information with respect to each.

23
24
25

> *In the event any such invention shall be deemed by University to be patentable*, and University desires, pursuant to determination by University as to its rights and equities therein, to seek patent protection thereon, *I shall execute any documents and do all things necessary, at University's expense, to assign to University all rights, title and interest therein* and to assist University in

26

---

27   [3] The case law sets out a second independent circumstance that eviscerates the exception to § 2860, where an employee was hired to invent.  Although the University asserts that that is true here, it is not relying on this second circumstance in its motion or its opposition.

28

securing patent protection thereon.

(Ex. 17 (emphasis added); *see* UC_STRAW2_00050954.)  The University owns all Program germplasm as a matter of law.

Because California law and the employment agreements here are dispositive, the Court need not resolve any factual disputes on ownership to rule in the University's favor.  Even CBC knew that the University owns all the Program germplasm.  That is why it requested  a breeding license many times.  As Dr. Shaw told Semillas, "[o]btaining an agreement for license to these, or part ownership, would put our company in positive cash flow rather quickly.  If we go it alone, our first product might be 5-7 years away."  (*See* Ex. 59.)  Now, having failed to obtain that license, CBC with no legal basis seeks to have the Court award it what it could not obtain in an arms-length negotiation.

For completeness, the University addresses the two categories that comprise the entire collection of unreleased Program germplasm in turn below.  But because these two categories cover *all* Program germplasm, the Court need not make variety-by-variety findings as to whether a particular variety would fall within the exception absent the license in order to grant the University's Motion.  Rather, the Court can decide that the University owns everything in either category as a matter of law because Drs. Shaw and Larson's employment agreements require assignment of any inventions excepted from § 2860, and thus there *is no exception* to apply.

### 2.   The University owns all germplasm not covered by patent rights or a pending patent application under § 2860

The first category of Program germplasm, which CBC calls the "Transition Cultivars,"[4] actually comprises more than a thousand strawberry varieties developed in the Program for which patent protection has not been sought.  The parties agree that "[t]he importance of these is huge." (*See* CBC_DS_00023984.)  It is undisputed that Drs. Shaw and Larson first developed and acquired possession of the Transition Cultivars by virtue of their employment in the Program,

---

[4] In sworn discovery, CBC defined Transition Cultivars as "all strawberry germplasm in the University's possession that was [developed] while Drs. Shaw and Larson were employed by the University."  (CBC Ex. T at 31.)  The University uses that definition here, although CBC's Motion is a little unclear as to whether it has changed the meaning.

1   using the work of the University's prior generation of breeders.  (CBC MSJ at 4 (citing CBC Ex.

2   H at 17:5-16; CBC Ex. E at 15:21, 16:18-24); Ex. 1 at 17:25-19:14.)  Absent an exception, these

3   varieties "belong to [their] employer" — the University — under § 2860.

4       No exception to § 2860 applies to the Transition Cultivars.  As CBC acknowledges, the

5   University has not patented or sought to patent them because no one — not Drs. Shaw or Larson,

6   nor anyone else at the University — has yet suggested that any varieties within this category of

7   material are possibly patentable, let alone "inventions" on which patent rights should be sought.

8   (CBC MSJ at 23.)  As there are no current or planned *patent rights* in these varieties, § 2860

9   governs, and the University owns them.  In the event that a variety is identified by the breeders or

10  the University as a "possibly patentable" invention in the future, the University would have the

11  right to decide whether to seek patent protection on it as an invention (in which case Drs. Shaw

12  and Larson would be obligated to assign the patent rights to the University), or not to seek such

13  rights, in which § 2860 would still apply to that variety.

14      While § 2860 is dispositive, University policy confirms that ownership lies with the

15  University.  In 2013, through his department head, Dr. Shaw requested a policy opinion from the

16  University's Executive Director of Research Policy Analysis and Coordination on this issue.  She

17  responded:

18          [C]onsistent with State law (California Labor Code § 2860) and
            long-standing University policy (Regulation #4, now APM 020;
19          Faculty Handbook, see Research - Other forms of Intellectual
            Property), products of research are owned by the University.
20          Ceding decision making over the disposition of University property
            would be inconsistent with appropriate stewardship of what is
21          ultimately a public asset.

22  (CBC Ex. NN; Ex. 60; Ex. 61; *see also* Ex. 7 at UC_STRAW2_00000917 ("Other forms of

23  intellectual property including tangible research products such as cell lines, plasmids, technical

24  schematics, and physical models are also governed by University policy.  Ownership is generally

25  with the University."); UC_STRAW2_00050983 at UC_STRAW2_00050986 ("Notebooks and

26  other original records of the research are the property of the University.").)  These policies bind

27  Drs. Shaw and Larson.  *Campbell v. Regents of Univ. of Cal.*, 35 Cal. 4th 311, 320 (2005)

28  ("[P]olicies established by the Regents as matters of internal regulation may enjoy a status

equivalent to that of state statutes."); *Tomlinson v. Qualcomm, Inc.*, 97 Cal. App. 4th 934, 943 (2002) (holding that "personnel policies and procedures in handbooks, manuals, and memoranda" are binding under California law).  Although the University more recently rendered this policy opinion, it has been true for many years, and confirmed by Drs. Shaw and Larson, who regularly negotiated test agreements with third parties stating University varieties "are owned by the Regents."  (Ex. 88 at ¶ 2.2; *see also* CBC00000921; CBC00000923.)

Just like a private sector employer, the University can prevent its former employees from walking out the door with the technological improvements that they developed within the scope of their employment.  *Zahler*, 180 Cal. App. 2d at 589; *see Goodyear Tire & Rubber Co. of Akron, Ohio, v. Miller*, 22 F.2d 353, 356 (9th Cir. 1927).

### 3.    The University owns the germplasm on which the University has decided to seek patent protection

The second category of Program germplasm, which CBC calls the "Core Strawberry Germplasm," is a subset comprising 180 elite varieties with "considerable commercial potential" that Drs. Shaw and Larson identified as possibly patentable prior to their retirement.  (CBC MSJ Ex. N at CBC_DS_00019775; Ex. 1 at 94:24-95:5; CBC MSJ at n.2.)  The University has already patented 11 of the original 180 varieties, expects to receive a patent on a 12th (Cabrillo) within a month, and sought patent protection on the rest in 2014.  (ECF Nos. 104-1 to 104-11; Ex. 63; Ex. 64.)  The Breeders signed confirmatory assignments for these first 12 varieties, and CBC does not dispute that the University owns them.  (Ex. 1 179:16-180:21.)  CBC does claim ownership, however, over the 168 remaining varieties that are subject of U.S. Plant Patent Application No. 14/545,653.  (Complaint ¶¶ 22, 42.)

In November 2013, Drs. Shaw and Larson identified this group of 180 varieties to the University as possibly patentable.  (CBC MSJ, Ex N at CBC_DS_00019775-76; Ex. 1 at 172:19-173:4 ("Kirk and I submitted a disclosure request for utility model patent to package 180 genotypes specifically for their tangible value as breeding materials.").)  They "initiate[d] the process formally" by disclosing the 180 varieties as "the most advanced strawberry genotypes presently available within the breeding program managed at the University of California."  (CBC

MSJ, Ex N at CBC_DS_00019787.)  This disclosure explicitly lists Drs. Shaw and Larson as "inventors."  (*Id.*)  At his deposition, Dr. Shaw admitted he thought that patenting these varieties was a valid option when he disclosed them back in 2013, and he still does to this day.  (Ex. 1 at 100:10-101:1 ("Q. So to be clear, you thought that seeking a utility patent was a valid option for the 180 genotypes that you submitted to the cultivar release committee?  A. The answer to that is I did and I do.").)  Given these circumstances, Drs. Shaw and Larson cannot dispute that they identified the Core Strawberry Germplasm as possibly patentable.  (*Id.* at 94:24-95:5.)  There is also no dispute that the University deemed them inventions as well and filed an application seeking patent rights on all of them.  (Ex. 26; Ex. 64.)

While Drs. Shaw and Larson may have disagreed with the *type* of patent protection the University decided to pursue, that was not their choice to make.  (Ex. 3 at 242:2-19.)  The employment agreements give the University — not the employee — the right to determine which plants to seek patent protection on, and what form of patent protection to seek.  The agreements provide for patenting "pursuant to determination *by University as to its rights and equities therein.*"  (*See, e.g.*, Ex. 17 (emphasis added); *see also* UC_STRAW2_00050954.)   Despite a direct request from the University, however, the Breeders flatly refuse a direct request from the University to execute a confirmatory assignment for the remaining 168 varieties.  (Ex. 65; Ex. 66; Ex. 29; Ex. 67; Ex. 31; Ex. 1 at 181:5-8.)

In sum, Drs. Shaw and Larson were subject to agreements obligating them to assign the Core Strawberry Germplasm to the University, so the University is the rightful owner.  *Regents of the Univ. of N.M. v. Knight*, 321 F. 3d 1111, 1121-23 (Fed. Cir. 2003) (holding that the University was the rightful owner of the patents and applications that the employee-inventor was obligated to assign); *see Chou*, 254 F. 3d at 1358; *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 161 (E.D.N.Y. 2010) ("Federal courts have consistently upheld the validity of patent-assignment obligations imposed on university students, faculty, and staff[.]").

