# Exhibit 2

```
1              UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3                  SAN FRANCISCO DIVISION
4   _____
                                   )
5   CALIFORNIA BERRY CULTIVARS,    )
                                   )
6   LLC,                           )
                                   )
7          PLAINTIFF,              )
                                   )
8          vs.                     )  No.  3:16-CV-02477-VC
                                   )
9   THE REGENTS OF THE UNIVERSITY  )
                                   )
10  OF CALIFORNIA,                 )
                                   )
11         DEFENDANT.              )
    _____)
12
13
14              C O N F I D E N T I A L
15
16
17            VIDEOTAPED DEPOSITION OF
18                 CHRIS VAN KESSEL
19            Thursday, November 17, 2016
20
21
22
23
24     Reported By:
25     KATHLEEN WILKINS, CSR #10068, RPR-RMR-CRR-CCRR-CLR
```

CONFIDENTIAL
Chris Van Kessel - November 17, 2016

Page 15

```
 1              THE VIDEOGRAPHER:  Will the certified
 2    court reporter please swear in the witness.
 3                  CHRIS VAN KESSEL,
 4              having been duly sworn,
 5         was examined and testified as follows:
 6              THE VIDEOGRAPHER:  Counsel.
 7              MR. LIPPETZ:  Thank you.
 8                EXAMINATION BY MR. LIPPETZ
 9    BY MR. LIPPETZ:
10         Q.   Good morning, Dr. van Kessel.
11              Could you please state your full name
12    for our record.
13         A.   Full name is Christianis Hendricus
14    Johannes van Kessel.
15         Q.   And we'll have you spell that later.
16              And are you currently employed?
17         A.   Yes.
18         Q.   Where are you employed?
19         A.   University of California.
20         Q.   What is your current role or title
21    there?
22         A.   I'm a distinguished professor in the
23    department of plant sciences at University of
24    California, the Col of Ag, Environmental Science.
25              (Reporter clarification.)
```

CONFIDENTIAL
Chris Van Kessel - November 17, 2016

Page 133

```
 1              Fine.  You have a third copy.  And I --
 2     yes, I was -- I was -- yeah.  I did ask that
 3     question.  And I said, "Well, we will have a
 4     third" -- "we need a third copy."
 5              "Fine."
 6         Q.   You were never told why they needed a
 7     third copy, though?
 8         A.   No.
 9         Q.   Your letter goes on to say:
10              "The transfer is to be for
11          materials preservation only."
12              What did you mean by that?
13         A.   Well, the copy of that material is going
14     to go for -- for the future of the breeding
15     program.  So we want to preserve that for -- for
16     the person who is going to come, for preservation.
17     That material should be preserved.  The material
18     should be preserved for UC to be part of the next
19     breeding program we will have -- we will have
20     whenever we will find a replacement for the
21     breeding program.
22              It is not to sell to private companies.
23     It is not for whatever.  It is to be -- it was
24     preserved for the continuation of the plant
25     breeding program in the future.
```

1  Q.   And you go on to say that:
2       "The department 'will
3       guarantee the security of this
4       material to protect your
5       commercial and research interests
6       in any and all materials
7       transferred.'"
8       What did you mean by that?
9  A.   When you start a breeding program, the
10 time between making the crops and potential
11 release as a variety is about 10, 12 years.  It
12 might be a bit valuable, what is a crop.  In
13 strawberries, it probably will be 10 years.  Okay.
14      If someone retires from University of
15 California who had established a breeding program,
16 there will be material in the pipeline of which he
17 or she was the inventor.
18      So if someone retires and there's
19 material in the pipeline that becomes patentable,
20 then even when this person is not on campus
21 anymore or retired, he or she should still be --
22 have the opportunity or even be asked or --
23 listen, we will file patent from a crop you made
24 five, six, seven years ago.  You will be listed on
25 the patent.  Your financial interests in that

1   material will be guaranteed.
2           That is not -- that is a policy for all
3   members in the department who have a breeding
4   program.  If they retire and there is still
5   material in that pipeline that can be patented,
6   they will have the right, they will have the
7   opportunity to be a co-applicant on that patent.
8   It will not be the sole applicant, because there
9   is someone else who took over, so there would be
10  more than one person on the applicant -- on the
11  patent.  But they will have the possibility, the
12  right, the guarantee to be member, to be cosign on
13  that.  That's what I mean by the security of the
14  material to protect your commercial interests.
15      Q.   So one commercial interest that Dr. Shaw
16  had in the plant material he was turning over was
17  the potential future revenue stream from patents
18  that could be issued on one or more of the plants;
19  yes?
20      A.   Correct.
21      Q.   The university has policies that also
22  discuss the possibility of generating revenue for
23  nonpatented tangible research projects; isn't that
24  correct?
25           MR. CHIVVIS:  Objection.  Vague.  Calls

1    for legal opinion.

