# Exhibit 3

1        UNITED STATES DISTRICT COURT NORTHERN DISTRICT
2              OF CALIFORNIA, SAN FRANCISCO DIVISION
3
4
5    CALIFORNIA BERRY CULTIVARS, LLC, )
                                      )
6               Plaintiff,            )
                                      )
7         vs.                         )Case No.
                                      )3:16-cv-02477-VC
8    THE REGENTS OF THE UNIVERSITY OF )
     CALIFORNIA, a corporation,       )
9                                     ) CONFIDENTIAL
               Defendants.            )
10   _____)
     THE REGENTS OF THE UNIVERSITY OF )
11   CALIFORNIA, a corporation,       )
                                      )
12             Cross-Complainant,     )
                                      )
13        vs.                         )
                                      )
14   CALIFORNIA BERRY CULTIVARS, LLC, )
     DOUGLAS SHAW, and KIRK LARSON,   )
15                                    )
               Cross-Defendants.      )
16   _____)
17
        VIDEO-RECORDED DEPOSITION OF PERSON MOST KNOWLEDGEABLE
18
                        FOR THE REGENTS
19
                 OF THE UNIVERSITY OF CALIFORNIA
20
                       MICHAEL CARRIERE
21
                   San Francisco, California
22
                     December 20, 2016
23
     Transcribed by:
24   DENISE HERFT
     CSR No. 12983
25

                                            Page 1

1              MR. CHIVVIS:  Matthew Chivvis of Morrison

2    and Foerster, LLC for The Regents of the University

3    of California and the witness.

4              THE VIDEOGRAPHER:  The court reporter --

5    the videographer will swear in the witness.

6              Sir, would you raise your right hand.

7

8              MICHAEL CARRIERE,

9    called as a witness, and having been first duly sworn

10   by the Videographer, was examined and testified as

11   follows:

12

13             MR. CHIVVIS:  Just a comment for the

14   record, we're beginning a little bit late today due

15   to a mixup with the scheduling of a court reporter

16   and videographer.  The deposition was scheduled to

17   9:00 a.m., we're proceeding at 12:18.  The parties

18   have agreed that this deposition will proceed on

19   videotape and audio only to be transcribed after

20   the fact due to the inability to schedule a court

21   reporter for this proceeding.

22             Due to the fact that a court reporter will

23   not be present to ask for clarification if anything

24   was unclear coming out of the witness's mouth or

25   any of the conversation between the parties or

                                              Page 7

1    Q   Has the University ever apart from this
2  litigation asserted to a third party that
3  benchmarking activities, as we just described them,
4  constitutes a breach of the grant of license as
5  described here?
6    A   Well, if I can elaborate a little bit, I
7  can provide some context, it's known with our
8  licensed nursery that if they are approached by an
9  entity that is going to be conducting research like
10 benchmarking or maybe a trial to look at fumigant
11 efficacy or a University looking at flavor profile
12 or something like that, that such use needs to be
13 covered under a test agreement and that the nursery
14 should make it clear to the person that's
15 approached them that they need -- that entity needs
16 to approach the University to secure a test
17 agreement for that use.
18   Q   Okay.  When you say it's known to
19 nurseries, is that embodied in a written agreement
20 between the University of California and Lassen?
21   A   That concept would be something that
22 nurseries have been made well aware of, say,
23 through public meetings to the point now.  We have
24 a fairly stable cohort of nurseries that have been
25 with the University for sometime and there's an

Page 75

1   institutional knowledge at those nurseries that

2   when somebody approaches them who is not a grower

3   for fruit production and is interested in accessing

4   plants from their nursery that the nursery should

5   contact us and the potential user should contact us

6   so a test agreement can be put in place.

7       Q   Okay.  Is that the policy embodied in a

8   written contract signed by the University and

9   Lassen Canyon?

10      A   It's embodied in agreement with the

11  tester, and I would say that as we were discussing

12  earlier 2.1 through 2.4 read with the limitation in

13  2.5 is an embodiment of that concept.

14      Q   Okay.  So apart from this agreement is

15  there an agreement between the University and

16  Lassen, I understand they don't have test

17  agreements between the University and Lassen, is

18  there an agreement between University and Lassen

19  other than this agreement in writing signed by both

20  parties indicates that Lassen shall perform in

21  accordance with what you just described if a third

22  party comes to seek to use varieties for

23  evaluation, et cetera?

