1    RACHEL KREVANS (CA SBN 116421)        DAVID D. SCANNELL (*pro hac vice*)
     RKrevans@mofo.com                     DScannell@mofo.com
2    WESLEY E. OVERSON (CA SBN 154737)    MORRISON & FOERSTER LLP
     WOverson@mofo.com                   2000 Pennsylvania Ave., NW
3    MATTHEW A. CHIVVIS (CA SBN 251325)    Washington, DC 20006
     MChivvis@mofo.com                    Telephone: 202.887.1500
4    JACOB P. EWERT (CA SBN 313732)       Facsimile:  202.887.0763
     JEwerdt@mofo.com
5    MORRISON & FOERSTER LLP
     425 Market Street
6    San Francisco, California  94105-2482
     Telephone:  415.268.7000
7    Facsimile:  415.268.7522

8    Attorneys for Defendant and Cross-Complainant
     THE REGENTS OF THE UNIVERSITY OF
9    CALIFORNIA

10

                UNITED STATES DISTRICT COURT

11

             NORTHERN DISTRICT OF CALIFORNIA

12

                  SAN FRANCISCO DIVISION

13

| | |
|---|---|
| 14   CALIFORNIA BERRY CULTIVARS, LLC, | Case No. 3:16-cv-02477-VC |
| 15           Plaintiff, | |
| 16     v. | **MOTION TO EXCLUDE EXPERT TESTIMONY BY DAVID NOLTE UNDER FRE 702** |
| 17   THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation, | |
| 18          Defendant. | |
| 19   THE REGENTS OF THE UNIVERSITY OF | |
| 20   CALIFORNIA, a corporation, | |
| 21         Cross-Complainant, | |
| 22     v. | |
| 23   CALIFORNIA BERRY CULTIVARS, LLC, DOUGLAS SHAW, and KIRK LARSON, | |
| 24         Crossclaim Defendants. | |
| 25 | |

26

27

28

1    The Regents of the University of California ("the University") respectfully request that the

2    Court exclude CBC's damages expert David Nolte from offering any testimony at trial because

3    his opinions do not meet the standard for admissibility set out by Federal Rule of Evidence 702.

4    **A.      Expert Testimony Based on Unfounded Assumptions Is Not Admissible**

5    Expert opinions based on unfounded assumptions do not meet the standard of admissible

6    expert testimony set out by the Federal Rules of Evidence, because they are not "based on

7    sufficient facts or data," and do not apply reliable analysis to "the facts of the case."  Fed. R.

8    Evid. 702(b) and (d).  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a

9    district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of

10   the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

11   When expert opinions are not based on contested facts, but instead on unfounded

12   assumptions, the proper remedy is not cross-examination, but exclusion.  *McGlinchy v. Shell*

13   *Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (finding no abuse of discretion to exclude expert

14   whose "speculation about the amount of appellants' damages has scant basis in the record" and

15   whose "study rests on unsupported assumptions and unsound extrapolation"); *Ollier v.*

16   *Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (affirming exclusion of

17   testimony that was "unsupported by the facts"); *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d

18   851, 853 (9th Cir. 1997) (affirming exclusion of testimony where the expert was unable

19   "satisfactorily to explain the reasoning behind his opinions" which were "unsubstantiated and

20   subjective, and therefore unreliable and inadmissible"); *Goomar v. Centennial Life Ins. Co.*, 855

21   F. Supp. 319, 326 (S.D. Cal. 1994), *aff'd*, 76 F.3d 1059 (9th Cir. 1996) ("If proffered expert

22   testimony is no more than unsupported speculation, the trial judge should exclude it.").

23   Courts are particularly likely to find expert testimony inadmissible when the expert relies

24   on self-serving assumptions that the party proffering that expert told that expert to make.  *Dep't of*

25   *Toxic Substances Control v. Technichem, Inc.*, No. 12-cv-05845-VC, 2016 U.S. Dist. LEXIS

26   33379, at *2 (N.D. Cal. Mar. 15, 2016) (excluding expert's testimony because "[w]hen he is not

27   simply speculating, Dr. Everett often does no more than regurgitate information given to him by

28   other sources (including self-serving assertions by the defendants).").  For example, the Third

1  Circuit affirmed the exclusion of expert testimony where the expert relied solely on the plaintiff's
2  own statements about his future earning potential, and the "figure derived from that reliance was
3  thus without proper foundation and insufficient for a jury properly to assess [plaintiff's]
4  damages." *Benjamin v. Peter's Farm Condo. Owners Ass'n.*, 820 F.2d 640, 643 (3d Cir. 1987).
5  As in *Benjamin*, Mr. Nolte's disclosure is a "castle made of sand." *Id*. (Internal quotations
6  omitted).

7  **B.    Mr. Nolte's Opinions Do Not Analyze "the Facts of the Case" as Rule 702 Requires**

8          Mr. Nolte's opinions are not based on an expert analysis of real data; indeed, they could
9  not have been, given that he spent only two days on the entire process of reviewing the
10 information on which he supposedly relied, analyzing it, forming his opinions, and drafting his
11 initial eight page disclosure.  Instead of analyzing and citing facts, Mr. Nolte simply assumed key
12 "facts" — in most cases, because CBC told him to make those assumptions — even when those
13 assumptions are unsubstantiated by anything in the record.  His opinions are therefore not "based
14 on sufficient facts or data," do not apply any reliable analysis to "the facts of the case," and
15 therefore should be excluded.  Fed. R. Evid. 702(b) and (d).

16         CBC simply told Mr. Nolte to assume those key "facts," and Mr. Nolte did so uncritically.
17 Two of the eight pages of Mr. Nolte's first report summarize statements made by Dr. Shaw and
18 Lucky Westwood during a single phone call with Mr. Nolte.  (Ex. 1 at 3-4; see Ex. 2 at 116:13-
19 117:22.)  Mr. Nolte's report then purports to apply economic analysis to the things CBC told him.
20 Mr. Nolte apparently did not believe it was his responsibility to check the assumptions CBC gave
21 him against the facts in the record, but expert testimony must be excluded where it plainly ignores
22 the facts, and relies instead on unsubstantiated assumptions.  *McGlinchy*, 845 F.2d at 807
23 (excluding testimony with "scant basis in the record" and which "rests on unsupported
24 assumptions.")

25         **1.    Mr. Nolte Assumes CBC Started its Breeding Program from Scratch,
               Ignoring that CBC Used University Cultivars**
26

27         One of Mr. Nolte's most prominent unfounded assumptions is that CBC's breeding
28 program "started from scratch."  His analysis purportedly compares where CBC would be if the

University had "shared" the cultivars the University owned with CBC in 2014, on the one hand, to where CBC's program is today, on the other.  Mr. Nolte — as he was instructed to do — assumes that CBC "faced delays having to start from scratch."  (Ex. 1 at 5.)  "Q. And then you assume they had to start from scratch then in 2014, rather than having access to the materials, correct? A. That is what I was told the fact witnesses will -- will be stating."  (Ex. 2 at 25:2-6.)

CBC did not start from scratch.  Instead, it is now undisputed that CBC conducted a breeding program that made extensive, infringing use of the University's patented cultivars.  (Ex. 3 at 15:17-16:18.)  Recently produced emails also confirm that CBC's breeding program also used CSG cultivars chosen from Dr. Shaw from the very beginning, despite the fact that it had no more right to use those cultivars than they did the patented cultivars.  (ECF No. 203-6; Ex. 4.)

Mr. Nolte's analysis falls apart if CBC actually had and used the University's plant materials, as the record shows it did; because CBC has had access to these materials since 2014, it has not been "delayed" by the University's decision not to license that material.  Indeed, Mr. Nolte himself candidly admitted as much:

> Q.  Mr. Nolte, if the jury concludes that CBC had access to the U.C. strawberry plant materials from December 1st, 2014 forward, then your analysis does not make sense, does it?
>
> A. Okay. Your hypothetical is 100 percent of the materials have been at CBC all along and the entire factual premise of CBC's claim is a boldfaced lie, and if that is your hypothetical, sure, you don't need my damage calculation 'cause the jury wouldn't – wouldn't believe anything that CBC is saying 'cause you just, in your hypothetical, said that it's a big lie.

(Ex. 2 at 126:1-12.)  His testimony is therefore "unsupported by the facts" and is inadmissible.  *Ollier*, 768 F.3d at 861.

> **2.**   **Mr. Nolte Assumes That CBC Will Not Release a Cultivar until 2027, Contradicting CBC's Admissions and All Other Available Facts**

Mr. Nolte's entire analysis depends on a theory that CBC has been delayed in releasing commercial cultivars.  The single most important input to that analysis, therefore, is when this supposed delay started, and how long it lasted.  Mr. Nolte chose not to analyze any of the facts that were available to him from discovery to support his theory of delay; instead, he

1    unquestioningly used the unfounded assumptions Dr. Shaw told him to make.

2         Mr. Nolte assumes that CBC will not release a cultivar until 2027, and purportedly

3    analyzes the effect of that delay on CBC's revenues.  But CBC witnesses' own testimony was that

4    they hope to release a cultivar in 2019 or 2020, and that the development lifecycle to release a

5    new variety is typically six years.  (Ex. 5 at 147:9-20, 156:4-19; Ex. 6 at 43:14-44:8.)  Six years

6    from the beginning of CBC's breeding program (2014), is 2020, which is when CBC actually

7    expects to release a cultivar.  There is no basis in the record for assuming that CBC will be

8    delayed at all, and certainly not until 2027, and Mr. Nolte cites none; instead, he cites the fact that

9    Dr. Shaw told him to make that assumption.

10        Mr. Nolte was told by Dr. Shaw that he should assume that the University's decisions

11   would cause an eight-year delay in CBC's breeding program.  ("Q. Where did you get the idea

12   that it would be an eight-year delay? A. I was told that in the discussions that I had which defined

13   this assignment.") (Ex. 2 at 26:5-8.)  Dr. Shaw apparently offered no support for this assumption

14   of an eight year delay, and Mr. Nolte cites none.  Indeed, Mr. Nolte testified that he simply

15   accepted that assumption from Dr. Shaw and moved on with his analysis.

16            Q. You assumed an eight-year delay in your report because you
               were told by the fact witness that is what it would be, correct?

17

18            A. Correct.

19   (*Id*. at 31:9-12.)  He refused to say whether he believed that an eight year delay was a factually

20   sound assumption.  "I'm not expressing opinions on that . . . I did the calculation on eight years

21   *because that's what I was told*."  (*Id.* at 28:2-11.) (emphasis added).

22        Mr. Nolte further assumed the "delay" would start in 2019, because Dr. Shaw told him to

23   make that assumption.  He then added Dr. Shaw's 8-year delay assumption to the assumed delay

24   start date, leading him to a 2027 date when CBC will supposedly release its first cultivar.  (*Id.* at

25   23:4-24:3.)  Again, Mr. Nolte could cite to nothing in the record that supported this assumption.

26   "Q. I'm asking you as an expert witness calculating damages, can you tell me when the eight-year

27   delay started and when it ended for purposes of your calculation, can you tell me that?   A. As a

28   factual matter, no.  Because I'm not a fact witness."  (*Id.* at 31:3-8.)  When asked whether it's

1    important when calculating damages to know when the purported delay starts and ends, he agreed

2    (as of course he must), but could only say "if you change that by a few years it doesn't matter."

3    (*Id*. at 28:18-19.)

4         Ms. Distler pointed out these errors in her Rebuttal Report.  (Ex. 7 at 94-96.)  In response,

5    Mr. Nolte offered a Supplemental Report in which he acknowledged that "perhaps a shorter

6    period could be applicable," and attempted to offer a laundry list of different calculations for

7    different periods of delay.  (Ex. 8 at 7.)  He simply applied net present value calculations to

8    different combinations of delays and starting dates, but never says which, if any, are actually

9    appropriate given the facts of this case, because he has no basis to do so.  (*Id*. at Ex.: Lost

10   Revenue Model.)

11        Moreover, all of the calculations in Mr. Nolte's Supplemental Report, by Mr. Nolte's own

12   admission, are wrong.  His stated assumption is that "there should be no lost revenue or lost profit

13   in a but-for scenario until 2019," when the delay would purportedly start, because "[t]hat is the

14   input I was given by Dr. Shaw."  But every alternative scenario he presents include damages

15   accruing before 2019.  (Ex. 2 at 36:18-22, 37:16-25; Ex. 8: Lost Revenue Model.)  He agreed that

16   this was an error when confronted with this point at his deposition.  (Ex. 2 at 36:18-38:24.)

17        This Supplemental Report does nothing to ground Mr. Nolte's analysis in "the facts of the

18   case."  Fed. R. Evid.  702.  Expert opinions that simply "regurgitate information" the expert has

19   been given by his or her client are inadmissible.  *Dep't of Toxic Substances Control*, 2016 U.S.

20   Dist. LEXIS 33379, at *2.

         **3.    Mr. Nolte Assumes That Cultivars Will Be Much More Profitable Than The
21              Undisputed Facts Show**

22

23        Mr. Nolte's opinion relies on an assumption that patented cultivars will remain highly

24   profitable in the last years of the patent's term.  Undisputed historical data, which Mr. Nolte

25   declined to analyze, proves that, again, Mr. Nolte substitutes unfounded assumption for expert

26   analysis of the facts.

27        Mr. Nolte's analysis supposedly assumes that the cultivars CBC would have released but

28   for the purported "delay" would have been as profitable as the University's released cultivars

have been.  Setting aside the lack of support for that assumption, a critical aspect of his supposed analysis is the assumptions he makes about how much licensing revenues each of those cultivars will generate over the last years of their patent term.  He used, as examples, several University cultivars which have not reached the end of their patent term.  Yet again, Mr. Nolte did not himself decide which were appropriate representative cultivars; that assumption was "provided by Dr. Shaw."  (Ex. 2 at 39:25.)

Mr. Nolte then makes "projections" about the future revenues that certain patented cultivars will generate in the second half of the patent's term.  (Ex. 1 at 13 (Trend Analysis Projections).)  But those "projections" were based on nothing in the facts or any defensible economic analysis.  For example, he assumed that the Ventana patented cultivar will make exactly $500,000 in each of years 16-20 of its patent term.  (*Id*.)  He candidly admitted that he did not perform any calculations using the historical data available to him that showed revenue for University cultivars in years 16-20 of their patent terms.   (Ex. 2 at 46:2-47:15.)  Instead, his opinions completely ignore that data.

Had Mr. Nolte analyzed the historical data, which is undisputed, he would have had to acknowledge that the University's licensing revenues decline substantially in the last years of a cultivar's term; that is, the facts he ignored show that his assumption was wrong.  The result is that his calculations grossly overstate the revenues each "exemplar" cultivar is likely to generate.  For example, Ms. Distler's analysis — which Mr. Nolte has not attempted to rebut — found that in the last *eight* years of a cultivar's term, historically, they have generated only 17.2% of the revenue they generated in their first twelve years.  (Ex. 7 at Schedule 21b.)  Mr. Nolte's projections for the Albion cultivar, for example and by contrast, assume that in its last eight years it will generate 48.7% of the revenues it generated in the first twelve years.  (*Id*.)  This leads Mr. Nolte to overstate the royalties Albion is likely to generate by more than $4.9 million.  (*Id*.)  Mr. Nolte's projections for the other cultivars he purportedly analyzed were similarly, drastically, overstated.  (*Id*.)  This is not because Mr. Nolte relied on different contested facts than Ms. Distler; it is because Mr. Nolte relied on no facts at all, only assumptions, and his opinions therefore are inadmissible.  *McGlinchy*, 845 F.2d at 807.

### 4.     Mr. Nolte Assumes that the University Would Have Given CBC A Free License

Mr. Nolte assumes that the University would have given CBC a royalty-free license to breed using UC's germplasm.  The University did not do so, and there are no facts set out in Mr. Nolte's report to support such an assumption.  Moreover, at deposition Mr. Nolte refused to even try to explain how this assumption — which his report indisputably makes — is economically sound; instead, he disavowed all responsibility for the assumptions stated in his report.  When asked if he assumed a royalty-free license, he offered the following admission, which underlines the inadmissibility of his opinions:  "Well, if you're asking me whether it's in my report, sure, it's in my report. But -- but no, *I really didn't write it.* This is not a conclusion I'm reaching."  (Ex. 2 at 93:12-24) (emphasis added.)  Yet again, Mr. Nolte was unable to "satisfactorily explain the reasoning behind" his "unsubstantiated and subjective" opinion, and that opinion is therefore inadmissible.  *Diviero*, 114 F.3d at 853.

### 5.     Mr. Nolte Could Not Possibly Have Reviewed "the Facts of the Case"

An expert such as Mr. Nolte must base his testimony "on sufficient facts and data," and apply his expertise to "the facts of the case."  Fed. R. Evid. 702.  The chronology of Mr. Nolte's disclosure makes clear that he used, at most, two days to review the record and write his opening report.  It is clear that at least one of the reasons he relied on the assumptions supplied by CBC, as described above, rather than "the facts of the case" is that he could not possibly have analyzed those facts with the rigor required by Rule 702 in the time he spent.

CBC did not disclose Mr. Nolte under the Protective Order as a potential expert until January 18 at 5pm, two days before the deadline for expert disclosures.  (Ex. 9.)  Mr. Nolte testified that he had spent "something in the vicinity of two days" on his initial report, confirming that he started working no earlier than he was disclosed.  (Ex. 2 at 8:4-8.)

Moreover, given CBC's late disclosure, there were fewer than twenty-four hours in which Mr. Nolte was able to view any information designated as confidential by the University.  This information is at the heart of Mr. Nolte's opinion, most importantly the University's historical revenues, which form the basis of his calculation of damages.  The Protective Order provided the

1    University fourteen days from disclosure in which to decide whether to object to Mr. Nolte seeing

2    confidential information.  (ECF No. 52 at 11.)  As a courtesy, the University expedited its vetting

3    — taking only two of the fourteen days — and the parties agreed to a one day extension on

4    service of opening reports (until January 21)  The University informed CBC that it did not object

5    to Nolte reviewing University confidential information on January 20 at 9:39 pm.  (Ex. 10.)  CBC

6    served Mr. Nolte's report at 8:34 pm on January 21.  (Ex. 11.)

7           This is a case with complicated facts.  Mr. Nolte could not have developed, articulated,

8    and served an opinion that would help the jury understand those facts in two days, nor could he

9    have analyzed the relevant facts in a twenty-four hour period with the level of care and rigor Rule

10   702 requires.  This explains why his report is not tied "to the facts of the case," but does not

11   excuse that failure.

12   **C.     Conclusion**

13          For all the foregoing reasons, the University respectfully requests that the Court exclude

14   Mr. Nolte from offering any testimony at trial.

15

16   Dated:  April 17, 2017                         RACHEL KREVANS
                                                     WESLEY E. OVERSON
17                                                   MATTHEW A. CHIVVIS
                                                     JACOB P. EWERDT
18                                                   DAVID D. SCANNELL
                                                     MORRISON & FOERSTER LLP

19

20                                          By:    _/s/ Matthew A. Chivvis_____
                                                     MATTHEW A. CHIVVIS
21
                                                     Attorneys for Defendant
22                                                   and Cross-Complainant
                                                     THE REGENTS OF THE
23                                                   UNIVERSITY OF CALIFORNIA

24

25

26

27

28

RACHEL KREVANS (CA SBN 116421)
RKrevans@mofo.com
WESLEY E. OVERSON (CA SBN 154737)
WOverson@mofo.com
MATTHEW A. CHIVVIS (CA SBN 251325)
MChivvis@mofo.com
JACOB P. EWERT (CA SBN 313732)
JEwerdt@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  415.268.7000
Facsimile:  415.268.7522

DAVID D. SCANNELL (*pro hac vice*)
DScannell@mofo.com
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: 202.887.1500
Facsimile:  202.887.0763

Attorneys for Defendant and Cross-Complainant
THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA BERRY CULTIVARS, LLC,<br><br>               Plaintiff,<br><br>   v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation,<br><br>               Defendant. | Case No. 3:16-cv-02477-VC<br><br>**DECLARATION OF MATTHEW CHIVVIS IN SUPPORT OF THE UNIVERSITY'S MOTION TO EXCLUDE EXPERT TESTIMONY BY DAVID NOLTE UNDER FRE 702** |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation,<br><br>               Cross-Complainant,<br><br>   v.<br><br>CALIFORNIA BERRY CULTIVARS, LLC, DOUGLAS SHAW, and KIRK LARSON,<br><br>               Crossclaim Defendants. | |

I, Matthew A. Chivvis, do hereby declare as follows:

1.      I am a partner with the law firm of Morrison & Foerster LLP and an attorney of record for Movant The Regents of the University of California (the "University") in the above-captioned matter.  I am admitted to practice law in the State of California and before this Court.  I submit this declaration in support of The Regents of the University of California's Motion to Exclude Expert Testimony by David Nolte Under FRE 702.  I have personal knowledge of the facts stated in this declaration, and I could and would competently testify to them if called as a witness.

2.      Attached as **Exhibit 1** is a true and correct copy of the Expert Report of David Nolte, served on January 21, 2016.

3.      Attached as **Exhibit 2** is a true and correct copy of excerpts of the transcript of the March 14, 2016, Deposition of David Nolte.

4.      Attached as **Exhibit 3** is a true and correct copy of excerpts of the transcript of the hearing before this Court in the above-captioned matter on September 22, 2016.

5.      Attached as **Exhibit 4** is a true and correct copy of Appendix B to the Corrected Expert Report Dr. Stephen Dellaporta, served on February 1, 2017.

6.      Attached as **Exhibit 5** is a true and correct copy of excerpts of the transcript of the November 29, 2016, Deposition of Lucky Westwood.

7.      Attached as **Exhibit 6** is a true and correct copy of excerpts of the transcript of the December 8, 2016, Deposition of Douglas Shaw.

8.      Attached as **Exhibit 7** is a true and correct copy of excerpts from the Rebuttal Expert Report Carrie L. Distler, served on February 21, 2017.

9.      Attached as **Exhibit 8** is a true and correct copy of excerpts from the Supplemental Expert Report of David Nolte, served on March 9, 2017.

10.      Attached as **Exhibit 9** is a true and correct copy of an email sent by Alexis Smith on January 18, 2017.

11.      Attached as **Exhibit 10** is a true and correct copy of an email sent by Rachel Krevans on January 20, 2017.

DECLARATION OF MATTHEW CHIVVIS IN SUPPORT OF THE UNIVERSITY'S MOTION TO
EXCLUDE EXPERT TESTIMONY BY DAVID NOLTE UNDER FRE 702
CASE NO. 3:16-cv-02477-VC

1

1    12.    Attached as **Exhibit 11** is a true and correct copy of an email sent by Alexis Smith

2  on January 21, 2017.

3

4    I declare under penalty of perjury that the foregoing is true and correct.

5    Executed on May 1, 2017, in San Francisco, CA.

6

7                                            */s/ Matthew A. Chivvis*
                                         MATTHEW A. CHIVVIS
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

# Redacted Version of Document Sought to Be Sealed



Fulcrum Financial Inquiry LLP
888 S. Figueroa Street, Suite 2000
Los Angeles, CA 90017

(213) 787-4100
www.fulcrum.com

January 21, 2017

Frederick McKnight, Esq.
Jones Day
555 S. Flower Street, 50th Floor
Los Angeles, CA  90071

Dear Mr. McKnight:

This report is provided in connection with California Berry Cultivars, LLC ("CBC") vs. The Regents of the University of California ("UC") (USDC Case No. 3:16-cv-02477) to the extent possible at this time.

## I.      DESCRIPTION OF ENGAGEMENT

Fulcrum Financial Inquiry LLP ("Fulcrum") was asked to calculate CBC's lost profit damages arising from UC's failure to provide CBC nonexclusive access to the Materials (defined subsequently) as of December 1, 2014, which would have allowed CBC personnel to continue development, patenting, and licensing efforts.

In addition to these damages, Fulcrum understands that Drs. Shaw and Larson are entitled to royalties on UC-patented cultivars for which Drs. Shaw and/or Larson are the inventors.  Any such amounts owed are not calculated as part of this report or Fulcrum's assignment.

Fulcrum assumes that CBC is able to prevail on its liability claims, for which Fulcrum expresses no opinion.

