Tharan Gregory Lanier (SBN 138784)
tglanier@jonesday.com
Greg L. Lippetz (SBN 154228)
glippetz@jonesday.com
Nathaniel P. Garrett (State Bar No. 248211)
ngarrett@JonesDay.com
Paul C. Hines (State Bar No. 294428)
phines@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:      +1.415.626.3939
Facsimile:       +1.415.875.5700

Sharyl A. Reisman (Admitted *Pro Hac Vice*)
sareisman@JonesDay.com
JONES DAY
250 Vesey Street
New York, NY  10281.1047
Telephone:      +1.212.326.3939
Facsimile:       +1.212.755.7306

Rick L. McKnight (SBN 55183)
fmcknight@jonesday.com
Alexis Adian Smith (SBN 274429)
asmith@jonesday.com
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071.2300
Telephone:      +1.213.489.3939
Facsimile:       +1.213.243.2539

Attorneys for Plaintiff and Crossclaim-Defendant
CALIFORNIA BERRY CULTIVARS, LLC and Cross-
Defendants DOUGLAS SHAW and KIRK LARSON

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA BERRY CULTIVARS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Defendant.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Cross-Complainant,<br><br>v.<br><br>CALIFORNIA BERRY CULTIVARS, LLC, DOUGLAS SHAW, AND KIRK LARSON,<br><br>Cross-Defendants. | Case No. 3:16-cv-02477-VC<br><br>**CALIFORNIA BERRY CULTIVARS, LLC, DOUGLAS SHAW, AND KIRK LARSON'S OPPOSITION TO THE UNIVERSITY'S MOTION TO EXCLUDE EXPERT TESTIMONY BY DAVID NOLTE**<br><br>Date:         May 8, 2017<br>Time:         10:00 am<br>Courtroom:  4<br>Judge:        Hon. Vince Chhabria |

California Berry Cultivars, LLC, Douglas Shaw, and Kirk Larson (collectively, "CBC") respectfully request this Court deny the motion by The Regents of the University of California ("UC") ("UC's Motion") to exclude expert testimony by David Nolte ("Nolte").

Nolte opined on the appropriate amount to award CBC in damages arising from UC's interference and destruction of CBC's intellectual property rights in the Transition Cultivars and Core Strawberry Germplasm (as defined in CBC's Verified Complaint, ECF 2-2 at 22, and collectively referred to as "Plant Types-at-Issue").  UC Ex.[1] 1, CBC Ex.[2] A.  Nolte's methodology for computing CBC's damages was standard and conventional.  He contrasted the but-for world in which CBC could exercise its intellectual property rights in the Plant Types-at-Issue starting in December 2014 with the actual world in which CBC is denied the intellectual property rights to that material.  By the time of trial in May 2017 that delay will have resulted in at least 3 years of plant development interruption and, of course, for the more than 400 destroyed genotypes, the delay is permanent and infinite.  Even for preserved material, the delay may be much longer and is in UC's hands.  This delay is a fact, not an assumption.

Nolte also considered that when starting from scratch, the range of time from crossing to release for commercialization of a new variety is around eight years.  He did not assume this. That testimony abounds in the record.  *See, e.g.*, UC Ex. 5 at 147:9-12; CBC Ex. B at 163:2-7 (agreeing that the range is somewhere between five and eight years).  That norm would suggest that for crosses beginning in December 2014, the first new cultivar would be commercialized by about 2022, eight years.  Because CBC would not have been starting from scratch, Nolte adopted the shorter end of the cycle range and started his damage calculation with commercialization with the first missing cultivar in the but-for world in 2019.  The Plant Types-at Issue had already been analyzed to some extent and the Plant Types-at-Issue resulted from crosses that took place no later than 2012.  UC does not complain about this assumption, which is not contradicted by

---

[1] References to "UC Ex." refer to exhibits to the Declaration of Matthew Chivvis In Support of the University's Motion to Exclude Expert Testimony by David Nolte Under FRE 702 dated April 17, 2017.

[2] References to "CBC Ex." refer to exhibits to the Declaration of Alexis A. Smith In Support of CBC's Opposition to the University's Motion to Exclude Expert Testimony by David Nolte Under FRE 702 dated April 24, 2017.

1    evidence.

2        Consistent with the testimony and past experience of the Doctors, who introduced one

3    new cultivar per year on average, Nolte projected in his calculations that same frequency of new

4    cultivars, just as UC's expert Carrie Distler ("Distler") did.  *See* CBC Distler Ex.[3] 2 at ¶ 51.

5    Unlike UC's Distler who projected royalty revenue from new cultivar development would extend

6    into perpetuity, (CBC Distler Ex. 2 at ¶ 34, CBC Distler Ex. 3 at 318:13-20), Nolte cut-off

7    computing damages for new cultivars after eight new cultivars were introduced.  Had he projected

8    more cultivars, he would have increased CBC's damages for those lost sales, but instead he

9    conservatively stopped after the introduction of the eighth new cultivar in 2026.  Ending the time

10   for the introduction of new cultivars was an assumption highly favorable to UC.  There is no

11   contrary evidence and UC does not and cannot complain about that assumption.

12       Finally, Nolte treats the but-for world of the missing Plant Types-at-Issue separately from

13   the development (or non-development) of the progeny of the International Semillas crosses.

14   There is no evidence to suggest CBC would not be able to have parallel breeding operations with

15   those International Semillas seed selections.  Nolte does not assume the existence or non-

16   existence of a parallel breeding operations.  He properly analyzes harm to CBC for the loss of the

17   intellectual property rights to the Plant Types-at-Issue, irrespective of whatever happens to the

18   International Semillas crosses.  CBC is not "capacity constrained" from carrying out two breeding

19   operations in parallel.  No evidence exists to suggest that two parallel breeding efforts would not

20   be operationally feasible or economically desirable.

21       Nolte's opinion is a product of reliable principles and methods applied to assumptions that

22   are factually supported; his opinion is consistent with the requirements of Fed. R. Evid. 702; and

23   is the type of expert testimony that is routinely admitted to aid the trier of fact in assessing

24   damages.  *See e.g. Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th

25   Cir. 2013) (affirming a lower court's admission of expert testimony on damages and explaining

26   that "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection

27       [3] References to "CBC Distler Ex." refer to exhibits to the Declaration of Alexis A. Smith
     In Support of CBC's Notice of Motion and Motion to Exclude the Testimony and Opinions of
28   UC's Expert Carrie Distler dated April 17, 2017.

CBC Opp. To UC Motion to Excl. Nolte
3:16-cv-02477-CV

1  to the pertinent inquiry") (quotations omitted).  At most, UC's quarrel with the reasonableness of

2  the assumptions and facts underlying Nolte's opinions is a matter to be handled by cross-

3  examination, not exclusion.  *See, e.g., Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183,

4  1196 (9th Cir. 2005) (holding "the reasonableness of the assumptions underlying the experts' ...

5  analysis, [or] criticisms of an expert's method of calculation [are] matter[s] for the jury's

6  consideration in weighing that evidence") (quotations omitted); *see also Summit 6, LLC v.*

7  *Samsung Elecs. Co*., 802 F.3d 1283, 1296 (Fed. Cir. 2015) (noting that "the question of whether

8  the expert is credible or the opinion is correct is generally a question for the fact finder, not the

9  court") (citations omitted).  Much of UC's challenge is based on playing word games with the

10  word "delay" – delay in getting the material, delay (or time) to develop new cultivars, or

11  contrasting the time differences projected for the progeny of Spanish crosses with the time for

12  introducing cultivars expected from the Transition Cultivar development.  His method and

13  calculations defy such word game confusion.

### A.   NOLTE'S OPINIONS ARE GROUNDED IN FACT.

15  Nolte estimated CBC's damages, not by taking a paper projection as UC's Distler did, but

16  by looking to historical *actual sales* of cultivars that were invented by the very same breeders,

17  Drs. Shaw and Larson (the "Doctors").  *See,* CBC Ex. A at p. 5 & Ex. 5 pp. 4-6; CBC Distler Ex.

18  2 at ¶ 33, Schs. 13a, 13b.  The Doctors would have developed new cultivars from the Plant

19  Types-at-Issue at CBC but-for UC's wrongful conduct.  Nolte projected the sales of those new

20  cultivars by looking to the actual sales data for other cultivars invented by the Doctors that had at

21  least five years of licensing history.  UC Ex. 1 at p. 3, C.2; CBC Ex. F at 39:12-25, 40:21-25;

22  CBC Ex. A at Ex. 5 pp. 4-6.[4]  There should be no dispute about the accuracy of the data

23  underlying Nolte's opinions, as that data was provided by UC.  *See e.g.,* UC Ex. 1 at p. 4 (citing

24  reliance upon UC STRAW2 00058007, UC STRAW2 0075844, UC STRAW2 00075847, and

25  UC STRAW2 00075842, all of which were produced by UC).

26  UC's reliance on *Benjamin v. Peter's Farm Condominium Owners Ass'n*, 820 F.2d 640

27  _____

28  [4] This exhibit was omitted from the copy of Nolte's March 9, 2017 report that UC filed as Exhibit to its motion, so it is attached as CBC Ex. A.

CBC Opp. To UC Motion to Excl. Nolte
3:16-cv-02477-CV

- 3 -

(1987) is inapposite.  In *Benjamin*, the economic expert opined on an injured party's post-injury

earning capacity.  *Id.*  The expert calculated damages in reliance on the plaintiff's personal and

unproven and subjective belief as to his post-injury earning capacity, despite the complete lack of

evidence or actual data to support that amount.  *Id.* at 641-43.  That is not the case here.[5]  Nolte

appropriately looked to *objective* evidence of past sales of the Doctors' cultivars to calculate sales

of new cultivars based on a plethora of evidence and actual data to support that amount.  *See*

*January v. Dr Pepper Snapple Group, Inc.*, 594 Fed. Appx. 907, 911 (9th Cir. 2014) (unpublished

decision) (admitting expert opinion regarding the plaintiff's lost overtime wages based upon

consideration of the plaintiff's past overtime wages).

### B.  NOLTE'S OPINIONS APPLY REASONABLE METHODOLOGIES TO THE FACTS OF THE CASE TO DETERMINE CBC'S DAMAGES.

Nolte's opinions are based on *real* data produced by UC.  *See, e.g.,* CBC Ex. A (citing

reliance upon UC STRAW2 00058007).  In his first report, Nolte based his damages calculations

on the past revenues (in dollars) received for sales of the Doctors' cultivars.  He noted that the

analysis would understate damages because "UC's rates have changed over time" and that a

"more accurate calculation would consider the actual units."  UC Ex. 1 at p. 5.  Shortly after his

first report and after having sufficient time to review information about unit sales that UC

designated under the protective order, he recalculated CBC's damages based on actual unit sales

data for increased accuracy.  *See* CBC Ex. A at p. 2.

UC twists Nolte's statement that "just the drafting time" took "something in the vicinity of

two days," UC Ex. 2 at 8:4-8, to assert that "he spent only two days on the entire process of

reviewing the information on which he supposedly relied, analyzing it, forming his opinions, and

drafting his initial eight page disclosure."  UC Motion at 2.  This is not so.  He spent considerably

more time for the entire process resulting in his opinions.  Nolte reviewed relevant evidence prior

---

[5] UC's reliance on *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (1988) is similarly misplaced.  *McGlinchy* involved an expert who forecasted lost sales by starting with "divined" future sales and working backwards by plugging in whatever compound growth rate would work (in that case using a 41% compound annual growth rate) to link his "divined" damages figure to actual past sales.  *Id.* at 807.  UC makes no similar contention here, nor could it.  Nolte started by looking to past sales and then applied a modest 4% long term growth rate to calculate the future lost sales.  UC Ex. 1 at 7; CBC Ex. A at Ex. 5 p.1 n.2 & p. 2 n.2.  *McGlinchy* is utterly irrelevant.

CBC Opp. To UC Motion to Excl. Nolte
3:16-cv-02477-CV

to CBC's request to share UC-designated Highly Confidential – Attorneys' Eyes Only ("HCAEO") materials.  Only the UC-designated "HCAEO" materials were unavailable until UC confirmed it did not object to disclosure of materials to Nolte.  Since much of the relevant data for UC strawberry sales is publicly available or in the possession of Doug Shaw, Nolte was able to analyze relevant information and begin preparing his calculations in advance of UC's confirmation. *See, e.g.,* CBC Ex. C at UC_STRAW2_00077144 (showing "Gross Strawberry Licensing Revenue" by year since 2004).  He also continued his analysis in preparing his supplemental report.

It is true that Nolte confirmed various key facts by interviewing Dr. Shaw and Lucky Westwood, but reliance on witnesses to inform him of testimony that will be adduced at trial is not improper.  *See, e.g., Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) (stating that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation"); *see also* 7 Annotated Patent Digest § 44:46.50 ("an expert opinion does not become fatally inadmissible just because the expert assumed a certain set of facts").

And, those key facts are all supported in the record.  For example, Drs. Shaw and Larson retired from UC in November 2014.  *See. e.g.*, ECF 155 at 181:23-182:6.  Around the time of the Doctors' retirement, there were more than 800 Transition Cultivars and 168 varieties in the Core Strawberry Germplasm that were subject to an omnibus patent application.  ECF 145-21 at 31-32; CBC Distler Exs. 15 & 16; ECF 173-26 at 2.  The Doctors invented all of the nine cultivars (Camino Real, Ventana, Albion, Palomar, Monterey, San Andreas, Portola, Benicia, and Mojave), the sales of which were utilized by Nolte to predict the average sales per cultivar for the eight missing cultivars.  ECF 145-13 at 55, 64, 73, 81, 89, 96, 104, 111, 120.  The average time from making the first crosses to commercial release of a cultivar is six to eight years.  *See, e.g.*, UC Ex. 5 at 147:9-12.  Finally, the Doctors historically generated an average of one cultivar per year for commercial release.  *See* ECF 145-13; CBC Distler Ex. 9; ECF 145-48 at 3; CBC Distler Ex. 1 at ¶ 14 (identifying that the Drs. Shaw and/or Larson "patent[ed] and releas[ed] for commercialization at least 24" patented cultivars during their tenure (which was 28 years for Dr.

CBC Opp. To UC Motion to Excl. Nolte
3:16-cv-02477-CV

Shaw and 23 years for Dr. Larson)).  In sum, there is an abundance of factual support for Mr. Nolte's opinion.

### 1. Nolte Assumes CBC Starts A Breeding Program Without Access To The 168 CSG And 800 TCs, Which Is An Undisputed Fact.

Nolte opined on CBC's damages resulting from UC's interference and destruction of CBC's intellectual property rights in the 968 Plant Types-at-Issue (800 Transition Cultivars and 168 Core Strawberry Germplasm).  It is undisputed that upon retirement the Doctors were forced to leave behind all the Plant Types-at-Issue in which they had intellectual property interest and now UC has destroyed at least 400 of those (CBC Ex. D at 242:1-19) without having notified the intellectual property owners, sought their permission, or offering to make the material available to CBC before the Doctors' creations and the unique genotypes were lost forever.  *See, e.g.*, ECF 155-9 at 2 ("[The Doctors] left all genetic materials on site at the UC"); CBC Ex. E at CBC00004796 (where interim Dean Delany said "we will not be transferring the transition cultivars or strawberry germplasm (*writ* large) to CBC or to Dr. Shaw's [sic]").  UC criticizes Nolte's argued failure to consider CBC's allegedly "infringing use of [UC] patented cultivars." UC Motion at 3:6-7.  That criticism is misplaced since CBC does not seek damages from inability to access UC-patented cultivars.

