RACHEL KREVANS (CA SBN 116421)
RKrevans@mofo.com
WESLEY E. OVERSON (CA SBN 154737)
WOverson@mofo.com
MATTHEW A. CHIVVIS (CA SBN 251325)
MChivvis@mofo.com
JACOB P. EWERDT (CA SBN 313732)
JEwerdt@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  415.268.7000
Facsimile:  415.268.7522

DAVID D. SCANNELL (*pro hac vice*)
DScannell@mofo.com
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: 202.887.1500
Facsimile:  202.887.0763

Attorneys for Plaintiff and Cross-Defendant
THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation,<br><br>Plaintiff,<br><br>v.<br><br>CALIFORNIA BERRY CULTIVARS, LLC, DOUGLAS SHAW, AND KIRK LARSON<br><br>Defendants. | Case No. 3:16-cv-02477-VC<br><br>**THE UNIVERSITY'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT TESTIMONY BY DAVID NOLTE UNDER FRE 702** |
| CALIFORNIA BERRY CULTIVARS, LLC<br><br>Cross-Complainant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation,<br><br>Crossclaim Defendants.. | |

Mr. Nolte's opinions are irrelevant, because they are based on rejected legal theories of harm, and should be excluded for that reason alone.  Furthermore, Mr. Nolte's opinions are inadmissible for all the reasons given in the University's motion.  CBC tries to confuse the issue by mischaracterizing the record, but as the University's motion established, Mr. Nolte's opinions do not rely on disputed facts, but on unfounded assumptions he was told to make by CBC.  They are therefore inadmissible.  *Dep't of Toxic Substances Control v. Technichem, Inc*., No. 12-cv-05845-VC, 2016 U.S. Dist. LEXIS 33379, at *2 (N.D. Cal. Mar. 15, 2016).

### A.    Mr. Nolte's Report is Based on Legal Theories Rejected by the Court's Summary Judgment Order

Mr. Nolte's reports rely on the premise that CBC's breeding program was delayed because it could not use the CSG and TCs that are not currently in its possession.  (Ex. 1 at 2, 5.)[1] But CBC had no right to possess, let alone use, those plants.  The University "owns the tangible property rights in the Core Strawberry Germplasm and Transition Cultivars in its possession," and Drs. "Shaw and Larson breached their agreements with UC by failing to assign rights in the Core Strawberry Germplasm."  (ECF No. 240 at 4, 8.)  CBC never acquired any rights to these varieties because it was not a bona-fide-purchaser for value.  (*Id*. at 10-11.)  Moreover, the University had no obligation to grant CBC a license to those varieties.  "The Patent Agreement's terms do not impose any requirements on UC to license inventions to the inventors . . ." (*Id*. at 16).  Nor did an implied covenant of good faith and fair dealing impose any such obligation.  (*Id*. at 17 ("Like a requirement to generate royalties, imposing a licensing requirement on UC would be inconsistent with the express terms of the Patent Agreement.).)

CBC's only remaining claim is its argument that the University breached an implied covenant, not by failing to give CBC a license, but by seeking patent protection on the CSG.  (*Id*.) The University will prove at trial that no such breach occurred.  But the relevant point for the University's motion is that Mr. Nolte does not offer an opinion that the University's decision to seek patent protection caused CBC any harm.  Thus, none of Mr. Nolte's opinions are relevant to

---

[1] Citations to "Exs. 1-11" refer to exhibits to the Declaration of Matthew Chivvis in Support of the University's Motion; "Exs. 12-14" refer to exhibits to the Declaration of Matthew Chivvis in Support of the University's Reply Motion unless otherwise noted.

1    any remaining CBC claim.

2        CBC cannot, and does not, contest these points.  Indeed, CBC confirms that "Nolte opined

3    on the appropriate amount to award CBC in damages arising from UC's interference and

4    destruction of CBC's *intellectual property rights* in the Transition Cultivars and Core Strawberry

5    Germplasm."  (CBC Opp. at 2) (emphasis added).  Because CBC never had any such intellectual

6    property rights, or rights to the tangible property that it wanted to use in breeding (the plants

7    themselves), Mr. Nolte's opinions are irrelevant and should be excluded.  Fed. R. Evid. 402.

