# EXHIBIT 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5    CALIFORNIA BERRY CULTIVARS,    )
     LLC,                           )
6                                   )
              Plaintiff             )
7                                   )
              vs.                   )  16-cv-02477-VC
8                                   )
     THE REGENTS OF THE             )
9    UNIVERSITY OF CALIFORNIA, a    )
     corporation,                   )
10                                  )
              Defendant             )
11   _____)

12

13

14       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15     Videotaped Deposition of Douglas V. Shaw, Ph.D.

16              San Francisco, California

17              Thursday, December 8, 2016

18

19

20   Reported by:

21   JOANNE M. FARRELL, RPR, CRR

22   CSR Nos. 4838(CA)  506(HI)  507(NM)

23   Job No. 2492592

24

25   Pages 1 - 293

                                            Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    true?

2        A.  That's correct.

3        Q.  It was a successful 30 years, right?

4            MR. LIPPETZ:  Objection.  Vague.

5            THE WITNESS:  In my opinion their program

6    was successful, yes.

7    BY MR. CHIVVIS:

8        Q.  But in 1986, around that time, they were --

9    they planned to retire; isn't that right?

10       A.  There was a plan for both of them to end

11   their employment within the next few years, correct,

12   yes.

13       Q.  And that, in part, was why you were hired,

14   to take over the program from them; is that true?

15           MR. LIPPETZ:  Objection.  Speculation.

16           Go ahead.

17           THE WITNESS:  Part of the responsibility

18   that I was hired to retain was to continue the

19   strawberry research program, which included

20   strawberry breeding at that time, yes.

21   BY MR. CHIVVIS:

22       Q.  So one of the reasons you were hired was to

23   oversee the university's strawberry breeding program

24   when Royce Bringhurst and Victor Voth retired,

25   correct?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        A.   That's correct.

2        Q.   By 1990 you had assumed direction over the

3   university's strawberry breeding program, true?

4        A.   That's correct.

5        Q.   And part of your role as the person

6   overseeing the university's strawberry breeding

7   program was to breed new strawberry varieties; is

8   that right?

9        A.   That had been a traditional role and, yes,

10  I was acting to breed strawberry cultivars at that

11  point.

12       Q.   So as director of the strawberry breeding

13  program at the university, you took it as part of

14  your charge to breed new strawberry varieties?

15       A.   It was part of my charge to breed new

16  strawberry cultivars, yes.

17       Q.   And moving into that role, you benefited

18  from the strawberry germplasm that Dr. Royce

19  Bringhurst and Victor Voth developed in the years

20  prior, correct?

21            MR. LIPPETZ:  Objection.  Vague.

22            THE WITNESS:  I think you need to define

23  "benefited from" for me.

24  BY MR. CHIVVIS:

25       Q.   You used germplasm in your breeding

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    program, as you were running it for the university,

2    that had been developed by doctor Royce Bringhurst

3    and Victor Voth, correct?

4         A.   That's correct.

5         Q.   You wouldn't have had the program that you

6    have at the university without their work, would

7    you?

8              MR. LIPPETZ:  Objection.  Speculation.

9              THE WITNESS:  I don't really have facts

10   enough to answer that question whether the program

11   would have been adequate, better, worse.  I can't

12   answer that.

13   BY MR. CHIVVIS:

14        Q.   I'm not asking that question.

15        A.   All right.

16        Q.   I'm just asking whether you would have had

17   the program you had without their work.

18        A.   I think the answer to that is no, I

19   wouldn't.

20        Q.   You would not have developed the varieties

21   that you developed without Dr. Bringhurst and Victor

22   Voth's work, would you?

23             MR. LIPPETZ:  Objection.  Vague.

24             Go ahead.

25             THE WITNESS:  That's very vague.  I

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Q.  The combined total of the university's

2  checks you've received for the Camarosa patent

3  royalties amounts to more than a million dollars;

4  isn't that right?

5      A.  I don't have the figures, but that wouldn't

6  surprise me, no.

7      Q.  Wouldn't surprise you?

8      A.  Would not surprise me, no.

9      Q.  In fact, you received a check last year for

10  your share of Camarosa royalties, right?

11      A.  Correct.

12      Q.  Royalties from varieties you developed

13  while head of the university strawberry breeding

14  program have made you very wealthy; isn't that true?

