# EXHIBIT 2

```
 1          UNITED STATES DISTRICT COURT NORTHERN DISTRICT
 2                OF CALIFORNIA, SAN FRANCISCO DIVISION
 3
 4
 5    CALIFORNIA BERRY CULTIVARS, LLC, )
                                       )
 6              Plaintiff,             )
                                       )
 7         vs.                         )Case No.
                                       )3:16-cv-02477-VC
 8    THE REGENTS OF THE UNIVERSITY OF )
      CALIFORNIA, a corporation,       )
 9                                     ) CONFIDENTIAL
                Defendants.            )
10    _____)
      THE REGENTS OF THE UNIVERSITY OF )
11    CALIFORNIA, a corporation,       )
                                       )
12              Cross-Complainant,     )
                                       )
13         vs.                         )
                                       )
14    CALIFORNIA BERRY CULTIVARS, LLC, )
      DOUGLAS SHAW, and KIRK LARSON,   )
15                                     )
                Cross-Defendants.      )
16    _____)
17
        VIDEO-RECORDED DEPOSITION OF PERSON MOST KNOWLEDGEABLE
18
                            FOR THE REGENTS
19
                  OF THE UNIVERSITY OF CALIFORNIA
20
                          MICHAEL CARRIERE
21
                      San Francisco, California
22
                          December 20, 2016
23
      Transcribed by:
24    DENISE HERFT
      CSR No. 12983
25


                                                              Page 1
```

```
 1              THE WITNESS:  I can speak to the steps as
 2   you bring them up.
 3   BY MR. LIPPETZ:
 4       Q   There were some steps is all I'm getting
 5   at --
 6              MR. CHIVVIS:  Same objection.
 7   BY MR. LIPPETZ:
 8       Q   -- correct?
 9       A   There were steps at the University leading
10   up to a release of a strawberry variety.
11       Q   Yes.
12       A   Yes.
13       Q   We mentioned before the last patented
14   strawberry variety was released January 2015;
15   correct?
16       A   Cabrillo was released in January 2015.
17       Q   Has there been a strawberry variety
18   released since January 2015?
19       A   There has not been a strawberry variety
20   released since then.
21       Q   Have any steps been taken at the
22   University to prepare to release a strawberry
23   variety in January 2016 -- sorry, 2017?
24       A   So here I think is the issue with steps,
25   steps could be anything from the time of release
```

Page 38

```
 1   pursued to patent issued; do you see that?
 2        A    Okay.  Hold on.  Oh, the final bullet?
 3        Q    Yes.
 4        A    Yeah.
 5        Q    So if it is not your text, happy to
 6   explain, but didn't you advise Leslyn in
 7   November 2014 that a separate non-provisional
 8   patent application needs to be filed for each claim
 9   patent variety?
10             MR. CHIVVIS:  I don't think you read the
11   whole bullet there, Greg.
12             MR. LIPPETZ:  Please, just make your
13   objection, Michael -- or Matthew.  It's not
14   appropriate to have a speaking objection what he
15   should or shouldn't read, okay.  My question was
16   clear, if you want to object to it, please do.
17             THE WITNESS:  So, again, the question was
18   about the final bullet?
19   BY MR. LIPPETZ:
20        Q    The question is, did you advise Leslyn
21   Krauss in November 2014 that a separate
22   non-provisional application was to be filed for
23   each patent variety claimed?
24        A    So I mean the bullet is what it is, it's
25   there and I -- this is from me so I wrote that.
```

Page 165

```
 1   The context is for an item that's going to be
 2   carried through to issuance.  It doesn't need us,
 3   thus was the case, for example, with Cabrillo, that
 4   was at one part of the broader application and has
 5   since been filed separately as a non-provisional
 6   and can be carried through to issuance in that way.
 7        Q   And in 2015 the University filed an
 8   authorized its lawyers to file a non-provisional
 9   patent application claiming 168 different varieties
10   in one application; correct?
11        A   168 at that point, yeah.
12        Q   Okay.  And in October of this year the
13   patent office issued an office action telling the
14   University it was improper to claim 168 patent
15   varieties in one application; correct?
16            MR. CHIVVIS:  Objection; documents speaks
17   for itself; calls for a legal conclusion.
18            THE WITNESS:  Again, it would be helpful
19   if you have it.
20   BY MR. LIPPETZ:
21        Q   And this is not necessarily the way you
22   want to do this, but I get the right to ask the
23   question.  I could be looking at this and say,
24   "isn't it true."  So isn't true that the patent
25   office advised the University in October of this
```

