Tharan Gregory Lanier (SBN 138784)
tglanier@jonesday.com
Greg L. Lippetz (SBN 154228)
glippetz@jonesday.com
Nathaniel P. Garrett (SBN 248211)
ngarrett@jonesday.com
Paul C. Hines (SBN 294428)
phines@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:	+1.415.626.3939
Facsimile:	+1.415.875.5700

Rick L. McKnight (SBN 55183)
fmcknight@jonesday.com
Alexis Adian Smith (SBN 274429)
asmith@jonesday.com
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071.2300
Telephone:	+1.213.489.3939
Facsimile:	+1.213.243.2539

Sharyl A. Reisman (Admitted *Pro Hac Vice*)
sareisman@JonesDay.com
JONES DAY
250 Vesey Street
New York, NY  10281.1047
Telephone:	+1.212.326.3939
Facsimile:	+1.212.755.7306

Attorneys for Cross-Complainant and Defendant CALIFORNIA BERRY CULTIVARS, LLC and Defendants DOUGLAS SHAW and KIRK LARSON

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>CALIFORNIA BERRY CULTIVARS, LLC, DOUGLAS SHAW, AND KIRK LARSON,<br><br>Defendants. | Case No. 3:16-cv-02477-VC<br><br>**TRIAL BRIEF OF CROSS-COMPLAINANT AND DEFENDANT CALIFORNIA BERRY CULTIVARS, LLC, AND DEFENDANTS DOUGLAS SHAW AND KIRK LARSON** |
| CALIFORNIA BERRY CULTIVARS, LLC,<br><br>Cross-Complainant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Cross-Defendant. | |

## I.     INTRODUCTION

Strawberry growers and developers joined together to form CBC because California's multi-billion dollar strawberry industry needs help like never before.  This dispute arose after UC leaders, under pressure from California Strawberry Commission and driven by powerful farming conglomerates, rejected the advice of UC's own experts and agreed to effectively shut down the traditional breeding program that had generated millions of dollars in revenue for California.  UC filed a bogus patent application solely to divest Drs. Shaw and Larson of their ownership of hundreds of potentially valuable strawberry varieties, destroyed hundreds of other varieties that UC demanded that Shaw and Larson physically transfer to UC, and since has not released a single new cultivar (other than one developed by Shaw and Larson before they retired).  As a result, the once-leading UC Davis strawberry breeding program has been set back for years, if not forever.

UC postures as the aggrieved victim of "theft" of its valuable property (the new strawberry varieties invented by Shaw and Larson).  Not so.  UC has always had the plants.  It never lost a license or opportunity because of CBC's efforts to continue Shaw's and Larson's work.  And, despite its complaints about inadequate information, UC was able to apply for its still un-issued omnibus patent on the CSG, a patent it pursued in bad faith solely to assert ownership over Shaw's and Larson's inventions, and to force them to transfer their copies of those plants to UC on the false representation that UC owned the IP rights to the plants.

That is what this case is really about – the consequences to California's strawberry industry and the damages to Shaw, Larson and CBC from UC's politically motivated campaign to take what it could not develop itself and to lock up Shaw's and Larson's inventions to quash any competition with the interests represented by the CSC.  The Court has already determined from the limited record at summary judgment that there is evidence UC acted in bad faith, and there will be much more evidence of that at trial.

CBC, Shaw and Larson take the opportunity of this Trial Brief to briefly explain to the Court what really happened leading up to this lawsuit.  They also draw the Court's attention to a key issue, ownership of IP rights in Transition Cultivars, the resolution of which will allow the parties to focus their jury presentation on the real dispute.

## II.   UC'S BAD FAITH VS. STRAWBERRY DEVELOPMENT

*Background of the Strawberry Program* - UC Davis has had a highly successful strawberry breeding program for decades.  Shaw and Larson did not start the program, and, properly managed, it ought to have continued with great success well beyond their time at UC.

