# Exhibit 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5    CALIFORNIA BERRY CULTIVARS,    )
     LLC,                           )
6                                   )
              Plaintiff             )
7                                   )
              vs.                   )   16-cv-02477-VC
8                                   )
     THE REGENTS OF THE             )
9    UNIVERSITY OF CALIFORNIA, a    )
     corporation,                   )
10                                  )
              Defendant             )
11   _____  )

12

13

14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15    Videotaped Deposition of Douglas V. Shaw, Ph.D.

16             San Francisco, California

17             Thursday, December 8, 2016

18

19

20   Reported by:

21   JOANNE M. FARRELL, RPR, CRR

22   CSR Nos. 4838(CA)  506(HI)  507(NM)

23   Job No. 2492592

24

25   Pages 1 - 293

                                          Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    University of California, the cross-claimant in this

2    case.

3             MR. LIPPETZ:  Craig Lippetz, Jones Day, for

4    California Berry Cultivars, Douglas Shaw and Kirk

5    Larson.

6             VIDEOGRAPHER:  Thank you.  Will the court

7    reporter please swear in the witness.

8                  Douglas V. Shaw, Ph.D.,

9    having been administered an oath, was examined and

10   testified as follows:

11            MR. CHIVVIS:  Thanks.  A few preliminary

12   things to get started here.  First, I'd like to

13   designate this transcript "Highly Confidential,

14   Attorneys Eyes Only."  It has a number of matters

15   regarding documents and other information that have

16   been designated by one or both parties may come up.

17   I'll deal with de-designations later with counsel,

18   Greg Lippetz here, as we decide which portions of

19   the transcript could be de-designated.

20            Another issue, Mr. Lippetz just alerted me

21   that there was a slight vendor issue, and that some

22   documents of Dr. Shaw's will be coming in a little

23   bit later here.  I don't think it should be an

24   issue.  I'll review those over the lunch break and

25   hopefully we can resolve that.

Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   true?

2         A.  That's correct.

3         Q.  It was a successful 30 years, right?

4             MR. LIPPETZ:  Objection.  Vague.

5             THE WITNESS:  In my opinion their program

6   was successful, yes.

7   BY MR. CHIVVIS:

8         Q.  But in 1986, around that time, they were --

9   they planned to retire; isn't that right?

10        A.  There was a plan for both of them to end

11  their employment within the next few years, correct,

12  yes.

13        Q.  And that, in part, was why you were hired,

14  to take over the program from them; is that true?

15            MR. LIPPETZ:  Objection.  Speculation.

16            Go ahead.

17            THE WITNESS:  Part of the responsibility

18  that I was hired to retain was to continue the

19  strawberry research program, which included

20  strawberry breeding at that time, yes.

21  BY MR. CHIVVIS:

22        Q.  So one of the reasons you were hired was to

23  oversee the university's strawberry breeding program

24  when Royce Bringhurst and Victor Voth retired,

25  correct?

                                        Page 16

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       A.  That's correct.

2       Q.  By 1990 you had assumed direction over the

3   university's strawberry breeding program, true?

4       A.  That's correct.

5       Q.  And part of your role as the person

6   overseeing the university's strawberry breeding

7   program was to breed new strawberry varieties; is

8   that right?

9       A.  That had been a traditional role and, yes,

10  I was acting to breed strawberry cultivars at that

11  point.

12      Q.  So as director of the strawberry breeding

13  program at the university, you took it as part of

14  your charge to breed new strawberry varieties?

15      A.  It was part of my charge to breed new

16  strawberry cultivars, yes.

17      Q.  And moving into that role, you benefited

18  from the strawberry germplasm that Dr. Royce

19  Bringhurst and Victor Voth developed in the years

20  prior, correct?

21          MR. LIPPETZ:  Objection.  Vague.

22          THE WITNESS:  I think you need to define

23  "benefited from" for me.

24  BY MR. CHIVVIS:

25      Q.  You used germplasm in your breeding

1    program, as you were running it for the university,

2    that had been developed by doctor Royce Bringhurst

3    and Victor Voth, correct?

4         A.  That's correct.

5         Q.  You wouldn't have had the program that you

6    have at the university without their work, would

7    you?

8              MR. LIPPETZ:  Objection.  Speculation.

9              THE WITNESS:  I don't really have facts

10   enough to answer that question whether the program

11   would have been adequate, better, worse.  I can't

12   answer that.

13   BY MR. CHIVVIS:

14        Q.  I'm not asking that question.

15        A.  All right.

16        Q.  I'm just asking whether you would have had

17   the program you had without their work.

18        A.  I think the answer to that is no, I

19   wouldn't.

20        Q.  You would not have developed the varieties

21   that you developed without Dr. Bringhurst and Victor

22   Voth's work, would you?

23             MR. LIPPETZ:  Objection.  Vague.

24             Go ahead.

25             THE WITNESS:  That's very vague.  I

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   certainly would not have developed exact varieties

2   that I developed because the varieties that I

3   developed did utilize that material.

4   BY MR. CHIVVIS:

5       Q.  So you would have not had the ability to

6   develop the exact varieties that you developed

7   because you would have not had the benefit of Royce

8   Bringhurst and Victor Voth's material, correct?

9               MR. LIPPETZ:  Objection.  Vague.

10              Go ahead.

11              THE WITNESS:  That's extremely vague,

12  again.  I would not have been able to develop the

13  exact varieties, that's correct.  I think I answered

14  that question.

15  BY MR. CHIVVIS:

16      Q.  The Camarosa variety was an important

17  strawberry variety released by the university's

18  strawberry breeding program; isn't that true?

19      A.  That's correct.

20              MR. LIPPETZ:  Objection to form.

21              Go ahead.

22              THE WITNESS:  Again, a little vague, but I

23  think certainly it was a successful variety if

24  that's the question, yes.  It became a successful

25  variety.

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  BY MR. CHIVVIS:

2      Q.  I'll use your words.

3      A.  Okay.

4      Q.  Camarosa was a successful strawberry

5  variety released by the university's strawberry

6  breeding program, correct?

7      A.  That's correct, yes.

8      Q.  It was a hit?

9          MR. LIPPETZ:  Objection.  Vague.

10         THE WITNESS:  It was widely used and

11  created a lot of value for growers.  I think

12  that's -- when you say is a hit, if you mean by

13  widely used a hit, that's fine, I agree with that.

14  BY MR. CHIVVIS:

15     Q.  Let's use your words.

16     A.  Yeah.

17     Q.  Camarosa was widely used and created a lot

18  of value for California strawberry growers, correct?

19     A.  Correct.

20     Q.  Camarosa made millions in royalties; isn't

21  that true?  Millions of dollars.

22     A.  I don't have the figures but I think it

23  did, yes.

24     Q.  And you were involved in the development of

25  Camarosa; isn't that true?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      A.   That's correct.

2      Q.   Dr. Royce Bringhurst and Victor Voth were

3  also involved in the development of Camarosa,

4  correct?

5      A.   That's right.

6      Q.   You're all named as inventors on the

7  Camarosa patent; isn't that true?

8      A.   That's correct.

9      Q.   The university filed that patent in 1993,

10  does that sound about right?

11      A.   That sounds correct, yes.

12      Q.   And you've received royalties from that

13  patent; isn't that true?

14      A.   That is correct.

15      Q.   The university sent you checks for hundreds

16  of thousands of dollars for your share of royalties

17  from the Camarosa patent, right?

18      A.   Again, I don't have the figures but I think

19  that's correct.  Certainly the university sent me

20  checks for hundreds of thousands of dollars.

21      Q.   And some of those checks, hundreds of

22  thousands of dollars in royalties in those checks,

23  was for your share of royalties from the Camarosa

24  patent; isn't that right?

25      A.   That's correct.

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1     Q.  The combined total of the university's

2  checks you've received for the Camarosa patent

3  royalties amounts to more than a million dollars;

4  isn't that right?

5     A.  I don't have the figures, but that wouldn't

6  surprise me, no.

7     Q.  Wouldn't surprise you?

8     A.  Would not surprise me, no.

9     Q.  In fact, you received a check last year for

10  your share of Camarosa royalties, right?

11     A.  Correct.

12     Q.  Royalties from varieties you developed

13  while head of the university strawberry breeding

14  program have made you very wealthy; isn't that true?

15           MR. LIPPETZ:  Objection.  Vague.

16           THE WITNESS:  Define "wealthy" for me.

17  BY MR. CHIVVIS:

18     Q.  Do you consider yourself wealthy?

19     A.  No.

20     Q.  The checks you've received from the

21  university for royalties from the strawberry

22  breeding program have totaled more than $10 million;

23  isn't that right?

24     A.  That's correct.

25     Q.  You don't consider that a lot of money?

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       A.  Page?

2       Q.  On page 11.

3           Do you see the first full paragraph there?

4       A.  Yes.

5       Q.  It states "Dr. Shaw notified the university

6   of his intent to leave and retire from the

7   university in late 2011"; isn't that right?

8       A.  I don't think I have the same document that

9   you have.  You said page 11?

10      Q.  Yes.

11      A.  The first paragraph?

12      Q.  The first full paragraph.

13      A.  Sorry, sorry.

14      Q.  The first full paragraph states --

15      A.  Right.

16      Q.  -- "Dr. Shaw notified the university of his

17  intent to leave and retire from the university in

18  late 2011"; isn't that right?

19      A.  Right.  I see that, yes, uh-huh.

20      Q.  And that was a truthful and accurate

21  statement when it was made?

22      A.  That's correct, yes, uh-huh.

23      Q.  So you notified the university of your

24  intent to leave and retire from the university in

25  late 2011; isn't that right?

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      A.   That's correct, yes.

2      Q.   You did so because you were unhappy; is

3  that fair?

4           MR. LIPPETZ:  Objection.  Vague.

5           THE WITNESS:  I won't say I was unhappy.  I

6  would say that we were -- it was time for me to move

7  on and retire and do some other things.  Certainly I

8  wasn't satisfied with the situation at the

9  university, but I won't say unhappy, no.

10  BY MR. CHIVVIS:

11     Q.   You weren't satisfied with the situation at

12  the university, right?

13     A.   I would say that's too simplistic a

14  response.  The connection between being unsatisfied

15  with the university was part of the reason.  The

16  second reason was it was getting time to retire.

17     Q.   And part of the reason was you thought the

18  university strawberry breeding program was not being

19  run like a business, right?

20          MR. LIPPETZ:  Objection.  Vague.

21          THE WITNESS:  Yeah, define what you mean by

22  "run like a business," please.

23  BY MR. CHIVVIS:

24     Q.   You thought the program could have made

25  more money?

Page 27

1    variety, correct?