**4.  The Court should declare the University the owner of all the germplasm, order Drs. Shaw and Larson to execute confirmatory assignments, and void their purported assignment to CBC**

As discussed above, the University owns all Program germplasm.  Consistent with its

preliminary finding, this Court should hold that "the University has ownership rights in the [germplasm] and that Dr. Shaw and Dr. Larsen violated their obligations under the patent agreements to assign their intellectual property interests in the [germplasm] to the University." (ECF No. 31 at 1.) Pursuant to that holding.

The Court should enter judgment for the University's on the University's first cause of action for declaratory relief that "as between Crossclaim Defendants and the University, the University is the sole assignee and rightful owner of the intellectual and tangible property rights to the Core Strawberry Germplasm and Transition Cultivars with the right to exclude others." (ECF No. 104 ¶ 42.)  The Court should also enter judgment for the University on its second cause of action for breach by Drs. Shaw and Larson of their employment agreements, due to their failure to execute confirmatory assignments for the Core Strawberry Germplasm or to provide Program data when the University requested them.

To remove any cloud over the University's title, Drs. Shaw and Larson should be ordered to execute confirmatory assignments, as and when requested by the University.  *Univ. of W. Va. Bd. of Trs. v. VanVoorhies*, 278 F.3d 1288, 1299 (Fed. Cir. 2002) (requiring employee-inventor to assign patents to employer after employee-inventor was found in breach of duty to assign); *Fenn v. Yale Univ.*, No. Civ. A. 396CV (CFD), 2005 WL 327138, at *6 (D. Conn. Feb. 8, 2005) (employee-inventor ordered to assign patents to employer after he breached his duty to assign). And because the Breeders could not assign to CBC what they do not own, the assignment to CBC should be found void.[5]  *See Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1572 (Fed. Cir. 1991) (a purported assignment "is a nullity" if the assignor had nothing to assign).

In addition, the Court should grant summary judgment in the University's favor on CBC's second cause of action for conversion.  (ECF No. 2-2 ¶ 42.)  Conversion requires as an element that CBC has an ownership interests in the property allegedly converted.  *Schwab v. H & R Block, Inc.*, 735 F. Supp. 954, 956-57 (N.D. Cal. 1988) (granting summary judgment on conversion claim where Plaintiff failed to demonstrate ownership), *aff'd*, 902 F.2d 40 (9th Cir. 1990).  Once

---

[5] To the extent this issue requires resolution of whether CBC's is a bona fide purchaser for value, the University addresses that issue in Section III.A.3.

1   the Court finds that ownership over the germplasm lies with the University, CBC will have no

2   property interest to support its claim as a matter of law.

3       **B.    The Court Should Enter Summary Judgment in the University's Favor on CBC's First (Breach of Contract) and Third (Breach of Implied Covenant) Causes of Action Because the University Did Not Breach Any Express or Implied Terms of the Employment Agreements**

4

5

6           The Court should enter judgment for the University on CBC's express and implied breach

    of contract and implied covenant causes of action.  CBC alleges the University breached Drs.

7   Shaw and Larson's employment agreement by failing (1) to recognize Drs. Shaw and Larson's

8   rights to the Transition Cultivars and Core Strawberry Germplasm, (2) to license this germplasm

9   to CBC, and (3) to generate royalties for any germplasm assigned.  (Complaint ¶ 38.)  But as to

10  (1), the University, not CBC, owns all Program germplasm, as discussed above, so there was

11  nothing legitimate to recognize.  And as to (2), the employment agreements do not anywhere

12  require that the University license anyone, let alone do so under terms of its employees' choosing.

13          For (3), CBC relies on the statement in the Patent Policy providing for the payment of

14  royalties "for and in consideration of" the assignment of Drs. Shaw and Larson's patent rights.

15  (UC_STRAW2_00050995; UC_STRAW2_00050954.)  Drs. Shaw and Larson are not the first

16  University employees to try to persuade a court of this interpretation of the agreements.

17  *Kucharczyk v. Regents of Univ. of California*, 946 F. Supp. 1419, 1431 (N.D. Cal. 1996)

18  Concerned employment agreements identical in all relevant respects to Drs. Shaw and Larson's

19  agreements.  *Id.* at 1424-25.  There, the University chose to license its employees' invention for a

20  fixed fee.  *Id.*  The employee-inventors sued, alleging that the University should have licensed a

21  running royalty instead, because that would have generated more money for them.  *Id.*  The Court

22  granted summary judgment for the University, holding that neither the agreements nor the

23  University's Patent Policy required the University even to obtain a royalty, let alone to maximize

24  its employees income .  *Id.* at 1425, 1427, 1431.  The Court should hold the same here.

25          Nor do the employment agreements create an implied covenant to license.  *Id.* at 1432.

26  An implied covenant of good faith and fair dealing "cannot impose substantive duties or limits on

27  the contracting parties beyond those incorporated in the specific terms of their agreement."  *Guz v.*

28

*Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 349-50 (2000); *see Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992) ("as a general matter, implied terms should never be read to vary express terms").

CBC's breach of contract claims fail for a further reason:  Drs. Shaw and Larson have not fulfilled the terms of their employment agreements.  *Consol. World Invs., Inc. v. Lido Preferred Ltd.*, 9 Cal. App. 4th 373, 380 (1992) ("It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance.").  Drs. Shaw and Larson refused to execute the required confirmatory assignments as to the Core Strawberry Germplasm.  (UC_STRAW2_00050995; *see also* UC_STRAW2_00050954.)  They also failed to "furnish University with complete information with respect to each" plant from within Core Strawberry Germplasm as well as the Transition Cultivars when requested.  (UC_STRAW2_00050995; Ex. 34; Ex. 1 at 193:6-194:22.)Ex. 34Ex. 1  As Dr. Shaw and Larson have failed to perform under their employment agreements, CBC cannot maintain breach claims arising from those agreements.

C.    **The Court Should Enter Summary Judgment in the University's Favor on CBC's Fourth (Breach of Fiduciary Duty) Cause of Action**

The University is entitled to summary judgment on CBC's breach of fiduciary duty claim.  CBC's only basis for asserting the University owed a fiduciary duty to Drs. Shaw and Larson appears to be a March 20, 2000, MOU regarding a discount mechanism for royalties paid by certain licensees.  (Complaint ¶¶ 32, 52; Ex. 68.)  The memorandum was written by the University at the Breeder's request.  (Ex. 68.)  Under the discount mechanism, the University's agreements with international licensees included a provision permitting a $1.50 discount on royalties for every thousand strawberry plants in return for a $1.00 contribution to Program research.  (*Id.*; Ex. 43 ¶ 1.9, 4.1.)

The undisputed facts establish that this MOU did not create a fiduciary relationship between the University and Drs. Shaw and Larson.  "[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law."

1    *City of HopeNat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 386 (2008) (quotations marks

2    and citation omitted).  Drs. Shaw and Larson requested the discount mechanism to fund their

3    research at the University.  (Ex. 1 at 131:20-132:1.)  They signed a "concurrence line" in the

4    MOU to demonstrate their consent to the mechanism given the effect on their share of future

5    royalties.  (Ex. 68.)  But "a joint interest in profits, or the accrual of profits for mutual benefit,

6    does not create a fiduciary relationship."  *Brian Jonestown Massacre v. Davies*, No. 13-cv-04005,

7    2014 WL 4076549, at *5 (N.D. Cal. Aug. 18, 2014).  Moreover, Drs. Shaw and Larson could

8    revoke the discount mechanism, and they did so on August 7, 2012.  (Ex. 1 at 132:2-19; Ex. 55.)

9        Drs. Shaw and Larson's revocation of the discount mechanism ended any purported

10   fiduciary duty arising out of the memorandum.  *See Houglet v. Barra, Inc.*, No. 91-cv-03245,

11   1993 WL 410452 at *2 (9th Cir. 1993) (unpublished) (finding a party who agrees to end

12   relationship agrees "to lose the fiduciary entitlements that came with it"); *United States v.*

13   *Paulson*, No. 15CV2057-AJB-NLS, 2017 WL 35536, at *4 (S.D. Cal. Jan. 4, 2017) (dismissing

14   breach of fiduciary duty claim for actions that occur after rights as a beneficiary have ended).

15   The University's alleged breaches of fiduciary duty all took place well after revocation, in 2013-

16   2015, and cannot be breaches of an obligation arising out of the revoked discount mechanism.

17   (Complaint ¶¶ 53, 15-19.)

18     **D.**  **The Court Should Enter Summary Judgment in the University's Favor on**
**CBC's Fifth (Unfair Competition) Cause of Action Because the University**

19   **Cannot Be Liable for Common Law Torts**

20       CBC alleges that the University has engaged in common law unfair competition against

21   CBC.  (Complaint ¶¶ 72-83.)  The University is entitled to summary judgment on this cause of

22   action because, as a matter of law, the University is not liable for common law torts.

23       California statute holds "[a] public entity is not liable for an injury, whether such injury

24   arises out of an act or omission of the public entity or a public employee or any other person."

25   Cal. Gov't Code § 815.  This provision "abolishes all common law or judicially declared forms

26   of liability for public entities."  *Miklosy v. Regents of Univ. of Cal.*, 44 Cal. 4th 876, 899 (2008)

27

28

University's Cross-Motion for Summary Judgment and Response to CBC's Motion
Case No. 3:16-cv-02477-VC
sf-3733885   16

1  (quotation marks and citation omitted).  For the purposes of the statute, "public entities"

2  explicitly include "the Regents of the University of California."  Cal. Gov't Code § 811.2.