2    BY MR. LIPPETZ:

3        Q.    You can answer.

4        A.    There are -- there are -- yeah.

5    There's -- there's a -- I think there's a

6    nonpatentable -- material -- there's no patent,

7    but still have commercial value.

8        Q.    When you were discussing Dr. Shaw's

9    commercial interests, were you also including the

10   possible commercial interests from revenue for

11   nonpatented sources?

12       A.    No.  I was using the department policy

13   that when the breeder retires and there is still

14   material in the pipeline that can be patented, can

15   generate royalties, the breeder who actually

16   retired will be part of the patent.  That's what

17   I -- no more, no less I mean by that sentence.

18       Q.    Why didn't you say "protect your

19   potential patent revenue" instead of "commercial

20   interest"?

21       A.    I see patents sort of a commercial

22   activity.

23       Q.    You knew there were other ways to

24   commercialize products of research at the

25   university besides patents, right?  We talked

1 on.
2     If this person has any interest in
3 something he or she were doing prior to them, of
4 course this person can continue that, even after
5 he or she's retired. I was not making any
6 exception. In this particular case, no, you
7 cannot anymore use your material for your research
8 interest. There might be some. Might be not
9 some. But at least he would -- the breeders are
10 treated similar like all the other ones.
11   Q.  Do the professors at UC Davis generally
12 own their own research?
13   A.  UC policy is that when it comes down to
14 material or discovery, there's a UC discovery,
15 there's a UC material, can be patent, royalties
16 will go to the inventor. But a material, the
17 material from any breeding program remains UC
18 property. That is not property of the inventor,
19 and that is not property of the faculty member.
20 That's clear. No doubt that material is UC
21 material. That does not belong to the breeder.
22 That does not belong to the inventor. It is UC
23 material.
24   Q.  Does the professor's research results,
25 data they've collected, does that belong to the

1   professor?
2           MR. CHIVVIS:  Objection.  Vague.  Calls
3   for a legal opinion.
4           THE WITNESS:  Yes, I think I will --
5   there must be legal opinion on that.  The research
6   results of a -- I mean, nontangible.  I mean,
7   there is not -- there is not plant or something.
8   Resource data.  Does the data belong?  Yes, the
9   data belongs also to the university.
10          What does -- does the -- I think I would
11  almost say can -- there should be someone legal,
12  how -- where the fine lines sits between data, the
13  paper written, the communication done, the
14  discovery.
15          My -- my initial feeling is that we
16  are -- we are part of University of California.
17  When we do research, when we discover something,
18  that is a UC discovery.  The inventor, of course,
19  has benefit of that through the patent, but it
20  remains a UC property.
21          But, again, I think you should get
22  some -- someone from the office of the president
23  to define clearly what belongs to university, what
24  belongs to the faculty.  When it comes down to
25  plant material and the breeding program, that I

CONFIDENTIAL
Chris Van Kessel - November 17, 2016

Page 140

```
 1    think is very clear, plant material from the
 2    breeding program, the varieties and so on, that is
 3    UC material.
 4              If you want to use that material, you
 5    need an agreement, a license or whatever it is,
 6    from the university.  You cannot just take it and
 7    go.  It is UC material.
 8    BY MR. LIPPETZ:
 9         Q.   You were and still are a professor at UC
10    Davis, right?  Yes?
11         A.   I am professor?
12         Q.   Yes.
13         A.   Yeah, I am professor.
14         Q.   You have conducted research as part of
15    being a professor?
16         A.   Yeah.  I have done, yeah.
17         Q.   And I think you said there's a fine
18    line, which suggests to me that you believe there
19    is some research that is yours versus some fine
20    line between what is yours and the university.
21              MR. CHIVVIS:  Objection.  Misstates
22    prior testimony.
23              THE WITNESS:  I don't know where the
24    fine line is.  It might be everything.  The UC
25    might say, "Well, everything you do under the
```

CONFIDENTIAL
Chris Van Kessel - November 17, 2016

Page 157

1  licensing agreement.
2      Then in the second paragraph, he says:
3          "We believe that the only
4      course of action left is for the
5      department of plant sciences to
6      support Doug's proposal to do a
7      public release of the elite
8      germplasm."
9      And then you write to a number of people
10  a couple of days later describing a meeting of the
11  variety release committee and concurrence that it
12  will be up to the breeders to decide if they wish
13  to proceed with a public release of the germplasm.
14      Do you see that?
15  A.  Yeah.
16  Q.  What is your understanding of the policy
17  regarding the breeders' ability to do a public
18  release of germplasm?
19  A.  Breeders have the right or can express
20  the opinion that their material will be public
21  release.  That has to be approved by IA, which
22  might or might not concur with their opinion that
23  the materials should be public released.
24      Public release means there's no royalty,
25  so there's a financial stake in their discussion.