24      A   No, it's a combination of the language

25  that's in the agreement and the understanding that

Page 76

```
1    Lassen has about how appropriately to proceed when
2    they're contacted.
3              MR. LIPPETZ:  Okay.  Let's go off the
4    record.
5              THE VIDEOGRAPHER:  Don't forget your
6    microphones, please.
7              This is the end of video one of Volume 1
8    of the deposition of Michael Carriere on
9    December 20th, 2016.  The time is 2:12 p.m.  We're
10   off the record.
11             (Recess taken from 2:12 until 2:20.)
12             THE VIDEOGRAPHER:  This is the beginning
13   of video two of Volume 1 of the deposition of
14   Michael Carriere on December 20th, 2016.  The time
15   is 2:20 p.m.  We're back on the record.
16   BY MR. LIPPETZ:
17       Q   You mentioned that the University had
18   conveyed its view that nurseries should arrange for
19   test agreements with third parties who wanted to
20   use Cultivars for evaluation through meetings or
21   presentations over the years; is that accurate?
22       A   Not exactly.  So we haven't signaled to
23   nurseries that they should be involved with putting
24   in place a test agreement, but that they should
25   notify the potential recipient that the recipient
```

Page 77

1    to pull up the documentation, we can.  You can ask

2    him questions about it.

3          MR. LIPPETZ:  I appreciate it.  Let me ask

4    my questions, please.

5    BY MR. LIPPETZ:

6          Q    You said you spoke at conferences at this

7    time, what conferences did anybody from the

8    University speak at at which it conveyed its view

9    that its UC patented varieties should not be used

10   for breeding?

11         A    I think it was a horticultural science

12   meeting, and I gave a presentation on the

13   strawberry licensing program, and I recall there

14   being an emphasis on this theme.  You know, it was

15   pretty much, get the message out, let it be known

16   this is the UC Davis position and policy.

17         Q    What time frame?

18         A    Early 2000s.

19         Q    And do you know whether representatives

20   from Driscoll were at this conference?

21         A    It wouldn't surprise me.  It was -- I

22   think it was in Sacramento so it was local,

23   relatively.  That meeting is held around the

24   country at a horticultural focus.  I think it

25   breeding session, breakout session on breeding, so

                                        Page 101

1   it was kind of a nice targeted audience for us to

2   be making this known.  So it wouldn't surprise me

3   if Driscoll was there, but I don't recall

4   specifically if there was someone there from

5   Driscoll.

6       Q    I think you made a statement that the

7   industry knows or knew or was conveyed the message.

8   Is the University certain that every member of the

9   strawberry industry knows that the University's

10  position is that its plants should not be used for

11  breeding?

12      A    I mean, that's a kind of canvassing that I

13  think would be, you know, level of diligence to

14  canvas the 300 to 500 members of the industry, that

15  would be difficult to say like each individual in

16  the industry, but again, it's just in the ether.

17  It's known through outreach, through Doug Shaw and

18  his comments to industry members.  I think it was

19  part of the reason why we might have had contact

20  from industry members seeking to clarify our

21  position because they had heard about it.

22      Q    Okay.  Has the University undertaken any

23  efforts to review publically filed patent

24  applications or patents to determine whether any

25  other companies besides the two examples I showed

Page 102

1 include them, so the general theme is Europe and

2 the Mediterranean basin, Mexico, South America, and

3 some part of Asia.

4   Q The UC patented strawberries that --

5 well -- strike that.

6     Does Eurosimius grow patented UC

7 strawberries for fruit production?

8   A They are an agricultural focused company,

9 but they are not a grower in the way that a fruit

10 grower would be a grower.

11   Q Does Eurosimius propagate UC patented

12 varieties for sale to growers such as Lassen Canyon

13 does?

14   A So Eurosimius's business model is to be a

15 sublicensor of such rights, so Eurosimius is very

16 well familiar with propagation by nurseries, in

17 fact, their business model is to sublicense

18 nurseries to propagate plants, but they're not

19 specifically in the business themselves of

20 propagating plants.

21   Q And the time frame I want to focus on for

22 the purpose of these questions is 2012 through the

23 present; okay?