## II.     FACTUAL & LEGAL BACKGROUND

This section provides background that provides context to this report.  Although Fulcrum is capable of summarizing information contained in this section (and may need to do so as part of providing background to any testimony), Fulcrum is not expressing an opinion of any facts contained in this section.

### A.  Employment and Strawberry Breeding Program Background

Based on complaints filed by both CBC and UC, the employment history and description of the UC Davis strawberry breeding program ("SBP") appear to be substantially the same for purposes relevant to Fulcrum's calculations.  Specifically:

1.  Douglas Shaw Ph.D. was a Professor of Plant Sciences at UC's Davis campus, with a special focus in genetics starting in 1986.  Dr. Shaw was employed at the UC Davis strawberry breeding program ("SBP") starting in 1988.

2.  Kirk Larson Ph.D. was employed at the UC Davis SBP starting in 1991.

3.  Drs. Shaw and Larson retired from the UC's employ in November 2014.

Jones Day
January 21, 2017
Page 2 of 8

The summary of a UC Internal Audit report on the UC SBP starts with the following background:[1]

> "California is the nation's leading producer of strawberries.  In 2013, over 2.3 billion pounds of strawberries were harvested in California, comprising approximately 88% of the fresh and frozen strawberries in the United States.  According to the California Department of Food and agriculture (CDFA), strawberries are one of California's top 20 crop and livestock commodities.  University of California (UC) produced varieties make up an estimated 80% of California's strawberry production.
>
> UC Davis' SBP began in the 1930s and has continued to the present day.  The SBP has been responsible for the release of a number of notable strawberry varieties, with over 30 patented varieties developed in the last six decades. …
>
> Until their retirement in November 2014, there were two strawberry breeders (breeders) dedicated to the SBP.  Both were faculty members in the UC Davis Department of Plant Sciences (Plant Sciences) within the College of agricultural and Environmental Sciences (CA&ES).  The breeders were responsible for developing the strawberry varieties that are the foundation of the SBP …
>
> Strawberry royalties have been trending upward over the past five years.  During fiscal year (FY) 2012 – 2013, UC collected over $7.5 million in gross strawberry licensing fees and royalties from UC Davis varieties. …
>
> The SBP is currently at a crossroads with the retirement of the breeders who have been the driving force behind the SBP over the last few decades. …"

## B.  CBC's Contentions

For purposes only of understanding the calculations Fulcrum described herein, Fulcrum understands that CBC contends:

1.  Upon their retirement, Drs. Shaw and Larson (i) had a nonexclusive right (license) to use the results of their research, plant materials and related information (collectively, the "Materials"), and (ii) assigned their rights to the Materials to CBC.

2.  The Materials include (i) approximately 168 cultivars developed by Drs. Shaw and Larson which are subject to a pending United States plant patent application, and (ii) approximately 250 plant varieties developed by Dr. Shaw and Larson that may have value as cultivars and breeding stock.  The Materials are a subset of the full collection of strawberry plant materials and information within the UC strawberry breeding program, and do not include any plants for which the UC had obtained a patent.

3.  UC violated their obligation to Drs. Shaw and Larson by withholding the Materials from CBC, and not safeguarding the living plants that will allow the Materials to now be provided to CBC in a reasonably usable form.

---

[1] December 2014 UC Internal audit report regarding the UC strawberry breeding program, project #14-75 (UC STRAW2 00077123 – 184), pages 2 - 3 [citations omitted]

CONTAINS ATTORNEYS EYES ONLY INFORMATION

Jones Day
January 21, 2017
Page 3 of 8

## C.  CBC's Expectations of what CBC Could Accomplish

Fulcrum discussed with Dr. Douglas Shaw and Mr. Lucky Westwood what CBC would be capable of accomplishing (i) absent UC's withholding of the Materials and (ii) in the actual conditions that CBC now faces.  Their comments included:

1. Drs. Shaw and Larson retired from UC in November 2014.  At that time, the transition cultivars comprised of more than 800 varieties, which were viable and in good health, approximately 250 of which, in CBC's judgment, warranted further evaluation and development as cultivars and to serve as breeding stock for annual crosses beginning 2015.  These counts excluded all plants for which UC has patents or patents pending.

2. The following nine cultivars were developed by Drs. Shaw and Larson and have at least five years of licensing history:[2]

   a.  Camino Real
   b.  Ventana
   c.  Albion
   d.  Palomar
   e.  Monterey
   f.  San Andreas
   g.  Portola
   h.  Benica
   i.  Mojave

   Earlier cultivars included the efforts of other developers.  The nine cultivars listed above are a good cross-select of the type of work that would be expected from CBC's efforts.  They include cultivars that were both commercially successful and not commercially successful, as well as a representative mix of short-day and day-neutral cultivars.

3. Absent UC's wrongful conduct, CBC would have been able to patent the first cultivar in 2018 and commercialize this cultivar in 2019.

4. The cultivar development cycle typically lasts eight years.  Since CBC had to start from scratch, the actual damages reflect the loss of eight missing cultivars that would have been developed earlier.

5. CBC could be expected to generate at least one new patented cultivar per year, on average.

6. Improvements in the licensing practices used by UC that will be implemented by CBC include:

   a.  Use of market royalty rates, which are higher than what UC has used; and

   b.  More rapid licensing to growers outside of California by eliminating the two-year preferred period that has existed for California growers;[3]

---

[2] This list is consistent with UC STRAW2 00075847
[3] Paragraph 7 of  UC's November 21, 2016 Third Amended Cross-Complaint

CONTAINS ATTORNEYS EYES ONLY INFORMATION

Jones Day
January 21, 2017
Page 4 of 8

    c.  Greater use of compliance audits to encourage/enforce complete and accurate reporting by growers;[4] and

    d.  Not engaging in practices found by the California State Auditor to have resulted in the SBP not receiving all royalties to which it otherwise would be entitled. [5]

An increase in California royalty rates from $8 per thousand plants to $10 per thousand plants would, by itself, increase royalties by 25 percent, with additional royalty increases occurring for the other reasons identified.

7.  U.S. patents for plant materials have a twenty year life.  Foreign licensing is an important part of the royalties, with such foreign licensing often lasting more than the period for U.S. patent protection.

## III.   INFORMATION RELIED UPON

In addition to my experience and training, Fulcrum relied upon the following information in preparing this report, each of which is of a type that is reasonably relied upon by experts in my field:

1.  Background materials, as follows:

    a.  CBC's May 2, 2016 Complaint filed in the Alameda Superior Court

    b.  UC's November 21, 2016 Third Amended Cross-Complaint

    c.  Presentation regarding the UC strawberry breeding program,  entitled "Addressing 21st Century challenges through genetic Innovation"[6]

2.  Interview with Dr. Douglas Shaw and Mr. Lucky Westwood, the results of which are summarized in the preceding section

3.  UC licensing results of certain cultivars, as follows:

    a.  UC STRAW2 00058007 and UC STRAW2 00075844, both of which show plants licensed from 1991 through 2014

    b.  UC STRAW2 00075847, showing royalties from 1994 through 2016

    c.  UC STRAW2 00075842, showing "inventor shares", aka Exhibit 102 from the Shaw deposition

4.  December 14, 2015 memorandum discussing SBP royalty rates (UC STRAW2 000085284 – 7)

5.  December 2014 UC internal audit report regarding the UC strawberry breeding program, project #14-75 (UC STRAW2 00077123 – 184)

6.  California State Auditor Report 2014 – 121, dated June 9, 2015  (UC STRAW2 00077360 – 408)

7.  Other documents and publicly-available information, as referenced herein

---

[4] See comments contained in the December 2014 internal audit report on the SBP program on pages 5 and 12.
[5] California State Auditor Report 2014 – 121, dated June 9, 2015
[6] http://gcr.ucdavis.edu/state-govt/capitol-speaker-series/events/strawberry.pdf

CONTAINS ATTORNEYS EYES ONLY INFORMATION

Jones Day
January 21, 2017
Page 5 of 8

Fulcrum had available, and considered, additional information that does not directly enter into the calculations contained herein.  This additional information generally consist of:

1.  Depositions and exhibits thereto, as follows:

    a.  December 8, 2016 for Douglas Shaw, Ph.D.
    b.  December 16, 2016 for Steven Knapp, Ph.D.
    c.  January 5, 2017 for Lucky Westwood

2.  A variety of financial planning documents and CBC historical financial statements, all bearing a production number with a CBC prefix

3.  CBC's Motion for Temporary Restraining Order, and related exhibits

A more detailed listing of the records and their related production numbers that were available to Fulcrum is attached as Exhibit 4.

## IV.    SUMMARY OF FULCRUM'S CONCLUSIONS

Lost profit damages represent the present value of the difference between what should have happened (called the "but-for" world), and what actually has or will occur (called the "actual" world).

1.  Absent the alleged wrongful conduct (the but-for world), UC would have shared access and ownership to the plant materials as of December 1, 2014, which would have allowed CBC to continue its development, patenting, and licensing efforts.  CBC would have been able to patent the first cultivar in 2018 and commercialize this cultivar in 2019.

2.  In the actual world, CBC implemented a similar level of effort, but faced delays having to start from scratch in a development cycle that typically lasts eight years.  As a result, actual damages span over eight years.

Importantly, all of the calculations and conclusions contained in the rest of this section use, as their starting point, the dollar amount of royalties collected by UC.  The use of dollars as the starting point in the analysis adds an element of imprecision (specifically, an understatement of the lost profits damages because:

1.  The UC's rates have changed over time,[7] yet the use of currency amounts does not reflect directly the growth in the units involved.

2.  The royalties are a mixture of licenses to the following categories, each of which have a different royalty rate:[8]

    a.  California – Currently $8.00 per thousand plants
    b.  United States – Currently $9.00 per thousand plants
    c.  Outside U.S. & Canada – Currently, $16.50 per thousand plants

A more accurate calculation would consider the actual units shipped to each of these territories, applied to rates that CBC would use for each geography.  I intend to perform such a calculation promptly using

---

[7] UC STRAW2 000085284 – 7
[8] UC STRAW2 00075847 and UC STRAW2 000085284 – 7

Jones Day
January 21, 2017
Page 6 of 8

the same general methodology described below.  The more accurate calculation predictably will increase the amount of lost profits, most likely by a significant amount.

Prior to the completion of the more accurate calculation described in the preceding paragraph, the present value of lost profits comparing the but-for and actual worlds is **at least $20,450,000.** Calculations of this amount are shown on Exhibit 1, and are explained as follows:

1. The historic licensing data for the nine cultivars listed in the "Background" (Section II) of this report are summarized.  Six of these nine cultivars have not reached the end of their licensing capability.  Fulcrum used a 21-year life for the more successful cultivars after considering the following:

   a. As described in Section II, U.S. patents are effective for twenty years, with foreign licensing often lasing longer than this.

   b. Some royalties occur while the patent is pending.

   c. Reporting delays cause the receipt of royalties past the patent expiration date.

   d. Multiple cultivars obtained royalties for more than 20 years.  UC cultivars with long economic lives include Camarosa, Chandler, Oso Grande, Pajaro, Parker, Douglas, Selva, Fern, Hecker, and Aptos.[9]

2. To analyze the expected results of a lost cultivar, one needs to consider the entire licensing life of the cultivar.  Additional future royalties (which are shaded in the last two pages of Exhibit 1) were estimated as follows:

   a. Camino Real - Revenues have been relatively stable for the past eight years, with declines being modest.  Post-2016 revenues are estimated to continue for the rest of the 21-year maximum period at $300,000 each year.

   b. Ventana - Revenues have been relatively stable for the past eight years, with only minor declines over the past six years.  Post-2016 revenues are estimated to continue for the rest of the 21-year maximum period at $500,000 each year.

   c. Albion – Although recent revenues are less than the preceding four peak years, revenues remain large.  Post-2016 revenues are estimated to continue for the remaining 21-year maximum period at $1,300,000 for the next two years, $1,000,000 for the next three years, and $700,000 for the last three years.

   d. Monterey – Revenues continue to increase.  Post-2016 revenues are estimated to be 80% of the actual and estimated future revenues for Albion, beginning in Albion's year 10.

   e. San Andreas - Post-2016 revenues are estimated to be equal to the actual and estimated future revenues for Albion, beginning in Albion's year 10.

   f. Portola - Revenues continue to increase.  Post-2016 revenues are estimated to be equal to the actual and estimated future revenues for Ventana, beginning in Ventana's year 10.

---

[9] UC STRAW2 00058007, "total strawberry" tab

CONTAINS ATTORNEYS EYES ONLY INFORMATION

3. As a reasonableness check on the above estimates for these six cultivars, Fulcrum made a second calculation of future expected revenues using an arithmetic average of royalties for whatever actual licensing period exists for that cultivar. The remaining portion of the 21-year maximum period use the arithmetic average royalty. Predictably, this calculation understates the future royalties because it gives equal weight to each of the first few licensing years, when the amounts involved are small and not representative of what will occur with an established cultivar. The results of this reasonableness check are shown on the last page of Exhibit 1, and support the reasonableness of the first calculation Fulcrum prepared.

4. As described in Section II, CBC's royalties will be at least 25% greater than what UC obtained.

5. The overall average licensing results using the two calculations describe above are shown on the third page of Exhibit 1 and are graphed in <u>Exhibit 2</u>. UC's past licensing history, as calculated above and on Exhibit 1, show that the average cultivar will generate $12,840,000 for CBC in lifetime royalties.

6. Over the eight years that CBC will miss cultivars because of UC's conduct, CBC will miss $102,720,000 of royalties (calculated as eight cultivars, at an average of $12,840,000 for each cultivar).

7. The revenue streams described above are royalties, for which there are only immaterial incremental expenses. Expenses are estimated at $1,500,000 annually under both the but-for and actual world. Because the level of expenses are the same, expenses need not be an explicit part of the calculation because one would be comparing identical amounts. Similarly, any misestimating of expenses does not alter the damage conclusion.

8. Inflation is expected to be 4% annually. A lower rate of inflation (which would be justified by historical inflation in the last several years) of approximately 2% to 3 % would increase damages.

9. A 15% compound annual discount rate is used. This is a reasonable discount rate for an established technology-based endeavor. The discount rate address both the time value of money and the business risk of this business. In this calculation a net discount rate is used; meaning, the 15% discount and 4% inflation are offset to equal a net 11%. This provides mathematical simplification, but otherwise is an identical mathematical result when compared to treating the discount rate and inflation separately. As would be typical when royalties are received throughout the year, a mid-year discounting convention is used.

The damages resulting from the discounting of eight years of missed cultivars is shown on the first page of Exhibit 1. For comparison, a similar calculation using the reasonableness-check revenues of $11,670,000 per average cultivar is shown on the second page of Exhibit 1.

The use of a discount rate that includes business risk addresses the possible concern that the future projections to which the discount rate is applied is otherwise "speculative". The discount rate is primarily based on future business risks, and serves to reduce substantially the damages calculated. Because of this discount, the damages are reasonably certainty because (i) all of the inputs have a historical basis, (ii) the methodology used is generally accepted and widely used, and (iii) substantially larger amounts could otherwise be presented, so the remaining amount represents a reasonable minimum. The total discount contained in this calculation is the difference between the $102,720,000 of undiscounted royalties, and the $20,450,000 of damages presented herein. The total discount is $82,270,000, or 80 percent.

CONTAINS ATTORNEYS EYES ONLY INFORMATION

Jones Day
January 21, 2017
Page 8 of 8

## V.   OTHER REQUIRED INFORMATION

A.   QUALIFICATIONS FOR OFFERING OPINIONS

Attached as <u>Exhibit 3</u> is a copy of my curriculum vitae summarizing my education, experience and qualifications.   <u>Exhibit 3</u> also includes a listing of the cases in which I have testified as an expert at trial or by deposition within the preceding four years, and publications that I have authored in the last ten years.

B.   COMPENSATION

Fulcrum is being paid at its normal hourly rates for the persons involved in the assignment.   Our compensation is not contingent on the conclusions reached or ultimate resolution of the case.   My personal hourly rate is currently $625.

Very truly yours,
Fulcrum Financial Inquiry LLP

By:   _David Nolte_

     David Nolte

CONTAINS ATTORNEYS EYES ONLY INFORMATION

# Exhibit 1

**California Berry Cultivars vs. University of California**
**Lost Revenue Model**
Trend Analysis Projections

Net Discount Rate  11%

| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Cultivar#8 | Subtotal | Present Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 2.5 | 0.77 | $ - | | | | | | | | $ - | $ - |
| 2020 | 3.5 | 0.69 | 40,000 | $ - | | | | | | | 40,000 | 27,761 |
| 2021 | 4.5 | 0.63 | 130,000 | 40,000 | $ - | | | | | | 170,000 | 106,291 |
| 2022 | 5.5 | 0.56 | 340,000 | 130,000 | 40,000 | $ - | | | | | 510,000 | 287,272 |
| 2023 | 6.5 | 0.51 | 490,000 | 340,000 | 130,000 | 40,000 | $ - | | | | 1,000,000 | 507,459 |
| 2024 | 7.5 | 0.46 | 680,000 | 490,000 | 340,000 | 130,000 | 40,000 | $ - | | | 1,680,000 | 768,045 |
| 2025 | 8.5 | 0.41 | 780,000 | 680,000 | 490,000 | 340,000 | 130,000 | 40,000 | $ - | | 2,460,000 | 1,013,187 |
| 2026 | 9.5 | 0.37 | 1,060,000 | 780,000 | 680,000 | 490,000 | 340,000 | 130,000 | 40,000 | $ - | 3,520,000 | 1,306,094 |
| 2027 | 10.5 | 0.33 | 1,040,000 | 1,060,000 | 780,000 | 680,000 | 490,000 | 340,000 | 130,000 | 40,000 | 4,560,000 | 1,524,311 |
| 2028 | 11.5 | 0.30 | 1,120,000 | 1,040,000 | 1,060,000 | 780,000 | 680,000 | 490,000 | 340,000 | 130,000 | 5,640,000 | 1,698,497 |
| 2029 | 12.5 | 0.27 | 990,000 | 1,120,000 | 1,040,000 | 1,060,000 | 780,000 | 680,000 | 490,000 | 340,000 | 6,500,000 | 1,763,503 |
| 2030 | 13.5 | 0.24 | 830,000 | 990,000 | 1,120,000 | 1,040,000 | 1,060,000 | 780,000 | 680,000 | 490,000 | 6,990,000 | 1,708,508 |
| 2031 | 14.5 | 0.22 | 830,000 | 830,000 | 990,000 | 1,120,000 | 1,040,000 | 1,060,000 | 780,000 | 680,000 | 7,330,000 | 1,614,064 |
| 2032 | 15.5 | 0.20 | 710,000 | 830,000 | 830,000 | 990,000 | 1,120,000 | 1,040,000 | 1,060,000 | 780,000 | 7,360,000 | 1,460,063 |
| 2033 | 16.5 | 0.18 | 730,000 | 710,000 | 830,000 | 830,000 | 990,000 | 1,120,000 | 1,040,000 | 1,060,000 | 7,310,000 | 1,306,436 |
| 2034 | 17.5 | 0.16 | 580,000 | 730,000 | 710,000 | 830,000 | 830,000 | 990,000 | 1,120,000 | 1,040,000 | 6,830,000 | 1,099,686 |
| 2035 | 18.5 | 0.15 | 570,000 | 580,000 | 730,000 | 710,000 | 830,000 | 830,000 | 990,000 | 1,120,000 | 6,360,000 | 922,533 |
| 2036 | 19.5 | 0.13 | 570,000 | 570,000 | 580,000 | 730,000 | 710,000 | 830,000 | 830,000 | 990,000 | 5,810,000 | 759,238 |
| 2037 | 20.5 | 0.12 | 450,000 | 570,000 | 570,000 | 580,000 | 730,000 | 710,000 | 830,000 | 830,000 | 5,270,000 | 620,425 |
| 2038 | 21.5 | 0.11 | 450,000 | 450,000 | 570,000 | 570,000 | 580,000 | 730,000 | 710,000 | 830,000 | 4,890,000 | 518,639 |
| 2039 | 22.5 | 0.10 | 450,000 | 450,000 | 450,000 | 570,000 | 570,000 | 580,000 | 730,000 | 710,000 | 4,510,000 | 430,933 |
| 2040 | 23.5 | 0.09 | | 450,000 | 450,000 | 450,000 | 570,000 | 570,000 | 580,000 | 730,000 | 3,800,000 | 327,110 |
| 2041 | 24.5 | 0.08 | | | 450,000 | 450,000 | 450,000 | 570,000 | 570,000 | 580,000 | 3,070,000 | 238,081 |
| 2042 | 25.5 | 0.07 | | | | 450,000 | 450,000 | 450,000 | 570,000 | 570,000 | 2,490,000 | 173,966 |
| 2043 | 26.5 | 0.06 | | | | | 450,000 | 450,000 | 450,000 | 570,000 | 1,920,000 | 120,849 |
| 2044 | 27.5 | 0.06 | | | | | | 450,000 | 450,000 | 450,000 | 1,350,000 | 76,551 |
| 2045 | 28.5 | 0.05 | | | | | | | 450,000 | 450,000 | 900,000 | 45,977 |
| 2046 | 29.5 | 0.05 | | | | | | | | 450,000 | 450,000 | 20,710 |
| | | | | | | | | | | | $ 102,720,000 | $ 20,446,189 |

Notes:
[1] Uses mid-year convention

**California Berry Cultivars vs. University of California**
**Lost Revenue Model**
Cultivar Average Projections

Net Discount Rate   11%

| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Cultivar#8 | Subtotal | Present Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 2.5 | 0.77 | $ - | | | | | | | | $ - | $ - |
| 2020 | 3.5 | 0.69 | 40,000 | $ - | | | | | | | 40,000 | 27,761 |
| 2021 | 4.5 | 0.63 | 130,000 | 40,000 | $ - | | | | | | 170,000 | 106,291 |
| 2022 | 5.5 | 0.56 | 340,000 | 130,000 | 40,000 | $ - | | | | | 510,000 | 287,272 |
| 2023 | 6.5 | 0.51 | 490,000 | 340,000 | 130,000 | 40,000 | $ - | | | | 1,000,000 | 507,459 |
| 2024 | 7.5 | 0.46 | 680,000 | 490,000 | 340,000 | 130,000 | 40,000 | $ - | | | 1,680,000 | 768,045 |
| 2025 | 8.5 | 0.41 | 780,000 | 680,000 | 490,000 | 340,000 | 130,000 | 40,000 | $ - | | 2,460,000 | 1,013,187 |
| 2026 | 9.5 | 0.37 | 1,060,000 | 780,000 | 680,000 | 490,000 | 340,000 | 130,000 | 40,000 | $ - | 3,520,000 | 1,306,094 |
| 2027 | 10.5 | 0.33 | 1,040,000 | 1,060,000 | 780,000 | 680,000 | 490,000 | 340,000 | 130,000 | 40,000 | 4,560,000 | 1,524,311 |
| 2028 | 11.5 | 0.30 | 740,000 | 1,040,000 | 1,060,000 | 780,000 | 680,000 | 490,000 | 340,000 | 130,000 | 5,260,000 | 1,584,059 |
| 2029 | 12.5 | 0.27 | 690,000 | 740,000 | 1,040,000 | 1,060,000 | 780,000 | 680,000 | 490,000 | 340,000 | 5,820,000 | 1,579,013 |
| 2030 | 13.5 | 0.24 | 620,000 | 690,000 | 740,000 | 1,040,000 | 1,060,000 | 780,000 | 680,000 | 490,000 | 6,100,000 | 1,490,972 |
| 2031 | 14.5 | 0.22 | 620,000 | 620,000 | 690,000 | 740,000 | 1,040,000 | 1,060,000 | 780,000 | 680,000 | 6,230,000 | 1,371,844 |
| 2032 | 15.5 | 0.20 | 570,000 | 620,000 | 620,000 | 690,000 | 740,000 | 1,040,000 | 1,060,000 | 780,000 | 6,120,000 | 1,214,074 |
| 2033 | 16.5 | 0.18 | 570,000 | 570,000 | 620,000 | 620,000 | 690,000 | 740,000 | 1,040,000 | 1,060,000 | 5,910,000 | 1,056,230 |
| 2034 | 17.5 | 0.16 | 550,000 | 570,000 | 570,000 | 620,000 | 620,000 | 690,000 | 740,000 | 1,040,000 | 5,400,000 | 869,444 |
| 2035 | 18.5 | 0.15 | 550,000 | 550,000 | 570,000 | 570,000 | 620,000 | 620,000 | 690,000 | 740,000 | 4,910,000 | 712,207 |
| 2036 | 19.5 | 0.13 | 550,000 | 550,000 | 550,000 | 570,000 | 570,000 | 620,000 | 620,000 | 690,000 | 4,720,000 | 616,799 |
| 2037 | 20.5 | 0.12 | 550,000 | 550,000 | 550,000 | 550,000 | 570,000 | 570,000 | 620,000 | 620,000 | 4,580,000 | 539,193 |
| 2038 | 21.5 | 0.11 | 550,000 | 550,000 | 550,000 | 550,000 | 550,000 | 570,000 | 570,000 | 620,000 | 4,510,000 | 478,335 |
| 2039 | 22.5 | 0.10 | 550,000 | 550,000 | 550,000 | 550,000 | 550,000 | 550,000 | 570,000 | 570,000 | 4,440,000 | 424,244 |
| 2040 | 23.5 | 0.09 | | 550,000 | 550,000 | 550,000 | 550,000 | 550,000 | 550,000 | 570,000 | 3,870,000 | 333,136 |
| 2041 | 24.5 | 0.08 | | | 550,000 | 550,000 | 550,000 | 550,000 | 550,000 | 550,000 | 3,300,000 | 255,918 |
| 2042 | 25.5 | 0.07 | | | | 550,000 | 550,000 | 550,000 | 550,000 | 550,000 | 2,750,000 | 192,131 |
| 2043 | 26.5 | 0.06 | | | | | 550,000 | 550,000 | 550,000 | 550,000 | 2,200,000 | 138,473 |
| 2044 | 27.5 | 0.06 | | | | | | 550,000 | 550,000 | 550,000 | 1,650,000 | 93,563 |
| 2045 | 28.5 | 0.05 | | | | | | | 550,000 | 550,000 | 1,100,000 | 56,194 |
| 2046 | 29.5 | 0.05 | | | | | | | | 550,000 | 550,000 | 25,312 |
| | | | | | | | | | | | $ 93,360,000 | $ 18,571,562 |