UC also argues that Nolte's opinion is inadmissible because UC's DNA expert opines that, unbeknownst to CBC, CBC possesses plants derived from 19 of the Plant Types-at-Issue.  If that parentage is proven and CBC is permitted to enjoy progeny from one year of use of 2% of the population, then it may reduce the damages to a minor extent.  However, it would be sheer speculation for Nolte to assume that unknown availability of 2% of the Plant Types-at-Issue would have made any significant difference in his calculation.  UC cites no evidence or testimony that: (a) CBC had access to the 100% of the Plant Types-at-Issue; (b) CBC knew of any use of the Plant Types-at-Issue in the varieties it evaluates; or (c) CBC could have been made whole by access to 2% of the Plant Types-at-Issue for breeding and no access to any Plant Types-at-Issue for further development and selection.

### 2. UC Claims "Nolte Assumes That CBC Will Not Release A Cultivar Until 2027." He Does Not.

UC mischaracterizes Nolte's report.  Nolte does not assume that CBC will release its first cultivar in 2027.  His calculation and opinion are based on CBC commercializing its first cultivar in 2019 and its last cultivar in 2026.  *See* UC Ex. 1 at p. 3 & Ex. 1; CBC Ex. A at Ex. 5 p. 1.

**(a)     Nolte's Opinion Is Based On Eight Missing Cultivars As Supported By The Relevant Evidence.**

Based on the facts and evidence, Nolte calculates damages for eight "missed cultivars." The premise of Nolte's opinion is that, but-for UC misconduct, CBC: (1) would have been able to enjoy its intellectual property rights with the Plant Types-at-Issue; and (2) would have been able to patent, commercialize, and generate revenue from an average of one new cultivar per year beginning with the first patent filing in 2018 and first commercialization in 2019 (the "eight missed cultivars").  *See* UC Ex. 1 at p. 3 C.3 & C.5, p. 7 IV.6, Ex. 1 (showing commercial introduction of the first missed cultivar in 2019, the second in 2020, and so on until the introduction of the eighth missed cultivar in 2026).  Unlike UC's Distler, Nolte cuts off that projection after eight years of new cultivars, although it would be reasonable to assume that CBC's commercialization of its breeding efforts would continue beyond that cutoff.  Limiting damages for only eight new cultivars is far more conservative than UC's damages expert's tactic of seeking damages for all varieties UC might ever make in perpetuity.  *See, e.g.,* CBC Distler Ex. 2 at ¶ 34.  This one-missed-cultivar-per-year for eight years approach is supported by the evidence and is abundantly clear from both of Nolte's reports.  CBC Ex. F at 23:4-21; UC Ex. 1 at p. 5 & Ex. 1; CBC Ex. A at Ex. 5 p. 1; s*ee also* ECF 145-48 at 3; CBC Distler Ex. 9.

**(b)     Any Assumption That CBC Will Not Suffer Harm For More Than "3 years" As Claimed By UC's Expert Is Speculative and Wrong.**

Nolte's opinion assumes that CBC is deprived of Plant Types-at-Issue until UC grants access for those in which CBC's intellectual property rights have not been destroyed.  So far, the delay is three years for some varieties, but the delay for at least 400 Transition Cultivars that were destroyed by UC (despite being the subject of CBC's claims in this action) is infinite.  *See, e.g.,* CBC Ex. D at 242:1-19.  If UC mitigates some of the problem and gives access to CBC, UC could offset the damages.  However, it would be speculative for Nolte to have assumed only a "3 year delay" as proposed by UC's expert, which would require UC to give copies of plant

1   materials now.  If UC does provide the plant material, then Nolte's calculation provides the basis

2   for damages for a different time periods as well.  *See* CBC Ex. A at p. 7, table 2 (showing

3   damages if CBC were to miss between four and eight cultivars).[6]

4         UC's argument regarding CBC's hopes for commercial release of a variety from a

5   separate line of germplasm being developed in connection with its consulting agreement with

6   International Semillas is irrelevant.  In the but-for world (absent UC's misconduct), CBC would

7   have had the rights to exploit its intellectual property rights in 968 Plant Types-at-Issue.  In the

8   actual world, CBC does not have access to those 968 varieties.  There is no evidence of any

9   capacity constraints that would have prevented CBC from working with two sets of germplasm.

10  Nor is there any indication that International Semillas could not commercialize its cultivars at the

11  same time CBC commercialized cultivars from Plant Types-at-Issue.  It would have been

12  speculative for Nolte to assume that CBC could only develop one germplasm collection or the

13  other.  There is no evidence to support that conjecture.

### 3.     Nolte Makes Reasonable And Modest Projections Of Damages Based On The Most Relevant Historical Sales Data.

14

15        Nolte appropriately calculates damages for CBC's missed cultivars by looking to the sales

16  of the Doctors' past cultivars as the best predictors.  UC Ex. 1 at p. 3.  *See, e.g.*, *January*, 594

17  Fed. Appx. 907 at 911.  Nolte assumes that cultivars will have a 21 year life of generating

18  royalties based on the term of United States Plant Patents, the additional years of historical

19  licensing in foreign jurisdictions, and the actual historical data.  *See* 35 U.S.C. § 154(a)(2); *see*

20  UC Ex. 1 at p. 4; CBC Ex. A at p. 4.  For those cultivars not yet at the end of their licensing life,

21  Nolte deduces the remaining sales based on historical patterns on a cultivar-by-cultivar basis and

22  spreads those remaining sales over the remainder of the life of the cultivar.  UC Ex. 1 at p. 6; *see*

23  *also* CBC Ex. A at p. 4.  Then Nolte calculates the average sales per cultivar for the nine

24  reference cultivars and uses those average sales to project the missed sales for each of the eight

25  missed cultivars.  UC Ex. 1 at pp. 6-7; CBC Ex. A at Ex. 5 pp. 3-6.  Nolte was not required to do

26

27      [6] UC claims that Nolte "agreed that" his alternative calculations were in error.  UC Motion at 5.  This is not so.  Nolte said he would "give some additional thought to the label" because it

28  was "clear from [UC Counsel's] questioning it's causing some confusion."  UC Ex. 2 at 38:11-13.

CBC Opp. To UC Motion to Excl. Nolte
3:16-cv-02477-CV

- 8 -

1  any different or more complicated mathematical calculations to estimate those remaining sales.

2  *See WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011)

3  (explaining that there is "not … an implicit requirement in Fed.R.Evid. 702 for the proffered

4  expert to make **complicated** mathematical calculations") (citations omitted).  Nolte explains his

5  reasonable estimates of the future royalties for the missed cultivars and also performs a

6  "reasonableness" check by using an "arithmetic average of royalties for whatever actual licensing

7  period exists for that cultivar."  *See* UC Ex. 1 at p. 7.  Nolte conservatively calculates that but for

8  UC misconduct, CBC would have generated approximately 1.1 billion plant sales over the life of

9  each missing cultivar.  CBC Ex. A at p. 5 & Ex. 5 p. 3.

10      It is true that Nolte could have used the cultivars Distler looks to in her critique of Nolte's

11  opinions.  Indeed, had he utilized historical sales of Distler's selected cultivars, the calculation of

12  CBC's damages would be substantially higher than those Nolte calculated.  *See* CBC Distler Ex.

13  2 at ¶ 205 & Sch. 17.1.  The cultivars Distler selected generated an average of 2.6 billion plant

14  sales over the life of each cultivar, more than double the 1.1 billion lifetime plant sales that Nolte

15  calculated.  *See* CBC Distler Ex. 2 at Schedule 17.1 (showing the median amount of

16  1,457,864,792 plant sales over the 20 year life of a cultivar and total sales per cultivar that

17  average 2.6 billion plant sales per cultivar).  That Nolte used a more conservative approach than

18  Distler, however, strengthens, not weakens his opinion.  *See, e.g., Summit 6, LLC,* 802 F.3d at

19  1296 (explaining that "it is common for parties to choose different, reliable approaches in a single

20  case and, when they do, the relative strengths and weaknesses of each approach may be exposed

21  at trial or attacked during cross-examination.  That one approach may better account for one

22  aspect of a royalty estimation does not make other approaches inadmissible.").

23          **4.**     **Nolte Cannot Include Offsets Of License Fees That Do Not Exist.**

24      UC argues that Nolte should have assumed that CBC would pay UC a license fee for

25  using the preserved and destroyed Transition Cultivars.  No agreement to do so exists, none

26  would be required, to suppose a fictional one would be speculative, and the royalty negotiations

27  in the past to avoid this dispute failed and resulted in no agreement.  UC cites no authority that

28  requires an expert to assume such facts that are *not* in the record.

Furthermore, UC's attempt to cast Nolte's opinion as "inadmissible" because his opinion assumes that CBC prevails on its claims is absurd.  That assumption is a necessary predicate to his opinion, which covers CBC's damages if CBC prevails on its claims.

### 5.   Nolte Had Sufficient Time to Review And Did Review and Rely Upon The Relevant Facts.

As explained in section B above, Nolte reviewed and relied upon facts that are supported by the evidence.  UC focuses on the amount of *time* they *think* he reviewed the facts.  Those criticisms are a mere distraction.  Nolte did not testify that he spent two days on the "entire process" of formulating his opinions.  Nolte was able to prepare preliminary calculations based on information that was publicly available and based on CBC documents (including documents of Douglas Shaw containing his royalty income) prior to the time he was disclosed to UC.  Those calculations were modified with the additional revenue information from the UC's improperly designated HCAEO information once clearance was obtained.  Regardless, UC cites no authority that requires an expert to review facts for a requisite amount of time.  If UC believes Nolte failed to consider certain facts, that concern goes to the weight of his testimony, which UC may cross-examine him about at trial, not the admissibility.  *See WWP, Inc.*, 628 F.3d at 1039 (finding that challenges to an economic expert's failure to consider certain facts "goes to the weight of [the expert's] testimony rather than admissibility").

### C.   CONCLUSION

For the foregoing reasons, CBC respectfully requests that this Court deny UC's request to exclude Nolte's opinions at trial.

Dated: April 24, 2017                              Respectfully submitted,

Jones Day


By:/s/ *Tharan Gregory Lanier*
      Tharan Gregory Lanier

Counsel for Plaintiff and Crossclaim-
Defendant CALIFORNIA BERRY
CULTIVARS, LLC and Cross-Defendants
DOUGLAS SHAW and KIRK LARSON

CBC Opp. To UC Motion to Excl. Nolte
3:16-cv-02477-CV

- 10 -

1    Tharan Gregory Lanier (SBN 138784)      Rick L. McKnight (SBN 55183)
     tglanier@jonesday.com                     fmcknight@jonesday.com
2    Greg L. Lippetz (SBN 154228)         Alexis Adian Smith (SBN 274429)
     glippetz@jonesday.com                     asmith@jonesday.com
3    Nathaniel P. Garrett (SBN 248211)      JONES DAY
     ngarrett@jonesday.com                     555 South Flower Street
4    Paul C. Hines (SBN 294428)           Fiftieth Floor
     phines@jonesday.com                      Los Angeles, CA  90071.2300
5    JONES DAY                              Telephone:     +1.213.489.3939
     555 California Street, 26th Floor        Facsimile:      +1.213.243.2539
6    San Francisco, CA  94104
     Telephone:     +1.415.626.3939
7    Facsimile:      +1.415.875.5700

8    Sharyl A. Reisman (Admitted *Pro Hac Vice*)
     sareisman@JonesDay.com
9    JONES DAY
     250 Vesey Street
10   New York, NY  10281.1047
     Telephone:     +1.212.326.3939
11   Facsimile:      +1.212.755.7306

12   Attorneys for Plaintiff and Crossclaim
     Defendant CALIFORNIA BERRY
13   CULTIVARS, LLC and Cross-Defendants
     DOUGLAS SHAW and KIRK LARSON

14

15                UNITED STATES DISTRICT COURT

               NORTHERN DISTRICT OF CALIFORNIA

16                SAN FRANCISCO DIVISION

17   CALIFORNIA BERRY CULTIVARS, LLC,     **Case No. 3:16-cv-02477-VC**

18                Plaintiff,            **DECLARATION OF ALEXIS A.**
                                     **SMITH IN SUPPORT OF**
19         v.                     **CALIFORNIA BERRY CULTIVARS,**
                                     **LLC, DOUGLAS SHAW, AND KIRK**
20   THE REGENTS OF THE UNIVERSITY OF     **LARSON'S OPPOSITION TO THE**
     CALIFORNIA,                        **UNIVERSITY'S MOTION TO**
21                Defendant.         **EXCLUDE EXPERT TESTIMONY**
                                       **BY DAVID NOLTE UNDER FRE 702**
22

23   THE REGENTS OF THE UNIVERSITY OF
     CALIFORNIA,

24                Cross-Complainant,

25         v.

26   CALIFORNIA BERRY CULTIVARS, LLC,
     DOUGLAS SHAW, AND KIRK LARSON,
27
               Cross-Defendants.
28

I, Alexis A. Smith, do hereby declare:

1.      I am an attorney licensed to practice in the State of California and admitted to practice before this Court.  I am an Associate with the law firm of Jones Day, counsel for Plaintiff and Crossclaim-Defendant California Berry Cultivars, LLC ("CBC"), Cross-Defendant Douglas Shaw, and Cross-Defendant Kirk Larson.  I have personal knowledge of the facts contained within this declaration and, if called as a witness, would and could testify competently to them.  I make this declaration in support of CBC, Dr. Shaw, and Dr. Larson's Opposition to the University's Motion to Exclude Testimony by David Nolte Under FRE 702.

2.      Attached as Exhibit A is a true and correct copy of the supplemental expert report of David Nolte dated March 9, 2017.

3.      Attached as Exhibit B is a true and correct copy of excerpts of the transcript of the December 9, 2016 deposition of Mary Delany.

4.      Attached as Exhibit C is a true and correct copy of the University of California, Davis Internal Audit Services, College of Agricultural and Environmental Sciences Plant Breeding Program – Strawberry Breeding, Internal Audit Services Project #14-75, dated December 2014 and produced with beginning Bates number UC_STRAW2_00077123.

5.      Attached as Exhibit D is a true and correct copy of excerpts of the transcript of the December 16, 2016 deposition of Steven Knapp.

6.      Attached as Exhibit E is a true and correct copy of an email chain with a last in time email from Mary Delany to AG Kawamura dated March 23, 2015 and produced with beginning Bates number CBC00004796.

7.      Attached as Exhibit F is a true and correct copy of excerpts of the transcript of the March 14, 2017 deposition of David Nolte.

//

//

//

//

//

1    Dated:  April 24, 2017

2                                            JONES DAY

3

4                                            By:  */s/ Alexis A. Smith*
                                                  Alexis A. Smith
5
                                             Attorneys for Plaintiff and Crossclaim-
6                                            Defendant CALIFORNIA BERRY
                                             CULTIVARS, LLC, and Cross-Defendants
7                                            DOUGLAS SHAW and KIRK LARSON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Decl. of Smith ISO Opp. Mot. To Excl. Nolte
Case No.: 3:16-CV-02477-VC

- 2 -

# Exhibit A

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED



Fulcrum Financial Inquiry LLP
888 S. Figueroa Street, Suite 2000
Los Angeles, CA 90017

(213) 787-4100
www.fulcrum.com

March 9, 2017

Frederick McKnight, Esq.
Jones Day
555 S. Flower Street, 50th Floor
Los Angeles, CA  90071

Dear Mr. McKnight:

This supplemental report is provided in connection with California Berry Cultivars, LLC ("CBC") vs. the Regents of the University of California ("UC") (USDC Case No. 3:16-cv-02477).  This report occurs because of the following:

1. On January 21, 2017 Fulcrum issued a report that included (Emphasis in the original):

    *"A more accurate calculation would consider the actual units shipped to each of these territories, applied to rates that CBC would use for each geography.  I intend to perform such a calculation promptly using the same general methodology described below.  The more accurate calculation predictably will increase the amount of lost profits, most likely by a significant amount."*

2. In a supplemental report dated February 21, 2017, Ms. Carrie Distler included comments regarding CBC's claims for damages (her Section VI, consisting of her paragraphs 180 to 214).  Certain of Ms. Distler's comments encourage Fulcrum to perform additional calculations, which are submitted in this supplemental report.