8        **B.    CBC Does Not Respond to the University's Key Points**

9        CBC ignores most of the grounds for exclusion identified in the University's motion.

10       First, the University established that Mr. Nolte's only basis for assuming that CBC will be

11   delayed for eight years was that Dr. Shaw told Mr. Nolte to make that assumption.  (Ex. 12 at

12   31:9-12 ("Q. You assumed an eight-year delay in your report because you were told by the fact

13   witness that is what it would be, correct? A. Correct.")  Mr. Nolte cited no facts supporting this

14   assumption, and CBC's opposition does not argue that Mr. Nolte has any basis for this opinion

15   other than Mr. Shaw's direction to make this assumption.

16       Second, the University established that Mr. Nolte assumes that CBC, in the actual world,

17   will not generate revenue from a released variety until 2027.  He was told to make that

18   assumption, but it ignores the fact that CBC expects to release a variety in 2020 or 2021.  Rather

19   than respond to this point, CBC denies it:  "Nolte does not assume that CBC will release its first

20   cultivar in 2027."  (CBC Opp. at 7.)  Yet this is precisely what Mr. Nolte assumed.  "Q. So you're

21   assuming that the delay would push out CBC from receiving any royalties until 2027; is that true?

22   THE WITNESS:  Sure.  Eight years past 2019 would be that."  (Ex. 12 at 23:22-24:3 (objection

23   omitted).)  His report calculates purportedly lost revenues in each of years 2020-2027; as he

24   testified, he assumes that CBC will be delayed and will not be able to release cultivars that will

25   generate revenue during this period.  (Ex. 1 at Lost Revenue Model.)  CBC misleads by saying

26   that Mr. Nolte's analysis is "based on CBC commercializing its first cultivar in 2019 and its last

27   cultivar in 2026."  (CBC Opp. at 7.)  That is an analysis of the but-for world – the world in which

28   CBC did have some hypothetical license from the University.  "Absent UC's wrongful conduct,

1  CBC would have been able to patent the first cultivar in 2018 and commercialize this cultivar in

2  2019." (Ex. 1 at 3.)  The University's point has always been that Mr. Nolte wrongly compares

3  this but-for world not to the actual world, but to a fictitious "actual" world in which CBC will be

4  delayed until 2027, an unfounded assumption Mr. Nolte was told to make.

5      Third, the University established that Mr. Nolte assumed, contrary to the facts, that CBC

6  "started from scratch" with its breeding program (Ex. 1 at 3 ("Since CBC had to start from

7  scratch . . .").)  He therefore doesn't account for the significant breeding using the University's

8  germplasm that CBC has actually done, which has entirely mitigated any purported delay.  CBC

9  simply ignores Mr. Nolte's explicit assumption, arguing:  "Because CBC would not have been

10 starting from scratch, Nolte adopted the shorter end of the cycle range and started his damage

11 calculation with commercialization with the first missing cultivar in the but-for world in 2019."

12 (CBC Opp. at 1.)  The absence of a citation to Mr. Nolte's report is telling; he didn't consider that

13 CBC "would not have been starting from scratch."

14     Fourth, the University established that all of the opinions in Mr. Nolte's Supplemental

15 Report are incurably incorrect, because they all assume lost revenues before 2019, which Mr.

16 Nolte agrees would be inappropriate.   (Ex. 2 at 36:18-22, 37:16-25; Ex. 8: Lost Revenue Model.)

17 CBC's opposition does not respond to that point.

18     **C.      CBC Responds to Arguments the University Has Not Made**

19     Rather than respond on the merits, CBC tries to confuse the issue by arguing against

20 strawmen.  The University has not argued that, as a conceptual framework, it would be

21 inappropriate to consider lost income caused by a delay (CBC Opp. at 2); rather, the University

22 has shown that there is no basis for Mr. Nolte's assumption that any such delay exists, or was

23 caused by any wrongful act.  Similarly, the University has not argued that it was inappropriate to

24 consider the University's historical sales (CBC Opp. at 3); instead, the University argued that Mr.

25 Nolte's calculations rest, in large part, on baseless assumptions, not those historical sales.  These

26 portions of CBC's Opposition are irrelevant.

27     **D.      CBC Tries to Modify Mr. Nolte's Opinions to Fit Its New Theory of Harm**

28     With all of CBC's claims for which Mr. Nolte gave a damages opinion eliminated by the

1    Court's forthcoming summary judgment order, CBC has tried to represent that Mr. Nolte's

2    opinions rest on its claims to right to use the TCs, which it apparently hoped would survive those

3    rulings.  In particular, CBC tries to say that the "delay" at issue is a delay in CBC's access to the

4    transition cultivars.  (CBC Opp. at 1 ("[F]or the more than 400 destroyed genotypes, the delay is

5    permanent and infinite.").)  This is wrong for several reasons.