15          MR. LIPPETZ:  Objection.  Vague.

16          THE WITNESS:  Define "wealthy" for me.

17  BY MR. CHIVVIS:

18      Q.  Do you consider yourself wealthy?

19      A.  No.

20      Q.  The checks you've received from the

21  university for royalties from the strawberry

22  breeding program have totaled more than $10 million;

23  isn't that right?

24      A.  That's correct.

25      Q.  You don't consider that a lot of money?

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      A.  Page?

2      Q.  On page 11.

3           Do you see the first full paragraph there?

4      A.  Yes.

5      Q.  It states "Dr. Shaw notified the university

6  of his intent to leave and retire from the

7  university in late 2011"; isn't that right?

8      A.  I don't think I have the same document that

9  you have.  You said page 11?

10     Q.  Yes.

11     A.  The first paragraph?

12     Q.  The first full paragraph.

13     A.  Sorry, sorry.

14     Q.  The first full paragraph states --

15     A.  Right.

16     Q.  -- "Dr. Shaw notified the university of his

17  intent to leave and retire from the university in

18  late 2011"; isn't that right?

19     A.  Right.  I see that, yes, uh-huh.

20     Q.  And that was a truthful and accurate

21  statement when it was made?

22     A.  That's correct, yes, uh-huh.

23     Q.  So you notified the university of your

24  intent to leave and retire from the university in

25  late 2011; isn't that right?

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      A.   That's correct, yes.

2      Q.   You did so because you were unhappy; is

3  that fair?

4           MR. LIPPETZ:  Objection.  Vague.

5           THE WITNESS:  I won't say I was unhappy.  I

6  would say that we were -- it was time for me to move

7  on and retire and do some other things.  Certainly I

8  wasn't satisfied with the situation at the

9  university, but I won't say unhappy, no.

10  BY MR. CHIVVIS:

11      Q.   You weren't satisfied with the situation at

12  the university, right?

13      A.   I would say that's too simplistic a

14  response.  The connection between being unsatisfied

15  with the university was part of the reason.  The

16  second reason was it was getting time to retire.

17      Q.   And part of the reason was you thought the

18  university strawberry breeding program was not being

19  run like a business, right?

20           MR. LIPPETZ:  Objection.  Vague.

21           THE WITNESS:  Yeah, define what you mean by

22  "run like a business," please.

23  BY MR. CHIVVIS:

24      Q.   You thought the program could have made

25  more money?

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    students.  Is that the question you're asking?

2    BY MR. CHIVVIS:

3        Q.  In 2011 you didn't train any graduate

4    students?

5        A.  Oh, that's correct, yes.

6        Q.  You thought the university strawberry

7    breeding program could be better run if it was run

8    as a private for-profit commercial enterprise,

9    correct?

10       A.  I thought that the time had come to

11   separate the cultivar development part of the plant

12   breeding program to private programs.  Not private

13   program but private programs.

14       Q.  And that's because you thought that portion

15   of the program could be better run if it was run as

16   a private for-profit commercial enterprise, correct?

17       A.  I think private for-profit enterprises

18   would be consistent with a letter that I wrote in

19   2011.

20       Q.  Let's use your words.  You thought the

21   university's strawberry breeding program could be

22   better run if it was run as private for-profit

23   commercial enterprises?

24       A.  I think that's accurate, yes.

25       Q.  And you thought that you could do a better

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   program; is that correct?

2        A.   That's correct.

3        Q.   But you didn't perform any crosses for the

4   university's program in 2014, did you?

5        A.   No, we did not.

6        Q.   None at all?

7        A.   In 2014, no.

8        Q.   So that means no new varieties from 2014

9   crosses will be in the program four to seven years

10  from 2014, right?

11            MR. LIPPETZ:  Objection.  Speculation.

12            THE WITNESS:  From the University of

13  California program, if we didn't make crosses there

14  would be no varieties from that particular potential

15  cross year, that's correct.

16  BY MR. CHIVVIS:

17       Q.   There's a gap in the pipeline for that

18  year?

19       A.   That would be -- I don't know what you mean

20  "a gap in the pipeline," but there will be no

21  crosses in 2014, therefore no possibility for

22  cultivars from that particular cross, potential

23  cross year.