1  made a request for plant patent.
2      Q   So Dr. Shaw was discussing as an invention
3  the use of these 180 germplasm for breeding under
4  utility patent or alternatively for a licensing as
5  tangible research property; correct?
6      A   So here we have reference to Doug's
7  request for consideration of utility patent so did
8  the TRP idea come from Doug or otherwise?  Maybe
9  the document will be a dispositive on that.
10     Q   If you look at the third full paragraph.
11     A   Oh, yeah, okay.  So it talks about TRP or
12 under utility patent?
13     Q   Right.
14     A   Okay.  Yeah.
15     Q   The University elected to pursue by filing
16 a provisional patent application on the 160 --
17 strike that.  Let me get this clear.  The original
18 provisional patent application we've been talking
19 about was on 169 varieties; is that correct?
20     A   That makes sense because it's 168 now, and
21 Cabrillo was capped off, carved out.
22     Q   So one became a plant patent and then 168
23 are still pending; correct?
24     A   Cabrillo is, I understand, still pending
25 as well.

Page 176

1   present, so I guess I think those are co-extensive,
2   the department members present was the -- were
3   members of the departmental cultivar release
4   committee, so yes, I think the discussion was in
5   the context of the Plant Sciences department
6   cultivar release committee, yeah.
7           MR. CHIVVIS:  And as to the issues within
8   the committee and that side of the equation within
9   the College of Agriculture, this witness is not
10  designated to answer on behalf of the University.
11  BY MR. LIPPETZ:
12      Q   The recommendation as modeled in this
13  document from Plant Sciences is in bold on the
14  second page there, and it discusses handling the
15  germplasm disclosed by Dr. Shaw under University
16  regulations governing TRP; correct?
17      A   Focused on the bold section?
18          MR. CHIVVIS:  Again, same scope objection.
19          THE WITNESS:  Okay.  So, yeah, it looks
20  like their recommendation is focused on TRP, yeah.
21  BY MR. LIPPETZ:
22      Q   Your department would have become involved
23  had the germplasm been licensed outside the
24  University as TRP; correct?
25          MR. CHIVVIS:  Objection; vague.

Page 180

```
 1              THE WITNESS:  So that would be an unusual
 2   situation for us to think about licensing in an
 3   environment where we haven't -- where we're not
 4   contemplating a formal intellectual property, so
 5   it's a paradigm that in some ways is without
 6   precedent because we engage in licensing around
 7   formal intellectual property and TRP, you know,
 8   isn't something we were contemplating we were going
 9   forward with, but in the hypothetical scenario, if
10   we were, you know, to contemplate licensing,
11   licensing activity resides with tech transfer, so
12   in that hypothetical scenario where this was going
13   forward with a -- in a TRP versus a formal IP
14   structure, perhaps, perhaps it would have been our
15   office, but that's not the case.  I mean, it
16   doesn't go forward with TRP so it's not -- I don't
17   have precedent to lean on to say, well, naturally
18   we engage around TRP, but the best I can think of
19   is that because we do engage around licensing that,
20   yeah, we might well have been involved but it
21   wasn't TRP so it's kind of a non-issue.
22   BY MR. LIPPETZ:
23        Q   The University has a policy that discusses
24   treatment of tangible research products or TRP;
25   correct?
```

Page 181

1          MR. CHIVVIS:  Object on scope.  This
2    witness is not designated on the protection of IP
3    issues.  Because you're talking about
4    non-intellectual protection, which is a policy you
5    had Mary Delaney testify on.  You asked her all
6    about guideline 10, that's where you're going;
7    right?
8    BY MR. LIPPETZ:
9        Q   Does the University have a policy relating
10   to tangible research products?
11         MR. CHIVVIS:  Same objection.
12         THE WITNESS:  So I'm -- I don't live in
13   this space, but I have a vague awareness of policy
14   around TRP.
15   BY MR. LIPPETZ:
16       Q   So has your department ever used the TRP
17   policy to protect the University's intellectual
18   property?
19       A   I'm trying to think broadly so there's so
20   many activities involved both plant and, of course,
21   utility is a huge area, and then we have material
22   transfer group that's under the hospices of
23   innovation access, so to the extent that there are
24   tangible materials that are covered under a
25   material transfer agreement, certainly then our