Yet it would be false modesty to pretend that Shaw's leadership of the UC Davis strawberry breeding program was not extraordinarily successful.  Since Shaw joined the program in 1986, twenty-four patented strawberry cultivars were released -- almost one every year until he retired in 2014.  UC has received almost $100,000,000 in royalties from Shaw's patented strawberry varieties, and UC Davis' strawberry breeding program was recognized under Shaw's leadership as the premier program in the world.  UC witnesses struggle to deny the importance of Shaw's and Larson's contributions to the program, with grudging admissions such as that Shaw's and Larson's time at UC was "congruent with success," but there is no denying the results.

The inventors of these valuable strawberry varieties were rewarded for their efforts, but this is no tale of individual greed.  Shaw donated a substantial portion of his royalties, hundreds of thousands of dollars over the years, directly to the UC breeding program staff and field workers.  He also agreed for many years to reduce his royalty share to encourage direct funding of the breeding program and allow UC resources (including money raised by his inventions) to be used elsewhere.  Shaw and Larson sincerely wanted to bring great strawberry varieties to California and farmers around the world.

But all things must end, and Shaw and Larson decided to retire from UC.  It had been many years working in the fields (breeders actually work with plants, in the fields and the mud, unlike geneticists).  Shaw and Larson gave what amounted to three years notice.  Leading up to that notice and thereafter, UC leaders were talking publicly about ending the program. Deans and administrators came and went, and clearly the future prospects for a vigorous strawberry breeding program at UC Davis were waning.

This was a disappointing outcome, not only to Shaw and Larson but also to those in the strawberry business around California, leaders and smaller participants alike in California's multi-billion dollar strawberry industry.  The growers that became the members of California

- 2 -

CBC, SHAW & LARSON'S TRIAL BRIEF
Case No. 3:16-CV-02477-VC

Berry Cultivars, LLC, or "CBC," had worked with Shaw for years. Shaw and Larson were famous for articles, presentations and posting trial data on strawberry varieties on the UC Davis website. They held "field days," where growers and nurseries from around California and the world could see what was happening in the fields and anticipate new strawberry varieties to plant. These growers got to know Shaw and Larson, trusted them, and formed CBC to keep the breeding program moving forward.

***UC's Bad Faith Negotiations*** - When it was clear Shaw and Larson were leaving, UC started talking even more loudly about ending the program. It fired (then rehired, but then re-fired) most of the workers. Shaw and the growers involved in CBC were disappointed by UC's mishandling of the strawberry breeding program, and worked for a long time to try to negotiate a "win-win," an arrangement where Shaw and CBC could keep pushing forward Shaw's highly successful program, paying UC royalties as CBC was able to release cultivars.

Many at UC were very interested in this plan. Shaw had for years discussed such options with UC Davis leaders, including deans and other leaders relating to the breeding program. There was general support for this public-private partnership, and UC's own Plant Sciences Department recommended the UC move forward as proposed by Shaw and CBC.

UC ultimately reached a different decision and refused to negotiate further. The surprising decision was the result of an agreement with the California Strawberry Commission ("CSC") that restricted the breeding program. The public agreement resulted from a settlement of a lawsuit CSC filed, urged by larger strawberry growers who had their own, "proprietary" breeding programs. Those growers did not want competition from Shaw at UC, or at CBC after his retirement. UC gave the CSC "input" into future UC licensing activities, a startling departure from academic independence and openness that had characterized the program under Shaw.

This agreement was intended directly to keep Shaw (and CBC) from continuing strawberry development. It worked – CBC is tied up by UC's claims and the new UC Davis program has not released a single new cultivar.

But that was not the whole story. UC had actually reached *two* agreements with CSC, one public, and one not. The other, and secret, agreement was that UC would not license Shaw (and

others), while CSC and UC were negotiating the settlement that gave CSC some control over the breeding program. *See* Exhibit A, Tx. 796. The Commission was explicit – it opposed the "University from entering into a license agreement with Dr. Shaw." So UC and the Commission entered into a secret agreement not to undertake any licensing during the very time when UC was supposed to be giving, fair consideration to its own Plant Sciences Department's recommendation to license Shaw and CBC, generating royalties for UC.