2        A.   That's correct.

3        Q.   Probably more than four years, right?

4        A.   That's correct.

5        Q.   In most cases it would take at least six

6    years?

7        A.   I would say a typical time would be six

8    years, correct, yes.

9        Q.   And it could take as long as 10?

10       A.   In my experience it's never taken 10.

11       Q.   Could take as long as eight?

12       A.   In my experience we've -- we have never

13   taken eight years, no.

14       Q.   Seven?

15       A.   Seven sometimes.

16       Q.   So it could take as many as seven years

17   from the cross-pollination of the parents to have a

18   finished strawberry variety for release, correct?

19          MR. LIPPETZ:  Objection.  Vague.

20          THE WITNESS:  Given the working definition

21   that you've given me I'd say yes.

22   BY MR. CHIVVIS:

23       Q.   All right.  Let's back up a little bit.

24          In 2014, at least until November, you were

25   still head of the university strawberry breeding

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  program; is that correct?

2      A.  That's correct.

3      Q.  But you didn't perform any crosses for the

4  university's program in 2014, did you?

5      A.  No, we did not.

6      Q.  None at all?

7      A.  In 2014, no.

8      Q.  So that means no new varieties from 2014

9  crosses will be in the program four to seven years

10 from 2014, right?

11          MR. LIPPETZ:  Objection.  Speculation.

12          THE WITNESS:  From the University of

13 California program, if we didn't make crosses there

14 would be no varieties from that particular potential

15 cross year, that's correct.

16 BY MR. CHIVVIS:

17     Q.  There's a gap in the pipeline for that

18 year?

19     A.  That would be -- I don't know what you mean

20 "a gap in the pipeline," but there will be no

21 crosses in 2014, therefore no possibility for

22 cultivars from that particular cross, potential

23 cross year.

24     Q.  The university lost a year?

25          MR. LIPPETZ:  Objection.  Vague.

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1         THE WITNESS:  I -- lost a year for what?

2    BY MR. CHIVVIS:

3         Q.  Lost a year in which parents were selected

4    and crossed to introduce new germplasm into the

5    strawberry breeding program?

6         A.  I can say that there will be no varieties

7    from that.  Whether the university lost a year or

8    not is -- you know, that's a term I can't get my

9    head around, I'm sorry.

10        Q.  There will be no new varieties tracing

11   their parentage back to a cross performed in 2014?

12        A.  I agree with that, yes.

13        Q.  Let's talk about 2013.  You were still

14   employed by the university in 2013, correct?

15        A.  Correct.

16        Q.  You were still head of the university's

17   strawberry breeding program in 2013; isn't that

18   right?

19        A.  That's correct.

20        Q.  You did perform crosses for the

21   university's strawberry breeding program in 2013,

22   though?

23        A.  In 2013 I performed crosses for two

24   experiments, as we had done in the past, with the

25   emphasis on development of disease resistance

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    germplasm.  The goal of those crosses was really not

2    cultivar development.

3        Q.  But you did perform crosses for the

4    university's strawberry breeding program in 2013,

5    right?

6            MR. LIPPETZ:  Objection.  Asked and

7    answered.

8            THE WITNESS:  One of the things that's been

9    problematic in the language here is the term

10   "strawberry breeding program" has a lot of different

11   meanings and interpretations, and even I use

12   different -- you know, I would say, interpretations

13   of that term at different times.

14           If you talk to people in the plant sciences

15   department and talk about strawberry breeding, that

16   could be any number of different things from very

17   fundamental research, which is our role, and part of

18   our responsibility, maybe the dominant

19   responsibility, up to the more narrow role of

20   cultivar development.

21           And, you know, to say that we were doing no

22   crosses related to strawberry breeding is just plain

23   inaccurate.  We were doing no crosses related to

24   the -- specifically aimed at the immediate

25   development of seedlings that would result in

Page 47

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    commercial cultivars.

2    BY MR. CHIVVIS:

3        Q.   So 2013?

4        A.   Yes.

5        Q.   In your role as a member of the faculty of

6    the university, you performed crosses in 2013?

7        A.   Yes.

8        Q.   Before you retired from the university you

9    had all of the 2013 progeny from those crosses

10   discarded?

11       A.   I think a more accurate way to say that is

12   we didn't retain any of those selections from those

13   experiments that we conducted.

14       Q.   So there's no germplasm in the university

15   strawberry proceeding program tracing its lineage

16   back to 2013 crosses, either, right?

17       A.   That's correct.

18       Q.   So no germplasm in the university

19   strawberry breeding program tracing its lineage back

20   to either 2013 or 2014, right?

21       A.   Yes.

22            MR. LIPPETZ:  Objection.  Asked and

23   answered.

24            THE WITNESS:  Yeah, I think I already

25   answered that question "Yes."

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          MR. CHIVVIS:  Just to get the record clear

2     I'm going to ask it again and you can object.

3     BY MR. CHIVVIS:

4          Q.  There's no germplasm in the university's

5     strawberry breeding program tracing its lineage back

6     to 2013 or 2014, correct?

7          A.  I want to avoid the term "germplasm"

8     because I'm not entirely sure what that could

9     entail.  It's too vague.  But I think what you're

10    trying to get at, there are no selections in the

11    university collection that trace the seedlings that

12    were generated from crosses conducted in 2013 or

13    2014.

14         Q.  I'll use your words.

15         A.  Okay.

16         Q.  There are no selections in the university's

17    strawberry breeding program that trace their lineage

18    back to crosses that were conducted in 2013 or 2014,

19    correct?

20         A.  That's correct.

21         Q.  And in four to seven years from 2013 or

22    2014, there will be no varieties to release as

23    finished varieties from the university program that

24    trace their lineage back to crosses conducted in

25    2013 or 2014, correct?

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      A.  I think that follows, yes.

2      Q.  The university has plots near Davis at a

3   place called Wolfskill Experimental Orchard, right?

4      A.  That's correct, yes.

5      Q.  Test fields?

6      A.  Test fields.

7      Q.  Your practice when you ran the university's

8   strawberry breeding program was to keep a foundation

9   stock of the university's germplasm at the test

10  fields at Wolfskill Experimental Orchard, right?

11     A.  I think we called it a nursery, but yes, I

12  think that's -- is that a term that's familiar to

13  you?

14     Q.  Sure.

15     A.  Okay.

16     Q.  This nursery stock that you kept at

17  Wolfskill Experimental Orchard was basically a copy

18  of everything important in the program, right?

19        MR. LIPPETZ:  Objection.  Vague.

20        THE WITNESS:  It was a copy of most of what

21  existed in the program at any slice of time.

22  BY MR. CHIVVIS:

23     Q.  Not everything?

24     A.  No, there was a second nursery down in

25  Southern California, and some of the university's

Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   breeding program, right?

2           MR. LIPPETZ:  I'm going to remind you just

3   to wait for him to finish, that's all.

4           THE WITNESS:  I'm sorry.  Okay.

5           Could I have your question?

6   BY MR. CHIVVIS:

7       Q.  I'll repeat it.

8       A.  Yeah, please, yeah.

9       Q.  Certainly by 2012, you'd begun having

10  conversations with others outside the university

11  about starting a private strawberry breeding

12  program, right?

13      A.  I'd begun the discussion about, at that

14  point, the interest in starting a private breeding

15  program, yes.

16      Q.  In 2012 you spoke to representatives from

17  Lassen Canyon Nursery about starting a private

18  strawberry breeding program, right?

19      A.  They were part of the group, yes.

20      Q.  And Lassen grows strawberries under license

21  from the university; isn't that right?

22      A.  That's correct.

23      Q.  Lassen is actually really important to the

24  university strawberry breeding program, true?

25          MR. LIPPETZ:  Objection.  Vague.

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          THE WITNESS:  Maybe you could rephrase

2     that.

3     BY MR. CHIVVIS:

4          Q.  Lassen Canyon Nursery is the most important

5     nursery in California to the University of

6     California strawberry breeding program; isn't that

7     right?

8          A.  Lassen Canyon Nursery is the largest

9     nursery in California and they -- I would think they

10    sell more University of California strawberry plants

11    than any other nursery.

12         Q.  That makes it the university's most

13    significant licensee in California, right?

14            MR. LIPPETZ:  Objection.  Vague.

15            THE WITNESS:  If you mean by the largest

16    producer of university plants by "significant," then

17    yes, that's accurate.

18    BY MR. CHIVVIS:

19         Q.  You spoke to Lassen representatives about

20    your new venture anyway, though, right?

21         A.  Define "spoke to."  I'm not having any luck

22    understanding your question.

23         Q.  You thought Lassen Canyon's future was with

24    your new strawberry breeding program that would be

25    private, not with the University of California,

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  right?

2      A.  That seems to be a compound question.  I

3  don't think we ever talked about an exclusion of the

4  University of California.  I think I talked to

5  Lassen Canyon about an inclusion in a private

6  venture, yes.

7      Q.  In 2012 you also spoke to representatives

8  from a Spanish company called Eurosemillas; isn't

9  that right?

10     A.  That's correct.

11     Q.  Eurosemillas is also a really important

12  licensee of the university's strawberry breeding

13  program; isn't that right?

14         MR. LIPPETZ:  Objection.  Vague.

15         THE WITNESS:  Again, "important" means?

16  BY MR. CHIVVIS:

17     Q.  Eurosemillas brings in more license

18  royalties to the university than any other company

19  that is a licensee of the university's strawberry

20  breeding program, correct?

21     A.  That's correct, yes.

22     Q.  By a significant margin, right?

23     A.  I don't know.

24     Q.  And again, you thought Eurosemillas should

25  be part of your private venture?

1    A.  In 2011 I explored the idea of Eurosemillas

2    participating in that private venture.

3    Q.  You were having these conversations in 2012

4    while you were still a university employee working

5    as head of the university strawberry breeding

6    program, right?

7    A.  That's correct.

8    Q.  In 2013 California Berry Cultivars was

9    formed?

10    A.  That's correct.

11    Q.  You're one of the owner members when it was

12    formed?

13    A.  Yes, I was designated a two percent share

14    of the company when it was formed.

15    Q.  So you're one of the owner members when it

16    was formed?

17    A.  Correct.

18    Q.  You own a piece of the company?

19    A.  I would own a piece of the future company,

20    yes.

21    Q.  You're still a university employee at the

22    time that California Berry Cultivars was formed?

23    A.  I was still, yeah, when the documents were

24    signed, I was still a university employee.

25    Q.  You were still head of the university's

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  strawberry breeding program when California Berry

2  Cultivars was formed, correct?

3      A.  That's correct.

4      Q.  And California Berry Cultivars' purpose was

5  to form a private strawberry breeding program,

6  right?