3      Even if CBC were to bring its unfair competition cause of action under California's

4  *statutory* unfair competition laws, its cause of action would still fail as a matter of law.  "[T]he

5  University of California is a 'public entity' (Gov. Code, § 811.2) and, therefore, not a 'person'"

6  who may be sued "within the meaning of the Unfair Practices Act."  *Cal. Med. Ass'n, Inc. v.*

7  *Regents of Univ. of Cal.*, 79 Cal. App. 4th 542, 551 (2000).

8      **E.   The Court Should Enter Summary Judgement in the University's Favor on**
        **the University's Fourth Through Twelfth Causes of Action Because CBC**
9       **Infringed the University's Plant Patents by Using University Varieties for**
        **"Benchmarking"**
10

11     The Court should enter judgment that CBC infringed the University's plant patents on the

12  Albion, Benicia, Fronteras, Grenada, Merced, Monterey, Petaluma, Portola, and San Andreas

13  varieties.  CBC admits that it has used these nine varieties in its California operations to compare

14  "the characteristics of the fruit and [each] plant" against other plants in its breeding program, i.e.,

15  for "benchmarking".  (CBC's Ex. T at 8-9; Ex. 41 at 178:3-7.)  That admission is an admission of

16  infringement.

17     The Plant Patent Act's statutory right to exclude others is not limited solely to asexual

18  reproduction of a patented plant.  35 U.S.C. § 163.  The statute includes provisions excluding

19  unauthorized *use*, sale, offering for sale, and importation as well.  *Id.*  These provisions are

20  disjunctive — violating any one of them results in infringement of a plant patent.  *Yoder Bros.,*

21  *Inc. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1347, 1383 (5th Cir. 1976) ("[W]e think [35 U.S.C. § 163]

22  is plain in its statement that a patentee may exclude others from asexually reproducing, selling or

23  *using* the plant.") (emphasis added).  CBC's "use" of the University's patented plants for

24  benchmarking thus constitutes patent infringement.

25     The University does not understand CBC to argue otherwise.  Rather, CBC asserts that its

26  use was authorized through the University's nursery license with CBC member Lassen.  (*See*

27  CBC MSJ at 8.)  This license defense fails as a matter of law.  CBC admits it obtained the

28  accused varieties from Lassen.  (CBC Ex. T at 8-9; *see also* Response to RFAs 2, 4, 14, 16, 20,

22, 26, 28, 32, 34, 44, 46, 60, 52, 56, 58, 62, 64, 68, 70.)  Lassen has a nursery license with the University that allows it to sell the plants "to growers for fruit production only."  (CBC MSJ at 8; Ex. 9 at UC_ STRAW2_000092188.)  The license explicitly states that "[n]o other rights are granted, and any Sale of Licensed Products not expressly authorized under this Agreement is prohibited."  (*Id.* at UC_ STRAW2_000092189.)  Lassen's license specifically excludes any use for breeding purposes.  (*Id.* at UC_STRAW2_000092190.)

Both CBC and Lassen knew that sale of University patented varieties for breeding pruposes falls outside the scope of nursery license and requires a separate "test agreement."  (*See* Carriere Dep at 75:1-77:2; Ex. 6 at 3006; Shaw Tr. at 110:7-14.)  In April 2016, a Lassen staff member forwarded CBC's request to purchase Fronteras, Grenada, Petaluma, and San Andreas varieties to Lassen's CEO, Elizabeth Ponce, with the following note:

> Pete forwarded Kyle's request to me as a reminder to ask you — Is there a problem selling CBC these plants?  I know typically if we know we are selling to a propagation entity we get a test agreement. I want this to be right so no one goes to Strawberry Jail . . . .

(LCN00000493.)  Ms. Ponce discussed the need for a test agreement with Kyle VandenLangenberg, CBC's breeding manager.  (Ex. 51 at 172:4-9.)  Ms. Ponce testified that CBC "didn't have permission to plant UC varieties in their plot without getting some — getting a license or test agreement from the University in 2016."[6]  (*Id.* at 176:4-10.)

CBC cannot dispute that its "benchmarking" with University-patented varieties was done as part of its breeding program.  As CBC's corporate representative explained:  "We want to see, grown under common condition, how our test plot varieties are doing vis-a-vis the University varieties."  (Ex. 41 at 178:8-18; *see also id.* at 181:22-182:3.)  He also testified that CBC "record[s] characteristics" about the University-patented varieties and uses these records to "evaluate" the progeny varieties CBC is growing.  (*Id.* at 179:7-20.)  Indeed, "[these progeny] and the benchmarking varieties are planted in a test plot" together.  (*Id.* at 180:22-181:2.)  This kind of rigorous testing for breeding program purposes unmistakably falls outside the scope of

---

[6] The University offered such a test agreement to CBC, but CBC refused to sign it.  (*See* CBC_DS_00026454; Ex. 56.)

1   Lassen's license for sale "to growers for fruit production."  CBC's later sales of fruit to a juicer

2   cannot un-ring that bell, and were plainly a pretext to try to avoid the consequences of

3   benchmarking.

4        Had CBC entered a test agreement with the University, as Lassen admits it should have,

5   the agreement itself would have served to demonstrate the baselessness of CBC ownership

6   assertions.  The University's test agreements follow a standard template.  They require the party

7   performing the testing to acknowledge "title to the Plant Materials, including the tangible material

8   comprising the Plant Materials, is owned by The Regents and is not transferred to Recipient

9   hereunder."  (*E.g.*, UC_STRAW2_00075214 at ¶ 2.2.)  "Plant Materials" is defined to include not

10  only the listed varieties in the test agreement, but also "seed, pollen, progeny (including *seedling*

11  *progeny*), and derivatives of such plants." [7]  (*Id.* at ¶ 1.2 (emphasis added).)

12       Given CBC's litigation posture in this case, of course it would want to avoid signing a test

13  agreement.  But without one, its benchmarking activities were unauthorized uses of University

14  patented varieties.

15  **III.    OPPOSITION TO CBC'S MOTION FOR SUMMARY JUDGMENT**

16       As the parties' cross-motions for summary judgment overlap on the issues of ownership

17  and infringement, the University addresses many of CBC's arguments on these issues above, and

18  incorporates them herein by reference to avoid burdening the Court with duplicate briefing.

19  Below, the University explains why CBC's remaining arguments fail. [8]

20

21

22       [7] Dr. VandenLangenberg confirmed at his deposition that the seedling progeny provision would
    cover CBC's current activities including those with seedling progeny from crosses CBC directed
23  in Spain.  (VandenLangenberg Dep. at 286:7-293:19.)

24       [8] CBC's motion relies upon its own Interrogatory Responses to support its various assertions
    regarding its breeding activities.  (*See, e.g.* CBC's Ex. T and Motion at 7:21-8:4, 8:10-11, 8:18-
25  20, 8:26-27, 27:7-9, 28 n.6, 32:19-20.)  The Federal Rules prohibit a party from relying upon
    material to support or dispute a fact during summary judgment that cannot be presented in a form
26  that would be admissible as evidence. Fed. R. Civ. P. 56(c)(2).  A party's "own interrogatory
    responses do not constitute admissible evidence, but are hearsay." *AT & T Corp. v. Dataway Inc.*,
27  577 F. Supp. 2d 1099, 1109 (N.D. Cal. 2008).  The University objects to this material and moves
    that these alleged facts should not be considered in support of CBC's arguments. *See Loomis v.*
28  *Cornish*, 836 F.3d 991, 996 (9th Cir. 2016) (rejecting motion for summary judgment argument
    because party failed to submit any potentially admissible evidence to support it).

**A.      The Court Should Deny CBC's Request for Summary Judgment That It Owns the Germplasm Because CBC Does Not Establish Its Ownership**

> **1.      Under § 2860, an employer owns non-patentable materials employees acquire possession of during the course and scope of their employment**

CBC asserts that § 2860 does not grant the University ownership over Drs. Shaw and Larson's so-called "inventions," a category to which CBC implies both the Transition Cultivars and Core Strawberry Germplasm belong despite arguing neither is possibly patentable.  (CBC MSJ at 9-12, 21.)  But as discussed in Section II.A.1, above, the exception to § 2860 and the common law rule for employer ownership in "inventions" applies only to *patent rights* in inventions.  CBC cites no case supporting its theory that employees retain rights in their non-patentable "inventions."  There are none.  The *Stanford* and *Dubilier* cases, which CBC does cite, involved ownership of *patent rights*.  Both cases found that, absent an employment agreement that assigns an invention to the employer, employees own the patent rights to their inventions.  Thus, neither applies to the question at issue here, which is who owns tangible materials that are not patentable inventions.

In the *Stanford* case, the Supreme Court accepted certiorari on whether the Bayh-Dole Act granted Stanford University title to the patents on the invention as opposed to the private company to which a faculty employee assigned his inventions.  *Stanford*, 563 U.S. at 781, 786-87.  The Supreme Court found that it did not.  *Id.* at 793.  For other arguments in its Motion, CBC also relies on the underlying opinion by the Federal Circuit, which considered the difference between "agree to assign" and "hereby assign" clauses in contracts the employee had entered into.  (CBC MSJ at 14-16.)  The Supreme Court did not consider the Federal Circuit's analysis of these assignment clauses because it was not an issue on which it granted certiorari.  *Id.* at 784 n.2.  As there is no Bayh-Dole issue in this case, *Stanford* is completely irrelevant.