1    I can see why the university would not promote
2    always public release.
3         But it is up to the breeder to express
4    his own opinion that his or her material should be
5    public released.  If it will happen, then that's
6    different question.
7       Q.   In general, the type of material that
8    would be considered for public release would be
9    material that is not being pursued for patent
10   protection; is that accurate?
11        MR. CHIVVIS:  Objection.  Calls for
12   speculation.
13        THE WITNESS:  Public release has been
14   used for material which we think -- the breeder
15   think it has low -- let's call it commercial
16   value.  It will never -- the cost of filing the
17   patent probably will not generate enough income to
18   cover the cost from the royalty income.  So that
19   is another reason why sometimes they go for public
20   release.  There are other reason, but this is one
21   of them.
22   BY MR. LIPPETZ:
23      Q.   So in your communication of June 2nd,
24   where you say it will be up to the breeders to
25   decide, you're not asking for permission.  You're

1    Kirk Larson have ownership rights in the genetic
2    materials and transition cultivars developed in
3    the university's strawberry breeding program?
4         A.   No, I do not.  What I said earlier, the
5    breeding programs, in general -- had nothing to do
6    with strawberry specifically.  When someone has a
7    breeding program or otherwise, the material -- the
8    plant material in that -- in that program is UC
9    property.  If that ends up to be a variety, it
10   remains UC property.
11        The breeders are the inventors.  They
12   are not the owners.  UC is the owner of the
13   material.  So I disagree with that conclusion,
14   that they have ownership rights.  No.  The UC has
15   ownership.  They are the inventors.
16        Q.   Do you think the statement you just made
17   about the university's ownership rights was a fact
18   commonly known in the plant sciences department
19   prior to the sending of Exhibit Number 24?
20             MR. LIPPETZ:  Objection.  Speculation.
21             THE WITNESS:  It is known by all
22   breeders, and I would always say includes --
23   including the strawberry breeders, that the
24   material belongs to the university.  That is known
25   as long as I've been the chair of the department,

CONFIDENTIAL
Chris Van Kessel - November 17, 2016

Page 240

1    even before that.  All breeders know that the
2    product coming out of pipeline is UC -- is owned
3    by the UC.
4           Yes.  I can say that -- I can say
5    clearly that that -- that all breeders know that
6    their material belongs to the university.
7    BY MR. CHIVVIS:
8        Q.   Do you think Doug Shaw knew that the
9    material was owned by the university?
10           MR. LIPPETZ:  Objection.  Speculation.
11           THE WITNESS:  Yes, he did.
12   BY MR. CHIVVIS:
13       Q.   Did he ever say as much to you?
14       A.   Yes, he did.
15           MR. CHIVVIS:  I'd like to mark another
16   exhibit.  Next in order.
17           What are we on?
18           THE REPORTER:  46.
19           MR. CHIVVIS:  46.
20           MR. LIPPETZ:  Yeah, help me out with
21   that.
22           (Whereupon, Deposition Exhibit 46
23           was marked for identification.)
24           THE WITNESS:  Spare copy?
25           MR. LIPPETZ:  46?

CONFIDENTIAL
Chris Van Kessel - November 17, 2016

Page 244

```
1    BY MR. CHIVVIS:
2         Q.   Dr. van Kessel, by Point Number 3, did
3    you have any intent to recognize that Dr. Shaw or
4    Dr. Larson or California Berry Cultivars owns any
5    rights in the germplasm that's described in
6    Exhibit Number 30?
7         A.   None.  The -- there was no intent
8    whatsoever to give any indication or -- an
9    indication that by writing this memo to Doug, he
10   would have legal right, or whatever it is, of the
11   material he was working with.  No.  That was never
12   the intent of -- of this -- of this letter.  No.
13   Never.
14        Q.   And do you believe that Dr. Shaw would
15   have known, both before and after receiving this
16   letter, that he had no ownership interest in the
17   germplasm described in the letter, Exhibit 30?
18             MR. LIPPETZ:  Objection.  Leading and
19   calls for speculation.
20             MR. CHIVVIS:  Let me rephrase.
21        Q.   What's your position, if any, on whether
22   Doug Shaw would have known, either before or after
23   receiving this letter, that he had no ownership
24   interest in the germplasm described in Exhibit 30?
25             MR. LIPPETZ:  Same objections.  Same
```