24   A Okay.

25   Q In that time frame the University had a

Page 105

1   practice of releasing patented Cultivars first in

2   California and then two years later to the rest of

3   the world, is that generally right?

4        A    Releasing for use in California, and then

5   two years later to the rest of the world including

6   the U.S. outside of California?

7        Q    Correct.

8        A    Yeah.

9        Q    That's accurate?

10        A    That's accurate.

11        Q    And the agreement with Eurosimius

12   discusses and even defines, I think, the words

13   two-year -- two-year Cultivars; is that correct?

14        A    I think it's a two-year delay cultivar.

15        Q    Two-year delay cultivar.

16        A    Yeah.

17        Q    And is there a -- I will point you to

18   section 2.6, but if there's other sections I should

19   be aware of, please let me know.  Does this

20   agreement have restrictions on Eurosimius's use of

21   these two-year Cultivars?

22        A    This agreement does not grant rights to

23   the two-year delay Cultivars until a specific time

24   frame, which is the end of the two-year delay.  The

25   use of Cultivars during the two-year delay period

Page 106

1      A    Okay.

2      Q    So a two-year delay cultivar becomes a

3  licensed cultivar at the expiration of the two-year

4  delay, is that a fair way to characterize it?

5      A    If I can take another look to make sure --

6      Q    Sure.

7      A    -- I'm answering with precision.

8           Yeah, I think that's right.  So at the end

9  of the two-year delay, a two-year delay cultivar

10  becomes a licensed cultivar.

11      Q    Is there a practice historically whereby

12  Eurosimius is allowed to themselves or their

13  sublicensees propagate two-year delay cultivars

14  prior to the expiration of the two-year period in

15  preparation for commercializing them in their

16  geographic regions?

17      A    So two parts, one is there would be an

18  allowance for -- under our test agreement for

19  growing a given cultivar during its two-year delay

20  period.  Sorry, I'm not tracking the second part of

21  your question.

22      Q    So the test agreements you're saying that

23  the materials delivered to Eurosimius under a test

24  agreement that Eurosimius is led to propagate those

25  and multiply those for the sublicensees in

                                        Page 109

```
 1   preparation --
 2         A    Right.
 3         Q    -- for releasing them commercially?
 4         A    So the preparation word, if I can focus on
 5   that real quickly?
 6         Q    Uh-huh.
 7         A    So there's preparation in the sense that
 8   use -- testing under the test agreement during a
 9   two-year delay is preparation in the sense that it
10   positions Eurosimius and the University to know
11   something about how a two-year delay variety might
12   perform in a given setting, a given geography once
13   the two-year delay is over.  So in that sense it's
14   preparation.  But it shouldn't be read as
15   preparation in the sense that the test agreement
16   somehow allows a form of commercialization that
17   just leads, segues into the post two-year delay
18   period.
19              So it's preparation in the data gathering
20   market reconnaissance sense but not in the sort of
21   bulk-up sense.
22         Q    So I'm focused more on the bulk-up sense.
23   So two years expire from the release of a cultivar
24   in California, Eurosimius is upon the expiration of
25   that two years, now is the chance to sell that in
```

Page 110

1    Europe, are they permitted to have someone begin

2    multiplying those plants prior to the expiration of

3    those two-year period in preparation of those

4    sales?

5         A    Multiplication can happen under a test

6    agreement, but there are strict revisions in the

7    test agreement that such plants be destroyed.

8         Q    Right.  Does Eurosimius have to start its

9    first propagation activities the day the two-year

10   delay expires --

11        A    Yeah.

12        Q    -- for its commercialization activities?

13        A    Yeah, that's a commercialization activity,

14   which is not allowed until the expiration of the

15   two-year delay.

16        Q    And so your understanding is that

17   Eurosimius either themselves or their authorized

18   sublicensees begin propagating the material upon

19   the expiration of the two-year delay?

20        A    Outside of the context of the test

21   agreement.

22        Q    Correct.

23        A    Yeah.

24        Q    And so isn't there, then, a delay until

25   there's enough of that plant material for

Page 111

1    would be through them and to the extent that

2    Eurosimius might put the two parties in contact to

3    know that a nursery in California has plants of a

4    new variety and a grower in Spain is interested in

5    growing some of them, but then the business

6    arrangement goes between the nursery in California

7    and the grower in Spain.