Notes:
[1] Uses mid-year convention

**California Berry Cultivars vs. University of California**
**Lifetime Royalty Calculation**

| | Cultivar Average | | Trend Projections | |
|---|---|---|---|---|
| | % | Projected Royalty | % | Projected Royalty |
| Average Roylaties | $ | 11,677,489 | | $ 12,866,198 |
| 1st year | 0% | - | 0% | - |
| | 0% | 40,000 | 0% | 40,000 |
| | 1% | 130,000 | 1% | 130,000 |
| | 3% | 340,000 | 3% | 340,000 |
| 5th | 4% | 490,000 | 4% | 490,000 |
| | 6% | 680,000 | 5% | 680,000 |
| | 7% | 780,000 | 6% | 780,000 |
| | 9% | 1,060,000 | 8% | 1,060,000 |
| | 9% | 1,040,000 | 8% | 1,040,000 |
| 10th | 6% | 740,000 | 9% | 1,120,000 |
| | 6% | 690,000 | 8% | 990,000 |
| | 5% | 620,000 | 6% | 830,000 |
| | 5% | 620,000 | 6% | 830,000 |
| | 5% | 570,000 | 6% | 710,000 |
| 15th | 5% | 570,000 | 6% | 730,000 |
| | 5% | 550,000 | 4% | 580,000 |
| | 5% | 550,000 | 4% | 570,000 |
| | 5% | 550,000 | 4% | 570,000 |
| | 5% | 550,000 | 4% | 450,000 |
| 20th | 5% | 550,000 | 4% | 450,000 |
| | 5% | 550,000 | 4% | 450,000 |
| (rounded) | | $ 11,670,000 | | $ 12,840,000 |

**California Berry Cultivars vs. University of California**
**UCDavis Strawberry Royalties**
Trend Analysis Projections

| | | |
|---|---|---|
| Average Royalty | $ | 10,292,958 |
| CBC Improvement | | 25% |
| CBC Expected Royalties | | 12,866,198 |

| Camino Real (2001-125) | Ventana (2001-126) | Albion (2004-323) | Palomar (2007-274) | Monterey (2008-332) | San Andreas (2008-333) | Portola (2008-334) | Benicia (2010-492) | Mojave (2010-493) | TOTALS |
|---|---|---|---|---|---|---|---|---|---|

100%

Source: UC_STRAW2_00075847
CONTAINS ATTORNEYS EYES ONLY INFORMATION
Values in green are projections

**California Berry Cultivars vs. University of California**
**UCDavis Strawberry Royalties**
Cultivar Average Projections

| | | |
|---|---|---|
| Average Royalty | $ | 9,341,991 |
| CBC Improvement | | 25% |
| CBC Expected Royalties | | 11,677,489 |

| Camino Real (2001-125) | Ventana (2001-126) | Albion (2004-323) | Palomar (2007-274) | Monterey (2008-332) | San Andreas (2008-333) | Portola (2008-334) | Benicia (2010-492) | Mojave (2010-493) | TOTALS |
|---|---|---|---|---|---|---|---|---|---|

100%

Source: UC_STRAW2_00075847
CONTAINS ATTORNEYS EYES ONLY INFORMATION
Values in green are projections

# Exhibit 2

# CBC's average expected royalties for each new cultivar average $12.9 million



**Source: UC Davis royalties from existing cultivars, with 25% increase and trend projections**

# CBC's average expected royalties for each new cultivar average $11.7 million



**Annual Cultivar Royalties**

**Average Total Cultivar Royalties: $11,680,000**

**Years Commerically Available**

**Source: UC Davis royalties from existing cultivars with 25% increase and average projections**

# CBC's average expected royalties for each new cultivar with different projections



**Annual Cultivar Royalties**

Trend Projections
**$12,870,000**

**Cultivar Average**
**$11,680,000**

**Years Commerically Available**

**Source: UC Davis royalties from existing cultivars, with 25% increase and various projections**

# Exhibit 3

**DAVID NOLTE**
Fulcrum Financial Inquiry LLP
213-787-4111
dnolte@fulcrum.com

## SUMMARY

With over 35 years of experience, Mr. Nolte has worked with a broad range of firms/industries in both litigation and non-litigation settings.  Mr. Nolte's client work focuses primarily on valuation of businesses and intangible business assets, economic studies, royalty and fraud auditing, and litigation-related financial analysis.

## LICENSES AND CERTIFICATIONS

Certified Public Accountant (CPA), 1979 to present

Accredited Senior Appraiser (ASA), 1995 to present

Certified Management Accountant (CMA), 1992 to present

## EDUCATION

MBA, California State University, Los Angeles, 1982

BA, Whittier College (graduated first in his class), 1977

## EMPLOYMENT

Fulcrum Financial Inquiry LLP (May 2002 to Present)

Founded firm.  Actively serves as the leader for numerous client engagements, as well as remaining responsible for Fulcrum's overall operations and direction.  See www.fulcrum.com for additional information.

Andersen LLP (1977 to 2002)

Responsible for the Southern California forensic accounting and damage analysis practice of this international accounting and consulting firm.  This practice was one of the largest such groups in the western United States.  In addition to leading the local group, served on the firm-wide steering committees for the litigation consulting and the bankruptcy & troubled company consulting service lines.

Prior to working as a full-time consultant, performed audits for large publicly traded and private companies, including serving as the overall audit partner for such services.

Other Employment

Adjunct Professor at Whittier College (1981 to 1986) - Taught upper division accounting and auditing classes

Darling Wold & Agee (1975 to 1977) Performed tax, business management, and accounting work at this CPA firm.

**LISTING OF TRIAL AND DEPOSITION TESTIMONIES IN THE LAST FOUR YEARS**

In the following listing, each case is listed only once, with the date of the most recent testimony shown.  For example, in a matter in which both deposition and trial testimony occurred, the date of the trial testimony is shown.

| | **LAW FIRM** **2013** | **NAMES OF PARTIES** | **DATE** | **CASE NO.** | **COURT/JURISDICTION** |
|---|---|---|---|---|---|
| 1 | Vista IP Law Group LLP | Subo Automation Inc., et al vs. Propack Processing & Packaging Systems, Inc. | 1/7/13 | SA CV 10-1946 AG | U.S. District Court, Central District Of California |
| 2 | Steiner & Associates | VS Media, Inc. Vs. Pivital Payments | 1/9/13 | SC109948 | Superior Court Of California, County of Los Angeles |
| 3 | Stetler, Duffy & Rotert, Ltd. | Smart Marketing Group, Inc. vs. Publications International. Ltd. | 1/17/13 | 04 C 0146 | United States District Court, Northern District of Illinois |
| 4 | Flynn, Delich & Wise LLP | Mitsui O.S.K. Lines, Ltd vs. Seamaster Logistics et al. | 2/1/13 | C 11-02861 SC | U.S. District Court, Northern District of California |
| 5 | Weingarten Brown LLP | Crestview Service Center, Inc. vs. Graver Family Trust | 2/13/13 | 1220044494 | JAMS Arbitration |
| 6 | Garrett & Tully | Gary Iskowitz et al. vs. Georges Marciano et al. | 2/22/13 | BC384493 & BC385790 | Superior Court Of California, County of Los Angeles |
| 7 | Silverman, Sclar Shin, & Byrne LLP | Malovani & Murray vs. Harvest Productions, et al. | 3/8/13 | SACV 11-00787 AG | U.S. District Court, Central District of California |
| 8 | Morris, Sullivan & Lemkul, LLP | Rancho California Owners Association vs. Outdoor Resorts Rancho California, Inc. et al. | 4/2/13 | RIC469533 | Superior Court Of California, County of Riverside |
| 9 | Reback, McAndrews & Kjar, Warford & Stockalper, LLP | Christophe & Danielle Schatteman vs. Salvador Brau. | 4/29/13 | BC462768 | Superior Court Of California, County of Los Angeles |
| 10 | Poindexter & Doutre | Estate of Elsinore Gilliland | 5/20/13 | P517929 | Superior Court of California, County of Los Angeles |
| 11 | Theodora Oringher PC | Healthcare Partners Medical Group et al. vs. Citizens Choice Health Plan, Inc. | 6/6/13 | 1210030411 | JAMS Arbitration |
| 12 | Crowell & Mooring LLP | Ralphs Grocery Company vs. Midtown Shopping Center Associates | 6/11/13 | BC493630 | Superior Court of California, County of Los Angeles |
| 13 | Procopio, Cory, Hargreaves & Savitch LLP | Kaneka Corporation vs. Uno & Company, Ltd. et al. | 6/20/13 | 3:10-CV-1430-P | United States District Court, Northern District of Texas |
| 14 | Kirtland & Packard LLP | POM Wonderful LLC Marketing and Sales Practices Litigation | 9/3/13 | ML 10-02199 DDP | U.S. District Court, Central District of California |

| | **LAW FIRM** | **NAMES OF PARTIES** | **DATE** | **CASE NO.** | **COURT/JURISDICTION** |
|---|---|---|---|---|---|
| 15 | Parr Brown Gee & Loveless | Derek Smith vs. Diamond Contract Services, Inc. | 9/4/13 | 120047102 | JAMS Arbitration |
| 16 | Pircher, Nichols & Meeks | Rapid Rack Industries, Inc. vs. China Export & Credit Corp et al. | 9/11/13 | CV11-07785 ODW | U.S. District Court, Central District of California |
| | **2013** (continued) | | | | |
| 17 | Callahan & Blaine | Festus Dada vs. KM Strategic Management | 9/18/13 | 1220043943 | JAMS Arbitration |
| 18 | Troy & Gould PC | LJB Bishop Enterprises, Inc. et al vs. Seaport Marina Hotel et al. | 9/27/13 | NC057896 | Superior Court of California, County of Los Angeles |

| **LAW FIRM 2014** | **NAMES OF PARTIES** | **DATE** | **CASE NO.** | **COURT/JURISDICTION** |
|---|---|---|---|---|
| 1 | Fredrikson & Byron, P.A. | Lerman vs. My Pillow, Inc. | 1/6/14 | SACV 12-00916 AG | U.S. District Court, Central District of California |
| 2 | Phillips Law Partners, LLP | Hot Shot Picture Cars vs. CHP Enterprises et al. | 2/13/14 | 11-4546-PLC | ADR Services, Inc. |
| 3 | Lobb & Cliff, LLP | Shawn Bennett vs. Filter Recycling Services, Inc. et al. | 3/5/14 | RIC 429614 | Superior Court of California, County of Riverside |
| 4 | McLeod, Moscarino, Witham & Flynn LLP | MedAssets Net Revenue System vs. Downey Regional Medical Center | 3/12/14 | CV13-01936 ODW | U.S. District Court, Central District of California |
| 5 | Law Offices of Michael Jason Lee | Mining Technologies International, Inc. vs. Versailles Investments, LLC | 3/28/14 | SC114519 | Superior Court of California, County of Los Angeles |
| 6 | Paul Hastings | Altamura, et al. vs. L'Oreal, USA, Inc., et al. | 4/4/14 | CV 11-1067 CAS | U.S. District Court, Central District of California |
| 7 | Dickson Wright; Moss & Barnett | Western Competitive Solutions, Inc. et al. vs. Roshka Heyman & Dewulf, LLP et al. | 5/1/14 | CV2012-50944 | Superior Court of the State of Arizona, County of Maricopa |
| 8 | Liner LLP | In re: Horizon Organic Milk Plus DHA Omega-3 Marketing and Sales Practice Litigation | 5/2/14 | 1:12-MD-02324 | U.S. District Court, Southern District of Florida |
| 9 | Lauson & Tarver LLP | Gravity Defyer vs. Under Armour, et al. | 5/30/14 | 2:13-CV-01842-JAK | U.S. District Court, Central District of California |
| 10 | Cadwalader Wickersham & Taft LLP | Ferolito et al. vs Arizona Beverages USA LLC | 6/25/14 | 12-004058 | Supreme Court of the State of New York, Nassau County |
| 11 | Jones Day | Cobb vs. BSH Home Appliances Corporation | 9/9/14 | SA CIV-10-00711 DOC | U.S. District Court, Central District of California |
| 12 | Raskin Anderson Law | Westmoore Management et al. vs. Weinberg et al. | 10/23/14 | SACV13-00132 AG | U.S. District Court, Central District of California |
| 13 | Moss & Barnett | James Zazzali, asTrustee for DBSI Estate vs. Eide Bailly LLP | 11/19/14 | 1:12-cv-00349-MJP | U.S. District Court,  District of Ohio |
| 14 | Jenner & Block LLP | Fox Broadcasting Company et al. vs. Dish Network, LLC et al. | 12/18/14 | CV12-04529GHK | U.S. District Court, Central District of California |

| | **LAW FIRM 2015** | **NAMES OF PARTIES** | **DATE** | **CASE NO.** | **COURT/JURISDICTION** |
|---|---|---|---|---|---|
| 1 | Lewis Brisbois Bisgaard & Smith | Prince v. Invensure | 1/28/15 | 30-2013-00638387-CU-BC-CJC | Superior Court of California, County of Orange |
| 2 | Allen Matkins Leck Gamble Mallory & Natsis LLP | Corbin Northridge, L.P. vs. HBC Solutions, Inc. et al. | 2/5/15 | 2:14-CV-02714-RGK | U.S. District Court, Central District of California |
| 3 | Swanson Law Office | Wood River Capital Resources, LLC re: AREI II (Four related cases in a Judicial Coordination Proceeding | 2/10/15 | 4730 | Superior Court of California, County of Los Angeles |
| 4 | Garrett & Tully, P.C. | Conquest International & Gillham vs. Hinton Kreditor Gronroos LLP et al. | 2/19/15 | BC 492003 | Superior Court of California, County of Los Angeles |
| 5 | Silverman, Sclar Shin, & Byrne LLP | Macro-Z-Technology Company vs. LarKor et al., and related matters | 3/4/15 | 30-2012-00590479-CU-BC-CJC | Superior Court of California, County of Orange |
| 6 | Gibbs, Giden, Locher, Turner, & Senet | Layton Construction Co., Inc. vs. Universal Health Services | 3/9/15 | MC022600 | Superior Court of California, County of Los Angeles |
| 7 | Minyard Morris LLP | Schofield vs. Cook | 3/10/15 | 13D006203 | Superior Court of California, County of Orange |
| 8 | Garrett & Tully | Stinchfield Financial Services, Inc. et al. vs. Stewart Title Guarantee Company, et al. | 3/12/15 | CV 098107 | Superior Court of California, County of San Luis Obispo |
| 9 | Sheppard Mullin Richter & Hampton LLP | United States Fidelity & Guarantee Company vs. Rexford Properties, LLC | 3/18/15 | BC 499060 | Superior Court of California, County of Los Angeles |
| 10 | Kaplan Zeena LLP | Couch vs. Morgan Stanley & Co. LLC et al. | 4/30/15 | 1:14-CV-00010-LJO | U.S. District Court, Central District of California |
| 11 | Kupferstein Manuel & Quinto LLP | Brady vs. Grendene S.A. et al | 5/1/15 | 3:12-CV-00604-GPC | U.S. District Court, Southern District of California |
| 12 | Moss & Barnett | Douglas Kelly, as Chapter 11 trustee of Petters Company, Inc. and other consolidated entities vs. Eide Bailly LLP | 5/5/15 | 65 Y 00008 12 | American Arbitration Association |
| 13 | Tycko & Zavareei LLP | Dapeer  vs. Neutrogena Corp. | 5/21/15 | 1:14-CV-22113-MGC | U.S. District Court, Southern District Of Florida |
| 14 | Greenberg Traurig | Estate of Stanley Diller & related trusts | 6/23/15 | BP136585 & BP140257 | Superior Court of California, County of Los Angeles |

| | LAW FIRM | NAMES OF PARTIES | DATE | CASE NO. | COURT/JURISDICTION |
|---|---|---|---|---|---|
| 15 | Greenberg Traurig | 24 Hour Fitness | 8/19/15 | BP136585 & BP140257 | Superior Court of California, County of Los Angeles |
| 16 | Hogan Lovells US LLP | Trebesch vs. Fall Line Capital et al. | 9/3/15 | 01-14-001-0482 | AAA Arbitration |
| 17 | Jones Day | In re: Ceasars Entertainment Operating Company, Inc., Debtor | 10/17/15 | 15-03193 (ABG) | United States Bankruptcy Court, Northern District of Illinois |
| 18 | Gartenberg Gelfand Hayton LLP | Van Wagenen vs. Wells Fargo Advisors, LLC | 11/18/15 | not available | FINRA arbitration, Los Angeles |
| 19 | Gerard Fox Law P.C. | Min Productions Pte. Ltd. vs. FireForge Inc., and Cross-complaint | 11/24/15 | 8:14-cv-00941-MMM | U.S. District Court, Central District of California |

| | LAW FIRM 2016 | NAMES OF PARTIES | DATE | CASE NO. | COURT/JURISDICTION |
|---|---|---|---|---|---|
| 1 | Carlton Fields Jorden Burt, LLP | Xzeres Corporation vs. CMI Technologies | 2/25/16 | 2:15-cv-00805-RGK | U.S. District Court, Central District of California |
| 2 | Sedwick LLP | YUM! Brands, Inc. vs. XL Syndicate, et al. | 5/26/15 | (none available) | Arbitration in New York |
| 3 | United States Attorney | Aeros Aeronautical Systems Corp. vs. United States | 6/10/16 | CV 2:15-1712 PSG | U.S. District Court, Central District of California |
| 4 | Jones Day | Operation Technology, Inc. vs. CYME International et al. | 6/21/16 | 8:14-cv-00999 JLS | U.S. District Court, Central District of California |
| 5 | Weintraub Tobin Chediak Coleman Grodin | Healthcare Solutions Insurance Agency, Inc. vs. Health Net of California et al. | 7/7/16 | 122Q 049089 | JAMS Arbitration |
| 6 | Lewis Brisbois Bisgaard & Smith | Ozuna vs. Tristar Transload | 10/31/16 | CIVDS1415289 | Superior Court of California, County of San Bernardino |
| 7 | Garrett & Tully | PNY Technologies vs. Miller Kaplan Arase &Co LLP | 11/9/16 | 15-cv-01728-MMC | U.S. District Court, Northern District of California |
| 8 | Kurzman Eisenberg Corbin & Lever, LLP | McKenna et al. vs. GEC energy Holdings et al., and related Cross Complaints | 11/17/16 | 11371-VCP | Delaware Chancery Court |
| 9 | Hartnett Law Group | In re: Lettice Family trusts and subtrusts | 11/30/16 | 0-2015-00819750-PR-TR-CJC | Superior Court of California, Orange County |
| 10 | Cozen O'Connor | KM Industrial, Inc. vs. Paramount Petroleum corporation, and Cross Complaint | 12/15/16 | S-1500-CV-280815 | Superior Court of California, Kern County |

## LISTING OF PUBLICATIONS AUTHORED
## IN THE LAST TEN YEARS

*How to Succeed with Expert Witnesses,* published in *The Survival Guide for New Attorneys in California* by the Los Angeles Lawyer and the Los Angeles County Bar Association Barristers, Fall 2005. Republished Fall 2006. Republished Fall 2011