Except for the additions specifically noted herein, Fulcrum's entire January 21, 2017 report remains unchanged.  Without limiting the generality of the foregoing, with the possible exception of the additional calculations attached hereto, none of Ms. Distler's comments cause me to modify any of the previously-reported conclusions.  Additionally, because this supplemental report is limited to providing and explaining additional calculations, the fact that this supplemental report does not rebut conceptual errors made by Ms. Distler should not be interpreted as agreement with Ms. Distler; stated otherwise, no assumption should be made that I agree with any portion of Ms. Distler's Section VI because I do not include a discussion of why she is wrong.

In order to help avoid duplicate references and any related confusion, all lists and exhibit numbers herein will continue from what was started in Fulcrum's January 21, 2017 report.

## I.     DESCRIPTION OF ENGAGEMENT  (no change)

## II.     FACTUAL & LEGAL BACKGROUND

CBC additionally provided the following information regarding the rates that CBC would charge, which are used in the additional calculations and conclusions expressed herein.  The following rates generally are a 25% rate increase for all three territories:

Jones Day
March 8, 2017
Page 2 of 9

1. $10.00 per 1,000 plants in California
2. $11.25 per 1,000 in the U.S. outside of California
3. $21.00 per 1,000 plants internationally

Because of the use of increased royalty rates, the 25% overall revenue increase used in Fulcrum's January 21, 2017 report is not used herein. Nevertheless, CBC continues to have opportunities for increased revenues that are not part of Fulcrum's calculations herein because of the other factors described in Fulcrum's January 21, 2017 report.

## III.    INFORMATION RELIED UPON

In addition to those records described in Fulcrum's January 21, 2017 report, Fulcrum relied on the following:

8.  Ms. Distler's February 21, 2017 report, including all documents to which Ms. Distler cites

9.  Other documents and publicly-available information, as referenced herein

## IV.    SUMMARY OF FULCRUM'S CONCLUSIONS

As a result of using (i) plant quantities (vs. currency amounts) and (ii) other changes encouraged by Ms. Distler's February 21, 2017 report, the present value of lost profits comparing the but-for and actual worlds is from roughly **$34.3 million to $47.9 million**. There are three reasons for these amounts relative to what Fulcrum reported on January 21, 2017, which are described in the following three additional sections.

## A.  Consideration of Additional Discount Rate Alternatives

In her paragraphs 193 and 194, Ms. Distler criticizes Fulcrum's January 21, 2017 report because:

> "… The Nolte Report does not include any analysis supporting this discount rate. Mr. Nolte simply claims (without identifying any support) that this 15% is 'a reasonable discount rate for an established technology-based endeavor.…'"

Fulcrum's discount rate calculations are based on generally-accepted methods on this subject. Although she misapplies inputs into these calculations and presents only partial calculations, Ms. Distler uses these same methods in her February 21, 2017 supplemental report. Specifically, Ms. Distler presents two dramatically different conclusions regarding discount rates, which (once fixed) can be used to explain why a 15% discount rate is on the high range of what is reasonable. To ensure an agreed starting point to those unfamiliar with discount rates, a decrease in the discount rate will increase damages (because of a lower present value discount). The reverse is also true.

Ms. Distiller's discount rate conclusions are:

1. When Ms. Distler is calculating UC's damages, her claimed discount rate is 7.5%.[1] This 7.5% is calculated using a weighted average cost of capital (usually abbreviated WACC in the field of corporate finance), with approximately 50% attributed to debt and 50% attributed to equity (ownership) capital. Even though Ms. Distler claims that my 15% rate is too low when evaluating a strawberry breeding program, her damage calculation for UC's strawberry breeding

---

[1] Distler Schedule 2c.2 from Ms. Distler's February 21, 2017 report

program uses a 7.5% rate.  While I do not agree that 7.5 is appropriate to use for either UC or CBC, Ms. Distler's objectivity can and should be called into question when she uses such transparently different conclusions for UC's vs. CBC's damages (see #2 immediately below) involving what she contends are highly similar strawberry breeding programs.

2. When Ms. Distler is calculating CBC's damages, her claimed discount rate is 20%.[2] Inexplicably, unlike UC's WACC, when performing a calculation for CBC, Ms. Distler fails to include any debt (which lowers the WACC).  Ms. Distler concludes that CBC's cost of equity (ownership) capital is 20%, nearly twice what she used for this parameter for UC.

   Part of Ms. Distler's 20% cost of equity capital is based on an industry adjustment that is based on other publicly-traded companies in the agricultural segment.  These companies can be considered in determining the percentage of debt and equity in the WACC.  For the agricultural companies that Ms. Distler uses in this calculation, the average weighting is approximately 30% debt and 70% equity.

The determination of individual inputs to the calculation of a discount rate can vary based on different ways of financing an enterprise.  Each decision affects other inputs.  The most common example involves the use of excessive debt in the capital structure, in which case the cost of equity (ownership) capital increases because the risk of business failure increases.  Alternatively, if no debt exists, the cost of equity (ownership) capital decreases because business's financial risks decrease.

Putting aside Ms. Distler's transparent inconsistencies and advocacy, one can use information from Ms. Distler's February 21, 2017 report to confirm the reasonableness of the discount rate that Fulcrum used.  The following illustrates that the 15% discount rate used in Fulcrum's January 21, 2017 report is at the high end of the range of reasonableness:

1. For purposes of a cost of equity capital, this illustration uses Ms. Distler's 20% cost of equity capital.   This is a high starting point that provides a basis for the discount rate actually being lower than what Fulcrum presents herein.

2. For purposes of determining the percentage of debt and equity, Ms. Distler's work supports two alternatives, at either 50% or 70% equity, and either 50% or 30% debt.  Because two alternatives are considered, the discount rate will be expressed as a range.

3. For purposes of the cost of debt, Fulcrum uses the prime rate (currently 3.75%) plus 200 basis points (2%).  It is likely that a lower spread than 200 basis points is possible, particularly once the first cultivars have been commercialized, so this debt rate illustration provides a basis for the discount rate being lower than what Fulcrum presents herein.

With these inputs, the discount rate is calculated under two alternatives, as follows:

Table 1: WACC (discount rate) calculation using Ms. Distler's inputs

|  | 50% debt & 50% equity | 70% equity & 30% debt |
| --- | --- | --- |
| Cost of Equity | 20% | |
| Cost of Debt | 5.75% | Same |
| Tax Rate | 40% | |
| Weighted Average (aka discount rate) | 12% | 15% |

[2]  Distler Schedule 2b.1 from Ms. Distler's February 21, 2017 report

Jones Day
March 8, 2017
Page 4 of 9

In summary, the 15% discount rate used in Fulcrum's January 21, 2017 is reasonable (if not high, as described above).  With a single input change that Ms. Distler uses for UC, a 12% discount rate is the correct result.  Fulcrum's discount rate range (i.e., 12% to 15%) is used in the rest of this report.

**B.  Use of Plant Quantities** (vs. currency amounts)

See #1 in the introduction to this supplemental report.  Related calculations of these amounts are shown on <u>Exhibit 5</u> (Exhibits 1 through 4 are used in Fulcrum's January 21, 2017 report).  As before, to determine the expected results of the eight missing cultivars, one needs to consider the entire licensing life.  The expected results are determined by analyzing nine existing cultivars, and must include projections of royalties for the six cultivars that are not at the end of their licensing life.  With the benefit of licensing information for each of the three territories (i.e., California, the United States outside of California, and international), projections were considered for each territory, as described herein.

In making its projections, Fulcrum looked for patterns in the historic plant quantity data.  We observed that most cultivars would remain at certain sales levels for between three and seven years, drop by a certain amount, and continue at the sales level for a slightly shorter period, then drop again.  Fulcrum's projections used this terraced sale structure.  Fulcrum also noted that certain cultivars followed the revenue patterns of other cultivars later in their life.  In those cases, Fulcrum's projections sought to follow the trends of other cultivars.

The plant quantity information[3] provides data through some part of 2014; the royalty dollar information[4] provides data through 2016.  Fulcrum checked the reasonableness of the 2014, 2015 and 2016 projections by noting that the projected 2014, 2015 and 2016 plant quantities would result in the approximate royalty amounts that UC actually collected.  The quantity information in 2014 appears to be incomplete for certain cultivars because the royalties that would have been collected on the quantities listed in 2014 were significantly less than the royalty amounts that UC actually collected.  Related calculations are shown in <u>Exhibit 7</u>.  In pages 4 through 6 of Exhibit 5, the data that is estimated with the benefit of royalty dollar information is highlighted in red.  As shown in Exhibit 7, the overall difference between the plant data in 2014, 2015 and 2016 compared to the currency data in the same years is insignificant.

Importantly, Fulcrum continued to limit projections to no more than 21 years of royalties.  International licensing, which may not be limited to the 20-year U.S. patent life, comprises additional licensing revenues.   Nevertheless, in order to ensure that the damage calculation is not overstated, the 21-year limitation continues to be used, which has the known effect of understating the total value of international licensing.

As occurred before, as a reasonableness check on the above estimates for six of the existing cultivars, Fulcrum made a second calculation of future expected revenues using an arithmetic average of royalties for whatever actual licensing period exists for that cultivar.  The results of this reasonableness check are shown on <u>Exhibit 6</u>, and result in a lifetime royalty estimate of $20,100,000,[5] which supports the reasonableness of the first (primary) calculation Fulcrum prepared.

---

[3] UC STRAW2 00058007
[4] UC STRAW2 00075844
[5] Rounded from $20,099,000.  See Exhibit 6 p.2

CONTAINS ATTORNEYS EYES ONLY INFORMATION

Jones Day
March 8, 2017
Page 5 of 9

For the nine cultivars used by Fulcrum to estimate the eight missed cultivars, a chart showing the actual and expected results follows:



## Average Unit Sales of Cultivars Used in Model

**Total Plants = 1.1 Billion**

 **Source: UC STRAW2 00058007**

When priced based on CBC's royalty rates, the source and timing of CBC's expected average royalties for each of the eight missed cultivars is charted as follows:

Jones Day
March 8, 2017
Page 6 of 9

# CBC's average expected royalties for each new cultivar average $16.8 million



**Source: UC STRAW2 00058007**

Using the same methodology described in Fulcrum's January 21, 2017 report, Fulcrum's revised calculations show:

1. The average cultivar generates $16,800,000[6] for CBC in lifetime royalties.

2. Over the eight years that CBC will miss cultivars because of UC's conduct, CBC will miss $134,400,000 of royalties (calculated as eight cultivars, at an average of $16,800,000 for each cultivar).

3. Using a 15% discount rate, the damages resulting from the discounting of eight years of missed cultivars is $34,300,000.[7]  Using a 12% discount rate, the damages resulting from the discounting of eight years of missed cultivars is $47,900,000.[8]

4. The present value discount is the difference between the cash flows that would have eventually been received, and the amount of damages that are calculated based on their present value.

---

[6] Rounded from $16,794,000.  See Exhibit 5 p. 3
[7] Rounded from $34,258,357.  See Exhibit 5 p. 1
[8] Rounded from $47,947,397.  See Exhibit 5 p. 2

CONTAINS ATTORNEYS EYES ONLY INFORMATION

Jones Day
March 8, 2017
Page 7 of 9

   a. Using 15%, the difference between the $134,400,000 of undiscounted royalties, and the
      $34,300,000 of damages presented herein, is $100,100,000. The total discount is 75
      percent.[9]
   b. Using 12%, the difference between the $134,400,000 of undiscounted royalties, and the
      $47,900,000 of damages presented herein, or $86,400,000. The total discount is 64
      percent.[10]

## C. Consideration of Different Periods Needed before Cultivars can be Commercialized

Based on input from CBC, Fulcrum initially used eight years as the period needed to develop a cultivar
that was ready for commercialization. Ms. Distler criticizes the use of this eight-year parameter, and
advocates a three-year damages period. Given that (i) CBC has been denied access to plant materials
since Drs. Shaw and Larson left UC's employ in November 2014 and (ii) no cultivar has been released
or is expected to be released by CBC in 2017, the three-year period Ms. Distler advocates is too short.
Nevertheless, if CBC's scientific endeavors are particularly successful, and/or UC decides post-trial that
it wishes to cooperate with CBC, perhaps a shorter period could be applicable. For this reason, Fulcrum
considered alternatives other than the eight-year development period discussed in Fulcrum's January
21, 2017 report.

If a shorter development period is applicable, two offsetting changes occur. Specifically:

   1. The number of cultivars for which damages are calculated decreases - In isolation, a decrease
      in the number of lost cultivars decreases the damage amount.

   2. The period of time occurring before cultivars are available for commercial exploitation
      decreases - In isolation, a decrease in the time occurring before cultivars are available for
      commercial exploitation increases the damage amount because there is a smaller present value
      discount.

The net offsetting effect causes damages to change less than what one might expect when additional
years of development occur. By using the eight years contained in Fulcrum's January 21, 2017 report
(and the 15% discount rate), damages were actually smaller than what could have occurred using
other parameters. Damages using alternative assumptions are calculated in <u>Exhibit 8</u>, and are
summarized below:

Table 2: Summary of Damages using Different Discount Rate and Time Inputs

| First Commercial Cultivar (# Years) | Damages Using Discount Rate | | Calculation Source |
|---|---|---|---|
| | 15% | 12% | |
| 2015 (4 years) | $31.3 million | $37.6 million | Exhibit 8 pp. 1, 5 |
| 2016 (5 years) | 33.6 million | 42.0 million | Exhibit 8 pp. 2, 6 |
| 2017 (6 years) | 34.7 million | 45.0 million | Exhibit 8 pp. 3, 7 |
| 2018 (7 years) | 34.8 million | 46.9 million | Exhibit 8 pp. 4, 8 |
| 2019 (8 years) | 34.3 million | 47.9 million | Exhibit 5 pp. 1, 2 |

A graph showing the preceding table follows:

---

[9] See Exhibit 5 p. 1
[10] See Exhibit 5 p. 2

Jones Day
March 8, 2017
Page 8 of 9



The following table additionally shows the results of calculations for the 7.5% and 20% discount rates that Ms. Distler concludes is appropriate for CBC and UC, respectively:

Table 3: Changes in damages using alternative discount rates

| Discount Rate | Damages | Calculation Source |
|---|---|---|
| 7.5% | $ 83.4 million | Exhibit 8 p. 9 |
| 12% | 47.9 million | Exhibit 5 p. 1 |
| 15% | 34.3 million | Exhibit 5 p. 2 |
| 20% | 20.6 million | Exhibit 8 p. 10 |

Discount rates have a dramatic impact on the calculation results, particularly when the extreme rates advocated by Ms. Distler are used.   A graph showing the effect of discount rate on the damage amounts follows.  The following graph illustrates the impact on the eight-year development period scenario, although a similar result would be seen using the other development period scenarios.