6         First, the Court's Summary Judgment Order held that the University owned all the

7    tangible property interests in the transition cultivars in its possession (as well as the CSG), and

8    had no obligation to license them to CBC.  (ECF No. 240 at 4.)  Thus CBC can have no claims

9    based on a delay in "access" to these cultivars; it had no rights to access them.  This should be the

10   end of the analysis.

11        Second, Mr. Nolte's report does not address purported harm caused by lack of access to

12   the TCs alone (or, for that matter, to the CSG alone), but purported harm caused by lack of access

13   to *the CSG and the TCs combined*.  (Ex. 1 at 2 (defining the 168 CSG and 250 TCs, collectively,

14   as the "Materials" which CBC purportedly had a right to use in its breeding program.)  Mr. Nolte

15   gave no opinion on any purported delay in revenue related solely to lack of access to the TCs.

16        Third, even assuming CBC had the right to access some of the TCs and use them for

17   breeding, which it did not, that lack of access would only be relevant if it caused some delay to

18   CBC's ability to breed a new patented variety.  It has not.  It is undisputed that, before he left the

19   University (and therefore before the alleged "destruction" took place), Dr. Shaw chose which

20   varieties to use in CBC's Spanish breeding program freely from among all of the University

21   patented varieties, the CSG, and the TCs.  (ECF No. 203-6; Ex. 13; ECF No. 160-17; Ex. 14.) No

22   facts support an argument that lack of access to the TCs alone had any impact on CBC's breeding

23   program, or its ability to produce cultivars ready for release.  More important, Mr. Nolte did not

24   offer this opinion.

25        Finally, CBC tries to vastly expand the scope of the varieties that Mr. Nolte referenced in

26   his report.  CBC represents that "Nolte opined on CBC's damages resulting from UC's

27   interference and destruction of CBC's intellectual property rights in the 968 Plant Types-at-Issue

28   (*800 Transition Cultivars* and 168 Core Strawberry Germplasm)."  (CBC Opp. at 6 (emphasis

added).)  This is wrong.  Mr. Nolte is quite specific about the varieties he assumed CBC had the right to use:  "(i) approximately 168 cultivars developed by Drs. Shaw and Larson which are subject to a pending United States plant patent application, [the CSG] and (ii) approximately *250 plant varieties* developed by Dr. Shaw and Larson that may have value as cultivars and breeding stock."  (Ex. 1 at 2.) (emphasis added.)  CBC is trying to make room for its new theory that it was harmed because it could not use "more than 400 destroyed genotypes."  Although beside the point, given Mr. Nolte's actual opinions, this mischaracterizes the facts; the University has not improperly destroyed any of what (the Court has now ruled) was its own tangible property, but has done what is always done in a breeding program in which hundreds of progeny are created every year; some are selected for advancement, and others are not.  In any event, CBC's new theory of the case would only save Mr. Nolte's report if Mr. Nolte had opined that lack of access to the TCs alone had caused CBC some delay; he did not.

### E.  CBC Did Not Start from Scratch

CBC titles one section:  "Nolte assumes CBC starts a breeding program without access to the 168 CSG and 800 TCs, which is an undisputed fact."  (CBC Opp. at 6.)  As CBC knows, that is not an undisputed fact.  DNA analysis of the progeny of CBC's Spanish breeding program show that CBC used the CSG extensively, and used a TC as well.  (ECF No. 203-6; Ex. 4.)

CBC also obfuscates the record by saying that their extensive use of the CSG would not have made a "significant difference" to Mr. Nolte's analysis, because the CSG CBC actually used comprise only "2%" of the plant types at issue.  (CBC Opp. at 6.)  The relevant question is not what varieties CBC ended up using, but how many varieties CBC had *access* to for its breeding program.  Of course CBC did not perform crosses using every one of the hundreds of University varieties; that would have been expensive and unnecessary.  Dr. Shaw freely chose, from among all the University's germplasm, the nineteen varieties he thought were most promising, and caused those varieties to be sent to Spain so that IS could breed with them on CBC's behalf.  (ECF No. 203-6; Ex. 13; ECF No. 160-17; Ex. 14.)