24       Q.   The university lost a year?

25            MR. LIPPETZ:  Objection.  Vague.

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          MR. CHIVVIS:  Just to get the record clear

2     I'm going to ask it again and you can object.

3     BY MR. CHIVVIS:

4          Q.  There's no germplasm in the university's

5     strawberry breeding program tracing its lineage back

6     to 2013 or 2014, correct?

7          A.  I want to avoid the term "germplasm"

8     because I'm not entirely sure what that could

9     entail.  It's too vague.  But I think what you're

10    trying to get at, there are no selections in the

11    university collection that trace the seedlings that

12    were generated from crosses conducted in 2013 or

13    2014.

14         Q.  I'll use your words.

15         A.  Okay.

16         Q.  There are no selections in the university's

17    strawberry breeding program that trace their lineage

18    back to crosses that were conducted in 2013 or 2014,

19    correct?

20         A.  That's correct.

21         Q.  And in four to seven years from 2013 or

22    2014, there will be no varieties to release as

23    finished varieties from the university program that

24    trace their lineage back to crosses conducted in

25    2013 or 2014, correct?

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      A.   I think that follows, yes.

2      Q.   The university has plots near Davis at a

3  place called Wolfskill Experimental Orchard, right?

4      A.   That's correct, yes.

5      Q.   Test fields?

6      A.   Test fields.

7      Q.   Your practice when you ran the university's

8  strawberry breeding program was to keep a foundation

9  stock of the university's germplasm at the test

10  fields at Wolfskill Experimental Orchard, right?

11      A.   I think we called it a nursery, but yes, I

12  think that's -- is that a term that's familiar to

13  you?

14      Q.   Sure.

15      A.   Okay.

16      Q.   This nursery stock that you kept at

17  Wolfskill Experimental Orchard was basically a copy

18  of everything important in the program, right?

19          MR. LIPPETZ:  Objection.  Vague.

20          THE WITNESS:  It was a copy of most of what

21  existed in the program at any slice of time.

22  BY MR. CHIVVIS:

23      Q.   Not everything?

24      A.   No, there was a second nursery down in

25  Southern California, and some of the university's

Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  strawberry breeding program when California Berry
2  Cultivars was formed, correct?
3      A.  That's correct.
4      Q.  And California Berry Cultivars' purpose was
5  to form a private strawberry breeding program,
6  right?
7      A.  That's correct.
8      Q.  And if the university's program were to
9  live on past your tenure at the university,
10  California Berry Cultivars' program would be in
11  competition with the university's program, correct?
12      A.  If both of them were intended to go
13  forward, there would certainly be a possibility for
14  competition between them.
15      Q.  You hoped that the university's program
16  wouldn't go forward and be in competition with CBC's
17  private breeding program, correct?
18      A.  I think that's not accurate.  I would say I
19  didn't expect it to go forward.
20      Q.  You did not expect the university's program
21  to go forward and be in competition with CBC's
22  private breeding program, correct?
23      A.  That's correct.
24      Q.  Initially you hoped the university would
25  agree to provide CBC with access to the university's

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    strawberry breeding materials, correct?

2         A.  We hoped to package and license the

3    material, the genetic material that Kirk and I had

4    developed over our career, for CBC and other

5    potential breeding companies.

6         Q.  You hoped that the university would agree

7    to provide CBC with a license to the genetic

8    material that was developed in the university's

9    strawberry breeding program, correct?

10        A.  That's correct.

11        Q.  But by 2013, you were growing uncertain

12   whether that license would ever be issued by the

13   university to CBC; isn't that right?

14             MR. LIPPETZ:  Objection.  Vague.

15             THE WITNESS:  I don't think it was ever a

16   certainty that that was going to happen from the

17   start, but I think that throughout most of 2013 we

18   were convinced that we would get a license from the

19   university to go forward.

20   BY MR. CHIVVIS:

21        Q.  By the end of 2013, however, you were less

22   convinced; isn't that right?

23        A.  No, I think it's fair to say that we had

24   not achieved a license by the end of 2013, and we

25   had hoped for one by the end of 2013.

                                        Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        Q.   So CBC needed a plan B; am I right?