Page 182

1   office would have some activity around TRP
2   materials biological materials, et cetera, but it's
3   different in kind from the environment that was
4   contemplated I think here as we were just
5   discussing as where it would have been a licensing
6   for income model.
7           So I think in part of the answer is yes,
8   the office does contemplate activity around
9   tangible materials by way of material transfer
10  agreements.  There's a group in our office that
11  works specifically in that area.  But not to my
12  knowledge do we think of it as something we would
13  license out with an expectation of income back,
14  back to the University.
15          MR. CHIVVIS:  How long have we been going
16  since the last?
17          THE VIDEOGRAPHER:  58 minutes.
18          MR. CHIVVIS:  Want to do another set or
19  break now?  It's your choice.
20          MR. LIPPETZ:  Yeah, let's take a break.
21          THE VIDEOGRAPHER:  Don't forget your
22  microphones, please.
23          The time is 5:31 p.m.  We are off the
24  record.
25          (Recess taken from 5:31 until 5:44.)

Page 183

1    Q   So if a UC variety that was -- as to which
2    patent protection had been sought in the U.S. but
3    not yet obtained was used for breeding in Spain
4    with the resulting seeds imported into the U.S.,
5    that couldn't be patent infringement of the U.S.
6    patent because there wasn't a patent yet, is that
7    consistent with your understanding?
8    A   So what I know about plant patents, and
9    this is really more a matter for patent attorneys,
10   is the bundle of rights that are available upon
11   issuance there is some capacity to reach back in
12   time with respect to perhaps with damages, I'm not
13   sure they have that right, but I know there's some
14   aspect whereby even pre-issuance there are some
15   retroactive rights that the patent holder has.
16   Q   And I'm not trying to get into the legal
17   particulars of pre-issuance damages, so we can move
18   on.
19       We saw documents before about that the --
20   Dr. Shaw's submission of 180 plants, which
21   ultimately resulted in, led to, not sure what the
22   right word is, the University sought patent
23   protection on 168 of those and that patent
24   application is still pending.  Who at the
25   University made the decision to seek plant patent

Page 217

```
 1   protection for those 168 varieties?
 2        A    So the general authority for such a
 3   decision resides within the tech transfer office.
 4   As we know from examination of documents earlier
 5   around meeting that Clint and I attended with the
 6   department of Plant Sciences, a variety release
 7   committee, there was input from that group with I
 8   would say in that meeting some pushback from Clint
 9   in particular, and I agreed in terms of the
10   suitability of the U.S. plant patent as an approach
11   over the utility and the TRP approach that came up
12   in that meeting, so we were listening to
13   stakeholders in that meeting but also providing
14   some counter-bailing view, maybe some pushback in
15   that meeting that the ideas that had come into that
16   forum were -- they were given sort of an advance
17   signal that tech transfer's choice would likely be
18   a U.S. plant patent, and we weren't sort of in
19   concurrence with the notion of that group at that
20   time, and that's what came to pass.
21             So the tech transfer exercised -- office
22   exercised its autonomous capacity to choose the
23   most appropriate path of intellectual property
24   protection for this particular complement of
25   varieties, so it resided in tech transfer sort of
```

Page 218

1   collaboratively with the director and with my
2   supervisor and -- but within the confines of tech
3   transfer, of course, with, then, the approval of
4   the Dean that we go forward in that fashion as
5   well, ultimately.
6        Q   So at the time that tech transfer was
7   making the decision about what type of intellectual
8   property protections to use, had the Dean's office
9   already rejected in writing the Plant Science
10  department proposal to treat the germplasm's TRP?
11       A   So my recollection of the sequence was the
12  Dean's office was saying no to the TRP, and then
13  was there overlap with discussions around plant
14  patenting, we would have let the Dean's office know
15  of our analysis that suggested plant patenting was
16  in our view the best approach, but I would have to
17  go to a white board or something and sketch out the
18  time frame to really know when sort of one
19  discussion ended and the next one started, but it
20  was pretty contemporaneous there when those things
21  were happening.
22       Q   Did tech transfer -- prior to the Dean
23  notifying Plant Sciences that she was rejecting
24  their proposal, did tech transfer go back to Plant
25  Sciences and inform them that they were going to be