In a decision without precedent, UC reversed course, rejected the recommendation of its own experts in the field, and pursued the filing of an unsupported, improper omnibus patent application to wrest rights from Shaw and Larson (and ultimately CBC). During all the negotiations, after all the communications and emails, no one at UC revealed that UC had already secretly agreed not to license Shaw or anyone associated with him. UC's participation in the negotiations was a sham.[1]

***UC's Bad Faith Patent Application*** – The new Dean broke the news that the UC would not deal with its most successful strawberry breeder. In that connection, the Dean also demanded that Shaw and Larson assign their rights to the 168 varieties of plants they had invented, the "Core Strawberry Germplasm," or "CSG," and authorized the omnibus filing of a single patent application for all 168 varieties. Both the demand and the filing of the CSG patent application were radical departures from years of UC practice.

Shaw's twenty-four patents over about the same number of years were always obtained the same way. Shaw and Larson did crosses. They grew the plants. They studied them, developed them, and tracked them over years. When enough time had passed, and sufficient data was generated to establish that they had developed a new and unique variety, they formally disclosed the variety to UC, with accompanying data, signed assignments, and went back to work.

The only exception—the only one in almost 30 years—was the CSG application at issue in this case. For this one application, UC demanded assignment with a blank form. It filed the

---

[1] The recent agreement remained secret during discovery. UC never disclosed its existence. It took a California Public Records Act, Cal. Court Code section 6250 et seq., request to the CSC to dislodge a document disclosing the secret agreement, although certainly other documents still remain in UC's files that relate to it. *See* attached Exhibit A (Trial Ex. 796).


application for 168 varieties, some of which were only in their third year of evaluation. It filed the application with summary data, but nowhere near the kind of data needed to patent each variety. It turned to a new law firm, one that had not done plant patent work for UC over the last decades, and who, it turned out, was UC's counsel in the CSC litigation.

This was no series of coincidences. The filing of the CSG application in its unusual, and improper, form was done for one reason – to create a claim for ownership over the CSG, prevent Shaw and CBC from working with it, and satisfy the CSC and its proprietary breeding backers that did not want competition from the previously successful UC program.

The bad faith conduct continued. UC and its lawyers induced Shaw to leave plants at UC, allegedly required "for the [CSC] litigation." They falsely asserted that UC then, before any assignment, legally owned all Shaw's and Larson's rights in their inventions. They continued to prosecute the sham patent application, which, years later, still languishes in the Patent Office. And, as was revealed in discovery, even after expressly promising to protect Shaw's and Larson's rights in the plants known as "Transition Cultivars," UC's new breeder destroyed hundreds of them, their unique qualities lost forever.

*UC's Conduct Damages CBC* – UC's misconduct caused CBC significant harm. Shaw has a decades-long, proven track record in breeding new and valuable strawberry varieties, working with material he has developed, nurtured and carefully evaluated over several years. Now, CBC cannot work with CSG because UC filed a sham patent application, and cannot work with the IP in the TCs because UC has destroyed the sole embodiment of much of it and insists on keeping the rest away from CBC. The Court has held that Shaw and Larson have no rights to this plant material in UC's possession. But Shaw and Larson had exercisable IP rights to the material in the Doctors possession when they were told by the University they had no IP rights in the plants they invented and must transfer the material to the University, which they did under protest. As a result, CBC cannot move forward with the benefit of Shaw's and Larson's IP rights, and the lost opportunity to build another, meaningful strawberry breeding program has caused significant damages to CBC, estimated by CBC's expert in the tens of millions.

UC has no meaningful damages on its laundry list of claims.  As to patent infringement, worldwide use of patented varieties for breeding is well known and long tolerated by UC.  UC cannot claim lost sales or profits on any claims, because CBC has sold nothing and UC has released no products independent of Shaw and Larson.  UC cannot claim lost information, because its 30(b)(6) witness claimed UC had all the information it needed to file the CSG application.  UC cannot claim lost property, because it persuaded Drs. Shaw and Larson, with false promises, to transfer all the CSG and TCs into UC's possession (at least, until UC unilaterally destroyed hundreds of TCs without so much as notifying Shaw or CBC in advance).  And UC cannot seriously be seeking damages for "stolen" farming property; a misplaced ATV (since returned) and a missing data logger do not a federal case make, at least they should not.