7      A.  That's correct.

8      Q.  And if the university's program were to

9  live on past your tenure at the university,

10  California Berry Cultivars' program would be in

11  competition with the university's program, correct?

12      A.  If both of them were intended to go

13  forward, there would certainly be a possibility for

14  competition between them.

15      Q.  You hoped that the university's program

16  wouldn't go forward and be in competition with CBC's

17  private breeding program, correct?

18      A.  I think that's not accurate.  I would say I

19  didn't expect it to go forward.

20      Q.  You did not expect the university's program

21  to go forward and be in competition with CBC's

22  private breeding program, correct?

23      A.  That's correct.

24      Q.  Initially you hoped the university would

25  agree to provide CBC with access to the university's

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Q.  So CBC needed a plan B; am I right?

2           MR. LIPPETZ:  Objection.  Vague.

3           THE WITNESS:  For CBC to proceed in the

4    time frame that we had initially planned on, it

5    would need a plan B, correct.

6    BY MR. CHIVVIS:

7      Q.  Needed some other source of strawberry

8    germplasm to start the CBC's strawberry breeding

9    program, correct?

10     A.  That's correct.  Under any circumstances,

11   timewise or not, if the University of California had

12   refused to license its unreleased genetic material,

13   CBC would have needed to find a different source of

14   materials.

15     Q.  You were involved in coming up with that

16   plan B, right?

17     A.  Yes.

18     Q.  In December 2013, you designed a cross plan

19   in consultation with employees of Eurosemillas?

20     A.  I think it was in consultation with

21   initially it was a company called International

22   Semillas.

23     Q.  International Semillas is an affiliate of

24   Eurosemillas; is that correct?

25     A.  I believe that's correct, yes.

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.  And you sent that cross plan to Javier Cano

2    at Eurosemillas in Spain, correct?

3    A.  I sent to Javier Cano.  I'm not sure that I

4    sent it -- it would be accurate to say I sent it to

5    Eurosemillas.

6    Q.  You sent the cross plan that you developed

7    in December 2013 to Javier Cano?

8    A.  Yes.

9    Q.  Who was then residing in Spain?

10   A.  Yes, okay.

11   Q.  And your intention was that the crosses

12   detailed in the 2013 cross plan would be performed

13   in Spain?

14   A.  Yes, that's correct.

15   Q.  You intended that after the crosses were

16   performed, that seeds would be collected from the

17   parent plants and then imported back into the

18   United States, correct?

19   A.  The agreement, which I don't have details

20   about, but the agreement between California Berry

21   Cultivars and International Semillas, which I think

22   they call a service agreement, called for evaluation

23   of the seeds that International Semillas produced by

24   California Berry Cultivars in the United States.

25   Q.  And the purpose of that was to create a

Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  germplasm stock for CBC in the United States,

2  correct?

3        A.  It was --

4            MR. LIPPETZ:  Objection.  Misstates facts.

5            Go ahead.

6            THE WITNESS:  Yeah, I think that misstates

7  the facts.  I think the idea was -- based on my

8  understanding of the service agreement was that the

9  evaluation of those would be done by California

10  Berry Cultivars.  I don't know the specific

11  ownership rights of that material with CBC.  I just

12  didn't pay much attention to that.

13  BY MR. CHIVVIS:

14        Q.  You never told Liz Ponce of Lassen Canyon

15  Nursery and Javier Cano that the purpose of the

16  crosses being performed in Spain was to create

17  breeding stock in the United States for CBC's future

18  use?

19        A.  I think both of them were aware of the

20  service agreement.  I mean, we were creating --

21        Q.  I'm not asking about the service agreement.

22        A.  Right.

23        Q.  I'm asking whether you ever told Liz Ponce

24  of Lassen Canyon Nursery and Javier Cano that the

25  purpose of the crosses that you directed be

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    performed in Spain was to establish breeding stock

2    for CBC in the United States?

3         A.  I think that the intent was to create

4    breeding stock.  The specifics of the ownership,

5    whether that be CBC or Eurosemillas or International

6    Semillas, I don't think that was clear.

7         Q.  I'm not talking about --

8         A.  I'm not understanding your question

9    clearly.

10        Q.  -- a set of agreements or anything like

11   that, I'm talking about the intent.  And --

12        A.  The intent was certainly to develop

13   breeding stock.

14             MR. LIPPETZ:  Stop.  Stop.  Could we get a

15   question?  Sorry, it's a little confusing now what

16   question he's answering.

17             THE WITNESS:  Okay.

18             MR. LIPPETZ:  Can we start with a question?

19             MR. CHIVVIS:  Yeah, please no speaking

20   objections.  If he's going to talk, he's going to

21   talk.  Don't cut him off --

22             MR. LIPPETZ:  I object the question's

23   vague.  Go ahead.

24   BY MR. CHIVVIS:

25        Q.  Backing up to my earlier question, is it

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    your position that you never represented to Liz

2    Ponce at Lassen Canyon Nursery and Javier Cano that

3    the purpose of the crossbreeding that was being

4    performed in Spain at your direction was to create

5    breeding stock for CBC in the United States?

6         A.  I don't remember a conversation.  We

7    certainly talked about creating breeding stock, but

8    whether that was for CBC or for some relationship

9    with International Semillas, I just don't recall.

10   I'm not sure I would have ever known that.

11        Q.  So you can't rule out that you said that?

12        A.  I can't rule out that I said that, no.

13        Q.  In 2014, while you were still an employee

14   of the University of California -- scratch that.

15        In 2014, prior to November, you're still an

16   employee of the University of California, correct?

17        A.  Correct.

18        Q.  And prior to your retirement, CBC was sent

19   seeds, resulting from the crosses that were

20   performed in Spain, at your direction, correct?

21        A.  That's correct.

22        Q.  CBC received those seeds in the

23   United States?

24        A.  That's correct.

25        Q.  A Eurosemillas employee brought them into

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    at the end of the growing year, correct?

2        A.  We retained some of the genotypes from that

3    seedling population, I think is how I would put it

4    as a plant breeder, yes.

5        Q.  The seedling population from the crosses

6    you designed in 2013?

7        A.  That's correct, yes.

8        Q.  And CBC still has some of those genotypes

9    in its program today?

10       A.  Yes.

11       Q.  Some of the parent varieties in the

12   crossing plan that you sent in December 2013 were

13   university varieties, correct?

14           MR. LIPPETZ:  Objection.  Vague.

15           THE WITNESS:  Yes, I think so.  Yes, I know

16   so, I'm sorry.

17   BY MR. CHIVVIS:

18       Q.  At least one of the varieties in your 2013

19   crossing plan hadn't been released in Spain at the

20   time that you directed the cross be performed; isn't

21   that correct?

22       A.  I didn't -- what do you mean by "released

23   in Spain"?

24       Q.  We talked earlier about the two-year delay?

25       A.  Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    BY MR. CHIVVIS:

2         Q.  Right.  I'm not asking about that.

3         A.  Right.

4         Q.  You're aware that one of the varieties in

5    your 2013 crossing plan was still within the

6    two-year window after release in California?

7         A.  I was --

8              MR. LIPPETZ:  Objection.  Asked and

9    answered.

10             Go ahead.

11             THE WITNESS:  I was aware that one of the

12   varieties had not been released for two years in

13   California.

14   BY MR. CHIVVIS:

15        Q.  That variety was Merced, correct?

16        A.  I believe that's the variety, correct.

17        Q.  And you were aware of that in 2013 when you

18   designed the cross plan?

19        A.  Aware of what?

20        Q.  You were aware that it had not yet been

21   released in California for two years?

22        A.  Yes.

23        Q.  And just to make the question more

24   specific, you were aware, when you included the

25   Merced variety in your 2013 cross plan, that it had

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   not yet been released in California for two years?

 2        A.   That's correct.

 3        Q.   And yet you directed a cross be performed

 4   in Spain using the Merced variety, correct?

 5             MR. LIPPETZ:  Objection.  Asked and

 6   answered.

 7             Go ahead.

 8             THE WITNESS:  I think I've answered that

 9   question already, but I was aware -- yes, I was

10   aware that that had been released in California, and

11   I did direct or recommend that that variety by used

12   as a parent.

13   BY MR. CHIVVIS:

14        Q.   In Spain?

15        A.   In Spain.

16        Q.   In 2013, when CBC was formed, did you file

17   a disclosure statement with the university informing

18   them that you had taken an ownership interest in a

19   private company?

20        A.   I don't recall doing that, no.

21        Q.   You have no recollection of doing that?

22        A.   No recollection.

23        Q.   And it wouldn't surprise you if you hadn't?

24        A.   No, I don't think I have, no.

25        Q.   In fact, sitting here today, you believe
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              MR. LIPPETZ:  Objection.  Asked and

2     answered.

3              THE WITNESS:  I think I already answered

4     that affirmatively, yes.

5     BY MR. CHIVVIS:

6         Q.  And that the 2015 crosses, like the prior

7     set of crosses, were to be performed according to a

8     specific cross plan that you designed, correct?

9         A.  I designed the cross plan that I hoped that

10    they would use, correct, yes.

11        Q.  And "they" being --

12        A.  -- International Semillas.

13        Q.  Including Javier Cano and David Garcia

14    Sinova, right?

15        A.  Yes.

16        Q.  You hoped Javier Cano, David Garcia would

17    implement your crosses and then provide the seeds

18    back to CBC in the United States, correct?

19        A.  That's correct.

20        Q.  You didn't disclose to the university in

21    any formal way that you had designed crosses of

22    strawberry plants for another company in 2013,

23    correct?

24              MR. LIPPETZ:  Objection.  Vague.

25              Go ahead.

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              THE WITNESS:  I don't recall any disclosure

2      of that, no.

3      BY MR. CHIVVIS:

4          Q.  And you did not disclose to the university

5      in any formal way that you had designed crosses in

6      2014 for a private strawberry breeding program,

7      correct?

8              MR. LIPPETZ:  Same objection.

9              THE WITNESS:  Again, I think I've already

10     answered that, but the answer is correct that I have

11     not disclosed that in a formal way to the

12     university.

13     BY MR. CHIVVIS:

14         Q.  The 2015 cross plan that you prepared in

15     2014 included a number of university varieties as

16     parents, correct?

17         A.  Correct.

18         Q.  Three of those varieties would not yet have

19     reached the end of the two-year delay window by the

20     time the crossing was to be implemented in Spain,

21     correct?

22         A.  I was aware that three of the parent

23     varieties used in Spain had not been released for

24     two years in California, correct.

25         Q.  And those varieties were Fronteras, Granada

                                            Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  and Petaluma, correct?

2      A.  Correct, yes.

3          MR. CHIVVIS:  Mark as 101.

4          (Exhibit 101 was marked for identification

5          by the court reporter and is attached

6          hereto.)