*Dubilier* likewise concerned *patent rights*.  *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933).  There, "past and then present practice" was that employee-inventors "were allowed to take patents on their inventions and have the benefits thereby conferred."  *Id.* at 195.  That is not true here, as the University requires all employees to execute agreements with assignment clauses as a condition of their employment.  (Ex. 1 at 89:2-20; Ex. 17 at

1   UC_STRAW2_00050996; UC_STRAW2_00050954 at UC_STRAW2_00059055.)  Neither case

2   concerns ownership of rights in non-patentable tangible materials, such as plant germplasm,

3   despite CBC's suggestion to the contrary.

4         CBC attempts to cabin § 2860 by suggesting it applies only to trade secret

5   misappropriation.  (CBC MSJ at 11.)  But the statute clearly casts a wider net:

> Everything which an employee acquires by virtue of his
> employment, except the compensation which is due to him from his
> employer, belongs to the employer, whether acquired lawfully or
> unlawfully, or during or after the expiration of the term of his
> employment.

9   Cal. Lab. Code § 2860.  Nothing in that language is limited to trade secrets, and the University

10  does not assert ownership over faculty lectures, which are not at issue here, as a matter of policy.

11        Furthermore, the trade secret cases on which CBC relies are consistent with the

12  University's.  In *Lomkin*, the employee took information "which he could not have secured other

13  than as an employee of the plaintiff."  *S. Cal. Disinfecting Co. v. Lomkin*, 183 Cal. App. 2d 431,

14  446 (1960).  The California Court of Appeals found that the information belonged to the

15  employer under § 2860.  *Id.*  In contrast, the employee in *Premier Displays* made blueprints for

16  an employer's competitor.  *Premier Displays & Exhibits v. Cogswell*, No. SACV 09-354 JVS

17  (ANx), 2009 WL 8623588, at *6 (C.D. Cal. Dec. 23, 2009).  There, the court found that the

18  blueprints were not acquired from the employer and thus did not fall under § 2860.  *Id.*  As in

19  *Lomkin*, Drs. Shaw and Larson acquired possession of Program germplasm from the University.

20  (Ex. 1 at 17:25-18:4, 18:16-19.)  They developed additional germplasm within the course and

21  scope of their employment.  (Ex. 1 at 16:13-17:16)  Thus, the University owns it.

22        CBC's reliance on *NetApp* is also misplaced.  (CBC MSJ at 11.)  In that case, the Court

23  considered whether an employer could maintain a claim of trespass to chattels against an

24  employee who copied and took certain information — specifically, "compilations of otherwise

25  publicly available information" — with him when he left his job.  *NetApp, Inc. v. Nimble Storage,*

26  *Inc.*, No. 5:13-cv-05058 LHK (HRL), 2015 WL 400251, at *16 (N.D. Cal. Jan. 29, 2015).  The

27  Court found that § 2860 did not grant the employer "a general property right" for the employees'

28  compilation of public information, which the court characterized as "non-confidential, non-trade

1  secret employee work product." *Id.* at *17.  Nothing in *NetApp* concerns tangible, propriety work

2  product or intellectual property acquired from an employer — like the Program germplasm.

3        CBC cites Labor Code § 2870 as an example of how the legislature restricted the scope of

4  § 2860.  (CBC's MSJ at 12.)  But that section only codifies the uncontroversial idea from

5  *Stanford* that inventors own the patent rights to their inventions unless they are required by

6  agreement to assign them to their employer.  *Compare* Cal. Lab. Code § 2870 (a)(2) (assignment

7  contract is valid if it concerns work performed by employee for employer) *with Stanford*, 563 U.S.

8  at 785-86 (employee-inventor assignments to employer are "well established").  Again, the

9  University employment agreements address this issue by requiring assignment of all "possibly

10  patentable" inventions which the University deems patentable.  The agreements even refer

11  directly to § 2870.

12      **2.**    **There is no dispute that University deemed the Core Strawberry**
                  **Germplasm varieties inventions, but even if they were not, the**

13                    **University would own them under § 2860**

14        As explained above, CBC takes the contradictory position that the Core Strawberry

15  Germplasm is an "invention" excepted from § 2860, but is somehow not an "invention" subject to

16  assignment under Drs. Shaw and Larson's employment agreements.  (CBC MSJ at 11, 16.)  These

17  agreements require assignment of any possibly patentable invention that the University deems

18  patentable and seeks to patent.  (Ex. 17 at 96; UC_STRAW2_00050954 at 55.)  Only *patent*

19  *rights* in inventions can fall within the invention exception to § 2860.  The employment

20  agreements thus eliminate the entire exception.  CBC misleads by suggesting that Dr. Shaw "did

21  not feel" that the Core Strawberry Germplasm was possibly patentable.  (CBC MSJ at 22.)  He

22  did and he still does, but that is not dispositive: the University's decision does.  (Ex. 1 o at

23  100:10-101:1; *see also id.* at 94:24-95:5.)

24        CBC relies on Dr. Knapp's deposition testimony to argue that the Core Strawberry

25  Germplasm is not "possibly patentable."  (CBC MSJ at 22-23.)  But as explained above,

26  "possibly patentable" is not the test here.  Moreover, Dr. Knapp was asked only for his subjective

27  belief on what he would "*recommend* for an individual patent," based on the short time he has

28  had with the material and without the benefit of the data Drs. Shaw and Larson accumulated.

1    (Knapp Dep. at 156:5-9 (emphasis added).)[9]  Again, Drs. Shaw and Larson identified the Core

2    Strawberry Germplasm as a possibly patentable invention, and the University deemed it

3    patentable and sought patent rights.  (CBC Ex. N at CBC_DS_00019775-77; Ex. 26; Ex. 64.)

4    That conclusively establishes that it must be assigned under their employment agreements.

5         CBC also relies on an office action on U.S. Plant Patent Application No. 14/545,653.

6    (CBC'S MSJ at 23.)  That action did not find the Core Strawberry Germplasm unpatentable.  To

7    the contrary, the Patent Office found that "[t]he invention of each [claim group] is distinct from

8    the invention of every [claim group] due to the fact that each [claim group] is drawn to a distinct

9    variety of strawberry plant," which is "substantially different from the other[s] in genotype and

10   breeding."  (CBC Ex. II at 18; *see also* Ex. 3 168:10-169:10.)  The Patent Office also found that

11   "all these inventions listed in this action are independent or distinct."  (CBC Ex. II at 18.)  In

12   other words, each new variety in the Core Strawberry Germplasm was in the Patent Office's view

13   a distinct variety that meets the requirements for patentability under the Plant Patent Act.  35

14   U.S.C. § 161 ("any distinct and new variety" of asexually reproducible plant may be patented).

15        Thus, the Patent Office issued a "restriction requirement" that "invited applicant to choose

16   one plant" to prosecute to issuance in that application — a common practice.  (CBC Ex. II at 2;

17   Carrier Dep. at 168:10-169:25; Manual of Patent Examining Procedure § 803.)  The University

18   made such an election previously, when it selected the Cabrillo variety for individual plant patent

19   prosecution.  As before, the University filed a continuation application to preserve its rights in

20   non-elected varieties.  (UC_STRAW2_000098747.)

21        If the Patent Office ultimately were to determine that any varieties from the Core

22   Strawberry Germplasm are not patentable, that would have no effect on the University's

23   ownership.  Rather, § 2860 would control because there would be no patent rights for these

24   varieties, so the University would own them under § 2860.  For the same reasons, Dr. Shaw's

25

26        [9] Michael Carriere of the University's technology transfer office was designated on the
     "University's practices with respect to the disclosure of any possibly patentable devices, process,
27   plants, or products ('Inventions') by any University employee, the University's practices or
     policies with respect to the determination of whether to file a patent for any Inventions . . . ."
28   (Knapp Exhibit 182A at 34 (Topic 36), 182B at 3.)

self-serving attack on the patentability of germplasm he himself first identified as patentable does nothing to support CBC's ownership claim; if he were right, § 2860 would cover these varieties and the University would own them.  (*See* CBC MSJ at 23.)

### 3. Drs. Shaw and Larson's assignment to CBC is ineffective because CBC was not a bona fide purchaser for value

CBC claims that, under the Federal Circuit's *Stanford* decision, Drs. Shaw and Larson made an effective transfer of whatever rights they had in in the Core Strawberry Germplasm to CBC in January 2016.  (CBC MSJ at 14-15.)  CBC argues that the "hereby assigns" clause of the transfer agreement trumps the employment agreements in which Drs. Shaw and Larson long before agreed "to assign" any possibly patentable possibly patentable inventions to the University that the University deeps patentable and seeks to patent.  (*Id.*)  That claim, however, fails for several reasons.

First, in *Stanford*, the employee executed both kinds of assignments (one with Stanford agreeing "to assign" and one with a third party that "hereby assigns" *before* he conceived the invention.  *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 583 F.3d 832, 842 (Fed. Cir. 2009).  Thus, at the moment the invention was conceived, there was a question about which assignment controlled.  The Federal Circuit found that the assignment to the third party controlled because the "hereby assigns" clause was immediately effective, unlike the agree "to assign" clause, which required Stanford University to request an assignment.  *Id.* at 841-42. Stanford also could not claim it was a bona fide purchaser because it had notice (through its employee) of the third party's rights before it sought a patent.  *Id.* at 842-43.