CONFIDENTIAL
Chris Van Kessel - November 17, 2016

Page 245

1  objections.
2          THE WITNESS:  The department of plant
3  science cannot release varieties or give
4  germplasm, or whatever is plant material, without
5  going through the proper protocol.  The department
6  is not -- has no legal status, has no legal
7  authority to release to the public, to third
8  parties, any material.  It has to go through the
9  proper channels.
10         It means it has to go through the
11 department.  The recourse has to be made by the
12 department, faculty to the department chair to the
13 dean to IA, to chancellor of research.  They are
14 the ultimate decision-making whether or not to
15 release material to -- I say to a third party or
16 to patent, whatever -- whatever -- whatever it
17 is -- that -- that -- a decision is never made at
18 department level.
19         All breeders know that.  We advise the
20 dean, the dean advise the vice chancellor, and
21 that's where the decision is being made.  Whether
22 I even like to do that, it would have been
23 overruled right away.  I don't have the authority.
24 BY MR. CHIVVIS:
25     Q.    Would Dr. Shaw have known that?

```
1              MR. LIPPETZ:  Objection.
2              THE WITNESS:  Absolutely.
3              MR. LIPPETZ:  Speculation.
4              THE WITNESS:  Absolutely.  He knows the
5     process.  He knows very well the process.  He has
6     gone through that for 38 times in his career when
7     he was going for patent.  That always had to go
8     through the department.  It was never the
9     department made the final decision on releasing
10    the varieties.  The department can't do that.
11             So, no, he knows that release of a
12    variety has to go through the proper channels.
13    And the decision of that, to release or not to
14    release, is not at a department level.  That is at
15    the vice chancellor level.
16    BY MR. CHIVVIS:
17       Q.   Would Dr. Larson have known that?
18             MR. LIPPETZ:  Objection.  Speculation.
19             THE WITNESS:  Absolutely.  This is
20    standard protocol.  Doug Shaw and Kirk Larson know
21    the standard protocol.
22    BY MR. CHIVVIS:
23       Q.   At the time you wrote the letter
24    reflected in Exhibit Number 30, who owned the
25    germplasm that's described in that exhibit?
```

CONFIDENTIAL
Chris Van Kessel - November 17, 2016

Page 271

1  Q.   And that rule was?
2  A.   That it has to go through the proper
3  channels.  The req will be made, the chair support
4  or not support.  It goes to the dean's office,
5  support or not support.  Goes to IA, the vice
6  chancellor research.  They have to make a final
7  decision, yes or no, to release plant material,
8  tangible research product, whatever, variety, to
9  the public.
10      That process has been followed, and I
11 always assumed that Doug has to follow the same
12 thing.  I was -- if the UC has a different rule 30
13 years ago, when Doug came aboard and he was still
14 using that policy, I was not being told.
15 Q.   What was the rule as you just stated on
16 where ownership lies?
17      MR. LIPPETZ:  Objection.  Asked and
18 answered.
19      THE WITNESS:  The ownership of the plant
20 material belongs to UC.  Period.
21      MR. CHIVVIS:  Nothing further.
22      MR. LIPPETZ:  No questions.
23      THE VIDEOGRAPHER:  This concludes
24 today's videotaped deposition of Dr. Chris van
25 Kessel.  We're off the record at 4:58 p.m.

CONFIDENTIAL
Chris Van Kessel - November 17, 2016

Page 276

1      CERTIFICATE OF REPORTER

2           I, Kathleen A. Wilkins, Certified

3   Shorthand Reporter licensed in the State of

4   California, License No. 10068, hereby certify that

5   the deponent was by me first duly sworn, and the

6   foregoing testimony was reported by me and was

7   thereafter transcribed with computer-aided

8   transcription; that the foregoing is a full,

9   complete, and true record of proceedings.

10          I further certify that I am not of

11  counsel or attorney for either or any of the

12  parties in the foregoing proceeding and caption

13  named or in any way interested in the outcome of

14  the cause in said caption.

15          The dismantling, unsealing, or unbinding

16  of the original transcript will render the

17  reporter's certificates null and void.

18          In witness whereof, I have hereunto set

19  my hand this day:

20  _____ Reading and Signing was requested.

21  _____ Reading and Signing was waived.

22  ___X___ Reading and Signing was not requested.

23          _____

24          KATHLEEN A. WILKINS

25          CSR 10068, RPR-RMR-CRR-CCRR-CLR