8         Q    Has the University ever allowed Eurosimius

9    to commercialize plants that it received for the

10   first time under a test agreement?

11        A    That has expressly not been something that

12   would be allowed.  We -- the University's intent in

13   the two-year delay is that commercialization

14   activities not take place during the two-year

15   delay.

16        Q    Let me rephrase the question, has the

17   University ever allowed Eurosimius to begin

18   commercializing plants after the expiration of the

19   two-year delay where those plants were propagated

20   from plants that first received under a test

21   agreement?

22        A    Eurosimius was not allowed to do that.

23        Q    Has the University ever been aware that it

24   had done it whether it was allowed to or not?

25        A    We're not aware that they have done it.

Page 113

1      Q    Has the University ever provided

2   permission to Eurosimius to do that?

3      A    No.   In fact, they were on notice that

4   they were not to do that.

5      Q    You've given us in tab 5 an example of --

6   I say "example" because personally I've seen a

7   number of test agreements between the UC and

8   Eurosimius, was there a reason that this one was

9   chosen?

10     A    They are similar in kind, so this one

11  doesn't stand out as a unique -- hold on just a

12  sec.   I mean, there's a uniqueness, of course, in

13  the selections that are included but otherwise the

14  language for quite sometime has tracked very

15  closely overtime, so the uniqueness exists and the

16  varieties that are included are selections.

17     Q    Going back to -- well, actually, talking

18  about either the exclusive license agreement or the

19  test agreement, in this case the -- there are facts

20  relating to the use of UC patented varieties that

21  had been released for commercialization in Europe,

22  not two-year delay cultivars, but actual released

23  in Europe --

24     A    Post two-year delay?

25     Q    -- post two-year delay.

Page 114

1   plant patent, and so that answer to that is no.  It

2   just doesn't speak to it.

3   BY MR. LIPPETZ:

4        Q    Okay.

5             MR. CHIVVIS:  Greg, are we getting back

6   into a topic I can say he's designated on so we can

7   say it's University testimony again here?

8   BY MR. LIPPETZ:

9        Q    So, Dr. Carriere, if you would like at the

10  agreement under tab seven of your binder,

11  Exhibit 276, and yes, this is a different topic.

12  This is a document signed by Dr. Shaw back in 1986;

13  correct?

14       A    1986, yes.

15       Q    And is the University's understanding that

16  this is the patent agreement that was operable for

17  the entire period Dr. Shaw worked for the

18  University?

19       A    Let's see, so yes, this is '86, which was

20  the time he began employment as I understand, and

21  then operative throughout his time of employment,

22  yes.

23       Q    The patent agreement -- let me ask this,

24  when an employee of the University makes an

25  invention, the intellectual property rights in that

                                        Page 130

1    invention are initially held by the inventor;

2    correct?

3        A    Around intellectual property?

4        Q    Correct.

5            MR. CHIVVIS:  Objection; calls for a legal

6    conclusion.

7            You can answer.

8            THE WITNESS:  So I know there are, you

9    know, state statutes around work product and

10   intellectual property, and both of those I

11   understand speak to ownership by the employer, in

12   this case the University.

13   BY MR. LIPPETZ:

14       Q    So let me ask it a different way; an

15   employee of the University that invents something,

16   that invention can transfer to the University

17   either pursuant to a law or pursuant to a contract;

18   is that correct?

19           MR. CHIVVIS:  Objection; calls for a legal

20   conclusion.

21           THE WITNESS:  Yeah, I -- so I have some

22   understanding of -- of the area around California

23   labor law and entitlement of employers to the work

24   product of employees, and my understanding there is

25   that the work product is the -- it's owned by the

                                          Page 131

1    employer.

2    BY MR. LIPPETZ:

3         Q    And that, in part, is covered by the

4    provision cited here Labor Code section 2870;

5    correct?

6         A    Here?

7         Q    In the agreement we were looking at under

8    tab 7 on the second page.

9         A    Okay.

10        Q    It's set forth toward the word "notice" on

11   the bottom of the second page.

12        A    Thanks.   I see 2870 in the middle of the

13   section?

14        Q    Yes, that's what I was referring to.

15        A    Okay.

16        Q    Does the University have any position on

17   whether the provisions of Labor Code 2870 apply to

18   inventions created by Dr. Shaw or Larson while they

19   were at the University?