# Exhibit 4

| Reference Number | Description |
|---|---|
| CBC_DS_00018819 | 2014 Plant Material Left at UC |
| CBC_DS_00018820 | 2013 Inventory List |
| CBC_DS_00018847 | 2014 Plant Material Left at UC |
| CBC_DS_00019105 | Cultivar Roundtable Notes |
| CBC_DS_00019129 | CBC Financial Projections |
| CBC_DS_00020644 | Email from Patrick Nielson to Jacob Appelsmith re: Letter and enclosures from Chief Counsel Appelsmith |
| CBC_DS_00024426 | Full Year Budget Estimate for 2014-15 |
| CBC_DS_00025370 | 2015 Full Year Budget Estimate |
| CBC00000042 | California Berry Cultivars Income Statement for the 5 Months Ending May 31, 2015 |
| CBC00000075 | California Berry Cultivars, LLC Operating Agreement |
| CBC00000389 | California Berry Cultivars, LLC Balance Sheet as of March 31, 2016 |
| CBC00000403 | California Berry Cultivars, LLC Balance Sheet as of May 25, 2016 |
| CBC00001336 | California Berry Cultivars, LLC Balance Sheet as of April 30, 2016 |
| CBC00001342 | Doug's Budget for Transition Cultivars |
| CBC00001816 | California Berry Cultivars, LLC Executive Summary & Business Plan |
| CBC00001849 | Strawberry Inc. 10-Year Forecast |
| CBC00002256 | 2014 Seedling Field Costs |
| CBC00002330 | California Berry Cultivars, LLC Balance Sheet as of December 31, 2014 |
| CBC00002349 | California Berry Cultivars, LLC Balance Sheet as of May 31, 2015 |
| CBC00002460, CBC00002487 | California Berry Cultivars, LLC Balance Sheet as of November 30, 2015 |
| CBC00003499 | Copy of CBC Budget 2014-2015 |
| CBC00004087 | California Berry Cultivars, LLC Balance Sheet as of December 9, 2015 |
| CBC00004132 | California Berry Cultivars, LLC Statement of Cash Flows January 1 – December 9, 2016 |
| CBC00004200 | California Berry Cultivars, LLC Balance Sheet Prev Year Comparison as of May 31, 2016 |
| CBC00008333 | 2016 Cash Flow Overview |
| CBC00010451 | 2015 Budget R1 |
| CBC00013903 | December 2014 CBC Financials |
| CBC00013913 | August 2015 CBC Financials |
| CBC00013925 | May 2015 CBC Financials |
| CBC00013929 | November 2015 CBC Financials |
| CBC00014110 | Copy of CBC Budget 2014-2015 |
| CBC00014138 | Copy of Copy of CBC Budget 2014-2015 |
| ECF No. 104 | University Third Amended Crossclaim |
| ECF No. 19 | Ex Parte Motion for TRO and OSC |
| ECF No. 19-1 | Ex. 1 to Ex Parte Motion for TRO and OSC |
| ECF No. 19-2 | Ex. 2 to Ex Parte Motion for TRO and OSC |
| ECF No. 19-3 | Ex. 3 to Ex Parte Motion for TRO and OSC |
| ECF No. 19-4 | Ex. 4 to Ex Parte Motion for TRO and OSC |
| ECF No. 19-5 | Ex. 5 to Ex Parte Motion for TRO and OSC |
| ECF No. 19-6 | Ex. 6 to Ex Parte Motion for TRO and OSC |
| ECF No. 2-2 | Verified Complaint |

| Reference Number | Description |
|---|---|
| Kawamura Ex. 165.9 | Exhibit 165.9 to the CBC 30(b)(6) Deposition of A.G. Kawamura - CBC Financials (Budgets, Income Statement, Balance Sheet, Cash Flow) |
| UC_STRAW2_000077360 | California State Auditor Report 2014-121 on the University of California, Davis |
| UC_STRAW2_000081751 | UC Davis - Plant Sciences Department - Strawberry Program Revenue and Expenses |
| UC_STRAW2_000085284 | UC Davis InnovationAccess Assessment of UC Davis Strawberry Program Royalty Rates |
| UC_STRAW2_000091127 | Non-California Discount Royalty Program Revenue Timeline |
| UC_STRAW2_00038636 | Email Michael Carriere to Mike Fahner |
| UC_STRAW2_00040893 | Notice re: Ex-California Royalty Rates |
| UC_STRAW2_00045149 | California Nursery Plants Used in California |
| UC_STRAW2_00050075 | UC Davis Commitment to Strawberry Program – Fiscal 2012 |
| UC_STRAW2_00058007 | Strawberry Sales Data |
| UC_STRAW2_00073415 | McGee Letter to Murai Regarding Change in Royalty Rates |
| UC_STRAW2_00075842 and UC_STRAW2_00075843 (Excel version) | Exhibit 102 - Strawberry Inventor Shares - Shaw |
| UC_STRAW2_00075844 | Strawberry Varieties Income per Fiscal Year |
| UC_STRAW2_00075847 | Strawberry Varieties Income per Fiscal Year |
| UC_STRAW2_00077123 | December 2014 University Internal Audit Report - Strawberry Breeding Project |
| UC_STRAW2_00077360 | June 2015 California State Audit Report - UCD Strawberry Breeding Program |
| UC_STRAW2B1_00027513 | Background for a Royalty Rate Increase on UC strawberry Cultivars Grown in California - May 2007 |
| Westwood 11/29/2016 Depo. | 2016-11-29 Lucky Westwood Transcript - Full |
| Westwood Ex. 1 | Exhibit 1 - Operating Agreement |
| Westwood Ex. 2 | Exhibit 2 - Email String Containing 5-9-16 Email from K VandenLangenberg to L. Westwood |
| Westwood Ex. 3 | Exhibit 3 - UCD Forecast |
| Westwood Ex. 4 | Exhibit 4 - 10-Year Sales Forecast by Plant Count |
| Westwood Ex. 5 | Exhibit 5 - 6-30-14 Services Agreement by and between IS and CBC |
| Westwood Ex. 6 | Exhibit 6 - 6-30-14 Services Agreement by and between IS and CBC |
| Westwood Ex. 7 | Exhibit 7 - 1-22-16 Limited Liability Company Authorization Resolution |
| Westwood Ex. 8 | Exhibit 8 - Confirmation of Transaction Notice |
| Westwood Ex. 9 | Exhibit 9 - CBC Responses to UC 1st Set of Rogs 1-3 |
| Westwood Ex. 10 | Exhibit 10 - Spreadsheet Representing Size of Market and Potential Revenues |
| Westwood Ex. 11 | Exhibit 11 - Talking Points for Conversation with Partners re Revenue Models |
| Westwood Ex. 12 | Exhibit 12 - Email String Containing 2-12-15 Email from Westwood to L Ponce re Question of Litigation Against UC |
| Westwood Ex. 13 | Exhibit 13 - Email String Containing 5-7-15 Email from L Westwood to AG Kawamura, et al re Oxnard Greenhouse |
| Westwood Ex. 14 | Exhibit 14 - Email String Containing 4-13-15 Email from AG Kawamura to L Westwood re Management Decisions |
| Westwood Ex. 15 | Exhibit 15 - 12-11-15 Email from K VandenLangenberg to D Shaw and L Westwood re Slides |

| Reference Number | Description |
|---|---|
| Westwood Ex. 16 | Exhibit 16 - Email Sring Containing 12-7-15 Email from M Kawamura to B Ito re Strawberry Meeting |
| Westwood Ex. 17 | Exhibit 17 - Email String Containing 1-20-16 Email L Ponce to AG Kawamural re Scheduled Santa Maria Field Day |
| Westwood Ex. 18 | Exhibit 18 - Email String Containing 7-28-16 Email from L Westwood to VandenLangenberg re Possible Agenda Item |
| Westwood Ex. 19 | Exhibit 19 - Email String Containing 1-26-16 Email from Westwood to VandenLangenberg re CBC Budget 2014-15 |
| Westwood Ex. 20 | Exhibit 20 - 1-26-16 Letter from J Appelsmith Responding to D Shaw 11-17-15 Email to Knapp |
| Westwood Ex. 21 | Exhibit 21 Email String Containing 8-31-14 Email from Westwood to Moncovich re Demur |
| Westwood 1/5/2017 Depo. (30(b)(6)) | 2017-01-05 Westwood Full Transcript |
| Westwood Ex. 397 | Exhibit 397 Email from G Lippetz to M Chivvis Dated 1-4-2017 re EXT CBC 30 b 6 Topics |
| Westwood Ex. 398 | Exhibit 398 University 30 b 6 Notice of Deposition of CBC Dated 11-7-2016 |
| Westwood Ex. 399 | Exhibit 399 Operating Agreement Dated 1-1-2014 |
| Westwood Ex. 400 | Exhibit 400 Operating Agreement Signature Pages |
| Westwood Ex. 401 | Exhibit 401 Limited Liability Company Authorization Resolution Dated 1-22-2016 |
| Westwood Ex. 402 | Exhibit 402 Email from J Simmons to J Cano Dated 4-23-2013 re Plant Breeding Adventure |
| Westwood Ex. 403 | Exhibit 403 Email from J Simmons to J Cano Dated 4-23-2013 re Plant Breeding Adventure - Cover Sheet |
| Westwood Ex. 404 | Exhibit 404 Email from D Shaw to K Larson Dated 12-11-2013 re File Attaching KL CBC Cross 2014 |
| Westwood Ex. 405 | Exhibit 405 Southern Elite Diallel 2014 |
| Westwood Ex. 406 | Exhibit 406 Email from K VandenLangenberg to J Hansen and D Shaw Dated 2-18-2015 re Task List |
| Westwood Ex. 407 | Exhibit 407 Chart re Pedigree |
| Shaw Depo. | 2016-12-08 Doug Shaw Transcript - Full |
| Shaw Ex. 52 | Exhibit 52 - SF Elite Diallel 2014 - Breeding Information and Trade Secrets |
| Shaw Ex. 53 | Exhibit 53 - Northern and Southern Elite Diallel 2016 Breeding and Trade Secrets Information |
| Shaw Ex. 54 | Exhibit 54 - Northern and Southern Elite Diallel 2016 and Northern and Southern Factorial 2016 |
| Shaw Ex. 100 | Exhibit 100 - CBC Shaw and Kirk 2nd Supplemental Responses to UC Rogs 1 4-6 |
| Shaw Ex. 101 | Exhibit 101 - Short Narrative The Demise of the UC Davis Strawberry Program |
| Shaw Ex. 102 | Exhibit 102 - Strawberry Inventor Shares |
| Shaw Ex. 103 | Exhibit 103 - 5-3-1994 - USPP 8708 |
| Shaw Ex. 104 | Exhibit 104 - 2-25-1986 State Oath of Allegiance for D Shaw |
| Shaw Ex. 105 | Exhibit 105 - Fax from N Hirsch to D Shaw Dated 8-2-99 re Attached Ltr of 7-2-1999 from R Nelson to Shaw |
| Shaw Ex. 106 | Exhibit 106 - Memo from D Shaw to C Voelker Dated 8-3-1999 re Nelson Letter |

| Reference Number | Description |
|---|---|
| Shaw Ex. 107 | Exhibit 107 - Letter Dated 9-28-1999 from B Duffet and R Huntington re Protection of New Plant Material |
| Shaw Ex. 108 | Exhibit 108 - Email from M Carriere to A Bennett Dated 9-6-2000 re Burns Doane Opinion 9-6 |
| Shaw Ex. 109 | Exhibit 109 Email from D Shaw to A Hakim-Elahi Dated 3-27-2000 re Research Memo |
| Shaw Ex. 110 | Exhibit 110 - Email from N Van Alfen to D Shaw Dated 9-3-209 re Strawberry Growers |
| Shaw Ex. 111 | Exhibit 111 Email from N Van Alfen to S Drown et al Dated 2-10-2010 re Strawberry Guidelines |
| Shaw Ex. 112 | Exhibit 112 - Email from D Shaw to C Van Kessel Dated 3-16-2011 re Germplasm Releases |
| Shaw Ex. 113 | Exhibit 113 - Letter from L Lewis to Dean Gardner et al Dated 4-27-1990 re Communication 28 |
| Shaw Ex. 114 | Exhibit 114 - UC Policy on Release of Sexually-Asexually Propogated Plant Materials January 1991 |
| Shaw Ex. 115 | Exhibit 115 - ANR Administrative Handbook Section 485 - Commercial Relese of Protected Plant Materials 6-1-2007 |
| Shaw Ex. 116 | Exhibit 116 - Email from D Shaw to C Van Kessel Dated 11-1-2011 re Strawberry Program |
| Shaw Ex. 117 | Exhibit 117 - Email from D Shaw to C Van Kessel Dated 4-5-2012 re Strawberries |
| Shaw Ex. 118 | Exhibit 118 - Letter from T DeJong to C Van Kessel Dated 12-18-2013 re Handling of Strawberry Core Germplasm |
| Shaw Ex. 119 | Exhibit 119 - Letter from H Dillard to C Van Kessel Dated 3-26-2014 re Release of the 180 Germplasm Lines |
| Shaw Ex. 120 | Exhibit 120 - Email from D Shaw to J Appelsmith of 6-13-2014 re Licensing of Core Strawberry Genetic Materials |
| Shaw Ex. 121 | Exhibit 121 - Email from D Shaw to M Carriere Dated 6-13-2014 re US Plant Patent Application Assignment |
| Shaw Ex. 122 | Exhibit 122 - Email from D Shaw to Dean Dillard Dated 11-7-2014 re 2013 Selections |
| Shaw Ex. 123 | Exhibit 123 - Email from D Shaw to C Van Kessel et al Dated 11-6-2014 re Research and Materials Expectations |
| Shaw Ex. 124 | Exhibit 124 - Email from Knapp to Shaw of 11-17-2015 re Confidential Strawberry Breeding Program Pedigrees and Documentation |
| Shaw Ex. 125 | Exhibit 125 - Email from D Shaw to C Voelker et al Dated 6-1-2013 re IA Document and Meeting |
| Shaw Ex. 126 | Exhibit 126 - Email from D McGee to D Shaw and K Larson Dated 6-17-2014 re US Plant Patent Application Assignment |
| Shaw Ex. 127 | Exhibit 127 - Email from J Cano Pecci to AG Kawamura Dated 11-21-2014 re Spain Trip Larson |
| Shaw Ex. 128 | Exhibit 128 - Email from D Shaw to J Cano Dated 12-9-2014 re 2015 CBC Cross List |
| Shaw Ex. 129 | Exhibit 129 - Chart - Northern Elite Diallel 2015 |

| Reference Number | Description |
|---|---|
| Shaw Ex. 130 | Exhibit 130 - Email from D Shaw to J Cano Pecci and L Ponce Dated 11-24-2014 re Spain Trip Larson |
| Shaw Ex. 131 | Exhibit 131 - Email from D Shaw to J Cano Dated 4-13-2015 re CBC Germplasm |
| Shaw Ex. 132 | Exhibit 132 - Germplasm Chart |
| Shaw Ex. 133 | Exhibit 133 - Google Map of Spain Dated 11-17-2016 |
| Shaw Ex. 134 | Exhibit 134 - Email from J Cano to D Shaw and C Manolo Dated 3-20-2015 re CBC Spanish Trip |
| Shaw Ex. 135 | Exhibit 135 - Visiting Program Kirk Larson for Tuesday 9 December |
| Shaw Ex. 136 | Exhibit 136 - Email from K VandenLangenberg to D Sinova and M Pecci re Seedling Recommendation |
| Shaw Ex. 137 | Exhibit 137 - General University Policy Regarding  Academic Appointees - Rev 7-1-14 |
| Shaw Ex. 138 | Exhibit 138 - Report of Category I and II Compensated Outside Professional Activities |
| Knapp Depo. | 2016-12-16 Steven Knapp Transcript Full |
| Knapp Ex. 182A | EXHIBIT-182A University Responses and Objs to CBC Notice of Deposition of University Dated 12-2-2016 |
| Knapp Ex. 182B | EXHIBIT-182B Email from M Chivvis to G Lippetz Dated 12-15-2016 re University Responses-Objs to CBC Notice of Deposition |
| Knapp Ex. 182C | EXHIBIT-182C University Responses-Objs to CBC Notice of Deposition of University Dated 12-2-2016 |
| Knapp Ex. 183 | EXHIBIT-183 - Binder - contains Exhibits 183.1 to 183.6 |
| Knapp Ex. 183 | EXHIBIT-183 - Binder - contains Exhibits 183.7 to 183.8 |
| Knapp Ex. 184A | EXHIBIT-184A Curriculum Vitae for S Knapp |
| Knapp Ex. 184B | EXHIBIT-184B Curriculum Vitae for S Knapp |
| Knapp Ex. 184C | EXHIBIT-184C S Knapp Publications |
| Knapp Ex. 185 | EXHIBIT-185 Chart Labeled Strawberry Crosses 6-15-2015 |
| Knapp Ex. 186 | EXHIBIT-186 WEO Nursery Map - 2016 |
| Knapp Ex. 187 | EXHIBIT-187 US PP27034 P3 Dated 8-9-2016 |
| Knapp Ex. 188 | EXHIBIT-188 Plot Maps |
| Knapp Ex. 189 | EXHIBIT-189 Chart Entitled YTD Production - Crates-Acre |
| Knapp Ex. 190 | EXHIBIT-190 Chart Entitled Weekly Production Crates-Acre |
| Knapp Ex. 191 | EXHIBIT-191 Email from M Delany to H Dillard Dated 8-5-2015 re Confidential - Missing Cultivars Tested with Growers |
| Knapp Ex. 192 | EXHIBIT-192 UC Strawberry Breeding Program Report by S Knapp and G Cole |
| Knapp Ex. 193 | EXHIBIT-193 FPS Transfer 2016 |

# Exhibit 2

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
    _____
 4  CALIFORNIA BERRY          )
 5  CULTIVARS, LLC,           )
 6            Plaintiff,      )
     vs.                      )  No. 3:16-cv-02477-VC
 7  THE REGENTS OF THE        )
 8  UNIVERSITY OF             )
    CALIFORNIA, a             )
 9  corporation,              )
10            Defendant.      )
    _____)
11  THE REGENTS OF THE        )
12  UNIVERSITY OF             )
13  CALIFORNIA, a             )
    corporation,              )
14        Cross-Complainant,)
15   vs.                      )
    CALIFORNIA BERRY          )
16  CULTIVARS, LLC, DOUGLAS   )
17  SHAW, and KIRK LARSON,    )
18        Cross-Defendants.  )
19  _____)
                 CONFIDENTIAL TRANSCRIPT
20
             VIDEOTAPED DEPOSITION OF DAVID NOLTE
21                Los Angeles, California
22                Tuesday, March 14, 2017
    Reported by:
23  LORI M. BARKLEY
    CSR No. 6426
24  Job No. 2556145
25  PAGES 1 - 135


                                      Page  1
```

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Does that sound about the time that you were | 09:13:53 |
| 2 | hired? | 09:13:54 |
| 3 | A.   Something in that vicinity, yes. | 09:14:00 |
| 4 | Q.   Okay.  Can you tell me how many hours you | 09:14:01 |
| 5 | personally spent drafting your first report on -- | 09:14:06 |
| 6 | that issued on January 21st, 2017? | 09:14:09 |
| 7 | A.   I didn't keep track of just the drafting | 09:14:20 |
| 8 | time, but something in the vicinity of two days. | 09:14:24 |
| 9 | Q.   And are you being compensated at $625 an | 09:14:37 |
| 10 | hour for your time? | 09:14:41 |
| 11 | A.   Yes. | 09:14:41 |
| 12 | Q.   Have you had any prior experience on valuing | 09:14:43 |
| 13 | intellectual property relating to agricultural | 09:14:48 |
| 14 | products? | 09:14:51 |
| 15 | MS. SMITH:  Objection, vague. | 09:15:05 |
| 16 | THE WITNESS:  Nothing comes to mind off the | 09:15:06 |
| 17 | top of my head. | 09:15:07 |
| 18 | BY MR. OVERSON: | 09:15:09 |
| 19 | Q.   Have you had any experience in doing damages | 09:15:09 |
| 20 | calculations relating to any agricultural products or | 09:15:15 |
| 21 | issues? | 09:15:18 |
| 22 | MS. SMITH:  Objection, vague. | 09:15:19 |
| 23 | THE WITNESS:  You said damage calculations? | 09:15:20 |
| 24 | BY MR. OVERSON: | 09:15:21 |
| 25 | Q.   Yes. | 09:15:21 |

Page 8

| | | |
|---|---|---|
| 1 | A.    Okay.  I do see that. | 09:41:52 |
| 2 | Q.    And then you assume they had to start from | 09:41:56 |
| 3 | scratch then in 2014, rather than having access to | 09:42:07 |
| 4 | the materials, correct? | 09:42:11 |
| 5 | A.    That is what I was told the fact witnesses | 09:42:18 |
| 6 | will -- will be stating. | 09:42:20 |
| 7 | Q.    And if they issued a similar level of effort | 09:42:32 |
| 8 | and if the typical cycle goes six years, that means | 09:42:36 |
| 9 | they would have a cultivar ready for release in 2020. | 09:42:39 |
| 10 | Is that true, sir? | 09:42:43 |
| 11 | A.    No, no.  The calculations are not premised | 09:42:45 |
| 12 | on that.  Look, if you want to assume that there's no | 09:42:46 |
| 13 | difference in what -- materials, then you can do | 09:42:49 |
| 14 | that, but that's not what my calculations are doing. | 09:42:53 |
| 15 | So you shouldn't try to quote my -- twist the words | 09:42:55 |
| 16 | in my report to suggest what you said is true. | 09:42:59 |
| 17 | That's not what my calculations are doing. | 09:43:02 |
| 18 | Q.    Your calculations assumed that CBC started | 09:43:06 |
| 19 | working in 2014 but would not have a cultivar for a | 09:43:11 |
| 20 | commercial release until 2027. | 09:43:17 |
| 21 | Is that true, sir? | 09:43:21 |
| 22 | MS. SMITH:  Objection, misstates the report. | 09:43:22 |
| 23 | THE WITNESS:  My report indicates that | 09:43:29 |
| 24 | there's an eight-year delay that has been caused by | 09:43:31 |
| 25 | the U.C.'s interruptions, caused by CBC not having | 09:43:33 |

Page 25

| | | |
|---|---|---|
| 1 | materials available to which CBC contends it was | 09:43:38 |
| 2 | entitled, and this report calculates the impact of an | 09:43:40 |
| 3 | eight-year delay. | 09:43:46 |
| 4 | BY MR. OVERSON: | 09:43:50 |
| 5 | Q.   Where did you get the idea that it would be | 09:43:50 |
| 6 | an eight-year delay? | 09:43:51 |
| 7 | A.   I was told that in the discussions that I | 09:43:54 |
| 8 | had which defined this assignment. | 09:44:02 |
| 9 | Q.   And they were told that they, CBC, could | 09:44:08 |
| 10 | have been able to release a cultivar in 2019 with | 09:44:10 |
| 11 | access to the materials, true? | 09:44:12 |
| 12 | A.   Correct. | 09:44:14 |
| 13 | Q.   And as a result of not having access to the | 09:44:14 |
| 14 | materials, there would be a further eight-year delay | 09:44:19 |
| 15 | from that to 2027, true? | 09:44:22 |
| 16 | A.   That is what I was told. | 09:44:26 |
| 17 | Q.   So this is just math, but that means that it | 09:44:26 |
| 18 | took from 2014 to 2027 to release a cultivar for CBC | 09:44:31 |
| 19 | without the materials. | 09:44:37 |
| 20 | That's what you're assuming in your report, | 09:44:37 |
| 21 | right? | 09:44:39 |
| 22 | MS. SMITH:  Objection, misstates the | 09:44:39 |
| 23 | witness's testimony and report. | 09:44:40 |
| 24 | THE WITNESS:  It says there's an eight-year | 09:44:48 |
| 25 | delay.  I believe the eight years would start from | 09:44:55 |

Page 26

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Doesn't have to be inflation.  But it would | 09:58:55 |
| 2 | be growth, a good portion of the growth could be | 09:58:59 |
| 3 | inflation, but not necessarily all of it. | 09:59:03 |
| 4 | Q.   Okay.  What's the 11 percent in this table? | 09:59:04 |
| 5 | What does it represent to you? | 09:59:06 |
| 6 | A.   It's the net discount rate. | 09:59:07 |
| 7 | Q.   Okay.  And how did you calculate -- I | 09:59:09 |
| 8 | understand.  We'll talk a little more about how you | 09:59:11 |
| 9 | get to 15 percent, but how did you get from | 09:59:14 |
| 10 | 15 percent to 11 percent? | 09:59:16 |
| 11 | A.   I have a 4 percent long-term growth rate. | 09:59:17 |
| 12 | Q.   Okay.  And it says:  Years of delay here on | 09:59:20 |
| 13 | your chart, four years, and then you have columns | 09:59:23 |
| 14 | below; and then on cultivar 1, you're showing income | 09:59:28 |
| 15 | coming in in 2015. | 09:59:32 |
| 16 | Do you see that? | 09:59:34 |
| 17 | A.   Correct. | 09:59:35 |
| 18 | Q.   So under the scenario where the U.C. | 09:59:37 |
| 19 | provides all the materials to CBC, CBC doesn't | 09:59:46 |
| 20 | commercialize anything until 2019, correct? | 09:59:50 |
| 21 | A.   That is the input that I was given by | 09:59:54 |
| 22 | Dr. Shaw, yes. | 09:59:59 |
| 23 | Q.   So it -- how -- why are you showing any | 09:59:59 |
| 24 | income in a damage calculation for 2015 through 2018, | 10:00:05 |
| 25 | when even if they received all the materials, they | 10:00:12 |

Page 36

| | | |
|---|---|---|
| 1 | wouldn't have had any income till 2019? | 10:00:14 |
| 2 | A.   Because I'm showing the impact of a smaller | 10:00:19 |
| 3 | amount of delay.  And this particular thing is based | 10:00:21 |
| 4 | on present valuing, based on the date of Dr. -- you | 10:00:25 |
| 5 | know, there may be -- hold on a minute. | 10:00:41 |
| 6 | You know, it may be that the confusion is | 10:01:01 |
| 7 | caused by the year nomenclature, although as I told | 10:01:02 |
| 8 | you before, it doesn't impact the calculations | 10:01:06 |
| 9 | themselves.  This calculation is based on a four-year | 10:01:08 |
| 10 | delay, and putting aside the years, which are just a | 10:01:13 |
| 11 | label, the four-year calculation is as shown on this | 10:01:16 |
| 12 | page. | 10:01:21 |
| 13 | And I'll -- and I can give some additional | 10:01:22 |
| 14 | thought in terms of the labeling, but again, it won't | 10:01:25 |
| 15 | change the numbers. | 10:01:27 |
| 16 | Q.   So you agree with me in terms of the | 10:01:29 |
| 17 | damages, there should be no lost revenue or lost | 10:01:34 |
| 18 | profit in a but-for scenario until 2019 -- | 10:01:41 |
| 19 | MS. SMITH:  Objection, misstates the | 10:01:46 |
| 20 | witness's testimony. | 10:01:48 |
| 21 | BY MR. OVERSON: | 10:01:49 |
| 22 | Q.   -- right? | 10:01:49 |
| 23 | A.   Under my initial calculations that is what I | 10:01:50 |
| 24 | was told, yes.  I was told that discounting should | 10:01:53 |
| 25 | start from 2019, which is what I've done. | 10:01:56 |

Page 37

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   And not just your initial calculations, in | 10:01:58 |
| 2 | fact, in your damages calculations you've assumed | 10:02:01 |
| 3 | there's no income until 2019, right? | 10:02:03 |
| 4 | A.   Yes.  The calculations in 2000- -- in my | 10:02:10 |
| 5 | first report were based on that. | 10:02:16 |
| 6 | Q.   Okay.  But then in Exhibit 8 here when | 10:02:21 |
| 7 | you're showing 2015, I think you're trying to tell me | 10:02:24 |
| 8 | that this is just a label and it makes no difference | 10:02:30 |
| 9 | whether it said 2019 or 2015 there. | 10:02:32 |
| 10 | Is that what you're saying? | 10:02:34 |
| 11 | A.   I'll give some additional thought to the | 10:02:34 |
| 12 | label on -- on the years, which is -- it's clear from | 10:02:37 |
| 13 | your questioning it's causing some confusion.  But it | 10:02:41 |
| 14 | does not -- I'm sorry, I'm funny, I -- you know, | 10:02:45 |
| 15 | maybe you should have a videotape on you, too. | 10:02:48 |
| 16 | Q.   I'm not confused.  It's just wrong. | 10:02:51 |
| 17 | There -- 2015 is wrong, isn't it, sir?  It's just a | 10:02:53 |
| 18 | mistake? | 10:02:56 |
| 19 | MS. SMITH:  Objection, argumentative. | 10:02:56 |
| 20 | THE WITNESS:  I indicated that I will | 10:02:58 |
| 21 | revisit the labeling, but this alternate calculation | 10:03:02 |
| 22 | shown in table 2 is -- illustrates the impact of | 10:03:08 |
| 23 | changing the number of years.  And the years of four, | 10:03:13 |
| 24 | five, six, seven, and eight are correct. | 10:03:21 |
| 25 | | |

Page 38