Jones Day
March 8, 2017
Page 9 of 9



**Using a Range of Reasonable Discount Rates,
Damages are in the Range of $34.3 to $47.9 Million**

**Source: Assumes an 8 Year Delay**

**V.      OTHER REQUIRED INFORMATION** (see the January 21, 2017 report)

Very truly yours,
Fulcrum Financial Inquiry LLP

By:      *David Nolte*

      David Nolte

CONTAINS ATTORNEYS EYES ONLY INFORMATION

**California Berry Cultivars vs. University of California**
**Exhibit 5: Lost Revenue Model**
Trend Analysis Projections

Net Net Discount Rate  11%  [2]
Years of Delay  8 Years

|  |  | A | B |  |  |  |  |  |  |  | C | D = sum B:C | E = A * D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Cultivar#8 | Subtotal | Present Value |
| 2019 | 2.5 | 0.77 | $  83,000 |  |  |  |  |  |  |  |  | $  83,000 | $  63,940 |
| 2020 | 3.5 | 0.69 | 257,000 | $  83,000 |  |  |  |  |  |  | 340,000 | 235,965 |
| 2021 | 4.5 | 0.63 | 746,000 | 257,000 | $  83,000 |  |  |  |  |  | 1,086,000 | 679,010 |
| 2022 | 5.5 | 0.56 | 1,156,000 | 746,000 | 257,000 | $  83,000 |  |  |  |  | 2,242,000 | 1,262,872 |
| 2023 | 6.5 | 0.51 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $  83,000 |  |  |  | 3,620,000 | 1,837,000 |
| 2024 | 7.5 | 0.46 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $  83,000 |  |  | 5,106,000 | 2,334,310 |
| 2025 | 8.5 | 0.41 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $  83,000 |  | 6,531,000 | 2,689,889 |
| 2026 | 9.5 | 0.37 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $  83,000 | 8,182,000 | 3,035,926 |
| 2027 | 10.5 | 0.33 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 9,568,000 | 3,198,379 |
| 2028 | 11.5 | 0.30 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 10,575,000 | 3,184,682 |
| 2029 | 12.5 | 0.27 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 10,959,000 | 2,973,266 |
| 2030 | 13.5 | 0.24 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 10,770,000 | 2,632,422 |
| 2031 | 14.5 | 0.22 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 10,221,000 | 2,250,662 |
| 2032 | 15.5 | 0.20 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 9,443,000 | 1,873,285 |
| 2033 | 16.5 | 0.18 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 8,534,000 | 1,525,188 |
| 2034 | 17.5 | 0.16 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 7,299,000 | 1,175,199 |
| 2035 | 18.5 | 0.15 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 6,204,000 | 899,905 |
| 2036 | 19.5 | 0.13 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 5,234,000 | 683,968 |
| 2037 | 20.5 | 0.12 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 4,387,000 | 516,472 |
| 2038 | 21.5 | 0.11 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,607,000 | 382,562 |
| 2039 | 22.5 | 0.10 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,953,000 | 282,161 |
| 2040 | 23.5 | 0.09 |  | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,245,000 | 193,253 |
| 2041 | 24.5 | 0.08 |  |  | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 134,086 |
| 2042 | 25.5 | 0.07 |  |  |  | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 91,734 |
| 2043 | 26.5 | 0.06 |  |  |  |  | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 59,103 |
| 2044 | 27.5 | 0.06 |  |  |  |  |  | 175,000 | 187,000 | 283,000 | 645,000 | 36,574 |
| 2045 | 28.5 | 0.05 |  |  |  |  |  |  | 175,000 | 187,000 | 362,000 | 18,493 |
| 2046 | 29.5 | 0.05 |  |  |  |  |  |  |  | 175,000 | 175,000 | 8,054 |
|  |  |  |  |  |  |  |  |  |  |  | $  134,352,000 | $  34,258,357 |
|  |  |  |  |  |  |  |  |  |  |  |  | 75% |

Notes:
[1] Uses mid-year convention
[2] 15% discount rate less assumed 4% long-term growth rate

1

**California Berry Cultivars vs. University of California**
**Exhibit 5: Lost Revenue Model**
Trend Analysis Projections

Net Net Discount Rate   8%  [2]
Years of Delay   8 Years

| Year | Years Discounted | A<br>PV Factor [1] | B<br>Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Cultivar#8 | C<br>Subtotal | D = sum B:C<br>Present Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 2.5 | 0.82 | $ 83,000 | | | | | | | | $ 83,000 | $ 68,473 |
| 2020 | 3.5 | 0.76 | 257,000 | $ 83,000 | | | | | | | 340,000 | 259,714 |
| 2021 | 4.5 | 0.71 | 746,000 | 257,000 | $ 83,000 | | | | | | 1,086,000 | 768,109 |
| 2022 | 5.5 | 0.65 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | | 2,242,000 | 1,468,267 |
| 2023 | 6.5 | 0.61 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | 3,620,000 | 2,195,099 |
| 2024 | 7.5 | 0.56 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 5,106,000 | 2,866,835 |
| 2025 | 8.5 | 0.52 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 6,531,000 | 3,395,297 |
| 2026 | 9.5 | 0.48 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 8,182,000 | 3,938,527 |
| 2027 | 10.5 | 0.45 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 9,568,000 | 4,264,535 |
| 2028 | 11.5 | 0.41 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 10,575,000 | 4,364,226 |
| 2029 | 12.5 | 0.38 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 10,959,000 | 4,187,685 |
| 2030 | 13.5 | 0.35 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 10,770,000 | 3,810,614 |
| 2031 | 14.5 | 0.33 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 10,221,000 | 3,348,489 |
| 2032 | 15.5 | 0.30 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 9,443,000 | 2,864,454 |
| 2033 | 16.5 | 0.28 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 8,534,000 | 2,396,959 |
| 2034 | 17.5 | 0.26 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 7,299,000 | 1,898,225 |
| 2035 | 18.5 | 0.24 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 6,204,000 | 1,493,937 |
| 2036 | 19.5 | 0.22 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 5,234,000 | 1,166,999 |
| 2037 | 20.5 | 0.21 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 4,387,000 | 905,692 |
| 2038 | 21.5 | 0.19 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,607,000 | 689,502 |
| 2039 | 22.5 | 0.18 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,953,000 | 522,672 |
| 2040 | 23.5 | 0.16 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,245,000 | 367,924 |
| 2041 | 24.5 | 0.15 | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 262,369 |
| 2042 | 25.5 | 0.14 | | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 184,484 |
| 2043 | 26.5 | 0.13 | | | | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 122,162 |
| 2044 | 27.5 | 0.12 | | | | | | 175,000 | 187,000 | 283,000 | 645,000 | 77,697 |
| 2045 | 28.5 | 0.11 | | | | | | | 175,000 | 187,000 | 362,000 | 40,377 |
| 2046 | 29.5 | 0.10 | | | | | | | | 175,000 | 175,000 | 18,073 |

E = A * D

Notes:
[1] Uses mid-year convention
[2] 12% discount rate less assumed 4% long-term growth rate

$ 134,352,000   $ 47,947,397
64%

2

**California Berry Cultivars vs. University of California**
**Exhibit 5: Lifetime Royalty Calculation**
Trend Analysis

| | A | B | C = A * B |
|---|---|---|---|
| | Average Units | Royalties ($/1000) | Expected Royalties |
| California | 646,103,605 | $ 10.00 | $ 6,461,036 |
| United States | 24,638,518 | 11.25 | 277,183 |
| International | 478,916,148 | 21.00 | 10,057,239 |
| | 1,149,658,271 | | $ 16,795,458 |

| | D | E = C * D | F | G = C * F | H | I = C * H | J = E + G + I |
|---|---|---|---|---|---|---|---|
| | | California | | United States | | International | |
| | % | Expected Royalties | % | Expected Royalties | % | Expected Royalties | Total Royalties |
| 1st year | 1% | $ 83,000 | 0% | $ - | 0% | $ - | $ 83,000 |
| | 4% | 255,000 | 0% | - | 0% | 2,000 | 257,000 |
| | 8% | 547,000 | 5% | 14,000 | 2% | 185,000 | 746,000 |
| | 11% | 690,000 | 5% | 14,000 | 4% | 452,000 | 1,156,000 |
| 5th | 13% | 831,000 | 8% | 22,000 | 5% | 525,000 | 1,378,000 |
| | 12% | 806,000 | 11% | 31,000 | 6% | 649,000 | 1,486,000 |
| | 9% | 613,000 | 7% | 18,000 | 8% | 794,000 | 1,425,000 |
| | 11% | 692,000 | 10% | 27,000 | 9% | 932,000 | 1,651,000 |
| | 9% | 574,000 | 11% | 29,000 | 9% | 866,000 | 1,469,000 |
| 10th | 7% | 450,000 | 13% | 35,000 | 8% | 779,000 | 1,264,000 |
| | 4% | 265,000 | 8% | 21,000 | 8% | 844,000 | 1,130,000 |
| | 4% | 240,000 | 6% | 16,000 | 7% | 711,000 | 967,000 |
| | 3% | 163,000 | 6% | 17,000 | 6% | 649,000 | 829,000 |
| | 2% | 119,000 | 4% | 10,000 | 6% | 579,000 | 708,000 |
| 15th | 1% | 68,000 | 3% | 10,000 | 4% | 438,000 | 516,000 |
| | 1% | 38,000 | 2% | 5,000 | 4% | 373,000 | 416,000 |
| | 0% | 20,000 | 1% | 4,000 | 3% | 350,000 | 374,000 |
| | 0% | 6,000 | 1% | 3,000 | 3% | 285,000 | 294,000 |
| | 0% | - | 0% | 1,000 | 3% | 282,000 | 283,000 |
| 20th | 0% | - | 0% | - | 2% | 187,000 | 187,000 |
| | 0% | - | 0% | - | 2% | 175,000 | 175,000 |
| (rounded) | 100% | $ 6,460,000 | 100% | $ 277,000 | 100% | $ 10,057,000 | $ 16,794,000 |
| | | | | | | | (rounded) |

3

**California Berry Cultivars vs. University of California**
**Exhibit 5: Strawberry Cultivar Unit Sales Analysis**
Trend Projections - California

Average Unit Sales          646,103,605

| Camino Real (2001-125) | Ventana (2001-126) | Albion (2004-323) | Palomar (2007-274) | Monterey (2008-332) | San Andreas (2008-333) | Portola (2008-334) | Benicia (2010-492) | Mojave (2010-493) | TOTALS |
|---|---|---|---|---|---|---|---|---|---|

00%

Notes:
[1] The source data for 2014 is apparently incomplete; 2014 units do not approach the 2014 royalties recorded.
[2] Unit data is lacking; however, total royalties are not.  Unit projections are made to tie to actual royalties.

Source: UC_STRAW2_00058007
CONTAINS ATTORNEYS EYES ONLY INFORMATION

4

**California Berry Cultivars vs. University of California**
**Exhibit 5: Strawberry Cultivar Unit Sales Analysis**
Trend Projections - United States

Average Unit Sales          24,638,518

| Camino Real (2001-125) | Ventana (2001-126) | Albion (2004-323) | Palomar (2007-274) | Monterey (2008-332) | San Andreas (2008-333) | Portola (2008-334) | Benicia (2010-492) | Mojave (2010-493) | TOTALS |
|---|---|---|---|---|---|---|---|---|---|

100%

Notes:
[1]  The source data for 2014 is apparently incomplete; 2014 units do not approach the 2014 royalties recorded.
[2]  Unit data is lacking; however, total royalties are not.  Unit projections are made to tie to actual royalties.

Source: UC_STRAW2_00058007
CONTAINS ATTORNEYS EYES ONLY INFORMATION

5

**California Berry Cultivars vs. University of California**
**Exhibit 5: Strawberry Cultivar Unit Sales Analysis**
Trend Projections - International

Average Unit Sales          478,916,148

| Camino Real (2001-125) | Ventana (2001-126) | Albion (2004-323) | Palomar (2007-274) | Monterey (2008-332) | San Andreas (2008-333) | Portola (2008-334) | Benicia (2010-492) | Mojave (2010-493) | TOTALS |
|---|---|---|---|---|---|---|---|---|---|

00%

Notes:
[1]  The source data for 2014 is apparently incomplete; 2014 units do not approach the 2014 royalties recorded.
[2]  Unit data is lacking; however, total royalties are not.  Unit projections are made to tie to actual royalties.

Source: UC_STRAW2_00058007
CONTAINS ATTORNEYS EYES ONLY INFORMATION

6

**California Berry Cultivars vs. University of California**
**Exhibit 6: Lost Revenue Model**
Cultivar Average Projections

Net Net Discount Rate  11% [2]

| | | A | B | | | | | | | | C | D = sum B:C | E = A * D |
| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Cultivar#8 | Subtotal | Present Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 2.5 | 0.77 | $ 83,000 | | | | | | | | $ 83,000 | $ 63,940 |
| 2020 | 3.5 | 0.69 | 257,000 | $ 83,000 | | | | | | | 340,000 | 235,965 |
| 2021 | 4.5 | 0.63 | 746,000 | 257,000 | $ 83,000 | | | | | | 1,086,000 | 679,010 |
| 2022 | 5.5 | 0.56 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | | 2,242,000 | 1,262,872 |
| 2023 | 6.5 | 0.51 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | 3,620,000 | 1,837,000 |
| 2024 | 7.5 | 0.46 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 5,106,000 | 2,334,310 |
| 2025 | 8.5 | 0.41 | 1,148,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 6,254,000 | 2,575,802 |
| 2026 | 9.5 | 0.37 | 1,347,000 | 1,148,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 7,601,000 | 2,820,346 |
| 2027 | 10.5 | 0.33 | 1,174,000 | 1,347,000 | 1,148,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 8,692,000 | 2,905,551 |
| 2028 | 11.5 | 0.30 | 1,034,000 | 1,174,000 | 1,347,000 | 1,148,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 9,469,000 | 2,851,608 |
| 2029 | 12.5 | 0.27 | 940,000 | 1,034,000 | 1,174,000 | 1,347,000 | 1,148,000 | 1,486,000 | 1,378,000 | 1,156,000 | 9,663,000 | 2,621,650 |
| 2030 | 13.5 | 0.24 | 941,000 | 940,000 | 1,034,000 | 1,174,000 | 1,347,000 | 1,148,000 | 1,486,000 | 1,378,000 | 9,448,000 | 2,309,296 |
| 2031 | 14.5 | 0.22 | 923,000 | 941,000 | 940,000 | 1,034,000 | 1,174,000 | 1,347,000 | 1,148,000 | 1,486,000 | 8,993,000 | 1,980,256 |
| 2032 | 15.5 | 0.20 | 871,000 | 923,000 | 941,000 | 940,000 | 1,034,000 | 1,174,000 | 1,347,000 | 1,148,000 | 8,378,000 | 1,662,012 |
| 2033 | 16.5 | 0.18 | 945,000 | 871,000 | 923,000 | 941,000 | 940,000 | 1,034,000 | 1,174,000 | 1,347,000 | 8,175,000 | 1,461,028 |
| 2034 | 17.5 | 0.16 | 945,000 | 945,000 | 871,000 | 923,000 | 941,000 | 940,000 | 1,034,000 | 1,174,000 | 7,773,000 | 1,251,516 |
| 2035 | 18.5 | 0.15 | 945,000 | 945,000 | 945,000 | 871,000 | 923,000 | 941,000 | 940,000 | 1,034,000 | 7,544,000 | 1,094,275 |
| 2036 | 19.5 | 0.13 | 945,000 | 945,000 | 945,000 | 945,000 | 871,000 | 923,000 | 941,000 | 940,000 | 7,455,000 | 974,203 |
| 2037 | 20.5 | 0.12 | 945,000 | 945,000 | 945,000 | 945,000 | 945,000 | 871,000 | 923,000 | 941,000 | 7,460,000 | 878,249 |
| 2038 | 21.5 | 0.11 | 945,000 | 945,000 | 945,000 | 945,000 | 945,000 | 945,000 | 871,000 | 923,000 | 7,464,000 | 791,640 |
| 2039 | 22.5 | 0.10 | 945,000 | 945,000 | 945,000 | 945,000 | 945,000 | 945,000 | 945,000 | 871,000 | 7,486,000 | 715,291 |
| 2040 | 23.5 | 0.09 | | 945,000 | 945,000 | 945,000 | 945,000 | 945,000 | 945,000 | 945,000 | 6,615,000 | 569,429 |
| 2041 | 24.5 | 0.08 | | | 945,000 | 945,000 | 945,000 | 945,000 | 945,000 | 945,000 | 5,670,000 | 439,714 |
| 2042 | 25.5 | 0.07 | | | | 945,000 | 945,000 | 945,000 | 945,000 | 945,000 | 4,725,000 | 330,115 |
| 2043 | 26.5 | 0.06 | | | | | 945,000 | 945,000 | 945,000 | 945,000 | 3,780,000 | 237,921 |
| 2044 | 27.5 | 0.06 | | | | | | 945,000 | 945,000 | 945,000 | 2,835,000 | 160,757 |
| 2045 | 28.5 | 0.05 | | | | | | | 945,000 | 945,000 | 1,890,000 | 96,551 |
| 2046 | 29.5 | 0.05 | | | | | | | | 945,000 | 945,000 | 43,491 |
| | | | | | | | | | | | $ 160,792,000 | $ 35,183,802 |
| | | | | | | | | | | | | 78% |