### F.  CBC Introduces a Hypothetical Parallel Breeding Program Which Mr. Nolte Did Not Consider

CBC offers a new hypothetical in this Opposition.  Specifically, CBC suggests that it could have conducted two simultaneous breeding programs, one in the United States, using varieties the University licensed to CBC, and a second program using seeds generated by the breeding in Spain administered by IS.  CBC admits that Mr. Nolte's report does not address this possibility.  (CBC Opp. at 2.)  Given that it is outside the scope of his report, he cannot testify about this hypothetical parallel breeding program at trial, nor can it be used to bolster the flawed opinions he did disclose.

### G.   CBC Offers No Excuse for Mr. Nolte's Failure to Calculate Declining Royalties

As Ms. Distler showed and the University's motion established, a typical patented cultivar generates most of its revenues in the first 12 years of its 20-year term, and annual revenues steeply decline in the last eight years.  (*E.g.*, Ex. 7 Sch. 21b.)  Mr. Nolte's projections are inflated because he uses an unfounded assumption of steady, high revenues in those last years, instead of performing any defensible economic analysis of what CBC could reasonably expect in that time period from any cultivars it patented and released.

CBC cannot, and does not, substantively dispute either of these propositions.  CBC tries to defend Mr. Nolte's assumptions by saying that they were validated by a "reasonableness check," but his reasonableness check was circular.  As CBC admits, Mr. Nolte checked his estimates for the *last few years* of a patent term (when, historically, revenues have declined substantially) against the average of the *first few years* (when revenues are historically at their highest).  The fact that these numbers were similar proves that the numbers he used for the last years were too high.

CBC's argument that Mr. Nolte's calculations are "more conservative" than Ms. Distler's is absurd.  As Ms. Distler showed, Mr. Nolte overstated lifetime royalties by millions of dollars for each cultivar he considered.  (Ex. 7 Sch. 21a-c.)  CBC argues that if Mr. Nolte had analyzed only the cultivars Ms. Distler discussed in this analysis, his projected damages would have "more than double[d]."  (CBC Opp. at 9.)  But that is because those varieties include the University's most popular varieties, in particular Camarosa, the all-time best-seller.  Ms. Distler never

suggested that these varieties were a reasonable proxy for the revenue an *average cultivar* would generate (and, indeed, Mr. Nolte agrees that an average cultivar would generate sales of 1.1 billion plants, far less than, for example, Camarosa (Ex. 8 at 5.)).  Ms. Distler's point is that the *rate of decline* shown by these varieties was a reasonable proxy for the average rate of decline. CBC's discussion of average revenue for these clearly above-average varieties is an attempt to distract from the facts relevant here.

### H.    CBC Cannot Avoid Mr. Nolte's Testimony About How Little Time He Spent Formulating His Opinion

CBC argues that Mr. Nolte "spent considerably more time" on his report than the two days he testified he spent.  That was not his testimony, and CBC's attorney argument should be disregarded.  (Ex. 2 at 8:4-8.)  CBC suggests that, even though Mr. Nolte had access to the University's confidential information for less than 24 hours, he nonetheless formed an opinion about that data before that point, because relevant data was "publicly available or in the possession of Doug Shaw."  (CBC Opp. at 5.)  As its sole support for this proposition, CBC cites a public audit (CBC Ex. C), but this document does not break down University royalties *by cultivar*, which was the basis of Mr. Nolte's analysis.  CBC cites no evidence, other than University confidential information, showing revenues by cultivar.  Therefore, Mr. Nolte's damages calculations (unless he impermissibly reviewed University confidential information before he was permitted to do so) must have been created in less than 24 hours.

The University's position is not that Rule 702 sets a minimum amount of time an expert must spend on his analysis.  But the Court can and should consider the fact that Mr. Nolte spent only two days drafting his report, and had access to the key data underlying his calculations for less than 24 hours, in determining whether Mr. Nolte's opinions are "unsubstantiated and subjective, and therefore unreliable and inadmissible," especially given the complexity of this case.  *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997).

### I.    Conclusion

For all the foregoing reasons, the University respectfully requests that the Court exclude Mr. Nolte from offering any testimony at trial.