2             MR. LIPPETZ:   Objection.   Vague.

3             THE WITNESS:   For CBC to proceed in the

4    time frame that we had initially planned on, it

5    would need a plan B, correct.

6    BY MR. CHIVVIS:

7        Q.   Needed some other source of strawberry

8    germplasm to start the CBC's strawberry breeding

9    program, correct?

10       A.   That's correct.   Under any circumstances,

11   timewise or not, if the University of California had

12   refused to license its unreleased genetic material,

13   CBC would have needed to find a different source of

14   materials.

15       Q.   You were involved in coming up with that

16   plan B, right?

17       A.   Yes.

18       Q.   In December 2013, you designed a cross plan

19   in consultation with employees of Eurosemillas?

20       A.   I think it was in consultation with

21   initially it was a company called International

22   Semillas.

23       Q.   International Semillas is an affiliate of

24   Eurosemillas; is that correct?

25       A.   I believe that's correct, yes.

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          Q.   Is that an accurate statement?

2          A.   I think that's accurate.  It's been a very

3     successful program.

4          Q.   Second sentence.

5               "The program was initiated by Harold Thomas

6     and Earl Goldsmith in 1930, built upon briefly by

7     Richard Baker and then more extensively by Victor

8     Voth and Royce Bringhurst."

9               Is that an accurate statement?

10         A.   That's correct.

11         Q.   Third sentence.

12              "From the 1950s to the 1980s, the combined

13    research and breeding skills of Bringhurst and Voth

14    led to the a development of varieties that dominated

15    the California and global strawberry industry."

16              Is that an accurate statement?

17         A.   That's an accurate statement.

18         Q.   "That domination continued from the 1980s

19    to the present with the current generation of

20    breeder scientists, Dr. Douglas Shaw and Kirk

21    Larson."

22              Is that an accurate statement?

23         A.   I think it's an accurate statement, sure.

24         Q.   Next paragraph.

25              "The retirement of Bringhurst and Voth led

                                        Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    people, you consider them carefully before you send

2    them?

3         A.   I think I do, yes.

4         Q.   And do you try to be truthful and accurate

5    with them when you write them?

6         A.   Yes.

7         Q.   So if it's an e-mail here and we are

8    looking at later and you wrote it, you consider your

9    statements carefully before you write them and

10   believe they are a truthful and accurate?

11        A.   I think they are a truthful and accurate

12   representation of what I was thinking at the time.

13        Q.   Fair enough.

14             Now, in this letter to Candy Volker, again,

15   page 3005, Exhibit 105, you wrote in the first --

16   it's the second paragraph, "The University of

17   California has never had a policy of releasing its

18   germplasm for general breeding purposes," correct?

19             MR. LIPPETZ:  Objection.  Misstates the

20   document.

21             THE WITNESS:  That's what the first

22   sentence says, yes.

23   BY MR. CHIVVIS:

24        Q.   And you believe that that statement was

25   accurate at the time that you made the statement to

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Candy Volker in 1999, correct?

2        A.  I believe so, yes.

3        Q.  Now, in the paragraph beginning with the

4    word "Third," which is actually the fourth

5    paragraph, overlaps 3005 to 3006, do you see that

6    paragraph?

7        A.  Yes, I do.

8        Q.  Second full sentence you stated "We intend

9    to develop the best strawberry cultivars in the

10   world and ensure that the best cultivars in the

11   world are available to growers without restriction

12   binding fruit sales, contract, or exorbitant royalty

13   or fee structure."

14           Do you see that?

15       A.  Yes, I do.

16       Q.  That was an accurate statement at the time

17   you made it in 1999, correct?

18       A.  Yeah, I believe that was a statement that I

19   would stand by in 1999, definitely.

20       Q.  Next sentence, "A one-way transfer of our

21   germplasm to proprietary strawberry breeding

22   companies would jeopardize this goal."

23           Do you see that?

24       A.  Yes, I do.

25       Q.  That was an accurate statement at the time

Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   you made it in 1999 to Ms. Candace Volker, correct?

2        A.   That was my feeling at the time, correct.

3        Q.   Last paragraph.   Still on Exhibit 105,

4   Bates LITTLE, page 3006.

5             Do you see the last paragraph there?

6        A.   Yes.

7        Q.   First sentence states "Lastly, as mentioned

8   above, licensing of UC cultivars has always been for

9   the intended purpose of fruit production, and we

10  have routinely followed practices that discourage

11  the use of our germplasm in breeding programs."