Page 219

1    seeking plant protection -- plant patent
2    protection?
3         A   Okay.  I don't recall if that was a step
4    that happened.  Keeping in mind that it -- it's a
5    step that in some ways had happened with Clint
6    putting forward strong reservations about the other
7    two paths in that meeting, subject of the document
8    we looked at with the departmental group, so I
9    think they were certainly on notice that we were
10   going to be, you know, contemplating and seriously
11   considering and maybe even moving down the path of
12   plant patents.
13            I would imagine that there was some
14   knowledge that made its way back to the department,
15   just don't recall the form and what time frame that
16   happened.
17        Q   Did --
18            MR. CHIVVIS:  And just let the record
19   reflect that the witness was referring to
20   Exhibit 118.
21   BY MR. LIPPETZ:
22        Q   Did tech transfer ever go back to Dr. Shaw
23   or Dr. Larson and relay to them that it was not
24   going to pursue the recommendation of Plant
25   Science's but rather seek plant patent protection

1       Q   So was it the University's conclusion in
2   December 2013 that it was impossible to seek
3   utility patent protection for these 180 in at least
4   part because of this requirement for deposit of
5   callus tissue?
6           MR. CHIVVIS:  Objection; calls for a legal
7   conclusion.
8           THE WITNESS:  So outside of a legal
9   conclusion about the permissibility of filing
10  utility patent on the strawberry lines, the view is
11  that we had something to overcome that we didn't
12  think we could overcome.
13  BY MR. LIPPETZ:
14      Q   Did the -- you mentioned before that the
15  TRP option recommended here, I think you gave some
16  testimony earlier that TRP was not a regularly used
17  form of IP protection by tech transfer; correct?
18      A   Right.  We chatted a bit about the
19  material transfer agreements and a group in our
20  office that works with biological materials in that
21  context, so there certainly is activity in our
22  office around biological materials, but to
23  contemplate licensing out under TRP for dollars,
24  consideration coming back in is not something that
25  we, to my knowledge, have done.

Page 227

1    Q   The TRP option wouldn't have required the
2  deposit of callus tissue, though; correct?
3    A   Right, just distinct from the utility, the
4  concern that we had around the utility patent
5  filing.
6    Q   The concern tech transfer had around TRP
7  was what?
8    A   May I have a look to refresh?
9    Q   Sure.
10    A   Thanks.  So the second paragraph in this
11  118 document resonates with my recollection of our
12  concerns around TRP at that time, which were based
13  in the reality of building a licensing program
14  around contractual rights independent of IP rights
15  and the inherent weakness in stepping into such a
16  model, so I think it had to do with concerns around
17  the weakness of a contractual contract based
18  arrangement.
19    Q   So it was the opinion of tech transfer at
20  this time that licensing under TRP as stated here
21  would not provide as strong intellectual protection
22  as a plant or utility patent; correct?
23    A   Not as strong, and one could contemplate
24  in an environment where the plants might find their
25  way outside of the contractual network that it

Page 228

```
 1   provides no protection, so it's not sort of just a,
 2   you know, it provides 90 percent and we want 100
 3   percent.  The concern would be that it one day we
 4   might find ourselves with zero percent protection
 5   if the plants, for whatever reason, found their way
 6   out -- were outside of the contractual structure
 7   that we put in place.
 8        Q    The University relies on written contracts
 9   in the form of its licenses with people like Lassen
10   and Eurosimius as a way to enforce its intellectual
11   property rights in the strawberry cultivars;
12   correct?
13        A    License agreements around the IP, yes.
14        Q    A lot of the test agreements, for example,
15   that deal with varieties that aren't patented yet;
16   correct?
17        A    Some subset of test agreements do have as
18   their subject matter patented varieties.  Some
19   subset have only patented, some have only
20   non-patented, and some might have a combination of
21   both.
22        Q    As to the non-patented varieties of
23   strawberries that are the subject of test
24   agreements, the University's intellectual property
25   rights in those Cultivars or plants are protected
```

```
 1                        CERTIFICATE

 2                            OF

 3                CERTIFIED SHORTHAND REPORTER

 4

 5             I, the undersigned, Certified Shorthand

 6   Reporter of the State of California do hereby certify:

 7             That the foregoing proceedings were taken

 8   before me at the time and place therein set forth; that

 9   any witnesses in the foregoing proceedings, prior to

10   testifying, were placed under oath; that a verbatim

11   record of the proceedings was made by me using machine

12   shorthand which was thereafter transcribed under my

13   direction; further, that the foregoing is an accurate

14   transcription thereof.

15                  I further certify that I am neither

16   financially interested in the action nor a relative of

17   employee of any attorney of any of the parties.

18                  IN WITNESS WHEREOF, I have this date

19   subscribed my name

20

21

22

23                     <%signature%>

24                   Dated: December 23, 2016

25                   Certificate Number 12983
```