***What This Case Is Not About*** – UC has spent this case litigating discovery battles, not the merits.  The most significant example is UC's focus on Eurosemillas, International Semillas, and the Spanish crosses of 2014.  Here, there is some factual uncertainty.  CBC thought the seeds it was receiving from those seeds conformed with Dr. Shaw's crossing plan using commercialized UC-patented varieties (because such crossing is legal in Spain and the industry understands importing such seeds in not patent infringement) available to the public and authorized for cloning by and use by UC's license agreements in Spain.  UC's hired expert claims to have found CSG material in the parentage of crosses in CBC's possession, but that remains an issue for cross-examination and trial.  What is clear is that neither party knows why the results of the crosses turned out as they did.  It certainly was not designed to be so by Dr. Shaw.

UC did not need to accept any factual uncertainty.  Eurosemillas is UC's largest European partner for strawberry propagation.  Eurosemillas is closely bound to UC with multiple agreements that require it to provide information and submit to inspection.  UC could easily have resolved this uncertainty by asking company it claims to be International Semillas' alter ego what happened.  Actually, UC did, and was told UC materials were not improperly used.  Rather than accept that answer, UC claims there is a vast, international conspiracy to hide a "secret breeding plan," one of which there is not a shred of evidence, and an issue that has so burdened the papers in this case it need not be discussed more here.

### III. OWNERSHIP OF IP RIGHTS IN THE TRANSITION CULTIVARS

Many of the parties' pending motions and disputes turn on a single issue – may CBC assert claims based on IP rights in the Transition Cultivars and CSG's. UC argues that all such claims are barred because the Court has ruled that UC owns the physical plants in its possession.

UC's argument is misplaced, because it does not address ownership of the *IP* rights in the TCs. The Court has identified two types of rights, IP and tangible property rights, in two classes of property, the CSG and TCs. The Court has addressed CBC's claims to ownership of tangible property and IP rights in the CSG and tangible property rights in the TCs. But that covers three of four possible things to own. The fourth is IP rights in the TCs (the thinking, effort and crossing decisions that led to each TC creates intellectual property rights, sometimes called "natural rights" as explained in CBC's Motion in Limine No. 1). The Court has not decided, much less rejected, CBC's claim to ownership of the IP rights in the TCs.

Nor could those rights be rejected, under the Court's own analysis. IP is not "acquired" by an inventor, it is created. UC's rights to intellectual property created by Shaw and Larson during their time at UC are based only on their Patent Agreements. Even if, as the Court has determined, UC has sole right and complete discretion to decide whether to assert ownership by declaring something "possibly patentable" and at least pretending to seek patent protection, UC did not do that here; in fact, it has conceded that the TCs are not "possibly patentable". As a result, UC not only has no claim to ownership over IP rights in the TCs, it has not even asserted such a claim the one way it was required to do so.

The path to the correct answer is straightforward: (1) the Court has held that there are severable IP and tangible property rights in plants developed by Shaw and Larson; (2) the Court has also held that UC may acquire those IP rights only by assignment under the patent agreement; but (3) UC has never demanded that assignment and has admitted it has no basis to do so. The Court's own analysis compels the conclusion that Shaw and Larson had IP rights in the TCs; therefore, the assignee of those rights, CBC, has claims based on UC's failure to permit it access to and destruction of the embodiment of those rights.

## IV. CONCLUSION

CBC, Shaw and Larson look forward to the upcoming Pretrial Conference and to the Court's guidance to the parties, to further shape this case for an efficient, fair jury trial.

Dated: May 1, 2017

Respectfully submitted,

Jones Day


By: */s/ Tharan Gregory Lanier*
     Tharan Gregory Lanier

Attorneys for Cross-Complainant and Defendant CALIFORNIA BERRY CULTIVARS, LLC and Defendants DOUGLAS SHAW and KIRK LARSON

- 8 -
CBC, SHAW & LARSON'S TRIAL BRIEF
Case No. 3:16-CV-02477-VC