7  BY MR. CHIVVIS:

8      Q.  Dr. Shaw, you're being handed what has been

9  marked as Exhibit No. 101, which is titled "A Short

10 Narrative, the Demise of the UC Davis Strawberry

11 Program, March 2016."  It has beginning Bates No.

12 CBC_DS_2913 at the bottom.

13         Do you see Exhibit No. 101?

14     A.  I see it, yes.

15     Q.  Do you recognize it?

16     A.  I can't say that I do.  A lot of the

17 material looks familiar, but I don't -- can you tell

18 me the author and the date?

19     Q.  Yeah.  Let's start here.  The date is

20 March 2016.

21     A.  Okay.

22     Q.  Do you see that in the upper left-hand

23 corner?

24     A.  The date, okay.

25     Q.  And I want to make a representation to you,

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        Q.   Is that an accurate statement?

2        A.   I think that's accurate.  It's been a very

3    successful program.

4        Q.   Second sentence.

5             "The program was initiated by Harold Thomas

6    and Earl Goldsmith in 1930, built upon briefly by

7    Richard Baker and then more extensively by Victor

8    Voth and Royce Bringhurst."

9             Is that an accurate statement?

10       A.   That's correct.

11       Q.   Third sentence.

12            "From the 1950s to the 1980s, the combined

13   research and breeding skills of Bringhurst and Voth

14   led to the a development of varieties that dominated

15   the California and global strawberry industry."

16            Is that an accurate statement?

17       A.   That's an accurate statement.

18       Q.   "That domination continued from the 1980s

19   to the present with the current generation of

20   breeder scientists, Dr. Douglas Shaw and Kirk

21   Larson."

22            Is that an accurate statement?

23       A.   I think it's an accurate statement, sure.

24       Q.   Next paragraph.

25            "The retirement of Bringhurst and Voth led

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      A.   That's correct, yes.

2      Q.   All University of California faculty

3  employees sign one of these when hired by the

4  university, is that your understanding?

5           MR. LIPPETZ:  You can answer.

6           THE WITNESS:  All university employees that

7  were hired in 1986 signed this version of the patent

8  agreement, yes.

9  BY MR. CHIVVIS:

10     Q.   And to your knowledge, all university

11  faculty employees signed a version of the patent

12  agreement when they are hired by the university,

13  correct?

14     A.   And I should say to my knowledge the other,

15  as well.  I don't know that they do, but I assume

16  that they do.  Certainly I did.

17     Q.   To your knowledge, your colleague, Dr. Kirk

18  Larson, signed one as well, correct?

19     A.   Kirk Larson signed a different version, but

20  to my knowledge he did, yes.

21     Q.   Let's flip to the patent agreement that's

22  at the conclusion of the document.  Do you see the

23  section on page ending Bates 50996, second page of

24  the document, the box labeled "Patent Agreement"?

25     A.   Yes, I do.

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    plant sciences in 2013?

2        A.  I am asking you to define "disclosure."

3        Q.  Did you make any submission to the cultivar

4    release committee in 2013 at the University of

5    California?

6        A.  Yes.

7        Q.  One of the submissions you made to the

8    cultivar release committee was 180 varieties that

9    you proposed the cultivar release committee make a

10   determination on whether to release, correct?

11       A.  That's not an accurate representation of

12   what I did.

13       Q.  You didn't ask the cultivar release

14   committee to come to a recommendation on whether to

15   release 180 varieties in 2013?

16       A.  That's not what the submission to the

17   University of California plant sciences department

18   cultivar release committee requested.

19       Q.  But you did make a submission?

20       A.  Yes.

21       Q.  And it related to 180 varieties?

22       A.  There was a submission that related to 180

23   genotypes, yes.

24       Q.  180 genotypes.  And in that submission you

25   mentioned that the 180 varieties may be protectable

1    with a utility model-type patent, correct?

2         A.  Yes, I think that's accurate.  May be

3    protectable.

4         Q.  There was a possibility?

5         A.  Yes.

6         Q.  You also requested that the cultivar

7    release committee instead consider licensing through

8    a TRP release those 180 varieties, correct?

9         A.  Yes.

10        Q.  In developing the release proposal, you

11   consulted with the university's innovation access

12   group, correct?

13        A.  I did not, no.

14        Q.  In considering your proposal, the TR --

15   excuse me, the cultivar release committee consulted

16   with innovation access, correct?

17        A.  That is my understanding.

18        Q.  To discuss the feasibility of patenting the

19   180 genotypes, correct?

20        A.  That's correct.

21             MR. LIPPETZ:  Objection.  Misstates prior

22   testimony.

23             Go ahead.

24             THE WITNESS:  State your question again.

25   I'm sorry, I got distracted.

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.   And you understand that the university had

2  decided to proceed with patenting the 168 genotypes

3  in the provisional patent application?

4    A.   The university had not decided to proceed

5  with the -- with a patent that was consistent with

6  my original request, or the original request to the

7  strawberry -- to the department's cultivar review

8  committee, which was for either a utility patent or

9  for licensing under tangible research product.

10    Q.   So to be clear, you thought that seeking a

11  utility patent was a valid option for the 180

12  genotypes that you submitted to the cultivar release

13  committee?

14    A.   The answer to that is I did and I do.  I

15  also think that, as you know, that wasn't the

16  recommendation of the plant sciences department

17  committee.

18    Q.   Yeah.  And I'm not focused on the plant

19  sciences department committee.

20    A.   I can understand why.

21    Q.   So if I'm hearing you correctly, you did

22  then in 2013 and you do now think that the 180

23  genotypes you submitted to the plant sciences

24  cultivar release committee be eligible for utility

25  patent?

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1         A.   I do, yes.

2         Q.   Assuming that the university had decided to

3   seek patent protection on 168 genotypes from within

4   the 180, and that it was within its rights to seek

5   that patent protection as a plant patent, you agree

6   that you would have been obligated to assign all

7   your rights to the university, correct?

8              MR. LIPPETZ:  Objection.  Calls for a legal

9   conclusion and speculation.

10             Go ahead.

11             THE WITNESS:  Yeah, I agree, I'm not

12  legally qualified to answer that question.

13  BY MR. CHIVVIS:

14        Q.   If the university had decided to seek a

15  utility patent on the 180 genotypes, or even a

16  subset thereof, you agree that the patent agreement

17  would have obligated you to execute an assignment to

18  the university, correct?

19             MR. LIPPETZ:  Objection.  Legal conclusion.

20  Speculation, and asked and answered.  Go ahead.

21             THE WITNESS:  Let me answer a different

22  question that I think is maybe more to the point,

23  which is:  Had the department committee decided that

24  a utility patent was the appropriate way to go to

25  list the 180, not 168, original items, I would have

                                        Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   people, you consider them carefully before you send

2   them?

3         A.   I think I do, yes.

4         Q.   And do you try to be truthful and accurate

5   with them when you write them?

6         A.   Yes.

7         Q.   So if it's an e-mail here and we are

8   looking at later and you wrote it, you consider your

9   statements carefully before you write them and

10  believe they are a truthful and accurate?

11        A.   I think they are a truthful and accurate

12  representation of what I was thinking at the time.

13        Q.   Fair enough.

14             Now, in this letter to Candy Volker, again,

15  page 3005, Exhibit 105, you wrote in the first --

16  it's the second paragraph, "The University of

17  California has never had a policy of releasing its

18  germplasm for general breeding purposes," correct?

19             MR. LIPPETZ:  Objection.  Misstates the

20  document.

21             THE WITNESS:  That's what the first

22  sentence says, yes.

23  BY MR. CHIVVIS:

24        Q.   And you believe that that statement was

25  accurate at the time that you made the statement to

                                        Page 108

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Candy Volker in 1999, correct?

2         A.  I believe so, yes.

3         Q.  Now, in the paragraph beginning with the

4    word "Third," which is actually the fourth

5    paragraph, overlaps 3005 to 3006, do you see that

6    paragraph?

7         A.  Yes, I do.

8         Q.  Second full sentence you stated "We intend

9    to develop the best strawberry cultivars in the

10   world and ensure that the best cultivars in the

11   world are available to growers without restriction

12   binding fruit sales, contract, or exorbitant royalty

13   or fee structure."

14             Do you see that?

15        A.  Yes, I do.

16        Q.  That was an accurate statement at the time

17   you made it in 1999, correct?

18        A.  Yeah, I believe that was a statement that I

19   would stand by in 1999, definitely.

20        Q.  Next sentence, "A one-way transfer of our

21   germplasm to proprietary strawberry breeding

22   companies would jeopardize this goal."

23             Do you see that?

24        A.  Yes, I do.

25        Q.  That was an accurate statement at the time

Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    you made it in 1999 to Ms. Candace Volker, correct?

2        A.  That was my feeling at the time, correct.

3        Q.  Last paragraph.  Still on Exhibit 105,

4    Bates LITTLE, page 3006.

5            Do you see the last paragraph there?

6        A.  Yes.

7        Q.  First sentence states "Lastly, as mentioned

8    above, licensing of UC cultivars has always been for

9    the intended purpose of fruit production, and we

10   have routinely followed practices that discourage

11   the use of our germplasm in breeding programs."

12           That was an accurate statement at the time

13   you made it in 1999, correct?

14       A.  I think that was accurate in 1999.

15       Q.  And next sentence.  "These practices

16   include the denial of licenses or test agreements to

17   individuals who seek to use genetic stocks as

18   parents rather than for fruit production."

19           That was an accurate statement at the time

20   you made it in 1999, correct?

21       A.  I believe so, yes.

22           MR. CHIVVIS:  Next in order.

23           (Exhibit 106 was marked for identification

24           by the court reporter and is attached

25           hereto.)

                                    Page 110

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  BY MR. CHIVVIS:

2      Q.  Dr. Shaw, I've handed you what's been

3  marked as Exhibit No. 106.  Exhibit No. 106 appears

4  to be the same as the last two pages as Exhibit

5  No. 105, except the Bates labels at the bottom start

6  with UC_STRAW2_948 and go to 945.

7          Dr. Shaw, would you agree with me that the

8  contents of Exhibit No. 106 are the same as the

9  contents of the last two pages of Exhibit No. 105?

10     A.  Yes.

11     Q.  The same letter from you to Candy Volker

12  about the plant sciences proposal, correct?

13     A.  I don't think it was plant sciences

14  proposal, but it was the same letter as on the

15  previous document you gave me.

16     Q.  So let me be clear about what exactly

17  transpired here.  At some point a representative of

18  plant sciences came to Ms. Volker and suggested that

19  the university should share some of its germplasm

20  for use in a private breeding company, correct?