Here, by contrast, Drs. Shaw and Larson's only assignment agreement at the time they conceived the Core Strawberry Germplasm was with the University.  (Ex. 17 at 96; UC_STRAW2_00050954 at 55; CBC Ex. FF.)  They attempted to assign their rights to CBC in January 2016 — more than a year after mid-2014, when the University filed a patent application on the Core Strawberry Germplasm and the University requested confirmatory assignments pertaining to these varieties.  (*See* Ex. 65; CBC Ex. FF.)  Because the University specifically requested confirmatory assignments and filed a patent application prior to Drs. Shaw and

Larson's attempted assignment to CBC, title transferred to the University in 2014, rendering any later-in-time assignment to CBC void. *Filmtec Corp.*, 939 F.2d at 1572 (holding that "[o]nce the invention is made and an application for patent is filed, however, legal title to the rights accruing thereunder would be in the assignee" and "the assignor-inventor would have nothing remaining to assign").

Second, CBC is not a bona fide purchaser of the rights to the Core Strawberry Germplasm because it had both constructive and actual notice of the University's ownership assertion before the attempted assignment to CBC.  The Patent Act provides that "[a]n interest that constitutes an assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice [i.e. actual notice], unless it is recorded [i.e., constructive notice] in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase." 35 U.S.C. § 261.  As the Federal Circuit found, § 261 contemplates that "the subsequent purchaser be exactly that — a transferee who pays valuable consideration, and is without notice of the prior transfer." *Filmtec*, 939 F.2d at 1573-74.

It is undisputed that CBC had actual *and* constructive notice of the University's prior rights in the Core Strawberry Germplasm before the January 2016 assignment.  The University gave actual notice of its ownership position to CBC, Dr. Shaw, and Dr. Larson no later than June 4, 2014.  (Ex. 79.)  CBC's corporate designee testified that CBC was aware of the University's ownership assertion as of 2014.  (Ex. 41 at 31:18-32:24.)  The purported assignment agreement between CBC and Drs. Shaw and Larson even acknowledges it explicitly in Schedule 4.  (CBC Ex. FF at CBC00004710.)  The University also gave constructive notice, and doubly met the requirements of § 261, by filing a patent application on the Core Strawberry Germplasm and recording Drs. Shaw and Larson's employment agreements with the Patent Office as obligations to assign with respect to that application.  (Ex. 80 at UC_STRAW2_00049338; Ex. 81.)  The University filed the initial application on July 30, 2014, and recorded the employment agreements on September 10, 2014.  (*Id.*)

Because CBC had both actual and constructive notice of the University's ownership of the patent-pending varieties, it cannot be a bona fide purchaser under *Stanford* or the patent statute.

1  Hence, CBC cannot claim that Drs. Shaw and Larson's assignment to CBC was effective.

2         **4.    The AIA clarified that an employer is the real party in interest for an**
             **invention on which the employee has breached an obligation "to**
3            **assign"**

4         The Federal Circuit's *Stanford* decision does not apply here for an additional reason:  it

5  was abrogated in relevant part by the America Invents Act (AIA), signed into law on September 6,

6  2011.  The AIA now explicitly allows an employer to proceed with patenting an invention where

7  the employee inventor "is under an obligation to assign the invention but has refused to make the

8  oath or declaration required."  35 U.S.C. § 115(d)(2)(B); *see also id.* § 118.  "If the [patent office]

9  grants a patent on an application filed under this section by a person other than the inventor, *the*

10 *patent shall be granted to the real party in interest* [here, the University] upon such notice to the

11 inventor as the [Patent Office] considers to be sufficient."  35 U.S.C. § 118 (emphasis added).

12 This was not the case before AIA revised the Patent Act.  35 U.S.C. § 118.)

13        Under the AIA, employers are able to effect employee-inventor assignments by filing a

14 patent application when the employee refuses to honor an obligation "to assign."  The University

15 followed these provisions with the patent application on the Core Strawberry Germplasm.

16        **5.    University policies confirm that the University owns the germplasm**

17        CBC denigrates certain University policies that also concern ownership, including the

18 Faculty Handbook, Academic Personnel Manual, and certain University Guidelines.  (CBC MSJ

19 at 17-20.)  But the Faculty Handbook is clear:  "tangible research products such as cell lines,

20 plasmids, technical schematics, and physical models are also governed by University policy.

21 Ownership is generally with the University."  (Ex. 7 at UC_STRAW2_00000916.)  Academic

22 Personnel Manual § 020 (APM 020) similarly states that "[n]otebooks and other original records

23 of the research are the property of the University."  (UC_STRAW2_00050983 at

24 UC_STRAW2_00050986.)  While APM 020 discusses this concept within the context of

25 permissible consulting activities, it shows how ownership is treated within the University as a

26 whole.

27        CBC claims the University's "Guidelines" offer no instruction as to ownership of

28 materials created within the scope of University employment.  (CBC's MSJ at 17-18.)  Guideline

10, however, recites that tangible research products include a "wide range of tangible property resulting from the conduct of research, as distinct from copyrightable expressions and patentable inventions." (Ex. 82.) This guideline thus explains what the Faculty Handbook refers to when it says the University owns tangible research products. Guideline 10 also explains that, when tangible research products are not patentable or copyrightable, the University may license such products. (*Id.*) That *the University* is the licensor confirms that it owns them.

In California, "[w]hen an employer promulgates formal personnel policies and procedures in handbooks, manuals, and memoranda disseminated to employees, a strong inference may arise that the employer intended workers to rely on these policies as terms and conditions of their employment, and that employees did reasonably so rely." *Tomlinson*, 97 Cal. App. 4th at 944; *see Campbell*, 35 Cal. 4th at 320 (University policies equivalent to statutes for matters of internal regulation). CBC has offered no evidence to suggest that the parties to this lawsuit did *not* treat University policies as binding on faculty employees. The University has, in contrast, offered evidence that such policies *are* considered binding on faculty employees and that Drs. Shaw and Larson were well aware of them. (*See* UC_STRAW2_00058569 at UC_STRAW2_00058576-77, 58581; Ex. 87; Ex. 79 at CBC_DS_00019586- CBC_DS_00019587; Ex. 4 at Ex. 4-95.)

### 6. The Agriculture and Natural Resource (ANR) policy is obsolete and its contents never supported CBC's position

CBC relies on a 1991 version of an ANR policy to argue that the Breeders had unilateral right to release certain University germplasm to the public, and (by implication) that they, not the University, owned the germplasm. (CBC's MSJ at 20-21.) CBC is wrong for two key reasons: first, the ANR policy CBC cites was no longer in force as of 2007, well before any of the dates relevant to the claims here; second, it *never* said what CBC claims it does.

In 1990, the University promulgated ANR 450, which governed release of certain plant varieties. (Ex. 83.) ANR 450 stated that the "Dean of the breeder/inventor's campus" had "final authority for the commercial release of protected plant materials." (*Id.* at UC_STRAW2_00050172.) It allowed breeders to make non-commercial releases of so-called "exotic" germplasm materials or stocks (e.g., comprising "feral/primitive" and/or "early

generation" materials of little value), but Breeders were still required to consult on "whether such releases would be prudent." (*Id.*)  ANR 450 also made clear that plant selections showing promise for the "possible commercial release" as the Breeders sought for the Core Strawberry Germplasm and Transition Cultivars are "[p]ropietary to the University of California." (*Id.* at UC_STRAW2_00050175.)  The policy specifically stated that where "significant amounts of University monies, staff sources, land, and/or facilities were used to develop" varieties, as again was the case here, the "rights are *not* released to the breeder/inventor." (*Id.* at UC_STRAW2_00050178 (emphasis in original).)  In 1991, ANR 450 was renumbered ANR 485, but otherwise not substantively revised.  ANR 485 is the version on which CBC relies.  (CBC Ex. PP.)  Thus, ANR 450 as promulgated, and its renumbered iteration ANR 485, demonstrate that if it were still in effect, the University, not the Breeders, owns the Core Strawberry Germplasm and Transition Cultivars.

In 2007, ANR 485 was *superseded* by a new version.  (UC_STRAW2_00000904; Delany Dep at 149:4-150:16.)  This new version completely removes the provision from ANR 450/485 on which CBC relies.  (*Compare* CBC Ex. PP at UC_STRAW2_00050136-42 *with* UC_STRAW2_00000904 (removing all sections after Section I of UC_STRAW2_00050136 (ANR 450/485)).)  Dr. Shaw was made aware of the new version of ANR 485, and he knew that public releases require approval from the University.  (*See* Ex. 84 at CBC_DS_00018886-88.)  Although the Plant Sciences Department Chair, Dr. van Kessel, at one time may have supported a public release, that does not mean he though the breeders themselves could unilaterally make such a release; in fact, Dr. van Kessel made clear that the Plant Sciences Department itself had no authority to approve one.  (UC_STRAW2_0000937; Ex. 2 at 157:16-158:6.)  Bottom line, no version of the ANR policy states that ownership lies with the breeder, not the University.