20             MR. CHIVVIS:   Objection; calls for a legal

21   conclusion, also completeness.   This is not the

22   complete 2870 listed here, if you would like to

23   take out the statute --

24             THE WITNESS:   Again, my understanding is

25   that based on 2860 and 2870, that ownership rests

                                        Page 132

1    with the University.

2    BY MR. LIPPETZ:

3        Q    Does the University have any understanding

4    of whether or not Drs. Shaw or Larson were required

5    to have been hired to invent in order for those

6    labor code provisions to apply to their inventions?

7        A    I'm not familiar with that concept, but

8    I'm not aware of any caveats to the Labor Code that

9    would suggest there was some entitlement based on

10   some other theory outside of the entitlement that

11   the employer has.

12       Q    In the fourth paragraph down under the

13   heading "Patent Agreement" on the second page, the

14   bottom box, the first sentence states that in the

15   invent any such invention shall be deemed by the

16   University to be patentable and the University

17   desires pursuant to determination by University as

18   to its rights and equities therein to seek patent

19   protection thereon, I shall execute any documents

20   and do all things necessary at University's expense

21   to assign to University all rights title and

22   interest therein and to assist University in

23   securing patent protection thereon; do you follow

24   that?

25       A    Yeah.

Page 133

1    which he would request that the patent office issue

2    the patent that's being requested?

3          MR. CHIVVIS:  Objection; vague.

4          THE WITNESS:  I think this agreement is

5    looking to affect the outcome you've described.

6    BY MR. LIPPETZ:

7      Q    And Douglas Shaw would be an inventor on

8    that patent; correct?

9      A    He would be an inventor.

10     Q    And if as the inventor he did not believe

11   that there was an invention in this application

12   that merited patent issuance, he shouldn't sign

13   this document; correct?

14     A    I think there's a lot of issues wrapped up

15   in that question.  The prosecution of intellectual

16   property resides in a tech transfer office so

17   questions about, you know, would this issue, could

18   it issue as the appropriate approach live with tech

19   transfer, and I think that would not be a reason to

20   not assign -- not sign this agreement.

21     Q    So the University is asking Doug Shaw to

22   sign an assignment even if Doug Shaw does not

23   believe there's a patentable invention in the

24   application?

25          MR. CHIVVIS:  Objection; asked and

Page 148

1  answered.

2  　　　　THE WITNESS:  He has an obligation as to

3  possibly patentable, the University thinks this is

4  patentable, but even if that were a question, it

5  wouldn't be a question for Doug Shaw.

6  　　　　MR. LIPPETZ:  We have to change tape.

7  　　　　THE VIDEOGRAPHER:  Don't forget your

8  microphones, please.

9  　　　　This is the end of video number two of

10  Volume 1 on the deposition of Michael Carriere on

11  December 20, 2016.  The time is 4:25 p.m.  We're

12  off the record.

13  　　　　(Recess taken from 4:25 until 4:34.)

14  　　　　THE VIDEOGRAPHER:  This is the beginning

15  of video number three of Volume 1 of the deposition

16  of Michael Carriere on December 20, 2016.  The time

17  is 4:34 p.m.  We're back on the record.

18  　　　　THE WITNESS:  So, Counsel, I have one item

19  that came up during the break and maybe chalk this

20  up to a rookie mistake, but when you were asking

21  about claims around breach of the patent

22  acknowledgement, of course the obvious thing would

23  have been to just go to the claims, so I would like

24  to take the opportunity to flag related items in

25  that universe that I was trying to capture.  The

Page 149

1    course, this document unproduced.  We do have

2    possession of this particular document but, you

3    know, we do ask that you produce versions of the

4    documents in the deposition.

5              THE WITNESS:  Third sentence, Due to the

6    fact that plant patents are restricted to one plant

7    and, therefore, one invention it is improper to

8    claim more than one plant in an application.

9    BY MR. LIPPETZ:

10       Q   And the patent office has, therefore,

11   asked the University to submit separate

12   applications for each claim variety in this

13   application; correct?

14             MR. CHIVVIS:  Objection; misstates the

15   document.

16             THE WITNESS:  What they asked for, if I

17   may have a look?

18   BY MR. LIPPETZ:

19       Q   Uh-huh.

20       A   So the summary of this paragraph -- is

21   that an approach I can take?