```
 1    BY MR. OVERSON:                                     10:03:29

 2        Q.   What do you mean when the say "the years   10:03:29

 3    four, five, six, seven, eight are correct"?         10:03:31

 4        A.   Well, there's -- there's two things shown in 10:03:33

 5    that column, and I was reading to you part, or call 10:03:35

 6    it half, of the label in table 2, and it's clear from 10:03:41

 7    your questioning that I should revisit the labels of 10:03:46

 8    the number of years, but -- but what this calculation 10:03:51

 9    does is addresses the impact of reducing the -- how  10:03:58

10    long it takes to develop a cultivar and how many    10:04:04

11    cultivars are missing.                              10:04:07

12        Q.   Can I ask you to turn back to Exhibit 1,   10:04:10

13    which is your first report, and I'm looking at page 3 10:04:48

14    of 8 of Exhibit 1 and specifically at paragraph 2,  10:04:50

15    which has the entry, first sentence (as read):      10:04:57

16             The following nine cultivars were         10:05:00

17             developed by Drs. Shaw and Larson         10:05:02

18             and have at least five years of           10:05:05

19             licensing history.                        10:05:07

20             And then there's a listing of nine names of 10:05:12

21    cultivars.  Where did you get these cultivars from? 10:05:14

22        A.   I note a U.C. document that identifies    10:05:21

23    these.  The timing or identification of cultivars in 10:05:29

24    which only Dr. Shaw and Larson were involved were   10:05:37

25    provided by Dr. Shaw.                               10:05:41
```

Page 39

1    the bottom half of page 6.                           10:15:04

2        Q.    Okay.  So I'm at -- I'm with you, I think,  10:15:09

3    and at paragraph 2A, let's take, for example, Camino 10:15:18

4    Real, which is the first one, it says (as read):     10:15:22

5              Revenues have been relatively              10:15:25

6          stable for the past eight years with           10:15:27

7          declines being modest.  Post 2016              10:15:29

8          revenues are estimated to continue            10:15:32

9          for the rest of the 21-year maximum           10:15:35

10         period at 300,000 each year.                   10:15:38

11             And for the next one, Ventana, you had     10:15:46

12   500,000 each year, and it listed -- I see what you're 10:15:49

13   saying, it lists it for each one.                    10:15:51

14             So how did you go about deciding that      10:15:53

15   300,000 was the right number for Camino Real going   10:15:55

16   forward?                                             10:15:58

17       A.    It was based on the thought process that is 10:15:58

18   described in the section that I just referred you to. 10:16:01

19       Q.    Did you do any kind of mathematical analysis 10:16:10

20   to reach 300,000 as the right amount to project for  10:16:12

21   the last five years for Camino Real?                 10:16:17

22       A.    It was based on what I describe as a trend  10:16:23

23   and the numbers that preceded it.  If you're asking  10:16:30

24   me whether it was a, you know, purely mathematical   10:16:35

25   process, the answer is no, but it was based on the   10:16:38

Page 46

```
 1    thinking that is described in my report.          10:16:42

 2        Q.   So you would agree with me that in general,  10:16:56

 3    looking at the 21-year period that the numbers,   10:16:58

 4    towards the end, tend to decline on these royalty  10:17:02

 5    streams, true?                                    10:17:06

 6        A.   Generally, that's correct.               10:17:09

 7        Q.   But at this one, you kept it at 300,000 for  10:17:10

 8    the last five years.  Is there a reason you did that  10:17:18

 9    as opposed to having it decline over the last five  10:17:21

10    years?                                            10:17:23

11        A.   Look, if someone wants to say that they want  10:17:28

12    to change the last year from 300,000 to 275,000, it's  10:17:30

13    fine, I suspect it will get lost in rounding.  But in  10:17:35

14    any event, I -- I -- this was my best estimate based  10:17:40

15    on the information I had.                          10:17:46

16        Q.   And what information did you have about    10:17:49

17    Camino Real apart from just the royalty stream from  10:17:57

18    years 1 through 16?                                10:17:59

19        A.   That is the information I was looking at.  10:18:02

20        Q.   Just that -- just those numbers?          10:18:04

21        A.   Correct.  I mean, I was mindful of what   10:18:06

22    generally was happening to these strawberries.  I   10:18:08

23    mean, I had the entire document and looked at them.  10:18:11

24    I noted that I was cutting this off at 21 years, and  10:18:15

25    in fact, there were royalty streams that were beyond  10:18:22
```

Page 47

CONFIDENTIAL

```
 1    royalties, and I'm not sure there should be any        11:44:35

 2    royalties deducted.  But in any event, I haven't       11:44:37

 3    deducted any royalties.                                11:44:39

 4    BY MR. OVERSON:                                        11:44:45

 5        Q.   In your report, you assumed that Drs. Shaw    11:44:46

 6    and Larson and CBC had a royalty free license to the  11:44:48

 7    materials, true?                                       11:44:55

 8            MS. SMITH:  Objection, misstates the          11:44:57

 9    witness's report.                                      11:44:58

10            THE WITNESS:  I made no such assumption.       11:45:01

11    BY MR. OVERSON:                                        11:45:03

12        Q.   Well, let's look at page 2 of your original  11:45:07

13    report.  B(1) says (as read):                          11:45:09

14                 Upon retirement Drs. Shaw and            11:45:16

15                 Larson had a non-exclusive right         11:45:19

16                 license to use the results of their      11:45:21

17                 research plant materials and related     11:45:22

18                 information, collectively the            11:45:24

19                 materials.                               11:45:25

20                 Did you write that?                      11:45:26

21        A.   Well, if you're asking me whether it's in my 11:45:28

22    report, sure, it's in my report.  But -- but no, I     11:45:30

23    really didn't write it.  This is not a conclusion I'm  11:45:34

24    reaching.                                              11:45:38

25                 This is a summary that I've prepared based 11:45:41
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | were projections, were done on a variety-by-variety | 13:16:27 |
| 2 | or cultivar-by-cultivar basis. | 13:16:31 |
| 3 | Q.   And they were based on a judgment that you | 13:16:34 |
| 4 | made based on the data that you had as opposed to | 13:16:35 |
| 5 | some kind of mathematical formula, true? | 13:16:38 |
| 6 | A.   Well, if you're asking me whether I had any | 13:16:42 |
| 7 | mathematical formula that I slavishly followed, the | 13:16:43 |
| 8 | answer is no, I didn't have any such mathematical | 13:16:47 |
| 9 | formula. | 13:16:50 |
| 10 | I did have data that I looked at, observed, | 13:16:50 |
| 11 | and evaluated in making -- putting the numbers on the | 13:16:53 |
| 12 | page that you see in my report. | 13:16:56 |
| 13 | Q.   Can you tell me how many times have you | 13:17:18 |
| 14 | spoken with Dr. Shaw? | 13:17:20 |
| 15 | A.   Once. | 13:17:24 |
| 16 | Q.   Okay.  And when was that? | 13:17:24 |
| 17 | A.   It was in the week prior to my January 21 | 13:17:35 |
| 18 | report. | 13:17:40 |
| 19 | Q.   And how many times have you talked to | 13:17:41 |
| 20 | Dr. Larson? | 13:17:43 |
| 21 | A.   I don't believe I've ever spoken with him. | 13:17:43 |
| 22 | Q.   And how many times have you spoken with | 13:17:46 |
| 23 | Mr. Westwood? | 13:17:48 |
| 24 | A.   Once. | 13:17:49 |
| 25 | Q.   And when was that? | 13:17:51 |

Page 116

| | | |
|---|---|---|
| 1 | A.    In the same conversation I -- in which I was | 13:17:51 |
| 2 | talking with Dr. Shaw. | 13:17:54 |
| 3 | Q.    Have you spoken with anybody else from CBC? | 13:17:57 |
| 4 | I'm excluding lawyers. | 13:18:02 |
| 5 | A.    The short answer is no.  The more careful, | 13:18:12 |
| 6 | longer answer is if there were some others on this | 13:18:16 |
| 7 | phone call that I was mentioning to you, I could not | 13:18:20 |
| 8 | identify their additional names, or even if there | 13:18:24 |
| 9 | were any such additional people. | 13:18:27 |
| 10 | Q.    Okay.  And on that one phone call, do you | 13:18:29 |
| 11 | recall how long it lasted? | 13:18:33 |
| 12 | A.    It was pretty long, you know, it could have | 13:18:43 |
| 13 | gone a couple hours.  I don't know specifically, but | 13:18:47 |
| 14 | I don't want to tell you it was -- it was not a short | 13:18:49 |
| 15 | phone call.  It was a longer phone call. | 13:18:51 |
| 16 | Q.    Less than two hours -- more than an hour, | 13:18:54 |
| 17 | less than two hours? | 13:18:57 |
| 18 | A.    Again, I really don't know the specific | 13:18:59 |
| 19 | time, but, you know, I -- I -- you're probably -- | 13:19:02 |
| 20 | that's probably right.  If someone said it went two | 13:19:09 |
| 21 | hours and five minutes I wouldn't argue with them. | 13:19:12 |
| 22 | I'm sure it went more than an hour. | 13:19:14 |
| 23 | Q.    Do you recall that we were talking about | 13:19:16 |
| 24 | 2014 unit sales and you thought they were not | 13:19:44 |
| 25 | complete, and what did you do in your calculation in | 13:19:48 |

Page 117

CONFIDENTIAL

```
1        Q.   Mr. Nolte, if the jury concludes that CBC      13:31:59

2   had access to the U.C. strawberry plant materials      13:32:03

3   from December 1st, 2014 forward, then your analysis    13:32:08

4   does not make sense, does it?                          13:32:14

5        A.   Okay.  Your hypothetical is 100 percent of   13:32:17

6   the materials have been at CBC all along and the       13:32:19

7   entire factual premise of CBC's claim is a boldfaced   13:32:25

8   lie, and if that is your hypothetical, sure, you       13:32:30

9   don't need my damage calculation 'cause the jury       13:32:33

10  wouldn't -- wouldn't believe anything that CBC is      13:32:35

11  saying 'cause you just, in your hypothetical, said     13:32:38

12  that it's a big lie.  I'm --                           13:32:41

13        MR. OVERSON:  I have no further questions.       13:32:43

14  Thank you.                                             13:32:44

15        MS. SMITH:  Can we take a short break and        13:32:50

16  then we'll redirect.                                   13:32:52

17        MR. OVERSON:  Sure.                              13:32:53

18        VIDEO OPERATOR:  Time is 1:32.  We're off        13:32:54

19  the record.                                            13:32:56

20                                                         13:52:08

21        (Recess taken.)

22                                                         13:52:25

23        VIDEO OPERATOR:  Time is 1:52.  We're on the     13:52:27

24  record.                                                13:52:31

25
```

Page 126

CONFIDENTIAL

```
 1   STATE OF CALIFORNIA      ) ss.

 2   COUNTY OF LOS ANGELES    )

 3

 4        I, Lori M. Barkley, CSR No. 6426, do hereby

 5   certify:

 6        That the foregoing deposition testimony

 7   taken before me at the time and place therein set

 8   forth and at which time the witness was administered

 9   the oath;

10        That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me, and

13   were thereafter transcribed under my direction and

14   supervision, and that the foregoing pages contain a

15   full, true and accurate record of all proceedings and

16   testimony to the best of my skill and ability.

17        I further certify that I am neither counsel

18   for any party to said action, nor am I related to any

19   party to said action, nor am I in any way interested

20   in the outcome thereof.

21        IN WITNESS WHEREOF, I have subscribed my

22   name this 28th day of March, 2017.

23

24

25        LORI M. BARKLEY, CSR No. 6426
```

Page 135

# Exhibit 3

PAGES 1 – 41

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

CALIFORNIA BERRY CULTIVARS, LLC,      )
                                      )
            PLAINTIFF,                 )
                                      )
V.                                    )   NO.  16-CV-02477 VC
                                      )
THE REGENTS OF THE UNIVERSITY OF      )   SAN FRANCISCO, CALIFORNIA
CALIFORNIA,                           )   THURSDAY
            DEFENDANT.                 )   SEPTEMBER 22, 2016
_____)
                                      )
THE REGENTS OF THE UNIVERSITY OF      )
CALIFORNIA,                           )
                                      )
            CROSS-COMPLAINANT,         )
                                      )
V.                                    )
                                      )
CALIFORNIA BERRY CULTIVARS,           )
DOUGLAS SHAW, AND KIRK LARSON,        )
                                      )
            CROSS-DEFENDANTS.          )
_____)


**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND**

**RECORDING  11:55 A.M. – 12:44 P.M. & 12:44 P.M. – 12:46 P.M.**


(APPEARANCES ON FOLLOWING PAGE)


*TRANSCRIBED BY:  JOAN MARIE COLUMBINI, CSR #5435, RPR*
*RETIRED OFFICIAL COURT REPORTER, USDC*

1          **MR. LIPPETZ:**  NO OBJECTION.

2          BUT I HAVE TO CLARIFY ONE THING.

3          A LOT OF THEIR PREMISED SUSPICIONS ABOUT WHAT HASN'T

4    BEEN PROVIDED STEMS FROM A FALSE PREMISE THAT HAS NEVER BEEN

5    SHOWN ANY EVIDENCE TO SUPPORT, WHICH IS THAT OUR CLIENTS SENT

6    MATERIAL OVERSEAS TO BE USED FOR THIS CROSSING.  WE'VE STATED

7    UP AND DOWN IN MEET AND CONFERS, ET CETERA, THAT NEVER

8    HAPPENED.

9          AND SO A LOT OF THIS, WELL, WHERE THERE'S THE

10   INFORMATION ABOUT WHERE THEY GOT THE MATERIAL, WHERE'S THE

11   INFORMATION ABOUT WHEN YOU SENT IT TO THEM, WE DID NOT SEND IT

12   TO THEM.  MY CLIENTS DID NOT SEND THE MATERIAL OVERSEAS TO BE

13   USED FOR CROSSING.

14         AND SO THESE, QUOTE/UNQUOTE, ALLEGED GAPS IN OUR

15   INFORMATION --

16         **THE COURT:**  WHO SENT THE MATERIALS OVERSEAS?

17         **MR. LIPPETZ:**  WE DON'T KNOW, AND THIS IS AGAIN WHAT

18   WE'RE TRYING TO SAY.  THEY JUST DON'T BELIEVE IT.

19         OUR CLIENT -- AND THIS IS THE STORY THAT WILL COME

20   OUT AS THIS CASE PROCEEDS -- CONTRACTED WITH AN ENTITY IN

21   SPAIN -- THERE WERE A COUPLE OF ENTITIES, BUT INTERNATIONAL

22   SEMILLAS IS THE ENTITY WE HAVE BEEN TALKING ABOUT -- TO TAKE

23   PATENTED VARIETY 1, MAYBE A U.C. VARIETY, MAYBE A UNIVERSITY OF

24   FLORIDA VARIETY, OR SOME OTHER PATENTED VARIETY, MATE IT WITH

25   PATENTED VARIETY NUMBER 2; CREATE STRAWBERRIES, DISTILL THE

```
 1   SEEDS FROM THOSE STRAWBERRIES, AND SEND US THE SEEDS IN THE

 2   U.S. FOR A NEW VARIETY, NOT AN ASEXUALLY-REPRODUCED VARIETY,

 3   BUT A NEW GENOTYPE TO BE PLANTED IN THE U.C. AND USED BY CBC IN

 4   ITS BUSINESS.

 5            THE COURT:  AND THEIR CONTENTION WITH RESPECT TO

 6   PATENT INFRINGEMENT IS THAT THAT DELIVERING OF THE PLANT FOR --

 7            MR. LIPPETZ:  OF THE SEEDS TO US YOU MEAN?

 8            THE COURT:  NO, NO, NO.  YOUR INITIAL -- YOUR ALLEGED

 9   INITIAL DELIVERY OF THE PLANT.

10            MR. LIPPETZ:  BUT THERE WAS NO INITIAL DELIVERY OF

11   THE PLANT.  THE PEOPLE IN SPAIN HAVE BEEN LICENSED -- SORRY.

12            THE COURT:  WAIT.  WHAT DID YOU JUST SAY YOU

13   CONTRACTED WITH THEM TO DO?

14            MR. LIPPETZ:  TO TAKE MATERIAL FROM A SOURCE WE DO

15   NOT KNOW THE SOURCE OF, TO TELL THEM, LOOK, PUT YOUR HANDS ON

16   PATENTED VARIETY NUMBER 1 SOMEHOW; WE DON'T KNOW WHAT IT IS,

17   BUT DO IT LAWFULLY.  PUT YOUR HANDS ON PATENTED VARIETY

18   NUMBER 2, MAKE A CROSS OF THAT AND SEND US THE RESULT.

19            THE COURT:  THE MORE I HEAR ABOUT THE CASE --

20            MR. LIPPETZ:  YEAH.

21            THE COURT:  -- THE MORE I LEARN ABOUT THIS, THE

22   SKETCHIER YOUR CLIENTS ARE SEEMING.

23            MR. LIPPETZ:  BUT, YOUR HONOR.  LET ME TELL YOU

24   SOMETHING --

25            THE COURT:  EVERY TIME I READ SOMETHING NEW, EVERY
```

1    **CERTIFICATE OF TRANSCRIBER**

2

3        I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

4    TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF

5    THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE

6    U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE

7    PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE

8    ABOVE MATTER.

9        I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR,

10   RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN

11   WHICH THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT

12   FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE

13   ACTION.

14

15                    _jncolumbini_

16                    JOAN MARIE COLUMBINI

17                    SEPTEMBER 27, 2016

18

19

20

21

22

23

24

25

**JOAN MARIE COLUMBINI, CSR, RPR**
**RETIRED OFFICIAL COURT REPORTER, USDC**
**510-367-3043**

# Exhibit 4

# Redacted Version of Document Sought to Be Sealed

# Exhibit 5

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
 5   CALIFORNIA BERRY CULTIVARS, )
     LLC,                        )
 6                               )
          Plaintiff,             )
 7                               )
            vs.                  ) No. 3:16-cv-02477-VC
 8                               )
     THE REGENTS OF THE          )
 9   UNIVERSITY OF CALIFORNIA, a )
     corporation,                )
10                               )
          Defendant.             )
11   _____ )
                                 )
12   AND RELATED CROSS-ACTION.   )
     _____ )
13   _____
14    A PORTION OF THIS TRANSCRIPT IS HIGHLY CONFIDENTIAL -
15                ATTORNEYS' EYES ONLY
16             DEPOSITION OF LUCKY WESTWOOD
17                   PALO ALTO, CA
18             Tuesday, November 29, 2016
19                     Volume I
20   Reported by: SUSAN F. MAGEE, RPR, CCRR, CLR
21   CSR No. 11661
22   Job No. 2487783
23   Pages 1-322
24   Pages 83-321 are HIGHLY CONFIDENTIAL - ATTORNEYS' EYES
25   ONLY AND ARE BOUND SEPARATELY
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   No.

2      Q.   When does CBC plan on releasing its first

3  plant?

4      A.   Well, we haven't selected it yet, so it's hard

5  to speculate.   My own judgment, it will not be before

6  two more years.   I'd probably begin to be a little

7  disappointed if it wasn't within four, but it won't be

8  that soon, no.

9      Q.   In your experience in the strawberry industry,

10  how long does it normally take from the germination

11  stage to release for a new variety?

12      A.   Six to eight years.

13      Q.   So if -- for the 2014 seeds, 2014 is Year 1?

14      A.   Mm-hmm.

15      Q.   So the hope is by year -- by Year 2020?   Is

16  that -- you'll release it?

17      A.   Well, we hope to release something before that,

18  but we haven't selected it yet again, so -- and there's

19  a lot of process to that before it goes out.   There's a

20  lot more work to this to be done still.

21      Q.   Once you pick a variety, there's a lot more

22  work?   What does that work involve?

23      A.   We have to go through a whole cleanup stage.

24  Strawberries are virus-indexed, and later on in our

25  chronology we'll -- we'll take a certain number of

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    right to take the first clones.

2        Q.   Still doing okay?

3        A.   Yeah.

4        Q.   A little while ago we were talking about the

5    plans for release and the hope that somewhere around

6    2018 that will be ready; is that correct?

7        A.   I believe I said that I -- that I was hopeful

8    that by 2018 we would have identified something that we

9    would like to release.  Actually releasing it at that

10   time I think is probably a little overoptimistic.

11       Q.   That hope for what you will identify, is it one

12   specific variety?

13       A.   I don't know.  I don't know if we'll get one or

14   more.

15       Q.   That will be from the 2014 plants; correct?

16       A.   Yes.

17       Q.   Is the hope, then, that in 2019 you'll be ready

18   to select from the 2015 plants?

19       A.   Sure.  I would hope that, yeah.

20       Q.   Is it possible that you will select zero from

21   the 2014 plants?

22       A.   Yes.

23       Q.   Is it possible that you will select zero from

24   the 2015 plants?

25       A.   Yes.

Veritext Legal Solutions
866 299-5127

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were administered an oath; that a record of

7   the proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10  testimony given.

11       Further, that if the foregoing pertains to the

12  original transcript of a deposition in a Federal Case,

13  before completion of the proceedings, review of the

14  transcript [ ] was [X] was not requested.

15       I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or any party to this action.

18       IN WITNESS WHEREOF, I have this date subscribed

19  my name.