Notes:
[1] Uses mid-year convention
[2] 15% discount rate less assumed 4% long-term growth rate

1

**California Berry Cultivars vs. University of California**
**Exhibit 6: Lifetime Royalty Calculation**
Cultivar Average

|  | A | B | C = A * B |
|---|---|---|---|
|  | Average Units | Royalties ($/1000) | Expected Royalties |
| California | 1,015,800,632 | $ 10.00 | $ 10,158,006 |
| United States | 29,471,991 | 11.25 | 331,560 |
| International | 457,812,422 | 21.00 | 9,614,061 |
|  | 1,503,085,045 |  | $ 20,103,627 |

| | D | E = C * D | F | G = C * F | H | I = C * H | J = E + G + I |
|---|---|---|---|---|---|---|---|
| | | California | | United States | | International | |
| | % | Expected Royalties | % | Expected Royalties | % | Expected Royalties | Total Royalties |
| 1st year | 1% | $ 83,000 | 0% | $ - | 0% | $ - | $ 83,000 |
| | 3% | 255,000 | 0% | - | 0% | 2,000 | 257,000 |
| | 5% | 547,000 | 4% | 14,000 | 2% | 185,000 | 746,000 |
| | 7% | 690,000 | 4% | 14,000 | 5% | 452,000 | 1,156,000 |
| 5th | 8% | 831,000 | 7% | 22,000 | 5% | 525,000 | 1,378,000 |
| | 8% | 806,000 | 9% | 31,000 | 7% | 649,000 | 1,486,000 |
| | 6% | 560,000 | 5% | 16,000 | 6% | 572,000 | 1,148,000 |
| | 6% | 654,000 | 7% | 22,000 | 7% | 671,000 | 1,347,000 |
| | 5% | 525,000 | 7% | 23,000 | 7% | 626,000 | 1,174,000 |
| 10th | 4% | 407,000 | 9% | 29,000 | 6% | 598,000 | 1,034,000 |
| | 2% | 250,000 | 5% | 16,000 | 7% | 674,000 | 940,000 |
| | 4% | 422,000 | 4% | 13,000 | 5% | 506,000 | 941,000 |
| | 4% | 407,000 | 5% | 15,000 | 5% | 501,000 | 923,000 |
| | 4% | 387,000 | 3% | 10,000 | 5% | 474,000 | 871,000 |
| 15th | 5% | 476,000 | 5% | 15,000 | 5% | 454,000 | 945,000 |
| | 5% | 476,000 | 5% | 15,000 | 5% | 454,000 | 945,000 |
| | 5% | 476,000 | 5% | 15,000 | 5% | 454,000 | 945,000 |
| | 5% | 476,000 | 5% | 15,000 | 5% | 454,000 | 945,000 |
| | 5% | 476,000 | 5% | 15,000 | 5% | 454,000 | 945,000 |
| 20th | 5% | 476,000 | 5% | 15,000 | 5% | 454,000 | 945,000 |
| | 5% | 476,000 | 5% | 15,000 | 5% | 454,000 | 945,000 |
| (rounded) | 100% | $ 10,156,000 | 100% | $ 330,000 | 100% | $ 9,613,000 | $ 20,099,000 |
| | | | | | | | (rounded) |

**California Berry Cultivars vs. University of California**
**Exhibit 6: Strawberry Cultivar Unit Sales Analysis**
Cultivar Average Projections - California

Average Unit Sales                              1,015,800,632

| Camino Real (2001-125) | Ventana (2001-126) | Albion (2004-323) | Palomar (2007-274) | Monterey (2008-332) | San Andreas (2008-333) | Portola (2008-334) | Benicia (2010-492) | Mojave (2010-493) | TOTALS |
|---|---|---|---|---|---|---|---|---|---|

100%

Source: UC_STRAW2_00058007
CONTAINS ATTORNEYS EYES ONLY INFORMATION

3

**California Berry Cultivars vs. University of California**
**Exhibit 6: Strawberry Cultivar Unit Sales Analysis**
Cultivar Average Projections - United States

Average Unit Sales                29,471,991

| Camino Real | Ventana | Albion | Palomar | Monterey | San Andreas | Portola | Benicia | Mojave |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |

100%

Source: UC_STRAW2_00058007
CONTAINS ATTORNEYS EYES ONLY INFORMATION

4

**California Berry Cultivars vs. University of California**
**Exhibit 6: Strawberry Cultivar Unit Sales Analysis**
Cultivar Average Projections - International

Average Unit Sales                    457,812,422



Source: UC_STRAW2_00058007
CONTAINS ATTORNEYS EYES ONLY INFORMATION

5

**California Berry Cultivars vs. University of California**
**Exhibit 7: Projections versus Actual Royalties**
2014 - 2016



**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

| | | | | |
|---|---|---|---|---|
| Net Discount Rate | 11% [2] | | | |
| Years of Delay | 4 Years | | | |

| | | *A* | *B* | | | *C* | *D = sum B:C* | *E = A \* D* |
|---|---|---|---|---|---|---|---|---|
| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Subtotal | Present Value |
| 2015 | 0 | 1 | $ 83,000 | | | | $ 83,000 | $ 83,000 |
| 2016 | 0 | 1 | 257,000 | $ 83,000 | | | 340,000 | 340,000 |
| 2017 | 0.5 | 0.95 | 746,000 | 257,000 | $ 83,000 | | 1,086,000 | 1,030,786 |
| 2018 | 1.5 | 0.86 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 2,242,000 | 1,917,128 |
| 2019 | 2.5 | 0.77 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 3,537,000 | 2,724,756 |
| 2020 | 3.5 | 0.69 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 4,766,000 | 3,307,681 |
| 2021 | 4.5 | 0.63 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 5,445,000 | 3,404,431 |
| 2022 | 5.5 | 0.56 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 5,940,000 | 3,345,878 |
| 2023 | 6.5 | 0.51 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 6,031,000 | 3,060,483 |
| 2024 | 7.5 | 0.46 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 5,809,000 | 2,655,700 |
| 2025 | 8.5 | 0.41 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 5,514,000 | 2,271,023 |
| 2026 | 9.5 | 0.37 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 4,830,000 | 1,792,168 |
| 2027 | 10.5 | 0.33 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 4,190,000 | 1,400,628 |
| 2028 | 11.5 | 0.30 | 708,000 | 829,000 | 967,000 | 1,130,000 | 3,634,000 | 1,094,386 |
| 2029 | 12.5 | 0.27 | 516,000 | 708,000 | 829,000 | 967,000 | 3,020,000 | 819,350 |
| 2030 | 13.5 | 0.24 | 416,000 | 516,000 | 708,000 | 829,000 | 2,469,000 | 603,477 |
| 2031 | 14.5 | 0.22 | 374,000 | 416,000 | 516,000 | 708,000 | 2,014,000 | 443,482 |
| 2032 | 15.5 | 0.20 | 294,000 | 374,000 | 416,000 | 516,000 | 1,600,000 | 317,405 |
| 2033 | 16.5 | 0.18 | 283,000 | 294,000 | 374,000 | 416,000 | 1,367,000 | 244,309 |
| 2034 | 17.5 | 0.16 | 187,000 | 283,000 | 294,000 | 374,000 | 1,138,000 | 183,227 |
| 2035 | 18.5 | 0.15 | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 136,204 |
| 2036 | 19.5 | 0.13 | | 175,000 | 187,000 | 283,000 | 645,000 | 84,287 |
| 2037 | 20.5 | 0.12 | | | 175,000 | 187,000 | 362,000 | 42,617 |
| 2038 | 21.5 | 0.11 | | | | 175,000 | 175,000 | 18,561 |
| | | | | | | | $ 67,176,000 | $ 31,320,968 |
| | | | | | | | | 53% |

Notes:

[1] Uses mid-year convention

[2] 15% discount rate less assumed 4% long-term growth rate

1

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Net Discount Rate | | 11% [2] | | | | | | |
| Years of Delay | | 5 Years | | | | | | |

| | | *A* | *B* | | | *C* | *D = sum B:C* | *E = A * D* |
|---|---|---|---|---|---|---|---|---|
| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Subtotal | Present Value |

| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Subtotal | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| 2016 | 0 | 1 | $ 83,000 | | | | | $ 83,000 | $ 83,000 |
| 2017 | 0.5 | 0.95 | 257,000 | $ 83,000 | | | | 340,000 | 322,714 |
| 2018 | 1.5 | 0.86 | 746,000 | 257,000 | $ 83,000 | | | 1,086,000 | 928,636 |
| 2019 | 2.5 | 0.77 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 2,242,000 | 1,727,142 |
| 2020 | 3.5 | 0.69 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 3,620,000 | 2,512,338 |
| 2021 | 4.5 | 0.63 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 5,023,000 | 3,140,579 |
| 2022 | 5.5 | 0.56 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 6,191,000 | 3,487,261 |
| 2023 | 6.5 | 0.51 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 7,096,000 | 3,600,926 |
| 2024 | 7.5 | 0.46 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 7,409,000 | 3,387,172 |
| 2025 | 8.5 | 0.41 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 7,295,000 | 3,004,554 |
| 2026 | 9.5 | 0.37 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 6,939,000 | 2,574,712 |
| 2027 | 10.5 | 0.33 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 6,481,000 | 2,166,460 |
| 2028 | 11.5 | 0.30 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 5,659,000 | 1,704,219 |
| 2029 | 12.5 | 0.27 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 4,898,000 | 1,328,867 |
| 2030 | 13.5 | 0.24 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 4,150,000 | 1,014,350 |
| 2031 | 14.5 | 0.22 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 3,436,000 | 756,606 |
| 2032 | 15.5 | 0.20 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 2,843,000 | 563,989 |
| 2033 | 16.5 | 0.18 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,308,000 | 412,484 |
| 2034 | 17.5 | 0.16 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 1,883,000 | 303,178 |
| 2035 | 18.5 | 0.15 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,554,000 | 225,411 |
| 2036 | 19.5 | 0.13 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 171,580 |
| 2037 | 20.5 | 0.12 | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 110,546 |
| 2038 | 21.5 | 0.11 | | | 175,000 | 187,000 | 283,000 | 645,000 | 68,409 |
| 2039 | 22.5 | 0.10 | | | | 175,000 | 187,000 | 362,000 | 34,589 |
| 2040 | 23.5 | 0.09 | | | | | 175,000 | 175,000 | 15,064 |
| | | | | | | | | $ 83,970,000 | $ 33,644,789 |
| | | | | | | | | | 60% |

Notes:

[1] Uses mid-year convention

[2] 15% discount rate less assumed 4% long-term growth rate

2

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Discount Rate | | 11% [2] | | | | | | | | | |
| Years of Delay | | 6 Years | | | | | | | | | |

| | | | A | B | | | | C | D = sum B:C | E = A * D |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Subtotal | Present Value |
| 2017 | 0.5 | 0.95 | $ 83,000 | | | | | | $ 83,000 | $ 78,780 |
| 2018 | 1.5 | 0.86 | 257,000 | $ 83,000 | | | | | 340,000 | 290,733 |
| 2019 | 2.5 | 0.77 | 746,000 | 257,000 | $ 83,000 | | | | 1,086,000 | 836,609 |
| 2020 | 3.5 | 0.69 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 2,242,000 | 1,555,984 |
| 2021 | 4.5 | 0.63 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 3,620,000 | 2,263,368 |
| 2022 | 5.5 | 0.56 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 5,106,000 | 2,876,103 |
| 2023 | 6.5 | 0.51 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 6,448,000 | 3,272,093 |
| 2024 | 7.5 | 0.46 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 7,842,000 | 3,585,127 |
| 2025 | 8.5 | 0.41 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 8,565,000 | 3,527,622 |
| 2026 | 9.5 | 0.37 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 8,673,000 | 3,218,111 |
| 2027 | 10.5 | 0.33 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 8,425,000 | 2,816,298 |
| 2028 | 11.5 | 0.30 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 7,906,000 | 2,380,908 |
| 2029 | 12.5 | 0.27 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 7,310,000 | 1,983,262 |
| 2030 | 13.5 | 0.24 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 6,367,000 | 1,556,233 |
| 2031 | 14.5 | 0.22 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 5,414,000 | 1,192,161 |
| 2032 | 15.5 | 0.20 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 4,566,000 | 905,795 |
| 2033 | 16.5 | 0.18 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 3,810,000 | 680,920 |
| 2034 | 17.5 | 0.16 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,137,000 | 505,083 |
| 2035 | 18.5 | 0.15 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,591,000 | 375,831 |
| 2036 | 19.5 | 0.13 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,070,000 | 270,503 |
| 2037 | 20.5 | 0.12 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 203,551 |
| 2038 | 21.5 | 0.11 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 139,258 |
| 2039 | 22.5 | 0.10 | | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 89,722 |
| 2040 | 23.5 | 0.09 | | | | 175,000 | 187,000 | 283,000 | 645,000 | 55,523 |
| 2041 | 24.5 | 0.08 | | | | | 175,000 | 187,000 | 362,000 | 28,073 |
| 2042 | 25.5 | 0.07 | | | | | | 175,000 | 175,000 | 12,226 |
| Notes: | | | | | | | | | $ 100,764,000 | $ 34,699,877 |
| | | | | | | | | | | 66% |