1

2   Dated:  April 28, 2017

RACHEL KREVANS
WESLEY E. OVERSON
3                                           MATTHEW A. CHIVVIS
JACOB P. EWERDT
4                                           DAVID D. SCANNELL
MORRISON & FOERSTER LLP

5

6                                           By:    /s/ Matthew A. Chivvis
MATTHEW A. CHIVVIS
7
Attorneys for Plaintiff and Cross-
8                                           Defendant
THE REGENTS OF THE
9                                           UNIVERSITY OF CALIFORNIA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RACHEL KREVANS (CA SBN 116421)
RKrevans@mofo.com
WESLEY E. OVERSON (CA SBN 154737)
WOverson@mofo.com
MATTHEW A. CHIVVIS (CA SBN 251325)
MChivvis@mofo.com
JACOB P. EWERDT (CA SBN 313732)
JEwerdt@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  415.268.7000
Facsimile:  415.268.7522

Attorneys for Plaintiff and Cross-Defendant
THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA

DAVID D. SCANNELL (*pro hac vice*)
DScannell@mofo.com
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: 202.887.1500
Facsimile:  202.887.0763

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation,<br><br>Plaintiff,<br><br>v.<br><br>CALIFORNIA BERRY CULTIVARS, LLC, DOUGLAS SHAW, AND KIRK LARSON<br><br>Defendants. | Case No. 3:16-cv-02477-VC<br><br>**DECLARATION OF MATTHEW CHIVVIS IN SUPPORT OF THE UNIVERSITY'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT TESTIMONY BY DAVID NOLTE UNDER FRE 702** |
| CALIFORNIA BERRY CULTIVARS, LLC<br><br>Cross-Complainant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation,<br><br>Crossclaim Defendants. | |

1    I, Matthew A. Chivvis, do hereby declare as follows:

2        1.       I am a partner with the law firm of Morrison & Foerster LLP and an attorney of

3    record for Movant The Regents of the University of California (the "University") in the above-

4    captioned matter.  I am admitted to practice law in the State of California and before this Court.  I

5    submit this declaration in support of The Regents of the University of California's Reply Motion

6    to Exclude Expert Testimony by David Nolte Under FRE 702.  I have personal knowledge of the

7    facts stated in this declaration, and I could and would competently testify to them if called as a

8    witness.

9        2.       Attached as **Exhibit 12** is a true and correct copy of excerpts of the transcript of

10   the March 14, 2017, Deposition of David Nolte.

11       3.       Attached as **Exhibit 13** is a true and correct copy of CBC_DS_00022566,

12   produced by Defendants in the above-captioned matter.

13       4.       Attached as **Exhibit 14** is a true and correct copy of UC_STRAW2B2_00070434,

14   produced by the University in the above-captioned matter.

15

16   I declare under penalty of perjury that the foregoing is true and correct.

17   Executed on April 28, 2017, in San Francisco, CA.

18

19                                    */s/ Matthew A. Chivvis*
                                      MATTHEW A. CHIVVIS

20

21

22

23

24

25

26

27

28

DECLARATION OF MATTHEW CHIVVIS IN SUPPORT OF THE UNIVERSITY'S REPLY MOTION          1
TO EXCLUDE EXPERT TESTIMONY BY DAVID NOLTE UNDER FRE 702
CASE NO. 3:16-CV-02477-VC

# Exhibit 12

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
    _____
 4  CALIFORNIA BERRY        )
 5  CULTIVARS, LLC,         )
 6            Plaintiff,    )
     vs.                    )  No. 3:16-cv-02477-VC
 7  THE REGENTS OF THE      )
 8  UNIVERSITY OF           )
    CALIFORNIA, a           )
 9  corporation,            )
10            Defendant.    )
    _____)
11  THE REGENTS OF THE      )
12  UNIVERSITY OF           )
13  CALIFORNIA, a           )
    corporation,            )
14        Cross-Complainant,)
15   vs.                    )
    CALIFORNIA BERRY        )
16  CULTIVARS, LLC, DOUGLAS )
17  SHAW, and KIRK LARSON,  )
18        Cross-Defendants. )
19  _____)
                 CONFIDENTIAL TRANSCRIPT
20
             VIDEOTAPED DEPOSITION OF DAVID NOLTE
21                 Los Angeles, California
22                 Tuesday, March 14, 2017
    Reported by:
23  LORI M. BARKLEY
    CSR No. 6426
24  Job No. 2556145
25  PAGES 1 - 135
```

                                          Page 1

CONFIDENTIAL