12            That was an accurate statement at the time

13  you made it in 1999, correct?

14       A.   I think that was accurate in 1999.

15       Q.   And next sentence.   "These practices

16  include the denial of licenses or test agreements to

17  individuals who seek to use genetic stocks as

18  parents rather than for fruit production."

19            That was an accurate statement at the time

20  you made it in 1999, correct?

21       A.   I believe so, yes.

22            MR. CHIVVIS:   Next in order.

23            (Exhibit 106 was marked for identification

24            by the court reporter and is attached

25            hereto.)

Page 110

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1           THE WITNESS:  I'm sorry.  Okay.

2           We conducted research for 30 years and we

3    developed all different kinds of information about

4    strawberry and strawberry experiments that we

5    conducted over those 30 years.

6    BY MR. CHIVVIS:

7           Q.  As I understand it, your position is that

8    you left behind a complete set of all the genotypes

9    in the program when you retired November 7th, 2014;

10   is that correct?

11          A.  Now I'm confused because you were talking

12   of -- now you're talking about genotypes.

13          Q.  I did shift to the genetic material, the

14   actual tissue.

15          A.  Right.

16          Q.  I just want to take that to the side.  Your

17   position is that you provided 100 percent of the

18   genotypes that were then existing in the university

19   strawberry breeding program to the university when

20   you retired on November 7, 2014, correct?

21          A.  Yes, there were copies of everything that I

22   had used in the Wolfskill Experimental Orchard

23   nursery or in Kirk Larson's nursery when I left the

24   university.

25          Q.  But your position was that you did not need

                                          Page 192

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    to leave the university with a copy of any of the

2    other types of information we just discussed, the

3    pedigree records, the evaluations of genotypes, et

4    cetera, correct?

5        A.  Yes.

6        Q.  And that was one of the things that

7    Dr. Knapp was asking you about, whether he could

8    have access to that information.  Do you have that

9    understanding?

10       A.  He was asking for some of that information.

11       Q.  And you refused to provide it to him,

12   correct?

13       A.  I think your first statement was correct, I

14   feel I'm under no obligation to provide that to him.

15       Q.  You currently have that information that

16   you developed as head of the university's strawberry

17   breeding program, by "that information" I'm

18   including the pedigree information, the specific

19   evaluations of genotypes and the like?

20       A.  I have a good bit of that, yes.

21       Q.  You have hundreds of megabytes of Lotus

22   Notes spreadsheets and other materials relating to

23   the University of California's strawberry breeding

24   program presently sitting on one of your computers

25   that is in your possession; isn't that true?

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1            MR. LIPPETZ:  Objection.  Misstates facts.

2       Go ahead.

3            THE WITNESS:  I don't know if I have a

4  hundred kilobytes.  I have some files that I took

5  with me and are on storage devices in my home.

6  BY MR. CHIVVIS:

7       Q.  And those files would include complete

8  pedigrees for the 180 genotypes that you submitted

9  to the plant sciences cultivar release committee;

10  isn't that right?

11       A.  I believe I have pedigrees for those 180,

12  yes.

13       Q.  You have evaluation data for the

14  performance of each of those genotypes in your

15  possession right now; isn't that true?

16       A.  I do, yes.

17       Q.  And you haven't provided either of those

18  two sets of information to the University of

19  California, correct?

20       A.  I have not provided that and I don't

21  believe I need to provide that, as your first

22  question suggested.

23       Q.  But you have retained a copy for yourself?

24       A.  I have copies of my research files.

25       Q.  And do you understand that the university

                                    Page 194

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4       That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were administered an oath; that

8   a record of the proceedings was made by me using

9   machine shorthand which was thereafter transcribed

10  under my direction; that the foregoing transcript is

11  a true record of the testimony given.

12      Further, that if the foregoing pertains to the

13  original transcript of a deposition in a Federal

14  Case, before completion of the proceedings review of

15  the transcript { } was {X} was not requested.

16      I further certify I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or any party to this action.

19      IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated:  December 15, 2016

23

24                  *Joanne M. Farrell*

25          Joanne M. Farrell, CSR No. 4838

                                        Page  293