Page 253

ERRATA SHEET

Case Title:       California Berry Cultivars, LLC v. The Regents of the University of
                  California (U.S.D.C. N.D. Cal. Case No. 3:16-cv-02477-VC)
Testimony of:     Michael Carriere
Date Taken:       December 20, 2016

page 19 line 22 – strike "right" and "industry"
page 20 line 2 – replace "product" with "products"
page 21 line 23 – replace "negligence" with "negotiation"
page 22 line 12 – replace "in" with "with"
page 22 line 14 – replace "agreement" with "agreements"
page 33 line 5 –spelling of "Camarosa" (here and throughout document)
page 44 line 8 – replace "supportive" with "supportive of"
page 53 line 3 – strike "its"
page 54 line 6 – spelling of Eurosemillas (here and throughout document)
page 68 line 4 – insert "a" after "of"
page 70 line 24 – replace "pro generator" with "progenitor"
page 71 line 7 – strike "he"
page 71 line 11 – replace "advising" with "anthropomorphizing"
page 71 line 17 – replace first "I" with "it"
page 72 line 13 – replace "lists" with "list"
page 80 line 1 – replace "not" with "that"
page 80 line 2 – replace "slash" with "ask"
page 98 line 14 – replace "its" with "this"
page 101 line 24 – replace "at" with "has"
page 107 line 11 – strike "it"
page 107 line 19 – insert "a" after "it's"
page 107 line 19 – replace "to" with "that"
page 111 line 6 – replace "revisions" with "provisions"
page 116 line 23 – invert "topic larger"
page 121 line 5 – replace "pro-generator" with "progenitor"
page 122 line 21 – replace "explain" with "explained"
page 122 line 21-22 – replace "link the" with "linked to"
page 125 line 11 – insert "to be" after "understand"
page 129 line 8 – replace "independent" with "individual"
page 130 line 1 – replace "that" with "the"
page 134 line 9 – replace "has" with "is"
page 135 line 9 – strike "of"
page 135 line 10 – replace "that's" with "that"
page 146 line 12 – replace "got" with "need"
page 151 line 2 – replace "that's" with "that it's"
page 155 line 3 – replace "absolute" with "absolutely"
page 155 line 7 – replace "but" with "it"
page 168 line 25 – insert comma after "plant"
page 176 line 9 – strike "a"

1

page 182 line 22 – replace "hospices" with "auspices"
page 186 line 2 – replace "wouldn't" with "would"
page 186 line 3 – replace "we had to misrepresent" with "had we misrepresented"
page 188 line 8 – strike "the"
page 191 line 1 – insert "different" after "entirely"
page 191 line 1 – replace "that" with "thats"
page 191 line 22 – invert "might we"
page 192 line 23 – invert "the University" and "within"
page 192 line 23 – replace "University" with "University's"
page 192 line 24 – strike "the"
page 194 line 18 – replace "appropriately" with "inappropriately"
page 203 line 11 – insert comma after "University"
page 209 line 13 – strike "then"
page 211 line 14 – insert "with" after "disagreed"
page 218 line 5 – insert "the" after "around"
page 218 line 14 – replace "counter-bailing" with "countervailing"
page 228 line 3 – replace "just" with "it's"
page 229 line 3 – strike "it"
page 230 line 20 – replace "would" with "wouldn't"
page 240 line 12 – insert "a" after "for"
page 240 line 12 – replace "and" with "in"
page 244 line 23 – replace "charge" with "chart"
page 244 line 23 – replace "the" with "they"
page 247 line 9 – replace "their" with "there"
page 250 line 23 – replace "intend today" with "intended to"