21     A.  No, that's not accurate.

22     Q.  There was no suggestion by the

23  representative of plant sciences that it had the

24  right to use university germplasm in its private

25  breeding program?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    label on the bottom is UC_STRAW2_50992 through

2    50994.

3           The document is to Ahmad Hakim-Elahi from

4    Douglas Shaw.  The date is March 27, 2000.

5           Do you have Exhibit No. 109 before you?

6       A.  Yes, I do.

7       Q.  What is Exhibit No. 109?

8       A.  Exhibit 109 is a copy of the research

9    agreement between myself and Kirk and UC Davis that

10   agreed to provide discounts to strawberry patent

11   licensees in return for research donations.

12      Q.  At the time this agreement was entered

13   into, you were concerned about the source of funding

14   for the university strawberry breeding program,

15   correct?

16      A.  I believe that the reason for these

17   agreements was to stabilize and to secure strawberry

18   breeding funds for Kirk Larson and myself and our

19   program, yes.

20      Q.  And you wanted these funds to be

21   stabilized, correct?

22      A.  Yes.  That was my objective.

23      Q.  You wouldn't have signed this agreement if

24   you didn't want that?

25      A.  Yeah, this was a mechanism for funding my

                                          Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    research and Kirk's research at the university.

2        Q.   You had the ability to withdraw from this

3    agreement reflected in Exhibit No. 109, correct?

4        A.   That's correct.

5        Q.   And, in fact, you did --

6        A.   That's correct.

7        Q.   -- didn't you?

8             You did in 2012, if I'm not mistaken.

9        A.   That's correct.

10       Q.   That was two years before your retirement,

11   right?

12       A.   That's correct.

13       Q.   Your withdrawal from the agreement

14   reflected in Exhibit 109 resulted eventually in a

15   downtick in funding to the strawberry breeding

16   program, correct?

17       A.   Removing this source of funding decreased

18   the amount of money that was available to our

19   breeding program, correct.

20       Q.   Thanks.  One more question on that.

21            Actually, I'll move on.

22            (Exhibit 110 was marked for identification

23            by the court reporter and is attached

24            hereto.)

25

Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      intellectual property protection, correct?

2          A.   I understood that was their opinion, yes.

3               (Exhibit 120 was marked for identification

4               by the court reporter and is attached

5               hereto.)

6      BY MR. CHIVVIS:

7          Q.   Dr. Shaw, I've handed you what's been

8      marked as Exhibit No. 120 for identification

9      purposes.  Number 120 appears to be an e-mail from

10     you, Dr. Shaw, to a number of people, including

11     Chris Van Kessel, Helene Dillard and Mary Delany.

12     The Bates numbers for the exhibit are UC_STRAW2_932

13     through 934.

14              Do you see Exhibit No. 120?

15         A.   Yes.

16         Q.   Exhibit No. 120 is an e-mail from you; is

17     that correct, Dr. Shaw?

18         A.   Yes, it is.

19         Q.   And all of the information, all of the

20     statements in Exhibit No. 120 are your statements,

21     correct?

22         A.   Yes.

23         Q.   And in the second full paragraph of Exhibit

24     No. 120, the first sentence you stated, "Kirk and I

25     submitted a disclosure request for utility model

                                        Page 172

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    patent to package 180 genotypes specifically for
 2    their tangible value as breeding materials."
 3              Is that correct?
 4         A.   That is correct, yes.
 5              MR. CHIVVIS:  Next in order.
 6              THE WITNESS:  Are you finished with this
 7    one?
 8              MR. CHIVVIS:  Yeah, we are on to the next
 9    one.
10              (Exhibit 121 was marked for identification
11              by the court reporter and is attached
12              hereto.)
13    BY MR. CHIVVIS:
14         Q.   Dr. Shaw, I've handed you what's been
15    marked as Exhibit No. 121 for identification
16    purposes.  It's an e-mail from you to Michael
17    Carriere and Kirk Larson.  A number of people are
18    cc'd.  The "Subject" line reads "U.S. Plant Patent
19    Application Assignment."  The e-mail is dated
20    June 13, 2014.  The Bates numbers at the bottom of
21    the document read UC_STRAW2_935 and go to 936.
22              Do you see that document?
23         A.   Yes, I do.
24         Q.   The first e-mail that appears at the start
25    of the page in Exhibit No. 121 is an e-mail from
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   BY MR. CHIVVIS:

2       Q.  And it was finished so you can proceed.

3       A.  If all you're asking is whether the 168

4   items on the plant patent that was filed are the

5   same as the 168 of those which I originally

6   submitted for review for either utility patent or a

7   licensing procedure through TRP, I'm in agreement

8   with you.

9       Q.  That's exactly what I'm asking.

10      A.  Okay.

11      Q.  The 12 that were not included in the

12  provisional application that you were sent had

13  already been submitted to the U.S. Patent Office

14  separately for individual plant patents, correct?

15      A.  No.

16      Q.  Eleven of the 12 that were not included had

17  already been submitted individually to the

18  United States Patent Office for plant patenting,

19  correct?

20      A.  Either submitted or patented, correct, yes.

21      Q.  The one of the 12 not included in the

22  provisional patent application that had not yet been

23  submitted, now has been submitted for a plant

24  patent?

25      A.  It is my recollection that the provisional

Page 179

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   plant patent included 181.1, at least the version

2   that I saw when it was originally shipped to me in

3   hard copy only, and may have later been removed, but

4   not as of June 6.

5       Q.  And when you say 181.1, you're referring to

6   the Cabrillo variety that has been now released by

7   the University of California, correct?

8       A.  That's correct.  That was the selection

9   number that eventually became Cabrillo.

10      Q.  So to be clear, 12 of the 180 genotypes

11  that you submitted to the plant sciences release

12  committee have now been the subject of individual

13  plant patent applications to the U.S. PTO, correct?

14          MR. LIPPETZ:  Oh, sorry.  That's okay.  Go

15  ahead.

16          THE WITNESS:  I agree with that, yeah.

17  BY MR. CHIVVIS:

18      Q.  And both you and Dr. Larson have assigned

19  each of those applications to the University of

20  California, correct?

21      A.  That's correct.

22      Q.  But you refused to assign the application

23  on the remaining genotypes, correct?

24      A.  The application on the remaining genotypes

25  is not a patent on which we disclosed.

Page 180

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Q.   And you refused to assign your rights in

2  that application, correct?

3      A.   We refused to assign an -- a patent

4  disclosure that we never created nor disclosed.

5      Q.   So you refused to assign your rights in the

6  patent application that Michael Carriere lists in

7  his e-mail of June 6, 2014, correct?

8      A.   That's correct, yes.

9           MR. CHIVVIS:  Go off the record for a

10  minute.

11          VIDEOGRAPHER:  Going off the record, the

12  time is 3:01.

13              (Recess taken at 3:01 p.m.)

14          (Proceedings resumed at 3:14 p.m.)

15          VIDEOGRAPHER:  We are back on the record.

16  The time is 3:14.

17              (Exhibit 122 was marked for identification

18              by the court reporter and is attached

19              hereto.)

20  BY MR. CHIVVIS:

21      Q.   Dr. Shaw, I've handed you what's been

22  marked as Exhibit No. 122 for identification

23  purposes.  It's an e-mail from you to Dean Helene

24  Dillard from the college of agricultural sciences

25  dated November 7, 2014, Bates label UC_STRAW2_70190.

                                        Page 181

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  Actually goes through 70191, but I don't see any

2  content on the last page.

3          Do you have that?

4      A.  Yes.

5      Q.  This is the date of your retirement?

6      A.  Yes, that's the day of my retirement.

7      Q.  So on November 6th, the day before your

8  retirement, Dean Helene Dillard wrote to you that

9  she'd like you to make available copies, or indicate

10  the locations, of seedlings planted in 2013.

11          Do you see that?

12      A.  Yes.

13      Q.  And you responded that there were no

14  selections from 2013, correct?

15          MR. LIPPETZ:  Objection.  Misstates the

16  record.

17          THE WITNESS:  What I responded was that

18  there are no selections from 2013 crosses.

19  BY MR. CHIVVIS:

20      Q.  Yes.

21      A.  Okay.  I see now but I haven't seen before

22  that in order to make copies of the seedlings

23  planted in 2013 -- and I'm just going to go through

24  this because this is just a misunderstanding and it

25  was probably my error.  The crosses planted in 2013

                                        Page 182

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    would be 2012 crosses, and they were all there.  She

2    was mistaken.  She was asking about selections from

3    2013 crosses, which would have been planted in 2014.

4    And we've already talked about that.

5        Q.  Yeah.  And you did make some -- you did

6    perform some crosses --

7        A.  I made some experimental crosses.

8        Q.  -- in 2013, and there were no selections

9    made from the 2013 crosses, correct?

10       A.  Right.  Correct.

11       Q.  So your statement is reflecting that there

12   were no selections made from the 2013 crosses?

13       A.  This is correct.

14       Q.  Okay.

15       A.  You have to forgive me, it was the day

16   before my retirement.

17       Q.  Just trying to make sure I understand.

18           (Exhibit 123 was marked for identification

19           by the court reporter and is attached

20           hereto.)

21   BY MR. CHIVVIS:

22       Q.  Dr. Shaw, I've handed you what's been

23   marked as Exhibit 123, an e-mail from you to Chris

24   Van Kessel, Theodore DeJong, Joseph DiTomaso and

25   cc'ing Helene Dillard.  It's dated November 6, 2014.

Page 183

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    to leave the university with a copy of any of the

2    other types of information we just discussed, the

3    pedigree records, the evaluations of genotypes, et

4    cetera, correct?

5        A.  Yes.

6        Q.  And that was one of the things that

7    Dr. Knapp was asking you about, whether he could

8    have access to that information.  Do you have that

9    understanding?

10       A.  He was asking for some of that information.

11       Q.  And you refused to provide it to him,

12   correct?

13       A.  I think your first statement was correct, I

14   feel I'm under no obligation to provide that to him.

15       Q.  You currently have that information that

16   you developed as head of the university's strawberry

17   breeding program, by "that information" I'm

18   including the pedigree information, the specific

19   evaluations of genotypes and the like?

20       A.  I have a good bit of that, yes.

21       Q.  You have hundreds of megabytes of Lotus

22   Notes spreadsheets and other materials relating to

23   the University of California's strawberry breeding

24   program presently sitting on one of your computers

25   that is in your possession; isn't that true?

Page 193

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          MR. LIPPETZ:  Objection.  Misstates facts.

2          Go ahead.

3          THE WITNESS:  I don't know if I have a

4    hundred kilobytes.  I have some files that I took

5    with me and are on storage devices in my home.