### 7.   The December 2013 Plant Sciences Department letter does not address ownership

CBC cites a letter from Dr. van Kessel and implies that the department recognized that Dr. Shaw had a property interest in Program germplasm.  (CBC MSJ at 6 (citing CBC Ex. Q).)  This letter concerns a copy of Program germplasm that the College of Agriculture and Environmental

1  Science requested when Drs. Shaw and Larson announced their intention to retire to start a

2  private breeding company.  (Ex. 85.)  At the time, Dr. van Kessel explained that the University

3  wanted the copy "[t]o preserve all the genetic material," which was unusual.  (*Id.* at

4  UC_STRAW2_00081353.)  When Dr. van Kessel later referenced Dr. Shaw's "commercial"

5  interest, he was referring only to Dr. Shaw's right as an inventor to receive royalties from the

6  patent (if any).  (van Kessel Dep at 134:1-135:20; 136:8-22.)  Dr. van Kessel was clear at his

7  deposition not only on that point but also that Drs. Shaw and Larson would have known that the

8  University owned the germplasm at all times.  (*See* Ex. 2 at 239:21-240:6; 271:19-20.)  Dr. van

9  Kessel further testified that he did not have the authority to alter the University's ownership rights

10  to the germplasm, and that Drs. Shaw and Larson would have known that as well.  (*Id.* at 244:21-

11  246:21.)

### 8.  The University owns the germplasm, the Court should deny CBC's motion and grant the University's

None of the issues CBC raises in its motion demonstrates that CBC should receive

summary judgment that it owns the germplasm, nor does CBC's motion raise triable issues that

preclude the Court from granting the University's cross-motion as discussed in Section II.A.

§ 2860 along with Drs. Shaw and Larson's employment agreements give the University

ownership of all the germplasm at issue in this case.

### B.  The Court Should Deny CBC's Request for Summary Judgment That It Did Not Infringe the University's Plant Patents

CBC moves for summary judgment on the University's claims of patent infringement.

*First*, CBC makes two arguments in an attempt to absolve its so-called "Spanish chain of conduct."

CBC argues that its importation and use of strawberry seeds harvested from University patented

varieties is not patent infringement because seeds of patented plants are not protected by the Plant

Patent Act.  (CBC MSJ at 25-28.)  CBC *then* argues that directing uses of University patented

varieties in Spain cannot constitute patent infringement because (a) CBC did not send the

patented plants to Spain, (b) the territorial scope of 35 U.S.C. § 271(a) does not reach CBC's

conduct in Spain, and (c) 35 U.S.C. § 271(f)(1) does not apply in the plant patent infringement

context.  (*Id.* at 28-31.)  *Second*, CBC argues that its use of University-patented varieties for

1  "benchmarking" does not infringe because (a) the University exhausted its patent rights when it

2  authorized the sale of its patented plants "to growers for fruit production," and (b) observation of

3  plants cannot constitute patent infringement.  (*Id.* at 31-34.)  These arguments all fail.

4        The University has multiple valid theories on how CBC's "Spanish chain of conduct"

5  satisfies statutory requirements for patent infringement, both as to the importation and use of

6  seeds resulting from CBC's breeding activity in Spain, and as to the breeding activity in Spain

7  itself.  Because CBC does not request partial summary judgment on a theory by theory basis, the

8  Court can deny CBC's motion for summary judgment if it finds that the University has defeated

9  any of these theories, or demonstrated triable issues on any of them.

10      **1.  CBC's request for summary judgment of non-infringement should be**
11  **denied because importing and using seeds of a patented plant is**
**infringement**

12        CBC asserts that 35 U.S.C. § 163 does not protect seeds because seeds are the product of

13  sexual reproduction, and the statute is only concerned with asexual reproduction.  (CBC MSJ at

14  25-28.)  But 35 U.S.C. § 163 protects any "part" of a plant covered by the statute, and seeds are a

15  part of the plant on which they grow.  Nothing in the statute excludes seeds from the scope of

16  plant "parts," and the legislative history confirms that unauthorized use or importation of plant

17  parts, even if the parts grow as the result of sexual reproduction, is infringement.

18        The exclusionary rights provision in the Plant Patent Act provides:

19          In the case of a plant patent, the grant shall include the right to
exclude others from asexually reproducing the plant, and from
20          *using*, offering for sale, or selling *the plant* so reproduced, *or any of*
*its parts*, throughout the United States, or from *importing the plant*
21          so reproduced, *or any parts thereof*, into the United States.

22  *Id.* (emphasis added).  This statute plainly protects the unauthorized "use" or "importation" of

23  "parts" of patented plants.  As the Federal Circuit's predecessor court has noted, Congress "was

24  speaking 'in common language of the people,' and [] not . . . [a] strict, scientific sense" when it

25  enacted the plant patent statute in 1930.  *In re Arzberger*, 112 F.2d 834, 838 (C.C.P.A. 1940).

26  The same should hold true for current version of the statute, enacted in 1998.

27        In common parlance, anything that grows on or as an extension of the plant is a part of the

28  plant, regardless of whether the plant had to be pollinated in order to grow the specific part.  The

1   Merriam-Webster dictionary simply defines "part" as "one of the constituent elements of a plant

2   or animal body." (Ex. 86.) And in a scientific sense, a strawberry "seed" is actually a small fruit

3   (called an "achene") that contains the tissue of the plant from which it was harvested; the embryo

4   that contains distinct genetics resulting from pollination is only a small part inside this "seed"

5   fruit. (UC_STRAW2_000096706 at UC_STRAW2_000096711.) The red fruit we call the

6   "berry" has many "seeds" imbedded in the surface. *Id.* CBC contends that "a seed contains

7   unique genetic material that is not identical to either parent plant," but that statement is

8   incomplete in key respects. (CBC MSJ at 5.) The seed (or "achene") is *mostly* made up of tissue

9   from the plant on which it grows and, regardless, is part of the plant on which it grows.

10   (UC_STRAW2_000096706 at UC_STRAW2_000096711; CBC_KL_00010150 at

11   CBC_KL_00010180.) Therefore, the University has at the very least demonstrated a triable issue

12   of fact — whether strawberry "seeds" are a part of the parent strawberry plant — that precludes

13   summary judgment for CBC.

14        Nor does the statute's reference to asexual reproduction limit which parts of a patented

15   plant are covered. (CBC MSJ at 25-28.) The Plant Patent Act twice refers to plant parts: first

16   when granting the patent owner the right to exclude others from using "the plant so reproduced,

17   *or any of its parts*, throughout the United States," and second when granting the patent owner the

18   right to exclude others from "importing the plant so reproduced, *or any parts thereof*, into the

19   United States." 35 U.S.C. § 163 (emphasis added). The statute excludes no part of a patented

20   plant from its scope. Its plain reading is that the unauthorized use of a patented plant or any of its

21   parts is infringement.

22        CBC asserts that the plain reading of 35 U.S.C. § 163 would "render the statute's focus on

23   asexual reproduction meaningless, the bounds of a plant patent endless, and stifle creation of

24   something new from the genetically unique seeds." (CBC MSJ at 27.) Not so. The statute's

25   mention of asexual reproduction does not limit the activities that can constitute infringing use of

26   the patented plant or its parts, it simply requires that the plant be "so reproduced," meaning that

27   the "part" must come from a plant that had previously been cloned, as all commercial

28   strawberries and CBC's plants are. CBC admits that the plants from which it directed the seeds

1    be harvested are the same asexually reproduced plants described in the University's plant patents.

2    (Ex. 1 228:2-229:3.)  Finally, the protection of seeds is not "contrary to the interest in promoting

3    innovation," as CBC claims.  (CBC MSJ at 27.)  Congress took innovation into account when

4    enacting the plant parts amendment to the Plant Patent Act.  *E.g.*, 144 Cong. Rec. H10221, 1998

5    WL 701274, at *H10259 (Oct. 9. 1998).

6         CBC next claims that the legislative history of 35 U.S.C. § 163 supports its argument that

7    seeds are excluded from the plant parts protected by the statute.  (CBC MSJ at 28.)  But CBC's

8    legislative history arguments focus on the 1930 amendment to 35 U.S.C. § 163 instead of the

9    1998 amendment that added patent protection for plant "parts."  The legislative history for the

10   1998 amendment confirms that the amendment was intended to broadly include all parts of a

11   patented plant within its scope.  As Congress noted, the pre-1998 statute had a "loophole" that

12   allowed "trading in plant parts taken from illegally-produced plants."  144 Cong. Rec. H10221,

13   1998 WL 701274, at *H10260 (Oct. 9. 1998).  Congress added plant "parts" to the statute to

14   "close[] this loophole by explicitly protecting plant parts."  *Id.*

15        The 1998 legislative history of § 163 also defeats CBC's contention that parts of plants

16   that grow after sexual reproduction are excluded from the protection of 35 U.S.C. § 163.  Other

17   plant parts besides seeds grow after sexual reproduction, for example, fruit, and Congress

18   repeatedly said it intended to protect fruit.  In the House Record, Congress stated that the

19   amendment "will fulfill the original intent of Congress by specifically providing that plant patents

20   are extended to include *parts of plants*, thus halting the current abuse of U.S. patent holders and

21   growers' rights of cut flowers, *fruit* crops, timber crops, and other propagated plants."  144 Cong.

22   Rec. H10221, 1998 WL 701274, at *H10260 (Oct. 9. 1998) (emphasis added).  The Senate

23   Record also noted that the amendment "closes a loophole in the Patent Act that foreign growers

24   have used to import the *fruit* or flowers of patented plants without paying a royalty because the

25   entire plant is not being sold."  S. Rep. 105-42, 1997 WL 394243, at *42-43 (1997) (emphasis

26   added).  Here, of course, what the parties refer to as "seeds" are actually "achenes," the true fruit

27   of the strawberry plant.  (UC_STRAW2_000096706 at UC_STRAW2_000096711.)  CBC's

28   arguments relying on the legislative history of the original 1930 act are simply wrong.  (CBC

1   MSJ at 26 (citing S. Rep. 71-315, at 1 (1930)).)  The same is true for its reliance on the Chisum

2   treatise, which also cites to the 1930 version of the act.[10]

3        CBC claims without support that Congress in 1998 only intended to protect commercially

4   valuable parts of the plant.  (CBC MSJ at 28.)  The statute contains no language about

5   commercially valuable plants or plant parts; all asexually reproduced plants and parts thereof are

6   protected.  *See* 35 U.S.C. § 163.  Moreover, CBC has no basis for asserting that strawberry seeds

7   are not commercially valuable.  CBC's points to the deposition of Dr. Knapp.  (CBC MSJ at 28 n.