22       Q   Sure.

23       A   Is that MOFO, Michael Ward, had a

24   discussion with the examiner whereby the examiner

25   asked the applicant to choose one plant distinct

                                        Page 168

1    from it asking that they all be separated out, so

2    we feel it's not improper, we have a path forward

3    for continued prosecution for continuing to keep

4    the examiner -- the application alive and going

5    forward and that was with the concurrence of the

6    examiner that we proceed in that fashion.

7         Q    Okay.

8         A    We feel like we have an appropriate proper

9    path forward after Mike Ward having had a phone

10   discussion with the examiner.

11        Q    And the University will be electing one of

12   the 168 as their initial matter to continue with

13   with this application; correct?

14             MR. CHIVVIS:   Objection; calls for

15   speculation.

16             You can testify if you know.

17             THE WITNESS:   That's -- that would --

18   that's an approach that's contemplated to keep the

19   application alive.

20   BY MR. LIPPETZ:

21        Q    Okay.   Which plant is the University going

22   to submit to the patent office?

23        A    So we have some time to respond to that

24   with the office action, and I'd be speculating

25   about which one it is at this point.

1    made a request for plant patent.

2         Q   So Dr. Shaw was discussing as an invention

3    the use of these 180 germplasm for breeding under

4    utility patent or alternatively for a licensing as

5    tangible research property; correct?

6         A   So here we have reference to Doug's

7    request for consideration of utility patent so did

8    the TRP idea come from Doug or otherwise?  Maybe

9    the document will be a dispositive on that.

10        Q   If you look at the third full paragraph.

11        A   Oh, yeah, okay.  So it talks about TRP or

12   under utility patent?

13        Q   Right.

14        A   Okay.  Yeah.

15        Q   The University elected to pursue by filing

16   a provisional patent application on the 160 --

17   strike that.  Let me get this clear.  The original

18   provisional patent application we've been talking

19   about was on 169 varieties; is that correct?

20        A   That makes sense because it's 168 now, and

21   Cabrillo was capped off, carved out.

22        Q   So one became a plant patent and then 168

23   are still pending; correct?

24        A   Cabrillo is, I understand, still pending

25   as well.

Page 176

1        Q    So it's the subject of a separate

2   application than the 168?

3        A    It's a separate application.

4        Q    And the University did not file any patent

5   application seeking utility patent on 180 genotypes

6   discussed in this letter nor on the 168; correct?

7             MR. CHIVVIS:  Objection; compound; vague.

8             THE WITNESS:  So there are two questions

9   buried.

10  BY MR. LIPPETZ:

11       Q    I'll split them up.

12       A    Okay.

13       Q    The University did not seek a utility

14  patent on the 180 genotypes discussed as being

15  submitted by Douglas Shaw in 2013; correct?

16       A    Correct.

17            MR. CHIVVIS:  Objection -- you got to give

18  me a moment to object.

19  BY MR. LIPPETZ:

20       Q    And the University did not seek a utility

21  patent on the 168 that are currently pending in

22  front of the patent office; correct?

23            MR. CHIVVIS:  Objection; vague.

24            THE WITNESS:  The 168 there was not a

25  utility patent sought on the 168.

                                        Page 177

1    because we haven't had an opportunity to or a

2    reason to, as to would we or would we continue to

3    be diligent and vigilant about that, yes.

4        Q    Switching topics, does the University

5    believe that its United States patents for

6    strawberries give it the right to prohibit others

7    from using its plants for sexual breeding in the

8    United States?

9        A    Sorry, I need to shift gears a little bit.

10   Okay.  So we're in that realm now, under its United

11   States plant patents, the position of The Regents

12   is that we do, indeed, have the ability to prohibit

13   the use of our patented lines for breeding, for use

14   in breeding.

15       Q    And, in fact, the University obtained

16   opinion letters from outside counsel regarding the

17   use of UC patented strawberry plants for sexual

18   breeding in the United States; correct?

19       A    Legal opinions, yes.

20       Q    And we discussed earlier communication

21   correspondence with plant sciences, relating to

22   this topic of the use of UC patent varieties for

23   breeding; do you recall that discussion we had?