20  Dated: December 9, 2016

21

22

23

24        _____

              Susan F. Magee, CSR No. 11661

25            RPR, CCRR, CLR

                                        Page 322

*California Berry Cultivars, LLC v. The Regents of the University of California*
Case No. 3:16-cv-02477-VC

**ERRATA SHEET**

**Witness:  Lucky Westwood**
**Deposition Date: January 5, 2017**

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 93 | 17 | "patent cultivar" should be "patented cultivar" | Transcription error |
| 19 | 7 | No, I don't dispute that the UC owns the Patent Rights to the cultivars | mispoke |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## ACKNOWLEDGMENT OF DEPONENT

I, Lucky Westwood, declare under penalty of perjury that I have read the foregoing pages 1 to 269 and that the same is a correct transcription of the answers given by me to the questions herein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

2/27/16
DATE

SIGNATURE

# Exhibit 6

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4
 5   CALIFORNIA BERRY CULTIVARS,   )
     LLC,                          )
 6                                 )
             Plaintiff            )
 7                                 )
             vs.                   )   16-cv-02477-VC
 8                                 )
     THE REGENTS OF THE            )
 9   UNIVERSITY OF CALIFORNIA, a   )
     corporation,                  )
10                                 )
             Defendant            )
11   _____)
12
13
14       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
15     Videotaped Deposition of Douglas V. Shaw, Ph.D.
16               San Francisco, California
17               Thursday, December 8, 2016
18
19
20   Reported by:
21   JOANNE M. FARRELL, RPR, CRR
22   CSR Nos. 4838(CA)  506(HI)  507(NM)
23   Job No. 2492592
24
25   Pages 1 - 293
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    of an initial selection, that's at least a year-long

2    process?

3          A.   Slightly more than a year, correct, yes.

4          Q.   And then after an initial selection is

5    made, there are further observations of the progeny

6    from the two parents over a series of years to

7    continually select down to the most high-performing

8    plants, correct?

9               MR. LIPPETZ:  Objection.  Vague.

10              THE WITNESS:  That is very vague but I

11   think the answer is there is certainly a process

12   that is multi-staged.

13   BY MR. CHIVVIS:

14         Q.   And it takes years?

15         A.   It can take years, yes.

16         Q.   To reach a finished variety?

17              MR. LIPPETZ:  Objection.  Vague.

18              THE WITNESS:  By "finished variety," you

19   mean?

20   BY MR. CHIVVIS:

21         Q.   A strawberry cultivar that is ready for

22   commercial release to the public.

23         A.   Yes.

24         Q.   It takes at least four years from the

25   selection of the parents to reaching a finished

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    variety, correct?

2         A.   That's correct.

3         Q.   Probably more than four years, right?

4         A.   That's correct.

5         Q.   In most cases it would take at least six

6    years?

7         A.   I would say a typical time would be six

8    years, correct, yes.

9         Q.   And it could take as long as 10?

10        A.   In my experience it's never taken 10.

11        Q.   Could take as long as eight?

12        A.   In my experience we've -- we have never

13   taken eight years, no.

14        Q.   Seven?

15        A.   Seven sometimes.

16        Q.   So it could take as many as seven years

17   from the cross-pollination of the parents to have a

18   finished strawberry variety for release, correct?

19             MR. LIPPETZ:  Objection.  Vague.

20             THE WITNESS:  Given the working definition

21   that you've given me I'd say yes.

22   BY MR. CHIVVIS:

23        Q.   All right.  Let's back up a little bit.

24             In 2014, at least until November, you were

25   still head of the university strawberry breeding

Page 44

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1         I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4         That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12        Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal

14   Case, before completion of the proceedings review of

15   the transcript { } was {X} was not requested.

16        I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19        IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated:  December 15, 2016

23

24                _Joanne M. Farrell_

25           Joanne M. Farrell, CSR No. 4838

                                        Page  293

# Exhibit 7

# Redacted Version of Document Sought to Be Sealed

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,

Cross-Complainant,

v.

CALIFORNIA BERRY CULTIVARS, LLC, DOUGLAS SHAW, and KIRK LARSON,

Crossclaim Defendants.

Case No. 3:16-cv-02477-VC

REBUTTAL EXPERT REPORT OF

CARRIE L. DISTLER

Submitted February 21, 2017

Highly Confidential – Subject to a Protective Order - Attorneys' Eyes Only

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     INFORMATION RELIED UPON ................................................................. 3

III.    SUMMARY OF OPINIONS ......................................................................... 4

    A.   The University's Damages ...................................................................... 4

    B.   CBC's Damages ..................................................................................... 9

IV.   THE UNIVERSITY'S LOST ROYALTY INCOME .................................. 10

    A.   The University Is Not Granted an Injunction ....................................... 11

    B.   The University Receives a Partial Injunction ...................................... 19

    C.   The University's Royalties Outside the U.S. ........................................ 28

    D.   Conclusion ........................................................................................... 29

V.    CBC IS FOUND TO INFRINGE THE PATENTS-AT-ISSUE ................. 31

    A.   Patent Infringement Remedy:  Lost Profits ......................................... 33

    B.   Patent Infringement Remedy:  Reasonable Royalty ............................ 44

    C.   The University is Not Granted an Injunction ....................................... 68

    D.   Partial Injunction: CBC Cannot Use the Non-Patented Core Strawberry Germplasm or Progeny Varieties with Non-Patented Core Strawberry Germplasm as a Parent or For Commercialization ................................................................................. 73

    E.   Partial Injunction:  CBC Cannot Use the Patented Core Strawberry Germplasm or Progeny Varieties with Patented Core Strawberry Germplasm as a Parent or For Commercialization 78

    F.   Partial Injunction:  CBC Cannot Use the Core Strawberry Germplasm as Parents, but can use the Progeny Varieties in Future Breeding Activities or for Commercialization .................... 79

    G.   Partial Injunction: CBC Cannot Use Any UCD Materials for Breeding, but Can Commercialize Varieties from the 2014 – 2016 Crosses ......................................................... 84

    H.   Conclusion ........................................................................................... 88

VI.   CBC'S CLAIMS FOR DAMAGES ........................................................... 90

    A.   The University Would Owe No Damages Because CBC Was Not Delayed by the University's Alleged Wrongdoing ......................................................... 93

    B.   Assuming That the University's Alleged Wrongdoing Caused Some Delay, Mr. Nolte's Calculations are Incorrect .......................................................................... 94

    C.   Other Flawed Assumptions In Mr. Nolte's Report .............................. 102

    D.   Damages From Other CBC Claims ..................................................... 104

    E.   Conclusion ........................................................................................... 107

United States District Court Northern District of California San Francisco Division
Case No. 3:16-cv-02477-VC
*The Regents of the University of California v. California Berry Cultivars, LLC, et al.*

# I.  INTRODUCTION

1.      On January 21, 2017, I issued an expert report in this matter to present my opinions regarding damages to the University[1] should the University prevail in its claims against the Crossclaim Defendants[2] ("Opening Report").  In my Opening Report, I concluded that the University has sustained and (absent action by this Court) will continue to sustain economic damages as a result of the Crossclaim Defendants' alleged wrongdoing.  I understand the University is seeking injunctive relief to avoid future harm to the University.  For Crossclaim Defendants' alleged wrongdoing up to the date of trial or the entry of an injunction, my Opening Report calculated damages to the University in the form of disgorgement of the Crossclaim Defendants' ill-gotten gains, the University's unnecessary out-of-pocket costs, and a reasonable royalty for a license to use the Patents-at-Issue:[3]

- As a result of the Crossclaim Defendants' alleged wrongdoing, the Crossclaim Defendants have benefited.  Given CBC has yet to commercialize varieties and generate sales, the current benefit that CBC has enjoyed as a result of the alleged wrongdoing is in the form of investment to start CBC's breeding program.  Due to the Crossclaim Defendants' alleged wrongdoing, CBC has received approximately $4.5 million in capital contributions to date for the purpose of creating a competing breeding program and unquantified in-kind contributions from CBC's affiliate in Spain.

- Though he was employed by UCD[4] until 2014, the last crosses by Dr. Shaw for developing future strawberry varieties at UCD[5] are from 2012.  During the latter years of his employment at UCD, Dr. Shaw was directing a strawberry breeding program on behalf of CBC.  Further, Drs. Shaw and Larson did not respond to Dr. Knapp's requests for assistance in the University's variety development of 2012

---

[1] As in my Opening Report, University refers to the Regents of the University of California.
[2] As in my Opening Report, Crossclaim Defendants refers to California Berry Cultivars, LLC ("CBC"), Douglas Shaw ("Dr. Shaw"), and Kirk Larson ("Dr. Larson").
[3] The Opening Report also identified my professional credentials and hourly billing rates in this matter.
[4] As in my Opening Report, UCD refers to University of California-Davis.
[5] As in my Opening Report, the University's or UCD's Strawberry Berry Breeding Program is referred to as the "Program" or the "University's Program".

non-patented Core Strawberry Germplasm and Transition Cultivars, but Dr. Dellaporta's analysis demonstrates this assumption is inaccurate.  Mr. Nolte has provided no other explanation for how the University's alleged wrongdoing could have caused the damages in his report.  Absent such a causal link, Mr. Nolte's damages are unsupported and unreliable.

188.    Although I understand CBC had access to the non-patented Core Strawberry Germplasm and Transition Cultivars and utilized them extensively in its breeding program, for the purpose of responding to other aspects of Mr. Nolte's analysis, I assume CBC did not have such access.

### B.   Assuming That the University's Alleged Wrongdoing Caused Some Delay, Mr. Nolte's Calculations are Incorrect

189.    Although, as discussed above, I understand that CBC had access to the non-patented Core Strawberry Germplasm and Transition Cultivars and utilized them extensively in its breeding program, for the purpose of this section, I assume CBC did not have such access.  Even making this assumption, Mr. Nolte's calculations are significantly flawed.  I describe some of those flaws in **Sections VI.B.1** through **B.4**, and calculate an adjusted version of the hypothetical analysis offered by Mr. Nolte, correcting these flaws, in **Sections VI.B.5.**

#### 1.   Mr. Nolte Has No Basis to Assume an Eight-Year Delay

190.    Mr. Nolte's damages assume the University's alleged failure to non-exclusively license the non-patented Core Strawberry Germplasm and Transition Cultivars will cause CBC to take an additional eight years to begin commercializing new varieties (compared to the timing absent the alleged wrongdoing).[398]  The Nolte Report states CBC would commercialize its first new variety in 2019, but for the University's alleged wrongdoing.[399]  His damage calculation therefore assumes CBC will not commercialize its first variety until 2027, and that the purported delay is attributable to CBC not having access to the Transition Cultivars and the non-patented Core Strawberry Germplasm.  Mr. Nolte's assumption is based on discussions with Dr. Shaw

---

[398] Nolte Report, p. 3.
[399] Nolte Report, p. 3.  Mr. Nolte has provided no support for this timing other than his discussions with Dr. Shaw and Mr. Westwood, and it is not apparent that this assumed timing is realistic.  Nonetheless, for the purpose of critiquing Mr. Nolte's analysis, I assume initial commercialization in 2019 in the but-for world.

United States District Court Northern District of California San Francisco Division
Case No. 3:16-cv-02477-VC
*The Regents of the University of California v. California Berry Cultivars, LLC, et al.*

and Mr. Westwood, and he does not identify any other support for such a delay.[400]   It is not surprising that Mr. Nolte has failed to identify other support for this assumption, as it is contrary to much of the evidence in this matter.   Rather than an eight-year delay, assuming erroneously that CBC did not have access to the non-patented Core Strawberry Germplasm and the Transition Cultivars, the University's alleged wrongdoing would have caused no more than a one- or two-year delay (if any).

191.   CBC witnesses have testified that, despite their alleged lack of access due to the University's actions, CBC currently expects to begin generating income from its first variety as early as 2020 or 2021.   Mr. Westwood testified to this potential timing,[401] as well as noting that CBC still hopes to release a new variety earlier than 2020.[402]   Based on Mr. Westwood's testimony, it appears CBC's current expectation for its potential initial commercialization of a new variety reflects either no delay or a delay of only one year from the timing Mr. Nolte assumes would occur but for the University's alleged wrongdoing.[403]   It should also be noted that Mr. Westwood appears to be referring to "crop years" (which end in June of each year),[404] whereas Mr. Nolte's analysis is based on calendar years ending in December;[405] therefore, Mr. Westwood's reference to crop year 2020 may actually relate to calendar year 2019 in Mr. Nolte's analysis, which would be *earlier* than the timing Mr. Nolte assumes would have occurred absent the University's alleged wrongdoing.   The Nolte Report does not address this discrepancy

---

[400] Nolte Report, p. 3.

[401] Deposition of Lucky Westwood (30(b)(6)), Jan. 5, 2017, pp. 153-156; Deposition of Kyle VandenLangenberg, Dec. 21, 2016, p. 206.

[402] Deposition of Lucky Westwood, Nov. 29, 2016, p. 147.

[403] Mr. Nolte's but-for projection assumes CBC would begin generating revenue in 2020 (Nolte Report, Exhibit 1), the same year Mr. Westwood identified as the first year in which CBC expects it may actually earn income from new varieties. Mr. Westwood also appears to give potentially conflicting testimony suggesting that CBC expects it may begin generating revenue from new varieties in crop year 2021 or 2022 (Deposition of Lucky Westwood (30(b)(6)), Jan. 5, 2017, p. 155-156.); this later potential commercialization would still reflect a delay of less than two years from Mr. Nolte's assumed initial commercialization absent the University's alleged wrongdoing.

[404] Deposition of Lucky Westwood (30(b)(6)), Jan. 5, 2017, p. 155-156.

[405] Although not explicitly stated in Mr. Nolte's report, the number of years he applies in discounting his projected lost profits indicates he is using calendar years rather than crop years.

REBUTTAL EXPERT REPORT OF CARRIE L. DISTLER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

United States District Court Northern District of California San Francisco Division
Case No. 3:16-cv-02477-VC
*The Regents of the University of California v. California Berry Cultivars, LLC, et al.*

between Mr. Westwood's testimony and the assumption of an 8-year delay that provides the basis for Mr. Nolte's damage calculation.[406]

192.    Even assuming CBC will not commercialize its first variety by 2021 (a delay of approximately two years from Mr. Nolte's but-for scenario), there is no basis to attribute any additional delay to the University's alleged wrongdoing.   According to Dr. Shaw, the development of a new variety from initial crosses through commercialization takes *up to* seven years.[407]   In Dr. Shaw's experience, it has never taken as many as eight years to develop a new variety.[408]   Dr. Shaw indicated a similar development timeframe of approximately five to seven years in internal correspondence with Dr. Vandenlangenberg.[409]   This development timeframe is also consistent with the University's experience during Dr. Shaw's employment.   The University produced a document identifying the original cross year and the first year of plant sales for 19 of its individually patented varieties, of which 14 developed from crosses performed during Dr. Shaw's tenure at UCD.[410]   Every one of those 14 varieties began generating sales between five and seven years after the initial crosses were performed.[411]   Even if the University's actions had required CBC to begin its breeding program without access to the Core Strawberry Germplasm and Transition Cultivars (which is incorrect, as noted above), CBC should have reasonably expected to commercialize its first variety in approximately seven years – that is, by 2020 or 2021, not 2027 as Mr. Nolte hypothesizes.[412]   Therefore, there is no basis to attribute any commercialization delays beyond 2020 or 2021 to the alleged wrongdoing cited by Mr. Nolte, and any damages should be limited to a delay of no more than one or two years, as I will show when calculating an adjusted calculation below in **Section VI.B.5.**.

---

[406] Mr. Nolte's failure to address this discrepancy is particularly noteworthy given that his sole source for the assumption of an 8-year delay is discussions with Mr. Westwood and Mr. Shaw.
[407] Deposition of Douglas Shaw, Dec. 8, 2016, p. 44.
[408] Deposition of Douglas Shaw, Dec. 8, 2016, p. 44.
[409] Deposition of Kyle VandenLangenberg, Dec. 21, 2016, Exhibit 324 (CBC00009328).
[410] UC_STRAW2_00045273.
[411] *See* **Schedule 20**.
[412] CBC's initial crosses were performed in late 2013 or early 2014 (Deposition of Lucy Westwood, Jan. 5, 2017, pp. 189-190).  2020 and 2021 are six and seven years after 2014, respectively.  It should be noted that this is consistent with the potential commercialization timing indicated by Mr. Westwood (Deposition of Lucky Westwood (30(b)(6)), Jan. 5, 2017, pp. 153-156).

REBUTTAL EXPERT REPORT OF CARRIE L. DISTLER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

United States District Court Northern District of California San Francisco Division
Case No. 3:16-cv-02477-VC
*The Regents of the University of California v. California Berry Cultivars, LLC, et al.*

### E.  Conclusion

214.    Dr. Nolte's analysis is based on the assumption that CBC's breeding program has been delayed as a result of the University's purported failure to "share access and ownership to the plant materials as of December 1, 2014."[454]   However CBC has used the Core Strawberry Germplasm and Transition Cultivars extensively in its breeding program to-date.[455]   As such, any alleged delay to CBC's commercialization of varieties is not the result of a lack of access to the University's materials, and there are no damages caused by the University's alleged wrongdoing. Even if one were to assume (erroneously) that CBC has been delayed by the University's alleged wrongdoing, CBC has been harmed by no more than $600,000 or $1.1 million.

---

[454] Nolte Report, p. 5.
[455] Dellaporta Report, Sections IV and V, Appendices B-H.

# SCHEDULE 21

United States District Court Northern District of California San Francisco Division

Case No. 3:16-cv-02477-VC

*The Regents of the University of California v. California Berry Cultivars, LLC et al.*

**Schedule 21a.  Nolte Royalty Overestimate Examples - Monterey, San Andreas, and Portola**



| | Monterey | San Andreas | Portola | University Average [7] |
|---|---|---|---|---|
| 8-Year Historical Total [1] | $ | | | |
| 12-Year Nolte Projection Total [2] | | | | |
| Last 12 years as percentage of first 8 years [3] | | | | |
| Last 12 years projection based on University variety experience [4] | $ | | | |
| Nolte Overstatement [5] | $ | | | |
| Nolte Overstatement percentage [6] | 242.7% | 89.6% | 278.7% | |

Sources / Notes:

[1] *See* **Schedule 21.1**.

[2] *See* **Schedule 21.1**.

[3] Calculated as [2] divided by [1].

[4] Calculated as 8-Year Historical Total for each variety multiplied by the 75.8% average of total royalties from years 9 through 20 as a percentage of total royalties in the first eight years.

[5] Calculated as [2] less [4].

[6] Calculated as [5] divided by [4].

[7] *See* **Schedule 17.1**.

United States District Court Northern District of California San Francisco Division
Case No. 3:16-cv-02477-VC
*The Regents of the University of California v. California Berry Cultivars, LLC et al.*

**Schedule 21b.  Nolte Royalty Overestimate Examples - Albion**



| | Albion | University Average [7] |
|---|---|---|
| 12-Year Historical Total [1] | $ | |
| 8-Year Nolte Projection Total [2] | | |
| Last 8 years as percentage of first 12 years [3] | | |
| Last 8 years projection based on University variety experience [4] | $ | |
| Nolte Overstatement [5] | $ | |
| Nolte Overstatement percentage [6] | | |

Sources / Notes:
[1] *See* **Schedule 21.1**.
[2] *See* **Schedule 21.1**.
[3] Calculated as [2] divided by [1].
[4] Calculated as 12-Year Historical Total for each variety multiplied by the 17.2% average of total royalties from years 13 through 20 as a percentage of total royalties in the first 12 years.
[5] Calculated as [2] less [4].
[6] Calculated as [5] divided by [4].
[7] *See* **Schedule 17.1**.

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

REBUTTAL EXPERT REPORT OF
CARRIE L. DISTLER

United States District Court Northern District of California San Francisco Division
Case No. 3:16-cv-02477-VC
*The Regents of the University of California v. California Berry Cultivars, LLC et al.*

**Schedule 21c.  Nolte Royalty Overestimate Examples - Camino Real and Ventana**



| | Camino Real | Ventana | University Average [7] |
|---|---|---|---|
| 15-Year Historical Total [1] | $ | | |
| 5-Year Nolte Projection Total [2] | | | |
| Last 5 years as percentage of first 15 years [3] | | | |
| Last 5 years projection based on University variety experience [4] | $ | | |
| Nolte Overstatement [5] | $ | | |
| Nolte Overstatement percentage [6] | 444.3% | 316.3% | |

Sources / Notes:
[1] *See* **Schedule 21.1**.
[2] *See* **Schedule 21.1**.
[3] Calculated as [2] divided by [1].
[4] Calculated as 15-Year Historical Total for each variety multiplied by the 6.9% average of total royalties from years 16 through 20 as a percentage of total royalties in the first 15 years.
[5] Calculated as [2] less [4].
[6] Calculated as [5] divided by [4].
[7] *See* **Schedule 17.1**.

United States District Court Northern District of California San Francisco Division
Case No  3:16-cv-02477-VC
*The Regents of the University of California v. California Berry Cultivars, LLC et al.*

**Schedule 21.1.  Historical and Nolte Projected Royalties for University Varieties**

| | Historical Performance [1] | | |
|---|---|---|---|
| | Monterey | San Andreas | Portola |
| Year 0 [2] | | | |
| Year 1 | | | |
| Year 2 | | | |
| Year 3 | | | |
| Year 4 | | | |
| Year 5 | | | |
| Year 6 | | | |
| Year 7 | | | |
| Year 8 | | | |
| 8-Year Total | | | |

| | Nolte Projection [3] | | |
|---|---|---|---|
| | Monterey | San Andreas | Portola |
| Year 9 | $ 1,699,435 | $ 2,124,294 | $ 833,722 |
| Year 10 | 1,523,730 | 1,904,663 | 675,828 |
| Year 11 | 1,268,648 | 1,585,810 | 613,934 |
| Year 12 | 1,245,183 | 1,556,478 | 603,502 |
| Year 13 | 1,040,000 | 1,300,000 | 583,809 |
| Year 14 | 1,040,000 | 1,300,000 | 637,498 |
| Year 15 | 800,000 | 1,000,000 | 514,624 |
| Year 16 | 800,000 | 1,000,000 | 500,000 |
| Year 17 | 800,000 | 1,000,000 | 500,000 |
| Year 18 | 560,000 | 700,000 | 500,000 |
| Year 19 | 560,000 | 700,000 | 500,000 |
| Year 20 | 560,000 | 700,000 | 500,000 |
| 12-Year Total | $ 11,896,996 | $ 14,871,245 | $ 6,962,917 |

| | Historical Performance [1] |
|---|---|
| | Albion |
| Year 0 [2] | |
| Year 1 | |
| Year 2 | |
| Year 3 | |
| Year 4 | |
| Year 5 | |
| Year 6 | |
| Year 7 | |
| Year 8 | |
| Year 9 | |
| Year 10 | |
| Year 11 | |
| Year 12 | |
| 12-Year Total | |

| | Nolte Projection [3] |
|---|---|
| | Albion |
| Year 13 | $ 1,300,000 |
| Year 14 | 1,300,000 |
| Year 15 | 1,000,000 |
| Year 16 | 1,000,000 |
| Year 17 | 1,000,000 |
| Year 18 | 700,000 |
| Year 19 | 700,000 |
| Year 20 | 700,000 |
| 8-Year Total | $ 7,700,000 |

| | Historical Performance [1] | |
|---|---|---|
| | Camino Real | Ventana |
| Year 0 [2] | | |
| Year 1 | | |
| Year 2 | | |
| Year 3 | | |
| Year 4 | | |
| Year 5 | | |
| Year 6 | | |
| Year 7 | | |
| Year 8 | | |
| Year 9 | | |
| Year 10 | | |
| Year 11 | | |
| Year 12 | | |
| Year 13 | | |
| Year 14 | | |
| Year 15 | | |
| 15-Year Total | | |

| | Nolte Projection [3] | |
|---|---|---|
| | Camino Real | Ventana |
| Year 16 | 300,000 | 500,000 |
| Year 17 | 300,000 | 500,000 |
| Year 18 | 300,000 | 500,000 |
| Year 19 | 300,000 | 500,000 |
| Year 20 | 300,000 | 500,000 |
| 5-Year Total | $ 1,500,000 | $ 2,500,000 |

Sources / Notes:
[1] UC_STRAW2_00075844-846 at 845
[2] First year of indicated royalties appears to be comprised primarily of upfront licensing fees  Excluded from calculation
[3] Nolte Report, Exhibit 1

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

# Exhibit 8



Fulcrum Financial Inquiry LLP
888 S. Figueroa Street, Suite 2000
Los Angeles, CA 90017

(213) 787-4100
www.fulcrum.com

March 9, 2017

Frederick McKnight, Esq.
Jones Day
555 S. Flower Street, 50th Floor
Los Angeles, CA  90071

Dear Mr. McKnight:

This supplemental report is provided in connection with California Berry Cultivars, LLC ("CBC") vs. the Regents of the University of California ("UC") (USDC Case No. 3:16-cv-02477).  This report occurs because of the following:

1.  On January 21, 2017 Fulcrum issued a report that included (Emphasis in the original):

    "*A more accurate calculation would consider the actual units shipped to each of these territories, applied to rates that CBC would use for each geography.  I intend to perform such a calculation promptly using the same general methodology described below.  The more accurate calculation predictably will increase the amount of lost profits, most likely by a significant amount.*"

2.  In a supplemental report dated February 21, 2017, Ms. Carrie Distler included comments regarding CBC's claims for damages (her Section VI, consisting of her paragraphs 180 to 214).  Certain of Ms. Distler's comments encourage Fulcrum to perform additional calculations, which are submitted in this supplemental report.