[1] Uses mid-year convention

[2] 15% discount rate less assumed 4% long-term growth rate

3

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

| | | | |
|---|---|---|---|
| Net Discount Rate | 11% [2] | | |
| Years of Delay | 7 Years | | |

| | | A | B | | | | | | | C | D = sum B:C | E = A * D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Subtotal | Present Value |
| 2018 | 1.5 | 0.86 | $ 83,000 | | | | | | | $ 83,000 | $ 70,973 |
| 2019 | 2.5 | 0.77 | 257,000 | $ 83,000 | | | | | | 340,000 | 261,922 |
| 2020 | 3.5 | 0.69 | 746,000 | 257,000 | $ 83,000 | | | | | 1,086,000 | 753,702 |
| 2021 | 4.5 | 0.63 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | 2,242,000 | 1,401,788 |
| 2022 | 5.5 | 0.56 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 3,620,000 | 2,039,070 |
| 2023 | 6.5 | 0.51 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 5,106,000 | 2,591,084 |
| 2024 | 7.5 | 0.46 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 6,531,000 | 2,985,777 |
| 2025 | 8.5 | 0.41 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 8,099,000 | 3,335,693 |
| 2026 | 9.5 | 0.37 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 9,311,000 | 3,454,841 |
| 2027 | 10.5 | 0.33 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 9,829,000 | 3,285,625 |
| 2028 | 11.5 | 0.30 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 9,803,000 | 2,952,193 |
| 2029 | 12.5 | 0.27 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 9,392,000 | 2,548,126 |
| 2030 | 13.5 | 0.24 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 8,735,000 | 2,135,024 |
| 2031 | 14.5 | 0.22 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 8,018,000 | 1,765,562 |
| 2032 | 15.5 | 0.20 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 6,883,000 | 1,365,437 |
| 2033 | 16.5 | 0.18 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 5,830,000 | 1,041,932 |
| 2034 | 17.5 | 0.16 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 4,940,000 | 795,380 |
| 2035 | 18.5 | 0.15 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 4,104,000 | 595,295 |
| 2036 | 19.5 | 0.13 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,420,000 | 446,918 |
| 2037 | 20.5 | 0.12 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,778,000 | 327,048 |
| 2038 | 21.5 | 0.11 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,245,000 | 238,107 |
| 2039 | 22.5 | 0.10 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 165,207 |
| 2040 | 23.5 | 0.09 | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 113,025 |
| 2041 | 24.5 | 0.08 | | | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 72,820 |
| 2042 | 25.5 | 0.07 | | | | | 175,000 | 187,000 | 283,000 | 645,000 | 45,063 |
| 2043 | 26.5 | 0.06 | | | | | | 175,000 | 187,000 | 362,000 | 22,785 |
| 2044 | 27.5 | 0.06 | | | | | | | 175,000 | 175,000 | 9,923 |
| | | | | | | | | | | $ 117,558,000 | $ 34,820,319 |
| | | | | | | | | | | | 70% |

Notes:
[1] Uses mid-year convention
[2] 15% discount rate less assumed 4% long-term growth rate

4

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

Net Discount Rate     8% [2]
Years of Delay     4 Years

| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Subtotal | Present Value |
|------|------|------|------|------|------|------|------|------|
| | | A | B | | | C | D = sum B:C | E = A * D |
| 2015 | 0 | 1 | $ 83,000 | | | | $ 83,000 | $ 83,000 |
| 2016 | 0 | 1 | 257,000 | $ 83,000 | | | 340,000 | 340,000 |
| 2017 | 0.5 | 0.96 | 746,000 | 257,000 | $ 83,000 | | 1,086,000 | 1,045,004 |
| 2018 | 1.5 | 0.89 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 2,242,000 | 1,997,561 |
| 2019 | 2.5 | 0.82 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 3,537,000 | 2,917,935 |
| 2020 | 3.5 | 0.76 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 4,766,000 | 3,640,583 |
| 2021 | 4.5 | 0.71 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 5,445,000 | 3,851,155 |
| 2022 | 5.5 | 0.65 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 5,940,000 | 3,890,055 |
| 2023 | 6.5 | 0.61 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 6,031,000 | 3,657,084 |
| 2024 | 7.5 | 0.56 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 5,809,000 | 3,261,544 |
| 2025 | 8.5 | 0.52 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 5,514,000 | 2,866,585 |
| 2026 | 9.5 | 0.48 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 4,830,000 | 2,324,992 |
| 2027 | 10.5 | 0.45 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 4,190,000 | 1,867,517 |
| 2028 | 11.5 | 0.41 | 708,000 | 829,000 | 967,000 | 1,130,000 | 3,634,000 | 1,499,725 |
| 2029 | 12.5 | 0.38 | 516,000 | 708,000 | 829,000 | 967,000 | 3,020,000 | 1,154,011 |
| 2030 | 13.5 | 0.35 | 416,000 | 516,000 | 708,000 | 829,000 | 2,469,000 | 873,575 |
| 2031 | 14.5 | 0.33 | 374,000 | 416,000 | 516,000 | 708,000 | 2,014,000 | 659,804 |
| 2032 | 15.5 | 0.30 | 294,000 | 374,000 | 416,000 | 516,000 | 1,600,000 | 485,346 |
| 2033 | 16.5 | 0.28 | 283,000 | 294,000 | 374,000 | 416,000 | 1,367,000 | 383,952 |
| 2034 | 17.5 | 0.26 | 187,000 | 283,000 | 294,000 | 374,000 | 1,138,000 | 295,956 |
| 2035 | 18.5 | 0.24 | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 226,113 |
| 2036 | 19.5 | 0.22 | | 175,000 | 187,000 | 283,000 | 645,000 | 143,812 |
| 2037 | 20.5 | 0.21 | | | 175,000 | 187,000 | 362,000 | 74,735 |
| 2038 | 21.5 | 0.19 | | | | 175,000 | 175,000 | 33,452 |
| | | | | | | | $ 67,176,000 | $ 37,573,497 |
| | | | | | | | | 44% |

Notes:
[1] Uses mid-year convention
[2] 12% discount rate less assumed 4% long-term growth rate

5

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

Net Discount Rate     8%  [2]
Years of Delay         5 Years

| Year | Years Discounted | PV Factor [1] | Cultivar#1 (A) | Cultivar#2 (B) | Cultivar#3 | Cultivar#4 | Cultivar#5 (C) | Subtotal (D = sum B:C) | Present Value (E = A * D) |
|------|-----------------|---------------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|
| 2016 | 0    | 1    | $ 83,000  |           |           |           |           | $ 83,000  | $ 83,000  |
| 2017 | 0.5  | 0.96 | 257,000   | $ 83,000  |           |           |           | 340,000   | 327,165   |
| 2018 | 1.5  | 0.89 | 746,000   | 257,000   | $ 83,000  |           |           | 1,086,000 | 967,596   |
| 2019 | 2.5  | 0.82 | 1,156,000 | 746,000   | 257,000   | $ 83,000  |           | 2,242,000 | 1,849,593 |
| 2020 | 3.5  | 0.76 | 1,378,000 | 1,156,000 | 746,000   | 257,000   | $ 83,000  | 3,620,000 | 2,765,193 |
| 2021 | 4.5  | 0.71 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000   | 257,000   | 5,023,000 | 3,552,682 |
| 2022 | 5.5  | 0.65 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000   | 6,191,000 | 4,054,433 |
| 2023 | 6.5  | 0.61 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 7,096,000 | 4,302,880 |
| 2024 | 7.5  | 0.56 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 7,409,000 | 4,159,886 |
| 2025 | 8.5  | 0.52 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 7,295,000 | 3,792,481 |
| 2026 | 9.5  | 0.48 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 6,939,000 | 3,340,190 |
| 2027 | 10.5 | 0.45 | 967,000   | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 6,481,000 | 2,888,634 |
| 2028 | 11.5 | 0.41 | 829,000   | 967,000   | 1,130,000 | 1,264,000 | 1,469,000 | 5,659,000 | 2,335,428 |
| 2029 | 12.5 | 0.38 | 708,000   | 829,000   | 967,000   | 1,130,000 | 1,264,000 | 4,898,000 | 1,871,638 |
| 2030 | 13.5 | 0.35 | 516,000   | 708,000   | 829,000   | 967,000   | 1,130,000 | 4,150,000 | 1,468,343 |
| 2031 | 14.5 | 0.33 | 416,000   | 516,000   | 708,000   | 829,000   | 967,000   | 3,436,000 | 1,125,664 |
| 2032 | 15.5 | 0.30 | 374,000   | 416,000   | 516,000   | 708,000   | 829,000   | 2,843,000 | 862,400   |
| 2033 | 16.5 | 0.28 | 294,000   | 374,000   | 416,000   | 516,000   | 708,000   | 2,308,000 | 648,252   |
| 2034 | 17.5 | 0.26 | 283,000   | 294,000   | 374,000   | 416,000   | 516,000   | 1,883,000 | 489,705   |
| 2035 | 18.5 | 0.24 | 187,000   | 283,000   | 294,000   | 374,000   | 416,000   | 1,554,000 | 374,207   |
| 2036 | 19.5 | 0.22 | 175,000   | 187,000   | 283,000   | 294,000   | 374,000   | 1,313,000 | 292,753   |
| 2037 | 20.5 | 0.21 |           | 175,000   | 187,000   | 283,000   | 294,000   | 939,000   | 193,856   |
| 2038 | 21.5 | 0.19 |           |           | 175,000   | 187,000   | 283,000   | 645,000   | 123,296   |
| 2039 | 22.5 | 0.18 |           |           |           | 175,000   | 187,000   | 362,000   | 64,073    |
| 2040 | 23.5 | 0.16 |           |           |           |           | 175,000   | 175,000   | 28,680    |
|      |      |      |           |           |           |           |           | $ 83,970,000 | $ 41,962,027 |
|      |      |      |           |           |           |           |           |           | 50%       |

Notes:
[1] Uses mid-year convention
[2] 12% discount rate less assumed 4% long-term growth rate

6

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

Net Discount Rate    8% [2]
Years of Delay       6 Years

| | | | A | B | | | | C | D = sum B:C | E = A * D |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Subtotal | Present Value |
| 2017 | 0.5 | 0.96 | $ 83,000 | | | | | | $ 83,000 | $ 79,867 |
| 2018 | 1.5 | 0.89 | 257,000 | $ 83,000 | | | | | 340,000 | 302,931 |
| 2019 | 2.5 | 0.82 | 746,000 | 257,000 | $ 83,000 | | | | 1,086,000 | 895,922 |
| 2020 | 3.5 | 0.76 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 2,242,000 | 1,712,586 |
| 2021 | 4.5 | 0.71 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 3,620,000 | 2,560,364 |
| 2022 | 5.5 | 0.65 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 5,106,000 | 3,343,876 |
| 2023 | 6.5 | 0.61 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 6,448,000 | 3,909,945 |
| 2024 | 7.5 | 0.56 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 7,842,000 | 4,403,000 |
| 2025 | 8.5 | 0.52 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 8,565,000 | 4,452,721 |
| 2026 | 9.5 | 0.48 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 8,673,000 | 4,174,877 |
| 2027 | 10.5 | 0.45 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 8,425,000 | 3,755,091 |
| 2028 | 11.5 | 0.41 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 7,906,000 | 3,262,749 |
| 2029 | 12.5 | 0.38 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 7,310,000 | 2,793,318 |
| 2030 | 13.5 | 0.35 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 6,367,000 | 2,252,756 |
| 2031 | 14.5 | 0.33 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 5,414,000 | 1,773,674 |
| 2032 | 15.5 | 0.30 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 4,566,000 | 1,385,057 |
| 2033 | 16.5 | 0.28 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 3,810,000 | 1,070,121 |
| 2034 | 17.5 | 0.26 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,137,000 | 815,828 |
| 2035 | 18.5 | 0.24 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,591,000 | 623,919 |
| 2036 | 19.5 | 0.22 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,070,000 | 461,538 |
| 2037 | 20.5 | 0.21 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 356,951 |
| 2038 | 21.5 | 0.19 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 250,989 |
| 2039 | 22.5 | 0.18 | | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 166,200 |
| 2040 | 23.5 | 0.16 | | | | 175,000 | 187,000 | 283,000 | 645,000 | 105,706 |
| 2041 | 24.5 | 0.15 | | | | | 175,000 | 187,000 | 362,000 | 54,932 |
| 2042 | 25.5 | 0.14 | | | | | | 175,000 | 175,000 | 24,589 |
| Notes: | | | | | | | | | $ 100,764,000 | $ 44,989,505 |
| | | | | | | | | | | 55% |

[1] Uses mid-year convention

[2] 12% discount rate less assumed 4% long-term growth rate

7

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Discount Rate | | 8% [2] | | | | | | | | | |
| Years of Delay | | 7 Years | | | | | | | | | |

| | | A | B | | | | | | C | D = sum B:C | E = A * D |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Subtotal | Present Value |
| 2018 | 1.5 | 0.89 | $   83,000 | | | | | | | $   83,000 | $   73,951 |
| 2019 | 2.5 | 0.82 | 257,000 | $   83,000 | | | | | | 340,000 | 280,491 |
| 2020 | 3.5 | 0.76 | 746,000 | 257,000 | $   83,000 | | | | | 1,086,000 | 829,558 |
| 2021 | 4.5 | 0.71 | 1,156,000 | 746,000 | 257,000 | $   83,000 | | | | 2,242,000 | 1,585,728 |
| 2022 | 5.5 | 0.65 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $   83,000 | | | 3,620,000 | 2,370,707 |
| 2023 | 6.5 | 0.61 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $   83,000 | | 5,106,000 | 3,096,181 |
| 2024 | 7.5 | 0.56 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $   83,000 | 6,531,000 | 3,666,921 |
| 2025 | 8.5 | 0.52 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 8,099,000 | 4,210,459 |
| 2026 | 9.5 | 0.48 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 9,311,000 | 4,481,988 |
| 2027 | 10.5 | 0.45 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 9,829,000 | 4,380,865 |
| 2028 | 11.5 | 0.41 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 9,803,000 | 4,045,627 |
| 2029 | 12.5 | 0.38 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 9,392,000 | 3,588,898 |
| 2030 | 13.5 | 0.35 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 8,735,000 | 3,090,596 |
| 2031 | 14.5 | 0.33 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 8,018,000 | 2,626,767 |
| 2032 | 15.5 | 0.30 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 6,883,000 | 2,087,899 |
| 2033 | 16.5 | 0.28 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 5,830,000 | 1,637,482 |
| 2034 | 17.5 | 0.26 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 4,940,000 | 1,284,728 |
| 2035 | 18.5 | 0.24 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 4,104,000 | 988,252 |
| 2036 | 19.5 | 0.22 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,420,000 | 762,540 |
| 2037 | 20.5 | 0.21 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,778,000 | 573,516 |
| 2038 | 21.5 | 0.19 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,245,000 | 429,147 |
| 2039 | 22.5 | 0.18 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 306,028 |
| 2040 | 23.5 | 0.16 | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 215,182 |
| 2041 | 24.5 | 0.15 | | | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 142,490 |
| 2042 | 25.5 | 0.14 | | | | | 175,000 | 187,000 | 283,000 | 645,000 | 90,626 |
| 2043 | 26.5 | 0.13 | | | | | | 175,000 | 187,000 | 362,000 | 47,095 |
| 2044 | 27.5 | 0.12 | | | | | | | 175,000 | 175,000 | 21,081 |
| Notes: | | | | | | | | | | $ 117,558,000 | $ 46,914,804 |
| | | | | | | | | | | | 60% |

Notes:
[1] Uses mid-year convention
[2] 12% discount rate less assumed 4% long-term growth rate