```
 1              Is that true, sir?                    09:39:22

 2              MS. SMITH:  Objection, assumes facts not in   09:39:23

 3    evidence, calls for speculation, lack of foundation.    09:39:25

 4              THE WITNESS:  Yeah.  I obviously don't   09:39:27

 5    understand what you're saying.  What I'm trying to    09:39:29

 6    communicate here is that there's an -- an eight-year    09:39:31

 7    delay that has occurred starting from 2019.  And if    09:39:34

 8    you're saying there's not an eight-year delay, then    09:39:41

 9    you can change the calculations, but the calculations    09:39:43

10    are premised on an eight-year delay, or a cultivar is    09:39:45

11    being missed and a starting point I was given was the    09:39:53

12    year that you mentioned in 2019.                    09:39:56

13              And if -- and that's what the calculations    09:40:00

14    are doing, they're consistent with what I just    09:40:03

15    described.                    09:40:06

16    BY MR. OVERSON:                    09:40:07

17       Q.   I see.                    09:40:07

18              So your eight-year delay starts in 2019; is    09:40:08

19    that true, sir?                    09:40:12

20       A.   The royalties actually get received the    09:40:15

21    following year, but yes.                    09:40:16

22       Q.   So you're assuming that the delay would push    09:40:18

23    out CBC from receiving any royalties until 2027; is    09:40:25

24    that true?                    09:40:32

25              MS. SMITH:  Objection, assumes facts not in    09:40:39
```

Page 23

| | | |
|---|---|---|
| 1 | evidence. | 09:40:41 |
| 2 | THE WITNESS:  Sure.  Eight years past 2019 | 09:40:49 |
| 3 | would be that. | 09:40:51 |
| 4 | BY MR. OVERSON: | 09:40:54 |
| 5 | Q.   And as you said, you're assuming in your | 09:40:55 |
| 6 | calculations, that CBC implemented a similar level of | 09:41:05 |
| 7 | effort in 2014 when they left as if they had received | 09:41:07 |
| 8 | access to the materials in 2014, right? | 09:41:10 |
| 9 | A.   I made no -- I made no such comment.  I'm | 09:41:15 |
| 10 | sorry if you thought I did. | 09:41:17 |
| 11 | Q.   Okay.  Could you look at page 5 of 8 of your | 09:41:19 |
| 12 | first report.  And if you look at Roman 4, sub 2 | 09:41:22 |
| 13 | paragraph, it says (as read): | 09:41:29 |
| 14 | In the actual world, CBC | 09:41:30 |
| 15 | implemented a similar level of | 09:41:31 |
| 16 | effort. | 09:41:34 |
| 17 | Do you see that, sir? | 09:41:34 |
| 18 | A.   No, I don't, but -- you I -- looking | 09:41:35 |
| 19 | there -- | 09:41:39 |
| 20 | Q.   Could you look on Roman 4, sub paragraph 2, | 09:41:39 |
| 21 | and the first line of your report says (as read): | 09:41:44 |
| 22 | In the actual world, CBC | 09:41:46 |
| 23 | implemented a similar level of | 09:41:48 |
| 24 | effort. | 09:41:50 |
| 25 | It says that, doesn't it, sir? | 09:41:50 |

Page 24

| | | |
|---|---|---|
| 1 | And the calculations contained in Exhibit 1 | 09:50:26 |
| 2 | to this deposition is based on eight years. | 09:50:29 |
| 3 | Q.   I'm asking you as an expert witness | 09:50:34 |
| 4 | calculating damages, can you tell me when the | 09:50:40 |
| 5 | eight-year delay started and when it ended for | 09:50:44 |
| 6 | purposes of your calculation, can you tell me that? | 09:50:49 |
| 7 | A.   As a factual matter, no.  Because I'm not a | 09:50:51 |
| 8 | fact witness. | 09:50:54 |
| 9 | Q.   You assumed an eight-year delay in your | 09:50:56 |
| 10 | report because you were told by the fact witness that | 09:51:01 |
| 11 | is what it would be, correct? | 09:51:04 |
| 12 | A.   Correct. | 09:51:06 |
| 13 | Q.   And then you made an assumption about when | 09:51:06 |
| 14 | that eight-year delay started and ended in order to | 09:51:10 |
| 15 | do your report, didn't you? | 09:51:13 |
| 16 | A.   In order to do my report I indicated or | 09:51:17 |
| 17 | believed that the -- it would have started when | 09:51:24 |
| 18 | Dr. Shaw and Larson left and they've been delayed | 09:51:28 |
| 19 | eight years. | 09:51:36 |
| 20 | Q.   Okay.  So if you calculate it from the day | 09:51:38 |
| 21 | they left, 2014, that would mean that they were | 09:51:44 |
| 22 | delayed until 2022.   True? | 09:51:46 |
| 23 | A.   If you're adding eight years, that's fine, | 09:51:52 |
| 24 | from 2014, it gets you to 2022. | 09:51:55 |
| 25 | Q.   Okay.  And they -- and in the but-for world | 09:51:58 |

Page 31

CONFIDENTIAL