6    BY MR. CHIVVIS:

7          Q.  And those files would include complete

8    pedigrees for the 180 genotypes that you submitted

9    to the plant sciences cultivar release committee;

10   isn't that right?

11         A.  I believe I have pedigrees for those 180,

12   yes.

13         Q.  You have evaluation data for the

14   performance of each of those genotypes in your

15   possession right now; isn't that true?

16         A.  I do, yes.

17         Q.  And you haven't provided either of those

18   two sets of information to the University of

19   California, correct?

20         A.  I have not provided that and I don't

21   believe I need to provide that, as your first

22   question suggested.

23         Q.  But you have retained a copy for yourself?

24         A.  I have copies of my research files.

25         Q.  And do you understand that the university

                                        Page 194

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   BY MR. CHIVVIS:

2       Q.   Putting that issue aside, on two separate

3   occasions you received an e-mail requesting an

4   assignment, correct?

5            MR. LIPPETZ:  Objection.  Asked and

6   answered.

7            THE WITNESS:  There was a request to sign

8   an assignment for an invention.  And that

9   invention -- I did not sign the assignments for that

10  invention.

11  BY MR. CHIVVIS:

12      Q.   On either of the two occasions that that --

13      A.   That's correct.

14      Q.   -- was requested of you.

15      A.   Yeah.

16      Q.   Exhibit No. 126 reflects a second occasion,

17  after the first one we went over earlier, on which

18  it was requested of you that you sign an assignment

19  to the provisional plant patent application that we

20  were just discussing, correct?

21           MR. LIPPETZ:  Objection.  Asked and

22  answered.

23           THE WITNESS:  Let me look at this first.

24           Your question again was -- or your

25  statement was that this is a document requesting

Page 216

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          MR. LIPPETZ:  Sorry, are we using the old

2     number or a new one?

3          MR. CHIVVIS:  I'm using the old number.

4     There may be instances where I failed to do that,

5     but I had the notes for this.

6     BY MR. CHIVVIS:

7          Q.  Dr. Shaw, I've handed you what's previously

8     been marked as Exhibit No. 52.

9          A.  Yes.

10          Q.  Now, Exhibit No. 52 is the cross plan that

11     you sent to Javier Cano in December 2013, correct?

12          A.  That is correct.

13          Q.  When you sent the cross plan, you were in

14     California?

15          A.  I believe so, yes.

16          Q.  Now, let's look at the cross plan.  If

17     you'd flip to, it's a native, the beginning Bates

18     here is 883 but it's the first internal page after

19     the cover page here.

20          Do you see a statement at the top, it says

21     "SD Elite Diallel 2014"?

22          A.  Yes.

23          Q.  What does SD Elite Diallel mean?

24          A.  SD stands for Short Day.  Short Day is one

25     of two types that we breed for in strawberry.  Elite

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    means -- it's not a technical term.  It's broadly

2    used.  It's what I use as a subset of parents that I

3    think is maybe a little better than the others.  And

4    a Diallel is that particular kind of breeding design

5    that you see there, which I can spend all day

6    describing to you if you'd like, a really quick

7    genetic lesson.

8        Q.   I appreciate your willingness to teach us

9    on that point but let's move ahead here.

10       A.   Fine.

11       Q.   Now, on the left-hand side of the SD Elite

12   Diallel 2014, there are a number of varieties

13   listed.

14       A.   Yes.

15       Q.   Palomar, Fortuna, Splendor, San Andreas,

16   Sabrina, Benicia and Merced.

17            Do you see that?

18       A.   Yes.

19       Q.   Palomar is a university-patented variety,

20   correct?

21       A.   That's correct.

22       Q.   And it's been subject to a university

23   patent as of 2014, correct?

24       A.   It was -- okay.  It was originally patented

25   earlier than that.  It was -- so under "Patent," if

Page 220

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    that's what you're asking?

2        Q.  Correct?

3        A.  Yeah.

4        Q.  Same is true with and San Andreas?

5        A.  Yes.

6        Q.  And Benicia?

7        A.  Yes.

8        Q.  Merced had a patent pending at the time and

9    was still in the two-year delay window, as we

10   previously discussed, correct?

11            MR. LIPPETZ:  You can answer.

12            THE WITNESS:  Yes.

13            I'm trying to slow down so you don't get in

14   a fight again.

15   BY MR. CHIVVIS:

16       Q.  On the column headings you see the same

17   varieties listed, correct, except for Palomar is

18   not?

19       A.  Yes.

20       Q.  You do have San Andreas, Benicia and

21   Merced?

22       A.  That's correct.

23       Q.  Then there are a number of numbers in the

24   boxes that intersect between columns and rows.

25       A.  Yes.

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.   Each one of those numbers represents a

2   family in your breeding work, correct?

3        A.   Yes, you could call it a family or a cross.

4        Q.   So cross number 1 listed there has one

5   University of California-patented variety as a

6   parent, which is Palomar, correct?

7        A.   That's correct.

8        Q.   Cross number 2, same is true, one

9   university-patented variety as a parent, Palomar?

10        A.   That's correct.

11        Q.   Cross number 4 has two university-patented

12   varieties as its two parents?

13        A.   That's true.

14        Q.   Palomar and San Andreas, correct?

15        A.   That's correct.

16        Q.   Cross number 5 has one University of

17   California parent, that's San Andreas?

18        A.   That's correct.

19        Q.   And I'm not going to go through each one of

20   the examples here, but I'm reading the chart

21   correctly; is that right?

22        A.   Everything you've said is accurate, yes.

23        Q.   So for each one of these numbered families

24   or crosses, if either the row or the column

25   intersecting is a University of California parent,

Page  222

1    that means that it had one to two University of

2    California parents, correct?

3         A.   That's correct.

4         Q.   Let's look at the SD Factorial 2014.  I

5    think we've discussed what SD means, Short Day,

6    right?

7         A.   Correct.

8         Q.   What does Factorial mean?

9         A.   Let me describe what a Diallel is first,

10   and then I can describe what a Factorial is in just

11   a couple sentences.

12        A Diallel is a breeding design where you

13   use the same set of parents as both males and

14   females.  So if you can see, if you look down you

15   see Splendor as the third one down in the Elite

16   Diallel, and you also see it over as the second one

17   across the rows there?  And so the cross is still

18   whatever the cross that is represented by the number

19   has the parents listed.

20        A Factorial is a little bit different, in

21   that it has two distinct sets of parents.  So you

22   notice that the six parents going down the rows are

23   different than the four parents going across the

24   rows.

25        Is that your understanding?

Page 223

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        Q.  Yeah, I see that.

2        A.  It's a different -- there's different uses

3    for these -- there's technical uses for these

4    designs.

5        Q.  I understand.

6        A.  Okay.

7        Q.  Thank you.

8            I'm going to go to the Diallel chart first.

9    You mentioned mother and father plants.

10       A.  Right.

11       Q.  Are the column headings one or the other?

12       A.  They can be.  We don't keep male and female

13   separate in our breeding design.  You make the

14   cross, but we pay no attention to which is the seed

15   parent and which is the pollen parent.

16           Again, without getting too complicated, in

17   some crops in some situations that can make a

18   difference.  In a strawberry it makes no difference

19   at all.

20       Q.  And you provided no direction with respect

21   to whether the columns or the rows should be the

22   father or mother plants?

23       A.  No.

24       Q.  Same is true for the Factorial?

25       A.  Absolutely.

Page 224

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Q.  Okay.  Back on to the Factorial.  2014

2   Short Day.  We already discussed that Palomar,

3   Benicia and Merced are University of California

4   varieties, correct?

5      A.  That's correct.

6      Q.  Mojave, which appears in the last column

7   heading, is also a University of California variety,

8   correct?

9      A.  Yes, that's correct.

10      Q.  And it would have been patented by the time

11   this crossbreeding was to be performed, correct?

12      A.  Yes.

13      Q.  The same understanding applies to this

14   Factorial chart, in that if a row reveals that the

15   university variety is on the left-hand side, then

16   that means it had that university variety as one of

17   its parents, correct?

18      A.  That's correct.

19      Q.  And if the column reflects a university

20   variety, if you follow that column down, then that

21   would be the parent for everything in that column,

22   correct?

23      A.  That's correct.

24      Q.  So, for instance, if you looked at

25   number 45, cross number 45, that would have Merced

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      as one of its parents and Mojave as the other,

2      correct?

3          A.  That's correct.

4          Q.  Moving on to the DN Elite Diallel 2014,

5      that's the next one down.  Do you see that?

6          A.  Yes.

7          Q.  DN stands for Day Neutral?

8          A.  Correct.

9          Q.  And a number of the varieties in this Day

10     Neutral Elite Diallel 2014 are UC-patented

11     varieties, correct?

12         A.  That's correct.

13         Q.  Albion is a University of

14     California-patented variety, correct?

15         A.  Correct.

16         Q.  Monterey is a University of

17     California-patented variety?

18         A.  Correct.

19         Q.  San Andreas is a University of California

20     patented variety?

21         A.  Correct.

22         Q.  Portola is a University of

23     California-patented variety?

24         A.  Correct.

25         Q.  I've already discussed Merced.

                                        Page 226

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          Same logic applies to this chart that we

2     discussed above for the Short Day Elite Diallel

3     except it's Day Neutral?

4          A.  Correct.

5          Q.  Let's go to the DN Factorial 2014, Day

6     Neutral Factorial 2014.  Same logic applies as to

7     the difference between Factorial and Diallel, right?

8          A.  Correct.

9          Q.  Again, we have a number of

10    university-patented varieties listed here, correct?

11         A.  Correct.

12         Q.  Palomar is a University of

13    California-patented variety, correct?

14         A.  Correct.

15         Q.  Benicia is a University of

16    California-patented variety?

17         A.  Correct.

18         Q.  Mojave, again, University of

19    California-patented variety?

20         A.  Correct.

21         Q.  Monterey?

22         A.  Correct.

23         Q.  Albion?

24         A.  Correct.

25         Q.  And Portola?

                                    Page  227

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      A.   Correct.

2      Q.   Now, when you use a variety name like

3   Albion, you expect that it's understood that you're

4   referring to a plant with a unique genotype.  Here

5   we are covered by University of California plant

6   patent, correct?

7      A.   This would be the same Albion that is -- a

8   copy of the same plant that was patented and

9   released it as Albion in -- you know, in California,

10  correct, yeah.

11     Q.   So it's a plant that's previously been

12  asexually reproduced in California?

13     A.   At some point in time, yes.

14     Q.   In the series of propagating the plant, its

15  lineage traces back in an unbroken chain to a plant

16  that, in fact, you originally developed at the

17  University of California strawberry breeding

18  program, correct?