8   6.)  But Dr. Knapp provided no testimony on the value of the strawberry seeds in general, nor did

9   he testify about the value of the seeds imported and planted by CBC specifically.  CBC's own

10  conduct demonstrates that strawberry seeds can be commercially valuable parts of a patented

11  strawberry plant:  CBC created its entire business plan around the importation and use of seeds

12  harvested from the University's varieties.  (Ex. 1 at 62:11-64:12; Ex. 41 at 132:23-135:3, 136:3-

13  138:13.)

14       As a matter of law, the unauthorized importation and use of plant parts harvested from

15  patented plants constitutes infringement under 35 U.S.C. §§ 163 and 271.  On this basis the

16  motion should be denied.  It is undisputed that CBC received seeds in the U.S., scarified and

17  germinated them, and then planted the seedling progeny.  (Ex. 41 at 120:20-122:2; Ex. 1  249:2-9;

18  CBC Ex. T at 14.)  Also, genuine fact disputes remain for the jury to decide on subsidiary issues,

19  including CBC's inducement of Semillas to import seeds, which University patented plants were

20  imported or used in this manner, and what CBC progeny descends from them.  (*See* UC's Third

21  Am. Crossclaim ¶ 53-107.)

22       **2.    CBC's request for summary judgment of non-infringement should be
            denied because directing uses of University patented varieties can and,
            on the undisputed facts here did, constitute patent infringement**

24       CBC asserts that its breeding activities in Spain cannot constitute infringement under any

25  _____

26  [10] The only other support that CBC cites is a 2001 student note in the Drake Journal of
    Agricultural Law.  (CBC Motion at 27 n. 5.)  The student writes that "[o]ne problem with the
    PPA is that it only protects asexually reproduced plants and not the seeds that are produced

27  sexually."  Ding, 6 Drake J. Agric. L. at 343.  The only support cited by the author is 35 U.S.C. §
    163, which is addressed above, and another student note from the year prior.  *Id.* at 343 n.101.

28  Neither student adequately addresses the broad meaning of plant "parts" in the amended statute.

1  provision of 35 U.S.C. § 271, because the University's "theories fail" because the "University

2  lacks any evidence that CBC sent any patented plants to Spain."  (CBC MSJ at 29.)  But this

3  misstates the record.  The University has evidence that Drs. Shaw and Larson caused patented

4  University varieties to be sent to Spain by University personnel or contractors, all the while (and

5  without the University's knowledge or authorization) intending that they be used as parents in a

6  breeding program for CBC's benefit.  (Ex. 41 at 193:12-194:12; Ex. 1 at 59:15-25, 63:23-64:13;

7  Ex. 48 96:15-103:3; CBC Ex. T 1 at 10, 15; Ex. 45 at Ex. 45, 4; Ex. 46; Ex. 47 at CBC00000932,

8  -34.)  Moreover, as discussed below, sending material from the U.S. by the alleged infringer is

9  not required to prove infringement if the infringing actions outside the U.S. were directed from

10  the U.S., which CBC has admitted.  (Ex. 1 75:6-10; CBC Ex. T at 10-11.)

11       CBC also claims that the University's claims "are not actionable under the U.S. patent

12  laws" because the actions occurred in Spain.  (CBC MSJ at 29.)  But U.S. patent law *does* reach

13  certain activity outside the U.S. when the "situs of infringement" is within the U.S.  *NTP Inc. v.*

14  *Research in Motion Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005).  The Plant Patent Act directs the

15  Courts to look to the utility patent law to supplement the limited number of plant patent statutes.

16  35 U.S.C. § 161 ("The provisions of [Title 35] relating to patents for inventions shall apply to

17  patents for plants, except as otherwise provided."); *Application of LeGrice*, 301 F.2d 929, 933

18  (C.C.P.A. 1962) ("35 U.S.C. [§] 161 engrafts the Plant Patent Act onto the basic patent law,

19  which requires us to apply thereto all the rules, regulations and provisions of the basic patent

20  law."); *see Cal. Table Grape Comm'n v. RB Sandrini, Inc.*, No. 1:06-cv-00842-OWW-TAG,

21  2007 WL 1847631, at *18 (E.D. Cal. June 27, 2007).  The University relies on utility patent

22  § 271(a) and (f)(1)  to reach CBC's extraterritorial infringement.

23       In *NTP*, the Federal Circuit held that the "situs of infringement" for use of a patented item

24  under § 271(a) is "the place where control of the [item] is exercised and beneficial use of the

25  [item] obtained" even where such use occurred "outside the United States."  418 F.3d at 1316-

26  17.   Here, control was exercised from the U.S. by the Breeders, and later CBC, and CBC

27  received the benefit of the use in the U.S.  CBC tries to distinguish *NTP* because it involved a

28  utility patent.  (CBC MSJ at 30.)  But the statute and case law discussed above reject that

distinction.  35 U.S.C. § 161; *Sandrini, Inc.*, 2007 WL 1847631, at *18.

In the *NTP* case, the accused system was the BlackBerry/RIM "push" email system that included a "RIM Relay" that was physically located in Canada.  The asserted patent claimed, inter alia, a component that "controls the accused systems and is necessary for the other components of the system to function properly," and the plaintiff identified the RIM Relay as that component.  418 F.3d at 1317.  The Federal Circuit held that the location of the RIM Relay in Canada did not preclude infringement of the asserted claims as a matter of law, and that "the location of the use of the communication system as a whole occurs in the United States" under § 271(a), because "RIM's customers located within the United States controlled the transmission of the originated information and also benefited [sic] from such an exchange of information."  *Id.*

The *NTP* framework has even been applied to patented items t *wholly* located outside the U.S.  In *CLS Bank International v. v. Alice Corp. (Pty.) Ltd.*, the court held that a system "for the settlement of payment instructions related to underlying foreign exchange transactions" that was located entirely outside of the U.S., was "used" within the U.S. by people who "merely transmit payment instructions for settlement" to the foreign system because they "control[] the system's input and benefit[] from the system's output."  667 F. Supp. 2d 29, 35 (D.D.C. 2009).  In *Renhcol Inc. v. Don Best Sports*, the court held that the location of a website on a server wholly within Canada does not, as a matter of law, defeat infringement at summary judgment because the facts could show that people in the U.S. who accessed the website "used" the patented invention in the U.S.  548 F. Supp. 2d 356, 360-61 (E.D. Tex. 2008).

Similarly here, CBC and Drs. Shaw and Larson directed that the patented University varieties be sent to Spain.  (CBC Ex. T at 10-11, 15; Ex. 1 at 59:15-25, 63:23-64:6; Ex. 41 at 193:12-194:12.)  Dr. Shaw created crossing plans to be performed in Spain that with patented University varieties.  (Ex. 1 at 68:5-16, 234:16-22.)  Dr. Shaw directed employees of the University and of CBC to consult (and they did consult) on the facilities, personnel, and procedures in Spain used to perform the crosses.  (Ex. 45; Ex. 46; CBC00000932; Ex. 48 96:15-103:3; Ex. 1 at 229:25-232:1.)  After the crosses were performed and the seeds harvested, CBC received the seeds in the U.S.  (CBC Ex. T at 12, 14, 16; Ex. 1 at 248:11-249:9;

1    VandenLangenberg Dep. at 92:15-93:2.)  And CBC now grows progeny germinated from those

2    seeds, has started breeding with the progeny, and intends to commercially release varieties

3    selected from these progeny or the results of breeding with them.  (CBC Ex. T at 14; Ex. 1 at

4    248:11-249:9; Ex. 41 at 223:7-225:3; Ex. 58; Ex. 54.)  These facts are more than sufficient to

5    defeat CBC's Motion; at the very least they demonstrate triable issues on the University's patent

6    infringement claims.

7           Finally, CBC argues that it did not infringe the University's patents under § 271(f)(1)

8    because that section only applies to patented inventions with components, and a plant does not

9    have components.  (CBC MSJ at 30.)  CBC's interpretation of § 271(f)(1) is too narrow.  That

10   statute provides:

11              Whoever without authority supplies or *causes to be supplied in or
                *from the United States all or a substantial portion of the*
12              *components of a patented invention*, where such components are
                uncombined in whole or in part, in such manner as to actively
13              induce the combination of such components outside of the United
                States in a manner that would infringe the patent if such
14              combination occurred within the United States, *shall be liable as an
                infringer.*

15   35 U.S.C. § 271(f)(1) (emphasis added).  Again, the Plant Patent Act directs courts to "engraft"

16   this concept from utility patent law into the law governing plant patents.  *Id.* § 161; *Sandrini, Inc.*,

17   2007 WL 1847631, at *18.  The Federal Circuit has interpreted § 271(f)(1) to apply to any

18   tangible item, regardless of how many components it has.  *See Cardiac Pacemakers, Inc. v. St.*

19   *Jude Med., Inc.*, 576 F.3d 1348, 1364-65 (Fed. Cir. 2009) (en banc in relevant part).  More

20   recently, the Federal Circuit held that "components" in the statute means *one or more*

21   components.  *Promega Corp. v. Life Techs. Corp.*, 773 F.3d 1338, 1351, 1354-55 (Fed. Cir.