24       A    (Inaudible response.)

25       Q    Part of the obtaining of opinion letters

Page 208

1     Q    So if a UC variety that was -- as to which

2   patent protection had been sought in the U.S. but

3   not yet obtained was used for breeding in Spain

4   with the resulting seeds imported into the U.S.,

5   that couldn't be patent infringement of the U.S.

6   patent because there wasn't a patent yet, is that

7   consistent with your understanding?

8     A    So what I know about plant patents, and

9   this is really more a matter for patent attorneys,

10  is the bundle of rights that are available upon

11  issuance there is some capacity to reach back in

12  time with respect to perhaps with damages, I'm not

13  sure they have that right, but I know there's some

14  aspect whereby even pre-issuance there are some

15  retroactive rights that the patent holder has.

16    Q    And I'm not trying to get into the legal

17  particulars of pre-issuance damages, so we can move

18  on.

19         We saw documents before about that the --

20  Dr. Shaw's submission of 180 plants, which

21  ultimately resulted in, led to, not sure what the

22  right word is, the University sought patent

23  protection on 168 of those and that patent

24  application is still pending.  Who at the

25  University made the decision to seek plant patent

Page 217

1    protection for those 168 varieties?

2         A    So the general authority for such a

3    decision resides within the tech transfer office.

4    As we know from examination of documents earlier

5    around meeting that Clint and I attended with the

6    department of Plant Sciences, a variety release

7    committee, there was input from that group with I

8    would say in that meeting some pushback from Clint

9    in particular, and I agreed in terms of the

10   suitability of the U.S. plant patent as an approach

11   over the utility and the TRP approach that came up

12   in that meeting, so we were listening to

13   stakeholders in that meeting but also providing

14   some counter-bailing view, maybe some pushback in

15   that meeting that the ideas that had come into that

16   forum were -- they were given sort of an advance

17   signal that tech transfer's choice would likely be

18   a U.S. plant patent, and we weren't sort of in

19   concurrence with the notion of that group at that

20   time, and that's what came to pass.

21            So the tech transfer exercised -- office

22   exercised its autonomous capacity to choose the

23   most appropriate path of intellectual property

24   protection for this particular complement of

25   varieties, so it resided in tech transfer sort of

Page 218

1    collaboratively with the director and with my

2    supervisor and -- but within the confines of tech

3    transfer, of course, with, then, the approval of

4    the Dean that we go forward in that fashion as

5    well, ultimately.

6        Q   So at the time that tech transfer was

7    making the decision about what type of intellectual

8    property protections to use, had the Dean's office

9    already rejected in writing the Plant Science

10   department proposal to treat the germplasm's TRP?

11       A   So my recollection of the sequence was the

12   Dean's office was saying no to the TRP, and then

13   was there overlap with discussions around plant

14   patenting, we would have let the Dean's office know

15   of our analysis that suggested plant patenting was

16   in our view the best approach, but I would have to

17   go to a white board or something and sketch out the

18   time frame to really know when sort of one

19   discussion ended and the next one started, but it

20   was pretty contemporaneous there when those things

21   were happening.

22       Q   Did tech transfer -- prior to the Dean

23   notifying Plant Sciences that she was rejecting

24   their proposal, did tech transfer go back to Plant

25   Sciences and inform them that they were going to be

                                        Page 219

1    transfer.

2         Q    And who decides what type of intellectual

3    property or patent protection to pursue within the

4    University of California's Davis campus?

5         A    Same answer, it would be innovation

6    access, tech transfer office.

7         Q    If an inventor designates a particular

8    type of intellectual property protection he or she

9    would like to pursue, does that bind the tech

10   transfer office?

11        MR. LIPPETZ:  Objection; vague;

12   speculative.

13        THE WITNESS:  No, it doesn't bind the tech

14   transfer office.  An inventor can certainly express

15   their interests and will be open to listening to

16   their view but ultimately the authority resides

17   with the tech transfer office, and the inventor's

18   view certainly does not bind the tech transfer

19   office.

20   BY MR. CHIVVIS:

21        Q    Dr. Carriere, is an ROI or record of

22   invention required to proceed with patenting?

23        A    No, record of invention is not required to

24   proceed with patenting.