Except for the additions specifically noted herein, Fulcrum's entire January 21, 2017 report remains unchanged.  Without limiting the generality of the foregoing, with the possible exception of the additional calculations attached hereto, none of Ms. Distler's comments cause me to modify any of the previously-reported conclusions.  Additionally, because this supplemental report is limited to providing and explaining additional calculations, the fact that this supplemental report does not rebut conceptual errors made by Ms. Distler should not be interpreted as agreement with Ms. Distler; stated otherwise, no assumption should be made that I agree with any portion of Ms. Distler's Section VI because I do not include a discussion of why she is wrong.

In order to help avoid duplicate references and any related confusion, all lists and exhibit numbers herein will continue from what was started in Fulcrum's January 21, 2017 report.

## I.      DESCRIPTION OF ENGAGEMENT  (no change)

## II.     FACTUAL & LEGAL BACKGROUND

CBC additionally provided the following information regarding the rates that CBC would charge, which are used in the additional calculations and conclusions expressed herein.  The following rates generally are a 25% rate increase for all three territories:

1.  $10.00 per 1,000 plants in California
2.  $11.25 per 1,000 in the U.S. outside of California
3.  $21.00 per 1,000 plants internationally

Because of the use of increased royalty rates, the 25% overall revenue increase used in Fulcrum's January 21, 2017 report is not used herein.   Nevertheless, CBC continues to have opportunities for increased revenues that are not part of Fulcrum's calculations herein because of the other factors described in Fulcrum's January 21, 2017 report.

## III.   INFORMATION RELIED UPON

In addition to those records described in Fulcrum's January 21, 2017 report, Fulcrum relied on the following:

8.  Ms. Distler's February 21, 2017 report, including all documents to which Ms. Distler cites

9.  Other documents and publicly-available information, as referenced herein

## IV.   SUMMARY OF FULCRUM'S CONCLUSIONS

As a result of using (i) plant quantities (vs. currency amounts) and (ii) other changes encouraged by Ms. Distler's February 21, 2017 report, the present value of lost profits comparing the but-for and actual worlds is from roughly **$34.3 million to $47.9 million**.   There are three reasons for these amounts relative to what Fulcrum reported on January 21, 2017, which are described in the following three additional sections.

## A.  Consideration of Additional Discount Rate Alternatives

In her paragraphs 193 and 194, Ms. Distler criticizes Fulcrum's January 21, 2017 report because:

> "… The Nolte Report does not include any analysis supporting this discount rate.  Mr. Nolte simply claims (without identifying any support) that this 15% is 'a reasonable discount rate for an established technology-based endeavor.…"

Fulcrum's discount rate calculations are based on generally-accepted methods on this subject. Although she misapplies inputs into these calculations and presents only partial calculations, Ms. Distler uses these same methods in her February 21, 2017 supplemental report.  Specifically, Ms. Distler presents two dramatically different conclusions regarding discount rates, which (once fixed) can be used to explain why a 15% discount rate is on the high range of what is reasonable.  To ensure an agreed starting point to those unfamiliar with discount rates, a decrease in the discount rate will increase damages (because of a lower present value discount).  The reverse is also true.

Ms. Distiller's discount rate conclusions are:

1.  When Ms. Distler is calculating UC's damages, her claimed discount rate is 7.5%.[1] This 7.5% is calculated using a weighted average cost of capital (usually abbreviated WACC in the field of corporate finance), with approximately 50% attributed to debt and 50% attributed to equity (ownership) capital.  Even though Ms. Distler claims that my 15% rate is too low when evaluating a strawberry breeding program, her damage calculation for UC's strawberry breeding

---

[1] Distler Schedule 2c.2 from Ms. Distler's February 21, 2017 report

program uses a 7.5% rate.  While I do not agree that 7.5 is appropriate to use for either UC or CBC, Ms. Distler's objectivity can and should be called into question when she uses such transparently different conclusions for UC's vs. CBC's damages (see #2 immediately below) involving what she contends are highly similar strawberry breeding programs.

2. When Ms. Distler is calculating CBC's damages, her claimed discount rate is 20%.[2] Inexplicably, unlike UC's WACC, when performing a calculation for CBC, Ms. Distler fails to include any debt (which lowers the WACC).  Ms. Distler concludes that CBC's cost of equity (ownership) capital is 20%, nearly twice what she used for this parameter for UC.

    Part of Ms. Distler's 20% cost of equity capital is based on an industry adjustment that is based on other publicly-traded companies in the agricultural segment.  These companies can be considered in determining the percentage of debt and equity in the WACC.  For the agricultural companies that Ms. Distler uses in this calculation, the average weighting is approximately 30% debt and 70% equity.

The determination of individual inputs to the calculation of a discount rate can vary based on different ways of financing an enterprise.  Each decision affects other inputs.  The most common example involves the use of excessive debt in the capital structure, in which case the cost of equity (ownership) capital increases because the risk of business failure increases.  Alternatively, if no debt exists, the cost of equity (ownership) capital decreases because business's financial risks decrease.

Putting aside Ms. Distler's transparent inconsistencies and advocacy, one can use information from Ms. Distler's February 21, 2017 report to confirm the reasonableness of the discount rate that Fulcrum used.  The following illustrates that the 15% discount rate used in Fulcrum's January 21, 2017 report is at the high end of the range of reasonableness:

1. For purposes of a cost of equity capital, this illustration uses Ms. Distler's 20% cost of equity capital.   This is a high starting point that provides a basis for the discount rate actually being lower than what Fulcrum presents herein.

2. For purposes of determining the percentage of debt and equity, Ms. Distler's work supports two alternatives, at either 50% or 70% equity, and either 50% or 30% debt.  Because two alternatives are considered, the discount rate will be expressed as a range.

3. For purposes of the cost of debt, Fulcrum uses the prime rate (currently 3.75%) plus 200 basis points (2%).  It is likely that a lower spread than 200 basis points is possible, particularly once the first cultivars have been commercialized, so this debt rate illustration provides a basis for the discount rate being lower than what Fulcrum presents herein.

With these inputs, the discount rate is calculated under two alternatives, as follows:

Table 1: WACC (discount rate) calculation using Ms. Distler's inputs

|  | 50% debt & 50% equity | 70% equity & 30% debt |
| --- | --- | --- |
| Cost of Equity | 20% | Same |
| Cost of Debt | 5.75% | |
| Tax Rate | 40% | |
| Weighted Average (aka discount rate) | 12% | 15% |

---

[2]  Distler Schedule 2b.1 from Ms. Distler's February 21, 2017 report

CONTAINS ATTORNEYS EYES ONLY INFORMATION

In summary, the 15% discount rate used in Fulcrum's January 21, 2017 is reasonable (if not high, as described above). With a single input change that Ms. Distler uses for UC, a 12% discount rate is the correct result. Fulcrum's discount rate range (i.e., 12% to 15%) is used in the rest of this report.

**B.  Use of Plant Quantities** (vs. currency amounts)

See #1 in the introduction to this supplemental report. Related calculations of these amounts are shown on <u>Exhibit 5</u> (Exhibits 1 through 4 are used in Fulcrum's January 21, 2017 report). As before, to determine the expected results of the eight missing cultivars, one needs to consider the entire licensing life. The expected results are determined by analyzing nine existing cultivars, and must include projections of royalties for the six cultivars that are not at the end of their licensing life. With the benefit of licensing information for each of the three territories (i.e., California, the United States outside of California, and international), projections were considered for each territory, as described herein.

In making its projections, Fulcrum looked for patterns in the historic plant quantity data. We observed that most cultivars would remain at certain sales levels for between three and seven years, drop by a certain amount, and continue at the sales level for a slightly shorter period, then drop again. Fulcrum's projections used this terraced sale structure. Fulcrum also noted that certain cultivars followed the revenue patterns of other cultivars later in their life. In those cases, Fulcrum's projections sought to follow the trends of other cultivars.

The plant quantity information[3] provides data through some part of 2014; the royalty dollar information[4] provides data through 2016. Fulcrum checked the reasonableness of the 2014, 2015 and 2016 projections by noting that the projected 2014, 2015 and 2016 plant quantities would result in the approximate royalty amounts that UC actually collected. The quantity information in 2014 appears to be incomplete for certain cultivars because the royalties that would have been collected on the quantities listed in 2014 were significantly less than the royalty amounts that UC actually collected. Related calculations are shown in <u>Exhibit 7</u>. In pages 4 through 6 of Exhibit 5, the data that is estimated with the benefit of royalty dollar information is highlighted in red. As shown in Exhibit 7, the overall difference between the plant data in 2014, 2015 and 2016 compared to the currency data in the same years is insignificant.

Importantly, Fulcrum continued to limit projections to no more than 21 years of royalties. International licensing, which may not be limited to the 20-year U.S. patent life, comprises additional licensing revenues. Nevertheless, in order to ensure that the damage calculation is not overstated, the 21-year limitation continues to be used, which has the known effect of understating the total value of international licensing.

As occurred before, as a reasonableness check on the above estimates for six of the existing cultivars, Fulcrum made a second calculation of future expected revenues using an arithmetic average of royalties for whatever actual licensing period exists for that cultivar. The results of this reasonableness check are shown on <u>Exhibit 6</u>, and result in a lifetime royalty estimate of $20,100,000,[5] which supports the reasonableness of the first (primary) calculation Fulcrum prepared.

---

[3] UC STRAW2 00058007
[4] UC STRAW2 00075844
[5] Rounded from $20,099,000. See Exhibit 6 p.2

CONTAINS ATTORNEYS EYES ONLY INFORMATION

Jones Day
March 8, 2017
Page 5 of 9

For the nine cultivars used by Fulcrum to estimate the eight missed cultivars, a chart showing the actual and expected results follows:

# Average Unit Sales of Cultivars Used in Model



**Total Plants = 1.1 Billion**

 **Source: UC STRAW2 00058007**

When priced based on CBC's royalty rates, the source and timing of CBC's expected average royalties for each of the eight missed cultivars is charted as follows:

CONTAINS ATTORNEYS EYES ONLY INFORMATION

Jones Day
March 8, 2017
Page 6 of 9

# CBC's average expected royalties for each new cultivar average $16.8 million



Source: UC STRAW2 00058007

Using the same methodology described in Fulcrum's January 21, 2017 report, Fulcrum's revised calculations show:

1. The average cultivar generates $16,800,000[6] for CBC in lifetime royalties.

2. Over the eight years that CBC will miss cultivars because of UC's conduct, CBC will miss $134,400,000 of royalties (calculated as eight cultivars, at an average of $16,800,000 for each cultivar).

3. Using a 15% discount rate, the damages resulting from the discounting of eight years of missed cultivars is $34,300,000.[7]  Using a 12% discount rate, the damages resulting from the discounting of eight years of missed cultivars is $47,900,000.[8]

4. The present value discount is the difference between the cash flows that would have eventually been received, and the amount of damages that are calculated based on their present value.

---

[6] Rounded from $16,794,000.  See Exhibit 5 p. 3
[7] Rounded from $34,258,357.  See Exhibit 5 p. 1
[8] Rounded from $47,947,397.  See Exhibit 5 p. 2

CONTAINS ATTORNEYS EYES ONLY INFORMATION

Jones Day
March 8, 2017
Page 7 of 9

    a.  Using 15%, the difference between the $134,400,000 of undiscounted royalties, and the $34,300,000 of damages presented herein, is $100,100,000.  The total discount is 75 percent.[9]

    b.  Using 12%, the difference between the $134,400,000 of undiscounted royalties, and the $47,900,000 of damages presented herein, or $86,400,000.  The total discount is 64 percent.[10]

## C.  Consideration of Different Periods Needed before Cultivars can be Commercialized

Based on input from CBC, Fulcrum initially used eight years as the period needed to develop a cultivar that was ready for commercialization.  Ms. Distler criticizes the use of this eight-year parameter, and advocates a three-year damages period.  Given that (i) CBC has been denied access to plant materials since Drs. Shaw and Larson left UC's employ in November 2014 and (ii) no cultivar has been released or is expected to be released by CBC in 2017, the three-year period Ms. Distler advocates is too short.  Nevertheless, if CBC's scientific endeavors are particularly successful, and/or UC decides post-trial that it wishes to cooperate with CBC, perhaps a shorter period could be applicable.  For this reason, Fulcrum considered alternatives other than the eight-year development period discussed in Fulcrum's January 21, 2017 report.

If a shorter development period is applicable, two offsetting changes occur.  Specifically:

1.  The number of cultivars for which damages are calculated decreases - In isolation, a decrease in the number of lost cultivars decreases the damage amount.

2.  The period of time occurring before cultivars are available for commercial exploitation decreases - In isolation, a decrease in the time occurring before cultivars are available for commercial exploitation increases the damage amount because there is a smaller present value discount.

The net offsetting effect causes damages to change less than what one might expect when additional years of development occur.  By using the eight years contained in Fulcrum's January 21, 2017 report (and the 15% discount rate), damages were actually smaller than what could have occurred using other parameters.  Damages using alternative assumptions are calculated in Exhibit 8, and are summarized below:

Table 2: Summary of Damages using Different Discount Rate and Time Inputs

| First Commercial Cultivar (# Years) | Damages Using Discount Rate | | Calculation Source |
|---|---|---|---|
| | 15% | 12% | |
| 2015 (4 years) | $31.3 million | $37.6 million | Exhibit 8 pp. 1, 5 |
| 2016 (5 years) | 33.6 million | 42.0 million | Exhibit 8 pp. 2, 6 |
| 2017 (6 years) | 34.7 million | 45.0 million | Exhibit 8 pp. 3, 7 |
| 2018 (7 years) | 34.8 million | 46.9 million | Exhibit 8 pp. 4, 8 |
| 2019 (8 years) | 34.3 million | 47.9 million | Exhibit 5 pp. 1, 2 |

A graph showing the preceding table follows:

---

[9] See Exhibit 5 p. 1
[10] See Exhibit 5 p. 2

CONTAINS ATTORNEYS EYES ONLY INFORMATION

Jones Day
March 8, 2017
Page 8 of 9



The following table additionally shows the results of calculations for the 7.5% and 20% discount rates that Ms. Distler concludes is appropriate for CBC and UC, respectively:

Table 3: Changes in damages using alternative discount rates

| Discount Rate | Damages | Calculation Source |
|---|---|---|
| 7.5% | $ 83.4 million | Exhibit 8 p. 9 |
| 12% | 47.9 million | Exhibit 5 p. 1 |
| 15% | 34.3 million | Exhibit 5 p. 2 |
| 20% | 20.6 million | Exhibit 8 p. 10 |

Discount rates have a dramatic impact on the calculation results, particularly when the extreme rates advocated by Ms. Distler are used.   A graph showing the effect of discount rate on the damage amounts follows.  The following graph illustrates the impact on the eight-year development period scenario, although a similar result would be seen using the other development period scenarios.

CONTAINS ATTORNEYS EYES ONLY INFORMATION

Jones Day
March 8, 2017
Page 9 of 9



## Using a Range of Reasonable Discount Rates, Damages are in the Range of $34.3 to $47.9 Million

**Source: Assumes an 8 Year Delay**

**V.     OTHER REQUIRED INFORMATION** (see the January 21, 2017 report)

Very truly yours,
Fulcrum Financial Inquiry LLP

By: _David Nolte_
     David Nolte

CONTAINS ATTORNEYS EYES ONLY INFORMATION

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

Net Discount Rate          11%  [2]
Years of Delay             4 Years

| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Subtotal | Present Value |
|------|------|------|------|------|------|------|------|------|
| | | A | B | | | C | D = sum B:C | E = A * D |
| 2015 | 0 | 1 | $  83,000 | | | | $  83,000 | $  83,000 |
| 2016 | 0 | 1 | 257,000 | $  83,000 | | | 340,000 | 340,000 |
| 2017 | 0.5 | 0.95 | 746,000 | 257,000 | $  83,000 | | 1,086,000 | 1,030,786 |
| 2018 | 1.5 | 0.86 | 1,156,000 | 746,000 | 257,000 | $  83,000 | 2,242,000 | 1,917,128 |
| 2019 | 2.5 | 0.77 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 3,537,000 | 2,724,756 |
| 2020 | 3.5 | 0.69 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 4,766,000 | 3,307,681 |
| 2021 | 4.5 | 0.63 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 5,445,000 | 3,404,431 |
| 2022 | 5.5 | 0.56 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 5,940,000 | 3,345,878 |
| 2023 | 6.5 | 0.51 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 6,031,000 | 3,060,483 |
| 2024 | 7.5 | 0.46 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 5,809,000 | 2,655,700 |
| 2025 | 8.5 | 0.41 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 5,514,000 | 2,271,023 |
| 2026 | 9.5 | 0.37 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 4,830,000 | 1,792,168 |
| 2027 | 10.5 | 0.33 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 4,190,000 | 1,400,628 |
| 2028 | 11.5 | 0.30 | 708,000 | 829,000 | 967,000 | 1,130,000 | 3,634,000 | 1,094,386 |
| 2029 | 12.5 | 0.27 | 516,000 | 708,000 | 829,000 | 967,000 | 3,020,000 | 819,350 |
| 2030 | 13.5 | 0.24 | 416,000 | 516,000 | 708,000 | 829,000 | 2,469,000 | 603,477 |
| 2031 | 14.5 | 0.22 | 374,000 | 416,000 | 516,000 | 708,000 | 2,014,000 | 443,482 |
| 2032 | 15.5 | 0.20 | 294,000 | 374,000 | 416,000 | 516,000 | 1,600,000 | 317,405 |
| 2033 | 16.5 | 0.18 | 283,000 | 294,000 | 374,000 | 416,000 | 1,367,000 | 244,309 |
| 2034 | 17.5 | 0.16 | 187,000 | 283,000 | 294,000 | 374,000 | 1,138,000 | 183,227 |
| 2035 | 18.5 | 0.15 | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 136,204 |
| 2036 | 19.5 | 0.13 | | 175,000 | 187,000 | 283,000 | 645,000 | 84,287 |
| 2037 | 20.5 | 0.12 | | | 175,000 | 187,000 | 362,000 | 42,617 |
| 2038 | 21.5 | 0.11 | | | | 175,000 | 175,000 | 18,561 |
| | | | | | | | $  67,176,000 | $  31,320,968 |
| | | | | | | | | 53% |

Notes:
[1] Uses mid-year convention
[2] 15% discount rate less assumed 4% long-term growth rate

1

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

Net Discount Rate 11% [2]
Years of Delay 5 Years

| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Subtotal | Present Value |
|------|------|------|------|------|------|------|------|------|------|
| | | *A* | *B* | | | *C* | | *D = sum B:C* | *E = A \* D* |
| 2016 | 0 | 1 | $ 83,000 | | | | | $ 83,000 | $ 83,000 |
| 2017 | 0.5 | 0.95 | 257,000 | $ 83,000 | | | | 340,000 | 322,714 |
| 2018 | 1.5 | 0.86 | 746,000 | 257,000 | $ 83,000 | | | 1,086,000 | 928,636 |
| 2019 | 2.5 | 0.77 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 2,242,000 | 1,727,142 |
| 2020 | 3.5 | 0.69 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 3,620,000 | 2,512,338 |
| 2021 | 4.5 | 0.63 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 5,023,000 | 3,140,579 |
| 2022 | 5.5 | 0.56 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 6,191,000 | 3,487,261 |
| 2023 | 6.5 | 0.51 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 7,096,000 | 3,600,926 |
| 2024 | 7.5 | 0.46 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 7,409,000 | 3,387,172 |
| 2025 | 8.5 | 0.41 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 7,295,000 | 3,004,554 |
| 2026 | 9.5 | 0.37 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 6,939,000 | 2,574,712 |
| 2027 | 10.5 | 0.33 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 6,481,000 | 2,166,460 |
| 2028 | 11.5 | 0.30 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 5,659,000 | 1,704,219 |
| 2029 | 12.5 | 0.27 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 4,898,000 | 1,328,867 |
| 2030 | 13.5 | 0.24 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 4,150,000 | 1,014,350 |
| 2031 | 14.5 | 0.22 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 3,436,000 | 756,606 |
| 2032 | 15.5 | 0.20 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 2,843,000 | 563,989 |
| 2033 | 16.5 | 0.18 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,308,000 | 412,484 |
| 2034 | 17.5 | 0.16 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 1,883,000 | 303,178 |
| 2035 | 18.5 | 0.15 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,554,000 | 225,411 |
| 2036 | 19.5 | 0.13 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 171,580 |
| 2037 | 20.5 | 0.12 | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 110,546 |
| 2038 | 21.5 | 0.11 | | | 175,000 | 187,000 | 283,000 | 645,000 | 68,409 |
| 2039 | 22.5 | 0.10 | | | | 175,000 | 187,000 | 362,000 | 34,589 |
| 2040 | 23.5 | 0.09 | | | | | 175,000 | 175,000 | 15,064 |
| | | | | | | | | $ 83,970,000 | $ 33,644,789 |
| | | | | | | | | | 60% |

Notes:
[1] Uses mid-year convention
[2] 15% discount rate less assumed 4% long-term growth rate

2

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Discount Rate | 11% [2] | | | | | | | | | |
| Years of Delay | 6 Years | | | | | | | | | |

| | | A | B | | | | | C | D = sum B:C | E = A * D |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Subtotal | Present Value |
| 2017 | 0.5 | 0.95 | $ 83,000 | | | | | | $ 83,000 | $ 78,780 |
| 2018 | 1.5 | 0.86 | 257,000 | $ 83,000 | | | | | 340,000 | 290,733 |
| 2019 | 2.5 | 0.77 | 746,000 | 257,000 | $ 83,000 | | | | 1,086,000 | 836,609 |
| 2020 | 3.5 | 0.69 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 2,242,000 | 1,555,984 |
| 2021 | 4.5 | 0.63 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 3,620,000 | 2,263,368 |
| 2022 | 5.5 | 0.56 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 5,106,000 | 2,876,103 |
| 2023 | 6.5 | 0.51 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 6,448,000 | 3,272,093 |
| 2024 | 7.5 | 0.46 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 7,842,000 | 3,585,127 |
| 2025 | 8.5 | 0.41 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 8,565,000 | 3,527,622 |
| 2026 | 9.5 | 0.37 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 8,673,000 | 3,218,111 |
| 2027 | 10.5 | 0.33 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 8,425,000 | 2,816,298 |
| 2028 | 11.5 | 0.30 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 7,906,000 | 2,380,908 |
| 2029 | 12.5 | 0.27 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 7,310,000 | 1,983,262 |
| 2030 | 13.5 | 0.24 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 6,367,000 | 1,556,233 |
| 2031 | 14.5 | 0.22 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 5,414,000 | 1,192,161 |
| 2032 | 15.5 | 0.20 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 4,566,000 | 905,795 |
| 2033 | 16.5 | 0.18 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 3,810,000 | 680,920 |
| 2034 | 17.5 | 0.16 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,137,000 | 505,083 |
| 2035 | 18.5 | 0.15 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,591,000 | 375,831 |
| 2036 | 19.5 | 0.13 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,070,000 | 270,503 |
| 2037 | 20.5 | 0.12 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 203,551 |
| 2038 | 21.5 | 0.11 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 139,258 |
| 2039 | 22.5 | 0.10 | | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 89,722 |
| 2040 | 23.5 | 0.09 | | | | 175,000 | 187,000 | 283,000 | 645,000 | 55,523 |
| 2041 | 24.5 | 0.08 | | | | | 175,000 | 187,000 | 362,000 | 28,073 |
| 2042 | 25.5 | 0.07 | | | | | | 175,000 | 175,000 | 12,226 |
| Notes: | | | | | | | | | $ 100,764,000 | $ 34,699,877 |
| | | | | | | | | | | 66% |