8

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

Net Discount Rate 3.5% [2]
Years of Delay 8 Years

| Year | Years Discounted | PV Factor [1] | Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Cultivar#8 | Subtotal | Present Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | *A* | *B* | | | | | | | *C* | *D = sum B:C* | *E = A * D* |
| 2019 | 2.5 | 0.92 | $ 83,000 | | | | | | | | $ 83,000 | $ 76,160 |
| 2020 | 3.5 | 0.89 | 257,000 | $ 83,000 | | | | | | | 340,000 | 301,431 |
| 2021 | 4.5 | 0.86 | 746,000 | 257,000 | $ 83,000 | | | | | | 1,086,000 | 930,247 |
| 2022 | 5.5 | 0.83 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | | 2,242,000 | 1,855,512 |
| 2023 | 6.5 | 0.80 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | 3,620,000 | 2,894,652 |
| 2024 | 7.5 | 0.77 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 5,106,000 | 3,944,829 |
| 2025 | 8.5 | 0.75 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 6,531,000 | 4,875,136 |
| 2026 | 9.5 | 0.72 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | 8,182,000 | 5,901,007 |
| 2027 | 10.5 | 0.70 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | 9,568,000 | 6,667,262 |
| 2028 | 11.5 | 0.67 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 10,575,000 | 7,119,776 |
| 2029 | 12.5 | 0.65 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 10,959,000 | 7,128,802 |
| 2030 | 13.5 | 0.63 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 10,770,000 | 6,768,945 |
| 2031 | 14.5 | 0.61 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 10,221,000 | 6,206,665 |
| 2032 | 15.5 | 0.59 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 9,443,000 | 5,540,316 |
| 2033 | 16.5 | 0.57 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 8,534,000 | 4,837,677 |
| 2034 | 17.5 | 0.55 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 7,299,000 | 3,997,673 |
| 2035 | 18.5 | 0.53 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 6,204,000 | 3,283,034 |
| 2036 | 19.5 | 0.51 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 5,234,000 | 2,676,066 |
| 2037 | 20.5 | 0.49 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 4,387,000 | 2,167,157 |
| 2038 | 21.5 | 0.48 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 3,607,000 | 1,721,586 |
| 2039 | 22.5 | 0.46 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 2,953,000 | 1,361,776 |
| 2040 | 23.5 | 0.45 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 2,245,000 | 1,000,272 |
| 2041 | 24.5 | 0.43 | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 1,729,000 | 744,314 |
| 2042 | 25.5 | 0.42 | | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 1,313,000 | 546,117 |
| 2043 | 26.5 | 0.40 | | | | | 175,000 | 187,000 | 283,000 | 294,000 | 939,000 | 377,352 |
| 2044 | 27.5 | 0.39 | | | | | | 175,000 | 187,000 | 283,000 | 645,000 | 250,438 |
| 2045 | 28.5 | 0.38 | | | | | | | 175,000 | 187,000 | 362,000 | 135,803 |
| 2046 | 29.5 | 0.36 | | | | | | | | 175,000 | 175,000 | 63,430 |
| | | | | | | | | | | | $ 134,352,000 | $ 83,373,435 |
| | | | | | | | | | | | | 38% |

Notes:

[1] Uses mid-year convention
[2] 7.5% discount rate less assumed 4% long-term growth rate

9

**California Berry Cultivars vs. University of California**
**Exhibit 8: Lost Revenue Model**
Alternate Trend Analysis Projections

Net Discount Rate    16% [2]
Years of Delay    8 Years

| Year | Years Discounted | A PV Factor [1] | B Cultivar#1 | Cultivar#2 | Cultivar#3 | Cultivar#4 | Cultivar#5 | Cultivar#6 | Cultivar#7 | Cultivar#8 | C Subtotal | D = sum B:C | E = A * D Present Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 2.5 | 0.69 | $ 83,000 | | | | | | | | | $ 83,000 | $ 57,271 |
| 2020 | 3.5 | 0.59 | 257,000 | $ 83,000 | | | | | | | | 340,000 | 202,244 |
| 2021 | 4.5 | 0.51 | 746,000 | 257,000 | $ 83,000 | | | | | | | 1,086,000 | 556,889 |
| 2022 | 5.5 | 0.44 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | | | 2,242,000 | 991,098 |
| 2023 | 6.5 | 0.38 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | | 3,620,000 | 1,379,532 |
| 2024 | 7.5 | 0.33 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | | 5,106,000 | 1,677,436 |
| 2025 | 8.5 | 0.28 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | | 6,531,000 | 1,849,638 |
| 2026 | 9.5 | 0.24 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | $ 83,000 | | 8,182,000 | 1,997,600 |
| 2027 | 10.5 | 0.21 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | 257,000 | | 9,568,000 | 2,013,781 |
| 2028 | 11.5 | 0.18 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | 746,000 | | 10,575,000 | 1,918,728 |
| 2029 | 12.5 | 0.16 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | 1,156,000 | | 10,959,000 | 1,714,139 |
| 2030 | 13.5 | 0.13 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | 1,378,000 | | 10,770,000 | 1,452,221 |
| 2031 | 14.5 | 0.12 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | 1,486,000 | | 10,221,000 | 1,188,099 |
| 2032 | 15.5 | 0.10 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | 1,425,000 | | 9,443,000 | 946,261 |
| 2033 | 16.5 | 0.09 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | 1,651,000 | | 8,534,000 | 737,218 |
| 2034 | 17.5 | 0.07 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | 1,469,000 | | 7,299,000 | 543,561 |
| 2035 | 18.5 | 0.06 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | 1,264,000 | | 6,204,000 | 398,290 |
| 2036 | 19.5 | 0.06 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | 1,130,000 | | 5,234,000 | 289,670 |
| 2037 | 20.5 | 0.05 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | 967,000 | | 4,387,000 | 209,305 |
| 2038 | 21.5 | 0.04 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | 829,000 | | 3,607,000 | 148,354 |
| 2039 | 22.5 | 0.04 | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | 708,000 | | 2,953,000 | 104,703 |
| 2040 | 23.5 | 0.03 | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | 516,000 | | 2,245,000 | 68,620 |
| 2041 | 24.5 | 0.03 | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | 416,000 | | 1,729,000 | 45,559 |
| 2042 | 25.5 | 0.02 | | | | 175,000 | 187,000 | 283,000 | 294,000 | 374,000 | | 1,313,000 | 29,825 |
| 2043 | 26.5 | 0.02 | | | | | 175,000 | 187,000 | 283,000 | 294,000 | | 939,000 | 18,388 |
| 2044 | 27.5 | 0.02 | | | | | | 175,000 | 187,000 | 283,000 | | 645,000 | 10,888 |
| 2045 | 28.5 | 0.01 | | | | | | | 175,000 | 187,000 | | 362,000 | 5,268 |
| 2046 | 29.5 | 0.01 | | | | | | | | 175,000 | | 175,000 | 2,195 |
| | | | | | | | | | | | | $ 134,352,000 | $ 20,556,783 |
| | | | | | | | | | | | | | 85% |

Notes:
[1] Uses mid-year convention
[2] 20% discount rate less assumed 4% long-term growth rate

10

# EXHIBIT B

Highly Confidential — Attorneys' Eyes Only
Mary Delany — December 9, 2016

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4    _____
      CALIFORNIA BERRY CULTIVARS,     )
 5    LLC,                            )
                                      )
 6        Plaintiffs,                 )
                                      )
 7           vs.                      )   Case No. 3:16-cv-02477
                                      )         VC
 8    THE REGENTS OF THE UNIVERSITY   )
      OF CALIFORNIA,                  )
 9                                    )
          Defendant.                  )
10    _____)
                                      )
11    and Related Claims.            )
      _____)
12

13

14       HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

15

16

17       VIDEOTAPED DEPOSITION OF MARY DELANY

18            San Francisco, California

19            Friday, December 9, 2016

20                  Volume I

21

22

23

24    REPORTED BY:

25    REBECCA L. ROMANO, RPR, CSR No. 12546
```

Highly Confidential — Attorneys' Eyes Only
Mary Delany — December 9, 2016

Page 2

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4    _____
      CALIFORNIA BERRY CULTIVARS,      )
 5    LLC,                             )
                                       )
 6         Plaintiffs,                 )
                                       )
 7           vs.                       )   Case No. 3:16-cv-02477
                                       )        VC
 8    THE REGENTS OF THE UNIVERSITY    )
      OF CALIFORNIA,                   )
 9                                     )
           Defendant.                  )
10    _____)
                                       )
11    and Related Claims.              )
      _____)
12

13

14

15

16

17

18          VIDEOTAPED DEPOSITION OF MARY DELANY,

19    taken on behalf of the Plaintiff and

20    Counterclaim-Defendant, at Morrison & Foerster,

21    LLP, 425 Market Street, San Francisco, California,

22    commencing at 9:04 a.m., Friday, December 9, 2016

23    before Rebecca L. Romano, Certified Shorthand

24    Reporter No. 12546

25
```

1    became aware -- yeah, the -- yes.

2         Q.    Did you also learn that the process of

3    moving from that initial cross-breeding activity to

4    the release of a new, valuable patentable cultivar

5    was a process that took somewhere between five,

6    seven, eight years, something like that?

7         A.    Yes.

8         Q.    And did you also learn that as a part of

9    that process, the breeder would start with a large

10   number of plants and, each year, reduce that number

11   down until they found a variety that they believed

12   was valuable and patentable?

13        A.    Yeah.

14             MS. KREVANS:   Same scope objection.

15        Q.    (By Mr. Lippetz) And, again, these are

16   all in your individual capacity --

17        A.    Right.

18        Q.    -- to avoid objections.

19             MS. KREVANS:   Okay.   Great.

20        Q.    (By Mr. Lippetz) When I say "you," for

21   these -- purposes of these questions, I mean --

22        A.    Mary Delany, right.

23        Q.    Now, I'm going to try this as a

24   university representative, but see where it goes.

25             Did the university -- does the university

Highly Confidential – Attorneys' Eyes Only
Mary Delany – December 9, 2016

Page 332

1    STATE OF CALIFORNIA      ) ss:
                              )
2    COUNTY OF CONTRA COSTA   )

3

4         I, Rebecca L. Romano, CSR. 12546, do hereby

5    certify:

6         That the foregoing deposition testimony was

7    taken before me at the time and place therein set

8    forth and at which time the witness was

9    administered the oath;

10        That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me,

13   and were thereafter transcribed under my direction

14   and supervision, and that the foregoing pages

15   contain a full, true and accurate record of all

16   proceedings and testimony to the best of my skill

17   and ability.

18        I further certify that I am neither counsel

19   for any party to said action, nor am I related to

20   any party to said action, nor am I in any way

21   interested in the outcome thereof.

22        IN WITNESS WHEREOF, I have subscribed my name

23   this 23rd day of December, 2016.

24        _____
          Rebecca L. Romano, RPR,
25        CSR. No 12546

Highly Confidential – Attorneys' Eyes Only
Mary Delany – December 9, 2016

Page 333

1            DEPOSITION ERRATA SHEET

2     Case Name:  California Berry Cultivars, LLC v. The
      Regents of the University of California
3     Name of Witness:  Mary Delany, Ph.D.
      Date of Deposition:  December 9, 2016
4     Job No.:  120916-RRD
      Reason Codes:  1.  To clarify the record.
5                    2.  To conform to the facts.
                     3.  To Correct transcript errors.
6     Page 55 Line 5 Reason ③

7     From SITTING to SIFTING

8     Page 165 Line 21 Reason ③

9     From the VIDEOGRAPHER to The DEPONENT

10    Page 235 Line 7 Reason ③

11    From THE VIDEOGRAPHER to The DEPONENT

12    Page 245 Line 12 Reason ③

13    From SITTING to SIFTING

14    Page 322 Line 14 Reason ③

15    From forward to Board

16    Page _____ Line _____ Reason _____

17    From _____ to _____

18    Page _____ Line _____ Reason _____

19    From _____ to _____

20    Page _____ Line _____ Reason _____

21    From _____ to _____

22    Page _____ Line _____ Reason _____

23    From _____ to _____

24    Page _____ Line _____ Reason _____

25    From _____ to _____

Highly Confidential — Attorneys' Eyes Only
Mary Delany — December 9, 2016

Page 334

1              DEPOSITION ERRATA SHEET

2      Page _____ Line _____ Reason _____

3      From _____ to _____

4      Page _____ Line _____ Reason _____

5      From _____ to _____

6      Page _____ Line _____ Reason _____

7      From _____ to _____

8      Page _____ Line _____ Reason _____

9      From _____ to _____

10     Page _____ Line _____ Reason _____

11     From _____ to _____

12     Page _____ Line _____ Reason _____

13     From _____ to _____

14     Page _____ Line _____ Reason _____

15     From _____ to _____

16     Page _____ Line _____ Reason _____

17     From _____ to _____

18     Page _____ Line _____ Reason _____

19     From _____ to _____

20     Page _____ Line _____ Reason _____

21     From _____ to _____

22     (X) Subject to the above changes, I certify that
       the transcript is true and correct

23     _____ No changes have been made.  I certify that
       the transcript is true and correct.

24

25                    MARY DELANY, Ph.D.

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

# Exhibit C

# REDACTED VERSION
# OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT D

Highly Confidential — Attorneys' Eyes Only
Steven Knapp Ph.D. — December 16, 2016

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5     _____
      CALIFORNIA BERRY CULTIVARS,    )
6     LLC,                           )
                                     )
7          Plaintiffs,               )
                                     )
8          vs.                       )   Case No. 3:16-cv-02477
                                     )            VC
9     THE REGENTS OF THE UNIVERSITY  )
      OF CALIFORNIA,                 )
10                                   )
           Defendant.                )
11    _____    )
                                     )
12    and Related Claims.            )
      _____    )
13

14

15       HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

16

17    VIDEO DEPOSITION OF STEVEN J. KNAPP, Ph.D.

18            San Francisco, California

19          Friday, December 16, 2016

20                  Volume I

21

22

23

24    REPORTED BY:

25    REBECCA L. ROMANO, RPR, CSR No. 12546

```
 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA

 3              SAN FRANCISCO DIVISION

 4

 5      _____
        CALIFORNIA BERRY CULTIVARS,    )
 6      LLC,                           )
                                       )
 7           Plaintiffs,               )
                                       )
 8             vs.                     )  Case No. 3:16-cv-02477
                                       )          VC
 9      THE REGENTS OF THE UNIVERSITY  )
        OF CALIFORNIA,                 )
10                                     )
             Defendant.                )
11      _____)
                                       )
12      and Related Claims.            )
        _____)
13

14

15

16          DEPOSITION OF STEVEN J. KNAPP, Ph.D.,

17      taken on behalf of the Plaintiff and

18      Cross-Defendants, at Morrison & Foerster LLP,

19      425 Market Street San Francisco, California,

20      commencing at 9:15 a.m., Friday, December 16, 2016,

21      before Rebecca L. Romano, Certified Shorthand

22      Reporter No. 12546

23

24

25
```

1      A.    There were 312, I believe, in that --

2   that Doug had, and there were some 290 or so that

3   were -- that we discovered in Irvine.

4      Q.    So 3 -- 312 2012s up north and 290 2012s

5   from south?

6      A.    Right.

7      Q.    And so that is?

8      A.    About 600, 601.

9      Q.    602.

10     A.    Yeah.

11     Q.    So you have discarded approximately 400

12  of the 2012 genotypes?