```
 1   STATE OF CALIFORNIA        ) ss.
 2   COUNTY OF LOS ANGELES      )
 3
 4          I, Lori M. Barkley, CSR No. 6426, do hereby
 5   certify:
 6          That the foregoing deposition testimony
 7   taken before me at the time and place therein set
 8   forth and at which time the witness was administered
 9   the oath;
10          That the testimony of the witness and all
11   objections made by counsel at the time of the
12   examination were recorded stenographically by me, and
13   were thereafter transcribed under my direction and
14   supervision, and that the foregoing pages contain a
15   full, true and accurate record of all proceedings and
16   testimony to the best of my skill and ability.
17          I further certify that I am neither counsel
18   for any party to said action, nor am I related to any
19   party to said action, nor am I in any way interested
20   in the outcome thereof.
21          IN WITNESS WHEREOF, I have subscribed my
22   name this 28th day of March, 2017.
23
24
25          LORI M. BARKLEY, CSR No. 6426
```

Page 135

# **Exhibit 13**

**From:**          DOUGLAS SHAW
**Sent:**          Thursday, September 12, 2013 10:01 AM
**To:**            Kirk Larson
**Subject:**       Spain and growers
**Attachments:**   KL Spain 2013.XLS

K:

I just contacted Javier and he wants all we can send.

The first sheet on the attached file has the plants for Spain. 8 boxes of 1000 for advanced selections and Merced, 3 boxes of 800 for the newer selections. Note that you will need to get two of the selections from the late harvest, as noted on the sheet.

The second sheet has a partially filled in table for California growers that you can use as a worksheet. Insert and add other selections if you wish, I will use this for test agreements when you complete it, which will of course be modified based on how many plants we get.

I'll plan on helping with the trim in Redding on September 30, and get the plants to WEO for Don to pick up by that evening.

I'll send the Spain list to Vicente this afternoon after you have another look at it.

I'll complete the discard and harvest list when you send it, and get it back to you tomorrow so you can arrange with Bruce to make tags.

D

Highly Confidential - Attorneys' Eyes Only

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# THIS DOCUMENT WAS PROVIDED IN NATIVE FORMAT UPON REQUEST.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Highly Confidential - Attorneys' Eyes Only

**2013-14 High elevation plantings: early dig**

| Item | | | ESA<br>Oct 1 | SC grower trials<br>Oct 1 | |
|---|---|---|---|---|---|
| Merced | | | 2000 | | |
| 8 | 20 | 602 | 2000 | * | |
| 8 | 55 | 2 | 2000 | * | |
| 8 | 132 | 608 | 2000 | * | |
| 8 | 181 | 1 | 200 | * | |
| 9 | 12 | 605 | 300 | * | |
| 9 | 20 | 609 | 300 | * | |
| 9 | 37 | 1 | 200 | * | |
| 9 | 132 | 3 | 200 | * | |
| 9 | 180 | 1 | 300 | * | |
| 10 | 30 | 1 | 100 | * | from late |
| 10 | 37 | 604 | 300 | * | |
| 10 | 106 | 8 | 100 | * | from late |
| 10 | 124 | 2 | 200 | * | |
| 10 | 141 | 1 | 200 | * | |

10400

2012 had 3400 plants in 5 boxes

2013 will have 8 boxes with 1000 each, 3 boxes with 800

Tab [CA grower]

| Item | | Hasegawa | S. Yamamoto | M Etchandy | Fugishige | Neihus | Larson | ESA | Total comm. | Available | #/moth | #fmother |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Merced | | | | | | | | | | | | |
| 8 | 20 602 | 4,000 | 2,000 | 2,000 | 2,000 | 2,000 | 1,000 | 2,000 | 2,000 | 2000 | 20.0 | 100 |
| 8 | 55 2 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 2,000 | 15,000 | 16000 | 20.0 | 800 |
| 8 | 132 608 | 4,000 | 2,000 | 2,000 | 2,000 | 2,000 | 1,000 | 2,000 | 8,000 | 8000 | 20.0 | 400 |