19     A.   That's correct.

20     Q.   The same genetics in the Albion that would

21  have been used in Spain at your direction as the

22  genetics of the plant Albion that you developed at

23  the University of California?

24     A.   In theory that's correct, yes.

25     Q.   And you'd expect that that would be

                                         Page  228

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    correct?

2         A.   It would be largely correct in almost all

3    circumstances, yes.

4         Q.   Unless a mistake was made?

5         A.   Or a mutation.

6         Q.   Yeah.  Now, on the third page of

7    Exhibit 52, that is just a duplication of the second

8    page using an internal code for each one of the

9    varieties, correct?

10        A.   That's correct, yes.

11        Q.   So you could see they roughly mirror each

12   other, and if one were to take these numbers and

13   match them up with the varieties listed on the

14   second page, it will all match up, and for each one

15   of the cross numbers, you could translate between

16   the two charts, correct?

17        A.   Yes, that's correct.

18        Q.   You sent someone to oversee the crossing

19   work being performed in Spain to make sure it was

20   being done correctly, correct?

21        A.   I did not go to Spain in 2014, and I don't

22   remember that anyone from CBC in California was

23   there when they were doing the crossing.  That was

24   handled by International Semillas.

25        Q.   You went to Spain earlier, though, and

Page 229

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   instructed individuals that are employees of

2   International Semillas and Eurosemillas the steps on

3   how to perform a proper cross according to your

4   direction, correct?

5          MR. LIPPETZ:  Objection.  Assumes facts.

6          THE WITNESS:  I think it's better to say

7   that we commented and perhaps consulted on their

8   procedures because they already knew how to do

9   crosses.

10  BY MR. CHIVVIS:

11     Q.  But you have a particular way of doing

12  crosses and you wanted to make sure they were

13  following appropriately your methods and techniques

14  to get the most effective usage of the cross plan

15  that you developed, correct?

16     A.  I would say that's not entirely accurate.

17  I would say everybody does crosses almost the same

18  way.  Anybody who's running a strawberry breeding

19  program with the idea of doing cultivar development

20  would use roughly the same techniques.

21         I was there in 2013 and at the time

22  International Semillas was just gathering facilities

23  to do crosses, and I did interact with them on

24  crossing for, I think, one day of my four-day stay.

25     Q.  And that involved some training, correct?

Page 230

1    A.   Certainly would have worked together on

2    their technique, yes.

3        Q.   To make sure they used what you thought

4    were best practices in performing the crosses

5    according to the style you'd become accustomed,

6    correct?

7        A.   I would say it was more of an interchange.

8    They had a couple people who had worked for breeding

9    programs before that were then beginning to work for

10   them.  So yeah, I mean, we shared any ideas that we

11   had about, you know, growing the plants, what we

12   would do for crosses, some thoughts about how we

13   labeled our crosses and things like that, how we

14   would recommend it be done.

15       Q.   And you made certain recommendations?

16       A.   We made recommendations, sure.

17       Q.   And they followed them, correct?

18            MR. LIPPETZ:  Objection.  Speculation.

19            THE WITNESS:  I can't really tell you

20   whether they followed them or not, but we did make

21   recommendations, yes.

22   BY MR. CHIVVIS:

23       Q.   The facilities that you toured in Spain in

24   2013, who were those facilities owned by?

25       A.   In 2013 the facility that we visited was an

Page 231

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  old cotton gin that I believe was still owned by

2  Eurosemillas.

3       Q.  Where was that facility located?

4       A.  I can't remember the name of the town, but

5  it would be west of Cordova, oh, maybe 40 or

6  50 miles, something like that.

7       Q.  Huelva?

8       A.  No.  Huelva is really way far away.

9       Q.  Ejica?

10      A.  Ejica.

11      Q.  Ejica, yeah.  That's the Catalonian

12  pronunciation?

13      A.  It's not Catalonian, it's Andalucian.

14      Q.  More knowledgeable about Spain than me.

15          All right, Ejica.  That's spelled

16  E-J-I-C-A, correct?

17      A.  That's the facility that I visited then,

18  yes.

19      Q.  And that was the correct spelling?

20      A.  I think so.

21      Q.  So the crosses you designed in 2013 were

22  performed by International Semillas at Eurosemillas

23  facilities in Ejica, Spain?

24      A.  I was there in 2013.  I don't know where

25  the crosses were done in 2014.  At some point they

Page 232

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    moved the crossing work to a different facility

2    closer to Seville, and again, I don't know the name.

3         Q.  Santo Tomas?

4         A.  It could be.  I don't know the name.

5         Q.  It's clearly somewhere in Spain, though?

6         A.  Yeah, I can tell you roughly where.

7    Probably 20 miles east of Seville.

8         Q.  On an island?

9         A.  No, no.  No.

10        Q.  Not that far?

11        A.  Seville is well inland.

12        Q.  So in 2013 you prepared this cross-claim --

13   excuse me, cross plan -- let's just scratch that and

14   start over.

15        In 2013 you prepared the cross plan shown

16   in Exhibit No. 52.  You sent it to Javier Cano in

17   Spain.  Crosses were performed in Spain according to

18   the plan.

19        A.  Yes.

20        Q.  And the resulting seeds were sent back into

21   the U.S. to CBC, correct?

22        A.  That's correct.

23        MR. CHIVVIS:  Previously marked as 53.

24        (Exhibit 53 was marked for identification

25        by the court reporter and is attached

Page 233

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              hereto.)

2              MR. CHIVVIS:  Let's go off the record for a

3      tape change.

4              VIDEOGRAPHER:  Going off the record, the

5      time is 4:44.

6                  (Recess taken at 4:44 p.m.)

7              (Proceedings resumed at 4:49 p.m.)

8              VIDEOGRAPHER:  This marks the beginning of

9      DVD number 4 in the deposition of Douglas Shaw.

10     Going back on the record, the time is 4:49.

11     BY MR. CHIVVIS:

12         Q.  Dr. Shaw, I handed you what's been

13     previously marked as Exhibit No. 53.

14              Do you have that before you?

15         A.  I do.

16         Q.  Exhibit No. 53 is a crossing plan that you

17     sent to Javier Cano and others in 2014 for crosses

18     that would be performed in 2015, correct?

19         A.  That would be correct.

20         Q.  You sent it from California in the

21     United States, correct?

22         A.  That's correct.

23         Q.  And first internal page, I guess it's

24     page 2 of the document, not Bates-labeled, lists a

25     number of Diallel and Factorial charts much like we

                                            Page 234

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    saw in Exhibit No. 52, correct?

2        A.  That's correct.

3        Q.  There's a set of Northern Diallel and

4    Factorials and then now Southern Diallel and

5    Factorials, right?

6        A.  That's correct.

7        Q.  With the Northern Diallel and Factorial

8    charts, we see two sets of charts side by side; one

9    has varieties by a variety name, let's say, and

10   another by a code.

11       A.  That's correct.

12       Q.  Is that a fair statement?

13       A.  Yes.

14       Q.  As with Exhibit No. 52, we can match those

15   two up and the code actually corresponds with a

16   particular variety name, correct?

17       A.  That's correct.

18       Q.  Now, looking at Northern Elite Diallel

19   2015, there are a number of University of California

20   varieties listed there; is that right?

21       A.  That's right.

22       Q.  There's San Andreas, Benicia, Monterey, and

23   I think that's it; is that right?

24       A.  You're looking at the Northern Elite

25   Diallel?

Page 235

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       Q.   Uh-huh.

2       A.   That's correct.

3       Q.   The same provisos about how to read this

4   chart that we discussed with Exhibit No. 52 apply?

5       A.   That's correct.

6       Q.   Each one of the University of California

7   varieties listed in the Northern Elite Diallel 2015

8   had already -- would have already been patented by

9   the time the crossing was to be performed, correct?

10      A.   That is correct.

11      Q.   Let's look at the Northern Factorial 2015.

12  Do you see that?

13      A.   Northern Factorial 1?

14      Q.   Yes, sorry, there's two of them.  There's a

15  Northern Factorial 1, 2015, and a Northern

16  Factorial 2, 2015, right?

17      A.   Correct.

18      Q.   Northern Factorial 1, 2015, has a number of

19  University of California varieties in it, correct?

20      A.   Correct.

21      Q.   Those include Monterey, San Andreas,

22  Benicia, Palomar and Mojave, correct?

23      A.   That's correct.

24      Q.   All those University of California

25  varieties would have been patented by the time

Page 236

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    crossing was to be performed according to this

2    chart, correct?

3         A.   That is correct.

4         Q.   Now let's look at Northern Factorial 2,

5    2015.  There are a number of University of

6    California varieties listed on that chart as well;

7    is that right?

8         A.   That's correct.

9         Q.   Included among the University of California

10   varieties are Albion, Portola, Merced, Petaluma,

11   Granada and Fronteras, correct?

12        A.   That's what I'm reading, yes.

13        Q.   Albion, Portola and Merced would have been

14   patented by the time this crossing was to be

15   performed, correct?

16        A.   Correct.

17        Q.   Petaluma, Granada and Fronteras were

18   subject to pending patent applications and in the

19   pre-commercialization two-year delay window at the

20   time this crossing was to be performed, correct?

21        A.   That's my understanding, yes.

22        Q.   So your understanding is they were not yet

23   commercially released in Spain at the time crossing

24   was to be performed?

25             MR. LIPPETZ:  Objection.  Misstates prior

Page 237

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    testimony.

2           THE WITNESS:  We've been through this

3    before.  I've already answered.

4    BY MR. CHIVVIS:

5       Q.  Please answer.

6       A.  I already answered this question.

7       Q.  And the answer was?

8           MR. LIPPETZ:  You can answer again.  It's

9    okay.

10          THE WITNESS:  Okay.  The answer was that

11   I'm unaware.  I don't have the facts to decide

12   whether these were in a pre-commercialization state

13   or were they commercially purchased.

14      Q.  Your understanding of how the two-year

15   delay worked, though, would be that they were not

16   available for commercial purchase in Spain at the

17   time crossing was to be performed, correct?

18          MR. LIPPETZ:  Objection.  Misstates his

19   prior testimony.

20          THE WITNESS:  My understanding is that they

21   would not have been for sale to commercial growers,

22   but whether they are commercially available for sale

23   would depend on elements of the contract that I have

24   no reason to understand or have knowledge about.

25

                                        Page 238

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   BY MR. CHIVVIS:

2       Q.  Now, there are a number of Southern charts

3   here as well, Southern Elite Diallel, 2015, Southern

4   Factorial 1 and 2 as well, right?

5       A.  Correct.

6       Q.  The Southern Elite Diallel lists Merced,

7   Petaluma, Granada, Fronteras as University of

8   California-patented varieties that you proposed to

9   be used in those crosses, correct?