22   2014).

23          In light of these decisions, CBC has infringed the University's plant patents under

24   § 271(f)(1).  CBC "cause[d]" University patented varieties "to be supplied" to Spain.  (Ex. 41 at

25   193:12-194:12; Ex. 62; Ex. 42 at UC_STRAW2_00045679; Ex. 13 at UC_STRAW2_00045621;

26   Ex. 14 at UC_STRAW2_00045637; UC_STRAW2_00045671 at UC_STRAW2_00045672; Ex.

27   44 at UC_STRAW2_00045655.)  These plants, each of which were patented, are "all or a

28

substantial portion" of the patented invention.  CBC induced the creation of these seeds by directing the breeding of University patented varieties according to Dr. Shaw's cross plans.  (Ex. 1 at 68:5-16, 234:16-22.)

> **3.**     **CBC's request for summary judgment of non-infringement should be denied because "benchmarking" with patented plants obtained from University licensees infringes the University's patents on those plants as a matter of law**

CBC asserts that it is not liable for using University patent varieties that it purchased from University licensees to "benchmark" because (1) the University's patent rights were exhausted by that purchase and (2) its benchmarking observations do not constitute an infringing use.  (CBC MSJ at 31-34.)  The University addresses much of CBC's argument in Section II.F, above.  CBC's remaining issues are addressed below.

**Exhaustion**.  CBC's exhaustion argument rests on a misinterpretation of the University's license agreements and a misstatement of the law.  CBC argues that it has authorization to benchmark with University patented varieties because it purchased those plants from Lassen, which has a license from the University that authorizes the sale of plants to "growers for fruit production."  (CBC MSJ at 32 (citing CBC Ex. X ¶ 2.2).)  CBC appears to confine "growers for fruit production" to a type of entity, rather than a type of activity.  But that reading does not square with the plain language of the contract.  *See* Cal. Civ. Code § 1638.  The license uses "for fruit production" as an adverb that describes the activity ("fruit production") multiple times.

For example, paragraph 15.2 of the license requires the licensee to mark the strawberries with the notice that "*[u]se* of the University of California strawberry cultivar '(name of Licensed Cultivar)' *for fruit production* in countries not authorized by the University of California and for propagation to parties not licensed by the University of California or its business partners IS PROHIBITED."  (*Id*. ¶ 15.2 (emphasis added); *see also id.* at ¶ 3.7.)  CBC's interpretation of the license would eviscerate the "use" restriction of the license.  According to CBC, they (or anyone else) can purchase University patented varieties and breed with them in the U.S. as long as they also sell at least some strawberry fruit harvested from those plants.

Under the proper interpretation of the license, the University's authorization of the use of

1   patented University plants only for fruit production purposes does not exhaust all other rights in

2   the plants, which the University retains.  The sale of a patented plant "made under a clearly

3   communicated, otherwise-lawful restriction as to post-sale use or resale does not confer on the

4   buyer and a subsequent purchaser the 'authority' to engage in the use or resale that the restriction

5   precludes." *Lexmark Int'l, Inc. v. Impression Prods., Inc.*, 816 F.3d 721, 735 (Fed. Cir. 2016) (en

6   banc), *cert. granted*, 137 S. Ct. 546 (2016); *see* 35 U.S.C. § 271(d)(4).  Here, the University's

7   restriction was clearly communicated.  Both Dr. Shaw and Lassen knew that the sale of patented

8   University plants to growers was for fruit production only, and for no other use.  (Ex. 1 at 110:7-

9   21; Ex. 6 at CBC_DS_00003006; CBC Ex. X ¶ 15.2.)  CBC has presented no evidence that this

10  restriction, which has been employed in University nursery licenses for more than 15 years, is

11  unlawful.  (CBC MSJ at 32.)  The Court should therefore hold that the University's right to

12  exclude CBC from using patented University plants for breeding program purposes such as

13  benchmarking was not exhausted when CBC purchased them from Lassen.

14       **Benchmarking**.  CBC argues that it is merely "observing" the University's patented

15  strawberry plants, and that observation of the plants for breeding program purposes, even if

16  unauthorized, is not patent infringement.  (CBC MSJ at 32-34.)  First, this is wrong because

17  growing and observing the plants is use.  Second, CBC's use of these plants for its breeding

18  program goes significantly beyond just looking at them now and then.  CBC lays out its

19  strawberry fields so that the University's plants are located next to the plants CBC has bred.  (Ex.

20  41 at 180:22-181:2; CBC Ex. T at 7:13-17; LCN00000493.)  CBC plants, grows, and does all

21  things necessary to bring the University plants to maturity and fruit production.  (Ex. 41 at

22  179:22-180:10; CBC Ex. T at 8:18-21, 14:4-12.)  CBC then measures many characteristics of the

23  plants and compares that measurement data against the data resulting from measurements of

24  plants CBC bred  to determine which of the CBC-bred plants (generally progeny of University

25  plants) are worth advancing for further analysis, and which should be discarded.  (Ex. 41 at

26  180:22-181:2.)  These constitute infringing uses, even under the *Monsanto* and *Sandrini* cases

27  that CBC cites.  (CBC MSJ at 33.)

28

1      The other cases CBC cites do not provide cover for CBC's activities.[11]  (CBC MSJ at 33-

2  34.)  *Van Well* involved the use of apple trees that a mortgagee did not have actual control over or

3  possession of.  *Van Well Nursery, Inc. v. Mony Life Ins. Co.*, 362 F. Supp. 2d 1223, 1228-29 (E.D.

4  Wash. 2005).  In *LA Gear Inc. v. ES Originals Inc.*, the court held that "unofficially observing

5  and handling the accused shoes in retail stores" did not constitute use because the distributor's

6  "superficial examinations" of the shoes were "*de minimis*."  859 F. Supp. 1294, 1297-99 (C.D.

7  Cal. 1994).  And the *Kaz* case concerned patent exhaustion.  *See Zenith Labs., Inc. v. Bristol-*

8  *Myers Squibb Co.*, No. Civ. A. 91-3423, 1992 WL 12604043, at *29 (D.N.J. July 21, 1992)

9  ( "*Kaz* is inapposite to the issue of 'use'" because the use of the patented products was

10  "permissible under an implied license granted to the defendant with the purchase" of the products)

11  (citing *Kaz Mfg. Co. v. Chesebrough-Ponds, Inc.*, 317 F.2d 679 (2d Cir. 1963).  In contrast, in

12  defiance of the explicit restrictions in the license, which an implied license could not contradict,

13  CBC is planting, growing, measuring, and comparing University patented varieties to other plants

14  in its breeding program.  This use is certainly not *de minimis* or superficial observations.

15      The Court should therefore deny CBC's motion for summary judgment that its

16  "benchmarking" activities do not infringe the University's patents, and grant the University's

17  cross-motion that such use is infringement.

---

[11] CBC cites, without real explanation, to many cases in footnote 7 to its motion, but none of these cases excuse CBC's conduct.  (CBC MSJ at 34 n.7.)  In *Intermedics, Inc. v. Ventritex, Inc.*, 775 F. Supp. 1269, 1281 (N.D. Cal. 1991), the Court merely found that sending clinical testing data, rather than samples, was not an act of infringement.  *See Biogen, Inc. v. Schering AG*, 954 F. Supp. 391, 397 (D. Mass. 1996) (discussing *Intermedics*).  The *Intermedics* and *Bird-B-Gone, Inc. v. Bird Barrier Am., Inc.*, No. SACV 12-00178 AG, 2013 WL 11730662, at *4 (C.D. Cal. Mar. 20, 2013), decisions also discuss a trade show safe harbor, under which courts have allowed the display and demonstration of devices at trade shows unless there is "sales oriented" activity.  But CBC is not demonstrating the patented University plants at a trade show.  This trade show safe harbor does not have a basis in statute and is not consistently followed.  *See Donnelly Corp. v. Reitter & Schefenacker GmbH & Co. KG*, 189 F. Supp. 2d 696, 704 (W.D. Mich. 2002) ("[The *Intermedics*] definition of 'use' stretches the plain and ordinary meaning of the word beyond recognition and seems contrary to logic.").  Finally, CBC cites two cases where the Courts declined to find personal jurisdiction over a defendant.  *QR Spex, Inc. v. Motorola, Inc.*, 507 F. Supp. 2d 650, 659 (E.D. Tex. 2007); *Med. Sols., Inc. v. C Change Surgical LLC*, 468 F. Supp. 2d 130, 132, 134 (D.D.C. 2006), *aff'd*, 541 F.3d 1136 (Fed. Cir. 2008).  But there is no personal jurisdiction issue here.

1

**IV.    CONCLUSION**

2          For the reasons stated above, the Court should deny CBC's Motion for Summary

3 Judgment and grant the University's Cross-Motion for Summary Judgment.

4

5 Dated: February 8, 2017                         MORRISON & FOERSTER LLP

6

7                                       By:    _/s/ Matthew A. Chivvis_
                                               Matthew A. Chivvis

8                                              Attorneys for The Regents of the
                                               University of California
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28