25        Q    Earlier today there was some discussion of

                                        Page 242

1              CERTIFICATE

2                  OF

3        CERTIFIED SHORTHAND REPORTER

4

5          I, the undersigned, Certified Shorthand

6   Reporter of the State of California do hereby certify:

7              That the foregoing proceedings were taken

8   before me at the time and place therein set forth; that

9   any witnesses in the foregoing proceedings, prior to

10  testifying, were placed under oath; that a verbatim

11  record of the proceedings was made by me using machine

12  shorthand which was thereafter transcribed under my

13  direction; further, that the foregoing is an accurate

14  transcription thereof.

15             I further certify that I am neither

16  financially interested in the action nor a relative of

17  employee of any attorney of any of the parties.

18             IN WITNESS WHEREOF, I have this date

19  subscribed my name

20

21

22

23             <%signature%>

24             Dated: December 23, 2016

25             Certificate Number 12983

                                    Page 253

ERRATA SHEET

Case Title:       California Berry Cultivars, LLC v. The Regents of the University of
                  California (U.S.D.C. N.D. Cal. Case No. 3:16-cv-02477-VC)
Testimony of:     Michael Carriere
Date Taken:       December 20, 2016

page 19 line 22 – strike "right" and "industry"
page 20 line 2 – replace "product" with "products"
page 21 line 23 – replace "negligence" with "negotiation"
page 22 line 12 – replace "in" with "with"
page 22 line 14 – replace "agreement" with "agreements"
page 33 line 5 –spelling of "Camarosa" (here and throughout document)
page 44 line 8 – replace "supportive" with "supportive of"
page 53 line 3 – strike "its"
page 54 line 6 – spelling of Eurosemillas (here and throughout document)
page 68 line 4 – insert "a" after "of"
page 70 line 24 – replace "pro generator" with "progenitor"
page 71 line 7 – strike "he"
page 71 line 11 – replace "advising" with "anthropomorphizing"
page 71 line 17 – replace first "I" with "it"
page 72 line 13 – replace "lists" with "list"
page 80 line 1 – replace "not" with "that"
page 80 line 2 – replace "slash" with "ask"
page 98 line 14 – replace "its" with "this"
page 101 line 24 – replace "at" with "has"
page 107 line 11 – strike "it"
page 107 line 19 – insert "a" after "it's"
page 107 line 19 – replace "to" with "that"
page 111 line 6 – replace "revisions" with "provisions"
page 116 line 23 – invert "topic larger"
page 121 line 5 – replace "pro-generator" with "progenitor"
page 122 line 21 – replace "explain" with "explained"
page 122 line 21-22 – replace "link the" with "linked to"
page 125 line 11 – insert "to be" after "understand"
page 129 line 8 – replace "independent" with "individual"
page 130 line 1 – replace "that" with "the"
page 134 line 9 – replace "has" with "is"
page 135 line 9 – strike "of"
page 135 line 10 – replace "that's" with "that"
page 146 line 12 – replace "got" with "need"
page 151 line 2 – replace "that's" with "that it's"
page 155 line 3 – replace "absolute" with "absolutely"
page 155 line 7 – replace "but" with "it"
page 168 line 25 – insert comma after "plant"
page 176 line 9 – strike "a"

1

page 182 line 22 – replace "hospices" with "auspices"
page 186 line 2 – replace "wouldn't" with "would"
page 186 line 3 – replace "we had to misrepresent" with "had we misrepresented"
page 188 line 8 – strike "the"
page 191 line 1 – insert "different" after "entirely"
page 191 line 1 – replace "that" with "thats"
page 191 line 22 – invert "might we"
page 192 line 23 – invert "the University" and "within"
page 192 line 23 – replace "University" with "University's"
page 192 line 24 – strike "the"
page 194 line 18 – replace "appropriately" with "inappropriately"
page 203 line 11 – insert comma after "University"
page 209 line 13 – strike "then"
page 211 line 14 – insert "with" after "disagreed"
page 218 line 5 – insert "the" after "around"
page 218 line 14 – replace "counter-bailing" with "countervailing"
page 228 line 3 – replace "just" with "it's"
page 229 line 3 – strike "it"
page 230 line 20 – replace "would" with "wouldn't"
page 240 line 12 – insert "a" after "for"
page 240 line 12 – replace "and" with "in"
page 244 line 23 – replace "charge" with "chart"
page 244 line 23 – replace "the" with "they"
page 247 line 9 – replace "their" with "there"
page 250 line 23 – replace "intend today" with "intended to"