[1] Uses mid-year convention
[2] 15% discount rate less assumed 4% long-term growth rate

3

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

Net Discount Rate   11% [2]
Years of Delay   7 Years

| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Subtotal | Present Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | A | B | | | | | | C | D = sum B:C | E = A * D |
| 2018 | 1.5 | 0.86 | $ 83,000 | | | | | | | $ 83,000 | $ 70,973 |
| 2019 | 2.5 | 0.77 | 257,000 | $ 83,000 | | | | | | 340,000 | 261,922 |
| 2020 | 3.5 | 0.69 | 746,000 | 257,000 | $ 83,000 | | | | | 1,086,000 | 753,702 |
| 2021 | 4.5 | 0.63 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | 2,242,000 | 1,401,788 |
| 2022 | 5.5 | 0.56 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 3,620,000 | 2,039,070 |
| 2023 | 6.5 | 0.51 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 5,106,000 | 2,591,084 |
| 2024 | 7.5 | 0.46 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 6,531,000 | 2,985,777 |
| 2025 | 8.5 | 0.41 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 8,099,000 | 3,335,693 |
| 2026 | 9.5 | 0.37 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 9,311,000 | 3,454,841 |
| 2027 | 10.5 | 0.33 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 9,829,000 | 3,285,625 |
| 2028 | 11.5 | 0.30 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 9,803,000 | 2,952,193 |
| 2029 | 12.5 | 0.27 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 9,392,000 | 2,548,126 |
| 2030 | 13.5 | 0.24 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 8,735,000 | 2,135,024 |
| 2031 | 14.5 | 0.22 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 8,018,000 | 1,765,562 |
| 2032 | 15.5 | 0.20 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 6,883,000 | 1,365,437 |
| 2033 | 16.5 | 0.18 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 5,830,000 | 1,041,932 |
| 2034 | 17.5 | 0.16 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 4,940,000 | 795,380 |
| 2035 | 18.5 | 0.15 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 4,104,000 | 595,295 |
| 2036 | 19.5 | 0.13 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,420,000 | 446,918 |
| 2037 | 20.5 | 0.12 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,778,000 | 327,048 |
| 2038 | 21.5 | 0.11 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,245,000 | 238,107 |
| 2039 | 22.5 | 0.10 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 165,207 |
| 2040 | 23.5 | 0.09 | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 113,025 |
| 2041 | 24.5 | 0.08 | | | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 72,820 |
| 2042 | 25.5 | 0.07 | | | | | 175,000 | 187,000 | 283,000 | 645,000 | 45,063 |
| 2043 | 26.5 | 0.06 | | | | | | 175,000 | 187,000 | 362,000 | 22,785 |
| 2044 | 27.5 | 0.06 | | | | | | | 175,000 | 175,000 | 9,923 |
| | | | | | | | | | | $ 117,558,000 | $ 34,820,319 |
| | | | | | | | | | | | 70% |

Notes:
[1] Uses mid-year convention
[2] 15% discount rate less assumed 4% long-term growth rate

4

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

Net Discount Rate     8% [2]
Years of Delay     4 Years

| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Subtotal | Present Value |
|---|---|---|---|---|---|---|---|---|
| | | A | B | | | C | D = sum B:C | E = A * D |
| 2015 | 0 | 1 | $ 83,000 | | | | $ 83,000 | $ 83,000 |
| 2016 | 0 | 1 | 257,000 | $ 83,000 | | | 340,000 | 340,000 |
| 2017 | 0.5 | 0.96 | 746,000 | 257,000 | $ 83,000 | | 1,086,000 | 1,045,004 |
| 2018 | 1.5 | 0.89 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 2,242,000 | 1,997,561 |
| 2019 | 2.5 | 0.82 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 3,537,000 | 2,917,935 |
| 2020 | 3.5 | 0.76 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 4,766,000 | 3,640,583 |
| 2021 | 4.5 | 0.71 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 5,445,000 | 3,851,155 |
| 2022 | 5.5 | 0.65 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 5,940,000 | 3,890,055 |
| 2023 | 6.5 | 0.61 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 6,031,000 | 3,657,084 |
| 2024 | 7.5 | 0.56 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 5,809,000 | 3,261,544 |
| 2025 | 8.5 | 0.52 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 5,514,000 | 2,866,585 |
| 2026 | 9.5 | 0.48 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 4,830,000 | 2,324,992 |
| 2027 | 10.5 | 0.45 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 4,190,000 | 1,867,517 |
| 2028 | 11.5 | 0.41 | 708,000 | 829,000 | 967,000 | 1,130,000 | 3,634,000 | 1,499,725 |
| 2029 | 12.5 | 0.38 | 516,000 | 708,000 | 829,000 | 967,000 | 3,020,000 | 1,154,011 |
| 2030 | 13.5 | 0.35 | 416,000 | 516,000 | 708,000 | 829,000 | 2,469,000 | 873,575 |
| 2031 | 14.5 | 0.33 | 374,000 | 416,000 | 516,000 | 708,000 | 2,014,000 | 659,804 |
| 2032 | 15.5 | 0.30 | 294,000 | 374,000 | 416,000 | 516,000 | 1,600,000 | 485,346 |
| 2033 | 16.5 | 0.28 | 283,000 | 294,000 | 374,000 | 416,000 | 1,367,000 | 383,952 |
| 2034 | 17.5 | 0.26 | 187,000 | 283,000 | 294,000 | 374,000 | 1,138,000 | 295,956 |
| 2035 | 18.5 | 0.24 | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 226,113 |
| 2036 | 19.5 | 0.22 | | 175,000 | 187,000 | 283,000 | 645,000 | 143,812 |
| 2037 | 20.5 | 0.21 | | | 175,000 | 187,000 | 362,000 | 74,735 |
| 2038 | 21.5 | 0.19 | | | | 175,000 | 175,000 | 33,452 |
| | | | | | | | $ 67,176,000 | $ 37,573,497 |
| | | | | | | | | 44% |

Notes:

[1] Uses mid-year convention

[2] 12% discount rate less assumed 4% long-term growth rate

5

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

Net Discount Rate        8% [2]
Years of Delay        5 Years

| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Subtotal | Present Value |
|------|------|------|------|------|------|------|------|------|------|
| | | A | B | | | C | | D = sum B:C | E = A * D |
| 2016 | 0 | 1 | $ 83,000 | | | | | $ 83,000 | $ 83,000 |
| 2017 | 0.5 | 0.96 | 257,000 | $ 83,000 | | | | 340,000 | 327,165 |
| 2018 | 1.5 | 0.89 | 746,000 | 257,000 | $ 83,000 | | | 1,086,000 | 967,596 |
| 2019 | 2.5 | 0.82 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 2,242,000 | 1,849,593 |
| 2020 | 3.5 | 0.76 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 3,620,000 | 2,765,193 |
| 2021 | 4.5 | 0.71 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 5,023,000 | 3,552,682 |
| 2022 | 5.5 | 0.65 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 6,191,000 | 4,054,433 |
| 2023 | 6.5 | 0.61 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 7,096,000 | 4,302,880 |
| 2024 | 7.5 | 0.56 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 7,409,000 | 4,159,886 |
| 2025 | 8.5 | 0.52 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 7,295,000 | 3,792,481 |
| 2026 | 9.5 | 0.48 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 6,939,000 | 3,340,190 |
| 2027 | 10.5 | 0.45 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 6,481,000 | 2,888,634 |
| 2028 | 11.5 | 0.41 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 5,659,000 | 2,335,428 |
| 2029 | 12.5 | 0.38 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 4,898,000 | 1,871,638 |
| 2030 | 13.5 | 0.35 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 4,150,000 | 1,468,343 |
| 2031 | 14.5 | 0.33 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 3,436,000 | 1,125,664 |
| 2032 | 15.5 | 0.30 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 2,843,000 | 862,400 |
| 2033 | 16.5 | 0.28 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,308,000 | 648,252 |
| 2034 | 17.5 | 0.26 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 1,883,000 | 489,705 |
| 2035 | 18.5 | 0.24 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,554,000 | 374,207 |
| 2036 | 19.5 | 0.22 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 292,753 |
| 2037 | 20.5 | 0.21 | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 193,856 |
| 2038 | 21.5 | 0.19 | | | 175,000 | 187,000 | 283,000 | 645,000 | 123,296 |
| 2039 | 22.5 | 0.18 | | | | 175,000 | 187,000 | 362,000 | 64,073 |
| 2040 | 23.5 | 0.16 | | | | | 175,000 | 175,000 | 28,680 |
| | | | | | | | | $ 83,970,000 | $ 41,962,027 |
| | | | | | | | | | 50% |

Notes:

[1] Uses mid-year convention

[2] 12% discount rate less assumed 4% long-term growth rate

6

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

Net Discount Rate   8% [2]
Years of Delay   6 Years

|  |  | | A | B |  |  |  | C | D = sum B:C | E = A * D |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Subtotal | Present Value |
| 2017 | 0.5 | 0.96 | $ 83,000 | | | | | | $ 83,000 | $ 79,867 |
| 2018 | 1.5 | 0.89 | 257,000 | $ 83,000 | | | | | 340,000 | 302,931 |
| 2019 | 2.5 | 0.82 | 746,000 | 257,000 | $ 83,000 | | | | 1,086,000 | 895,922 |
| 2020 | 3.5 | 0.76 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 2,242,000 | 1,712,586 |
| 2021 | 4.5 | 0.71 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 3,620,000 | 2,560,364 |
| 2022 | 5.5 | 0.65 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 5,106,000 | 3,343,876 |
| 2023 | 6.5 | 0.61 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 6,448,000 | 3,909,945 |
| 2024 | 7.5 | 0.56 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 7,842,000 | 4,403,000 |
| 2025 | 8.5 | 0.52 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 8,565,000 | 4,452,721 |
| 2026 | 9.5 | 0.48 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 8,673,000 | 4,174,877 |
| 2027 | 10.5 | 0.45 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 8,425,000 | 3,755,091 |
| 2028 | 11.5 | 0.41 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 7,906,000 | 3,262,749 |
| 2029 | 12.5 | 0.38 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 7,310,000 | 2,793,318 |
| 2030 | 13.5 | 0.35 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 6,367,000 | 2,252,756 |
| 2031 | 14.5 | 0.33 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 5,414,000 | 1,773,674 |
| 2032 | 15.5 | 0.30 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 4,566,000 | 1,385,057 |
| 2033 | 16.5 | 0.28 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 3,810,000 | 1,070,121 |
| 2034 | 17.5 | 0.26 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,137,000 | 815,828 |
| 2035 | 18.5 | 0.24 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,591,000 | 623,919 |
| 2036 | 19.5 | 0.22 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,070,000 | 461,538 |
| 2037 | 20.5 | 0.21 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 356,951 |
| 2038 | 21.5 | 0.19 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 250,989 |
| 2039 | 22.5 | 0.18 | | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 166,200 |
| 2040 | 23.5 | 0.16 | | | | 175,000 | 187,000 | 283,000 | 645,000 | 105,706 |
| 2041 | 24.5 | 0.15 | | | | | 175,000 | 187,000 | 362,000 | 54,932 |
| 2042 | 25.5 | 0.14 | | | | | | 175,000 | 175,000 | 24,589 |
| | | | | | | | | | $ 100,764,000 | $ 44,989,505 |
| | | | | | | | | | | 55% |

Notes:
[1] Uses mid-year convention
[2] 12% discount rate less assumed 4% long-term growth rate

7

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

| | | | |
|---|---|---|---|
| Net Discount Rate | 8% [2] | | |
| Years of Delay | 7 Years | | |

| | | | A | B | | | | | | C | D = sum B:C | E = A * D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Subtotal | Present Value |
| 2018 | 1.5 | 0.89 | $ 83,000 | | | | | | | $ 83,000 | $ 73,951 |
| 2019 | 2.5 | 0.82 | 257,000 | $ 83,000 | | | | | | 340,000 | 280,491 |
| 2020 | 3.5 | 0.76 | 746,000 | 257,000 | $ 83,000 | | | | | 1,086,000 | 829,558 |
| 2021 | 4.5 | 0.71 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | 2,242,000 | 1,585,728 |
| 2022 | 5.5 | 0.65 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 3,620,000 | 2,370,707 |
| 2023 | 6.5 | 0.61 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 5,106,000 | 3,096,181 |
| 2024 | 7.5 | 0.56 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 6,531,000 | 3,666,921 |
| 2025 | 8.5 | 0.52 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 8,099,000 | 4,210,459 |
| 2026 | 9.5 | 0.48 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 9,311,000 | 4,481,988 |
| 2027 | 10.5 | 0.45 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 9,829,000 | 4,380,865 |
| 2028 | 11.5 | 0.41 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 9,803,000 | 4,045,627 |
| 2029 | 12.5 | 0.38 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 9,392,000 | 3,588,898 |
| 2030 | 13.5 | 0.35 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 8,735,000 | 3,090,596 |
| 2031 | 14.5 | 0.33 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 8,018,000 | 2,626,767 |
| 2032 | 15.5 | 0.30 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 6,883,000 | 2,087,899 |
| 2033 | 16.5 | 0.28 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 5,830,000 | 1,637,482 |
| 2034 | 17.5 | 0.26 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 4,940,000 | 1,284,728 |
| 2035 | 18.5 | 0.24 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 4,104,000 | 988,252 |
| 2036 | 19.5 | 0.22 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,420,000 | 762,540 |
| 2037 | 20.5 | 0.21 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,778,000 | 573,516 |
| 2038 | 21.5 | 0.19 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,245,000 | 429,147 |
| 2039 | 22.5 | 0.18 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 306,028 |
| 2040 | 23.5 | 0.16 | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 215,182 |
| 2041 | 24.5 | 0.15 | | | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 142,490 |
| 2042 | 25.5 | 0.14 | | | | | 175,000 | 187,000 | 283,000 | 645,000 | 90,626 |
| 2043 | 26.5 | 0.13 | | | | | | 175,000 | 187,000 | 362,000 | 47,095 |
| 2044 | 27.5 | 0.12 | | | | | | | 175,000 | 175,000 | 21,081 |
| Notes: | | | | | | | | | | $ 117,558,000 | $ 46,914,804 |
| | | | | | | | | | | | 60% |

[1] Uses mid-year convention
[2] 12% discount rate less assumed 4% long-term growth rate

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

| Net Discount Rate | 3.5% [2] |
|---|---|
| Years of Delay | 8 Years |

| | | A | B | | | | | | | | C | D = sum B:C | E = A * D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Cultivar#8 | Subtotal | Present Value |
| 2019 | 2.5 | 0.92 | $ 83,000 | | | | | | | | $ 83,000 | $ 76,160 |
| 2020 | 3.5 | 0.89 | 257,000 | $ 83,000 | | | | | | | 340,000 | 301,431 |
| 2021 | 4.5 | 0.86 | 746,000 | 257,000 | $ 83,000 | | | | | | 1,086,000 | 930,247 |
| 2022 | 5.5 | 0.83 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | | 2,242,000 | 1,855,512 |
| 2023 | 6.5 | 0.80 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | 3,620,000 | 2,894,652 |
| 2024 | 7.5 | 0.77 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 5,106,000 | 3,944,829 |
| 2025 | 8.5 | 0.75 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 6,531,000 | 4,875,136 |
| 2026 | 9.5 | 0.72 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 8,182,000 | 5,901,007 |
| 2027 | 10.5 | 0.70 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 9,568,000 | 6,667,262 |
| 2028 | 11.5 | 0.67 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 10,575,000 | 7,119,776 |
| 2029 | 12.5 | 0.65 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 10,959,000 | 7,128,802 |
| 2030 | 13.5 | 0.63 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 10,770,000 | 6,768,945 |
| 2031 | 14.5 | 0.61 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 10,221,000 | 6,206,665 |
| 2032 | 15.5 | 0.59 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 9,443,000 | 5,540,316 |
| 2033 | 16.5 | 0.57 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 8,534,000 | 4,837,677 |
| 2034 | 17.5 | 0.55 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 7,299,000 | 3,997,673 |
| 2035 | 18.5 | 0.53 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 6,204,000 | 3,283,034 |
| 2036 | 19.5 | 0.51 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 5,234,000 | 2,676,066 |
| 2037 | 20.5 | 0.49 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 4,387,000 | 2,167,157 |
| 2038 | 21.5 | 0.48 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,607,000 | 1,721,586 |
| 2039 | 22.5 | 0.46 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,953,000 | 1,361,776 |
| 2040 | 23.5 | 0.45 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,245,000 | 1,000,272 |
| 2041 | 24.5 | 0.43 | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 744,314 |
| 2042 | 25.5 | 0.42 | | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 546,117 |
| 2043 | 26.5 | 0.40 | | | | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 377,352 |
| 2044 | 27.5 | 0.39 | | | | | | 175,000 | 187,000 | 283,000 | 645,000 | 250,438 |
| 2045 | 28.5 | 0.38 | | | | | | | 175,000 | 187,000 | 362,000 | 135,803 |
| 2046 | 29.5 | 0.36 | | | | | | | | 175,000 | 175,000 | 63,430 |
| | | | | | | | | | | | $ 134,352,000 | $ 83,373,435 |
| | | | | | | | | | | | | 38% |

Notes:

[1] Uses mid-year convention

[2] 7.5% discount rate less assumed 4% long-term growth rate

9

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

Net Discount Rate 16% [2]
Years of Delay 8 Years

| Year | Years Discounted | A PV Factor [1] | B Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Cultivar#8 | C / D = sum B:C Subtotal | E = A * D Present Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 2.5 | 0.69 | $ 83,000 | | | | | | | | $ 83,000 | $ 57,271 |
| 2020 | 3.5 | 0.59 | 257,000 | $ 83,000 | | | | | | | 340,000 | 202,244 |
| 2021 | 4.5 | 0.51 | 746,000 | 257,000 | $ 83,000 | | | | | | 1,086,000 | 556,889 |
| 2022 | 5.5 | 0.44 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | | 2,242,000 | 991,098 |
| 2023 | 6.5 | 0.38 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | 3,620,000 | 1,379,532 |
| 2024 | 7.5 | 0.33 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 5,106,000 | 1,677,436 |
| 2025 | 8.5 | 0.28 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 6,531,000 | 1,849,638 |
| 2026 | 9.5 | 0.24 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 8,182,000 | 1,997,600 |
| 2027 | 10.5 | 0.21 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 9,568,000 | 2,013,781 |
| 2028 | 11.5 | 0.18 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 10,575,000 | 1,918,728 |
| 2029 | 12.5 | 0.16 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 10,959,000 | 1,714,139 |
| 2030 | 13.5 | 0.13 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 10,770,000 | 1,452,221 |
| 2031 | 14.5 | 0.12 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 10,221,000 | 1,188,099 |
| 2032 | 15.5 | 0.10 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 9,443,000 | 946,261 |
| 2033 | 16.5 | 0.09 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 8,534,000 | 737,218 |
| 2034 | 17.5 | 0.07 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 7,299,000 | 543,561 |
| 2035 | 18.5 | 0.06 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 6,204,000 | 398,290 |
| 2036 | 19.5 | 0.06 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 5,234,000 | 289,670 |
| 2037 | 20.5 | 0.05 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 4,387,000 | 209,305 |
| 2038 | 21.5 | 0.04 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,607,000 | 148,354 |
| 2039 | 22.5 | 0.04 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,953,000 | 104,703 |
| 2040 | 23.5 | 0.03 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,245,000 | 68,620 |
| 2041 | 24.5 | 0.03 | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 45,559 |
| 2042 | 25.5 | 0.02 | | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 29,825 |
| 2043 | 26.5 | 0.02 | | | | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 18,388 |
| 2044 | 27.5 | 0.02 | | | | | | 175,000 | 187,000 | 283,000 | 645,000 | 10,888 |
| 2045 | 28.5 | 0.01 | | | | | | | 175,000 | 187,000 | 362,000 | 5,268 |
| 2046 | 29.5 | 0.01 | | | | | | | | 175,000 | 175,000 | 2,195 |
| | | | | | | | | | | | $ 134,352,000 | $ 20,556,783 |
| | | | | | | | | | | | | 85% |

Notes:
[1] Uses mid-year convention
[2] 20% discount rate less assumed 4% long-term growth rate

10

# Exhibit 9

| | |
|---|---|
| **From:** | Alexis Smith |
| **To:** | Chivvis, Matthew Alan; Krevans, Rachel; Patterson, Elizabeth Ann; Ewerdt, Jake |
| **Cc:** | California Berry Cultivars-JonesDay |
| **Subject:** | [EXT] Expert Disclosure - David Nolte |
| **Date:** | Wednesday, January 18, 2017 5:20:26 PM |
| **Attachments:** | 2012 Nolte Testimonies.pdf |
| | Nolte executed Ex A.PDF |
| | Nolte Resume Short.pdf |
| | Rule 26 requirements - 2013 through 2016.pdf |

Matthew,

Pursuant to section 7.4 of the Protective Order, CBC, Shaw, and Larson disclose David Nolte as an expert with whom we intend to disclose University produced financial information relating to the strawberry breeding program (including, but not limited to, royalty and expense information) and other information relating to each party's damages claims.  His signed acknowledgement of the protective order, resume, and information pertaining to the items requested under section 7.4(a)(2) under the protective order are attached below.

David Nolte resides in La Habra Heights, California.  His current employer is Fulcrum Inquiry and all of his employment income for more than the past five years is and has been from Fulcrum Inquiry.


We ask that you please let us know as soon as possible if we have permission to share information designated by the University in this matter or if you have any concerns.

Regards,

Lexi



Alexis Smith (Lexi) (bio)
Associate
**JONES DAY® - One Firm Worldwide**$^{SM}$
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Office +1.213.243.2653
asmith@jonesday.com


==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========

# Exhibit 10

| | |
|---|---|
| **From:** | Krevans, Rachel |
| **To:** | Gregory L Lippetz; Alexis Smith |
| **Cc:** | california_berry_cultivars_jonesday@jonesday.com; Chivvis, Matthew Alan; CBC_UCRegents |
| **Subject:** | CBC v. UC - Crossclaim Defendants" Disclosure of Damages Experts |
| **Date:** | Friday, January 20, 2017 9:39:09 PM |

Greg,

Despite Crossclaim Defendants' extremely late disclosures and the lack of any excuse for that lateness, we have devoted significant effort to expedite our vetting, have completed our review for your three damages experts, and consulted with our client.  This is to inform you that the University does not object to the disclosure of confidential information to CBC's proposed damages experts: Richard J. Eichmann, Thomas R. McCarthy, and David Nolte.

The University is reviewing Mark Sorrells, who was disclosed just this afternoon, and will provide a response regarding Mr. Sorrells as soon as our vetting and client consultation is complete.   Given the number of things we need to follow up on, I can tell you it will not be before Monday and it may not be possible by Monday.

Please do not take the fact that we  went to a huge effort to solve this problem for you multiple times in the past weeks, at a time when as you know we are extraordinarily busy with key deadlines of our own, as a sign that we will continue to do so.  We expect that you will plan your activities in a more orderly fashion going forward.

Rachel

# Exhibit 11

| From: | Alexis Smith |
|---|---|
| To: | Chivvis, Matthew Alan; Krevans, Rachel; Patterson, Elizabeth Ann; Ewerdt, Jake; Overson, Wesley E. |
| Cc: | California Berry Cultivars-JonesDay |
| Subject: | [EXT] CBC v. UC - FRCP 26(a)(2) Disclosures |
| Date: | Saturday, January 21, 2017 8:33:54 PM |
| Attachments: | CBC v UC - CBC Expert Disclosure - Shaw and Westwood.pdf |
| | CBC initial report with exibits.pdf |

Counsel,

Attached are the FRCP 26(a)(2) disclosures of Douglas Shaw, Lucky Westwood, and David Nolte.

Alexis Smith (Lexi) (bio)
Associate
**JONES DAY® - One Firm Worldwide**<sup>SM</sup>
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Office +1.213.243.2653
asmith@jonesday.com

==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========