13     A.    Right.

14     Q.    Do you maintain any -- any copies of the

15  genotypes you've discarded?

16     A.    No.

17     Q.    So those 400 are just gone from the

18  collection; is that correct?

19     A.    Correct.

20     Q.    Were any of those on the discard list

21  that Doug had left behind?

22     A.    I believe so, yes.

23     Q.    So, in essence, if you had followed

24  Doug's instructions and the evaluations he had

25  done, it would have saved you some work; is that

Highly Confidential - Attorneys' Eyes Only
Steven Knapp Ph.D. - December 16, 2016

1    STATE OF CALIFORNIA        ) ss:
                                )
2    COUNTY OF CONTRA COSTA     )

3

4        I, Rebecca L. Romano, CSR. 12546, do hereby

5    certify:

6        That the foregoing deposition testimony was

7    taken before me at the time and place therein set

8    forth and at which time the witness was

9    administered the oath;

10       That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me,

13   and were thereafter transcribed under my direction

14   and supervision, and that the foregoing pages

15   contain a full, true and accurate record of all

16   proceedings and testimony to the best of my skill

17   and ability.

18       I further certify that I am neither counsel

19   for any party to said action, nor am I related to

20   any party to said action, nor am I in any way

21   interested in the outcome thereof.

22       IN WITNESS WHEREOF, I have subscribed my name

23   this 4th day of January, 2017.

24                    _____
                      Rebecca L. Romano, RPR,
25                    CSR. No 12546

**ERRATA SHEET**

| | |
|---|---|
| Case Title: | California Berry Cultivars, LLC v. The Regents of the University of California (U.S.D.C. N.D. Cal. Case No. 3:16-cv-02477-VC) |
| Testimony of: | Steven J. Knapp, Ph.D. |
| Date Taken: | December 16, 2016 |

Reason Codes:      1. To clarify the record.
                   2. To conform to the facts.
                   3. To correct transcript errors.

Page 128 Line 20 – change "That's correct." to "That's correct, although Julia Harshman worked on strawberries at University of Maryland as well."
Reason: 1

Page 197 Line 60 – change "76" to "576"
Reason: 3

Page 202 Line 17 – change "Yes." to "I don't know."
Reason: 2

Page 203 Line 4 – change "Yes." to "No."
Reason: 2

Page 204 Line 6 – change "No." to "For the Scarlet that we have, which is a USDA plant introduction, we do not need a license because it is a publicly available European cultivar."
Reason: 2

Page 207 Line 12 – change "allow head-to-head comparisons" to "allow head-to-head comparisons without a license"
Reason: 1

Page 207 Line 23 – change "Correct." to "Correct.  We are using the publicly available Scarlet variety."
Reason: 2

Page 208 Line 18 – change "No, that wouldn't be surprising to me." to "No, that wouldn't be surprising to me, so long as they had a test agreement."
Reason: 1

Page 214 Line 25 – change "It was due to the use of high-elevation" to "Liz said it was due to the use of high-elevation"
Reason: 1

Page 215 Line 21 – change "the concern was" to "Liz's concern was"
Reason: 1

Page 216 Line 19 – change "Correct." to "I don't know."
Reason: 2

Page 216 Line 21 – change "Correct." to "I don't know."
Reason: 2

Page 217 Line 16 – change "Yes, I believe." to "Yes, I now believe."
Reason: 1

Page 223 Line 13 – change "We chose to split the planting." to "We originally chose to split the planting for reasons independent from Lassen. However, we did a second planting at Cedar Point after we had concerns about the relationship with Lassen."
Reason: 2

Page 224 Line 1 – change "That is correct." to "That is correct, for the embryo within the seed only."
Reason: 1

Page 353 Line 17 – change "Correct." to "Correct, there is no longer a risk."
Reason: 1


Subject to the above changes, I certify that the transcript is true and correct.

_____
STEVEN J. KNAPP, Ph.D.

# EXHIBIT E

| From: | Mary E. Delany <medelany@ucdavis.edu> |
|---|---|
| Sent: | Monday, March 23, 2015 8:42 AM |
| To: | Ag Kawamura |
| Cc: | Jacob A Appelsmith; Steven J Knapp; Mary E. Delany; Helene R Dillard; Karl M Engelbach |
| Subject: | RE: Opportunities for progress...transition cultivar time frame request  3-22-15 |

Dear AG,

Thank you for all the continuing conversation to this point. I do look forward to future interactions and I know the more you become involved with our new breeder and his developing program that you will come to believe there are great things ahead for strawberry agriculture.

I have thought much over the last few days of our recent conversations with Jacob and Karl on Thursday, and then by phone with you on Friday wherein I let you know that our decision stands that we will not be transferring the transition cultivars or strawberry germplasm (*writ* large) to CBC or to Dr. Shaw's as an employee of CBC under the current set of circumstances.

Also, I have to mention that I do not agree that it is '*just as simple as the two docs getting together alone in a room to work things out*'. The issues are far more involved than that simple solution suggests and I don't agree that such a meeting is worthy at this particular juncture. Dr. Knapp has numerous activities underway that we should all be very, very excited to see progress as quickly as possible.

I acknowledge your renewed request as outlined in your email below that we provide ~145 cultivar copies, but we will not be proceeding with such a transfer.
Dr. Knapp will be directing the multiplication of the cultivars during this season (expedited planning underway) and we welcome Dr. Shaw's and/or Dr. Larson's assistance and cooperation in the context of the UCD program.

Best,

Mary

**Mary E. Delany, Ph.D.**
**Professor, Developmental Genetics**
**Fiddyment Endowed Chair in Agriculture**
**Department of Animal Science**
**and**
**Executive Associate Dean**
**College of Agricultural and Environmental Sciences**
**University of California, Davis**
**530-752-0233**
medelany@ucdavis.edu

**From:** Ag Kawamura [mailto:ag.kawamura@ocproduce.com]
**Sent:** Friday, March 20, 2015 5:00 PM
**To:** Mary E. Delany; Steven J Knapp

**Cc:** Doug Shaw
**Subject:** Opportunities for progress...transition cultivar time frame request

Hello Mary and Steve,

Thank you both for your willingness to discuss with me the various issues and opportunities for progress! As a result of our discussions, one area of agreement we shared was acknowledging that the clock was ticking on the transition cultivars and that we should move forward at least with the physical planting of identified plant selections. In the ordinary course of Prof. Shaw's program he would have been planting these "spring" selections up at the Lassen Canyon Nursery. Since Prof. Knapp is planning cultivar plantings at the same nursery, I would like to request that you authorize a release of a copy of about 145 plants from the Department's collection to Prof. Shaw. Complete copies of the selected 145 plants would remain with the Department. Next week, Doug's team members could pick up the identified plants and move them to the Lassen Canyon Nursery facility at Manteca where they can be accounted for and cared for through Lassen staff protocols. I am making this request so that another year is not lost and that it would also create an atmosphere of cooperation!

A part of the timing challenge is that Prof. Shaw is leaving for Europe this weekend on a long planned trip. Steve, upon his return he will contact you and I am confident that all of you can agree on a collaborative work framework that would move our programs forward. I was excited to know that your good focus on preserving and enhancing the germplasm collection is yet another example of investing in the future viability of our strawberry industry! We certainly do need to keep seeking solutions as we have some very serious cultural challenges ahead of us. Thank you and please advise at your earliest convenience. Best regards, AG

EXHIBIT F

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
    _____
 4  CALIFORNIA BERRY           )
 5  CULTIVARS, LLC,            )
 6              Plaintiff,     )
     vs.                       )  No. 3:16-cv-02477-VC
 7  THE REGENTS OF THE         )
 8  UNIVERSITY OF              )
    CALIFORNIA, a              )
 9  corporation,               )
10              Defendant.     )
    _____)
11  THE REGENTS OF THE         )
12  UNIVERSITY OF              )
13  CALIFORNIA, a              )
    corporation,               )
14        Cross-Complainant,)
15   vs.                       )
    CALIFORNIA BERRY           )
16  CULTIVARS, LLC, DOUGLAS    )
17  SHAW, and KIRK LARSON,     )
18        Cross-Defendants.  )
19  _____)
                  CONFIDENTIAL TRANSCRIPT
20
            VIDEOTAPED DEPOSITION OF DAVID NOLTE
21               Los Angeles, California
22               Tuesday, March 14, 2017
    Reported by:
23  LORI M. BARKLEY
    CSR No. 6426
24  Job No. 2556145
25  PAGES 1 - 135


                                        Page 1
```

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
    _____
 4  CALIFORNIA BERRY            )
 5  CULTIVARS, LLC,             )
 6              Plaintiff,      )
     vs.                        ) No. 3:16-cv-02477-VC
 7  THE REGENTS OF THE          )
 8  UNIVERSITY OF               )
    CALIFORNIA, a               )
 9  corporation,                )
10              Defendant.      )
    _____)
11  THE REGENTS OF THE          )
12  UNIVERSITY OF               )
    CALIFORNIA, a               )
13  corporation,                )
14        Cross-Complainant,)
15   vs.                        )
16  CALIFORNIA BERRY            )
    CULTIVARS, LLC, DOUGLAS     )
17  SHAW, and KIRK LARSON,      )
18        Cross-Defendants.     )
    _____)
19
20      Videotaped Deposition of DAVID NOLTE,
21  Volume I, taken on behalf of Defendants, at 555 South
22  Flower Street, 50th Floor, Los Angeles, California,
23  beginning at 9:11 a.m., and ending at 2:02 p.m., on
24  Tuesday, March 14, 2017, before LORI M. BARKLEY,
25  Certified Shorthand Reporter No. 6426.
```

Page 2

```
 1              Is that true, sir?                    09:39:22

 2              MS. SMITH:  Objection, assumes facts not in   09:39:23

 3     evidence, calls for speculation, lack of foundation.   09:39:25

 4              THE WITNESS:  Yeah.  I obviously don't    09:39:27

 5     understand what you're saying.  What I'm trying to   09:39:29

 6     communicate here is that there's an -- an eight-year   09:39:31

 7     delay that has occurred starting from 2019.  And if   09:39:34

 8     you're saying there's not an eight-year delay, then   09:39:41

 9     you can change the calculations, but the calculations   09:39:43

10     are premised on an eight-year delay, or a cultivar is   09:39:45

11     being missed and a starting point I was given was the   09:39:53

12     year that you mentioned in 2019.                09:39:56

13              And if -- and that's what the calculations   09:40:00

14     are doing, they're consistent with what I just    09:40:03

15     described.                                       09:40:06

16     BY MR. OVERSON:                                  09:40:07

17        Q.   I see.                                   09:40:07

18              So your eight-year delay starts in 2019; is   09:40:08

19     that true, sir?                                  09:40:12

20        A.   The royalties actually get received the    09:40:15

21     following year, but yes.                         09:40:16

22        Q.   So you're assuming that the delay would push   09:40:18

23     out CBC from receiving any royalties until 2027; is   09:40:25

24     that true?                                       09:40:32

25              MS. SMITH:  Objection, assumes facts not in   09:40:39
```

Page 23

| | | |
|---|---|---|
| 1 | BY MR. OVERSON: | 10:03:29 |
| 2 | Q.   What do you mean when the say "the years | 10:03:29 |
| 3 | four, five, six, seven, eight are correct"? | 10:03:31 |
| 4 | A.   Well, there's -- there's two things shown in | 10:03:33 |
| 5 | that column, and I was reading to you part, or call | 10:03:35 |
| 6 | it half, of the label in table 2, and it's clear from | 10:03:41 |
| 7 | your questioning that I should revisit the labels of | 10:03:46 |
| 8 | the number of years, but -- but what this calculation | 10:03:51 |
| 9 | does is addresses the impact of reducing the -- how | 10:03:58 |
| 10 | long it takes to develop a cultivar and how many | 10:04:04 |
| 11 | cultivars are missing. | 10:04:07 |
| 12 | Q.   Can I ask you to turn back to Exhibit 1, | 10:04:10 |
| 13 | which is your first report, and I'm looking at page 3 | 10:04:48 |
| 14 | of 8 of Exhibit 1 and specifically at paragraph 2, | 10:04:50 |
| 15 | which has the entry, first sentence (as read): | 10:04:57 |
| 16 | The following nine cultivars were | 10:05:00 |
| 17 | developed by Drs. Shaw and Larson | 10:05:02 |
| 18 | and have at least five years of | 10:05:05 |
| 19 | licensing history. | 10:05:07 |
| 20 | And then there's a listing of nine names of | 10:05:12 |
| 21 | cultivars.  Where did you get these cultivars from? | 10:05:14 |
| 22 | A.   I note a U.C. document that identifies | 10:05:21 |
| 23 | these.  The timing or identification of cultivars in | 10:05:29 |
| 24 | which only Dr. Shaw and Larson were involved were | 10:05:37 |
| 25 | provided by Dr. Shaw. | 10:05:41 |

Page 39

| | | |
|---|---|---|
| 1 | Q.   Why did you mention only Dr. Shaw and Larson | 10:05:53 |
| 2 | involved?  You're saying there are other cultivars | 10:05:56 |
| 3 | that have other co-inventors and you excluded those | 10:05:58 |
| 4 | or -- | 10:06:02 |
| 5 | A.   Correct. | 10:06:02 |
| 6 | Q.   And so is it correct that Dr. Shaw | 10:06:02 |
| 7 | identified these nine as the one you should orient | 10:06:06 |
| 8 | on? | 10:06:11 |
| 9 | A.   I would not agree with what you are | 10:06:11 |
| 10 | describing, the way you said it.  I mean, there's no | 10:06:13 |
| 11 | doubt that I had a conversation with Dr. Shaw and the | 10:06:16 |
| 12 | result of the conversation were that these nine were | 10:06:20 |
| 13 | identified, but it's not quite the way your question, | 10:06:23 |
| 14 | it was phrased. | 10:06:27 |
| 15 | Q.   Did you have -- you're aware that there are | 10:06:28 |
| 16 | many, many more cultivars that were commercialized by | 10:06:31 |
| 17 | Dr. Shaw and Larson when they were at U.C. beyond | 10:06:36 |
| 18 | these nine, true? | 10:06:40 |
| 19 | A.   There were -- | 10:06:43 |
| 20 | MS. SMITH:  Objection, vague. | 10:06:44 |
| 21 | THE WITNESS:  There are cultivars that | 10:06:48 |
| 22 | occurred subsequently, for which there was less than | 10:06:49 |
| 23 | five years of history, and there were cultivars | 10:06:53 |
| 24 | before that time, for which other breeders were also | 10:06:56 |
| 25 | involved, and so that's a longer way of agreeing with | 10:07:01 |

Page 40

1  STATE OF CALIFORNIA        ) ss.

2  COUNTY OF LOS ANGELES      )

3

4       I, Lori M. Barkley, CSR No. 6426, do hereby

5  certify:

6       That the foregoing deposition testimony

7  taken before me at the time and place therein set

8  forth and at which time the witness was administered

9  the oath;

10       That the testimony of the witness and all

11  objections made by counsel at the time of the

12  examination were recorded stenographically by me, and

13  were thereafter transcribed under my direction and

14  supervision, and that the foregoing pages contain a

15  full, true and accurate record of all proceedings and

16  testimony to the best of my skill and ability.

17       I further certify that I am neither counsel

18  for any party to said action, nor am I related to any

19  party to said action, nor am I in any way interested

20  in the outcome thereof.

21       IN WITNESS WHEREOF, I have subscribed my

22  name this 28th day of March, 2017.

23

24

25       LORI M. BARKLEY, CSR No. 6426

Page 135