| 8 | 181 1 | 400 | 400 | 400 | | | 200 | 200 | 15,000 | 20000 | 20.0 | 1000 |
| 9 | 132 3 | 400 | 400 | 400 | | | 200 | 200 | 1,600 | 2000 | 20.0 | 100 |
| 9 | 180 1 | 1,000 | 1,000 | 1,000 | | 1,000 | 200 | 300 | 1,600 | 2000 | 20.0 | 100 |
| 9 | 12 605 | | | | | | | 300 | 4,500 | 6000 | 20.0 | 300 |
| 9 | 20 609 | | | | | | | 300 | 300 | 4000 | 20.0 | 200 |
| 9 | 37 1 | | | | | | 50 | 300 | 300 | 4000 | 20.0 | 200 |
| 10 | 30 1 | | | | | | 0 | 100 | 350 | 2000 | 20.0 | 100 |
| 10 | 37 604 | | | | | | | 300 | 100 | 480 | 20.0 | 24 |
| 10 | 106 8 | | | | | | 0 | 100 | 100 | 4000 | 20.0 | 200 |
| 10 | 124 2 | | | | | | 50 | 200 | 250 | 240 | 20.0 | 12 |
| 10 | 141 1 | | | | | | 50 | 200 | 250 | 480 | 20.0 | 24 |

CBC_DS_00022567_Highly Confidential - Attorneys' Eyes Only.XLS

# Exhibit 14

| | |
|---|---|
| **From:** | DOUGLAS SHAW [dvshaw@ucdavis.edu] |
| **Sent:** | Thursday, September 12, 2013 2:01 PM |
| **To:** | Kirk Larson |
| **Subject:** | FW: Shipment to Spain advanced selections UC |
| **Attachments:** | image001.jpg; VI Spain selections 2013.XLS |

Forgot to copy you on this….

D

---

**From:** DOUGLAS SHAW
**Sent:** Thursday, September 12, 2013 1:56 PM
**To:** 'Vicente Ivars'; 'Jami Simmons'; lcn@cot.net
**Cc:** RafaelCambra.lci@fragaris.com
**Subject:** RE: Shipment to Spain advanced selections UC

Vicente and Jami:

Attached is the list of selections and plant numbers we intend to send to Spain this year. There will be 11 cartons.

Kirk will harvest from the nursery on Sunday September 29 , trim and pack on Monday September 30. I should be able to get the plants to Wolfskill that afternoon, and Don Yoshimura will take them to south San Francisco in time for an early morning flight on October 1. October 2 would work as well, your choice.

I'll talk with Jami for a reminder about how the phytosanitary issues work, I can't remember how it works, but I do remember that I had it wrong last year.

Thanks again for your help with this.

D

---

**From:** Vicente Ivars [mailto:vim.lci@fragaris.com]
**Sent:** Monday, September 09, 2013 1:58 AM
**To:** 'Jami Simmons'; lcn@cot.net
**Cc:** DOUGLAS SHAW; RafaelCambra.lci@fragaris.com
**Subject:** Shipment to Spain advanced selections UC

Dear Jami and Scott,

This is just to let you know LCI will take care of the air shipment to Spain of plants of advanced selections chosen by Douglas and/or Kirk. It is still too early but as soon as you may have an idea when these plants might be dug, I will appreciate you let us know.

Douglas, please advise as soon as possible list of selections as well as quantities of plants to apply for the import authorization from authorities in Madrid. I am estimating 4 ctns isn't?

Looking forward to hearing from yu
Best regards
**Vicente Ivars**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**LASSEN CANYON INTERNATIONAL, SL**
**VALENCIA, SPAIN**
**Tel +34-963504897 / +34-664504924**
**Fax + 34-963504904**



http://lassencanyonnursery.com/

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

DOCUMENT

PLACEHOLDER

This Document has been provided in native format.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**2013-14 High elevation plantings: early dig**

| Item | | | ESA Oct 1 |
|------|-----|-----|------|
| Merced | | | 2000 |
| 8 | 20 | 602 | 2000 |
| 8 | 55 | 2 | 2000 |
| 8 | 132 | 608 | 2000 |
| 8 | 181 | 1 | 200 |
| 9 | 12 | 605 | 300 |
| 9 | 20 | 609 | 300 |
| 9 | 37 | 1 | 200 |
| 9 | 132 | 3 | 200 |
| 9 | 180 | 1 | 300 |
| 10 | 30 | 1 | 100 |
| 10 | 37 | 604 | 300 |
| 10 | 106 | 8 | 100 |
| 10 | 124 | 2 | 200 |
| 10 | 141 | 1 | 200 |
| | Total | | 10400 |

2013 will have 8 boxes with 1000 each, 3 boxes with 800