10      A.  That's correct.

11      Q.  And the same issue with Petaluma, Granada

12  and Fronteras applies; it was your understanding it

13  was in the two-year delay window, those varieties

14  were in the two-year delay window at the time

15  crossing was performed?

16          MR. LIPPETZ:  You can answer.

17          THE WITNESS:  Same answer as last time,

18  yes.

19  BY MR. CHIVVIS:

20      Q.  And that answer is yes?

21      A.  The answer is that I don't have the ability

22  or the knowledge to decide whether they were in the

23  commercial production there or not based on the

24  absence of knowledge about the license.

25      Q.  But putting the license aside, you were

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    aware that they were within the two-year period

2    after release in California?

3         A.  It had not been two years since they were

4    released in California by the time they were

5    included in this crossing design.

6         Q.  And they would not have been outside that

7    two-year window by the time the crossing was to be

8    performed?

9         A.  I believe that's correct, yeah.

10        Q.  Now let's look at Southern Factorial 1,

11   2015.

12             You see varieties listed there:  Merced,

13   Petaluma, Granada, Fronteras, Monterey and San

14   Andreas, correct?

15        A.  That's correct.

16        Q.  And Merced, Petaluma, Monterey and San

17   Andreas were all patented at the time crossing was

18   to be performed, right?

19        A.  That's correct.

20        Q.  And Granada and Fronteras and Petaluma

21   would have been in that two-year delay window period

22   at the time the crossing was to be performed,

23   correct?

24             MR. LIPPETZ:  You can answer.

25             THE WITNESS:  That's correct.

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    BY MR. CHIVVIS:

2         Q.   Southern Factorial 2, 2015, UC varieties

3    there are Benicia and Mojave and Palomar, correct?

4         A.   That's correct.

5         Q.   All three of those varieties would have

6    been patented at the time the crossing suggested by

7    your cross plan was to be performed, correct?

8         A.   That's correct.

9         Q.   And as with the previous cross plan, you

10   sent it from California to individuals in Spain with

11   the intention that they perform the crosses in Spain

12   and then send the resulting seeds from those crosses

13   back to CBC in the United States, correct?

14        A.   That's correct.

15             MR. CHIVVIS:  This is 54.

16             (Exhibit 54 was marked for identification

17             by the court reporter and is attached

18             hereto.)

19   BY MR. CHIVVIS:

20        Q.   Dr. Shaw, I've handed you what's been

21   marked as Exhibit No. 54 for identification

22   purposes.

23             Do you see Exhibit No. 54?

24        A.   Yes, I do.

25        Q.   Exhibit No. 54 is a cross plan that you and

Page 241

1  Kyle VandenLangenberg developed for crosses to be

2  performed in Spain, correct?

3      A.  That's correct.

4      Q.  And so the record clear, Kyle

5  VandenLangenberg is another breeder that is employed

6  by California Berry Cultivars, correct?

7      A.  That's correct.

8      Q.  You and Kyle sent the cross plan in Exhibit

9  No. 54 to individuals in Spain with the intention

10  that they perform these crosses in Spain and then

11  send the results of those crosses as seeds back into

12  the United States to CBC, correct?

13      A.  That's correct.

14      Q.  And you were in California at the time that

15  you and Kyle VandenLangenberg sent this cross plan

16  to individuals in Spain?

17      A.  I believe so, yeah.

18      Q.  Let's walk through the varieties listed.

19          This set up appears to be somewhat similar

20  to Exhibit No. 53, in that we have both the Northern

21  and Southern set of the Diallel and Factorial

22  charts; is that a fair assessment?

23      A.  That's a fair assessment.

24      Q.  The Northern Elite Diallel 2016 includes

25  University of California varieties Monterey, San

Page 242

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   Andreas, Mojave, Petaluma, Granada, Fronteras and

2   Cabrillo; is that right?

3       A.  Yes.

4       Q.  In fact, all of the varieties listed in the

5   Northern Elite Diallel 2016 are University of

6   California varieties?

7       A.  That's correct.

8       Q.  Now, all the varieties listed in the

9   Northern Elite Diallel 2016 would have been patented

10  by the time crossing was to be performed in Spain,

11  except for Cabrillo, right?

12      A.  That's correct.

13      Q.  Cabrillo was subject to a pending patent

14  application at the time, right?

15      A.  That's my understanding, yes.

16      Q.  And Cabrillo was in the two-year delay

17  window at the time the crossing was to be performed

18  in Spain, according to the Northern Elite Diallel

19  chart, right?

20      A.  As before, it had not been two years since

21  the release of Cabrillo in California.

22      Q.  Right.  So it was still in that two-year

23  delay window, fair?

24      A.  It had not been two years since it had been

25  released.

Page 243

1        Q.  I think you're agreeing with me, right?

2            MR. LIPPETZ:  Objection.  Asked and

3    answered a number of times.

4    BY MR. CHIVVIS:

5        Q.  You still can answer.

6        A.  It had not been two years since the release

7    of Cabrillo in California.

8        Q.  And at the time the crossing was to be

9    performed, you don't have any understanding that

10   University of California policy as to the two-year

11   delay had changed, correct?

12       A.  No.

13       Q.  And by "No," you mean I was correct that

14   the policy hasn't changed?

15       A.  Is that what you asked the first time, had

16   the policy changed or not?

17       Q.  Yeah.

18       A.  I have no knowledge that the policy had

19   changed.

20       Q.  Thank you.  Northern Factorial 1, 2016

21   lists Albion, Monterey, San Andreas, Cabrillo and

22   Merced, all of which are University of California

23   varieties, correct?

24       A.  Correct.

25       Q.  Same issue with Cabrillo, it had not yet

Page 244

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   been two years since its release in California by

2   the time crossing was to be performed?

3       A.  That's correct.

4       Q.  Northern Factorial 2, 2016 lists Benicia,

5   Mojave, Petaluma, Granada, Fronteras, Palomar and

6   Portola, all of which were University of California

7   patented varieties?

8       A.  That's correct.

9       Q.  All those varieties would have been

10  patented by the time crossing would have been

11  performed, right?

12      A.  That's my understanding, yes.

13      Q.  Under other crosses a number of patented

14  varieties are listed.  That appears under the

15  Northern Factorial 2016 chart.

16          Do you see that?

17      A.  Yes.

18      Q.  So among the varieties listed there in

19  cross 136, you have both Petaluma and Merced, those

20  are both University of California-patented

21  varieties, correct?

22      A.  Correct.

23      Q.  137 has Fronteras and Merced, those are

24  both University of California-patented varieties,

25  correct?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      A.   That's correct.

2      Q.   138 has Fronteras, which is a University of

3  California-patented variety.

4      A.   That's correct.

5      Q.   139 has Granada, which is a University of

6  California-patented variety?

7      A.   That's correct.

8      Q.   Number 140 has Mojave, which is a

9  University of California-patented variety; is that

10  right?

11      A.   That's right.

12      Q.   Moving to the Southern Elite Diallel 2016

13  on the next page, the only University of

14  California-patented variety I see here is Benicia;

15  is that a fair assessment?

16      A.   That's correct.

17      Q.   And that would have been patented by the

18  time crossing was to be performed?

19      A.   That's correct.

20      Q.   Southern Factorial 1, 2016 lists Mojave,

21  Merced, Petaluma, Granada and Fronteras as

22  University of California-patented varieties, right?

23      A.   That's correct.

24      Q.   They all would have been patented by the

25  time crossing was to be performed?

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          A.   Correct.

2          Q.   Southern Factorial 2, 2016, lists Monterey,

3    San Andreas, Cabrillo, Palomar and Benicia as

4    University of California patented varieties, right?

5          A.   That's correct.

6          Q.   And all of those except for Cabrillo would

7    have been patented by the time crossing was to be

8    performed; is that right?

9          A.   That's correct.

10         Q.   Cabrillo was still within the two-year

11   window because it hadn't been two years since its

12   release in California, right?

13         A.   It had not been two years since its release

14   in California.

15         Q.   Other crosses listed at the bottom,

16   number 67 says Rania (phonetic) and Monterey.

17   Monterey was a University of California patented

18   variety, right?

19         A.   Correct.

20         Q.   And it was patented at the time crossing

21   was to be performed according to this cross plan?

22         A.   Yes.

23         Q.   So let me get this straight.  The cross

24   plan that's represented as Exhibit No. 54 here, is a

25   cross plan that you developed with Kyle

Page 247

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    VandenLangenberg?

2        A.  Correct.

3        Q.  The two of you sent it from California to

4    individuals in Spain?

5            MR. LIPPETZ:  Objection.  Misstates his

6    prior testimony.

7            Go ahead.

8            THE WITNESS:  Ask the question again,

9    please.

10   BY MR. CHIVVIS:

11       Q.  Kyle VandenLangenberg and you sent this

12   cross plan to individuals in Spain?

13       A.  I believe we did, yeah.

14       Q.  With the intention that the crosses in this

15   cross plan be performed in Spain, correct?

16       A.  Correct.

17       Q.  And that the resulting seeds would be

18   shipped back into the United States to CBC, correct?

19       A.  That's correct.

20       Q.  Now, for each of the cross plans listed as

21   Exhibit Nos. 52, 53 and 54, when CBC received the

22   seeds from the individuals who sent them in Spain,

23   it then germinated those seeds; is that correct?

24       A.  That's correct.

25       Q.  And grew the seedlings?

Page 248

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       A.  That's correct.

2       Q.  And at the end of the first evaluation

3  period with those seedlings, made decisions about

4  which seedlings to continue into the next year of

5  the pipeline process for CBC, correct?

6       A.  That's true for 2014 and 2015.

7       Q.  We are still in the period of evaluation

8  for 2016?

9       A.  Correct.

10          MR. CHIVVIS:  Break?

11          MR. LIPPETZ:  Sure.

12          VIDEOGRAPHER:  Going off the record, the

13  time is 5:10.

14              (Recess taken at 5:10 p.m.)

15          (Proceedings resumed at 5:27 p.m.)

16          VIDEOGRAPHER:  We are back on the record.

17  The time is 5:27.

18  BY MR. CHIVVIS:

19      Q.  Dr. Shaw, in 2014 you inquired with Javier

20  Cano about him receiving you and Kirk in Spain to

21  supervise all CBC crosses for the following year;

22  isn't that correct?

23      A.  If I inquired about that I never followed

24  up on it because I did not go to Spain in 2014.

25      Q.  This is a statement in 2014 about you

Page 249

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1     I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4     That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12     Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal

14   Case, before completion of the proceedings review of

15   the transcript { } was {X} was not requested.

16     I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19     IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated:  December 15, 2016

23

24

25     Joanne M. Farrell, CSR No. 4838

Page 293